# Exhibit 6

EX-1.1 2 d176601dex11.htm EX-1.1

**Exhibit 1.1**

CS DISCO, INC.
[●] Shares of Common Stock

Underwriting Agreement

[●], 2021

J.P. Morgan Securities LLC
BofA Securities, Inc.

As Representatives of the
    several Underwriters listed
    in Schedule 1 hereto

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

c/o BofA Securities, Inc.
One Bryant Park
New York, New York 10036

Ladies and Gentlemen:

CS Disco, Inc., a Delaware corporation (the "Company"), proposes to issue and sell to the several underwriters listed in Schedule 1 hereto (the "Underwriters"), for whom you are acting as representatives (the "Representatives"), an aggregate of [●] shares of Common Stock, par value $0.001 per share, of the Company (the "Underwritten Shares"). In addition, the Company proposes to issue and sell, at the option of the Underwriters, up to an additional [●] shares of Common Stock, and the certain stockholder of the Company named in Schedule 2 hereto (the "Selling Stockholder") proposes to sell to the several Underwriters, at the option of the Underwriters, up to an additional [●] shares of Common Stock of the Company (collectively, the "Option Shares") . The Underwritten Shares and the Option Shares are herein referred to as the "Shares". The shares of Common Stock of the Company to be outstanding after giving effect to the sale of the Shares are referred to herein as the "Stock".

The Representatives agree that up to [●] shares of the Underwritten Shares to be purchased by the Underwriters under this Agreement shall be reserved for sale to the Company's directors, employees, the friends and family members of such directors and employees and certain other parties related to the Company (collectively, "Participants"), as set forth in the Prospectus (as hereinafter defined) under the heading "Underwriting" (the "Directed Share Program"). The Directed Share Program shall be administered by Fidelity Capital Markets (the "Directed Share Provider"). The Shares to be sold by the Directed Share Underwriter and its affiliates pursuant to the Directed Share Program are referred to hereinafter as the "Directed Shares". Any Directed Shares not orally confirmed for purchase by any Participant by [●] [A/P].M., New York City time on the business day on which this Agreement is executed will be offered to the public by the Underwriters as set forth in the Prospectus.

1

(ss) *Status under the Securities Act*. At the time of filing the Registration Statement and any post-effective amendment thereto, at the earliest time thereafter that the Company or any offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2) under the Securities Act) of the Shares and at the date hereof, the Company was not and is not an "ineligible issuer," as defined in Rule 405 under the Securities Act.

(tt) *No Ratings*. There are (and prior to the Closing Date, will be) no debt securities, convertible securities or preferred stock issued or guaranteed by the Company or any of its subsidiaries that are rated by a "nationally recognized statistical rating organization", as such term is defined in Section 3(a)(62) under the Exchange Act.

(uu) *Directed Share Program.* The Company represents and warrants that (i) the Registration Statement, the Pricing Disclosure Package and the Prospectus, any Preliminary Prospectus and any Issuer Free Writing Prospectuses comply in all material respects, and any further amendments or supplements thereto will comply in all material respects, with any applicable laws or regulations of foreign jurisdictions in which the Pricing Disclosure Package, the Prospectus, any Preliminary Prospectus and any Issuer Free Writing Prospectus, as amended or supplemented, if applicable, are distributed in connection with the Directed Share Program, and that (ii) no authorization, approval, consent, license, order, registration or qualification of or with any government, governmental instrumentality or court, other than such as have been obtained, is necessary under the securities laws and regulations of foreign jurisdictions in which the Directed Shares are offered outside the United States. The Company has not offered, or caused the underwriters to offer, Shares to any person pursuant to the Directed Share Program with the specific intent to unlawfully influence (i) a customer or supplier of the Company to alter the customer or supplier's level or type of business with the Company, or (ii) a trade journalist or publication to write or publish favorable information about the Company or its products.

