**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LYNN GAMBRILL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CS DISCO, INC; KIWI CAMARA; MICHAEL LAFAIR,<br><br>Defendants. | Case No. 1:24-cv-00028-RP<br><br>CLASS ACTION |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Bert W. Pluymen ("Pluymen" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia,* counsel's investigation, which includes, among other things: (a) review and analysis of regulatory filings made by CS Disco, Inc. ("CS Disco" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning CS Disco; (d) other public information concerning CS Disco; and (e) Plaintiff's own investigation.

## INTRODUCTION

1. This is a securities class action on behalf of persons and entities that purchased shares of CS Disco's common stock between July 21, 2021, and September 11, 2023, inclusive (the "Class Period").

2. The claims asserted herein are alleged against CS Disco and certain of the

Company's officers under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3. CS Disco provides ediscovery services to mainly law firms and corporate clients. It has three principal lines of business: Ediscovery, a platform for collecting and reviewing documents; Review, a service whereby CS Disco, relying on machine learning, conducts review projects for law firms and clients, and Case Builder, which allows attorneys to organize documents and evidence. Beginning with its July 2021 initial public offering ("IPO") and throughout the Class Period, CS Disco repeatedly touted strong growth in its revenues attributable to growth in the full spectrum of CS Disco's product suite, and asserted that it had good advance visibility into changes in the demand from individual customers over time, as well as years of data on their customer usage, allowing them to reliably forecast revenue. In reality, however, at the time of the IPO and in the first few quarters after going public, Disco was benefiting from an unprecedented amount of revenue from a small number of unusually large Review assignments. Worse, because the relatively new Review product was driving revenue, their projections were not based on the years of precedent that they claimed, but on the unwarranted assumption that they would continue to receive similarly large Review matters going forward.

4. Disco was also concealing a secret that hit closer to home – the fact that CS Disco founder and Chief Executive Officer ("CEO") Camara, even before CS Disco went public, had a pattern of harassing young female employees. Even before CS Disco went public, Camara had a habit of only hiring female receptionists after reviewing their photos. CS Disco received a further complaint about how Camara treated young female employees in 2022, with several former employees claiming to the Wall Street Journal that they had raised complaints about Camara to human resources, executives, and during exit interviews, which fell on deaf ears. One employee complained that Camara surrounded himself with young female staffers and hosted them at house

parties. Former employees complained that he deliberately staffed young female employees to the office of the CEO. On September 6, 2023, Camara participated in a companywide happy hour, encouraging employees to take shots of tequila. Afterwards, he took a small group of employees to a restaurant, where he groped a young female employee and attempted to coax her to come back to his hotel. He also pushed meat into the woman's face and told her to "eat it like an animal." This last incident, which was reported by several employees to HR, finally led to Camara's resignation.

5. The truth began to emerge on August 11, 2022, when CS Disco released financial results for the second quarter of 2022 that shocked investors and analysts alike. The company revised its annual revenue projections downward, revealing that its previous projections relied on continuing to receive revenues from a small number of large Review matters, matters which had disappeared in the preceding months.

6. As a result of these disclosures, the price of CS Disco stock declined $15.53 between August 11, 2022 and August 12, 2022, a drop of more than 53 percent.

7. Then, on September 11, 2023, CS Disco disclosed that Camara had resigned, but not that it was due to his own misconduct. On this news, the price of Disco's stock fell $1.81, a decline of more than 23%. While Defendants did not disclose the reason for the resignation at the time, the Wall Street Journal revealed that it was due to the allegations of harassment against him.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and putative class members have suffered significant losses and damages. Plaintiff and putative class members seek damages for redress, reasonable attorneys' fees, injunctive relief, and all other relief this Court deems just and proper.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company has offices and conducts business in this District and a substantial part of the conduct complained of herein occurred in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES AND OTHER SIGNIFICANT INDIVIDUALS

### A. Plaintiff

13. Plaintiff Bert Pluymen is a resident of Austin, Texas. As indicated in his previously submitted certification, Plaintiff purchased shares of CS Disco common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Corporate Defendant

14. Defendant CS Disco provides solutions for electronic discovery ("ediscovery"), legal document review, and case management for enterprises, law firms, legal services providers, and governments.

15. Incorporated in Delaware, the Company maintains its corporate headquarters and principal place of business in Austin, Texas, with its only other U.S. office in Manhattan, New York City. It is a citizen of Texas and Delaware. CS Disco's common stock trades on NYSE under ticker symbol "LAW." As of February 20, 2023, CS Disco had over 59 million shares of common stock

outstanding, owned by hundreds or thousands of investors.

**C. Individual Defendants**

16. Defendant Kiwi Camara ("Camara") was at all relevant times, CS Disco's CEO. Defendant Camara signed quarterly and annual financial reports for the Company during the Class Period, including the Registration Statements for the IPO and SPO. On September 11, 2023, the Company disclosed in a form 8-K filed with the SEC that Camara had resigned from the Company.

17. Defendant Michael Lafair ("Lafair") is, and was at all relevant times, CS Disco's Executive Vice President and Chief Financial Officer ("CFO"). Defendant Lafair signed the Company's quarterly and annual financial statements during the Class Period, including the Registration Statements for the IPO and SPO.

18. Defendants Camara and Lafair are referred to herein as the "Individual Defendants."

**D. Relevant Former Employees**

19. FE-1 is a former Senior Manager of Data Operations who performed that role from August 2019 to September 2022. FE-1 oversaw a team that managed all the data that CS Disco received that needed to be uploaded into CS Disco's platform. FE-1 explained FE-1's team worked with all the data that needed to be reviewed as part of discovery for client cases. This data included data clients were going to review using the platform, as well as data CS Disco received for Managed Review projects. FE-1's team made sure the data was processed, loaded, and ready for review. FE-1 also worked on reporting and metrics.

