**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LYNN GAMBRILL, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>CS DISCO, INC; KIWI CAMARA; MICHAEL LAFAIR,<br><br>     Defendants. | Case No. 1:24-cv-00028-RP<br><br>CLASS ACTION |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 2

    A.    Company Background ...................................................................................... 2

    B.    CS Disco Reports Massive Growth, Concealing that it is Driven By a Small Number of Review Projects ........................................................................................................ 3

    C.    Camara's Pattern of Harassment and Discrimination ...................................... 5

III.  ARGUMENT ............................................................................................................. 6

    A.    The Complaint Adequately Alleges Securities Fraud .................................... 6

        1.    The Complaint Alleges Falsity ............................................................... 6

            a.    Defendants' Failure to Disclose Reliance on a Small Number of Large Review Projects Rendered their Statements Misleading ................................ 6

            b.    Defendants' Risk Disclosures Were Inadequate ...................................... 11

            c.    Defendants' Code of Conduct Was Misleading ....................................... 12

        2.    The Complaint Alleges a Strong Inference of Scienter ........................... 15

            a.    Defendants Knew or Recklessly Disregarded That The Growth Statements Were False or Misleading When Made ................................ 15

            b.    The Complaint Alleges Scienter Regarding the Code of Conduct ........ 18

            c.    Defendants' Motive to Commit Fraud Further Supports a Strong Inference of Scienter ........................................................................................................ 19

i

B.      The Complaint Adequately Alleges Control Person Claims ................................... 20

IV.    CONCLUSION ....................................................................................................... 20

**TABLE OF AUTHORITIES**

Cases

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) .............................. 15, 17

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002) ....................................... 16

*Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175 (5th Cir. 2019) ........................................ 20

*Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)......... 9

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) .................................................. 14

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128 (N.D. Cal. 2013) ..................................................................................................... 18

*City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245 (10th Cir. 2001)..................... 18

*Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570 (N.D. Tex. 2021)..................................... 20

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015) .... 19

*Fener v. Belo Corp.*, 513 F. Supp. 2d 733 (N.D. Tex. 2007).......................................................... 9

*Gamboa v. Citizens, Inc.*, No. A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018)........................................................................................................................................ 18

*In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................. 7

*In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254  (M.D. Tenn. Nov. 19, 2019)........................................................................................................................ 7

*In re Fastly, Inc. Sec. Litig.*, No. 20-CV-06024-PJH, 2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ....................................................................................................................................... 12

*In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ..................................................................................... 16

*In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681 (S.D.N.Y. 2008)........................................... 13

*In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999)........................................... 19

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583 (S.D. Tex. 2018) ............... 14

*In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001)................................. 8

*In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573 (W.D. Tex. 2022).................... 10, 15, 16

*In re Terravia Holdings, Inc. Sec. Litig.*, No. 16-CV-06633-JD, 2020 WL 553939 (N.D. Cal. Feb. 4, 2020).............................................................................................................................. 15

*In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009 WL 6325540 (S.D. Tex. July 9, 2009)...................................................................................................................................... 17

*In re Vale S.A. Sec. Litig.*, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017)................................... 13

*In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624 (S.D. Tex. 2021)......................... 19

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527 (5th Cir. 2008) ........................................................................................................................................... 20

*Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659 (N.D. Tex. 2022) .................................... 14

*Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)................. 7

*Local 731 IB of T Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016)....................................................................................................................................... 18

*Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016) ............................ 14

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ......................................................... 6

*Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ......................................................................................................................... 9

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27  (2011) ......................................................... 6

*McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 685 (E.D. Tex. 2001) ............................... 9

*McNulty v. Kanode*, No. A-13-CV-026-LY, 2013 WL 12077503 (W.D. Tex. Nov. 6, 2013)..... 11

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007). .................................................... 13

*Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019)... 17, 18

*Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001) ............................................................ 15

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................ 17

*Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, No. MO:19-CV-217-DC, 2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) ................................................................................... 13, 14

*Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015) .......................................................................... 19

*R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) ................................................................. 8

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017) ........................................................................................................................ 14

*Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)........................................................................................................................ 10

*S.E.C. v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) .................... 18

*Sapssov v. Health Mgmt. Assocs., Inc., 22 F. Supp. 3d 1210 (M.D. Fla. 2014)*............................ 7

*Southland Sec. Corp. v. INSpire Ins. Sols.*, Inc., 365 F.3d 353 (5th Cir. 2004)............................ 11

*Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676 (5th Cir. 2014)................................. 10, 19

*Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575 (W.D. Tex. 2014).............................. 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) .................................................. 15

Lead Plaintiff Bert Pluymen ("Plaintiff") submits this memorandum in opposition to Defendants' motion (ECF No. 54, "Motion") to dismiss Plaintiff's Amended Class Action Complaint (ECF No. 53, "Complaint").

