**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| LYNN GAMBRILL, on behalf of herself and all others similarly situated, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 1:24-cv-00028-RP |
| CS DISCO, INC., KIWI CAMARA, and MICHAEL LAFAIR, | § § § § | |
| *Defendants*. | § § | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

TO THE HONORABLE ROBERT L. PITMAN:

**I.    Introduction and summary.**

Plaintiff's Opposition confirms that he fails to state a securities fraud claim.  He does not argue Defendants made any false statements of fact.  Rather, he claims that their true statements were rendered misleading by the omission of additional information.  But Plaintiff fails to meet the high standard for pleading such claims under Rule 9(b) and the PSLRA.

First, in an effort to defend his Growth Theory, Plaintiff argues that Defendants misled investors by making accurate statements about DISCO's business, while not stating that its revenues were not "stable" or "predictable" because they were "concentrated in a small number of matters."  But DISCO repeatedly disclosed this exact risk, just in different words.  DISCO specifically disclosed that it relied on 10% of its customers for much of its revenue, and that those customers could disappear or reduce their usage of DISCO's products at any time and for any reason, given the unpredictable nature of litigation lifecycles.  Plaintiff thinks DISCO should have described the risk using the words "low single digit number of review projects," but the law does not require that level of granularity.  DISCO's robust, repeated disclosure of the risks its usage-

based business model – under which DISCO's revenue depended on how much each customer used each of its products each month – posed to investors was more than adequate to defeat Plaintiff's claim that its public statements were "misleading by omission."

Second, as to his Code of Conduct theory, Plaintiff admits that aspirational codes are not actionable, yet he fails to explain how or why DISCO's code – which did not state that all employees were always in compliance, nor that every violation would immediately be detected or remedied – was a false or misleading statement of fact when made. The anonymous, double-hearsay newspaper account of an alleged incident on which Plaintiff bases this theory cannot, as a matter of law, make DISCO's previously published code false or misleading by omission.

Finally, both of Plaintiff's theories also fail because he does not allege specific facts raising a "cogent and compelling" inference that the Defendants knew or were deliberately reckless in not realizing their true statements were somehow misleading investors.

This lawsuit is a baseless, hindsight effort to capitalize on a stock drop arising from decreased usage from large customers due to litigation volatility – a business risk DISCO had fully disclosed to its investors throughout the Class Period. The materialization of that risk is not fraud.

**II.     Plaintiff has failed to allege the requisite facts to support his liability theories.**

      **A.     Plaintiff's Growth Theory fails.**

Plaintiff claims that DISCO misled investors with statements about its "sources of rapid revenue growth" and statements that "annual revenues are readily predictable based on years of data," Opp. at 6, while allegedly failing to disclose that "recent revenue growth was actually driven by a small number of large, one-off Review[s]," and that "their revenues could be materially affected by the termination of [those] projects." *Id*. at 6, 11. This argument fails because Plaintiff does not claim DISCO's statements about revenues and customers were affirmatively false, and because DISCO repeatedly disclosed the risk of losing customers. DISCO warned investors that:

> We derive a substantial portion of our revenue from sales to our top 10% of customers. As a result, our revenue could fluctuate materially and could be materially and disproportionately impacted by purchasing decisions of these customers.

Declaration of Brett H. De Jarnette, Exhibit ("Ex.") 1 at 27; Ex. 8 at 6 (disclosing that each top 20 customer generated over $1 million, accounting for *at least* $20 million in 2021).

> DISCO also warned investors that such customers could stop usage at any time:
>
> any loss of customers or decline in their use of our solution could harm our business . . . *Customers may terminate or reduce their use of our solution for any number of reasons*, including the settlement or other resolution of legal matters, reductions in the volume of major legal matters experienced.

Ex. 1 at 21 (emphasis added).  Plaintiff thinks DISCO should have said its revenue could be impacted by a "low single digit number of review projects," Opp. at 11-12, but whether DISCO said "single digit," "top 20," "top 10%," or "small number," the overarching risk disclosed was the same:  much of DISCO's revenue came from a small number of customers who had the option to reduce their usage of DISCO's products at any time.[1]  *See McNulty v. Kanode*, 2013 WL 12077503, at *9-11 (W.D. Tex. Nov. 6, 2013).

