IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LYNN GAMBRILL, on behalf of herself and all others similarly situated, | § | No. 1:24-CV-28-DAE |
| | § | CLASS ACTION |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| CS DISCO, INC., KIWI CAMARA, and MICHAEL LAFAIR, | § | |
| | § | |
| Defendants. | § | |

ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE; (2) GRANTING MOTION FOR JUDICIAL NOTICE; AND (3) CANCELLING HEARING SET FOR FEBRUARY 14, 2025

Before the Court are Defendants' CS Disco, Inc. ("Disco"), Kiwi Camara ("Camara"), and Michael LaFair ("LaFair") (collectively, "Defendants"): (1) Motion to Dismiss filed on May 10, 2024 (Dkt. # 54); and (2) Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Dkt. # 55). The Court finds a hearing on these matters is not necessary and thus **CANCELS** the hearing in this case set for February 14, 2025. After careful consideration of the memoranda filed in support of and in opposition to the Motion, the Court, for the reasons below, **GRANTS IN PART** and **DENIES IN**

**PART** Defendants' motion to dismiss and **GRANTS** the motion for judicial notice.

BACKGROUND

This case concerns a securities class action lawsuit brought against Disco and Disco former Chief Executive Officer ("CEO") Camara, and current Chief Financial Officer ("CFO") LaFair ("Individual Defendants"). On March 8, 2024, Lead Plaintiff Bert W. Pluymen and additional plaintiffs Lynn Gambrill and Bert Pluyman (collectively, "Plaintiffs") filed a Class Action Complaint on behalf of persons and entities that purchased shares of Disco's common stock between July 21, 2021, and September 11, 2023, inclusive (the "Class Period"). (Dkt. # 53.)

Plaintiffs allege securities fraud claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Id. ¶¶ 101–10.) Plaintiffs also bring claims for control person liability against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Id. ¶¶ 111–16.)

I. The Company

Disco provides ediscovery services mainly to law firms and corporate clients. (Dkt. # 53 at ¶ 3.) It has three principal lines of business:

(1) "Ediscovery," a platform for collecting and reviewing documents; (2) "Review," a service whereby Disco, relying on machine learning, conducts review projects for law firms and clients; and (3) "Case Builder," which allows attorneys to organize documents and evidence. (Id.) Disco was founded by Camara in 2013 and is headquartered in Austin, Texas. (Id. ¶ 23.) Camara served as CEO of Disco until his resignation on September 11, 2023. (Id. ¶ 16.) LaFair is, and was at all relevant times in this suit, Disco's CFO. (Id. ¶ 17.)

On July 21, 2021, Disco completed an initial public offering ("IPO") of its common stock pursuant to a Registration Statement on Form S-1. (Dkt. # 53 at ¶ 24.) In the IPO, the company sold an aggregate of 7,500,000 shares of common stock, including 500,000 shares issued pursuant to the underwriters' option to purchase additional shares at a public offering price of $32 per share. (Id.) Thereafter, on September 17, 2021, Disco completed a second public offering ("SPO") of its common stock pursuant to a Registration Statement on Form S-1. In the SPO, selling stockholders sold an aggregate 6,050,000 shares of common stock, including 550,000 shares sold pursuant to the underwriters' option to purchase additional shares at an offering price of $53 per share. (Id. ¶ 25.) According to the amended complaint, this "secondary offering allowed corporate insiders including Camara to offload millions of dollars of stockholdings to the public." (Id.)

In September 2021, LaFair explained in an earnings call that Disco relies on a usage-based revenue model wherein customers pay the company based on their actual usage of Disco, as opposed to a flat monthly fee or annual subscription. (Dkt. # 35 at ¶ 28.) LaFair thus clarified that Defendants could not report on traditional software as a service metric that analysts typically use to judge growth of subscription-based companies, such as total billings; instead, Disco focuses on "attention on total revenue growth." (Id.)

II. The Class Period

Plaintiffs' complaint alleges that throughout the class period, Disco announced large revenue growth and that it consistently beat its earnings projections. (Dkt. # 53 at ¶ 31.) For instance, on September 2, 2021, Plaintiffs allege that Disco announced that its revenue was up 88% for that second quarter from the second quarter of 2020. (Id.) Additionally, Plaintiffs allege that Disco later announced the following growth for each of the next few quarters: (1) the third quarter growth was up 67% from the previous year's third quarter; and (2) the fourth quarter growth was up 76% from the previous fourth year's quarter. (Id.) Thereafter, on May 12, 2022, Disco announced $34.5 million in revenue from the first quarter of 2022, revising upwards it annual revenue guidance to $149—$153 million. (Id.)

As the basis for its growth, Plaintiffs allege that Defendants explained that their Review product added significantly to their revenue growth. (Dkt. # 53 at ¶ 32.) Additionally, Plaintiffs allege that Defendants specifically denied, when asked by analysts, that their rapid revenue growth and overperformance of guidance were attributable to a small number of large matters. (Id. ¶ 33–35.) However, according to Plaintiffs, in reality Disco's "outsized revenue performance and earnings beats throughout the Class Period were attributable to a small number of large Review projects—projects that Defendants knew were, by definition, of limited duration." (Id. ¶ 36.) Plaintiffs contend that as those projects came to an end in the second quarter of 2022, Disco had to revise its 2022 projections downward, projecting a decline of $17 million. (Id.)

