IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LYNN GAMBRILL, on behalf of herself and all others similarly situated, | §<br>§<br>§ | No. 1:24-CV-28-DAE |
| | § | CLASS ACTION |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | |
| CS DISCO, INC., KIWI CAMARA, and MICHAEL LAFAIR, | §<br>§<br>§ | |
| Defendants. | §<br>§ | |

_____

ORDER DENYING MOTION FOR RECONSIDERATION

Before the Court are Defendants' CS Disco, Inc. ("Disco"), Kiwi Camara ("Camara"), and Michael LaFair ("LaFair") (collectively, "Defendants") Motion for Reconsideration as to Court's Rulings on Scienter and Falsity (Dkt. # 71).  The Court finds a hearing on this matter is not necessary.  After careful consideration of the memoranda filed in support of and in opposition to the Motion, the Court, for the reasons below, **DENIES** the motion.

BACKGROUND

This case concerns a securities class action lawsuit brought against Disco and Disco former Chief Executive Officer ("CEO") Camara, and current Chief Financial Officer ("CFO") LaFair ("Individual Defendants").  On March 8, 2024, Lead Plaintiff Bert W. Pluymen and additional plaintiffs Lynn Gambrill and

Bert Pluyman (collectively, "Plaintiffs") filed a Class Action Complaint on behalf of persons and entities that purchased shares of Disco's common stock between July 21, 2021, and September 11, 2023, inclusive (the "Class Period"). (Dkt. # 53.)

Plaintiffs alleged securities fraud claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Id. ¶¶ 101–10.) Plaintiffs also brought claims for control person liability against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Id. ¶¶ 111–16.)

I.      The Company

Disco provides ediscovery services mainly to law firms and corporate clients. (Dkt. # 53 at ¶ 3.) It has three principal lines of business: (1) "Ediscovery," a platform for collecting and reviewing documents; (2) "Review," a service whereby Disco, relying on machine learning, conducts review projects for law firms and clients; and (3) "Case Builder," which allows attorneys to organize documents and evidence. (Id.) Disco was founded by Camara in 2013 and is headquartered in Austin, Texas. (Id. ¶ 23.) Camara served as CEO of Disco until his resignation on September 11, 2023. (Id. ¶ 16.) LaFair is, and was at all relevant times in this suit, Disco's CFO. (Id. ¶ 17.)

2

On July 21, 2021, Disco completed an initial public offering ("IPO") of its common stock pursuant to a Registration Statement on Form S-1.  (Dkt. # 53 at ¶ 24.)  In the IPO, the company sold an aggregate of 7,500,000 shares of common stock, including 500,000 shares issued pursuant to the underwriters' option to purchase additional shares at a public offering price of $32 per share. (Id.)  Thereafter, on September 17, 2021, Disco completed a second public offering ("SPO") of its common stock pursuant to a Registration Statement on Form S-1. In the SPO, selling stockholders sold an aggregate 6,050,000 shares of common stock, including 550,000 shares sold pursuant to the underwriters' option to purchase additional shares at an offering price of $53 per share.  (Id. ¶ 25.) According to the amended complaint, this "secondary offering allowed corporate insiders including Camara to offload millions of dollars of stockholdings to the public."  (Id.)

In September 2021, LaFair explained in an earnings call that Disco relies on a usage-based revenue model wherein customers pay the company based on their actual usage of Disco, as opposed to a flat monthly fee or annual subscription.  (Dkt. # 35 at ¶ 28.)  LaFair thus clarified that Defendants could not report on traditional software as a service metric that analysts typically use to judge growth of subscription-based companies, such as total billings; instead, Disco focuses on "attention on total revenue growth."  (Id.)

II.    The Class Period

Plaintiffs' complaint alleges that throughout the class period, Disco announced large revenue growth and that it consistently beat its earnings projections.  (Dkt. # 53 at ¶ 31.)  For instance, on September 2, 2021, Plaintiffs allege that Disco announced that its revenue was up 88% for that second quarter from the second quarter of 2020.  (Id.)  Additionally, Plaintiffs allege that Disco later announced the following growth for each of the next few quarters: (1) the third quarter growth was up 67% from the previous year's third quarter; and (2) the fourth quarter growth was up 76% from the previous fourth year's quarter.  (Id.)  Thereafter, on May 12, 2022, Disco announced $34.5 million in revenue from the first quarter of 2022, revising upwards its annual revenue guidance to $149—$153 million.  (Id.)

