# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| LYNN GAMBRILL, Individually and On Behalf of All Others Similarly Situated, <br><br>                  Plaintiff, <br><br>          v. <br><br> CS DISCO, INC; KIWI CAMARA; MICHAEL LAFAIR, <br><br>              Defendants. | Case No. 1:24-cv-00028-DAE <br><br> <u>CLASS ACTION</u> |

**PLAINTIFF'S OPPOSED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

I.    INTRODUCTION...............................................................................................................1

II.   STATEMENT OF FACTS..............................................................................................2

III.  PROCEDURAL HISTORY..............................................................................................3

IV.   ARGUMENT....................................................................................................................5

   A.   The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23 .......5

     1.   Standards for Class Certification.................................................................5

     2.   The Rule 23(a) Requirements are Satisfied..................................................6

        a.   The Proposed Class is So Numerous that Joinder is Impracticable ......................6

        b.   There Are Common Questions of Law and Fact .......................................................7

        c.   Plaintiffs' Claims Are Typical of the Class.................................................................7

        d.   Plaintiff Will Fairly and Adequately Protect the Interests of the Class ................8

   B.   The Requirements of Rule 23(b)(3) Are Satisfied............................................................9

     1.   Common Questions of Law and Fact Predominate.......................................9

        a.   Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic*10

        b.   CS Disco's Common Stock Traded in an Efficient Market During the Class Period
             .....................................................................................................................11

        c.   Damages can be Calculated on a Classwide Basis ..................................................16

     2.   A Class Action is Superior to Other Available Methods for the Fair and Efficient
          Adjudication of the Controversy ......................................................................18

   C.   Plaintiff's Counsel Satisfies the Rule 23(g) Prerequisite for Appointment as Class
        Counsel.............................................................................................................................19

V.    DEFENDANTS WILL NOT BE ABLE TO REBUT THE FRAUD ON THE MARKET
      PRESUMPTION AND, THOUGH NOT REQUIRED, THERE IS AFFIRMATIVE
      EVIDENCE THAT THEIR MISREPRESENTATION HAD AN IMPACT ON CS
      DISCO'S SHARE PRICE ..............................................................................................19

**VI.    CONCLUSION** ............................................................................................................. **20**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).......................................................................................................... 10

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) .............................................................................................. 6

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................................................ 9

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds,*
    568 U.S. 455 (2013)............................................................................................................ 6

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).......................................................................................................... 10

*Buettgen v. Harless*,
    2011 WL 1938130 (N.D. Tex. May 19, 2011) .................................................................. 12

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989)............................................................................. 11, 13, 14

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)....................................................................................... 16

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)................................................................... 17

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    2015 WL 5097883 (D.N.J. Aug. 31, 2015) ....................................................................... 14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................................................ 17

*Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) .................................................................. 7

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113, (2021)......................................................................................................... 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)............................................................................................... 10, 11, 19

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................... 13

*In re Amerifirst Sec. Litig.*,
139 F.R.D. 423 (S.D. Fla. 1991) ..................................................................... 13

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ....................................................................... 17

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
No. CV H-14-3428, 2017 WL 2608243 (S.D. Tex. June 15, 2017) ................... 7

*In re Concho Res., Inc.,*
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ..................................................... 6

*In re Dynegy, Inc. Sec. Litig.*,
226 F.R.D. 263 (S.D. Tex. 2005) ...................................................................... 7

*In re Elec. Data Sys. Corp. Sec. Litig.*,
226 F.R.D. 559 (E.D. Tex.) ............................................................................ 10

*In re Heckmann Corp. Sec. Litig.*,
No. CA 10-378-LPS-MPT, 2013 WL 2456104 (D. Del. June 6, 2013) ............ 13

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ....................................................................... 13

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .................................................. 18

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
No. CIV.A. 05-1151 SRC, 2013 WL 396117 (D.N.J. Jan. 30, 2013) ............... 13

*In re Reliant Energy ERISA Litig.*,
2005 WL 2000707 (S.D. Tex. Aug. 18, 2005) .................................................... 7

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019) .................................................... 17

*In re Vale S.A. Sec. Litig.*,
2022 WL 122593 (E.D.N.Y. Jan. 11 2022) ...................................................... 14

*In re Waste Manag*ement *Sec. Litig.*,
*2025 WL 958467 (S.D.N.Y. Mar. 31, 2025)* ............................................. 19, 20

iv

*KB Partners I, L.P. v. Barbier*,
   2013 WL 2443217 (W.D. Tex. June 4, 2013) ........................................................... 7, 12, 18

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................ 11, 15, 16

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ................................................................................... 12

