**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

LYNN GAMBRILL, BERT W.       ) Case Number A-24-CV-28-DAE
PLUYMEN, Individually and )
On Behalf of All Others    )
Similarly Situated,        )
                           )
      Plaintiffs,          )
                           )
vs.                        ) Austin, Texas
                           )
CS DISCO, INC., KIWI       )
CAMARA, and MICHAEL        )
LAFAIR,                    )
                           )
      Defendants.          ) September 18, 2025

        *******************************

            MOTION TO COMPEL HEARING

    BEFORE THE HONORABLE MAGISTRATE JUDGE LANE

        *******************************

APPEARANCES

For Plaintiffs:       Mr. Jonathan Stern
Bert W. Pluymen       The Rosen Law Firm, P.A.
and the Proposed      275 Madison Ave, 40th Floor
Class                 New York, New York 10016
                      jonathan.stern@gmail.com


For Defendants:       Mr. Peter D. Kennedy
                      Graves, Dougherty, Hearon &
                      Moody, PC
                      401 Congress Avenue, Suite 2700
                      Austin, Texas 78701
                      Email: pkennedy@gdhm.com
- and -

For Defendants:          Ms. Ashley Kemper Corkery
                         Ms. Anuva V. Ganapathi
                         Cooley LLP
                         3175 Hanover Street
                         Palo Alto, California 94304
                         acorkery@cooley.com
                         aganapathi@cooley.com


Transcriber:             Ms. April Balcombe, CSR, CRR, CRC
                         501 West 5th Street, Suite 4150
                         Austin, Texas 78701
                         (512) 391-8795

Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

P-R-O-C-E-E-D-I-N-G-S

THE BAILIFF:  All rise.

THE COURT:  Thank you, everyone.  Please be seated.

THE CLERK:  Court calls for a motion hearing, Gambrill and others versus CS Disco and others, C -- 24-CV-28.

THE COURT:  Good afternoon everyone.  Let's start with announcements.  Tell me who you are and who you represent.  We'll start over here on my left, please.

MR. STERN:  Yes, Your Honor.  I'm Jonathan Stern from the Rosen Law Firm for the plaintiff, Bert Pluymen, and the proposed class.

MR. KENNEDY:  Your Honor, Pete Kennedy with Graves Dougherty representing the defendants.  With the Cooley Law Firm are Ashley Corkery and Anuva Ganapathi.

THE COURT:  All right.  Well, welcome to all of you.

Okay.  We still have issues remaining as it relates to the Defendant's motion to compel.  You all have -- it sounds like you worked to narrow some of those, but nonetheless, we still have what I -- y'all have helpfully categorized as four different categories of information that the Defense believes they're

entitled to and the Plaintiff either doesn't believe they're entitled to it or has already complied with it or otherwise.

We'll hear from Plaintiff on what their situation is. I guess as we attack this, I'll share with you just some initial thoughts. Much like the Plaintiff, I do wonder about the relevance, because that's the touchstone for whether or not what you're requesting is producible, what is the relevance as it relates to the hearing that I believe we have scheduled in early December, as it relates to class certification and how these -- if you get these responses, what form or shape they're going to take, how they're going to weave their way into the presentation that I'm going to hear in December and/or the writing that you all submitted in advance and after that hearing.

Some of it, I don't frankly understand what -- what the purpose of it is.

The other part of it is, is just how far does work product and attorney-client privilege go here? And so we were going to talk about that as well. But the motion is the defense.

I thought I'd let y'all go first and why don't we take them category by category, I think, would be the most helpful. And you all have numbered them,

and why don't we just stick with that.

Plaintiff's investment portfolio size and performance.  Who wants to speak?

MS. CORKERY:  Great, Your Honor.  Ashley Corkery on behalf of Defendants and I'm happy to handle the argument here.

THE COURT:  Great.

MS. CORKERY:  So I'll start with the investment history and the relevance is the first thing you raised.  As our case law cited, it goes first for upcoming class certification in opposition.  It goes both to typicality and adequacy.

So as to typicality, it goes to whether there are any unique defenses to adequacy, the sophistication of a plaintiff is, of course, front and center.  And it also -- just generally, Rule 26 is broad.

The information as to investment history and, again, we're looking, just document sufficient to show for a narrow time frame goes to rebut the fraud on the market presumption.

So by way of example, if lead plaintiff who is looking to represent a nationwide class, multimillion-dollar securities litigation, has an investment practice of investing in eDiscovery companies

or AI companies, that would be probative and indicative of purchasing irrespective of the actual challenge statements at issue.

I think also you can look at whether the trading practices are in the short term and glean quite a bit.

And that's why we said it's only --

THE COURT:  What do you mean on the short term?

MS. CORKERY:  In short term if as a purchaser, there are -- Lead Plaintiff's typical practice is to quickly do gains throughout, selling.  That would play into whether the challenged statements had any impact on his decision to purchase.

THE COURT:  I'm not trying to wordsmith here, but are you talking about in the number of trades they execute?  Is that what you're talking about or something different than that?

MS. CORKERY:  Correct, number of trades.  And I can give one example.  We recently received the supplemental discovery responses that show that Lead Plaintiff divested all of his CS Disco stock on one specific day in November in 2021 after the challenge statement, and then a year later, on that exact same date, divested all of CS Disco stock again.

It could be a coincidence or it could be a pattern and practice.  And looking at the surrounding trades as this -- this Circuit, the Northern District of Texas, the only Motion to Compel decision that compelled investment history recognized it's relevant in that regard.

I think also looking at Plaintiff's case law that was cited to show investment history sophistication, in those cases only was not sufficient to defeat adequacy or typicality.  It at least demonstrates in those cases the Defendants had access to the surrounding investment history.

