**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| LYNN GAMBRILL, Individually and On Behalf of All Others Similarly Situated, | § § § § § § § § § § § § | |
| *Plaintiff,* | | |
| v. | | No. 1:24-cv-00028-DAE |
| CS DISCO, INC., KIWI CAMARA, and MICHAEL LAFAIR, | | |
| *Defendants.* | | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR CLASS CERTIFICATION</u>**

## I.      Introduction and summary.

In its first four quarters as a public company, DISCO consistently beat its public revenue projections, known as "guidance," as its year-over-year revenue grew between 63% and 88%. Nonetheless, DISCO repeatedly warned investors, and the market clearly understood, that DISCO's usage-based business model (where customers can increase or decrease their spending at any time for any reason) could cause significant revenue volatility.  Unfortunately, that risk materialized in Q2 2022, prompting DISCO to revise its full-year guidance downward in August 2022, citing fewer large Review projects that quarter than expected.  As one analyst recognized, DISCO "consistently communicated that the usage-based nature of its platform can and will result in revenue volatility."  DISCO's stock price dropped and this lawsuit followed.

After the Court's ruling on DISCO's motion to dismiss, this lawsuit rests on just four allegedly misleading statements: two by Camara in September 2021 about typical customer "adoption journeys" and an "atypical" customer that contributed to "outsized" Q2 2021 revenue growth; and two others by Camara in January 2022 about the types of customers DISCO was targeting.  Plaintiff claims that these statements were misleading because they did not also state that the "real drivers" of 2021 revenue had been a small number of "seven-figure" Review projects.

Plaintiff seeks to represent a class of DISCO shareholders who bought stock between September 3, 2021 and August 11, 2022, relying entirely on the fraud-on-the market theory recognized in *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988).  Although individual reliance on the allegedly false statement is typically required in securities cases, *Basic* allowed, for purposes of class certification, a court to presume that every class member relied on the (allegedly inflated) stock price when buying or selling.  That presumption is based on the theory that, in an efficient market, the allegedly false statements are "baked into" the stock price, and thus a purchase or sale

of stock based on its price was, in essence, made in reliance on the alleged misstatements.  The Court in *Basic*, however, also held that the presumption can be rebutted by evidence showing that the challenged statements did not increase, or prevent a decline in, the company's stock price.  If that presumption is rebutted, class certification must be denied because individualized determinations of reliance will overwhelm common issues of fact.

In this case, Plaintiff asserts a "price maintenance" theory.   That is, while Plaintiff admits that the four surviving statements did not ***increase*** DISCO's stock price, he argues that they kept the stock price from ***dropping*** until the market learned the "truth" in a "corrective disclosure," which he claims was DISCO's August 2022 revised guidance.  But a stock drop at the end of a proposed class period does not mean that any prior statement inflated the stock price or that Plaintiff is entitled to the presumption of reliance.  Rather, under *Basic* and its progeny, the presumption is rebutted, and certification must be denied, if the later statement (*i.e.* the revised guidance) did not "correct" the earlier challenged statements.  For a statement to be deemed "corrective" there must be a close "fit" or "match" between that later statement and the challenged statements.

DISCO's August 2022 guidance revision and related comments did not "correct" any of the four surviving statements because it did not address, let alone contradict, the challenged statements.  The August 2022 statements did not undermine or render false Camara's prior descriptions of the typical DISCO customer "adoption journey," the exceptional customers that contributed to DISCO's "outsized" Q2 2021 results, or the customers DISCO was targeting.  At most, the August 2022 revision reflected the materialization of DISCO's well-known risk of revenue volatility.  The August 2022 stock price drop, therefore, is not evidence that the few surviving challenged statements had prevented a decline in DISCO's stock price.  Therefore,

Plaintiff cannot use the fraud-on-the-market theory to show class-wide reliance, and the presumption of reliance is rebutted, precluding certification.

Certification should also be denied because Plaintiff has failed to show that damages can be calculated on a class-wide basis, consistent with his theory of liability. Instead, his proffered expert, Zachary Nye, offers only general assurances about possible methodologies without providing a model tied to the specific facts of this case. Nye's "trust me" approach cannot withstand the "rigorous" analysis courts must undertake to assess damages methodologies.

## II.    Factual background.

### A.  DISCO and its usage-based revenue model.

Founded in 2013, DISCO is a leading e-discovery company that offers cloud-based litigation management services to companies and law firms. ¶23.[1] DISCO went public in July 2021. *Id.* ¶24. At all relevant times, DISCO offered a suite of products, including Ediscovery (its flagship product), Review (an AI-charged document review service), and Professional Services.