4. <u>Representations and Warranties of the Selling Stockholder</u>. The Selling Stockholder represents and warrants to each Underwriter and the Company that:

(a) *Required Consents; Authority*. All consents, approvals, authorizations and orders necessary for the execution and delivery by such Selling Stockholder of this Agreement and the Power of Attorney (the "Power of Attorney") and the Custody Agreement (the "Custody Agreement") hereinafter referred to, and for the sale and delivery of the Shares to be sold by such Selling Stockholder hereunder, have been obtained other than such consents, approvals, authorizations, or orders as may have been obtained under the Act or as may be required by the rules and regulations of FINRA or under the blue sky laws of any jurisdiction in connection with the purchase and distribution of the Share by the Underwriters except for such consents, approvals, authorizations, or orders as would not, individually or in the aggregate, be reasonably

18

Exhibit D

FORM OF LOCK-UP AGREEMENT

_____, 2021

J.P. MORGAN SECURITIES LLC
BofA SECURITIES, INC.

As Representatives of
the several Underwriters listed in
Schedule 1 to the Underwriting
Agreement referred to below

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, NY 10179

c/o BofA Securities, Inc.
One Bryant Park
New York, NY 10036

  Re:  CS Disco, Inc. — Public Offering

Ladies and Gentlemen:

  The undersigned understands that you, as Representatives of the several Underwriters, propose to enter into an underwriting agreement (the "Underwriting Agreement") with CS DISCO, Inc., a Delaware corporation (the "Company") and the Selling Stockholder listed in Schedule 2 to the Underwriting Agreement, providing for the public offering (the "Public Offering") by the several Underwriters named in Schedule 1 to the Underwriting Agreement (the "Underwriters"), of Common Stock (defined below) of the Company (the "Securities"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Underwriting Agreement.

  In consideration of the Underwriters' agreement to purchase and make the Public Offering of the Securities, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned hereby agrees that, without the prior written consent of J.P. Morgan Securities LLC and BofA Securities, Inc. (the "Representatives") on behalf of the Underwriters, the undersigned will not, and will not cause any direct or indirect affiliate to, during the period beginning on the date of this letter agreement (this "Letter Agreement") and ending at the close of business 180 days after the date of the final prospectus relating to the Public Offering (the "Prospectus"), or such shorter period as is provided in this Letter Agreement (such period, the "Restricted Period"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to

54

purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of common stock, $0.001 per share par value, of the Company (the "Common Stock") or any securities convertible into or exercisable or exchangeable for Common Stock (including without limitation, Common Stock or such other securities which may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the Securities and Exchange Commission and securities which may be issued upon exercise of a stock option or warrant) (collectively with the Common Stock, the "Lock-Up Securities"), (2) enter into any hedging, swap or other agreement or transaction that transfers, in whole or in part, any of the economic consequences of ownership of the Lock-Up Securities, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Lock-Up Securities, in cash or otherwise, (3) make any demand for, or exercise any right with respect to, the registration of any Lock-Up Securities (other than any "piggyback" rights), or (4) publicly disclose the intention to do any of the foregoing (except as may be permitted in connection with an Early Lock-Up Expiration or Blackout-Related Release (each as defined below) or pursuant to exceptions set forth in this Letter Agreement). The undersigned acknowledges and agrees that the foregoing precludes the undersigned from engaging during the Restricted Period in any hedging or other transactions or arrangements (including, without limitation, any short sale or the purchase or sale of, or entry into, any put or call option, or combination thereof, forward, swap or any other derivative transaction or instrument, however described or defined) designed or intended, or which could reasonably be expected to lead to or result in, a sale or disposition or transfer (whether by the undersigned or any other person) of any economic consequences of ownership, in whole or in part, directly or indirectly, of any Lock-Up Securities, whether any such transaction or arrangement (or instrument provided for thereunder) would be settled by delivery of Lock-Up Securities, in cash or otherwise.