20. FE-2 is a former Regional Sales Executive at CS Disco from December 2021 to April 2023.

21. FE-3 is a former Vice President of Review Sales from August 2019 to February 2023.

## BACKGROUND

### A. Company Background

22. CS Disco is a public company that offers advanced document review solutions to corporate clients and law firms.

23. CS Disco was founded in 2013 by Defendant Camara and is headquartered in Austin, Texas.

24. On July 21, 2021, the Company completed an initial public offering ("IPO") of its common stock pursuant to a Registration Statement on Form S-1. In the IPO, the Company sold an aggregate of 7,500,000 shares of common stock, including 500,000 shares issued pursuant to the underwriters' option to purchase additional shares at a public offering price of $32.00 per share.

25. On September 17, 2021, the Company completed a secondary public offering ("SPO") of its common stock pursuant to a Registration Statement on Form S-1. In the SPO, selling stockholders sold an aggregate of 6,050,000 shares of common stock, including 550,000 shares sold pursuant to the underwriters' option to purchase additional shares at an offering price of $53.00 per share. This secondary offering allowed corporate insiders including Camara to offload millions of dollars in stockholdings to the public.

26. According to its IPO registration statement, CS Disco offers three main products:

- DISCO Ediscovery automates much of the ediscovery process, saving legal departments from costly and cumbersome manual tasks associated with collecting, processing, enriching, searching, reviewing, analyzing, producing and using enterprise data that is at issue in legal matters.
- DISCO Review is AI-powered document review that consistently delivers legal document reviews that are high quality, on time and on budget.
- DISCO Case Builder allows legal professionals to collaborate across teams to effectively build a compelling case by offering a single place to search, organize and review witness testimony and other important legal data.

27. In other words, Disco Ediscovery is CS Disco's document collection and hosting

product, Disco Review is a service whereby CS Disco actually conducts document reviews on behalf of clients using AI, and Disco Case Builder is a platform for organizing discovery information. Disco Ediscovery is CS Disco's original product and Review and Case Builder are more recent additions, with Review launching in 2019.

28. As Lafair explained on a September 2, 2021 earnings call, the Company relies on a usage-based revenue model, meaning that customers, rather than signing up for a flat monthly or annual subscription, pay Disco based on the actual usage of Disco. "Because of this dynamic" Lafair explained, Defendants could not report on traditional software as a service metric that analysts typically use to judge growth of subscription-based companies, such as total billings. Rather, CS Disco focuses its "attention on total revenue growth."

29. However, despite this revenue model, Defendants told investors that customers follow an "adjustment journey" that leads to them to go from being a five, to six, to seven figure customer "at maturity." While Camara acknowledged that "[o]ver the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer", he reassured investors that "as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect … that as our base grows, more of these specific customer usage fluctuations washout in the aggregate." Camara boasted that the journey for a customer to reach seven figures accelerated recently:

> In terms of what we're doing to drive expansion, this is obviously a huge focus for us. What we're seeing in Q2 and in general in the more recent quarters is that customers have taken this journey, which used to take multiple years and shortened it dramatically. So what we're seeing with that customer is a customer that went from zero in Q4 of last year to multi-million dollars of revenue over three quarters, and over the course of that journey, has shifted their ediscovery program to DISCO, both in terms of adopting our DISCO Ediscovery product and then more recently, DISCO Review. We think this is something that's super promising about the

business.

**B. CS Disco Reports Massive Growth, Concealing that it is Driven By a Small Number of Review Projects**

30. Beginning with the Company's IPO and up until it reported its financial results for the first quarter of 2022, CS Disco frequently touted its rapid revenue growth. This rapid growth was key to the Company's prospects in the mind of many investors. As summarized by investor resource Seeking Alpha in March of 2022, the Company's "growth story of Disco is very much intact . . . revenues are still growing strongly, fueled by both new customer acquisitions *and by increased spending of existing ones'*".

31. Throughout the Class Period, CS Disco announced large revenue growth and consistently beat its earnings projections. On September 2, 2021, CS Disco announced total revenue for the quarter of $29.5 million, up 88% compared to the second quarter of 2020. Its projected revenue for the following quarter of $25.5 - $25.9 million, representing year-over-year growth between 43% and 45% and fiscal year 2021 revenue in the range of $103.5 - $104.3 million, representing year-over-year growth between 51% and 52%. On November 9, 2021, CS Disco announced quarterly revenue of $29.9 million, up 67% compared to the third quarter of 2020, and above its prior quarter projection. It projected fourth quarter revenue in the range of $28.2 - $28.8 million, representing year-over-year growth between 47% and 50% and annual revenue of $108.7 - $109.3 million, representing year-over-year growth between 59% and 60%. On February 24, 2022, it announced fourth quarter revenue of $33.8 million, up 76% compared to the fourth quarter of 2020 and annual revenue of $114.3 million, up 67% compared to fiscal year 2020. It then projected first quarter 2022 revenue of $30.0 - $31.0 million, representing year-over-year growth between 42% and 47%, and annual revenue of $146.8 - $150.8 million, representing year-over-year growth between 28% and 32%. On May 12, 2022, the company announced $34.5 million in revenue

from the first quarter of 2022, and revised upwards its annual revenue guidance to $149.0 - $153.0 million. The following chart shows CS Disco's earnings performance:

| Reporting Quarter/Year | Announced Revenue | Percentage Increased From Year Prior | Projected Revenue for Following Quarter | Year-Over-Year Projected Growth for Following Quarter | Projected Revenue for Fiscal Year | Year-Over-Year Projected Growth for Fiscal Year |
|---|---|---|---|---|---|---|
| Q2 2021 | $29.5 Million | 88% | $25.5-$25.9 million | 43-45% | $103.5-$104.3 million | 51-52% |
| Q3 2021 | $29.9 million | 67% | $28.2-$28.8 million | 47-50% | $108.7-$109.3 million | 59-60% |
| Q4 2021 | $33.8 million | 76% | $30-$31 million | 42-47% | $146.8-$150.8 million | 28-32% |
| Q1 2022 | $34.5 million | | | | $149-153 million | |

32. As Defendants explained, their Review product added significantly to their revenue growth. When asked about the effect of customers adopting the Review and Case Builder products on their revenues, Camara explained that adoption of those products effectively doubles or triples the revenue coming from a single customer, noting that "this obviously varies a bit customer by customer, but if you look at mature customers who are adopting all solutions, their total spend is 2-3x their eDiscovery only spend. And that's why we're so excited about this multi-product strategy, right. It creates an enormous tailwind for growth as we go into '22 and '23 and continue to drive higher multi-product attach rates."