## I.   INTRODUCTION

CS Disco pitched itself to investors as a rapidly growing but stable company offering a suite of e-discovery products to investors, with its recent revenue growth attributable to a variety of products and a variety of clients. In reality, its growth was anything but stable, instead relying on Disco having been hired for a small number of large document review projects. As a veteran of the legal field, Disco CEO Kiwi Camara was well aware that growth based on a few large litigations was not sustainable, but instead of coming clean with investors, he and CFO Michael Lafair repeatedly reassured investors that their revenue growth came from a variety of sources and was very predictable year to year. When those large litigations inevitably ended and Disco had to walk back its rosy projections, its stock crashed.

Worse yet, Disco hid a darker secret – that Camara was abusing his position to harass female employees, in blatant violation of Disco's course of conduct. Camara's misconduct finally caught up with him when he blatantly harassed an employee in front of dozens of their coworkers and was forced to resign. Defendants attempted to cover up the reasons for Camara's ouster but the Wall Street journal revealed Camara's inappropriate conduct.

Defendants' motion to dismiss attempts to sidestep these well-pled allegations by obfuscating both the law and the facts. Defendants claim that the omission of the contribution of large reviews to the company's revenue growth did not render their statements misleading, disregarding the fact that the omission of those large reviews made their growth seem much more stable and much more predictable than it truly was. Defendants claim that the code of conduct was not misleading, dismissing their promise to have zero tolerance for harassment as merely

aspirational, but the cases they compare it to contain much more vague and inactionable codes of conduct than here. Defendants' scienter arguments fare no better. Defendants claim, contrary to binding precedent, that confidential witness allegations are per se invalid, and therefore ask the court to disregard the fact that well pled allegations from former CS Disco employees confirmed that Camara and Lafair frequently attended sales meetings where they learned about CS Disco's sales pipeline, including the dependence of Disco's revenues on a few large Review projects. With respect to the concealing of Camara's misconduct, they ask the Court to reach the absurd conclusion that Camara did not know that his own misconduct violated the code of conduct.

## II.    STATEMENT OF FACTS

### A.    Company Background

CS Disco is a public company that offers advanced document review solutions to corporate clients and law firms. ¶22. It was founded in 2013 by Defendant Camara and is headquartered in Austin, Texas. ¶23. On July 21, 2021, the Company completed an initial public offering ("IPO") of its common stock pursuant to a Registration Statement on Form S-1. ¶24. In the IPO, the Company sold an aggregate of 7,500,000 shares of common stock, including 500,000 shares issued pursuant to the underwriters' option to purchase additional shares at a public offering price of $32.00 per share. *Id.* According to its IPO registration statement, Disco offers three main products. ¶26. Disco Ediscovery is Disco's document collection and hosting product, Disco Review is a service whereby Disco conducts document reviews on behalf of clients using AI, and Disco Case Builder organizes discovery information. *Id.* Disco Ediscovery is CS Disco's original product and Review and Case Builder are more recent additions, with Review launching in 2019. ¶27.

As Lafair explained on a September 2, 2021 earnings call, the Company relies on a usage-based revenue model, meaning that customers, rather than signing up for a flat monthly or annual subscription, pay Disco based on the actual usage of Disco. ¶28. "Because of this dynamic" Lafair

explained, Defendants could not report on traditional software as a service metric that analysts typically use to judge growth of subscription-based companies, such as total billings. *Id.* Rather, CS Disco focuses its "attention on total revenue growth." *Id.*

However, despite this revenue model, Defendants told investors that customers follow an "adjustment journey" that leads to them to go from being a five, to six, to seven figure customer "at maturity." ¶29. While Camara acknowledged that "[o]ver the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer", he reassured investors that "as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect ... that as our base grows, more of these specific customer usage fluctuations washout in the aggregate." *Id.*

**B.     CS Disco Reports Massive Growth, Concealing that it is Driven By a
Small Number of Review Projects**

Throughout the Class Period, CS Disco announced large revenue growth and consistently beat its earnings projections. ¶31. As Defendants explained, their Review product added significantly to their revenue growth. ¶32. When asked about the effect of customers adopting the Review and Case Builder products on their revenues, Camara explained that adoption of those products effectively doubles or triples the revenue coming from a single customer. *Id.*