Plaintiff tries to distinguish *McNulty*, arguing that the company in that case "fully warned investors of the company's financing needs."  Opp. at 11.  But the company only disclosed overarching risks about limited liquidity and debt accumulation, without specifically disclosing its plans to file for bankruptcy.  This omission did not make its statements actionable.  *Id.* at *9-10, 12.  Plaintiff also fails to distinguish *In re Fastly Inc. Sec. Litig.*, which dismissed securities fraud claims because the company disclosed the overarching risk of government bans of its customers; it was not required to disclose the specific fact that TikTok was its top customer which faced more government scrutiny.  2021 WL 5494249, at *2, 11, 19 (N.D. Cal. Nov. 28, 2021).  Nor does

---

[1] Financial analysts understood that DISCO "consistently communicated that the usage-based nature of its platform can and will result in revenue volatility" and that lower usage was "simply a natural outcome of existing reviews falling off and/or new ones not yet starting."  Ex. 12 at 1.

Plaintiff address *In re Intuitive Surgical Sec. Litig.*, which dismissed claims that the company should have disclosed more details about litigation risk because "the information the company did provide was entirely consistent with the more detailed explanation" that the plaintiffs argued should have been included.  65 F. Supp. 3d 821, 836 (N.D. Cal. 2014) (*citing Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1007 (9th Cir. 2002)).  As in *McNulty*, *Fastly*, and *Intuitive Surgical*, DISCO's disclosures were "entirely consistent" with risk posed by large Review customers, precluding its true statements from being considered "misleading by omission."

Plaintiff claims three of DISCO's statements "created the impression that CS Disco's revenue growth was stable and predictable, when in reality, its dependence on a small number of large Review matters made it anything but."  Opp. at 7.  This argument ignores DISCO's repeated disclosures stating the opposite – its reliance on a small number of large customers that could stop usage at any time.  When considered in context, as required, these statements cannot be considered misleading when made.  *Borderplex Inv. Partners v. Borderplex Realty Tr.*, 2017 WL 1738080, at *8 (W.D. Tex. Apr. 5, 2017) (dismissing complaint, noting that "courts must pay special attention to any other statements or circumstances that relate to the statement [being] analyzed").  The observation that each of DISCO's "customers goes through an adoption journey that has historically taken several years" did not create a false impression that there were no large Review projects, mature customers only had small matters, or that revenue was "stable and predictable."  Opp. at 7.  Nor did the observation that, as DISCO's customer base "grows, more of these specific customer [and] usage fluctuations washout in the aggregate," create the impression that growth was invulnerable to fluctuations from large Review projects.  *Id.*  Likewise, Plaintiff fails to allege facts showing that the nonspecific observation that "[p]eople, in general, have an ongoing and continuous spend on their legal department on legal services and that is the budget we tap into,"

DEFENDANTS' REPLY ISO MTN. TO DISMISS
NO. 1:24-CV-00028-RP

was false or misleading. *Id.* Large companies' legal departments unquestionably have large litigation budgets, and that is DISCO's market. DISCO did not guarantee it would ***receive*** "ongoing and continuous" revenue; only that it would "tap into" those budgets, which it does, while warning investors that the flow through those taps could be shut off, decrease, or increase at any time based on customers' changing usage of DISCO's products.

Plaintiff's cases about "growth drivers" reinforce this point, as the challenged statements in those cases were directly contradicted by the omitted information. For example, in *Sapssov v. Health Mgmt. Assocs., Inc.*, the company attributed growth to business initiatives, while failing to disclose that fraudulent billing practices drove growth. 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th Cir. 2015). In *In re Envision Healthcare Corp. Sec. Litig.*, the defendant misrepresented that growth was driven by strong customer service and quality care instead of the real reason – out-of-medical-network billing. 2019 WL 6168254, at *7-12 (M.D. Tenn. Nov. 19, 2019). In *In re Providian Fin. Corp. Sec. Litig.*, the company attributed growth to a "customer-focused approach" while not disclosing growth was driven by illegally charging fees. 152 F. Supp. 2d 814, 823–24 (E.D. Pa. 2001). Plaintiff alleges no such direct contradictions here.