To support its allegations, Plaintiffs allege that three former Disco employees confirmed that the company's product was concentrated in a small number of matters, and that Disco had lost business around the summer of 2022 from a handful of clients whom Disco had been handling large Review projects. (Id. ¶ 37–39.) One former employee stated that the revenue from these Review projects was not sustainable, and that it was difficult to find new Review clients "because []Disco had a very untraditional way of selling them." (Id. ¶ 40–42.) According to the former employee, "[o]ther companies sold Review projects on an hourly basis, whereas []Disco charged a flat fee based upon the total number of

documents," and that Disco's "clients were paying based upon the total document population, not the number of documents that were actually going to be reviewed." (Id. ¶ 42.) According to the complaint, "[t]his was difficult for clients to understand and caused issues with some of the clients when []Disco was trying to negotiate with them." (Id.) A former employee stated that during a "metrics call" in February 2022, the employee "made clear" that the Review business "would miss its numbers starting in March 2023," and that although he could not recall if LaFair or Camara were on that specific call, "he did recall having discussions in the ensuing weeks, including with Camara regarding 'the lull in the Managed Review Business.'" (Id. ¶ 45.)

III. Harassment and Discrimination Allegations

Plaintiffs further allege that, in addition to Disco's failing Review business, "the company was hiding a darker secret." (Dkt. # 53 at ¶ 46.) On September 10, 2023, Camara abruptly resigned as CEO of the company, causing its shares to plummet and leaving investors "baffled." (Id. ¶ 47.) On September 20, 2023, the Wall Street Journal reported that Camara resigned "after the small company's board began investigating allegations that he groped a young female employee," at a September 6, 2023 dinner with staff. (Id.) Plaintiffs allege the article revealed a pattern of harassment and misconduct that Camara engaged in on

multiple occasions, including inappropriate conduct, culminating in the September 6, 2023 staff dinner. (Id.)

IV. Current Suit

On September 19, 2023, Plaintiffs originally filed their Class Action suit for Violations of the Federal Securities Laws against Defendants in the Southern District of New York. (Dkt. # 1.) On January 8, 2024, pursuant to the parties' Joint Stipulation, the case was transferred to the Austin Division of the Western District of Texas. (Dkt. # 34.) On March 8, 2024, Plaintiffs filed their amended securities class action complaint. On May 10, 2024, Defendants filed the instant motion to dismiss Plaintiffs' amended class action complaint. (Dkt. # 54.) On July 8, 2024, Plaintiffs filed their response in opposition (Dkt. # 57); on August 12, 2024, Defendants filed their reply (Dkt. # 63).

Additionally, on May 10, 2024, Defendants filed a Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of their motion to dismiss. (Dkt. # 55.) On July 8, 2024, Plaintiffs filed a response in opposition (Dkt. # 58); on August 12, 2024, Defendants filed their reply (Dkt. # 62).

# LEGAL STANDARD

## I. Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## II. Rule 9(b) and the Private Securities Litigation Reform Act

When "the complaint involves an allegation of fraud," Rule 9(b) requires the complaint to plead "with particularity the circumstances constituting fraud." Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 956 (5th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). The Private

Securities Litigation Reform Act ("PLSRA") "has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." Id. (citing Ind. Elec. Workers' Pension Tr. Fund. IBEW v. Shaw Grp., Inc., 537 F.3d 527, 533 (5th Cir. 2008)). "First the plaintiff must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." Id. (quotation omitted). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." Id. (quotation omitted).

## DISCUSSION

Defendants contend that Plaintiff's amended complaint fails to state a claim for relief and should be dismissed because it falls short of the PSLRA's heightened pleading requirements, mischaracterizes Disco's public statements, ignores the context surrounding those statements, and improperly relies on hindsight. (Dkt. # 54.) Among others, Defendants argue that Plaintiff does not allege that Disco made any false statements of fact, only that Disco's "accurate public statements were rendered misleading by not disclosing additional information." (Id. at 2.)

I. Section 10(b) of the Securities Exchange Act of 1934

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R § 240.10b–5(b). While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. R2 Invs. LDC v. Phillips, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); see also Dura Pharm., 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)). The Fifth Circuit has explained that:

a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and [the Private Securities Litigation Reform Act]:

> (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the representation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

Neiman v. Bulmahn, 854 F.3d 741, 746 (5th Cir. 2017) (alterations omitted) (quoting Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003)).

A. Actionable Misstatements or Omissions

To be actionable, a misrepresentation or omission of a fact must be objectively material. See Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 568 U.S. 455, 467 (2013) ("[T]he question of materiality . . . is an objective one[.]" (internal quotation marks omitted)). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic v. Levinson, 485 U.S. 224, 231–32, 194 (1988) (quoting TSC Inds., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); see also Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 362 (5th Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." (internal quotation marks omitted)). The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders. Kapps v. Torch Offshore, Inc., 379 F.3d 207, 216 (5th Cir. 2004).

The Supreme Court has been "careful not to set too low a standard of materiality for fear that management would bury the shareholders in an avalanche of trivial information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." Lormand v. US Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009). There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not, material. See Matrixx Initiatives, 563 U.S. at 49. Instead, determining materiality is a "fact-specific inquiry . . . that requires consideration of the source,

content, and context of the allegedly omitted information." Id. at 44 (internal quotation marks and citation omitted); see also Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir.b1994). ("[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." (internal quotation marks and footnote omitted)).