As the basis for its growth, Plaintiffs allege that Defendants explained that their Review product added significantly to their revenue growth.  (Dkt. # 53 at ¶ 32.)  Additionally, Plaintiffs allege that Defendants specifically denied, when asked by analysts, that their rapid revenue growth and overperformance of guidance were attributable to a small number of large matters.  (Id. ¶ 33–35.)  However, according to Plaintiffs, in reality Disco's "outsized revenue performance and earnings beats throughout the Class Period were attributable to a small number of large Review projects—projects that Defendants knew were, by definition, of

4

limited duration." (Id. ¶ 36.) Plaintiffs contend that as those projects came to an end in the second quarter of 2022, Disco had to revise its 2022 projections downward, projecting a decline of $17 million. (Id.)

To support its allegations, Plaintiffs alleged that three former Disco employees confirmed that the company's product was concentrated in a small number of matters, and that Disco had lost business around the summer of 2022 from a handful of clients whom Disco had been handling large Review projects. (Id. ¶ 37–39.) One former employee stated that the revenue from these Review projects was not sustainable, and that it was difficult to find new Review clients "because []Disco had a very untraditional way of selling them." (Id. ¶ 40–42.) According to the former employee, "[o]ther companies sold Review projects on an hourly basis, whereas []Disco charged a flat fee based upon the total number of documents," and that Disco's "clients were paying based upon the total document population, not the number of documents that were actually going to be reviewed." (Id. ¶ 42.) According to the complaint, "[t]his was difficult for clients to understand and caused issues with some of the clients when []Disco was trying to negotiate with them." (Id.) A former employee stated that during a "metrics call" in February 2022, the employee "made clear" that the Review business "would miss its numbers starting in March 2023," and that although he could not recall if LaFair or Camara were on that specific call, "he did recall having discussions in

5

the ensuing weeks, including with Camara regarding 'the lull in the Managed Review Business.'" (Id. ¶ 45.)

### III.   Harassment and Discrimination Allegations

Plaintiffs further allege that, in addition to Disco's failing Review business, "the company was hiding a darker secret." (Dkt. # 53 at ¶ 46.) On September 10, 2023, Camara abruptly resigned as CEO of the company, causing its shares to plummet and leaving investors "baffled." (Id. ¶ 47.) On September 20, 2023, the Wall Street Journal reported that Camara resigned "after the small company's board began investigating allegations that he groped a young female employee," at a September 6, 2023 dinner with staff. (Id.) Plaintiffs allege the article revealed a pattern of harassment and misconduct that Camara engaged in on multiple occasions, including inappropriate conduct, culminating in the September 6, 2023 staff dinner. (Id.)

### IV.   Current Suit

On September 19, 2023, Plaintiffs originally filed their Class Action suit for Violations of the Federal Securities Laws against Defendants in the Southern District of New York. (Dkt. # 1.) On January 8, 2024, pursuant to the parties' Joint Stipulation, the case was transferred to the Austin Division of the Western District of Texas. (Dkt. # 34.) On March 8, 2024, Plaintiffs filed their amended securities class action complaint. On January 30, 2025, the Court granted

in part and denied in part Defendants' motion to dismiss.  (Dkt. # 69.)  The Court

dismissed nine of thirteen challenged statements and narrowed the class period in

this case by over a year.  (Id.)  However, the Court denied the motion as to two

statements Camara made on September 2, 2021, and two made on January 11,

2022, about general customer spending, usage, and maturity.  (Id. at 19–21.)

On February 27, 2025, Defendants filed the instant motion for

reconsideration regarding the remaining claims in this case.  (Dkt. # 71.)  On

March 13, 2025, Plaintiffs filed a response in opposition.  (Dkt. # 74.)  On March

20, 2025, Defendants filed a reply.  (Dkt. # 75.)

LEGAL STANDARD

Defendants move for reconsideration pursuant to Rule 54(b) of the

Federal Rules of Civil Procedure.  (Dkt. # 71.)  Because the Court's order on

Defendants' motion to dismiss was interlocutory and did not dispose of all of the

claims in this case, it is analyzed under Fed. R. Civ. Pro. 54(b) rather than Rule 59

or Rule 60, which apply to final judgments.  Cabral v. Brennan, 853 F.3d 763, 766

(5th Cir. 2017).  Rule 54(b) provides that an interlocutory order "may be revised at

any time before the entry of a judgment adjudicating all of the claims and all the

parties' rights and liabilities."  Under this rule, "the trial court is free to reconsider

and reverse its decision for any reason it deems sufficient, even in the absence of

new evidence or an intervening change in or clarification of the substantive law."

Id. at 767 n.3 (quoting Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir. 1990)).