*Luna v. Carbonite, Inc.*,
   2023 WL 4539855 (D. Mass. July 14, 2023) ............................................................ 17, 20

*Maldonado v. Ochsner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007) ........................................................................................... 5

*Malriat v. QuantumScape Corp.*,
   2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ............................................................. 12

*Marcus v. J.C. Penney Co., Inc.*,
   No. 6:13-CV-736-MHS-KNM, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ...................... 15

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................................ 13, 16

*Prause v. TechnipFMC, PLC*,
   2020 WL 3549686 (S.D. Tex. Mar. 9, 2020) ........................................................ 6, 8, 9, 18

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................ 16, 18

*Rougier v. Applied Optoelectronics, Inc.*,
   No. 4:17-CV-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ............................. passim

*Schneider v. Natera, Inc.*,
   2025 WL 369243 (W.D. Tex. Jan. 28, 2025) ..................................................................... 5

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................................... 14

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) .................................................................................... 11, 12

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ........................................................................................ 14, 20

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................................. 5, 7

*Zeidman v. J. Ray McDermott & Co.*,
   651 F.2d 1030 (5th Cir. 1981) ...................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 23 ........................................................................ passim

Lead Plaintiff Bert Pluymen ("Plaintiff" or "Pluymen") respectfully submits this Motion to: (1) certify the proposed Class pursuant to Rule 23(a) and 23(b)(3); (2) appoint Plaintiff as Class Representative; and (3) appoint The Rosen Law Firm, P.A. ("Lead Counsel" or "Rosen Law") as Class Counsel and Kendall Law Group, PLLC ("Kendall Law") as Liaison Counsel.[1]

## I.     INTRODUCTION

As the Supreme Court, the Fifth Circuit, and courts in this District have held, securities class actions like this one are ideally suited to class treatment. Without a class action, all investors who would otherwise be part of a class would use the same extensive evidence to prove the elements of falsity, scienter, and loss causation. Even reliance presents a common issue, because investors would rely on the fraud on the market presumption to meet this element. Moreover, for most class members, individual actions are not solutions at all, because most investors will not have suffered losses large enough to justify a trial. Thus, a class action prevents an extensive drain on the Court's resources while ensuring that class members can have real remedies.

The Court should certify a class consisting of:

All purchasers of CS Disco, Inc.'s common stock between September 3, 2021 and August 11, 2022, inclusive. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

The Court should also appoint Plaintiff Pluymen as Class Representative, and appoint Lead Counsel as Class Counsel. Plaintiff and Lead Counsel have taken this case through an amended complaint, a motion to dismiss, a motion for reconsideration on the motion to dismiss, discovery, and this motion for class certification. Plaintiff has kept abreast of the case and monitored counsel

---

[1] Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted. A proposed form of Order is submitted herewith. In addition, attached as Ex. A to the Stern Declaration is Plaintiff's completed response to W.D. Tex. L.R. 23, Appendix A.

through nearly two years of litigation and is well-qualified to serve as the Class Representative. He meets all requirements for certification.

## II.    STATEMENT OF FACTS

CS Disco is an e-discovery company that offers a variety of products including a relatively new "Review" product that assists law firms and corporate clients in conducting document review in connection with litigation. Dkt. No. 53 ¶26.

On September 2, 2021, Defendants Camara and LaFair participated in an earnings call for the second quarter of 2021, in which Camara stated in his opening remarks, among other things, that: "So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend. That journey has historically taken our customary several years." *Id*. ¶50; *see also* Dkt. No. 69 at 16-17, 21. On the same call, Camara stated, among other things, that:

> So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher five-figure customer grow to be a six-figure customer and then grow to be a seven-figure customer at maturity. … Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.

*Id.* ¶52; *see also* Dkt. No. 69 at 17, 21.

On September 17, 2021, CS Disco completed a secondary public offering ("SPO") of its common stock pursuant to a Registration Statement on Form S-1. In the SPO, selling stockholders sold an aggregate 6,050,000 shares of common stock, including 550,000 shares sold pursuant to the underwriters' option to purchase additional shares at an offering price of $53 per share which allowed corporate insiders, including Camara, to offload millions of dollars of stockholdings to the public. *Id*. ¶25.

On January 11, 2022, Camara participated in the 24th Annual Needham Virtual Growth Conference, and responded to a question by the presenter: "So for mature customers, they'll have

dozens or hundreds of simultaneous active matters in our platform … People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into." *Id*. ¶62; *see also* Dkt. No. 69 at 17, 21.

On that call, Camara responded to another question stating, among other things, that:

I would say there's not as much variance in the ultimate wallet size of the customer. So, like how big will the customer be when they get to maturity. But there's more variance in how quickly they get there. … So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.