We're getting class certification rulings looking at that and determining whether it's either decisive or it's one factor to play.  So as a Lead Plaintiff in a nationwide class, I think looking at that decision and what the practices are is highly probative.

This is not something where we can just go to deposition and ask Lead Plaintiff, you know, what are your other investments in the surrounding time period, what are your practices?

Because the response is going to be, without documents sufficient to show, I don't recall what day I traded that.  I, you know, generally have this practice.  But there is a lot more you can glean and there is no

burden here.

It's printing a brokerage statement, Schwab, Fidelity.  We actually in three months, where we received the CS Disco investments, received a few surrounding ones, so I don't see much burden here either, Your Honor.

THE COURT:  All right.  Let me ask you a couple of more questions.  What -- y'all have asked for five years of records.  What -- what is my begin date/end date and then what is the magic, particularly to the end date?

MS. CORKERY:  So the five-year surrounding was we just said five years to present.  Obviously that's shifted since we served the discovery in May.  We certainly work during meet and confer if there was another time frame that Plaintiffs' counsel preferred to work with and we would discuss the relevance.

I will say the only controlling Fifth Circuit N.D. Cal case, which is Brody v. Zix said that you're -- it's not just the class period because you have to look at the decision before to purchase the stock or the decision after to divest.

And so we'll need some surrounding time frame.  That's why we set it five years back from when all stock was sold.  I'm happy, Your Honor, in your

discretion what you believe is viable.

I think five years is certainly an easy pull and all relevant, but if there is something else Your Honor would propose, we're happy to...

THE COURT:  Well, with a proposed class -- or class action period time frame, I understand that July of '21 to September of '23.  How much before July of '21 do you need to go?

MS. CORKERY:  So it's through December 31st -- or sorry, it's through August 2022, January 2021 to August 2022.  So we were looking at, you know --

THE COURT:  Okay.  Well, I may have a wrong date here.  So what -- what is my class period?

MS. CORKERY:  Sorry.  So the class period is September 21st, 2021, to August 11th, 2022.

THE COURT:  All right.  Say that one more time for me.

MS. CORKERY:  September 21st, 2021 -- sorry, September 2nd, 2021 -- apologies, Your Honor, through August 11th, 2022.

THE COURT:  Okay.  How much before September 2nd of '21 do you need to go with this request?

MS. CORKERY:  I believe given we've seen divesting of all stock on a year, at least a year before

to see if that same year impacted it.

THE COURT:  Let's say you get back a Fidelity brokerage statement and -- by the way, let's back up on another thing.  Is the Lead Plaintiff Gambrill or Pluymen?

MS. CORKERY:  Pluymen.  Gambrill was the initial complaint before there was appointment for Lead Plaintiff.

THE COURT:  Right.  I do wonder sometimes if we should restyle the case, but I'll let the District Judge worry about that.  So Pluymen.  Let's assume -- is this still a form -- he is probably still a lawyer that practiced in the Austin area?

MS. CORKERY:  Correct.

THE COURT:  Okay.  Let's assume he has tons of money and he's trading and trading and trading.  How was -- you find that out and depose him and he said, yeah, those are my trades, what is your point?  What is your point?

MS. CORKERY:  Our point is to be able to look to see if it was actually a challenge statement that served any functionality in purchasing this stock or that impacted the decision-making, and to determine whether there were other factors and that would, even at the merits stage, be something that you'd look at for

04:00 the rebuttable presumption of fraud on the market.  And numerous courts have indicated that surrounding context is highly relevant.

THE COURT:  Okay.  Break that down one more level for somebody who is not as sophisticated, meaning me, in this area of the law.  What do you mean?

MS. CORKERY:  So in terms --

MR. KENNEDY:  Reliance.

The question is reliance on the allegedly false statement, did he rely on them when he decided.

THE COURT:  And the theory being if he is sophisticated, he is more likely not to rely on a false statement?

MR. KENNEDY:  Yes.

MS. CORKERY:  Correct.  Thank you.

THE COURT:  Okay.  Isn't -- a sophisticated investor and a Luddite investor, aren't they both entitled to truthful statements?  Why -- why does their status as sophisticated or not matter with regard to whether or not the statement is truthful or not in reliance?  In other words, is a sophisticated investor supposed to know when somebody may not be telling them the truth?

MS. CORKERY:  And I think, Your Honor, this goes back to kind of the seminal case on the fraud on

the market rebuttable presumption which is what this case is based on.

So Basic v. Levinson, the question is, there is a presumption by a showing that the Plaintiff traded or would have traded in stock despite his knowledge that the statement was false.

And that's the standard we're operating under, that 1988 case; and if the surrounding purchases defeat that, then that's relevant and that's what -- what cases are looking for when they look at that rebuttable presumption of whether there was any reliance.

THE COURT:  Well, it's a little different.  I mean, not only has this been referred to me, this initial class certification review in December has as well, so sometimes you get the benefit of, you could make an argument in front of me that's different than the one you'll make in front of the District Judge.

This is the same thing.  I'm just telling you, I don't understand the logic of how a sophisticated investor means they have less protection, then, from a statement that -- and I'm not saying your clients did this -- but we're dealing with the arguments that are being made, that that sophisticated investor is entitled to less protection than the unsophisticated investor as

it relates to the statements that they hear and rely upon.

MS. CORKERY:  And so it's not just they're entitled to less protection.  It's looking at whether they're typical of the class and whether there are usage defenses in the class certification decisions and then adequacy.

So even in all the case law that Plaintiffs cited as to, well, this didn't rise to the level in that one case, different facts, to show that they were an atypical investor or that they weren't adequate, it's relevant.