Unlike traditional subscription-based software companies, DISCO charges by usage. Before and throughout the proposed Class Period, DISCO warned that its customers could increase, decrease, or terminate usage *at any time and for any reason*. Ex. 1 at 21.[2] DISCO also emphasized that usage (and therefore revenue) is impacted by the unpredictable nature of litigation, which it does not (and cannot) control. *Id*.

### B.  DISCO delivers tremendous results following its IPO, but tempers investor expectations.

For the first four quarters following its IPO, DISCO consistently beat its quarterly

---

[1] "¶" cites refer to the Amended Complaint (ECF No. 53).
[2] "Ex." refer to the exhibits attached to the Declaration of Rachel K. Ivanowsky in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification, submitted herewith.

guidance:

|  | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 |
|---|---|---|---|---|
| **Revenue** | **29,546,815** | **29,854,327** | **33,809,617** | **34,468,132** |
| **Public Guidance** | N/A | $25.5-25.9 | $28.2-28.8 | $30-31 |
| **QoQ Growth** | 40% | 1% | 13% | 2% |
| **YoY Growth** | 88% | 67% | 76% | 63% |

Ex. 2. DISCO also consistently beat its internal quarterly expectations. *Id.* Throughout that time, no single product or revenue stream drove DISCO's revenue, or its growth. Its flagship product, Ediscovery, was the most significant revenue contributor. *See id.* Moreover, during the quarters reported in the Class Period, large "seven-figure" Review projects accounted for a small portion of DISCO's revenue and did not drive its performance. *See* Ex. 3; Ex. 4 ("Eisfeldt Rpt.") ¶53.

DISCO's most significant growth during the proposed Class Period came in Q2 2021, with 88% year-over-year growth and 40% quarter-over-quarter growth in revenue. Ex. 2. As DISCO's then-CEO, Kiwi Camara, put it: Q2 2021 "gives you a sense of just how good good can be when absolutely everything in our business fires on all cylinders." Ex. 5 at 9. Q2 2021 was also DISCO's first quarter with "seven-figure" Review projects: (1) a "well-known consumer brand" that "ramp[ed] from zero to a multimillion-dollar level of spend" and (2) a "a leading global travel company" that "grew to be a $1 million-plus customer in the quarter." *Id.* at 4. DISCO told investors that they should "not expect" such "outsized" growth going forward. *Id.* at 6.

It also repeatedly warned investors that "a customer's usage can fluctuate based on the number and nature of legal matters they have at any particular time." *See* Ex. 5 at 5; *id.* at 6 ("[T]here is inherent volatility from quarter-to-quarter as customers' legal matters begin and expand and shrink"). The market understood these risks, as investment analysts reported that the Q2 2021 revenue increase was driven by "***unusually*** strong large customer activity that investors should not expect to reoccur in future periods," including "a single customer [that] accounted for

nearly $3M of revenue, representing ~10% of the business." Ex. 6 at 1[3]; Ex. 7 at 22; *see also* Eisfeldt Rpt. ¶29. They similarly acknowledged the risk that CS Disco's usage-based revenue model could make its revenue volatile and unpredictable, particularly in light of customer concentration, which could result in "lumpy" or "spike[y]" revenue. Ex. 8; *See also* Ex. 9 at 1 (noting that DISCO's "usage-based revenue model adds risk for quarterly lumpiness" which is "exacerbated by customer concentration"); Eisfeldt Rpt. ¶25 (listing other analysts).

### C. DISCO reduces FY 2022 revenue guidance.

Plaintiff claims that the "truth" was revealed on August 11, 2022. That day, DISCO announced that it reduced FY 2022 guidance from $149 to $153 million to a range of $132 to $136 million.[4] Ex. 10 at 4; Ex. 11 at 4. Camara explained that in Q2 2022, there were fewer seven-figure Review projects than expected, which prompted DISCO to adjust projections for the remainder of the year. Ex. 12 at 10–11 ("what we saw a shortage of in the second quarter are a couple: one, two or three large reviews billing north of $1 million per quarter.").

Elaborating on what changed over the last three months, Camara said that "the presence or absence of one to six [large, seven-figure] reviews can take a quarter from good to great to a complete home run." Ex. 12 at 7. However, Camara also added that as the Ediscovery product had scaled, it had seen "materially decreased volatility." *Id.* at 9.