Notwithstanding the foregoing, the undersigned may:

(a) transfer or otherwise dispose of the undersigned's Lock-Up Securities:

(i) as a bona fide gift or gifts, including, without limitation, to a charitable organization or education institution, or for bona fide estate planning purposes,

(ii) by will, other testamentary document or intestacy,

(iii) to any member of the undersigned's immediate family or to any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, or if the undersigned is a trust, to a trustor or beneficiary of the trust or to the estate of a beneficiary of such trust (for purposes of this Letter Agreement, "immediate family" shall mean any relationship by blood, current or former marriage, domestic partnership or adoption, not more remote than first cousin),

(iv) to a corporation, partnership, limited liability company or other entity of which the undersigned and the immediate family of the undersigned are the legal and beneficial owner of all of the outstanding equity securities or similar interests,

(v) to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible under clauses (i) through (iv) above,

(vi) if the undersigned is a corporation, partnership, limited liability company, trust or other business entity, (A) to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended) of the undersigned, or to any investment fund or other entity controlling, controlled by, managing or managed by or under common control with the undersigned or affiliates of the undersigned (including, for the avoidance of doubt, where the undersigned is a partnership, to its general partner or a successor partnership or fund, or any other funds managed by such partnership), or (B) as part of a distribution, transfer or disposition to direct or indirect members, shareholders, general and limited partners, managers or equityholders of the undersigned or its affiliates,

(vii) by operation of law, such as pursuant to a qualified domestic order, divorce settlement, divorce decree or separation agreement,

(viii) to the Company from an employee, independent contractor or other service provider of the Company upon death, disability or termination of employment or cessation of services, in each case, of such employee independent contractor or service provider,

(ix) as part of a sale of the undersigned's Lock-Up Securities acquired in (1) the Public Offering or (2) open market transactions after the closing date for the Public Offering,

(x) to the Company in connection with the vesting, settlement, or exercise of restricted stock units, restricted stock awards, options, warrants or other rights to purchase shares of Common Stock (including, in each case, by way of "net" or "cashless" exercise), including for the payment of exercise price and tax and remittance payments due as a result of the vesting, settlement, or exercise of such restricted stock units, restricted stock awards, options, warrants or rights, provided that any such shares of Common Stock received upon such exercise, vesting or settlement shall be subject to the terms of this Letter Agreement, and provided further that any such restricted stock units, restricted stock awards, options, warrants or rights are held by the undersigned pursuant to an agreement or equity awards granted under a stock incentive plan or other equity award plan, each such agreement or plan which is described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, or

(xi) pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction that is approved by the Board of Directors of the Company and made to all holders of the Company's capital stock involving a Change of Control (as defined below) of the Company (for purposes hereof, "Change of Control" shall mean the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons, of shares of capital stock if, after such transfer, such person or group of affiliated persons would hold at least a majority of the outstanding voting securities of the Company (or the surviving entity)); provided that in the event that such tender offer, merger, consolidation or other similar transaction is not completed, the undersigned's Lock-Up Securities shall remain subject to the provisions of this Letter Agreement;

56

provided that (A) in the case of any transfer or distribution pursuant to clause (a)(i), (ii), (iii), (iv), (v), (vi) and (vii), such transfer shall not involve a disposition for value and each donee, devisee, transferee or distributee shall execute and deliver to the Representatives a lock-up letter in the form of this Letter Agreement, (B) in the case of any transfer or distribution pursuant to clause (a) (i), (ii), (iii), (iv), (v), (ix) and (x), no filing by any party (donor, donee, devisee, transferor, transferee, distributer or distributee) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or other public announcement shall be required or shall be made voluntarily in connection with such transfer or distribution (other than a filing on a Form 5 made after the expiration of the Restricted Period referred to above) and (C) in the case of any transfer or distribution pursuant to clause (a)(vi), (vii) and (viii) it shall be a condition to such transfer that no public filing, report or announcement shall be voluntarily made and if any filing under Section 16(a) of the Exchange Act, or other public filing, report or announcement reporting a reduction in beneficial ownership of shares of Common Stock in connection with such transfer or distribution shall be legally required during the Restricted Period, such filing, report or announcement shall clearly indicate in the footnotes thereto the nature and conditions of such transfer;