33. Defendants specifically denied, when asked by analysts, that their rapid revenue growth and overperformance of guidance were attributable to a small number of large matters. On CS Disco's September 2, 2021 earnings call, Lafair responded to a question as follows:

**Koji Ikeda, Analyst**

Got it. Okay. Thanks for that. And just last question me. So in this quarter, clearly very, very strong growth here 88%, adding $8.4 million sequentially. I guess there must have been a couple of big deals that came out of the platform with a lot of data. So how should we be thinking about the visibility of that revenue stream tied to that data?

I mean, I guess a bit, the data gets taken off at some point, right, so now, how do we think about the visibility of that data? When could it potentially come up? And how are your customers talking with your salespeople about that data stream so we can be prepared for that?

**Michael Lafair, Chief Financial Officer**

So I think if you look at Q2, that 88% year-on-year growth gives you a sense of just how good can be when absolutely everything in our business fires on all cylinders. There was no particular driver of the outperformance in Q2, whether you look at new customers, whether you look at increased growth from existing customers, whether you looked at faster adoption journeys like the two examples we talked about in our prepared remarks, whether you think about growth internationally or growth in the United States, whether you think about growth in the core DISCO Ediscovery product or an increased adoption in DISCO Review, all of these things were really firing on all cylinders, and there isn't a single driver of growth in Q2.

In terms of how we have insight into our customers' data usage? Look, we obviously internally have deep bottoms-up forecasting insights, where our customer success teams and sales teams have deep relationships with our clients. We have telemetry that gives us insight into the legal matters going on into the platform, and we use all of that to form a picture that gives us visibility and confidence in how the legal needs and the resulting data of our clients to change over time.

I think the other point is the point I made with Sterling which is that as DISCO gets bigger and bigger, as our customer base expands and as more of our customers become mature, the impact of a fluctuation in data usage from any particular customer becomes a smaller and smaller part of our overall revenue base.

34. Camara reiterated this sentiment on a November 11, 2021 earnings call:

**Tyler Radke, Analyst**

Hey. Good evening, guys. Thanks for taking my question. I wanted to just help -- see if you could help us understand just kind of the moving pieces between Q2 and Q3. Obviously if you called out Michael, there was the kind of unusually large impact from a large customer in Q2. So maybe just help us understand, like, how much did that large customer revenue kind of go down sequentially and where you made that up of that primarily new customers or expansions?

> **Kiwi Camara, Chief Executive Officer.**
>
> So the shift is not due to any particular customer as opposed to our business as a whole. If you look at Q2, the way I describe that on our last earnings call was a tsunami of goodness. It's literally everything going right and that could go right in our business. If you think about every customer at Disco or each of our businesses or each of our geographies, each of them have fluctuation because of the usage based nature of our business, and what you saw in Q2 was all of those usage based streams having their positive variants stack up. And so in some sense Q2 with 88% growth is an example of how good, good can be when everything in our business goes right.
>
> Now coming off of that amazing quarter, we couldn't expect that all of those fluctuating trends would again stack up magically in Q3 and so we gave you conservative guidance. But of course as Q3 actually turned out, it was another stellar quarter and we beat that guidance by 16%. So that's how to think about it. There is not a particular customer that's driving ups or downs. It's more appropriate to think that our whole business is a usage based and has these kinds of fluctuations which informs our guidance philosophy.

35. On February 4, 2022, on an earnings call, Lafair reassured the public that:

> And so there are a few customers, but this is actually fairly broad-based in terms of a large number of customers and this is in the numbers, 20 customers last year are a million or more and so we did have some customers that started in Q4 of the prior year. And then when you run the dollar-based net retention, it was a big number, but the reality is, it was a good number all year and so we were pleased with what it was when we went public. We're also seeing kind of broad-based, it's not like there is huge concentration and so we feel really, really good about the growth this year and we feel good about the numbers where we ended last year, across the board.

36. In reality, however, CS Disco's outsized revenue performance and earnings beats throughout the Class Period were attributable to a small number of large Review projects – projects that Defendants knew were, by definition, of limited duration. As those projects ended in the second quarter of 2022, CS Disco had to revise its 2022 revenue projections downward, projecting from $132.0 to $136.0 million, a decline of $17 million.

37. FE-1 confirmed that CS Disco's review product was concentrated in a small number of matters. FE-1 stated that CS Disco did not have a lot of review projects. FE-1 knew this because FE-1's team had to work with the Managed Review team for projects, but FE-1's team did not have

to help them with many projects. FE-1's impression was that there was a "failure to launch" for the Managed Review offerings and they were a "total flop." FE-1's understanding from talking to other employees was that the projects were mismanaged because they were led by people who did not have any experience running document reviews. FE-1 said CS Disco had a couple clients that could have been "whales" with significant profit margins if the company had been able to properly execute the Managed Review projects. However, FE-1 said word gets out quickly when there are issues.

38. FE-1 was aware, through people FE-1 knew at other companies that offered Managed Review that most of them have a lot of work. However, at CS Disco, the Review Team had to sit around a lot because they had almost nothing to do. FE-1 said that it was well known at CS Disco that there were not very many Managed Review projects. FE-1 said this could not have been a surprise and leadership must have known well ahead of the revised guidance. FE-1 said Managed Review was reported on constantly and was always a big topic at sales meetings and town meetings. FE-1 said the sales team was always pushed to sell Managed Review and they received a higher commission for it. FE-1 expressed the company's leadership presented "numbers" and thought the company would "catch up" – meaning that they would simply find a way to meet rosy numbers. However, they finally had to "own up" after the company "flopped" and admit they had been "lying."

39. FE-2 recalled that around summer 2022 CS Disco lost business from a handful of clients for which CS Disco had been handling large Review projects, and this business was "drying up rapidly. FE-2 said Peloton was the client that CS Disco lost the largest amount of business from around this time. FE-2 believes Lyft may have been another one because she knew CS Disco also had a lot of Review projects from Lyft. Regarding how FE-2 knew about the Peloton and Lyft accounts, FE-2 said it was common knowledge that these companies were some of CS Disco's

largest accounts. FE-2 also heard some details about these accounts during private conversations with other employees, including Client Success Managers.