Defendants specifically denied, when asked by analysts, that their rapid revenue growth and overperformance of guidance were attributable to a small number of large matters. ¶33. For instance, on CS Disco's September 2, 2021 earnings call, Lafair claimed "there was no particular driver of the outperformance in Q2, whether you look at new customers, whether you look at increased growth from existing customers, whether you looked at faster adoption journeys like the two examples we talked about in our prepared remarks, whether you think about growth

3

internationally or growth in the United States, whether you think about growth in the core DISCO Ediscovery product or an increased adoption in DISCO Review, all of these things were really firing on all cylinders, and there isn't a single driver of growth in Q2." *Id.* In reality, CS Disco's outsized revenue performance were attributable to a small number of large Review projects that Defendants knew were, by definition, of limited duration. ¶36. As those projects ended in the second quarter of 2022, CS Disco had to revise its 2022 revenue projections downward, projecting from $132.0 to $136.0 million, a decline of $17 million. *Id.*

FE-1 confirmed that CS Disco's review product was concentrated in a small number of matters. ¶37. FE-1 said that it was well known at CS Disco that there were not very many Managed Review projects. ¶38. FE-1 said Managed Review was reported on constantly and was always a big topic at sales meetings and town meetings. *Id.* FE-2 recalled that around summer 2022 CS Disco lost business from a handful of clients for which CS Disco had been handling large Review projects, and this business was "drying up rapidly". ¶39.

FE-2 stated that revenue from Review cases was not sustainable. ¶40. FE-2 explained that sometimes corporations had large litigation matters that required significant resources, but this only lasted for a finite amount of time. *Id.* FE-2 expressed that corporations will not "endure legal fires in perpetuity," so eDiscovery companies like CS Disco need to find other clients, including other corporations, to get more cases to replace revenue from existing cases that would eventually and inevitably end. *Id.* FE-2 stated that there was a huge push for the sales team to sell Review projects and there was a lot of pressure on them. *Id.* Every time the sales team opened a new matter, someone from senior leadership would demand to know why there were no Review projects from that customer. *Id.* FE-2 said that senior leadership knew the ongoing projects were going to end, which was "unspoken". *Id.* FE-3 explained that Managed Review tends to be "very spiky" in terms

4

of new business coming in and existing projects coming to an end. ¶43.

FE-3 also explained the importance of the Managed Review revenues to CS Disco's performance. ¶44. FE-3 recalled that going back to August and September 2020, Managed Review had not met its numbers, then met its numbers in October 2020 and continued making its numbers every quarter thereafter until the meeting in February 2022. *Id.* As FE-3 explained, when CS Disco first launched the Managed Review business in 2019 it "flopped" because it had been run by "a well-meaning rep" who had never run a review line of business before. *Id.*

FE-3 remembered a so-called "metrics call" in February 2022. ¶45. FE-3 tracked a range of activities related to the CS Disco salesforce over the preceding 90 days, including meetings with prospective customers that the salesforce participated in, and opportunities for sales. *Id.* The metrics call was held every Wednesday and Camara participated regularly. *Id.* At that call, FE-3 made clear that FE-3 projected that the Managed Review business would miss its numbers starting in March 2022[1]. *Id.* While FE-3 could not recall whether Camara was on that call, he did recall having several discussions in the ensuing weeks, including with Camara regarding "the lull in the Managed Review Business". *Id.* Lafair was also in attendance at most Metrics calls. *Id.*

### C.    Camara's Pattern of Harassment and Discrimination

Beyond CS Disco's failing Review business, the company was hiding a darker secret. On September 10, 2023, Camara abruptly resigned, causing CS Disco's share price to plummet, and leaving investors baffled. On September 20, 2023, the Wall Street Journal revealed the misconduct, concealed for years, that ultimately led to Camara's resignation. The article revealed a pattern of harassment and misconduct that culminated in Camara engaging in inappropriate conduct at a September 6, 2023 staff dinner.

---

[1] The Complaint inadvertently refers to the date as March 2023.

5

## III.    ARGUMENT

### A.    The Complaint Adequately Alleges Securities Fraud

The elements of a claim under Section 10(b) of the Exchange Act are: (i) a false statement or omission of material fact in connection with purchase of a security; (ii)  with scienter; (iii) upon which the plaintiff relied; and (iv) that caused plaintiff's losses. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). The Court assesses these claims under a Rule 12(b)(6) analysis, except that the inference of scienter must be strong and misleading statements must be pleaded with particularity, as required by the Private Securities Litigation Reform Act ("PSLRA"). *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). Defendants challenge falsity and scienter.