Plaintiff argues that the challenged statements in *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005), were "distinct" from the omitted information, and therefore distinguishable from DISCO's. Opp. at 8. But the company's statements in *R2* about its debt obligations were more closely related to the omitted fact of its inability to pay those debts than were DISCO's statements about its revenue sources and the "omitted" reference to Review. *R2*, 401 F.3d at 642; *Brody*, 280 F.3d at 1006 (dismissing complaint, holding that failure to disclose merger discussions not misleading because the company did not "affirmatively intimate[] that no merger was

imminent."). As in *R2* and *Brody*, DISCO did not "affirmatively intimate" that it had no large Review customers or that it was invulnerable from usage fluctuations.

For the same reason, Plaintiff's argument that DISCO's statements about revenue projections were "misleading" because "the presence of large Review projects made revenues far less predictable than promised," Opp. at 8, fails. Whether DISCO warned of its reliance on large customers who used Review or large "Review projects" is a distinction without a difference; the overarching risk was the same. Projections were based on historical data and past accuracy, and DISCO did not promise investors that revenues would remain stable and predictable; Lafair specifically warned that revenue could "go the other way" than projected. AC ¶ 54.

*Azar v. Yelp, Inc.*, 2018 WL 6182756, *13 (N.D. Cal. Nov. 27, 2018) proves Defendants' point, as the company said a local advertising program had strong retention and was predictable, when in fact (unlike DISCO) the program had a poor retention and performance history. *Id.*

Contrary to Plaintiff's characterization, Lafair's expression of his confidence in DISCO's revenue projections were not "concrete factual" statements – it was, by definition, his opinion about predictions based on accurate historic data. Unlike *In re SolarWinds Corp. Sec. Litig.*, where the company repeatedly discussed cybersecurity measures and how it examined system logs while not disclosing that its server password had been stolen and was publicly available for over a year and half, 595 F. Supp. 3d 573, 580, 586–88 (W.D. Tex. 2022), Lafair's opinions could not create an impression of unwavering stability and predictability, especially considered in context of DISCO's disclosures about its business model.[2]

---

[2] Finally, Plaintiff ignores that Lafair's statement that "we have a lot of historical data ... that gives us a ton of insight into the trends ... that we're able to model out," Opp. at 10, describes "assumptions underlying" its revenue model, which are protected by the PSLRA safe harbor. §§ 78u-5(c)(1)(A)(i) & 78u-5(c)(1)(B)(i). Plaintiff does not allege that Lafair had "actual knowledge" that it "was not possible to meet the projection[s]" to avoid the safe harbor. *W. Pa.*

DEFENDANTS' REPLY ISO MTN. TO DISMISS
NO. 1:24-CV-00028-RP

**B.    Plaintiff fails to plead that DISCO's Code of Conduct was false or misleading.**

Plaintiff concedes that aspirational codes of conduct – like those stating that a company "refuse[s] to tolerate harassment," is committed to following the law, takes discrimination allegations seriously, and prohibits misconduct – are inactionable as a matter of law.  Opp. at 14. Plaintiff insists that DISCO's Code of Conduct is different, without explaining how or why.  *Id.* Nor can he, because DISCO's Code of Conduct, like those at issue in Defendants' cases, is aspirational; it makes no claim that all employees always comply with the code, but only that violations "will not be tolerated" and "***may*** be subject to disciplinary action."  AC ¶71 (emphasis added).  Plaintiff's only case, *Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758 (W.D. Tex. Sept. 13, 2021), is inapposite.  There, the company made "highly specific" "representations about . . . purported controls for avoiding conflicts," (not an aspirational code of conduct), when in fact it had no such controls, allowing the CFO to embezzle.  *Id.* at *3-4, 16-18.