Here, Plaintiffs allege that that Defendants made materially false and misleading statements related to Disco's vulnerability of revenues to Review matters, and Camara's pattern of harassment and discrimination. (Dkt. # 53 at 18–23.)

1. Vulnerability of Revenues to Review Matters

Plaintiffs allege Defendants made several misstatements related to the vulnerability of Disco's revenue to Review matters during the Class Period:

a. In July 2021, the company filed a Form 424B4 in connection with its IPO that stated Disco's "revenue growth depends in part on the success of our strategic relationship with law firms and other legal services providers."

b. In a Form S-1 the Company filed on September 13, 2021, signed by Defendants Lafair and Camara, Disco again referred to its recent rapid growth, and its "focus[] on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

c. In a Form 10-Q for the quarter ending September 30, 2021 filed on November 10, 2021 and signed by Defendants Camara and Lafair, the Company repeated that it had experienced "rapid growth in recent periods," and again attributed its success to its "focus[]on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

d. On February 25, 2022, the Company filed its Form 10-K for fiscal year ended December 31, 2021, signed by Defendants Camara and Lafair,

reasserting that in recent periods it had experienced "rapid growth" and that it "focused on acquiring new customers and driving continued use and increased usage of our solution for existing customers."

e. In a Form 10-Q financial report for the period ending June 30, 2021, filed on September 3, 2021, and signed by Camara and LaFair, Disco stated that it had been experiencing "rapid growth" and noted its "go-to market strategy is focused on acquiring new customers and driving continued used and increased usage of our solution for existing customers."

Plaintiffs contend these statements were misleading because they failed to disclose to investors that its revenue growth was contingent on a small number of large Review projects. (Dkt. # 53 at 18–22.) However, in moving to dismiss, Defendants assert that Plaintiffs fail to argue that these statements were false, only that they were rendered misleading by omission. (Dkt. # 54 at 9.) Defendants assert that none of these challenged statements even address Review, let alone minimize its contribution to Disco's revenue growth. (Id. at 10.)

"To determine whether a statement constitutes a misrepresentation, the Court must view the statement in the context in which it was made." McNulty v. Kanode, No. A-13-CV-026-LY, 2013 WL 12077503, at *5 (W.D. Tex. Nov. 6, 2013) (citation omitted). Defendants have attached to their motion to dismiss the complete versions of the relevant Forms in which Plaintiff alleges statements within them constitute misrepresentations.[1] (Dkt. # 54-1.) In the IPO, the

[1] Regarding its documents attached to their motion to dismiss, Defendants have also filed a Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of their Motion to Dismiss. (Dkt. # 55.)

Prospectus repeatedly informs investors about the risks in investing and the statements within address that Disco is subject to volatility among other significant risks. (Id. at 10–52.) Likewise, the September 13, 2021 Form S-1 states that "[o]ur business depends on customers increasing their use of solution and any loss of customers or decline in their use of our solution could harm our business," and also that "even if our customers expand their usage of our solution, we cannot guarantee that they will maintain those usage levels for any meaningful period of time." (Id. at 91.) The Form goes on to recognize that "[a] limited number of customers represent a substantial portion of our revenue," and that if the company "fail[s] to retain these customers, [its] revenue could decline significantly." (Id. at 92.) Additionally, the November 1, 2021 Form 10-Q reiterates in the "Risks Related to Our Business and Industry" section these same warnings. (Id. at 119.)

Considering Defendants' statements in context, the Court finds that Plaintiffs have failed to plead sufficient facts that demonstrate any falsity or

---

The motion is unopposed by Plaintiffs except for Exhibit 12, which is a Report published by Canaccord Genuity on August 11, 2022, titled "CS Disco: Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD." (Dkt. # 58.) Despite Plaintiffs' objection to this evidence, the Court will **GRANT** Defendants' motion for judicial notice (Dkt. # 55). In reviewing the document, the Court will only consider it for the purpose proffered by Defendants—"to show that Defendants' risk disclosures about large customers and concentrated usage being susceptible to the volatility of litigation pipelines were available prior to the August 11, 2022[] alleged corrective disclosure, not for the truth of the matter asserted." (Dkt. # 62 at 2.)

actionable omission of Disco's representations in each of these Forms. See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 541 (5th Cir. 2008) (stating that for an omission to be actionable it "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"). "When determining what has been disclosed, . . . it is wrong to treat each individual piece of information separately, as if it had no relation to the other pieces which surround it." Isquith v. Middle S. Util., Inc., 847 F.2d 186, 200 n.9 (5th Cir. 1988). Plaintiffs' allegations that Disco made misstatements or omissions in these Forms regarding a failure to disclose to investors that its revenue growth was contingent on a small number of large Review projects does not meet Rule 9(b)'s heightened pleading requirements. Plaintiffs have thus failed to plead sufficient facts that Defendants' statements in the Forms were false or omitted any material fact at the time it was made. Accordingly, the Court concludes that the statements above do not give rise to a claim of securities fraud, and Defendants' motion will be granted as to these statements.