## DISCUSSION

Defendants move the Court to reconsider its decision finding that Plaintiffs had adequately pled that Camara's September 2021 and January 2022 statements were made with scienter.  (Dkt. # 71 at 4.)  Defendants contend that: (1) the Court made a chronological error that warrants reconsideration of its ruling on scienter; (2) the amended complaint fails to allege any facts raising a strong inference of scienter; (3) any inference of scienter is not compelling as competing inferences; and (4) the Court should also reconsider its ruling as to the alleged falsity of Camara's September 2021 and January 2022 statements.  (Dkt. # 71 at 4– 12.)

A.    Camara's September 2021 and January 2022 Statements

In its Order, the Court found that the following statements concerning growing usage and customer maturity could be misleading if there is evidence that Disco's real revenue drivers were in fact only a handful of large Review projects, and that Plaintiffs had therefore alleged a securities fraud claim based on these statements:

   a. On September 2, 2021, Camara and LaFair participated in an earnings call with investors for the second quarter of 2021, in which Camara stated in his opening remarks that

A great example of what has driven the acceleration in growth this quarter is a well-known consumer brand that in Q4 of last year hired a new Deputy General Counsel to the major technology company that has been a longstanding DISCO customer. He ran a sole-source procurement for ediscovery when he started his new job, and between the fourth quarter of 2020, and the first quarter of 2021, his new company migrated their ediscovery program to DISCO Ediscovery. But in the second quarter of 2021, this company experienced a series of major legal issues that caused them to accelerate their adoption of our second product, DISCO Review. **So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend. That journey has historically taken our customary several years.**

b.  During the same call, Camara responded to a question from an analyst that

Sterling Auty, Analyst

Yeah. Thanks. Hi guys, and welcome to the public markets. Maybe just to get kicked off, my first question would be about that large consumer customer that you mentioned and kind of your comments about the business model and the variability it can generate. What are some **of** the things that you're doing to drive increased usage to try to let's say smooth out some of the volatility that you might see from a single customer quarter-to-quarter?

Kiwi Camara, Chief Executive Officer and Director

**So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher five-figure customer grow to be a six-figure customer and then grow to be a seven-figure customer at maturity.** Over the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer. **Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.**

c.  On January 11, 2022, Camara participated in the 24th Annual Needham Virtual Growth Conference, and responded to a question by the presenter, Scott Berg, as follows:

Scott Berg

Okay. Around the complexity question often comes a view point that customers use a platform like Disco for maybe a short time frame and then maybe on an infrequent basis, but for an average Fortune 1000 type customer that you might have, how many matters could they be managing concurrently? And is the typical usage of the Disco platform maybe weekly, monthly or something longer for these matters?

Kiwi Camara

**So, for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform** and I think Scott that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works. You take any one of these matters and we've got matters alive in our system; they date all the way back to 2013 the same way we have corporate customers, who have been continuous customers going all the way back to 2013. I think one good way to think about this is looking at companies spend on their own legal department or on legal services. While the nature of the legal matters that a company is exposed to may change from time to time and while unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that. **People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into.**

d. On the same call, Camara responded to another question:

Scott Berg

Is -- next question is on e-discovery, is expansion of e-discovery use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?

…

Kiwi Camara

**I would say there's not as much variance in the ultimate wallet size of the customer. So, like how big will the customer be when they get to maturity. But there's more variance in how quickly they get there.** So, over the last few earnings calls, right, we've talked about the extreme positive examples, where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that. And then there are also examples of customers that take four years, five years, even six years to get to their mature spend. **So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.**

(Dkt. # 69 at 16–21).  The Court also found that Plaintiffs had sufficiently alleged

that Camara acted with scienter when he made those statements in the earning call

and conference above.  (Id. at 36–38.)  The Court stated:

> [T]he Court finds that Plaintiffs have sufficiently pleaded scienter regarding Camara's statements about Disco's growth on September 2, 2021, and January 11, 2022—or at a minimum, that Camara acted with severe recklessness when making these statements. Plaintiffs allege generally that Defendants "acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws." (Dkt. # 53 at ¶ 105.) Plaintiffs further plead that "Individual Defendants . . . had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class." (Id. ¶ 106.)
>
> Furthermore, Plaintiffs have alleged that Camara and LaFair specifically held themselves out as knowledgeable about the company's sales and their customers' use of their product. (See, e.g., Dkt. # 53 at ¶ 54.) Plaintiffs further allege additional facts in support of scienter, including that Camara and LaFair participated in insider stock sales (id. ¶ 84–85), and that Camara closely tracked customer usage that allowed Disco "to very accurately predict revenue on an annual basis." (Dkt. # 53 at ¶ 86.) Thus, Plaintiffs imply that Camara knew exactly where Disco's revenue came from. Furthermore, Plaintiffs allege that Camara regularly attended monthly calls where Review product revenue was discussed and that "on one such call [a confidential former employee] specifically stated that revenue from large Review matters would dry up beginning in March of 2022," and that the former employee "specifically discussed this issue with Camara after that call." (Id. ¶ 87.)