*Id*. ¶64; *see also* Dkt. No. 69 at 17-18, 21.

However, the truth began to emerge on August 11, 2022, when CS Disco released financial results for the second quarter of 2022 that shocked investors and analysts alike. The Company revised its annual revenue projections downward, revealing that its previous projections relied on the assumption that CS Disco would continue to receive seven figure per quarter revenues from a small number of large Review matters, matters which had disappeared in the preceding months. *Id*. ¶5. As a result of these disclosures, the price of CS Disco stock declined $15.53 between August 11, 2022 and August 12, 2022, a drop of more than 53 percent. *Id*. ¶¶6, 78.

As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the price of Disco's shares, Plaintiff and putative class members have suffered significant losses and damages. *Id*. ¶8. Plaintiff and putative class members seek damages for redress, reasonable attorneys' fees, injunctive relief, and all other relief this Court deems just and proper. *Id*. ¶8.

## III.    PROCEDURAL HISTORY

On September 19, 2023, this action was filed in the Southern District of New York. Dkt. No. 1. On December 14, 2023, Plaintiff was appointed Lead Plaintiff by the Southern District of New York and his choice of counsel, Rosen Law, was approved as Lead Counsel. Dkt. No. 32.

3

On January 3, 2024, the Parties filed a stipulation and proposed order transferring the case to the Western District of Texas and setting a pleading schedule[2] which was ordered by Magistrate Judge Sarah Netburn on January 8, 2024. Dkt. Nos. 33 and 34. On January 9, 2024, this case was transferred from the Southern District of New York to the Western District of Texas. Dkt. No. 35.

On March 8, 2024, Plaintiff filed the amended complaint (the "Complaint"). Dkt. No. 53. On May 10, 2024, Defendants filed a motion to dismiss the Complaint and requests for judicial notice. Dkt. Nos. 54-55. On July 8, 2024, Plaintiff filed memoranda in opposition to both the Defendants' motion to dismiss the Complaint and requests for judicial notice. Dkt. Nos. 57-58. On August 12, 2024, Defendants filed replies in further support of their motion to dismiss the Complaint and requests for judicial notice. Dkt. Nos. 62-63. On August 13, 2024, this case was reassigned from Judge Robert Pitman to Judge David A. Ezra. Dkt. No. 64.

On January 30, 2025, the Court issued its order granting in part and denying in part Defendants' motion to dismiss the Complaint ("Motion to Dismiss Order") and granted Defendants' motion for judicial notice. Dkt. No. 69. In particular, the Court denied the motion to dismiss as to four statements that Camara made at an earnings call and an investor conference in September 2021 and January 2022 respectively. *Id*. at 16-21; *see also supra* §I. The Court, after a detailed analysis of the allegations in the Complaint and the Parties' arguments, found that "as to this part of their securities claim, Plaintiff has alleged sufficient facts that Camara's descriptions in the phone call that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers—were either false or

---

[2] The pleading schedule was modified pursuant to an agreed motion. Dkt. Nos. 51 (motion) and 52 (order).

misled investors if it is true that customer spending was actually spiky and driven by only a few large Review projects." *Id*. at 21.

The Court also found that several facts supported a strong inference of scienter. The Court noted that Camara and Lafair held themselves out as knowledgeable about the Company's sales and customer use of the Company's products, that Camara and Lafair participated in insider stock sales, and that Camara closely tracked customer usage. *Id.* at 37. The Court further noted that FE-3 stated that Camara participated in regular sales calls, noting that on one such call Camara was updated regarding the ending of large review projects. *Id.*

On February 27, 2025, Defendants filed a motion for reconsideration on the Motion to Dismiss Order. Dkt. No. 71. On March 13, 2025, Plaintiff filed a memorandum in opposition to Defendants' motion for reconsideration. Dkt. No. 74. On March 20, 2025, Defendants filed a reply in further support of their motion for reconsideration. Dkt. No. 75. On April 9, 2025, the Court issued its order denying Defendants' motion for reconsideration. Dkt. No. 77.

## IV.    ARGUMENT

### A.    The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23

#### 1.    Standards for Class Certification

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Schneider v. Natera, Inc.*, 2025 WL 369243, at \*2 (W.D. Tex. Jan. 28, 2025), *report and recommendation adopted*, 2025 WL 880256 (W.D. Tex. Mar. 21, 2025) (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).

Courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). But Rule 23 does not

5

"license … free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 568 U.S. 455, 465-66 (2013); "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009) (the "question is not whether the plaintiff … will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

### 2.      The Rule 23(a) Requirements are Satisfied

#### a.      The Proposed Class is So Numerous that Joinder is Impracticable

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." Numerosity "'is generally assumed to have been met' in a class action suit involving nationally traded securities, since the putative class is likely sufficiently numerous, geographically dispersed, and difficult to identify." *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *2 (S.D. Tex. Mar. 9, 2020) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)).

This case easily meets numerosity. During the Class Period, the common stock of CS Disco traded on the NYSE under the ticker "LAW." During the Class Period, CS Disco had between 57.4 and 58.6 million shares of common stock outstanding, an average of more than 1.9 million CS Disco shares were traded each week, and an average of 3.3% of shares trading weekly. Nye Report ¶25. Joinder of all these class members is plainly impracticable. *See also In re Concho Res., Inc.,* 2025 WL 1040379, at *5 (S.D. Tex. Apr. 7, 2025) ("The Fifth Circuit favors the presumption that 'any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'") (quoting *Zeidman*, 651 F.2d at 1039).

6

### b.    There Are Common Questions of Law and Fact

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." This is "not demanding," *In re Reliant Energy ERISA Litig.*, 2005 WL 2000707, at *2 (S.D. Tex. Aug. 18, 2005), and "a single common question will do." *Dukes*, 564 U.S. at 359 (cleaned up). The presence of "some plaintiffs having different claims or claims that require some individualized analysis does not defeat commonality." *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 269 (S.D. Tex. 2005).

Almost all questions of law and fact in this case are common to Plaintiff and Class members. Whether Defendants made false statements, whether they had scienter, and whether these statements caused Plaintiff's losses, are all common questions. That is enough for commonality. Courts regularly hold that such questions satisfy Rule 23(a)(2). *See e.g.*, *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *7 (S.D. Tex. Sept. 27, 2023) ("Whether Cabot's representations were materially false and impacted the stock price are common questions of law and fact.").

### c.    Plaintiffs' Claims Are Typical of the Class

The claims of the representative plaintiffs must also be typical of the claims of the class. Rule 23(a)(3). This requirement "is not demanding," *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013), and is met "by showing that class representatives' claims arise from a similar course of conduct and share the same legal theory." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. CV H-14-3428, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017).

Plaintiff's claims and those of all Class members arise from the same misrepresentations and omissions. Like all Class members, Plaintiff purchased CS Disco common stock during the Class Period not knowing that Defendants had made materially false and misleading statements that artificially inflated the price of CS Disco common stock. Plaintiff and the Class all relied on

7

the integrity of the market when they purchased CS Disco common stock at artificially inflated prices and were damaged when that artificial inflation dissipated after revelations that Defendants' statement was a misrepresentation. Plaintiff's claims and the Class's are based on the same violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See also Prause*, 2020 WL 3549686, at *3 (typicality met where "each class member's claim arises from the same allegedly false and misleading information as Plaintiff[s]' claim[s]"). Thus, Plaintiff's claims are typical.

### d.    Plaintiff Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is satisfied. Here, courts evaluate three factors: "(1) the zeal and competence of the representative[s'] counsel; (2) the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Prause*, 2020 WL 3549686, at *4 (alterations in original). Each factor is met here.

Plaintiff's claims are aligned with those of the Class. Plaintiff will recover if, and only if, he proves the Class's claims.[3] Further, Plaintiff understands his duties as Class Representative and is willing and able to serve as the representative party on behalf of the Class. In addition, Plaintiff's has submitted a declaration affirming: (i) he understands his responsibilities as fiduciary of the Class, (ii) is willing to accept these responsibilities; and (iii) is willing to be deposed and attend

---

[3] In addition, through counsel, Plaintiff understands the potential advantages and disadvantages of proceeding as a class action rather than individually, and does not intend on settling his claims on an individual basis. *See* Dkt. No. 12-2 (Plaintiff's PSLRA Certification).

trial. *See* Ex. B (Plaintiff's Declaration in Support of this Motion); *see also* Dkt. No. 12-2 (Plaintiff's PSLRA Certification).