And Rule 26 -- we don't know what that surrounding history shows, but Rule 26 certainly provides that we're entitled to review that relevant --

THE COURT:  Relevant, but is it proportional? I mean, you're making -- frankly, it sounds like a bit of a fishing expedition.  Because I've asked you, let's assume you're going to get what you think you're going to get, which is a robust Fidelity statement which shows an active trader investing -- and I've heard the word reliance, I get it.

I'm just warning you, as it comes to December, if there were statements that were made that were false or not false is going to be more material to

me than whether or not somebody was sophisticated or not.  And that's the part where I maybe don't know enough.  And it's kind of your last clear chance.

Explain to me one more time, I guess, why the status of the investor, whether they execute a lot of trades and have a lot of money, is different than the investor who has worked for the Government his whole life and only owns mutual funds and gets into this?  What's the --

MS. CORKERY:  So I understand Your Honor's reservation.  There is certainly case law that's looking at that to look at whether that's typical or adequate, but even if we take two cases that Plaintiffs cited in their opposition for case law that, consistent with your notion that, you know, the investment didn't defeat class certification on those two grounds, in N.D. Cal cases, Kalodner and In Re: First Republic Bank.

The Court went on to say that that evidence is still relevant at trial and goes to the reliance.  And that is -- we don't want to be back to the courtroom again when we get to the merits of rebutting the fraud on the market.

And so courts have looked at the surrounding investment history, and, again, the only Fifth Circuit case we have is that Northern District of California,

Brody v. Zix, which did find and compelled trading history for this very reason.

THE COURT: Okay. Mr. Pluymen's decided to be the named plaintiff in this case. Why didn't that immediately subject him to a little bit more invasiveness in his personal business? The privacy arguments you made don't work for me at all, so why isn't this material relevant for the reasons Counsel stated?

MR. STERN: Yes, Your Honor. And we will focus on the relevance issue, not the privacy issue. And Mr. Pluymen did agree to be a named plaintiff in this case and he provided, as Defendants noted, trading statements showing all those trades for the month where he traded, you know, we -- CS Disco's securities in one of his accounts.

In the other account, we just have the tax statement -- we just have the statement that shows all the trades. So he has provided those. The issue here is relevance.

And in this case, as the Defendants note, the fraud on the market presumption applies, which means that we're not just saying that class members were harmed because they reviewed the false statements.

What we're saying is, those false statements

caused the price of CS Disco stock to be higher than it would be otherwise, and when the news came out, the price dropped.

And we're saying that everyone, every investor, whether they're sophisticated, whether unsophisticated, from, you know, Warren Buffet down to someone who just downloaded the Robinhood app, relied on the integrity of the price and this affected the integrity of the price.

And so for that, sophistication is not relevant. His trades in other securities isn't -- aren't relevant. What's relevant is, you know, when did he purchase, when did he sell his transactions in this company, and their -- Defendants were saying they want to use it to rebut fraud on the -- fraud on the market presumption.

But, again, it's not necessarily based on, you know -- even if he did say, I want to invest in every AI company out there and bought every publically-traded company that said anything about AI, it would still be true that he overpaid for this security because the price was inflated by the fraud according to our complaint.

And now obviously that's a contested allegation, but it's a common issue to everyone. And so

why he bought or didn't buy isn't relevant in this case because he relied on the price, and we would note that in the Cassava Sciences case just a couple of weeks ago, Judge Ezra noted that investor sophistication doesn't -- doesn't disqualify a class representative in a fraud on the market case, much like this one.

THE COURT:  But that's not the only claim you've made.

MR. STERN:  Our -- our claim is entirely based on the fraud on the market.  It's not based on necessarily who read what.

THE COURT:  Thanks for reminding me.  Let me go back over here.

MR. KENNEDY:  Part of my role is the fact that I'm not sophisticated, Your Honor, in securities as well.

THE COURT:  You and I are in the same boat.

MR. KENNEDY:  So I tell you what, as I understand, right?  They plead fraud on the market.  We have not conceded that they've accurately or can rely on that, but they are pleading.  So we're entitled to discovery to find out whether we can rebut presumption here.

The issue doesn't go to the merit.  We're not asking for this discovery to keep the claim.  We're

just showing that the statement is false, but it goes to commonality and typicality.

So if Mr. Pluymen didn't rely on those statements, all right, if they -- let me back up.  If they can't plead successfully fraud on the market, they can't certify a class because every investor may have made the decision based on different reasons.

That's why fraud on the market exists.  It's so that you can -- can certify the class.  We're not there yet.  And so what we're trying to find out is, did Mr. Pluymen rely on these statements or did he make other decisions?

Now, he's going to say he bought it just based on the price because they don't want to say that he relied on the statements because if they introduced reliance, it's going to defeat class certification, right?

But we're at the early stage of trying to understand Mr. Pluymen's investment decision-making.  And the fact that he bought these stocks tells us something.  How active a trader he is and his methods of trading will tell us a lot more for us to be able to test his assertion that he's doing it based on the price.

So it's at the early stage and we need to

know what his investment practices are because, A, he wants to be the Lead Plaintiff in a certified class action and, B, he is insisting that he is typical and common among all of them. And it seems like we're entitled to figure out if he is or isn't.

And it isn't because we have an extra defense if he is or isn't sophisticated. The question is whether they can meet their burden of class certification. And their burden of class certification relies entirely on them successfully stating a claim that can be a fraud on the market claim and our inability to rebut that.

THE COURT: Gotcha. My question was going to be: Counsel mentioned the Ezra opinion that called into question whether or not this information is necessary. What do you say about that opinion? As I think -- this is an Ezra case. It is. So why should I order something that he has recently said is not material or relevant?

Why don't you summarize, Mr. Stern, which case you're talking about?