Though the market was disappointed, analysts had long been aware that such a downturn was possible. Canaccord noted that "[t]o Disco's credit, *it has consistently communicated that the usage-based nature of its platform can and will result in revenue volatility*," and reported that "[c]ustomer spend volatility *finally* cut[] the other way." Ex. 14 at 1; Ex. 15 at 1 (Review was

---

[3] All emphasis is added unless otherwise indicated.
[4] DISCO originally issued guidance in February 2022. Ex. 13 at 4. After a strong Q1 2022, DISCO raised its full year 2022 revenue guidance on May 12, 2022 to $149–$153 million. Ex. 10 at 4.

"generally used by very large customers" subjected the business to "volatil[ity] due to the timing of activity in large reviews"). Analysts still remained optimistic about DISCO's future, echoing Camara's prior comments and noting that "as the review business gains greater scale and customer count increases, revenue volatility should subside over time." Ex. 16 at 1; *see also* Ex. 17 at 2 ("[a]s [DISCO] scales, we would look to see smoother, more diversified revenue growth").

### D. Plaintiff's motion for class certification.

Plaintiff seeks to certify a class of "[a]ll purchasers of CS Disco, Inc.'s common stock between September 3, 2021 and August 11, 2022," (the "Class Period"). Mot. at 1. All that remains following the Court's order on Defendants' Motion to Dismiss are four statements made by Camara. The first set of challenged statements, made on the September 2021 earnings call reporting Q2 2021 results, attributed DISCO's "outsized" revenue for that period in part to two customers whose use of the Review product had taken them from zero to a "seven-figure" spend with DISCO in a short period of time. In discussing the quarter, DISCO's then-CEO, Camara, contrasted those two examples with the typical "adoption journey" for DISCO's customers, which took a number of years to reach that level of spend. While noting, again, that individual customer usage could fluctuate, Camara also said he expected customer revenue fluctuations to "washout" in the aggregate as DISCO's revenue base grew. Ex. 5 at 7. The second set of challenged statements occurred at the January 2022 Needham Growth Conference, where Camara again discussed larger customers and their adoption journeys, and noted that DISCO was targeting large customers with ongoing and continuous legal budgets. Ex. 18 at 4, 12.

Plaintiff claims Defendants misled investors by suggesting DISCO's "seven-figure" customers represented a "stable" revenue source while failing to disclose that the "true drivers" of revenue growth were a small number of "one-off," "seven-figure" Review projects. ¶¶ 51, 53;

ECF No. 78-4¶ 7; ECF No. 69 ("MTD Order") at 20. According to Plaintiff, the "truth" was revealed when "[t]he Company revised its annual projections downward, revealing that its previous projections relied on the assumption that CS Disco would continue to receive seven figure per quarter revenues from a small number of large Review matters, matters which had disappeared in the preceding months." Mot. at 3. In support of his Motion, Plaintiff offers the report of Dr. Nye. *See* ECF No. 78-7 ("Nye Rpt.").

### III.   Argument

#### A.  Plaintiff fails to satisfy Rule 23(b).

Plaintiff moves for class certification under Rule 23(b)(3), which requires him to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance analysis under Rule 23(b) is "rigorous." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

A plaintiff alleging securities fraud must prove that he relied on the alleged misrepresentation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*"). Whether an investor relies on alleged misstatements is typically an individualized inquiry. However, the Supreme Court has recognized a presumption of reliance on public statements because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. When the presumption applies, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," and therefore relies on alleged misstatements. *Id.* at 247. Because he cannot prove that each putative class member relied on the four surviving statements, Plaintiff asks the Court to presume class-wide reliance under the fraud-on-the-market theory. *Id.* at 242, 246.

This presumption is rebuttable: "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[5]  *Basic,* 485 U.S. at 248.  Defendants can rebut the presumption by showing that the asserted misrepresentation "did not affect the market price of the defendant's stock"—that is, there was no "price impact." *Halliburton II*, 573 U.S. at 264, 279–80.  "***Price impact is thus an essential precondition for any Rule 10b-5 class action***" and a class cannot be certified without it because reliance then becomes an individual question for each class member, defeating commonality and predominance.  *Id.* at 282.

The Court should deny certification under Rule 23(b)(3) for three reasons.  ***First***, and as set forth in the expert report of Dr. Andrea Eisfeldt, the challenged statements did not prevent a price decline, defeating the fraud-on-the-market presumption of reliance.  ***Second***, Plaintiff cannot invoke the *Affiliated Ute* presumption of reliance that he argues for in the alternative.  ***Third***, Plaintiff fails to prove that he can calculate damages consistent with his theory of liability.

### 1.    Defendants have rebutted the *Basic* presumption.

Plaintiff does not contend that the challenged statements increased DISCO's stock price. Mot. at 19.  Instead, he claims they prevented a price decline—in other words, he asserts a "price maintenance" theory.  *Id*.