(b) exercise outstanding options, settle restricted stock units, restricted stock awards or other equity awards or exercise warrants pursuant to plans described in the Registration Statement, the Pricing Disclosure Package and the Prospectus; provided that any Lock-Up Securities received upon such exercise, vesting or settlement shall be subject to the terms of this Letter Agreement;

(c) convert outstanding preferred stock, warrants to acquire preferred stock or convertible securities into shares of Common Stock or warrants to acquire shares of Common Stock; provided that any such shares of Common Stock or warrants received upon such conversion shall be subject to the terms of this Letter Agreement;

(d) establish trading plans pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Lock-Up Securities; provided that (1) such plans do not provide for the transfer of Lock-Up Securities during the Restricted Period and (2) no filing by any party under the Exchange Act or other public announcement shall be required or made voluntarily in connection with such trading plan and any public announcement or filing under the Exchange Act made by any person regarding the establishment of such plan during the Restricted Period shall include a statement that the undersigned is not permitted to transfer, sell or otherwise dispose of securities under such plan during the Restricted Period in contravention of this Letter Agreement; provided further that the foregoing clauses (1) and (2) shall not apply to any Lock-Up Securities released pursuant to the Early Lock-Up Expiration (as defined below); and

(e) sell the Securities to be sold by the undersigned pursuant to the terms of the Underwriting Agreement.

In addition, notwithstanding the foregoing, if at any time beginning 90 days after the date of the Prospectus (the "Early Expiration Threshold Date") the last reported closing price of the Common Stock on the primary exchange on which the Common Stock is listed (the "Closing Price") is at least 25% greater than the initial public offering price per share set forth on the cover page of the Prospectus (the "IPO Price") for 5 out of any 10 consecutive Trading Days ending on or after the Early Expiration Threshold Date (which 10 Trading Day period may begin prior to the Early Expiration Threshold Date), including the last day of such 10 Trading Day

period (any such 10 Trading Day period during which such condition is satisfied, the "Measurement Period"), then 25% of the aggregate number of shares of Common Stock owned by the undersigned or issuable upon the conversion of outstanding shares of preferred stock or exercise or settlement of vested equity awards owned by the undersigned, which percentage shall be calculated based on the undersigned's ownership as of the date of the Prospectus, will be automatically released from the restrictions set forth in this Letter Agreement (the "Early Lock-Up Expiration") immediately prior to the opening of trading on the primary exchange on which the Common Stock is listed on the third Trading Day following the end of the Measurement Period (the "Early Lock-Up Expiration Date"); provided, however, that if, at the time of such Early Lock-Up Expiration Date, the Company is in a Blackout Period or within five Trading Days prior to a Blackout Period, the actual date of such Early Lock-Up Expiration shall be delayed (the "Early Lock-Up Expiration Extension") until immediately prior to the opening of trading on the second Trading Day (the "Extension Expiration Date") following the first date (such first date, the "Extension Expiration Measurement Date") that the Company is no longer in a Blackout Period under its insider trading policy; provided, further, however, that, in the case of any of an Early Lock-Up Expiration or an Early Lock-Up Expiration Extension, the Company shall announce through the issuance of a press release with a major news service, or on a Form 8-K, the Early Lock-Up Expiration and the Early Lock-Up Expiration Date, or the Early Lock-Up Expiration Extension and the Extension Expiration Date, as the case may be, at least two full Trading Days prior to the opening of trading on the Early Lock-Up Expiration Date or the Extension Expiration Date, as applicable.