40. FE-2 stated that revenue from Review cases was not sustainable. FE-2 explained that sometimes corporations had large litigation matters that required significant resources, but this only lasted for a finite amount of time. FE-2 explained that some people had died while using Peloton products and there was an SEC investigation, so the company was involved in significant litigation for a while. However, FE-2 expressed that corporations like Peloton will not "endure legal fires in perpetuity," so eDiscovery companies like CS Disco need to find other clients, including other corporations, to get more cases to replace revenue from existing cases that would eventually and inevitably end. FE-2 did not recall when there may have first been signs that Review revenue from Peloton or other large clients was drying up but, as noted above, the business from Peloton (as well, possibly, as Lyft) had declined significantly around summer 2022.

41. FE-2 stated that there was a huge push for the sales team to sell Review projects and there was a lot of pressure on them. Every time the sales team opened a new matter, someone from senior leadership would demand to know why there were no Review projects from that customer. FE-2 said Review projects had the highest margins and that senior leadership knew the ongoing projects were going to end, which was "unspoken," and that must have been why they were putting pressure on the sales team.

42. FE-2 stated that the Review projects were difficult to sell because CS Disco had a very untraditional way of selling them. Other companies sold Review projects on an hourly basis, whereas CS Disco charged a flat fee based upon the total number of documents. However, CS Disco's clients were paying based upon the total document population, not the number of documents that were actually going to be reviewed. The Disco Review Team did not review all the documents because they used technology to draw out the most responsive documents. The Review

Team reviewed the documents until they reached documents that were consistently no longer responsive, and then they would stop reviewing them. This was difficult for clients to understand and caused issues with some of the clients when CS Disco was trying to negotiate with them.

43. FE-3 explained that Managed Review tends to be "very spiky" in terms of new business coming in and also existing projects or engagements coming to an end. At "a growing company" like CS Disco, the impact of these spikes, whether up or down, is particularly pronounced, whereas with a larger company the spikes can be more "normalized." Regarding the variability and volatility of Managed Review he said that every time a new review project comes in it means one should already begin thinking about when and from where the next one will come. FE-3 described highly aggressive growth goals being pushed on Managed Review. As FE-3 explained, the goals for 2020 were triple what Managed Review had achieved in 2019. In 4Q2020, Managed Review achieved more revenue than Managed Review had in the preceding three quarters. The goals for 2021 were then doubled what had been achieved in 2020. For 2022, the goals for Managed Review were then tripled from what the goals had been in 2021, which meant the goals were 75% more than what Managed Review had achieved in 2021. FE-3 stated that the Managed Review business for 2022 had been "silly" in terms of being so high.

44. FE-3 also explained the importance of the Managed Review revenues to CS Disco's performance around the time of the IPO. Managed Review had been the "heroes" of 2021 because Managed Review "blew our numbers out of the water." FE-3 recalled that going back to August and September 2020 and prior, Managed Review had not met its numbers, then met its numbers in October 2020 and continued making its numbers every quarter thereafter until the meeting in February 2022. As FE-3 explained, when CS Disco first launched the Managed Review business in 2019 it "flopped" because it had been run by "a well-meaning rep" who had never run a review line of business before.

45. FE-3 "distinctly" remembered a so-called "metrics call" in February 2022. FE-3 tracked a range of activities related to the CS Disco salesforce over the preceding 90 days, including meetings with prospective customers that the salesforce participated in, and opportunities for sales. The metrics call was held every Wednesday and Camara participated in them regularly. At that call, FE-3 made clear that FE-3 projected that the Managed Review business would miss its numbers starting in March 2023. While FE-3 could not recall whether Camara was on that specific call, he did recall having several discussions in the ensuing weeks, including with Camara regarding "the lull in the Managed Review Business". Lafair was also in attendance at most monthly Metrics calls.

**C. Camara's Pattern of Harassment and Discrimination**

46. Beyond CS Disco's failing Review business, the company was hiding a darker secret.

47. On September 10, 2023, Camara abruptly resigned, causing CS Disco's share price to plummet, and leaving investors baffled. On September 20, 2023, the Wall Street Journal revealed the misconduct, concealed for years, that ultimately led to Camara's resignation.

> Kiwi Camara … drew attention last week when he resigned from software supplier, walking away from stock options once valued at nearly $110 million.
>
> Current and former employees now say he abruptly quit as chief executive after the small company's board began investigating allegations that he groped a young female employee.
>
> The alleged incident, at a Sept. 6 dinner with staff, triggered an investigation by outside lawyers, some of the employees said. It came more than a year after a CS Disco employee had made a formal complaint about Camara's behavior around young female employees.
>
> Camara, 39 years old, didn't respond to requests for comment.
>
> Camara resigned on Sunday, Sept. 10, a few days after the board opened its investigation into the sexual assault allegation. Camara forfeited an award of stock options that had made him one of the highest paid CEOs of 2022. It was the latest chapter in an unusual career that began when Camara graduated at age 19 from law school.

CS Disco, a niche supplier of software for lawyers, gave little explanation for its leader's sudden departure, saying it didn't stem from policy or operational disagreements. Employees said they learned of his exit during a company meeting on the afternoon of Sept. 11, where leaders wished Camara the best on his next chapter.

In a press release that day, venture capitalist Krishna Srinivasan, the board's chairman and a director since 2013, said: "We are grateful to Kiwi for his vision, passion, and dedication to Disco over the past decade."

A spokesman for CS Disco referred back to the company's statements in the press release and a related securities filing. Srinivasan didn't respond to requests for comment.

The Wall Street Journal spoke with more than a dozen current and former CS Disco employees as well as other people familiar with the matter for this article.

**Dinner with staff**

Camara co-founded CS Disco in 2013—when he was 29—to develop software used by lawyers to sort through documents. The company hired hundreds of employees, whom Camara called "Discovians," and the CEO regularly hosted alcohol-fueled social events for them.

On Wednesday, Sept. 6, the CEO participated in a companywide happy hour in a food hall in the Austin, Texas, building that houses the company's main offices. At the event, Camara was encouraging employees to take shots of tequila.

After the happy hour, Camara invited a small group of employees to dinner at the nearby Peacock Mediterranean Grill. At the restaurant, the drinking continued and Camara pushed roasted meat into the face of one young employee, telling her to eat it "like an animal."

Camara groped the woman, who was visibly uncomfortable, and tried to coax her to return to his condo, some of the employees said. Employees intervened to stop the CEO and the woman left. The incident was reported by employees to CS Disco's head of human resources the same night.

The next day, the law firm Cooley opened an investigation on behalf of the board and interviewed people who attended the dinner. It couldn't be learned what the investigation determined.

Cooley previously did legal work for CS Disco, including advising on its initial public stock offering. Often boards hire independent firms for investigations. A Cooley spokesman declined to comment.

**Complaint to ethics hotline**

It wasn't the first time that a CS Disco employee had complained about Camara's behavior with young female employees.

The CEO hired some female receptionists only after he reviewed photos of them, a practice he didn't follow for men, according to former employees and a lawsuit filed in federal court in Austin in 2018 by a former CS Disco employee. Part of the suit was dismissed and the parties agreed to dismiss the rest, which alleged age and gender discrimination.

In early 2022, a CS Disco employee contacted the company's ethics hotline requesting an investigation into Camara's treatment of young female employees, including how they were hired, social gatherings he hosted and comments he made.

…

The company's finance chief and others reviewed the materials. An outside lawyer, also from Cooley, investigated the complaint. It couldn't be learned what the investigation found.

Several former CS Disco employees said that in recent years they had raised concerns about Camara's behavior to human resources, top executives and during exit interviews, and that they felt nothing changed.

In February 2022, one employee complained to human resources that the CEO surrounds himself with young female staffers and "prefers to have a house party with associates rather than a professional dinner. This is very inappropriate behavior," according to a document reviewed by the Journal. It is unclear if the company took any action.

**Emerging leader program**

In 2022, Camara spearheaded a program at CS Disco called the Emerging Leader Rotational Program, or ELRP. The company would recruit and hire about 40 new college graduates, offering them a roughly $80,000 job where they would spend several years rotating through divisions of the company.

A recent job description for the ELRP states: "Working alongside top legal minds, entrepreneurs, and technologists, you'll make a meaningful impact while deepening your skills with one-to-one attention from our leaders and coaches."

Former CS Disco managers familiar with the ELRP said Camara would socialize with the company's youngest staff. He sought to select young female ELRP associates, they said, to do rotations in the Office of the CEO. Weekend events for ELRP associates such as visits to wineries struck managers as wasteful while executives were urging belt tightening.

The company rented a house in the Northeast for a recruiting trip where Camara could socialize with ELRP candidates and company staff. Camara also discussed with employees renting an Airbnb in Austin when a new class of ELRP associates was arriving so they could all stay together.

"It was so weird," one former ELRP associate said, "what are we—on Love Island together?"

> Camara, who lives in the Austonian, a luxury condominium a block away from CS Disco's headquarters, would also entertain ELRP associates and other employees at his apartment or an event space atop the skyscraper where he lived.
>
> The former ELRP associate said the boss would strongly encourage his visitors to try his brandy or cognac and smoke cigars with him. Camara generally wasn't easy to refuse. "He'd say stuff like, 'I'll fire you if you don't do things my way,'" this person said.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED SUBSTANTIAL LOSSES TO INVESTORS

### A. Misstatements Related to Vulnerability of Revenues to Review Matters

48. The Class Period begins on July 2021, when the Company filed a form 424B4 in connection with its IPO that stated, among other things, that the Company's "revenue growth depends in part on the success of our strategic relationships with law firms and other legal services providers". It was signed by Defendants Camara and Lafair.

49. The foregoing statement was misleading, failing to disclose to investors that its revenue growth was in fact contingent on a small number of large Review projects.

50. On September 2, 2021, Camara and Lafair participated in an earnings call with investors for the second quarter of 2021. On that call, in his introductory remarks, Kamara stated:

> A great example of what has driven the acceleration in growth this quarter is a well-known consumer brand that in Q4 of last year hired a new Deputy General Counsel to the major technology company that has been a longstanding DISCO customer. He ran a sole-source procurement for ediscovery when he started his new job, and between the fourth quarter of 2020, and the first quarter of 2021, his new company migrated their ediscovery program to DISCO Ediscovery. But in the second quarter of 2021, this company experienced a series of major legal issues that caused them to accelerate their adoption of our second product, DISCO Review. **So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend. That journey has historically taken our customary several years.**

51. The foregoing statement was misleading because it told investors that when customers increased their revenues to seven figures, that represented a stable revenue source, when

in reality several of its seven figure customers were driven by one-time large Review projects.

52. On that call, Kamara responded to a question from an analyst as follows:

> Sterling Auty, Analyst
>
> Yeah. Thanks. Hi guys, and welcome to the public markets. Maybe just to get kicked off, my first question would be about that large consumer customer that you mentioned and kind of your comments about the business model and the variability it can generate. What are some **of** the things that you're doing to drive increased usage to try to let's say smooth out some of the volatility that you might see from a single customer quarter-to-quarter?
>
> Kiwi Camara, Chief Executive Officer and Director
>
> **So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher five-figure customer grow to be a six-figure customer and then grow to be a seven-figure customer at maturity.** Over the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer. **Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.**

53. The foregoing statement was misleading because it told investors that when customers increased their revenues to seven figures, that represented a stable revenue source, when in reality several of its seven figure customers were driven by one-time large Review projects. It was also misleading to claim that specific customer usage fluctuations would "washout" when in reality, because of the disproportionate impact of a few large Review projects, the ending of those projects would have a material impact on revenues.

54. At that conference, Kamara answered another question from Berg:

> Scott Berg
>
> Okay. Well, we're going to take a couple questions from the audience here. First question is, what level of visibility does the company have into annual revenues at the beginning of any year? Because you're in quiet period and you're not guiding to next fiscal year or anything. But just in general on a 12-month basis and the question is based on given the consumption-driven nature of the business, how should we

> think about that visibility?
>
> Kiwi Camara
>
> So, we've talked about this before in the past. **We feel fairly confident in our ability to project the revenue over an annualized basis. There's a lot of variability that we've talked about in the business that can impact quarter-to-quarter. But we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends, customer growth, dollar net retention that we're able to model out also sales rep productivity. So, we feel really good about our kind of annualized. I've been here for almost four years and our ability to project on an annualized basis is actually really, really good.**
>
> Quarter to quarter, the variability of our business, it can go both ways. I mean you could have a case that's in our system and there could be a discovery motion and it could create a huge, huge uptick in business kind of at the end of the quarter that may impact the quarter and it could go the other way. A case could settle, the parties could settle, it could be a fairly large case and that could affect variability, **but the reality is all these clients have ongoing legal matters and one case may settle one particular quarter or there may be a large discovery motion that kind of increases it. But over the long term 12 month period, we feel pretty confident.**

55. The foregoing statement was misleading because annual revenue was materially dependent on a small number of large Review projects, and given the newness of the Review business, and the dependence of annual revenues on a small number of Large Review projects, CS Disco lacked the ability to predict annual revenue accurately.

56. In a Form 10-Q financial report for the period ending June 30, 2021 filed on September 3, 2021 and signed by Camara and Lafair, the Company stated that it had been experiencing "rapid growth" and noted that its "go-to-market strategy is focused on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

57. The foregoing statement was misleading, failing to disclose to investors that its revenue growth was in fact contingent on a small number of large review projects.

58. In a Form S-1 the Company filed on September 13, 2021, signed by Defendants Lafair and Camara, CS Disco again referred to its recent rapid growth, and its "focus[] on acquiring new customers and driving continued use and increased usage of our solution for existing

customers."

59. The foregoing statement was misleading, failing to disclose to investors that its revenue growth was in fact contingent on a small number of large review projects.

60. In a Form 10-Q for the quarter ending September 30, 2021 filed on November 10, 2021 and signed by Defendants Camara and Lafair, the Company repeated that it had experienced "rapid growth in recent periods," and again attributed its success to its "focus[]on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

61. The foregoing statement was misleading, failing to disclose to investors that its revenue growth was in fact contingent on a small number of large Review projects.

62. On January 11, 2022, Kamara participated in the 24th Annual Needham Virtual Growth Conference, and responded to a question by the presenter, Scott Berg, as follows:

> Scott Berg
>
> Okay. Around the complexity question often comes a view point that customers use a platform like Disco for maybe a short time frame and then maybe on an infrequent basis, but for an average Fortune 1000 type customer that you might have, how many matters could they be managing concurrently? And is the typical usage of the Disco platform maybe weekly, monthly or something longer for these matters?
>
> Kiwi Camara
>
> **So, for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform** and I think Scott that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works. You take any one of these matters and we've got matters alive in our system; they date all the way back to 2013 the same way we have corporate customers, who have been continuous customers going all the way back to 2013. I think one good way to think about this is looking at companies spend on their own legal department or on legal services. While the nature of the legal matters that a company is exposed to may change from time to time and while unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that. **People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into.**

63. The foregoing statement was misleading because it failed to disclose that revenues

were materially impacted by a small number of large Review matters that were not part of ongoing and continuous legal department spends.

64. On that same call, Camara responded to another question:

> Scott Berg
>
> Is -- next question is on e-discovery, is expansion of e-discovery use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?
>
> …
>
> Kiwi Camara
>
> **I would say there's not as much variance in the ultimate wallet size of the customer. So, like how big will the customer be when they get to maturity. But there's more variance in how quickly they get there.** So, over the last few earnings calls, right, we've talked about the extreme positive examples, where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that. And then there are also examples of customers that take four years, five years, even six years to get to their mature spend. **So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.**

65. The foregoing statement was misleading because it falsely told investors that customers reached a mature stable spend, when in reality several of its largest customers at that time were spending unusually high amounts on CS Disco's Review product due to the existence of unusually large litigation matters.

66. On February 25, 2022, the Company filed its Form 10-K for fiscal year ended December 31, 2021, signed by Defendants Camara and Lafair, reasserting that in recent periods it had experienced "rapid growth" and that it "focused on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

67. The foregoing statement was misleading for failing to disclose to investors that its revenue growth was in fact contingent on a small number of large review projects.

68. On May 12, 2022, the Company held an analyst conference call to discuss First Quarter 2022 results. On that call, Lafair answered a question from an analyst:

> Koji Ikeda
>
> Hey, Kiwi. Hey, Mike. Thanks taking the questions here. A couple from me. First, okay, so the second quarter guide and just wanted to ask a couple questions here on that. When looking at it from a sequential basis, it's going to be – your guidance has being down quarter-over-quarter and that's similar to how you guided or initially guided to the first quarter when you -- on the fourth quarter call. So kind to understand the put and takes there, but just wanted to be sure, is there anything that we should be thinking about in the second quarter to call out? Is there anything seasonal? Is there any matters that have come off already off the platform that we should be thinking about? Any sort of help there and just kind of reconcile that quarter-over-quarter decline with the guide there.
>
> Michael Lafair, Chief Financial Officer
>
> Hey, Koji, it's Michael. Really great question. As you know, since we went public, we've actually guided down every single quarter sequentially. And part of that really has to do with the fact that we're a usage base model and on a quarter-to-quarter basis there can be variability in the numbers. **We're also very prudent in our approach to guidance as we've discussed many, many times. And we have raised our full-year guidance for the year. With really good visibility into the full year, we feel really confident about that number and that's kind of where we are with our guidance.**

69. The foregoing statement was misleading because CS Disco's annual 2022 revenue projections were materially dependent on the continuation of a single digit number of large review matters, matters that by this time had already been terminated.

### B. <u>Misstatements Related to Camara's Pattern of Harassment and Discrimination</u>

70. Throughout the Class Period, CS Disco maintained a copy of a Code of Conduct and Business Ethics on its website. It stated – in relevant part, regarding sexual harassment and discrimination:

> The Company is committed to providing a work environment free of any form of unlawful harassment or discrimination. The Company is committed to maintaining a respectful, courteous work environment that respects the dignity and worth of each employee. Inappropriate workplace behavior and unlawful harassment are wholly inconsistent with this commitment. No employee, contract worker,

> customer, vendor or other person who does business with this organization is exempt from the prohibitions within this policy.
>
> …
>
> You may not, while acting on behalf of the Company or while using our computing or communications equipment or facilities, either:
>
> …
>
> • commit any unlawful or illegal act, including harassment…..

71. It stated, regarding its zero-tolerance policy for violations of the code:

> Violations of this Code will not be tolerated. Any employee who violates the standards in this Code may be subject to disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

72. The foregoing statements were misleading for failing to disclose that Camara was engaged in repeated harassment and discrimination, which had already been reported to Disco Human Resources, and faced no repercussions for his conduct.

## THE TRUTH EMERGES

### A. The Truth Related to the Vulnerability of Revenue to Review Matters is Revealed

73. On August 11, 2022, the Company adjusted downward its annual revenue guidance to $132.0 to $136.0 million.

74. That same day, on an earnings call, Camara answered a question from an analyst as follows:

> Derrick Wood, Analyst
>
> Thank you. I guess, Kiwi, I mean in your prepared remarks you talked about how your market is -- you know, withstands the macro headwinds. And in fact, often

leads to more disputes and litigation activity. Why do you think you're seeing this kind of change in demand behavior play out, especially considering your review technology has a strong ROI? I guess, just trying to get a sense for what has changed so dramatically over the last three months and is it perhaps due to some lost customers from using review or can you just shed a little bit more color on what the customer behavior is doing, when it's doing?

Kiwi Camara, Co-Founder, Chief Executive Officer and Director

Sure. It's less about lost customers and more about changes in customers' usage on the platform. Again to put this in perspective, the presence of two to three large reviews, reviews that build more than $1 million in a quarter would cause this to be a great quarter and two to three more reviews were caused to be an absolute home run quarter. So the volatility that we're talking about in the review business has to do with the presence or absence of a low single-digit number of big-ticket reviews.

75. On that call, Camara also answered another call from an analyst:

Scott Berg, Analyst

Hi, Kiwi and Michael, thanks for taking my question today. Kiwi, let me ask this in a different way. I know where all kind of ask in roughly the same question, plus or minus. But your new guidance caused for second half revenues to be down 21.5% at the midpoint with that $17 million reduction, that's a big number annualized $34 million. I guess what we're trying to understand is, in this review product, $17 million, even if I break up between two quarters, it sounds like it's more than just a couple of customers. How can that -- I guess how can the magnitude be that big in a swing factor be that big in this one area? It's not a couple gigabytes of data usage yields, not a few million bucks one way or the other necessarily up. The big enough number, the big enough percentage that it's outside of, I think our standard deviation or two of what we would think volatility with model to look like? Thank you.

Kiwi Camara, Co-Founder, Chief Executive Officer and Director

I think the magnitude we're talking about in the review business and specifically what we saw a shortage of in the second quarter are a couple one, two or three large reviews billing north of $1 million per quarter. The presence or absence of one to six of those reviews can take a quarter from good to great to a complete home run and again that is volatility that's created by the big ticket sizes in review, as well as the relatively small size of the review revenue base today.

In terms of our go-forward guidance, we have sought to de-risk the guidance as much as possible and to adhere to the guidance philosophy that we've articulated on each of our prior earnings calls, where we expect to be prudent in our forward guidance. Now that will result in some quarters that have outsized beats[ph] as you've seen in the past and some quarters that have more modest beats like the quarter we just reported.

76. On that same call, Camara responded to another question from an analyst:

> Tyler Radke, Analyst
>
> Hey, thanks for taking a follow-up. So, Kiwi, maybe you could help us understand why these review deals aren't happening, is it simply because maybe these use cases were for a legal case that got pushed out, that was maybe more cyclical and then just help us understand are you not anticipating any more of these larger of (inaudible) is to form the second half. Just help us understand how much you've kind of de-risk the guide from the Disco Review perspective?
>
> Thank you.
>
> Kiwi Camara, Co-Founder, Chief Executive Officer and Director
>
> Sure. So, typically and again we're talking about a small handful of reviews that build more than $1 million in a quarter. Those tend to be a big ticket litigation of the sort[ph] you would read about in the paper. And the timing of them is again somewhat exogenous. It depends on when such a litigation is initiated, when a big new investigation is initiated, it depends on rulings by the court or other decision makers say a regulator about the scope of discovery. In the investigation, it depends on the progress or lack thereof in settlement negotiations if the timing of rulings on incremental motions and on the final disposition of the case. So it's a lot dependent on what's going on in the specific legal process.
>
> In terms of our guidance, what we have sought to do is to de-risk the guidance from the point of view of these kinds of large reviews.

77. Analysts were shocked by the sudden decline in revenue due to such a small number of large matters, with Cowen downgrading their rating for CS Disco stock, stated that:

> It was unclear what caused such a change in consumption from these large $1m+ customers. A lot of it is likely due to a change in the stage of lawsuits/investigations. Some could be competitors being used for new cases on-boarding where LAW may not be involved. In either case, the significant guide down reveals that 1) LAW is much more dependent on large customer consumption behavior than we had thought; 2) the strong growth last year appears to have been turbo-charged by its Review product, which is now modeled to decline this yr; and 3) the big recalibration in guide shows there is limited visibility in nearer-term usage trends.

78. As a result of these disclosures, the price of CS Disco stock declined $15.53 between August 11, 2022 and August 12, 2022, a drop of more than 53 percent.

79. On September 13, 2022, at a Piper Sandler Growth Frontiers Conference, Kamara was asked why Review revenue was more "lumpy" than the ediscovery revenue. Camara stated

that "if you look at the quarters we've had while we've been public, in each of those quarters except for last quarter, we had one or two, or three, or four big ticket reviews. And by buy [sic] big ticket reviews, I mean, reviews that generated more than a million dollars of revenue in the quarter." Camara then admitted, for the first time, that "[g]iven the size of the review product today, review of that magnitude having or not having that can swing the top line numbers in a material way."

80. On an earnings call dated November 10, 2022, Camara admitted that the "tidal wave of goodness" that drove CS Disco's revenue beats in 2021 and early 2022 were attributable to a small number of very large reviews:

> I think more generally until the Review business gets to larger scale, it's going to be possible for these large Review kind of use cases to impact revenue in any particular quarter. And last year, we saw that happen to the good, right. Q2 of last year was the tidal wave of goodness. And this year, we're seeing what happens when that tidal wave goes out. But we're not seeing any fundamental shift in how many large matters there are in the world or sort of anything like that.

81. The Wall Street Journal, on October 29, 2023, also reported problems with Disco's Review product. According to the Journal, "Koch Industries … ran into significant problems with the managed review service in 2020…" The Journal reported that "CS Disco waived the majority of the fees for a project after poor communication led to errors in the document review, which Koch's internal processes identified and resolved. The conglomerate no longer uses CS Disco for that service."

**B. The Truth Related to Camara's Pattern of Harassment and Discrimination is Revealed**

82. On September 11, 2023, CS Disco disclosed the resignation of Camara, filing an 8-K that stated, in pertinent part, that:

> On September 10, 2023, Kiwi Camara, Chief Executive Officer of CS Disco, Inc. (the "Company"), notified the board of directors (the "Board") of the Company of his resignation from his position as Chief Executive Officer and as a member of the

> Board, effective immediately. Mr. Camara's resignation from the Board is not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

83. On this news, the price of CS Disco's stock fell $1.81, a decline of more than 23%, between September 11, 2023 and September 12, 2023.

## ADDITIONAL FACTS IN SUPPORT OF SCIENTER

### A. Insider Stock Sales

84. Camara's sales of CS Disco stock in its secondary offering dated September 14, 2021, gave Camara a motive to commit fraud. In the secondary offering, Camara sold 707,069 shares of CS Disco stock for $51.2775 per share after deducting underwriter expenses, an increase from the IPO price of $32 per share, for total proceeds to Camara of $36,256,730.65.

85. Lafair's sales of CS Disco stock in its secondary offering dated September 14, 2021, gave Lafair a motive to commit fraud. In the secondary offering, Lafair sold 66,724 shares of CS Disco stock for $51.2775 per share after deducting underwriter expenses, an increase from the IPO price of $32 per share, for total proceeds to Lafair of $3,421,439.91. After that secondary offering, throughout the Class Period, Lafair sold a total of $7,288,586 in CS Disco stock, including $1,439,912 worth of stock on August 11, 2021, just prior to the disclosure the same day that CS Disco was revising its annual guidance downward. These sales total 59%[1] of the shares LaFair held before the secondary offering.

### B. Facts In Support of Scienter Related to the Vulnerability of Revenues to Review Matters

86. Further supporting an inference of Camara's scienter is the close tracking of

[1] During that same period, Lafair was able to offset his sales through the exercise of 317,231 options to purchase shares of Disco. They were exercised at the heavily discounted strike price of $1.50 per share.

customer usage that, according to Camara, allowed them to very accurately predict revenue on an annual basis. On a September 2, 2021, analyst call Camara claimed that "[i]n terms of how we have insight into our customers' data usage? Look, we obviously internally have deep bottoms-up forecasting insights, where our customer success teams and sales teams have deep relationships with our clients. We have telemetry that gives us insight into the legal matters going on into the platform, and we use all of that to form a picture that gives us visibility and confidence in how the legal needs and the resulting data of our clients to change over time." Camara stated, in a January 11, 2022, investor conference, that "[w]e feel fairly confident in our ability to project the revenue over an annualized basis. There's a lot of variability that we've talked about in the business that can impact quarter-to-quarter. But we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends customer growth, dollar net retention that we're able to model out also sales rep productivity. So, we feel really good about our kind of annualized. I've been here for almost four years and our ability to project on an annualized basis is actually really, really good."

87. Further supporting an inference of Camara's scienter is the fact that Camara regularly attended monthly calls where future Review revenue was discussed, and that on one such call FE-3 specifically stated that revenue from large Review matters would dry up beginning in March of 2022, and that FE-3 specifically discussed this issue with Camara after that call.

88. Further supporting an inference of Lafair's scienter is the fact that Lafair regularly attended monthly calls where future Review revenue was discussed, and that on one such call FE-3 specifically stated that revenue from large Review matters would dry up beginning in March of 2022.

**C. Facts in Support of Scienter Related to Camara's Harassment and Discrimination**

89. There is a strong inference of scienter as to Camara because the statements were

rendered false and misleading due to Camara's own misconduct including hiring female, but not male, receptionists only after reviewing photos of them, inappropriate comments made by Camara, hosting inappropriate social gatherings for young female employees including house parties, and deliberately selecting young female employees to do rotations in the Office of CEO.

90. There is strong evidence of scienter as to Lafair because, according to the Wall Street Journal, Lafair reviewed a complaint "to the company's ethics hotline requesting an investigation into Camara's treatment of young female employees, including how they were hired, social gatherings he hosted and comments he made."

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

91. CS Disco's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

92. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of CS Disco who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

93. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of CS Disco during the Class Period (the "Class"); and were

damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

94. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. Common questions of law and fact exist as to

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

97. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE**

98. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with over 400,000 shares per day on

average during the Class Period;

(e) the Company traded on the NYSE, and was covered by 21 analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

99. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Promulgated Thereunder Against All Defendants**

101. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

105. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

106. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set

forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

107. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

108. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

109. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

110. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## SECOND CLAIM

## Violation of Section 20(a) of The Exchange Act

## Against the Individual Defendants

111. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

113. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

114. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

115. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company,

each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

116. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2024

Respectfully submitted,

*/s/ Joe Kendall*

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219

Phone: (214) 744-3000
Fax: (214) 744-3015
Email: jkendall@kendalllawgroup.com

*Local Counsel for Lead Plaintiff*

Jonathan Stern (admitted *pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all counsel of record on March 8, 2024 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
JOE KENDALL