#### 1.    The Complaint Alleges Falsity

##### a.    Defendants' Failure to Disclose Reliance on a Small Number of Large Review Projects Rendered their Statements Misleading

Throughout the Class Period, Defendants made numerous statements painting a specific, compelling, and misleading picture of the drivers of CS Disco's revenue growth – that customers increase their spend with CS Disco by gradually adopting the company's products over a large range of legal matters, resulting in mature customers having a large, stable spend with CS Disco. As Defendants note, these statements can be placed into two categories: statements about the sources of rapid revenue growth, painting a picture that customers gradually ramp up to stable multimillion dollar spends (¶¶48, 50, 52, 56, 58, 20, 62, 64, 66), and statements that annual revenues are readily predictable based on years of data (¶¶ 54, 68).

**Defendants' claims that revenues were driven by customers gradually ramping to stable multimillion dollar spends:** These statements were misleading because, in reality, CS Disco's recent revenue growth was actually driven by a small number of large, one-off Review

projects. This created an affirmatively, and materially, misleading state of affairs for investors as it created the impression that CS Disco's revenue growth was stable and predictable, when in reality, its dependence on a small number of large Review matters made it anything but. Defendants have "a duty to tell the whole truth, and disclose 'material, firm-specific adverse facts that affect the validity or plausibility' of [their] statement." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 716 (W.D. Tex. 2010); *see also Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632, at *22 (S.D. Tex. Dec. 12, 2000) (because the defendants "voluntarily chose to speak publicly" on a topic, they "therefore had a duty to tell the whole truth"). By speaking about the drivers of customer spend growth, they had a duty to disclose the full truth regarding that growth. For instance, Camara claimed that "each of our customers goes through an adoption journey that has historically taken several years" and as a result "as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller". ¶52. Camara also claimed that while the nature of the matters a company is exposed to from time to time "[p]eople in general have an ongoing and continuous spend on their legal department and on legal services and that is the budget we tap into". ¶62. In reality, the budget that CS Disco tapped into was not the normal ongoing and continuous spend. Numerous courts have recognized that failure to disclose the true drivers of revenue growth are materially misleading. *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254, at *12 (M.D. Tenn. Nov. 19, 2019) ("[A] reasonable person could view the statements regarding the drivers of success as misleading for omitting information regarding out-of-network-billing as a factor driving revenue"); *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014)*, aff'd*, 608 F. App'x 855 (11th Cir. 2015) ("Because Newsome put the source of HMA's success at issue, the alleged failure to disclose the true source of this revenue could give rise to

7

liability under § 10(b)".); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824–25 (E.D. Pa. 2001) ("Having put the issue [of the source of its success] in play, Providian is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.").

Defendants' claims that the challenged statements "do not discuss the drivers of growth" ignores the substance of the statements. The statements, on their face, describe the drivers of customer spending– but customer spending and revenue are two sides of the same coin. Every dollar of customer spend is a dollar of revenue for CS Disco. Defendnts acknowledge that the statements informed investors that "legal department budgets are steady over time" but disregard the fact that such a statement is highly misleading where the largest and most consequential customers' spends were driven not by steady legal department spending but one-off large Review projects. Defendants' reliance on *R2 Investments* is misplaced. In *R2,* the subject matter disclosed (the obligation to repurchase debt) and the omitted information (the inability to repurchase debt) are distinct, and the disclosure of the former did not create a misleading impression with investors regarding the latter. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). Here, by contrast, Defendants' description of customer spend being driven by gradual adoption across a wide range of matters, resulting in a steady mature spend, misled investors about the reality that customer spend was spiky and driven by large one-off reviews.

**Defendants' statements regarding their ability to reliably predict revenues**: these statements were misleading for failing to disclose that the presence of large Review projects made revenues far less predictable than promised. In *Yelp*, the court found similar statements to those at issue here materially misleading, where Yelp claimed that the "use of a local sales team to sign up local advertisers [is]"a fairly proven model" [and] that Yelp is 'pretty good at operating' and tends

8

to produce favorable returns that are 'predictable over time'", but Yelp omitted the fact that the company was facing systemic retention challenges. *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *13 (N.D. Cal. Nov. 27, 2018). The court found that "once Defendants chose to tout Yelp's local advertising model as 'fairly proven,' omitting any mention of the churn issues that would likely significantly and negatively impact revenue" was materially misleading. This is strikingly similar to Defendants' statements that "So, we feel really good about our kind of annualized" revenue figures (¶54)[2] and that they had "really good visibility into the full year" (¶68). This was misleading because revenue growth was being materially driven by large, one-off Review projects that are impossible to predict, since individual lawsuits are of limited duration and can settle at any point.

Defendants' claim that these statements are mere puffery is meritless. Only statements that "contain no concrete factual or material misrepresentation" may be deemed "puffery." *Lormand*, 565 F.3d at 249 n.14. Determining whether a statement is "material" involves "a mixed question of law and fact [that] it is usually left for the jury." *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 746 (N.D. Tex. 2007). "The Court will not dismiss a complaint on grounds of immateriality of the alleged misrepresentation unless the misrepresentation is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 685 (E.D. Tex. 2001). And, in any event, "[e]ven if these statements were looked upon as mere 'puffery,' as the defense claims, that does not negate the duty to disclose other information necessary to make those statements not misleading *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015). As this Court has held, while "generalized positive statements

---

[2] Defendants correctly note that Lafair was the maker of this statement.

9

about a company's progress are not a basis for liability …. when there are differences between the image projected by the speaker and the reality on the ground, especially when an utterance is repeated, the alleged statement can be considered misleading." *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (internal citations and quotations omitted). Here, Defendants projected an image of being able to reliably predict revenue growth, when the reality was different.

Nor can Defendants' misleading statements properly be described as forward looking. "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (quotation omitted). "In determining whether a statement falls within the safe harbor, this Court must examine which aspects of the statement are alleged to be false. A forward-looking statement, for instance, whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision." *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019). The statements were misleading for what they stated about present fact. For instance, Lafair's statement at the January 11, 2022 Needham Conference was misleading for claiming that "we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends, customer growth, dollar net retention that we're able to model out" when in reality CS Disco's revenues at that time were being positively affected by historically atypical large Review projects. ¶54. Similarly, Lafair's statement on the May 12, 2022 earnings call referred to Defendants' then-present insight into annual revenues, which was misleading because of the inherent unpredictability of one off Review projects. ¶68. Defendants' reliance on authority from the Ninth Circuit on the scope of forward looking statements cannot override the Fifth Circuit's binding authority.

10

In addition, the Safe Harbor is wholly inapplicable to statements made at the Needham Conference because they were wholly unaccompanied by meaningful cautionary language. Oral statements can only qualify for the safe harbor, among other requirements "if (i) the statement is accompanied by a cautionary statement that the 'particular' oral statement is forward-looking and that actual results could differ materially" and "(ii) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document". *Southland Sec. Corp. v. INSpire Ins. Sols.*, Inc., 365 F.3d 353, 372 (5th Cir. 2004). Nowhere in the transcript provided by Defendants for the Needham Conference does any such language appear. See Dkt. No. 54-1, pp 123-136.

### b.  Defendants' Risk Disclosures Were Inadequate

Defendants' argument that their statements were not materially misleading in light of their supposed risk disclosures is meritless, because Defendants nowhere disclosed that their revenues could be materially affected by the termination of a low single digit number of review projects. *McNulty* is distinguishable in that it related to purely forward-looking statements about the company's future cash needs that was coupled with meaningful warnings. *McNulty v. Kanode*, No. A-13-CV-026-LY, 2013 WL 12077503, at *11 (W.D. Tex. Nov. 6, 2013). The court found the statement "our cash needs will not be significant, but we do anticipate we need to balance the foundation of the Company and probably do a modest offering in the future, which we intend to do" not misleading because the company's SEC filings fully warned investors of the company's financing needs. *Id.* Here, Defendants seriously understated the risks posed to CS Disco by their reliance on a small, single digit number of individual review projects. Defendants point to statements that "the expansion of customers who use Review" and "Accelerated adoption of DISCO Review" contributed to revenue growth, but these statements neither were phrased as warnings of risk nor made clear that the "accelerated adoption" took the form of large one-off

11

reviews by very few customers, as opposed to adoption of many smaller reviews or adoption by many customers. Their statement that adoption of Review could double or triple a given customer's spend gave no notice that the spend was concentrated in a single matter or that a small number of such customers were contributing so much to revenue. The risk disclosure "[o]ur business depends on customers increasing their use of our solution and any loss of customers or decline in their use of our solution could harm our business" is too generic to be meaningful – it is hard to imagine any company that would not suffer from the loss of customers or decline in customer use of products. Nor are Defendants disclosures that DISCO's top 20 customers contributed a large amount of revenue adequate where Defendants misled investors into believing that its' top customers' spend is stable and spread across a large number of matters, rather than unstable and concentrated in a small number of matters.

Nor is *Fastly* on point. *Fastly* found risk disclosures adequate when they disclosed that 30% of its revenue was at risk by potential sanctions on Chinese companies who were their customers, but did not disclose specifically that the company in question was TikTok. *In re Fastly, Inc. Sec. Litig.*, No. 20-CV-06024-PJH, 2021 WL 5494249, at *12 (N.D. Cal. Nov. 23, 2021). Plaintiff does not complain that Defendants failed to identify the specific customers that had large review matters, but that they misled investors into believing that any risks from customers reducing their spend was spread across a large number of matters, not a few large matters.

### c.    Defendants' Code of Conduct Was Misleading

CS Disco's Code of Conduct, which was hosted on CS Disco's website throughout the class period, was materially misleading because its CEO's actions ran flagrantly afoul of that code throughout the class period. Where "Code of Ethics specifies practices the company purports to adopt or that purport to reflect the current state of the company, as opposed to aspirational statements, these statements are actionable" *Nykredit Portefolje Admin. A/S v. Propetro Holding*

12

*Corp.*, No. MO:19-CV-217-DC, 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021). CS Disco's code of conduct prohibited harassment and discrimination, stated that violations will not be tolerated, and identified consequences. ¶¶70-71. Nonetheless, Camara, CS Disco's CEO, repeatedly harassed employees, and his conduct was tolerated, rendering the code misleading.

Defendants challenge the Complaint's allegations that Camara engaged in harassment by calling into question the source of the allegations – an article from the Wall Street Journal. Courts routinely credit allegations in reputable media sources as sufficiently reliable to accept as true in PSLRA cases. *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *2 (crediting allegations of falsity derived from CNBC report as it is a reliable source). *Vale* is distinguishable. In *Vale,* plaintiffs relied on a purportedly false statement attributed to Vale in a Wall Street Journal article, which the court found insufficiently specific under Rule 9(b) because it failed to identify the actual speaker. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017). Nor was the Wall Street Journal's article unreliable for inadequate sourcing. Defendants attempt to argue the contrary in reliance on *Optionable*, but in that case plaintiffs cited two articles, one that cites no source for its description of the contents of a report prepared by the accounting firm Deloitte, and another attributing it merely to "a source familiar with the report." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008). Here, by contrast, the Wall Street Journal identifies allegations from several eyewitness current or former employees. ¶47. Nor does their reliance on *Miller* afford a different conclusion. *Miller* does not address the particularity with which a media report describes its sources, but instead holds that the misconduct outlined in that media source must be described with particularity. *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007). And the Wall Street Journal article provided specific details of Camara's misconduct. It describes Camara, at a September 6, 2023 happy hour at Peacock Mediterranean Grill, thrusting roast meat into the face of a young employee. It described Camara groping a woman and trying to

13

cajole her to return to his condo. It described Camara demanding to see photos of female receptionists before hiring them. It described inappropriate conduct towards members of the Emerging Leader Rotational Program, including Camara threatening to fire employees who would not drink or smoke cigars with him.

Next, Defendants attempt to argue that the Code of Conduct is too aspirational to be actionable. But their cases are distinguishable from this one on their facts. *Plains All American* is distinguishable because the statements in the code of conduct merely referred vaguely to the company's commitment to safe and environmentally responsible operations and included no specifics about prohibited conduct or the consequences for violating that prohibition. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 624 (S.D. Tex. 2018). *Jacobowitz* similarly involves vague statements about the company being committed to following the law. *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 681 (N.D. Tex. 2022). *HP* referred only to a refusal "to tolerate harassment" without any reference to the consequences of misconduct. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1273 (9th Cir. 2017). *Lopez* similarly involved statements less specific than those here. *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28-29 (S.D.N.Y. 2016). And one court in this District distinguished *Bondali*, finding it inapplicable where the code of conduct created a concrete prohibition against share pledges. *Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, No. MO:19-CV-217-DC, 2021 WL 9037758, at *23 (W.D. Tex. Sept. 13, 2021) *citing Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015). The Code is therefore actionable.

Defendants also complain that the Complaint does not allege when the Code of Conduct first appeared on the website. But courts have found that a complaint successfully alleges the falsity of a statement on a website when the statement appeared on the website throughout the class

period. *In re Terravia Holdings, Inc. Sec. Litig.*, No. 16-CV-06633-JD, 2020 WL 553939, at *5 (N.D. Cal. Feb. 4, 2020); *see also In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. At 585 (finding defendants liable for fraud stemming from "security statement" on company website where defendants kept statement on website after learning of breach.).

### 2.  The Complaint Alleges a Strong Inference of Scienter

The PSLRA requires a complaint to allege facts giving rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). But the PSLRA "was not enacted to raise the pleading burdens ... to such a level that facially valid claims … must be routinely dismissed." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation … meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). "[A] plaintiff … must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" *Lormand*, 565 F.3d at 250 (citing *Tellabs*, 551 U.S. at 328). The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 251 (quoting *Tellabs*, 551 U.S. at 324).

The Complaint need not establish knowledge. "[C]onduct that is severely reckless satisfies" scienter. *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (defining recklessness as "extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.")).

### a.  Defendants Knew or Recklessly Disregarded That The Growth Statements Were False or Misleading When Made

The Complaint adequately alleges scienter because Defendants and the Company knew, or

15

recklessly disregarded, facts suggesting that their statements regarding revenue growth swere false and misleading when made. "Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at \*10 (E.D. Tex. June 16, 2004) (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432–33 (5th Cir. 2002)).

Here, Lafair and Camara held themselves out as knowledgeable about the company's sales pipeline and their customers' use of their product. Lafair stated on January 11, 2022 that "we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends, customer growth, dollar net retention that we're able to model out also sales rep productivity. So, we feel really good about our kind of annualized. I've been here for almost four years and our ability to project on an annualized basis is actually really, really good." ¶54. Camara also stated that "we obviously internally have deep bottoms-up forecasting insights, where our customer success teams and sales teams have deep relationships with our clients. We have telemetry that gives us insight into the legal matters going on into the platform, and we use all of that to form a picture that gives us visibility and confidence in how the legal needs and the resulting data of our clients to change over time." ¶33. Defendants' self-professed knowledge of the subject matter of the misstatements supports an inference that they well aware that they were false. *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d at 584 (where "Plaintiffs plead that Brown held himself out as a responsible and knowledgeable authority regarding SolarWinds' cybersecurity measures", this supported an inference of scienter as to Brown regarding a security breach).

In addition, the allegations in the Complaint derived from confidential witnesses further support a strong inference of scienter. The Fifth Circuit has adopted the Second Circuit's holding

16

in *Novak* that, to plead a strong inference of scienter relying on confidential sources, "there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. " *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002) *quoting Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). FE-3, as a former Vice President of Review sales, was well positioned to know the state of the Review pipeline. Lafair touted the sales team's deep relationships with clients as a key source of their knowledge. According to FE-3, both Lafair and Camara regularly attended meetings regarding sales metrics. ¶45. Defendants argue that this is not supportive of scienter because FE-3 described specifically one meeting in February 2022 where FE-3 discussed the fact that Review revenue would be drying up, and that this meeting was after all but one of the false statements alleged in the Complaint. But this misses the point. The fact that Lafair and Camara regularly attended sales meetings where their sales pipeline was discussed in specific detail put them on notice of the fact that sales were highly dependent on spiky review revenue. *In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009 WL 6325540, at *38 (S.D. Tex. July 9, 2009) (CW allegation that defendant attended meeting where subject matter of fraud was discussed contributed to inference of scienter).

Defendants also argue that confidential witness allegations are per se unreliable. This runs directly counter to *Tchuruk*. Defendants' reliance on "confidential witnesses who do not relate any interaction with" the individual defendants, but FE-3 described just such interactions. *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019). Nor can the Seventh Circuit's dictum in *Baxter International* undercut *Tcheruk*'s binding holding. Moreover, when the Seventh Circuit actually squarely addressed the reliability of confidential witnesses in giving rise to a strong inference of scienter, it too adopted the standard in *Novak*.

17

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008).

In addition, Defendants' argument that their disclosure of risks belies any inference of scienter is meritless. In the first place, as set forth in section III.A.I.b above, those risk disclosures were inadequate. In *Pier 1* and *Diodes*, defendants warned investors about the exact problem that was supposedly concealed. *Pier 1 Imports, Inc.*, 935 F.3d at 437; *Local 731 IB of T Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958 (5th Cir. 2016).

**b.      The Complaint Alleges Scienter Regarding the Code of Conduct**

Defendants make the bizarre argument that the Complaint failed to allege scienter as to the code of conduct allegations, despite the fact that they concern his own conduct. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013) ("Finding scienter where the defendant "obviously knew of his own conduct"); *see also S.E.C. v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *11 (S.D. Tex. Oct. 7, 2015) (granting S.E.C. motion for summary judgment in fraud action where misstatement concerned defendant's conduct). Camara cannot seriously contend that he thought that groping a female employee, demanding to see pictures of female, but not male employees before hiring them, and pressuring young employees to drink with him with threats to fire the employees if they didn't do things Camara's way, complied with the code of conduct. ¶47. *Fleming* bears no resemblance to this case. In *Fleming*, the court found a lack of scienter where defendants had no reason that pending litigation was material and therefore should be disclosed. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263 (10th Cir. 2001). This has nothing to do with whether a defendant's conduct violated the company's policies. *Gamboa v. Citizens, Inc.* is distinguishable because there, Defendants' disclosure of significant *negative* information undercut scienter, a fact not present here. No. A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018).

Similarly, the inference of scienter as to Lafair is straightforward. The WSJ article noted

18

that a CS Disco employee contacted the company's ethics hotline requesting an investigation into Camara's treatment of young female employees, and that the company's "finance chief" (Lafair) reviewed the materials, and that the matter was taken sufficiently seriously that outside counsel was retained. *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) ("[I]f a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter.").

<strong>c.   Defendants' Motive to Commit Fraud Further Supports a Strong Inference of Scienter</strong>

The Complaint alleges that Lafair and Camara's stock sales support scienter by showing their motive for fraud. Motive allegations are properly considered alongside other allegations of scienter. *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015). Even if allegations of Defendants' motives do not suffice by themselves to show scienter, they contribute to the holistic analysis of the allegations. *See also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684-85 (5th Cir. 2014) (motive allegations "might meaningfully enhance the strength of the inference of scienter," but are not necessary). Stock sales made shortly after false statements raise an inference that the seller aimed to pump up the company's stock price through his misstatements. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015). Stock sales made shortly before a corrective disclosure raise an inference that insiders are trying to cash out before the truth comes out. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999). The Complaint alleges that Camara and Lafair had motive and opportunity to commit fraud based on their stock sales in a September 2021 secondary offering. Specifically, Camara sold 707,069 shares for total proceeds of over $36 million. ¶84. Lafair sold 66,724 shares for total proceeds of over $3.4 million. ¶85. Lafair sold an additional $7.2 million worth of stock throughout the class period, including $1.4 million on August 11, 2021, just prior to disclosing reduced guidance. ¶85. And the

19

timing of those sales was suspicious, as the secondary offering took place just weeks after Defendants made false statements on their September 2, 2021 earnings call. ¶50.

Defendants point to Lafair's 10b5-1 plan as negating the inference of scienter from his suspiciously timed stock sale, but they disregard the Fifth Circuit's holding that a 10b5-1 plan cannot negate the inference of scienter from suspiciously timed stock sales unless the Form 4 disclosing the plan also includes the date of the plan. *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019). Defendants' other arguments fare no better. *Match Group* specifically noted that alleging that the stock sales were out of line with prior trading practices was not a per se requirement, merely that in the specific context of that case, "the allegedly suspicious insider sales would otherwise be asserted in a vacuum". *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 600 (N.D. Tex. 2021). And *Shaw Group* did not hold that stock sales did not contribute to a strong inference of scienter because they were below market peak, it merely questioned plaintiffs' characterization that $20 below peak was actually "near" the peak. *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543 (5th Cir. 2008). Defendants also argue that Lafair's increase in holdings during the class period negates any inference of scienter, but they disregard the fact that these were due to the exercise of options Lafair received as compensation, not voluntary purchases.

### B.    The Complaint Adequately Alleges Control Person Claims

Defendants do not contest that they are control persons of CS Disco, merely that, because they assert there is no underlying violation, there is therefore no control person liability. But because, the Complaint alleges a primary violation, the Complaint alleges control person liability.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. To the extent the Court grants the motion, Plaintiff requests leave to amend. Fed. R. Civ. P. 15(a).

Dated: July 8, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com

*Lead Counsel for Plaintiff*

-and-

**KENDALL LAW GROUP, PLLC**
Joe Kendall
Texas Bar No. 11260700
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Phone: (214) 744-3000
Fax: (214) 744-3015
Email: jkendall@kendalllawgroup.com

*Liaison Counsel for Plaintiff*

**SCHALL LAW FIRM**
Brian Schall (*pro hac vice* application forthcoming)
2049 Century Park East, Ste. 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
brian@schallfirm.com

*Additional Counsel to Lead Plaintiff*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2024, a true and correct copy of the foregoing document was

served on all counsel of record registered via the Court's CM/ECF electronic filing system.

/s/ Jonathan Stern

Jonathan Stern

22