Plaintiff's Code of Conduct theory also flounders on its single "source," double-hearsay, anonymous statements in a *Wall Street Journal* article that failed to describe how the anonymous sources had personal knowledge of their accusations.  "[S]hort, generalized statements of unnamed" sources are given little to no weight, as they are easily made and hard to rebut.  *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 873 (S.D. Tex. 2016).  Plaintiff concedes that *In re Vale S.A. Sec. Litig.* rejected allegations from an article because it "failed to identify the actual speaker," 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017), and this Court should do the same here.  Even if those anonymous allegations are credited, they focus on an incident that purportedly took place right before Camara resigned, well after the Code of Conduct was

---

*Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2018 WL 4524107, at *15-16 (D. Or. May 29, 2018).

**DEFENDANTS' REPLY ISO MTN. TO DISMISS**
**NO. 1:24-CV-00028-RP**

promulgated.  AC ¶47.  Indeed, Plaintiff's suggestion that this alleged misconduct led to Camara's resignation would confirm, not contradict, the effectiveness of DISCO's Code of Conduct.

### C. Plaintiff fails to plead particularized facts raising a strong inference of scienter.

Plaintiff fails to plead facts showing that DISCO made any false or misleading statements; therefore, he necessarily fails to plead facts showing that DISCO, Lafair, and Camara **_knew_** or **_were reckless_** as to any statement.  The Court's inquiry as to scienter can end here.

But even if DISCO's true statements could be considered "misleading by omission," Plaintiff has failed to allege the requisite scienter – that Defendants knew or were reckless as to whether the allegedly omitted information made DISCO's true statements misleading.  *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (Knowledge of a purportedly omitted fact "is not sufficient to demonstrate that the defendant *intentionally withheld* those facts from, or *recklessly disregarded* [their] importance [ ] to, a company's shareholders.").

***Growth Theory.***  Plaintiff's primary argument is that Camara and Lafair had access to sales and financial information.  Opp. at 16.  Of course they did.  But Plaintiff fails to allege particularized facts known by each Defendant at the time each challenged statement was made that contradicted their statements, let alone facts showing they believed the challenged statements were false or misleading when made, as required.  *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019) (affirming dismissal of claims for failure to allege "specific allegations that any Defendant knew of the falsity of any of the statements").  Plaintiff does not allege facts showing any Defendant believed (1) Review projects would unexpectedly end, (2) DISCO would need to reduce revenue guidance, or that (3) Defendants were misleading investors. Plaintiff's allegations cannot support a reasonable (much less strong) inference that Defendants intended to defraud investors, given the Company's robust warnings about large customers terminating usage at any time.  *See* Mot. at 17.

DEFENDANTS' REPLY ISO MTN. TO DISMISS
NO. 1:24-CV-00028-RP

Plaintiff claims "Former Employee 3" provided contradictory information to DISCO, but in the Fifth Circuit, "courts must discount allegations from confidential sources." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 433 (5th Cir. 2019). Further, Plaintiff does not allege facts showing that "Former Employee 3," a sales manager (not an account manager) was "in a position to be personally knowledgeable of" when *existing* reviews would end or the Company's overall financial projections. Plaintiff does not allege that "Former Employee 3" managed relationships with existing customers or tracked when existing reviews would end. Rather, Plaintiff alleges "Former Employee 3" tracked activities to generate future sales "related to the CS Disco salesforce over the preceding 90 days, including meetings with prospective customers . . . and opportunities for sales." AC ¶45.

But even if "Former Employee 3" did have personal knowledge, Plaintiff claims only that "Former Employee 3" made the vague prediction at a sales meeting[3] in February 2022 that Review sales "would miss its numbers" in March. *Id.*, ¶45. At the outset, this allegation lacks credibility because DISCO met or exceeded its revenue guidance in both Q1 and Q2 2022. Nor does Plaintiff claim that Lafair attended the meeting, even though he is the only Defendant who made a challenged statement after this meeting. *Id.*, ¶¶45, 68. Therefore, given that Plaintiff does not allege Lafair heard or learned of whatever alleged contradictory predictions "Former Employee 3" supposedly made, that anonymous source cannot support scienter as to any Defendant.

*Code of Conduct Theory*. Plaintiff does not effectively argue that any Defendant knew or believed the Code of Conduct was a false or materially misleading statement of fact. Mot. at 17. Plaintiff primarily relies on purported conduct that allegedly occurred in September 2023, days

---

[3] Courts reject allegations that defendants "regularly attended meetings." *See e.g.*, *Owens v. Jastrow*, 789 F.3d 529, 542 n.13 (5th Cir. 2015).

before the end of the Class Period and long after the Code of Conduct was published.  *See* AC ¶ 47.  Plaintiff does not explain how any supposed knowledge regarding events in September 2023 could support scienter for statements allegedly made months and years beforehand.  And Lafair's alleged investigation of a complaint against Camara shows that DISCO took employee complaints seriously, even against its founder and CEO.  *See Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.* 964 F. Supp. 2d 1128, 1134, 1141, 1146 (N.D. Cal. 2013) (no scienter even when policy was allegedly violated).

*Stock Sales*.  Plaintiff acknowledges that stock sales "do not suffice by themselves to show scienter," while claiming that Camara and Lafair's stock sales support an inference that they intended to defraud investors.  Opp. at 19.  He ignores the context of those sales.  Sales in a secondary offering after an IPO raises the innocent inference that "the [executive] sold stock ... to take a profit on some of his newly acquired shares." *Ind. Elec. Worker's Pension Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 543 (5th Cir. 2008).  Nor does Plaintiff address the fact that Camara and Lafair only sold 15.1% and 9.5% of their holdings in the secondary offering, respectively, which is too little to raise a strong inference of scienter.  *Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th Cir. 2001) (sales of 17% and 98% insufficient to raise an inference of scienter).

Nor can Lafair's subsequent August 11, 2022, share sale raise an inference of scienter.  He sold only a small percentage of his holdings that day (less than 10%); he sold them at 57% below the Class Period high (~$29.50 versus ~$69.50 per share); his sales were pursuant to an automatic 10b5-1 trading plan; and he increased his holdings during the Class Period.  *See* Exs. 15, 16.  Each of these undisputed facts alone undermines scienter; collectively, they preclude any "strong inference" of an intent to defraud investors.  *Ronconi*, 253 F.3d at 435 (sale of 17% does not support inference of scienter); *Shaw Grp.*, 537 F.3d at 544 (selling shares below the market peak

cuts against scienter); *Hopson, v. MetroPCS Commc'ns, Inc.,* 2011 WL 1119727, at \*14 n.14 (N.D. Tex. Mar. 25, 2011) (automated plan sales contrary to "an inference of suspiciousness"); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) (increases in holdings cut against scienter).

Finally, viewing Plaintiff's allegations holistically, as required, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007), the more compelling inference is not that each Defendant intended to defraud investors, but rather that they believed DISCO's statements were true and were not "misleading by omission," particularly in light of the company's robust disclosures about the risks posed by its customer base and litigation-dependent business model.[4]

## III.    Conclusion.

For these reasons, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

By:/s/  *Patrick E. Gibbs*
    Patrick E. Gibbs
    Admitted *Pro Hac Vice*
    pgibbs@cooley.com
    Brett H. De Jarnette
    Admitted *Pro Hac Vice*
    bdejarnette@cooley.com
    Cooley LLP
    3175 Hanover Street
    Palo Alto, California 94304-1130
    (650) 843-5000 (phone)
    (650) 849-7400 (fax)

---

[4] As stated in Defendants' Motion, absent a primary violation of Section 10(b), there is no control person liability under Section 20. *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at \*14 (S.D. Tex. Sept. 29, 2010).

DEFENDANTS' REPLY ISO MTN. TO DISMISS
NO. 1:24-CV-00028-RP

Peter D. Kennedy
Texas Bar No. 11296650
pkennedy@gdhm.com
Hailey L. Suggs
Texas Bar No. 24113497
hsuggs@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5764
(512) 480-9908 (Fax)

**Attorneys for Defendants**


## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing document

was served on all counsel of record registered via the Court's CM/ECF electronic filing system.


*/s/      Peter D. Kennedy*
Peter D. Kennedy