Defendants next move to dismiss the following statements about growing usage and customer maturity from being considered securities violations:

f. On September 2, 2021, Camara and LaFair participated in an earnings call with investors for the second quarter of 2021, in which Camara stated in his opening remarks that

> A great example of what has driven the acceleration in growth this quarter is a well-known consumer brand that in Q4 of last year hired a new Deputy General Counsel to the major technology company that has been a longstanding DISCO customer. He ran a sole-source procurement for ediscovery when he started his new job, and between the fourth quarter of 2020, and the first quarter of 2021, his new company migrated their ediscovery program to DISCO Ediscovery. But in the second quarter of 2021, this company experienced a series of major legal issues that caused them to accelerate their adoption of our second product, DISCO Review. **So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend. That journey has historically taken our customary several years.**

g. During the same call, Camara responded to a question from an analyst that

> Sterling Auty, Analyst
>
> Yeah. Thanks. Hi guys, and welcome to the public markets. Maybe just to get kicked off, my first question would be about that large consumer customer that you mentioned and kind of your comments about the business model and the variability it can generate. What are some of the things that you're doing to drive increased usage to try to let's say smooth out some of the volatility that you might see from a single customer quarter-to-quarter?
>
> Kiwi Camara, Chief Executive Officer and Director
>
> **So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher five-figure customer grow to be a six-figure customer and then grow to be a seven-figure customer at maturity.** Over the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer. **Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.**

h. On January 11, 2022, Camara participated in the 24th Annual Needham Virtual Growth Conference, and responded to a question by the presenter, Scott Berg, as follows:

Scott Berg

Okay. Around the complexity question often comes a view point that customers use a platform like Disco for maybe a short time frame and then maybe on an infrequent basis, but for an average Fortune 1000 type customer that you might have, how many matters could they be managing concurrently? And is the typical usage of the Disco platform maybe weekly, monthly or something longer for these matters?

Kiwi Camara

**So, for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform** and I think Scott that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works. You take any one of these matters and we've got matters alive in our system; they date all the way back to 2013 the same way we have corporate customers, who have been continuous customers going all the way back to 2013. I think one good way to think about this is looking at companies spend on their own legal department or on legal services. While the nature of the legal matters that a company is exposed to may change from time to time and while unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that. **People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into.**

i. On the same call, Camara responded to another question:

Scott Berg

Is -- next question is on e-discovery, is expansion of e-discovery use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?

…

Kiwi Camara

**I would say there's not as much variance in the ultimate wallet size of the customer. So, like how big will the customer be when they get to maturity. But there's more variance in how quickly they get there.** So, over the last few earnings calls, right, we've talked about the extreme positive examples, where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that. And then there are also examples of customers that take four years, five years, even six years to get to their mature spend. **So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.**

Plaintiffs assert the above statements are misleading because they told investors that when customers increased their revenues to seven figures it represented a stable revenue source but in reality only several of its seven figure customers were driven by large Review projects. (Id. at 18–20.) Plaintiffs also allege that given the newness of large Review projects Disco lacked the ability to predict annual revenue accurately. (Id. at 20.) According to Plaintiffs, these statements were misleading because they failed to disclose that revenues were materially impacted by a small number of large Review matters that were not part of ongoing and continuous legal department spends. (Dkt. # 53 at 21–22.) Plaintiffs further argue these statements are misleading because they falsely told investors that customers reached a mature stable spend, when in reality several of its largest customers at that time were spending unusually high amounts on Disco's Review product due to the existence of unusually large litigation matters. (Id. at 22.)

In moving to dismiss Plaintiffs' claims, Defendants maintain these statements only generally observe that Disco experienced strong growth, customers vary in how long they take to reach maturity, and that legal department budgets are steady over time. (Id.) Thus, Defendants contend that none of these statements are inconsistent with some large Review projects contributing to growth. (Id.)

In response, Plaintiffs argue that by speaking about the drivers of customer spend growth, Defendants had a duty to disclose the full truth regarding that growth. (Dkt. # 57 at 13.) Regarding this, Plaintiffs contend that the reality of Disco's budget was not a normal and ongoing continuous expenditure by its clients as discussed in the statements above. (Id.) Therefore, according to Plaintiffs, the failure to disclose the true drivers of revenue growth is materially misleading. (Id.)

Again, the Court must review the statements in these calls in context to determine whether a reasonable investor could have found them misleading in light of the circumstances in which they were made. As mentioned, Defendants' statements in the Forms above advised investors of the risks, including the company's reliance on a small number of large customers that could stop their usage of Disco's products at any time. (Dkt. # 54-1 at 91–119.) Nevertheless, Plaintiffs have sufficiently alleged that while Camara's statements in these calls regarding "growth drivers" may be true insofar as "legal department budgets are steady over time," Camara's statements could be misleading if there is evidence that Disco's real revenue drivers were in fact only a handful of large Review projects. In such case, Camara's statements suggesting that any fluctuations in specific customer usage would "washout in the aggregate" could be false and misleading. (Dkt. # 53 at 19.) "Whether stated as an opinion or fact, a reasonable person could view the statements regarding the drivers of success as misleading for

omitting information regarding [one-off large Review projects] as a factor driving revenue." In re Envision Healthcare Corp. Secs. Lit., No. 3:17-cv-01112, 2019 WL 6168254, at *12 (M.D. Tenn. Nov. 19, 2019); see also Norfolk Cty Retirement Sys. v. Cmty Health Sys., Inc., No. 3:11-00433, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016), rev'd on other grounds, 877 F.3d 687 (6th Cir. 2017), ("once [defendants] put the topic of the cause of [their] financial success at issue, they were obligated to disclose information concerning the source of the success") (quotation omitted). Thus, as to this part of their securities claim, Plaintiffs have alleged sufficient facts that Camara's descriptions in the phone call that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers—were either false or misled investors if it is true that customer spending was actually spiky and driven by only a few large Review projects. (Dkt. # 57 at 14.) Defendants' motion is denied as to Plaintiffs' securities fraud claim based on these statements.

Plaintiffs next allege the following were material misstatements by LaFair regarding Disco's revenue projections. (Dkt. # 53 at 23.)

j. At the January 11, 2022, Needham Conference, Camara stated:

Scott Berg

Okay. Well, we're going to take a couple questions from the audience here. First question is, what level of visibility does the company have into annual revenues at the beginning of any year? Because you're in quiet period and you're not guiding to next fiscal year or anything. But just in general on a 12-month basis and the question is based on given the consumption-driven nature of the business, how should we think about that visibility?

Kiwi Camara

So, we've talked about this before in the past. **We feel fairly confident in our ability to project the revenue over an annualized basis. There's a lot of variability that we've talked about in the business that can impact quarter-to-quarter. But we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends, customer growth, dollar net retention that we're able to model out also sales rep productivity. So, we feel really good about our kind of annualized. I've been here for almost four years and our ability to project on an annualized basis is actually really, really good.**

Quarter to quarter, the variability of our business, it can go both ways. I mean you could have a case that's in our system and there could be a discovery motion and it could create a huge, huge uptick in business kind of at the end of the quarter that may impact the quarter and it could go the other way. A case could settle, the parties could settle, it could be a fairly large case and that could affect variability, **but the reality is all these clients have ongoing legal matters and one case may settle one particular quarter or there may be a large discovery motion that kind of increases it. But over the long term 12 month period, we feel pretty confident.**

k. On May 12, 2022, the Company held an analyst conference call to discuss First Quarter 2022 results. On that call, Lafair answered a question from an analyst:

> Koji Ikeda
>
> Hey, Kiwi. Hey, Mike. Thanks taking the questions here. A couple from me. First, okay, so the second quarter guide and just wanted to ask a couple questions here on that. When looking at it from a sequential basis, it's going to be – your guidance has being down quarter-over-quarter and that's similar to how you guided or initially guided to the first quarter when you -- on the fourth quarter call. So kind to understand the put and takes there, but just wanted to be sure, is there anything that we should be thinking about in the second quarter to call out? Is there anything seasonal? Is there any matters that have come off already off the platform that we should be thinking about? Any sort of help there and just kind of reconcile that quarter-over-quarter decline with the guide there.
>
> Michael Lafair, Chief Financial Officer
>
> Hey, Koji, it's Michael. Really great question. As you know, since we went public, we've actually guided down every single quarter sequentially. And part of that really has to do with the fact that we're a usage base model and on a quarter-to-quarter basis there can be variability in the numbers. **We're also very prudent in our approach to guidance as we've discussed many, many times. And we have raised our full-year guidance for the year. With really good visibility into the full year, we feel really confident about that number and that's kind of where we are with our guidance.**

Plaintiffs allege in their complaint that these statements are misleading because Disco's annual 2022 revenue projections were materially dependent on the continuation of a single digit number of large Review matters that by the time the statements had been made, the Review projects had already been terminated. (Id. at 23.)

Defendants move to dismiss on the basis that Camara's and LaFair's statements above about revenue projections were not misleading by omission because they did not create the impression that Disco did not have large Review projects that contributed to growth. (Dkt. # 54 at 11.) Instead, Defendants contend that the statements were simply optimism or positive statements. (Id.)

Additionally, Defendants assert that the statements are protected under the PLSRA's safe-harbor for forward-looking statements. (Id. at 11–12.)

In response, Plaintiffs argue that both statements were misleading because they failed to disclose that the presence of large Review projects made revenues far less predictable than promised. (Dkt. # 57 at 14.) In this way, according to Plaintiffs, Defendants projected an image of being able to reliably predict revenue growth, but the reality was different. (Id. at 16.) Plaintiffs further contend that the misleading statements are not properly described as forward-looking statements. (Id.)

A statement is inactionable if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). The Fifth Circuit has described the test for applying the safe-harbor provision as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." Southland, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward looking and accompanied by "meaningful cautionary statements" or (2) immaterial. Id. Under the second prong, the safe harbor protects a forward-

looking statement if the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading. Id.

A cautionary statement must "identify important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u–5(c)(1)(A)(i). This standard is "somewhat ambiguous given the variety of possible factual circumstances that could arise." In re Harman Int'l Indus., Inc., 791 F.3d 90, 101 (D.C. Cir. 2015) (citations omitted). The question is how to separate those disclosures that provide investors with "meaningful" and "important" information from those that are either too vague for an investor to find relevant or too specific to expect a reasonable issuer to identify as important. The case law is clear that while "cautions must be tailored to the risks that accompany the particular projections," the cautionary-statement requirement does not demand prescience. Asher v. Baxter Int'l Inc., 377 F.3d 727, 732 (7th Cir. 2004) (collecting cases). "[T]he cautions need not identify what actually goes wrong and causes the projections to be inaccurate." Id.

Both Camara's and LaFair's statements are forward-looking because they provide earnings projections or predictions about Disco's performance for the year. See Spitzberg v. Hous. Am. Energy Corp., 758 676, 692 (5th Cir. 2014). The question, then, is whether the forward-looking statements (1) included cautionary language; (2) were immaterial; or (3) were made without actual

knowledge that they were false or misleading. See 15 U.S.C. § 78u-5(c)(1). In viewing the conversation in context, Camara's statement includes cautionary language which follows the forward-looking statement that "[t]here's a lot of variability that we've talked about in the business that can impact quarter-to-quarter," and that "[q]uarter-to-quarter, the variability of our business, it can go both ways," and also warning that if a case ended up settling, "it could be a fairly large case and that could affect variability." (Dkt. # 53 at 19–20.) Additionally, LaFair's statement includes cautionary language in the sentence directly before that reiterates Disco's use of a "usage base model and [that] on a quarter-to-quarter basis there can be variability in the numbers." (Dkt. # 53 at 23.)

Given the above cautionary language, the Court finds both statements were accompanied by meaningful cautionary language that "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement." Azar v. Yelp, Inc., No. 18-cv-00400-EMC, 2018 WL 6182756, at *7 (N.D. Cal. Nov. 27, 2018) (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010)). The cautionary statements do not appear to be "a boilerplate litany of generally applicable risk factors," but were instead specific and tailored to Disco's usage-based model at the time. See Southland, 365 F.3d at 372 (determining a "meaningful" cautionary statement "calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable

to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors"); In re Harman Int'l Indus., Inc., 791 F.3d 90, 101 (D.C. Cir. 2015) (stating that cautionary statement must be tailored "to a particular company's status at a particular time"). Accordingly, the Court finds that the safe harbor applies to Camara's and LaFair's statements above and therefore Plaintiffs have failed to properly plead a securities fraud claim based on the statements in the calls.

Furthermore, even apart from the safe harbor, the Court finds that Camara's and LaFair's statements can be classified as generalized, positive statements about Disco's future prospects and are thus inactionable. "[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003). Defendants were "under no duty to cast its business in a pejorative, rather than a positive, light." Id.; citing Abrams v. Baker Hughes, Inc., 292 F.3d 424, 433 (5th Cir. 2002) ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance."); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1069 (5th Cir. 1994)). Thus, Defendants' motion to dismiss is granted as to these statements.

2. Pattern of Harassment and Discrimination

Plaintiffs also offer the following alleged misstatements related to Camara's Pattern of Harassment and Discrimination during the Class Period:

a. Throughout the Class Period, Disco maintained a copy of a Code of Conduct and Business Ethics on its website. It stated – in relevant part, regarding sexual harassment and discrimination:

> The Company is committed to providing a work environment free of any form of unlawful harassment or discrimination. The Company is committed to maintaining a respectful, courteous work environment that respects the dignity and worth of each employee. Inappropriate workplace behavior and unlawful harassment are wholly inconsistent with this commitment. No employee, contract worker,
>
> customer, vendor or other person who does business with this organization is exempt from the prohibitions within this policy.
>
> …
>
> You may not, while acting on behalf of the Company or while using our computing or communications equipment or facilities, either:
>
> …
>
> • commit any unlawful or illegal act, including harassment…..

b. Regarding its zero-tolerance policy for violation of the code, it also stated:

> Violations of this Code will not be tolerated. Any employee who violates the standards in this Code may be subject to disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

According to Plaintiffs, these statements were misleading because they failed to disclose that Camara was engaging in repeated harassment and discrimination, which had already been reported to the company's human

resources ("HR"), but Camara in fact faced no repercussions for his conduct. (Dkt. # 53 at 23–24.)

Defendants move to dismiss these alleged misstatements because Plaintiffs base their allegations on a single news article reporting improper conduct by Camara. (Dkt. # 54 at 14.) According to Defendants, however, the Wall Street Journal newspaper article is double hearsay because it relies on what a reporter told Plaintiffs about what Camara allegedly did, and these vague assertions are based entirely on anonymous sources. (Id. at 14–15.) Additionally, Defendants assert that this theory of liability also fails because courts do not allow "bootstrapping from employee conduct codes," to form the basis of a claim because they are inherently aspirational. (Id. at 15.)

In response, Plaintiffs argue that the Code of Conduct was misleading because Camara repeatedly harassed employees, but his conduct was nonetheless tolerated in contravention of these statements in the Code of Conduct. (Dkt. # 57 at 19.) Plaintiffs further contend that courts routinely credit allegations in reputable media sources such as the Wall Street Journal as sufficiently reliable to accept as true in PSLRA cases, and that the Code of Conduct is sufficient to form the basis of a claim in this case. (Id. at 19–20.)

Plaintiffs' complaint recites a September 20, 2023 Wall Street Journal article which details Camara's resignation from Disco based on statements from

"[c]urrent and former employees" of Disco who say Camara "abruptly quit as chief executive after the small company's board began investigating allegations that he groped a young female employee." (Dkt. # 53 at 15.) Regarding the incident, the article recites that a September 6, 2023 dinner with staff "triggered an investigation by outside lawyers, some of the employees said." (Id.) The incident "came more than a year after a CS Disco employee had made a formal complaint about Camara's behavior around young female employees." (Id.) The article goes on to detail the events of the September 6 dinner, citing its sources as "more than a dozen current and former CS Disco employees as well as other people familiar with the matter for this article." (Id. at 16.) Additionally, the article details several other incidents involving Camara's treatment of other young female employees in the years prior to that dinner, including several complaints to the company's ethics hotline in 2022. (Id.)

To satisfy the heightened pleading standard in a securities-fraud case, "media sources must be sufficiently detailed to indicate [] their reliability and be based on an independent investigative effort." In re Mylan N.V. Sec. Litig., Civ. A. No. 20-00955, 2023 WL 3539371, at *6 (W.D. Pa. May 18, 2023) (alteration in original) (quoting In re Loewen Grp. Inc. Sec. Litig., Civ. A. No. 98-06740, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004)); see In re Optionable Sec. Litig.,

577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (citation and internal quotation marks omitted)). Generally, when considering confidential witness allegations, it is proper to "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 263 (3d Cir. 2009) (quoting Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)).

Here, although the Wall Street Journal article provides details as to the background of Camara's alleged harassment and discrimination, including information that employees contacted Disco's ethics hotline on more than one occasion complaining of Camara's conduct, the Court finds that the article, and by extension, the dependent allegations contained in Plaintiffs' amended complaint, does not satisfy the heightened pleading standard. For comparison, in Mylan N.V., a Pennsylvania district court found that allegations reliant upon both an anonymously sourced book and Bloomberg articles met the pleading standard

because: the authors' reporting was detailed and derived from comprehensive "independent investigative efforts"; the "unnamed witnesses [were] described with enough particularity to give the Court confidence that the information they provided was reliable"; and "most of the allegations from the [operative] complaint that borrow from the [book] relate to reporting that could be plausibly corroborated by a review of documents examined by [the book's author] and the authors of the Bloomberg articles." 2023 WL 3539371, at *8. Conversely, the Wall Street Journal article here does not provide corroborative sources, sufficient detail about the sources, or any indication that it is based on independent investigative efforts. Instead, the article states only vaguely what "[c]urrent and former employees" said about Camara's departure and does not name the "spokesman for CS Disco" that was interviewed. (Dkt. # 53 at 15–16.) Nor does the article name the "more than a dozen current and former CS Disco employees as well as other people familiar with the matter for this article" whom the Wall Street Journal spoke to. (Id. at 16.) Likewise, the article does not state it conducted its own independent investigation, and in fact in several places states that after attempting to interview persons close to the matters discussed in the article, "[i]t couldn't be learned what the investigation determined," or "found." (Id. at 15–18.)

District courts have rejected similar claims based on unsubstantiated, anonymous sources. See, e.g., In re Vale S.A. Sec. Litig., Civ. A. No. 15-cv-9539, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017) (dismissing securities fraud claims that "relie[d] on 'unattributed' statements in the [WSJ] . . . for failure to satisfy the Fed. R. Civ. P. 9(b) pleading standard" because the newspaper article relied upon an "unidentified" employee as its source and neither the article nor the complaint provided further information about the source); see also Chan v. New Oriental Educ. & Tech. Grp. Inc., Civ. A. No. 16-9279, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019) (finding the subject "article [did] not meet the heightened particularity required of claims under Section 10(b) and Rule 10b-5" as the article was "devoid of [relevant] information," and did not provide "the who, what, when, where, and how").

Therefore, the Court finds Plaintiffs have not adequately pled that the statements contained in the Code of Conduct are material misstatements and omissions because the Wall Street Journal article they rely on does not provide the sufficient level of detail required by the heightened pleading standard and does not indicate an independent investigative effort. Given this, the Court finds no need to consider Defendants' remaining arguments based on the language in the Code of Conduct because they are premised on the information contained in the Wall Street

Journal article. The Court will therefore grant Defendants' motion as it pertains to the securities fraud allegation on this basis.

B. Scienter

Defendants assert that Plaintiffs have not alleged specific facts that give rise to a strong inference of scienter. (Dkt. # 54 at 16.) The PSLRA specifically requires that a complaint in a securities case support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "'Scienter' is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003). For purposes of 10(b) liability, a defendant must have acted with, at minimum, severe recklessness. Warren v. Reserve Fund, Inc., 728 F.2d 741, 745 (5th Cir. 1984).

To evaluate scienter in a securities-fraud case, a court must (1) take the well-pleaded allegations as true; (2) evaluate the facts collectively, including facts contained in "documents incorporated in the complaint by reference and matters subject to judicial notice," "to determine whether a strong inference of scienter has been pled"; and (3) "take into account plausible inferences opposing as well as supporting a strong inference of scienter." Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 982 (5th Cir. 2019). To withstand a motion to dismiss, "an inference of scienter must be more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)). Scienter must be alleged with respect to "the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Alaska Elec. Pension Fund, 915 F.3d at 982 (quotation marks omitted).

As addressed above, the only plausible securities fraud claim alleged is Plaintiffs' allegations pertaining to Disco's growing usage and customer maturity based on Camara's descriptions that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers. To be actionable, Plaintiffs must establish that Camara acted with scienter when he made those statements in an earnings call with investors on September 2, 2021, and on January 11, 2022, when Camara participated in the 24th Annual Needham Virtual Growth Conference.

Regarding this theory of liability, Defendants contend that Plaintiffs fail to allege particularized facts about what Camara knew at the time each challenged statement was made. (Dkt. # 54 at 16.) Defendants further argue that

Plaintiffs do not allege whether they believed the challenged statements were false or misleading when made. (Id.) For instance, Defendants assert that Plaintiffs do not plead particularized facts that Camara or any Defendant believed: (1) large Review projects would unexpectedly end, (2) Disco would need to reduce fiscal 2022 revenue guidance in August 2022, or that (3) Defendants were misleading investors. (Id. at 16–17.) Additionally, Defendants maintain that there can be no scienter where Disco repeatedly warned investors about the risks involved in its usage-based model. (Id. at 17.)

Despite Defendants' contentions to the contrary, the Court finds that Plaintiffs have sufficiently pleaded scienter regarding Camara's statements about Disco's growth on September 2, 2021, and January 11, 2022—or at a minimum, that Camara acted with severe recklessness when making these statements. Plaintiffs allege generally that Defendants "acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws." (Dkt. # 53 at ¶ 105.) Plaintiffs further plead that "Individual Defendants . . . had actual knowledge of the material omissions and/or the falsity of the material statements set forth above,

and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class." (Id. ¶ 106.)

Furthermore, Plaintiffs have alleged that Camara and LaFair specifically held themselves out as knowledgeable about the company's sales and their customers' use of their product. (See, e.g., Dkt. # 53 at ¶ 54.) Plaintiffs further allege additional facts in support of scienter, including that Camara and LaFair participated in insider stock sales (id. ¶ 84–85), and that Camara closely tracked customer usage that allowed Disco "to very accurately predict revenue on an annual basis." (Dkt. # 53 at ¶ 86.) Thus, Plaintiffs imply that Camara knew exactly where Disco's revenue came from. Furthermore, Plaintiffs allege that Camara regularly attended monthly calls where Review product revenue was discussed and that "on one such call [a confidential former employee] specifically stated that revenue from large Review matters would dry up beginning in March of 2022," and that the former employee "specifically discussed this issue with Camara after that call."[2] (Id. ¶ 87.) Thus, Plaintiffs maintain Camara knew that

[2] Defendants assert that confidential witness allegations are unreliable and should not be used to support scienter. (Dkt. # 54 at 18–19.) The Fifth Circuit has held that confidential sources may be used, but they must be described with "sufficient

the Review projects would not sustain the predictions Camara made in the statements at issue.

Taking the foregoing, well-pleaded allegations as true and evaluating the facts collectively, the Court finds that Plaintiffs have met their pleading obligations to adequately plead scienter at this stage and will decline to grant Defendants' motion to dismiss on this basis.

C. Remaining Elements

Defendants' motion to dismiss does not challenge Plaintiffs' pleading of the remaining elements required to state a viable securities fraud claim—that Plaintiffs acted in reliance on Defendants' representation or omission, and that the representation or omission proximately caused Plaintiffs' losses. After careful review, the Court finds Plaintiffs' amended complaint adequately pleads facts in support of these elements.

---

particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." ABC Arbitrage v. Tchuruk, 291 F.3d 336, 353 (5th Cir. 2002); see also Barrie v. Intervoice–Brite, Inc., 397 F.3d 249, 259 (5th Cir. 2005) (citing Tchuruk). Here, the Court finds that the amended complaint sufficiently describes the information that the confidential former employee could testify about to support Plaintiffs' allegations concerning conversation with Camara regarding the outlook of Review projects. (Dkt. # 53 at ¶ 43–45, 87–88.)

Thus, for the foregoing reasons, the Court will grant in part and deny in part Defendants' motion to dismiss Plaintiffs' claim for securities fraud violations.

V. Control Person Liability

Defendants further argue that the § 20(a) control person liability claim must be dismissed because Plaintiffs failed to allege a primary claim under § 10(b) and Rule 10b-5. (Dkt. # 54 at 21.) However, as stated above, Plaintiffs have adequately alleged the primary claim as to Camara's statements in an earnings call with investors on September 2, 2021, and his statements on January 11, 2022, when he participated in the 24th Annual Needham Virtual Growth Conference. Plaintiffs' § 20(a) claim is therefore not subject to dismissal on this basis. See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp., 514 F. Supp. 3d 942, 957 (S.D. Tex. 2021).

CONCLUSION

For the reasons stated above, Defendants' (1) Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** (Dkt. # 54); and (2) Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED** (Dkt. # 55). The hearing in this case is **HEREBY CANCELLED**. The parties proposed scheduling order is due **within thirty days of the date of**

**this Order**. To the extent the motion to dismiss is granted, that dismissal is without prejudice; should Plaintiffs wish to file an amended complaint they must do so within thirty days of this Court's order.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, January 30, 2025.

______________________________________
David Alan Ezra
Senior United States District Judge