11

Thus, Plaintiffs maintain Camara knew that the Review projects would not sustain the predictions Camara made in the statements at issue.

(Dkt. # 69 at 36–38.)

B.    Chronological Error

According to Defendants, the Court made a chronological error when it relied on a "metrics call" where an unnamed employee allegedly said that "revenue from large Review matters would dry up beginning in March of 2022," and "discussed this issue with Camara after that call." (Id.) Defendants argue that the "metrics call" referenced in the Order occurred in February 2022, or after Camara made the statements at issue. (Dkt. # 71 at 5.) Therefore, according to Defendants, that call cannot support an inference that Camara intended to defraud investors in September 2021 and January 2022. (Id.) Defendants ask the Court to reconsider Plaintiffs' scienter allegations without considering the February 2022 metrics call or any subsequent discussions. (Id. at 6.)

"'Scienter' is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003). For purposes of 10(b) liability, a defendant must have acted with, at minimum, severe recklessness. Warren v. Reserve Fund, Inc., 728 F.2d 741, 745 (5th Cir. 1984). To evaluate scienter in a securities-fraud case, a court must (1) take the well-pleaded allegations as true; (2) evaluate the facts collectively, including facts contained in "documents incorporated in the complaint by reference and

12

matters subject to judicial notice," "to determine whether a strong inference of scienter has been pled"; and (3) "take into account plausible inferences opposing as well as supporting a strong inference of scienter." Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 982 (5th Cir. 2019). To withstand a motion to dismiss, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)). Scienter must be alleged with respect to "the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." Alaska Elec. Pension Fund, 915 F.3d at 982 (quotation marks omitted).

To the extent that Plaintiffs' allegations concerning Camara's statements: (1) in an earnings call with investors on September 2, 2021, and his (2) on January 11, 2022, when he participated in the 24th Annual Needham Virtual Growth Conference, rely on a former employee's statement to Camara in February 2022, there is no scienter. Nevertheless, the Court did not solely rely on the former employee's February 2022 statement to Camara when finding that Plaintiffs had

properly alleged scienter.  Instead, the Court simply used this as example of a monthly call without regard to the call's timing.  The Court stated that "Plaintiffs allege that Camara regularly attended monthly calls where Review product revenue was discussed and that '*on one such call* [a confidential former employee] specifically stated that revenue from large Review matters would dry up beginning in March of 2022,' and that the former employee 'specifically discussed this issue with Camara after that call.'"[]  (Dkt. # 69 at 37 (citing Dkt. # 53 ¶ 87).)

Additionally, the Court found that Plaintiffs adequately alleged that Camara and LaFair specifically "held themselves out as knowledgeable about the company's sales and their customers' use of their product."  (Dkt. #  69 at 37 (citing Dkt. # 53 at ¶ 54).)  And the Court also considered Plaintiffs' allegations that Camara and LaFair participated in insider stock sales (Dkt. # 53 at ¶ 84–85), and that Camara closely tracked customer usage that allowed Disco "to very accurately predict revenue on an annual basis."  (Id. ¶ 86.)  Regarding scienter, the Court found that "Plaintiffs imply that Camara knew exactly where Disco's revenue came from," and that "Plaintiffs maintain Camara knew that the Review projects would not sustain the predictions Camara made in the statements at issue." (Dkt. # 69 at 37–38.)  Although Defendants contend these allegations are not sufficient to meet the PLSRA's heightened pleading standard, the Court finds that Plaintiffs have sufficiently pled facts to support a strong inference of scienter, or

that Defendants at least acted with reckless disregard, to survive dismissal at this stage.

Regarding Defendants' remaining arguments in support of reconsideration, they are: (1) attempts to rehash legal arguments made in its prior briefing, (2) arguments that could have been raised in prior briefing, or (3) they ask the Court to consider the merits of their arguments. The Court will consider the merits of these arguments at a later stage of this case. For now, the Court finds no basis upon which to reconsider its prior ruling.

CONCLUSION

For the reasons stated above, Defendants' Motion for Reconsideration as to Court's Rulings on Scienter and Falsity is **DENIED** (Dkt. # 71).

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, April 9, 2025.

_____
David Alan Ezra
Senior United States District Judge

15