Finally, Lead Counsel is experienced in complex class litigation, especially securities fraud actions, and can prosecute this action vigorously. *See e.g.,* Ex. C (Rosen Law firm resume). Lead Counsel has already done so, partially defeating Defendants' motion to dismiss the Complaint and defeating Defendants' motion for reconsideration of the Motion to Dismiss Order. *See* Dkt. Nos. 69 and 77. Lead Counsel has, for nearly two years, zealously advanced the interests of Plaintiff and the putative Class. Lead Counsel is continuing to spend the resources necessary to properly represent the class, having retained Dr. Nye, a preeminent financial expert, in connection with this Motion for Class Certification. *See* Nye Report. Lead Counsel will continue to dedicate the funds and resources necessary to pursue Plaintiffs' claims, on behalf of the Class, including through trial and any potential appeals. Thus, Lead Counsel can manage this case.[4]

## B.    The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication. Both requirements are met here.

### 1.    Common Questions of Law and Fact Predominate

"Predominance is … readily met in certain cases alleging consumer or securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Prause*, 2020 WL 3549686, at *6. "Predominance does

---

[4] Pursuant to L.R. CV-23 and the referenced Ex. A, Plaintiff further states that the claims do not require subclasses and that Rosen Law has represented plaintiffs in hundreds of securities class actions and are now prosecuting dozens of such actions on behalf of classes. *See* Ex. C.

not require all questions of law or fact to be common, but only that common questions predominate over individual questions." *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 570 (E.D. Tex.), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Where, as here, claims are based upon violation of the securities laws, "[p]redominance is a test readily met." *Amchem Prods., Inc. v. Windsor*, 521 at 625.

In securities fraud cases, plaintiffs may establish a class-wide presumption of reliance based on the fraud on the market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988). Further, because this case is premised on a failure to disclose that customer spending was "spiky and driven by only a few large Review projects" (Dkt. No. 69 at 21), the Class is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). With reliance a common question, Defendants' liability predominantly turns on issues common to the Class.

a. **Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic***

*Basic* "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246-47). Thus, whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action.'" *Id.* That false positive statements artificially inflate the prices of securities that trade on an efficient market is hardly disputed, as "[e]ven the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices." *Id.* at 272.

To invoke the presumption of reliance under this theory, a plaintiff must show: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded

10

in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id*. at 268.

Plaintiffs readily satisfy each of *Basic*'s requirements and are entitled to a presumption of reliance. First, this Court has already held that Plaintiff alleged Defendants made public misrepresentations to the market. *See* Dkt. No. 69 at 21. Second, courts do not resolve materiality at the class certification stage because it "is an objective issue susceptible to common, classwide proof." *Halliburton II*, 573 U.S. at 282. Finally, as detailed below, the market for CS Disco's common stock was efficient during the Class Period. Thus, *Basic*'s requirements are met.

> ### b. CS Disco's Common Stock Traded in an Efficient Market During the Class Period

"Drawing from *Cammer v. Bloom* and *Krogman v. Sterritt*, the Fifth Circuit has adopted eight factors for gauging whether a security trades in an efficient market." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *10 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted,* No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)). The five *Cammer* factors are: "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; and (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. The three additional *Krogman* factors are: "(1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float[.]" *Id*. These factors "must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." *Unger v. Amedisys Inc.*,

401 F.3d 316, 323 (5th Cir. 2005). The factors are not "an exhaustive list, and in some cases one of the above factors may be unnecessary." *Id.*

*Cammer* **Factor 1 - Average Trading Volume:** A high average trading volume is "one of the strongest factors for gauging market efficiency" because it "suggests significant investor interest in a company and implies that many investors are executing trades based on newly available or disseminated corporate information." *Rougier*, 2019 WL 6111303, at *11. A "substantial presumption" of an efficient market applies where the average weekly trading volume is "1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004). Here, the average weekly trading volume for CS Disco common stock during the Class Period was 3.3% of shares outstanding, far exceeding the 1-2% threshold. Nye Report ¶25.

*Cammer* **Factor 2 – Analyst Coverage:** Significant analyst coverage of a company's stock offers "persuasive evidence of market efficiency because those investment professionals make buy or sell recommendations to their investor clients, and thereby help incorporate market information into the market price of the stock." *KB Partners*, 2013 WL 2443217, at *7. During the Class Period, at least 11 analysts published at least 60 analyst reports on CS Disco ( Nye Report ¶¶29-30, Exs. 5A and 5B) well above the number courts have deemed supportive of a finding of market efficiency. *See Buettgen v. Harless*, 2011 WL 1938130, at *7 (N.D. Tex. May 19, 2011) (4 analysts); *see also Malriat v. QuantumScape Corp.,* 2022 WL 17974629, at *8 (N.D. Cal. Dec. 19, 2022) ("Courts have found this factor supports market efficiency with as few as four to seven analysts covering a particular stock.") (citing cases)

*Cammer* **Factor 3 – Market Makers:** The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the

12

market. *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431–32 (S.D.N.Y. 2014). In fact, courts have found the fact that a security trades on the NYSE in itself sufficient to satisfy this factor.[5] As Dr. Nye explains, the NYSE "uses a single designated market-maker ('DMM'), formerly known as a specialist, to maintain a competitive and efficient market for the securities assigned to that firm."  Nye Report ¶34.Moreover, during the Class Period, at least 80 firms made a market for CS Disco common stock, and over 100 institutional investors held its shares. Nye Report ¶¶35-36, 41.

*Cammer* **Factor 4 – S-3 Eligibility:** A company's eligibility to use SEC Form S-3 "is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. However, *Cammer* Factor 4 may still be satisfied if Form S-3 "ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met," because "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." *Cammer*, 711 F. Supp. at 1287. CS Disco common stock surpassed the minimum stock requirements of Form S-3 throughout the Class Period even though the Company was not eligible to file a Form S-3 during the Class Period due to timing factors. Nye Report ¶47; *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 431 (S.D. Fla.

---

[5] *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (similar). In fact, courts within the Third Circuit have gone so far as to say that if the security trades on a major and efficient exchange such as the NYSE or NASDAQ, analysis of Cammer factors is not required. *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. CIV.A. 05-1151 SRC, 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013) (finding "[t]he Cammer factors may be useful to determine efficiency if the market on which a security is traded is less open and well-developed than the NYSE" but not when the stock "trades on a major and efficient exchange."); *In re Heckmann Corp. Sec. Litig.*, No. CA 10-378-LPS-MPT, 2013 WL 2456104, at *13 (D. Del. June 6, 2013) ("Since the stock undisputedly traded on the NYSE during the class period,… the market is efficient.").

1991) ("a company's ineligibility for Form S–3 registration is not dispositive when it is due, as here, to timing factors") (citations omitted).

*Cammer* **Factor 5 – Cause and Effect Relationship:** A cause-and-effect relationship between "unexpected corporate events or financial releases and an immediate response in the price of the stock" can be an "important indicator of market efficiency." *Rougier*, 2019 WL 6111303, at *12.[6] However, "[A] plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017). The overwhelming showing on *Cammer* factors one through four renders *Cammer* factor five unnecessary. *Waggoner*, 875 F.3d at 97.

Nevertheless, Dr. Nye shows *Cammer* factor five supports approval. *See* Nye Report ¶¶48-56. Dr. Nye performed an event study[7] which shows "a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1287, 1291. An event study is a well-established methodology to determine whether a particular stock price reacts to new company-specific information and is generally accepted by courts when evaluating Cammer factor five. *See Rougier*, 2019 WL 6111303, at *15 ("Event studies are commonly used in securities fraud class actions."); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (event study methodology

---

[6] Notably, numerous courts have found that the fifth *Cammer* factor is not required to demonstrate market efficiency. *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *8 (E.D.N.Y. Jan. 11 2022) ("[I]f the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider . . . evidence supporting Cammer factor 5[.]"). *R. & R. adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016) (rejecting argument that fifth *Cammer* factor was needed to demonstrate efficiency), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F. 3d 79 (2d Cir. 2017).

[7] An event study is a well-established methodology to determine whether a particular stock price reacts to new company-specific information and is generally accepted by courts when evaluating Cammer factor five. *See also e.g., Rougier*, 2019 WL 6111303, at *15 ("Event studies are commonly used in securities fraud class actions.").

"widely accepted in the academic community and in the courts" to show cause-and-effect relationship contemplated by *Cammer*). Dr. Nye's event study created a model of trading in CS Disco's common stock that controls for broader movements in the market and CS Disco's industry. Nye Report ¶50. Dr. Nye found that out of the five dates examined during the Class Period, two (*i.e.*, 40%) are associated with statistically significant Company-specific returns at or above the 95% confidence level (one is a statistically significant negative return, and one is a statistically significant positive return). *Id.* ¶52. In sum, Dr. Nye found that "Disco's stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information, thereby supporting my conclusion that the market for Disco stock was efficient throughout the Class Period." *Id.* ¶54.

*Krogman* **Factor 1 – Market Capitalization:** Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Thus, "[t]he higher a company's market capitalization, the more likely that its shares trade in an efficient market." *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2016 WL 8604331, at *7 (E.D. Tex. Aug. 29, 2016), *report and recommendation adopted,* No. 6:13-CV-736, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017). During the Class Period, CS Disco's market capitalization was as high as $3.78 billion. Nye Report ¶55. By comparison, the median market capitalization of the 1,220 companies listed on the NYSE was $4.77 billion at the start of the Class Period, while the median market capitalization of the 2,999 companies listed on the NASDAQ was approximately $452.1 million. Nye Report ¶58. As of September 3, 2021 (i.e., the start of the Class Period), CS Disco's market capitalization was greater than 41.5% and 82.1% of NYSE-listed and NASDAQ-listed stocks, respectively. Nye Report ¶58. *See e.g., Rougier*, 2019 WL 6111303, at *13 ($1.0 billion); *J.C.*

15

*Penney*, 2016 WL 8604331, at *7 ($2.2 billion).

***Krogman* Factor 2 – Bid-Ask Spread:** The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. A "narrow bid-ask spread is indicative of higher trading volume" and suggests an efficient market. *Rougier*, 2019 WL 6111303, at *13. Conversely, a large bid-ask spread "is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Here, during the Class Period, the average bid-ask spread for CS Disco common stock averaged $0.03 (or 0.09%) with a median of $0.01 (or 0.04%), supporting market efficiency. Nye Report ¶¶42, 59; *see e.g., Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (2.44% bid-ask spread weighed in favor of market efficiency).

***Krogman* Factor 3 – Public Float:** The public float is the percentage of shares that are held by the public as opposed to company insiders. See *Krogman*, 202 F.R.D. at 478. "When stocks are predominantly held by insiders as opposed to the public, stock prices are less likely to reflect all available information about the security." *Rougier*, 2019 WL 6111303, at *13. A large public float indicates "there is a large proportion of shares that are available to non-insiders," and supports market efficiency. *Id*. Here, CS Disco's public float averaged 76.9%. Nye Report ¶60; *see McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (float of 57% to 69% supported market efficiency).

For all these reasons, the market for CS Disco common stock was efficient during the Class Period and Plaintiff is entitled to rely on the fraud on the market presumption of reliance.

### c.    Damages can be Calculated on a Classwide Basis

Plaintiff's proposed damages methodologies for their claims also entail myriad common, class-wide issues, further supporting a finding of predominance. *See Rooney v. EZCORP, Inc.*, 330

16

F.R.D. 439, 450 (W.D. Tex. 2019) (issues related to calculation of damages predominate where plaintiffs "demonstrate that their theory of damages is consistent with their theory of liability").

For the Rule 10(b)-5 claims, the predominance requirement is "easily satisfied" since Plaintiffs "invoke[e] the *Basic* presumption and seek[] out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15. At class certification, plaintiffs must show that they will be able to proffer a damages model that comports with their theory of liability. *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). "Plaintiff's burden for purposes of class certification 'is simply to propose'"—and not to establish—"'a methodology for calculating damages that corresponds to its theory of liability.'" *Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *10 (D. Mass. July 14, 2023) (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019)).

Dr. Nye shows that he will be able to calculate damages on a classwide basis. *See* Nye Report ¶¶61-66. Dr. Nye describes the method he will use to calculate the out-of-pocket measure of damages. *See id*. This is "the standard measurement of damages in Section 10(b) securities cases." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases)). To calculate out-of-pocket damages, Dr. Nye will use an event study to isolate fraud-related losses following the corrective disclosure. Nye Report ¶¶63-66. This use of an event study to calculate out-of-pocket damages "limit[s] damages to those that are attributable to [Plaintiffs'] theory of liability." *RH*, 2018 WL 4931543, at *3. "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action." *RH*, 2018 WL

17

4931543, at *3 (collecting cases)). Plaintiff will thus show how "damages stemmed from the defendant's actions that created the legal liability." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016).

Thus, although damages for each individual Class member may vary, the methodology for calculating damages will apply commonly to each Class member for all of Plaintiff's claims.

### 2.    A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) also requires that a class action be superior to other methods for adjudicating the controversy. Rule 23(b)(3). To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for the court to consider:

> (A) the class members' interests in individually controlling the prosecution … of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by … class members; (C) the desirability … of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Rule 23(b)(3); *EZCORP*, 330 F.R.D. at 451.

First, the proposed Class likely contains thousands of investors whose respective damages are small enough to render individual litigation prohibitively expensive. *See Prause*, 2020 WL 3549686, at *7 (superiority met where "[t]he costs … of individual litigation would prove prohibitive for potential class members"); *EZCORP*, 330 F.R.D. at 451 (same). Second, Plaintiffs know of no other pending actions concerning the claims alleged here. Third, concentrating litigation in this forum is desirable given the "geographic dispersal of investors" and CS Disco's headquarters is within this district, *id.*, and doing so would "promote[] judicial efficiency and economy, as well as uniformity of decisions." *Prause*, 2020 WL 3549686, at *7. Fourth, there will be no difficulties in managing this securities fraud case as a class action. Indeed, superiority is "easily satisfied" in securities fraud class actions. *See KB Partners*, 2013 WL 2443217, at *14.

18

**C.      Plaintiff's Counsel Satisfies the Rule 23(g) Prerequisite for Appointment as Class Counsel**

In confirming its appointment of Lead Counsel as Class Counsel, the Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Lead Counsel has substantial experience in the field of securities class action litigation in this and other districts. *See* Ex. C; *see also supra* §IV.A.2.d. Lead Counsel is qualified and the Court should appoint them as Class Counsel in this case.

## V.      DEFENDANTS WILL NOT BE ABLE TO REBUT THE FRAUD ON THE MARKET PRESUMPTION

To rebut the fraud on the market presumption, Defendants must show "***through evidence*** that the misrepresentation ***did not in fact affect*** the stock price." *Halliburton II*, 573 U.S. at 279. Defendants bear the burden of persuasion, not merely a burden of production. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126, (2021). "To prove a lack of price impact … the defendant must sever the causal link between the disclosure of the truth and the price drop." *In re Waste Management Sec. Litig.*, 2025 WL 958467, at *12 (S.D.N.Y. Mar. 31, 2025).

Defendants' misleading statements consisted of reassurances regarding the reliability of CS Disco's revenues and ability to predict those revenues, based on historical patterns of customer spend. Thus, the misleading statements at issue in this case would not be expected to cause CS Disco's stock price to increase when Camara uttered them, but rather prevent the decline that would have occurred had Camara told the truth.

"To prove a lack of price impact in an inflation-maintenance case, the defendant must sever the causal link between the disclosure of the truth and the price drop." *Waste Management*, 2025

19

WL 958467, at *12 (S.D.N.Y. Mar. 31, 2025). "[S]imply pointing to other potential causes for a stock price change following a corrective disclosure is ... not enough to rebut the *Basic* presumption." *Luna*, 2023 WL 4539855, at *10. That is because Defendants must show that none of the stock price decline results from the correction of the false statement. *Waggoner*, 875 F.3d at 105 (emphasis in original).

Again, Plaintiff **need not** show price impact. Defendants must, instead, show a complete absence of price impact by a preponderance of the evidence. Nevertheless, Plaintiff's affirmative showing of price impact establishes that Defendants cannot possibly meet their burden.

Dr. Nye provides further evidence of price impact. Unusual stock price movements are evidence that the market is incorporating news. Dr. Nye finds a statistically significant excess stock price decline on August 12, 2022. Nye Report ¶52 n.96. Because there is clear evidence of price impact on August 12, 2022, Defendants will not be able to show a complete absence of price impact. Finally, disaggregation of the portion of the loss attributable to revelation of Defendants' fraud is for summary judgment or trial. *Waggoner*, 875 F.3d at 105. Defendants cannot meet their burden of showing a complete absence of price impact.

## VI.    CONCLUSION

The Court should issue an Order: (1) certifying this action to proceed as a class action pursuant to Rule 23(a) and (b)(3) and certifying the Class defined herein; (2) appointing Plaintiff Bert Pluymen as the Class Representative; (3) appointing The Rosen Law Firm, P.A. as Class Counsel and Kendall Law Group, PLLC as Liaison Counsel; and (4) granting such other and further relief as the Court may deem just and proper.[8]

---

[8] Should the Class be certified, Plaintiff will submit to the Court for its approval a notice plan for the Class that complies with Rule 23(c)(2)(B). The cost of the notice will be borne by Plaintiff, subject to reimbursement as part of any settlement or judgment in his favor.

Dated: August 4, 2025                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         /s/ Jonathan Stern
                                         Jonathan Stern (*pro hac vice*)
                                         275 Madison Avenue, 40th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Fax: (212) 202-3827
                                         Email: jstern@rosenlegal.com

                                         *Lead Counsel for Lead Plaintiff and the Class*

                                         -and-

                                         **KENDALL LAW GROUP, PLLC**
                                         Joe Kendall
                                         Texas Bar No. 11260700
                                         3811 Turtle Creek Blvd., Suite 825
                                         Dallas, Texas 75219
                                         Phone: (214) 744-3000
                                         Fax: (214) 744-3015
                                         Email: jkendall@kendalllawgroup.com


                                         *Liaison Counsel for Lead Plaintiff and the Class*

21

## CERTIFICATE OF CONFERENCE

Pursuant to the Local Rules of this District, I hereby certify that counsel has complied with

the conferral requirement of Local Rule CV-7(g). Defendants oppose this motion.

/s/ Jonathan Stern
Jonathan Stern

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2025, a true and correct copy of the foregoing document was served on all counsel of record registered via the Court's CM/ECF electronic filing system.

/s/ Jonathan Stern
Jonathan Stern