MR. STERN: Yes, the Cassava Sciences decision on class certification, Judge Ezra certified a class based on the fraud on the market theory, and the Court, in certifying, noted in a footnote that the -- and I

have to go look and find the case, but the Court noted in a footnote that sophistication doesn't defeat the appropriateness of a class representative for class certification of a fraud on the market case.

And it was just a footnote, but I do think there is more case law that is saying that the reason for this is, you know -- as they say, their goal is to rebut the fraud on the market presumption.

The question -- the presumption is that their state- -- alleged misstatements inflated the price of the -- of stock and, therefore, everyone was damaged when they bought the stock at an inflated price.

And so Mr. Pluymen's sophistication or not doesn't change what the price was.  You know, it's a question of sort of how did the market react to that information, not a question of what is his particular strategy, because our point is, it's the price that's inflated and everyone paid the same price.

MS. CORKERY:  And your --

THE COURT:  In other words, if I go with you and order five years and they have the right to appeal to Judge Ezra, I guess, within seven days or so, what assurance can you give me that he's not going to cite his own case and say -- and overrule me?

MS. CORKERY:  So that was a ruling on class

certification and the surrounding context is as though in discovery they were reviewing whether they were sophisticated investors.

So in that case, all that Judge Ezra did was reject the argument that the plaintiffs were atypical of the class because they were sophisticated investors.

At no time in that decision was there an understanding that it wouldn't either go to typicality or that it wasn't discoverable evidence because it was limited to just the idea that it's pretty common.

We're looking at all these class certification rulings that you look at the sophistication, the usage defenses, and I can't see that that would -- an order as to it not being certified or being -- having any import on a discovery order.

THE COURT:  Okay.  So this is one of those, Judge, we want it, we're entitled to it under the law but Judge Ezra is probably not going to think it's material and I've already telegraphed to you, the logic of it doesn't make sense to me either.

And I'm going to be helping Judge Ezra with the decision whether or not this class should be certified.  So you still want it, but I don't get it.

Listen, I'm going to terminate further discussion.  I'm going to -- Mr. Pluymen, when he made

the decision to be the Lead Plaintiff, he opened up himself a bit more than maybe everybody else.  That's a decision that the Lead Plaintiff needs to make before they get involved in one of these cases.

So I'm comfortable ordering, because I do think it's relevant, although barely, the information. But I'm -- I'm going to -- just so I have my dates right, from January 1st of 2021 to 12/31/2023.  So that's one, two -- three calendar years of the information that was requested by the Defendants.

Is it -- I should know this, but I trust there is a Protective Order or there can be or will be?

MS. CORKERY:  There is a Two-Tier Protective Order.

THE COURT:  Now, is there anything about the trading statements other than that needs to be redacted or --

MR. STERN:  His account numbers, we redact the obviously, you know, personal identifying information.

THE COURT: Okay.  Yes.  Okay.  So split the baby in half -- almost in half.  All right.  Just for -- because we're kind of on the Lead Plaintiff, I'm going to jump to Category Number 4, which is what work has the Plaintiff done that evidences his capacity to be the Lead Plaintiff, if you will, in this case.

What is your objection to giving us more than his talking to his lawyers?

MR. STERN:  Well, yes, Your Honor, our concern was, we asked.  You know, Defendants said, we want more detail.  We asked, what more detail do you need?  They -- so they sort of tell us, you know, if you say this, this, and this, that would be sufficient.

And so we didn't want to have a back-and-forth where we keep modifying and modifying.  And in addition, Mr. Pluymen is going to be deposed on Tuesday and, you know, in terms of the number of hours, that's obviously constantly changing.  And, you know, as of Tuesday, he's going to spend significantly more hours than before since he will be sitting for his deposition.

So it seems like, you know, we provided an answer.  They wanted more detail.  They wouldn't say what, and he's going to be deposed and they are going to be able to ask as much detail as they want on Tuesday, so it seems like the most efficient thing to do is to -- to take that and if they have more specific questions, they can ask him on Tuesday.

THE COURT:  True, but they're not obligated to wait until the deposition to get answers to their discovery.  The issue is whether or not the answers you've given are sufficient.  Why aren't they

sufficient?

MS. CORKERY:  Your Honor, they're not sufficient.  We asked specifically in meet and confer, you say regularly in response to that interrogatory.  We regularly communicated about briefing and it's a very terse, perfunctory response.

We said, can you just quantify it's weekly?  Biweekly?  You can indicate, you know, closer to exit becomes why.  Our worry with waiting until deposition is that you're on the record.  You have seven hours.

We're preparing and Lead Plaintiff could testify -- just a hypothetical -- of, I'd have to go back and look at my calendar invites or emails to figure out how often I was.

We're not looking for a highly detailed, but clearly a one sentence of, I regularly communicate, is not giving us much understanding.  Because Lead Plaintiff at the end is clearly going to seek some sort of award, and it's difficult on that verified response to justify or for us to question an award amount when we have no idea of what level of work has been put in.

Obviously as a Lead Plaintiff in a nationwide large class action, you have a duty to supervise and monitor and we're looking for some level of description that gives that to us.

I know in Plaintiffs' opposition, it was stated that we now have a class cert declaration, which Your Honor will see before the hearing. And the sole thing that that declaration states is, I have communicated with Rosen Law, and then goes through a couple of motions, but there is nothing as to the amount of time dedicated or, you know, what quantifiable work's been put in.

I certainly understand, Counsel, that that can change through time but some sort of disclosure beyond a quick sentence, I believe, is required under the discovery rules.

THE COURT: So, again, you guys are, I trust, involved in this area of the law more than I am. What do you typically expect to see the Lead Plaintiff say?

MS. CORKERY: So I think the case law that was cited was very intuitive, especially on Plaintiffs' side. If we take Plaintiffs' side, for example, of the Slaughter case, that said you don't need to detail every minute point, but you can't be so high level that, I communicated regularly, leaves us without an understanding.

So I think either quantifying by hours or identifying some more level of information is helpful. I'm sorry. Thank you.

Another case, you know, that Plaintiffs have cited which is the Astor case had said you largely need to do more detail and provide something and I agree --

THE COURT:  The devil is in the detail.  What detail do you want?  Because I'm going to go -- I'm going to turn to Mr. Stern in a minute and I'm going to tell him the one-sentence answer is not enough.  He has got to do more.

But like he told me earlier and I kind of still -- I don't understand what you want him to do, do you want him to say, on January 10th, we had a one-hour conversation with counsel; on February 5th, we had a 45 minute, what do you want and what is that going to get you?

MS. CORKERY:  So the quantifiable amount of time, so we asked them to quantify the time and to provide more detail.  So right now what it states is: I, you know, regularly communicated about the complaint, about class certification, about this.

Did you skim it before?  Did you review it after?  We're not looking to wade into any sort of privileged communications or the substance, but simply the technical points of:  I had a practice of thoroughly reviewing in advance.  I, you know, on average have X amount of hours, something more than what we have.

I agree with you, Your Honor. Every court in discretion is different, but I usually, in class actions, see quite a bit more than what we have and --

THE COURT: Understood. Tell me what you want. I mean, because you have that experience, what -- what have you seen? I mean, don't give me your pie in the sky what you want, but what have reasonable jurors ordered people in Mr. Pluymen's position to provide?

MS. CORKERY: A reasonable response that I've seen that's not asking for pie in the sky is the number of hours spent on major tasks and details as to, for that specific task, you know, was it reviewed before? Was it reviewed thoroughly or was it skimmed, for example. I've reviewed the production, or I was, you know, told about the production.

THE COURT: Mr. Pluymen, again, as we alluded earlier, he is a lawyer. As I recall, he is a good one, so be careful what you ask for. What -- hearing what their complaint is and hearing me also tell you that you've got to do more than just regularly communicate with counsel, what do you propose I order you to do that's reasonable?

MR. STERN: Yes, Your Honor. Well, we propose we can provide the total number of hours spent thus far, though I wouldn't know -- this is only going to be as

of, you know, when we're providing it.

THE COURT:  Right.

MR. STERN:  And I would also propose that we could identify the specific -- you know, we could identify the specific documents he's reviewed as well as, you know, I think at this -- you know, preparations for -- you know, preparations for class certification. And we can sort of go through -- you know, we can talk about pleadings, motion to dismiss stage, and, you know, post motion to dismiss class certification at the discovery stage.

MR. KENNEDY:  I had, again, unsophisticated timesheets.  We ordered him to produce timesheets that would be adequate to recover attorneys' fees in federal court -- time, date, work done.

THE COURT:  If you've got a case that tells me that.

MR. KENNEDY:  I don't, Your Honor, but I think it's within your discretion.

THE COURT:  No, it is.  And that's why I was asking earlier.  Again, giving you all credit for being more immersed in this area in the law than me, which is a fact, why plow new ground here?  What are -- what are smarter judges than me ordering here?

MR. STERN:  Your Honor, I can speak for that.

Timesheets seem highly unusual since courts typically don't provide them and he hasn't been keeping contemporaneous records.

He is acting as a party here, not as -- you know, as an attorney, although he is an attorney.  So if he is providing time sheets, he would have to produce them retrospectively which is not something that we typically do with timesheets.  They're supposed to be kept contemporaneous --

THE COURT:  I'm not doing timesheets.  I'll tell you why.  You all haven't offered that up anywhere here as what you wanted.  It is kind of late with timesheets -- it does seem -- I'm getting ahead of myself here.  All right.

Nobody is helping me out a whole lot here. Tell me, again, because I'm going to put it in the written order what you're going to do to enhance that limited response that you've given so far.  Number of hours spent --

MR. STERN:  Number of hours, we can -- I think we could maybe break this down to the pleadings motion to dismiss stage, the motion for reconsideration, the discovery and class certification, and provide the amount of hours spent on each of those and a two-sentence description as to each category of the type

of work done.

THE COURT:  All right.  Here is how I'm going to summarize it, number of hours spent on selected tasks.  And what was that last part you offered?

MR. STERN:  For the different categories, a two-sentence description of each category of tasks.

THE COURT:  Okay.  That's the reasonable compromise we're going to strike.

MS. CORKERY:  Great.  And, Your Honor, the only thing I would note is, I know this is two-sentence descriptions.  I'm sure this is -- but then if -- whether filed pleading was reviewed before or after.

THE COURT:  I trust you'll include that?

MR. STERN:  Yes, Your Honor.

THE COURT:  Okay.  And we're -- you're going to get what we're all going to anticipate.  How is that going to help?

MS. CORKERY:  This will be largely helpful as adequacy, as Your Honor will see in the upcoming hearing is a core part of this, highly relevant, and the extent to which the Lead Plaintiff has monitored, supervised, or been involved, will -- this will be one indication of that.

THE COURT:  Well, I anticipate the information you get will not help you with that argument at that

time.

So moving on, the next -- I actually thought those first two were the easiest ones and we've already have been at it for 35 minutes.

2 to 3, any preference on which one of those you want to tackle first?

MS. CORKERY:  No, Your Honor.

THE COURT:  All right.  Maybe as between 2 and 3, 3 being maybe a little easier for me to get my -- wrap my arms around:  The facts underlying the claim of misleading statements.  Why don't you, in a nutshell, tell me what you've gotten and why it's deficient and what you expect.

MS. CORKERY:  So, so far for those six contention interrogatories, we've received a response that it's premature, and I think this also goes through other discovery as well.

We have asked in meet and confer that Plaintiff merely state either does not have any underlying facts at this time and we'll supplement once available, or to identify it.

And I think if you look at just Interrogatory Number 11, that one is most astonishing because it is requesting that the Plaintiff identify what alleged misstatements are and who said it and the

fact that it's premature at this point, yet that goes back to the entire pleadings concerning.

Even some of the case law that Plaintiff had cited, the Hoose v. Jefferson, for example, found saying, See complaint, and the response, to be clear, doesn't even say that yet, is insufficient because the complaint's not verified.  The contention interrogatories are.

And our worry is that we'll get through class cert briefing, through discovery, and later find out the theory of what the alleged misstatement is and the securities action is broader or different from the assumption we have been operating under.

So for Interrogatory Number 11, I would say that's not premature.  That's the crux of this case. And for the remaining, for anything that supports that, we should know as we proceed through discovery as it will inform the scope of discovery.

THE COURT:  I have to be honest, as I read through the four different categories, I did question relevance on some of these.  We've touched on that.  But I did think this particular one the Defendants wanted was one that you should have to respond to.

Tell me why that -- this isn't fair game. And you've got to do something more than, See the

complaint.

MR. STERN:  All right.  Yes, Your Honor. Again, we're not saying that we should not at any point have to respond to these --

THE COURT:  Yeah, but right now before -- why certify a class if we find out it blows up later, right?

Why aren't they -- I mean, if you're so sure of yourself that you want to commission a nationwide class on this, my sense is you've got to have some better information than "see the complaint" as it relates to answering this category of questions.

MR. STERN:  Yes, Your Honor.  The first is, again, we haven't received any documents.  And my understanding is there's actually an initial production of documents that's ready to go this week.

And so obviously we will be -- if Your Honor orders us to provide this, it will be -- we will be having to answer it as we're sort of reviewing the initial production of documents that they gave us, so that --

THE COURT:  So your theory of the case is going to change depending on what documents they're going to produce?

MR. STERN:  Well, if we learn additional information, that might bear on, you know --

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

THE COURT:  Well, that's always true, but as right now, again, this thing has been around, what, 18 months or so.  You have a theory of the case.  You've articulated it in a complaint.  You've got to do more.

MR. STERN:  Yes, Your Honor.  And when I say that, I mean, the first question really would ask us to restate information that's in the complaint and these are -- you know, these contingent interrogatories are typically, you know, provided -- again, provided a standard for when contingent interrogatories are ordered before the close of discovery, and I don't really feel like that issue was addressed.

There is specific reasons why you'd provide them.  This would largely be restated information in the complaint and we were subjected to a higher pleading.  I mean, I'll -- in notes, I see the complaint.  If we're ordered to do this, we will -- you know, but it will largely be restating information in the complaint because we were required to put all of the factual basis for the information in the complaint --

THE COURT:  Are you going to have to meet a fraud standard with this?

MR. STERN:  We had to reach -- we had to reach a higher standard than a typical fraud standard.  Unlike a normal fraud case, we had to -- for each statement

that is alleged to be misleading, we had to provide the facts supporting it and the reasons for any information provided, information belief.

And we had to show a strong inference of scienter which is a high -- again, so we had to show that it was at least as likely as not the Defendants had knowledge. And we had to have factual pleadings that were sufficient for that.

The -- you know, Congress has decided that pleadings needs to be, you know, at -- to a higher standard in securities fraud cases, and we met that standard.

THE COURT: I'm going to end up ordering them to comply or to -- to answer the questions that have been posed in this Category 3: Facts underlying the claim of misleading statements.

But to Mr. Stern's argument, isn't he just going to get a good associate to re-craft the complaint, answer your questions, and won't that be compliance with the questions that you say need to be answered?

Again, this is -- again, this is one of those, I'm not really sure what more you expect them to do other than what they have given you in the complaint.

MS. CORKERY: Well, Your Honor, this -- even just after Lead Plaintiff appointment filed, that was

more than a year and a half ago, the amended complaint, and especially after the motion to dismiss ruling, we're entitled after we served this discovery in May 2025 to see what, if any, additional facts they have.

Of course at the end, like, Plaintiff can supplement, but this is all -- the case law uniformly says that you need to identify the information you have as of that date.  Even Plaintiffs' own cited case, Brassell v. Turner, another one they cited, had ordered to state that this is based on facts that you had even before you filed the complaint.

And so you are under an obligation to verify what those facts are and what else do you have in a year and a half since you filed your amended complaint.

THE COURT:  Okay.  I'm going to order that you do that.  I don't see -- I don't see them doing a whole lot more than what's in the complaint -- and then obvious -- or the amended complaint and anything that I guess has arisen since.

MR. STERN:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  The last category is:  Witness information.  Let me see if I understand -- let me get to where I understand where we are with this one.

(Reading):  Defendants want to know the

identity of third parties -- the identity of each third party with whom Plaintiff or counsel has communicated regarding this action.  That's Number 2.

And Interrogatory Number 3 is:  Seeks a description of written records of communication with third parties.  Defendant also offers -- we're not seeking the substance of the communications either way, but we are seeking kind of what?

Do you want to know whether or not Mr. Stern last week talked to somebody about this case?

MS. CORKERY:  Your Honor -- and I can clarify here so there is no miscommunication.  What we're seeking is the identities of third parties that Plaintiff has communicated with counsel, the dates, and then the -- any underlying documents.

So there is case law that we cited where, if it is a preexisting document or fact, for example, something about CS Disco in the market, all of those are discoverable, they're not privileged.  We are not wading into any work product.

The case law that Plaintiffs cited was as to, you know, opinions, mental impressions, notes from a live, you know, interview with a third party.  We're not seeking any of that.

We're just seeking the preexisting facts of

documents that would be exchanged that are discoverable and then just the date and names.

To date, the Plaintiff has taken the position that third parties such as a putative class member, their identity is privileged to work product.

We're not looking for work product as to all the members they decided putative, potential class members they didn't contact.  We're just seeking who they've spoken with.

We don't need to know anything about the substance of that conversation that they would have memorialized separately.

THE COURT:  So what do you expect if -- let's say I go your way, what do you expect to get from me? Not -- not from me, I'm sorry, from them?

MS. CORKERY:  The date -- the date of each interaction with that third party, so it would be the date when the former employees or the putative class members met with or conferred with Plaintiff and then whether any preexisting facts or documents, what those documents were that were exchanged, the underlying documents.

THE COURT:  Would those documents otherwise already be discoverable?

MS. CORKERY:  They would be.  So we have a

separate request for production that seeks the production of any documents referenced in your responses.

So an entirely appropriate response to this interrogatory would be, See Bates xxx for those communications.

THE COURT: But if they've already given it to you, you already have it?

MS. CORKERY: Correct, and we don't have any -- any underlying documents, for example, that perhaps putative class members sent over.

THE COURT: So, again, I have never seen this request. Again, I -- maybe it is common in this area, but I want to know what opposing -- who everybody opposing counsel has talked to. It's a new one for me. You're entitled to that?

MS. CORKERY: The identities of third-party witnesses and we've cited cases, so Orgulf v. Magnolia and Shenwick v. Twitter, for example, gave the interview dates by which they had interviewed individuals.

THE COURT: But not their names?

MS. CORKERY: Dates and names for that and then, you know, for underlying documents shared, it was actually in the case in opposition for the Plaintiff, In Re: New Century noted that preexisting documents that

putative class members have provided to counsel is discoverable and that was noted in a footnote in our reply.

THE COURT:  Let's take that little sliver. Isn't that true?

MR. STERN:  Your Honor --

THE COURT:  That last part.

MR. STERN:  -- I'm a little bit surprised about this because I didn't see the briefs in the reply, and I didn't think it was still sort of a live issue. Into -- any documents that we were provided -- again, you know, this is -- they're making it two separate things.

So we contended that our interviews in connection with investigating this case with potential, you know, former employees, we contended that that was attorney work product because we -- you know, because we prepared memoranda in anticipation of litigation.

Communications with our clients are attorney-client privilege -- sorry, communications with potential class members are attorney-client privilege, and that would include the underlying documents, just like we wouldn't say, hey, send us and identify for us a list of every document that, you know, Kiwi Camara, the Defendant, has sent to Cooley, LLP.  We would never ask

that because I think that's pretty clearly trampling on to the attorney-client relationship.

So asking for us to produce, you know, documents that class members provided which also they haven't stated the relevance of why one individual class member, and the only documents they provided to us are their trades, why, you know, that person's trades who's not -- as Your Honor noted, Bert Pluymen did decide to become an owned plaintiff. That carries with it certain obligations.

But individual class members who didn't decide to become Lead Plaintiff and just communicated with us, it strikes me that that -- it cuts both ways.

THE COURT: Tell me how getting -- finding out who Mr. Stern's colleagues have talked to, how that's going to help with the issues we're going to be dealing with in early December?

MS. CORKERY: With respect to early December, so for just class certification, we don't, you know, know with whom they've discussed, but it's certainly relevant even for initial disclosures that were due as to individuals who may have information relevant to claims or defenses that would be used at trial.

So it's within the scope of Rule 26. I agree with Your Honor that particularly to focusing on

class certification of adequacy, typicality, numerosity, kind of -- this is -- this is a larger point.

But we cited multiple cases, In Re: Wells Fargo, for example, that the client-lawyer relationship with a potential member of the class doesn't begin until the class is certified.  The class is not yet certified.  If it were, you know, that would change.  But right now, that's why case law says they're not a member.

For example, Kiwi Camara is one of our clients.  Defendant in the action would be a putative class member.  But right now, those communications are not protected, and that's what the case law demonstrates.

MR. STERN:  Yes, Your Honor.  You know, again, they -- this is just, again, a reversal of what they said on reply.  On replying, they said they're not seeking communications.  We understand those communications are privileged.

And now they're arguing that they're not privileged because they're not yet a client, but a prospective client still has an expectation of confidentiality and privilege.

And, again, this is not, you know, my privilege we're defending, it's not Mr. Pluymen's.  It is privilege of absent class members who either weren't

eligible or decided not to be clients.  We have no idea what the relevance is of -- and you know they said they might be, you know, individuals that might have -- they brought up our initial disclosure obligations.

Defendants have repeatedly misstated.  It is people that we might, you know, provide evidence from at trial and we have no intention at this time for calling action class members.

And to the extent that that's our obligation, we've done it.  We haven't listed them because we don't deem them to be relevant under those initial disclosures.  So I really have no idea what the relevance of these askings are.

THE COURT:  Yeah, I don't either.  Burden is on you all.  You haven't convinced me.  I am going to deny your requests that are categorized in Category Number 2, witness information.

You're dancing so close to attorney-client work product, and up against the backdrop of that, I don't see the relevance.  I don't see it at this time, not even close, really, for me, so that one is going to be a denial.

So I'll enter a short, written order that memorializes how we're treating those four categories, but that's going to be of no help.  I think it's better

that we've talked about it here and I think we have a general understanding of what needs to be done.

MR. KENNEDY:  Yes, Your Honor, just on -- on Number 1, there is one issue I just wanted to clarify -- it just occurred to me as we're discussing other ones. Mr. Pluymen has additional accounts where he didn't trade CS Disco securities.

I believe they were for the benefits of others in his family.  We would ask that he provide the trades just in the two accounts where he did.  It simplifies things and it's the accounts where the -- so it's the most relevant.

THE COURT:  I think you have to go a little further than that.  I don't know if they're going to be entitled to all the -- like, if he's with Fidelity, Schwab and all these other places, trading for and on behalf of trusts and other people, but I mean, at the deposition, he's certainly going to have to talk about that.

MR. STERN:  Sure.  You know, they can ask him about all accounts he has.  But he has two accounts in his own name for his own benefit.  One is an IRA and one is a regular account.

THE COURT:  Is he trading --

MR. STERN:  He is trading in those two, and

that's what I'm proposing that we provide.

THE COURT:  I know, but he's trading other account -- I mean, like, in my family, I'm the one doing everything.  So is that what it's like for him?

MR. STERN:  I believe so.

THE COURT:  So doesn't that -- isn't that relevant to whether or not he's a sophisticated trader?  Whether, like, for instance, if he is buying AI stocks in the name of the trust and he's very active over here, isn't that relevant to this?  Find a way to summarize what he's traded in everything.

MR. STERN:  In every --

THE COURT:  Yes, anything that he's doing that evidences that he's a sophisticated trader and investor.

MR. STERN:  Okay.  We will --

THE COURT:  I know I'm -- I'm trying to give you better guidance.  I don't think you can cabin this to just the trading accounts that involve CS.  You've got to provide a fuller picture of who he -- what type of trading he's doing.

I think the individual trades that he's making over here aren't necessarily necessary but is -- perhaps his holding positions or -- and find a way to summarize --

MR. STERN:  If --

THE COURT:  -- his trading conduct across -- that -- anything that he's engaged in, find a way to summarize that, and then he'll be open to asking -- or he'll be open to questioning at the deposition on those broader issues.

I mean, for instance, let's say, he's -- I'm making this up -- he's trading a trust account through Schwab.  So you give him a summary.  He's trading a million dollars in a trust account through Schwab, executing transactions totaling $800,000 that year.

I think they're entitled to ask, you know, What -- Are you trading on a weekly basis, daily basis?  Bop, bop, bop, bop.  And I don't know how much further you need to go.  I mean...

MR. STERN:  So, yes, so we could -- we could, in addition, provide a written -- you know, he has these other accounts as to how much we're -- and I'm not -- I'm not actually totally sure which were open when.

So obviously I can't speak to that sitting here, but to the extent were -- any were open during that time period, we could just provide a written descript saying he also had, you know, the following other accounts.  He traded in them.  This is how much money was in them.

THE COURT:  That's good enough for me, given

where we are right now.

MS. CORKERY:  And your Honor, just to clarify, would it be types he's traded and amounts so we can break down if he's divested everything on the exact same day as was twice as CS Disco?

THE COURT:  Say that again.

MS. CORKERY:  Would it break down as to each stock, then, what was traded, so we can see if everything was divested on the same day as we saw a pattern with CS Disco?

THE COURT:  Okay.  As it relates to the two accounts that traded CS stock, you are getting over the whole kit and caboodle --

MR. STERN:  I mean, they already have the account statements for those dates.

THE COURT:  Yes.

MR. STERN:  We will make sure that they're there so that --

THE COURT:  You want individual trades that he can -- he executed in other stocks --

MS. CORKERY:  So it's --

THE COURT:  -- for other people in his family?

MS. CORKERY:  If he's trading in their particular names.  We're not just getting the brokerage name.  We're getting the actual name of what he's

trading in; is that correct?

MR. STERN:  Not for the other accounts on behalf of other members of his family, I didn't think.

THE COURT:  What are we talking about?  I mean, are we talking about five, six other accounts worth millions of dollars or what are we talking about?

MR. STERN:  I haven't asked him about the amounts -- I know there's -- I believe -- again, I just want to -- I believe there's three other accounts, one is an IRA in his wife's name -- I don't know -- I believe it's hers, and I think there are two in the kids' names.  I have to check.

THE COURT:  Do you know what?  You produce it all.  But I am telling you right now, you're asking for a lot, and I don't understand the relevance of it.  So make sure it's under the Protective Order, redact what you need to redact.

For the other three accounts, what I'm trying to say, you need to provide the same level of detail as you're going to do -- provide for the same two CS Disco accounts that he traded.

But what I'm telling you all is I don't understand the relevance of what you're doing here, but because he is the named plaintiff, my standards -- my standards are relaxed a little bit here, but I'm telling

you when we get to the hearing in December and you get all this information, you better tell me why you needed it so much --

MS. CORKERY:  Yes, sir.

THE COURT:  -- because I don't get it.

MS. CORKERY:  Yes, Your Honor.

THE BAILIFF:  All rise.

*(Proceedings concluded.)*

REPORTER'S CERTIFICATE


        I, APRIL C. BALCOMBE, DO HEREBY CERTIFY THAT THE
FOREGOING WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING
MADE AT THE TIME OF THE AFORESAID PROCEEDINGS AND IS A
CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM
THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT
THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE
PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE
UNITED STATES, ON THIS 30th DAY OF SEPTEMBER, 2025.



                    /S/April C. Balcombe
                    APRIL C. BALCOMBE, CSR, CRR
                    Official Court Reporter
                    United States District Court
                    Austin Division
                    501 West 5th Street, Suite 4150
                    Austin, Texas 78701
                    (512) 391-8795
                    SOT Certification No. 5752
                    Expires: 7-31-26

        APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
   U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)