In "price maintenance" cases, courts look at whether a stock drop following the alleged

---

[5] Plaintiff alleges he relied on the market price in buying his shares. *See* ¶¶ 98–99.  Plaintiff sold those shares just weeks later and then bought more after that, which undermines any claim that he actually relied on Camara's statements, let alone lost money because of them. ECF No. 94-1.  Plaintiff also realized that he did not list all of his stock transactions in his application to be lead plaintiff, and he just filed a corrected certification.  *Id*.  Nonetheless, Defendants are not moving to disqualify Plaintiff on adequacy grounds at this time.

"corrective disclosure" shows that the earlier challenged statements had artificially inflated or maintained the price.  As this Court knows, stock prices can fluctuate for a variety of reasons that are not indicative of fraud, such as market forces and unexpected events.  Here, DISCO's stock price dropped in August 2022 because it revised its annual guidance based on recent volatility in Review usage.  *See* ¶73.  While Plaintiff claims that this stock drop is "clear evidence of price impact" (Mot. at 20), a stock drop does not mean that earlier statements artificially inflated the stock price.  *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) ("*Goldman I*").  Specifically, a price drop is not evidence of artificial inflation unless there is a close "fit" or "match" between the challenged statements and the alleged corrective disclosure.  *Id.*; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) ("*Goldman II*").  In other words, the information disclosed at the end of the class period must be "corrective" of an earlier alleged misstatement, and must not have been publicly available before that date.  *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *10 (S.D. Tex. Feb. 9, 2024); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004) ("confirmatory information has already been digested by the market and will not cause a change in stock price").  District courts must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact" and they should be "aided by a good dose of common sense." *Goldman I*, 594 U.S. at 122, 127.

Plaintiff claims the following statements, made on August 11, 2022, were allegedly "corrective" of the surviving alleged misrepresentations: (1) DISCO's announcement of revised FY 2022 guidance based, in part, on future expectations for large Review projects, and (2) Camara's general commentary during the accompanying earnings call about the Review business, such as, his statement about how "the presence or absence of one to six of those reviews can take

a quarter from a good to great to a complete home run." Mot. at 3; ¶¶5, 73, 75.

These statements did not "correct" Camara's earlier statements and thus the resulting price decline does not prove that DISCO's price had been artificially maintained by the alleged misrepresentations. At most, they reflect a materialization of a publicly known and disclosed risk—including by Camara himself.

### a.    DISCO's revised guidance was not "corrective."

A corrective disclosure must reveal "new facts that, taken as true, render some aspect of the defendants' prior statements false or misleading." *In re Apache*, 2024 WL 532315, at \*10. For instance, the Fifth Circuit has held that alleged misstatements did not impact a stock's price because the company's statements about disappointing third quarter earnings did not "correct" its prior allegedly false statements about financial performance ***before*** the third quarter. *Greenberg*, 364 F.3d at 667–69 (defendant rebutted the presumption of reliance). The Court should do the same here.

As an initial matter, the revised guidance cannot be "corrective" because it is tethered to a theory of liability the Court has already dismissed as non-fraudulent. MTD Order at 23. Specifically, the Court dismissed one of Plaintiff's original theories that the FY 2022 guidance was "misleading because DISCO's annual 2022 revenue projections were materially dependent on the continuation of a single digit number of large Review matters." *Id*. at 23–27 (holding forward-looking statements about FY 2022 were inactionable under PSLRA's safe harbor because they "provide[d] earnings projections or predictions about DISCO's performance for the year" and because they were "generalized, positive statements about Disco's future prospects").

Moreover, the revised guidance announced in August 2022 does not address, let alone "correct," any of the four challenged statements. DISCO lowered revenue projections for 2022 from $149 to $153 million to $132 to $136 million, in part, because there were fewer large Review

projects in Q2 2022 than DISCO expected.  *See* Ex. 12 at 10–11 ("what we saw a shortage of in the second quarter are a couple one, two or three large reviews billing north of $1 million per quarter").  But the revised guidance had nothing to do with the two challenged statements made nearly a year earlier on the September 2021 earnings call about "outsized" Q2 2021 results, the typical customer "adoption journey," and Camara's expectation that revenue fluctuations would "washout" in the aggregate as DISCO's revenue base grew.  Nor did the revised guidance have anything to do with the two challenged statements made seven months earlier in January 2022 discussing larger customers and their adoption journeys, noting that DISCO was targeting large customers with ongoing and continuous legal budgets.  *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at *18, 31 (S.D.N.Y. Sept. 4, 2025) (disclosure that Goldman's CEO met with the architect of scheme to misappropriate funds did not correct Goldman's earlier statement that it "had no visibility into" whether funds were diverted); *In re Kirkland Gold LTD. Sec. Litig.*, 2024 WL 1342800, at *10–12 (S.D.N.Y. Mar. 29, 2024) (announcement that Kirkland was acquiring a mine did not correct statements describing "minimum production levels and costs for potential acquisition targets").  Similarly, the Review shortage in Q2 2022 that prompted the revised guidance did not happen until ***after*** the challenged statements were made, and therefore cannot be corrective.  *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (information that did not exist at the time the challenged statements were made is not corrective); *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *7 (N.D. Cal. Sep. 27, 2024) (same).  As Dr. Eisfeldt's opines, "[t]he economic content of the allegedly omitted information and that of the alleged corrective disclosure differ, particularly due to intervening financial results and guidance issued after the alleged misrepresentations that affected market expectations[.]"  Eisfeldt Rpt. ¶8.

    *In re Concho Resources, Inc. Securities Litigation* is instructive.  2025 WL 1040379, at *2,

-11-

16 (S.D. Tex. Apr. 7, 2025). There, plaintiffs alleged that defendants misled investors by making positive statements about 2017 and 2018 financial results and the status of oil rig projects. *Id.* at *2, 10. According to plaintiffs, the company "corrected" these statements by later announcing poor Q2 2019 earnings and revising annual guidance. *Id.* at *2 (internal quotations omitted). The Court denied class certification based on a lack of price impact, holding that "there is a mismatch between the contents" of the revised guidance on the one hand, and challenged statements about historical performance and general project status on the other. *Id.* at *16; *see also Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11 (N.D. Cal. Sept. 17, 2024) (prediction of 2022 financial condition did not correct past 2021 performance). As in *Concho*, DISCO's announcement of revised guidance did not correct Camara's earlier statements about a different subject matter, from a different time period.

Any stock price decline resulting from the announcement of revised guidance does not demonstrate that the challenged statements artificially inflated the stock price.

> **b.** **Camara's commentary about Review and risk of volatility did not "correct" the challenged statements.**

Plaintiff also claims that Camara's August 11, 2022, general commentary about what changed recently and how "volatility in the review business has to do with the presence or absence of a low single-digit number of big-ticket reviews," was corrective. ¶¶74–76. He is wrong.

Camara responded to analyst questions about DISCO's performance in Q2 2022, more than half a year *after* he made the four challenged statements. By definition, Camara's discussion of DISCO's Q2 2022 performance could not "correct" his earlier statements about DISCO's financial performance *before* that quarter. *FibroGen*, 2024 WL 1064665, at *12. Camara did not refer back to, let alone contradict, his challenged statements from September 2021 or January 2022 about adoption journeys, wallet sizes, or customer usage. *Id.* Nor did he say that DISCO's revenues had

previously (or ever) been dependent on "seven-figure" Review projects, or when exactly large Review projects drove a quarter to be "great" or a "home run." Rather, Camara emphasized that DISCO's business was subject to heightened volatility risk: "[a]ctivity or lack of activity in particular cases, especially in large cases, can drive increased volatility in our revenue"—a risk which DISCO had repeatedly disclosed. *See* Ex. 12 at 3; Ex. 1 at 21; Eisfeldt Rpt. ¶24.

As Dr. Eisfeldt's report demonstrates "information regarding the volatility of CS Disco's revenue and related risks was already publicly known" prior to the class period—including that DISCO's (1) "usage-based pricing model resulted in 'spiky' and 'lumpy' revenue" (2) "Review product resulted in large increases in revenue per customer," (3) "CS Disco had meaningful customer concentration," (4) "CS Disco had recent 'extreme positive examples' of rapid customer expansion that contributed to the revenue growth experienced in Q2 2021, but which would not necessarily repeat in the future." Eisfeldt Rpt. ¶8. The "reiteration of such information would not impact CS Disco's stock price." *Id.* Because Camara did not reveal new facts that revealed that his challenged statements were false when made, his statements were not "corrective." *In re Apache,* 2024 WL 532315, at *10.

Plaintiff ignores the *only* statement on the August 2022 earnings call that actually discussed Review's performance during the proposed Class Period: "Our Q2 [2022] revenue grew 14% despite a very challenging comparison in *Q2 2021* when revenue grew 88% *and benefited from a small number of large reviews*. In each of our earnings calls we have explained how *the usage-based nature of our business can result in revenue volatility* as a result of changes in the timing and nature of usage on our platform." Ex. 12 at 3. That statement was true and consistent with the challenged statements; it did not "correct" them. In the September 2021 challenged statement, Camara had identified two large customers who were driving DISCO's revenue growth: (1) a well-

known consumer brand that had "ramp[ed] from 0 to a multimillion dollar level of spend" in Q2 2021, and (2) a leading global travel company that started using DISCO in Q2 2021 "and grew to be a $1 million-plus customer in the quarter."[6]  Ex. 5 at 4.

Confirming that the August 2022 earnings call did not "correct" earlier alleged misstatements about the concentration of DISCO's business or its volatility risk, analysts did not express surprise that a small number of large Review projects propelled the company's Q2 2021 growth.  *See* Eisfeldt Rpt. ¶¶74, 82.  Given this, ***Plaintiff does not even try to claim Camara's August 2022 statement about DISCO's Q2 2021 growth was "corrective."***[7]

Further, Judge Ezra held, when ruling on DISCO's motion to dismiss without considering evidence, that the challenged statements could suggest "that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers" and could be considered misleading ***if*** "it is true that customer spending was actually spiky and driven by only a few large Review projects."  MTD Order at 21.  However, the evidence shows that analysts did ***not*** interpret the challenged statements as suggesting that DISCO had "steady" or "stable" revenue.  Eisfeldt Rpt. ¶¶25, 48, 70.  To the contrary, they understood that (1) there was risk of "spiky" and "lumpy" revenue; (2) Review could result in large revenue

---

[6] The other three challenged statements did not refer to Review revenue, projects, or customers, and thus were not "corrected" by the August 2022 statements.

[7] Plaintiff and Dr. Nye point to an August 2022 analyst report by Cowen speculating that DISCO "is much more dependent on large customer consumption behavior than we had thought."  Nye Rpt.¶56 n.103; ¶77.  But this one analyst report does not show that any challenged statement inflated DISCO's stock price.  Cowen's commentary is vague as to time and does not say that DISCO was dependent on large Reviews at the time of the challenged statements.  The most reasonable reading is that Cowen was surprised by the amount of large Review revenue the FY 2022 guidance assumed – which relates to a dismissed theory and is detached from the challenged statements.  *See also* Eisfeldt Rpt. ¶¶75–77.  Regardless, analysts as a whole recognized that DISCO "has consistently communicated that the usage-based nature of its platform can and will result in revenue volatility."  Ex. 14 at 1.

increases; (3) DISCO had customer concentration risk; and (4) "atypical" customer growth had contributed to the Q2 2021 results.  *Id.* ¶¶25, 26, 29, 30, 39.  The evidence shows that, in fact, DISCO's revenue was *not* "driven by only a few large Review projects" as Plaintiff's Complaint alleged.  *See supra* at II.B.  In Q2 2021, large Review projects were *one of the* contributors of DISCO's growth that quarter, as Camara disclosed, but not *the* "driver."   *See* Ex. 5 at 4.  The next quarter, in Q3 2021, DISCO still beat its guidance and analyst expectations by several million dollars, even without two "seven-figure" Review customers.  *See supra* at II.B; Eisfeldt Rpt. ¶¶53– 54.  This evidence—which Judge Ezra could not consider when ruling on DISCO's motion to dismiss—shows that none of the four challenged statements were "corrected" by the alleged "corrective disclosure."

Finally, and as set forth in the Eisfeldt Report, DISCO's internal projections were *more optimistic* than publicly issued guidance, and analyst revenue forecasts.  Eisfeldt Rpt. ¶¶43–45. Namely, both in September 2021 and January 2022, at the time of the challenged statements, internal documents reflect that DISCO projected higher revenue for subsequent quarters than analysts were forecasting.  *Id*.  Such evidence "does not indicate that CS Disco's stock price would have declined had the Company disclosed its internal financial projections that were allegedly constructed under asymmetric information."  *Id.* ¶46.

### c.    The alleged corrective disclosure reflected the materialization of a disclosed risk.

Price impact is also rebutted because DISCO's August 2022 stock price decline was a materialization of a previously disclosed risk, and thus not, a "corrective disclosure" for price impact purposes.  *See Basic*, 485 U.S. at 248 (defendants may "rebut the presumption of reliance" by showing that the market was "privy to the truth . . . and thus [] the market price would not have been affected by the[] misrepresentations"); *Greenberg*, 364 F.3d at 665–66 ("[C]onfirmatory

information has already been digested by the market and will not cause a change in stock price.").

Plaintiff argues that the August Disclosure revealed "the **undisclosed risk** that Disco's customer spend growth was driven by only a handful of large Review projects."  Nye Rpt. ¶56. But the "risk" created by the purportedly omitted information—the revenue volatility that it might cause—was explicitly and repeatedly disclosed before the start of the Class Period.  As Dr. Eisfeldt explains, investment analysts "acknowledged that CS Disco's usage-based revenue model resulted in revenue volatility and unpredictability, including specific discussions that revenues could 'spike' and be 'lumpy' from quarter-to-quarter given that revenues would be impacted by unpredictability in individual legal matters starting and ending[.]"  Eisfeldt Rpt. ¶25.

 DISCO reiterated that risk throughout the Class Period, including during the September 2, 2021 Earnings Call and January 2022 Needham Conference when the four surviving challenged statements were made:

- "[W]e have a usage-based business model. So there is inherent volatility from quarter-to-quarter as customers' legal matters begin and expand and shrink. And as activity in those matters increases and decreases usage of our different products."  Ex. 5 at 6; *see also* Ex. 19 at 2 ("pricing model is usage-based and subject to volatility, therefore we do not expect the growth levels seen in Q2 to be sustained"); Ex. 8 at 8 ("Risks to our PO are: 1) usage based pricing model could result in lumpy revenue").

- "In terms of what drives variability in our results, it is the usage-based nature of our business . . . *Any customers usage can go up and down over time* based on the kinds of legal exposure the customer has and how much data or documents those legal matters involve."  Ex. 18 at 11; *see also* Ex. 20 at 3 ("Risks to Target[:]  Transactional revenue model creates scenarios where revenue visibility could dimish [*sic*] causing wide swings in quarterly revenues").

DISCO's acknowledgement that the risk of "[c]ustomer spend volatility finally cut[ting] the other way" in August 2022 does not "correct" DISCO's earlier statements.  Ex. 14 at 1.

Further, the facts around DISCO's growth in Q2 2021 were disclosed to and understood by the market and therefore any purported risk "that Disco's customer spend growth was driven by only a handful of large Review projects" was **known**.  DISCO specifically disclosed that *two*

new customers rapidly adopted DISCO products and contributed to DISCO's Q2 2021 growth. Eisfeldt Rpt. ¶36. Thus, the market "knew" that just two DISCO customers contributed more than 10% of DISCO's Q2 2021 revenue, and accounted for more than 25% of its Q2 2021 year-over-year revenue growth. *Id.* ¶37. These disclosures were also consistent with the Company's internal information. *See id.* ¶35; *supra* at II.B. As Dr. Eisfeldt opines, "any stock price decline on August 12, 2022 reflecting the materialization of publicly known risks regarding revenue volatility does not provide reliable economic evidence to infer price impact from the alleged misrepresentations." Eisfeldt Rpt. ¶78. Because the allegedly "corrective" information conveyed in August 2022 was known to the market well before then, it is not evidence that the four challenged statements had inflated or maintained DISCO's stock price. *Fibrogen*, 2024 WL 1064665, at \*12 (information must be "new" to have back-end price impact).

### 2.    Plaintiff is not entitled to the *Affiliated Ute* presumption.

Plaintiff argues, in the alternative, that he is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Mot. at 17. The *Affiliated Ute* presumption is "narrow . . . [and] limited to cases that primarily allege omissions." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). "[T]he mere fact of [alleged] concealment cannot transform affirmative conduct into omissions." *Id.* at 1205. And purported "half-truths" are not enough. *In Re FirstEnergy Corp. Sec. Litig.,* 149 F.4th 587, 618-20 (6th Cir. 2025). Plaintiff does not argue, let alone establish, that this case involves primarily omissions as opposed to allegedly misleading statements. To the contrary, Plaintiff concedes that that this case involved "public *misrepresentations* to the market." Mot. at 18. As such, he fails to establish that the *Affiliated Ute* presumption should apply. *See Akin v. Q–L Invs., Inc.,* 959 F.2d 521, 529 (5th Cir. 1992) ("It is not enough that a claim has aspects of

omission—at a sufficiently high level of generality, they all do."); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at \*21 (N.D. Tex. Aug. 21, 2023) (*Affiliated Ute* presumption did not apply where "Plaintiff's claims involve[d] a mix of allegedly fraudulent conduct").

### 3.      Plaintiff fails to meet his burden under *Comcast*.

The Court should also deny class certification because Plaintiff fails to prove that he can calculate damages on a classwide basis that is consistent with his theory of liability.  *Comcast*, 569 U.S. at 35 (a "model purporting to serve as evidence of damages in [a] class action must measure *only* those damages attributable to that theory.").   Relying on just six boilerplate paragraphs of Nye's 67-paragraph report, Plaintiff proposes an "out of pocket methodology" for calculating damages, which would measure the artificial inflation at the time of purchase less than that at the time of sale.  Mot. at 17; Nye Rpt. ¶¶61-66.  But Plaintiff's proposed "methodology" cannot withstand the "rigorous analysis" that trial courts must conduct.  *Comcast*, 569 U.S. at 35; *see FirstEnergy*, 149 F.4th at 621 (remanding so district court could conduct a rigorous analysis).

Neither Plaintiff nor Nye explains how they would even attempt to calculate inflation on each day of the class period under Plaintiff's theory.  And as discussed above, the August 2022 disclosures did not correct the challenged statements. *See supra* III.A.1.b.   Because these disclosures were not corrective, Nye cannot focus on the stock price decline to calculate damages.  But even if Nye could, he fails to explain how he could determine the probability the allegedly corrective events would materialize, at the time each challenged statement was made.  Without proposing a methodology that would address these issues, Plaintiff cannot meet his burden under *Comcast*, and the Court should deny class certification.

The Court needs more than the expert "asking the Court simply to trust them." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at \*12 (S.D. Tex. May 20, 2014) ("*BP II*").  Nor is it sufficient

to vaguely identify techniques that could potentially be used to calculate damages without actually "propos[ing] one model" that "tie[s] these theories to the facts of this case." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying class certification on damages in a securities case). In *Loritz*, plaintiffs' expert only "discusse[d] general techniques for computing damages," rather than presenting a specific "damages theory tied to their theory of liability." *Id.* And in another securities case, a court rejected an expert's general averments about a to-be-determined methodology as nothing more than his "say-so" and insufficient to certify a class for damages. *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014). But that is all Nye does here.

Nye conceded in deposition that "artificial inflation" can "vary" on each day of a class period, meaning the purported price inflation on which the Plaintiff's claim is based may be less than the back-end price drop. Ex. 21 at 135:5–136:22. As the Supreme Court has held, experts cannot always "infer front-end price inflation [] from the back-end price drop." *Goldman I*, 594 U.S. at 123. But Nye does not propose ***any*** methodology for measuring alleged artificial inflation that varies throughout a class period. Nor has he even assessed whether the alleged artificial inflation varied in this case.

> Q. So inflation can vary throughout the class period, right, and it may not always match the back-end?
>
> A. It can, yeah …
>
> Q. Have you at this point determined whether the alleged price inflation – the reduction in the price inflation at the back-end is the same as the price inflation at the front end or at different parts of the class period?
>
> A. No, I haven't implemented the model, so … .

Ex. 21 at 136:6–8; 137:11–18. Nye just insists, without explaining how, that "one can estimate the price inflation due to the alleged fraud for each day during the Class Period." Nye Rpt. ¶63.

Nye's failure to offer a methodology to measure purported artificial inflation is even more problematic, given that Plaintiff's claim is based on an alleged materialization of concealed risks. *See* Ex. 21 at 147:6–8 ("I think under their theory of liability the reduction in 2022 revenue guidance and EBITDA guidance is a materialization of that risk that was concealed"). In other words, Plaintiff appears to allege that DISCO's concealment of the "truth" in September 2021 and January 2022 understated the risk that DISCO would revise FY 2022 revenue guidance in August 2022. *Id.* at 147:10–14 (describing the allegedly undisclosed risk that "the company had [] much more revenue volatility -- and worse prospects than the market understood"). But at least two courts denied class certification based on the out-of-pocket method being inconsistent with a materialization of risk theory because the back-end stock drop cannot match front-end inflation. *See, e.g., In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (*"BP I"*); *Ind. Pub. Ret. Sys. v. AAC Holdings., Inc.*, 2023 WL 2592134, at *24-25 (M.D. Tenn. Feb. 24, 2023).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court deny Plaintiff's Motion.

Dated: October 3, 2025

Respectfully submitted,

By: */s/Brett H. De Jarnette*
Brett H. De Jarnette
Admitted *Pro Hac Vice*
Patrick E. Gibbs
Admitted *Pro Hac Vice*
pgibbs@cooley.com
bdejarnette@cooley.com
Ashley Kemper Corkery
Admitted *Pro Hac Vice*
acorkery@cooley.com

Tijana Brien
Admitted *Pro Hac Vice*
tbrien@cooley.com
Cooley LLP
3175 Hanover Street
Palo Alto, California 94304-1130
(650) 843-5000 (phone)
(650) 849-7400 (fax)

Peter D. Kennedy
Texas Bar No. 11296650
pkennedy@gdhm.com
Hailey L. Suggs
Texas Bar No. 24113497
hsuggs@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5764
(512) 480-9908 (Fax)

***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record on October 3, 2025, via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*/s/ Brett H. De Jarnette*