In addition, if (i) if the restrictions set forth in this Letter Agreement would apply during any portion of the last Blackout Period regularly scheduled to begin prior to the date 180 days after the date of the Prospectus, (ii) at least 135 days have elapsed since the date of the Prospectus and (iii) the Company has publicly released results for the quarterly period during which the Public Offering occurred, then the Restricted Period shall end at least ten Trading Days prior to the regularly scheduled commencement of the Blackout Period described in clause (i) (the "Blackout-Related Release"); provided, however, that, promptly upon the Company's determination of the date of the Blackout-Related Release and in any event at least seven Trading Days in advance of the Blackout-Related Release, the Company shall notify the Representatives of the date of the impending Blackout-Related Release, and shall announce the date of the Blackout-Related Release through a major news service, or on a Form 8-K, at least two Trading Days in advance of the Blackout-Related Release. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, in no event shall the Restricted Period end earlier than 135 days or later than 180 days after the date of the Prospectus.

For purposes of this Letter Agreement, a "Trading Day" is a day on which the New York Stock Exchange and the Nasdaq Stock Market are open for the buying and selling of securities. For purposes of this Letter Agreement, "Blackout Period" shall mean a broadly applicable and regularly scheduled period during which trading in the Company's securities would not be permitted under the Company's insider trading policy.

If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any Company-directed Securities the undersigned may purchase in the Public Offering.

58

If the undersigned is an officer or director of the Company, (i) the Representatives on behalf of the Underwriters agree that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of Lock-Up Securities, the Representatives on behalf of the Underwriters will notify the Company of the impending release or waiver, and (ii) the Company has agreed in the Underwriting Agreement to announce the impending release or waiver through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by the Representatives on behalf of the Underwriters hereunder to any such officer or director shall only be effective two business days after the publication date of such announcement. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration or that is to an immediate family member as defined in FINRA Rule 5130(i)(5) and (b) the transferee has agreed in writing to be bound by the same terms described in this letter to the extent and for the duration that such terms remain in effect at the time of the transfer.

In furtherance of the foregoing, the Company, and any duly appointed transfer agent for the registration or transfer of the securities described herein, are hereby authorized to decline to make any transfer of securities if such transfer would constitute a violation or breach of this Letter Agreement.

The undersigned hereby represents and warrants that the undersigned has full power and authority to enter into this Letter Agreement. All authority herein conferred or agreed to be conferred and any obligations of the undersigned shall be binding upon the successors, assigns, heirs or personal representatives of the undersigned.

The undersigned acknowledges and agrees that the Underwriters have not provided any recommendation or investment advice nor have the Underwriters solicited any action from the undersigned with respect to the Public Offering of the Securities and the undersigned has consulted their own legal, accounting, financial, regulatory and tax advisors to the extent deemed appropriate. The undersigned further acknowledges and agrees that, although the Representatives may be required or choose to provide certain Regulation Best Interest and Form CRS disclosures to you in connection with the Public Offering, the Representatives and the other Underwriters are not making a recommendation to you to participate in the Public Offering, enter into this Letter Agreement, or sell any Shares at the price determined in the Public Offering, and nothing set forth in such disclosures is intended to suggest that the Representatives or any Underwriter is making such a recommendation.

The undersigned understands that, if (i) the Underwriting Agreement does not become effective by September 30, 2021, (ii) if the Underwriting Agreement (other than the provisions thereof which survive termination) shall terminate or be terminated prior to payment for and delivery of the Common Stock to be sold thereunder, (iii) prior to execution of the Underwriting Agreement, either the Company, on the one hand, or the Representatives, on the other hand, notifies the other in writing that it does not, or the Underwriters do not, as applicable, intend to proceed with the Public Offering or (iv) prior to execution of the Underwriting Agreement, the registration statement filed with the SEC in connection with the Public Offering is withdrawn the undersigned shall be automatically released from all obligations under this Letter Agreement. The undersigned understands that the Underwriters are entering into the Underwriting Agreement and proceeding with the Public Offering in reliance upon this Letter Agreement.

This Letter Agreement and any claim, controversy or dispute arising under or related to this Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Very truly yours,

[*NAME OF STOCKHOLDER*]

By: _____
  Name:
  Title: