# EXHIBIT 18

C Corrected Transcript

11-Jan-2022

# CS Disco, Inc. (LAW)

Needham Growth Conference

CONFIDENTIAL

DISCO_003590

**CS Disco, Inc.** (LAW)
Needham Growth Conference

Corrected Transcript
11-Jan-2022

# CORPORATE PARTICIPANTS

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

**Michael S. Lafair**
*Chief Financial Officer, CS Disco, Inc.*

# OTHER PARTICIPANTS

**Scott Berg**
*Analyst, Needham & Co. LLC*

# MANAGEMENT DISCUSSION SECTION

**Scott Berg**
*Analyst, Needham & Co. LLC*

Hello. Welcome, everyone. Thanks for joining us today at our 24th Annual Growth Conference here at Needham. My name is Scott Berg, I lead our enterprise software and SaaS research efforts here. Today, with us, we have DISCO, a recent IPO in the space. We have the company's Founder and CEO, Kiwi Camara; along with the company's CFO, Michael Lafair. Welcome, gentlemen.

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

Thanks for having us, Scott.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Of course. I guess to start off, for those that are not as familiar with DISCO because you are a new public company, how about a little background of the company?

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

Sure. So, I studied computer science as an undergraduate and then went to law school and became a lawyer. And when I was a lawyer, I was always just amazed at the amount of work that happens in legal departments and law firms that doesn't really call for the exercise of human legal judgment. And this all came to a head when my largest client as a lawyer came to us in 2012 and asked us to have a look at their e-discovery program. So, at that time, we took a look at all of the solutions in the market and decided that we could do better. And so, we built the first version of DISCO Ediscovery as an internal tool at my old law firm for this one client. Had great success with it, spun it out, and then built the business from there. And over time, what we've come to believe is that applying modern advances in technology, things like elastic compute and artificial intelligence, to the kinds of big data

CONFIDENTIAL

DISCO_003591



problems that lawyers have can enable us to build these solutions that automate away huge categories of legal services while providing an experience that delights end user lawyers. Over time, we've expanded beyond e-discovery, launching our second and third products, DISCO Review and DISCO Case Builder, and expanded outside the United States, launching our EMEA presence and Canada.

# QUESTION AND ANSWER SECTION

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Got it. All right. Well, congrats on the recent public listing. A question I always like to ask new issuers is how has the IPO impacted your business, if at all?

**Michael S. Lafair**
*Chief Financial Officer, CS Disco, Inc.*

A

So, Scott, the IPO has done a couple of things. It's definitely increased brand awareness around the company. We've seen more inbound RFPs and it's also more inbound possible customers, which is awesome. It also has helped us attract candidates on the hiring front and also is obviously allowing us to invest more in go-to-market and R&D and also continue to scale out our G&A group.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Great. One housekeeping here really quick. We will take audience Q&A when we're finished with our questions here. If you'd like to ask a question to the company, just enter it into your Q&A box that's on the presentation window. They'll pop up in my moderator window and I will work our way through those when we're done here. But let's start with a couple questions in the legal tech industry because I know it's not an industry that's as well-known to public investors. Probably the number one question I got around the IPO, and really since then still, is what makes the legal tech market so complex? Why can't glorified search engine like Google or another application perform general keyword discovery?

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

I think there are a few big differences. One of the easiest to understand is that if you look at any of the kind of enterprise applications of record, take Microsoft or Google or Salesforce, they'll often provide tools for dealing with their own data, but they won't help the enterprise aggregate data from the dozens or hundreds of different systems of record or platforms or software applications that the enterprise uses. So, if you think about a legal department having to deal with discovery obligations, they've got to go through data not from any one of those platforms but from all of them. Think about collecting from Office, Slack, Bloomberg, Zoom, Salesforce, Zendesk and many, many more, and we can help them with that problem.

Second, it's not just search, it's also analytics. We're actually in the middle of DISCO's 2022 kickoff right now, Scott, and there was a great customer panel this morning. And one of the customers said I fell in love when I saw search visualization, and that's an example of the kind of analytics tool that's in our platform that goes well beyond search. It lets lawyers kind of visually interrogate the data so that they can see patterns that wouldn't be apparent if they were just using keyword searching or looking document-by-document. And even beyond the analytics is this workflow layer where we allow lawyers not just to find evidence but then to do all their work product on it. So,

Copyright © 2001-2022 FactSet CallStreet, LLC

CONFIDENTIAL

DISCO_003592



think about lawyers tagging documents, redacting them, highlighting them, using them as exhibits, sharing them; all of that legal workflow is happening in our product, and we use it to power the AI models that learn to anticipate what lawyers are looking for and then make those predictions so that huge categories of what the lawyers are working on can be automated. That's on the product side.

I think the other observation is on the go-to-market side. Selling into legal is wild and crazy and very, very different, and we've built a go-to-market engine that we think is uniquely adapted to the highly collaborative nature of legal work where we can start in a legal department, spread to the law firms that represent that company, and then use the lawyers at the law firms to spread to other legal departments that are represented by them in other matters.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Around the complexity question often comes a viewpoint that customers use a platform like DISCO for maybe a short timeframe and then maybe on an infrequent basis. But for an average Fortune 1000-type customer that you might have, how many matters could they be managing concurrently? And is the typical usage of the DISCO platform maybe weekly, monthly or something longer for these matters?

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

So, for a mature customer, they'll have dozens or hundreds of simultaneous active matters in our platform. And I think, Scott, that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works. You take any one of these matters and we've got matters alive in our system that date all the way back to 2013, the same way we have corporate customers who've been continuous customers going all the way back to 2013. I think one good way to think about this is looking at companies spend on their own legal department or on legal services. While the nature of the legal matters that a company is exposed to may change from time to time, and while unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that, people in general have an ongoing and continuous spend on their legal department and on legal services, and that is the budget that we tap into.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Expedite is not a word that I would use for legal process, so I might not use that again; fair enough. Keyword or contextual search seems fairly straightforward and there are several vendors in the space, in your space for a while. Why is the DISCO model the right model versus other legacy platforms?

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

It's interesting. I think we have one of the best competitive sets in software today because we generally don't compete with the software companies; we compete with the services companies. So, the most typical kind of way a customer switches onto our platform is that they'll have a relationship with one or more of these large services folks, people like EY or Deloitte or Consilio or Epiq and they'll switch to DISCO. And if you think about why they think DISCO is a better solution, it's all the advantages of software over services. Just take automation; we're able to automate the huge parts of the end-to-end process from collecting data, to orchestrating its review, to processing it, to getting it out the door. If you think about what customers are switching from, they're switching from big professional services businesses. And if you look at their experience using DISCO, the median matter in

CONFIDENTIAL

DISCO_003593

## CS Disco, Inc. (LAW)
Needham Growth Conference

 
DISCO consumes zero hours of professional services over the course of its entire, often multi-year life at our company. So, that automation is tremendous, that software eats services.

In addition to that, we're able to deliver the kind of consumer-grade user interface that the next generation of lawyers, the people who are becoming deputy general counsels or general counsels or partners of law firms today expect. For them, a services-based solution feels wholly foreign; it's like doing research by calling up a librarian instead of using Google. We're able to give them that self-service, high-performance experience that they want and expect.

Now, switching sides, if you look at the software competitors in our space, there are some kind of legacy software companies and then there are other more recent startups. And relative to both those groups, I think there is some key things that set DISCO apart. First, from the very beginning, we spent $1 of R&D on platform for every $1 we spent on features. And that translates into, we believe, the best performance in the industry across a variety of dimensions, from ingestion of data, to processing, to speed of search, to speed of document rendering, to production and dozens of other things that we track and make better every year. As well as giving us the ability to handle vast quantities of data, a capability that was further improved by our launch of ECA that we talked about on our last earnings call.

The combination of this performance, this platform where lawyers do the work themselves and access to all this data lets us train these integrated AI models that actually automate legal document review. Unlike many of our competitors, we've built cross-matter AI model training so we can learn from all the matters that a client is handling. And we've built a full stack product offering, DISCO Review, that lets us sell the legal department and the general counsel what they want, not just tools for doing e-discovery but the actual automated review of their documents using AI.

### Scott Berg
Analyst, Needham & Co. LLC

Q

All right. And then, one of the things that surprised me when working to better understand the legal technology space is how much of the e-discovery process is done manually. You kind of touched on that already, Kiwi, a little bit. But for a company that is using a typical legacy vendor, how much of this process requires some sort of manual process versus what you all can automate specifically on the DISCO platform?

### Kiwi Camara
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

 A

Yeah. It's crazy, Scott. And again, the headline stat is we'll typically displace a professional services business, right? A business that distinguishes itself, counts its bill-by-the-hour services. And then, you look at what customers do on DISCO. And again, the median matter on DISCO consumes zero hours of professional services. So, in many cases, it's kind of full automation. And what are those services that are being automated? So, it's everything from humans who do what's called forensics where they're going out into the enterprise, tapping into enterprise IP systems or endpoint devices, collecting that data, staging it, doing triage to separate out things that might be useful versus things that are clearly not, then using different kinds of software based on the different file types to process that data, meaning extract text from it, image it, run analytics on it, basically enrich the data by creating this metadata and then loading the documents into one of these legacy review platforms.

Now, once the data is there, the services don't end. There's this whole category of things that go under the heading of project management where you have bill-by-the-hour project managers acting as a user interface between the end user, a lawyer, and of the data that's hiding in the system because the system is too difficult, too slow, too cumbersome for the lawyers to use, and it goes on and on and on, right? And so, it's all of that stuff that

CONFIDENTIAL

is a consequence of not having software that is designed to automate away the things that don't require human legal judgment. We've built that software, and it gives lawyers direct access to the evidence which they love.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

Okay. I guess moving to product a little bit away from the industry. I think while many investors focus on just the e-discovery functionality, you all have put together an entire workflow platform with two primary additional models, DISCO Review and Case Builder. What functions or processes do these two modules manage and why is the platform approach likely the right product strategy over time?

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

So, DISCO Ediscovery is a set of tools that helps lawyers find evidence faster in these huge collections of millions, tens of millions or hundreds of millions of enterprise data and documents. With DISCO Review, we took that one step further with an AI-powered platform that actually automates or greatly accelerates the process of legal document review with as high or higher quality than old manual review by lawyers. And then finally, DISCO Case Builder generalizes this evidence process to go beyond documents and data and onto testimony, so that moment where Matlock gets the admission on the stand, that's what Case Builder helps our lawyers find and then use in court.

Now, over time, we believe that our long-term flywheel, our long-term growth strategy at DISCO is all about building more and more legal tech applications on top of our underlying technology platform so that we can address more and more categories of legal work. If you think about a customer, a legal department, we want over time to have more and more of their legal workload happen on our platform and consequently capture a growing percentage of their legal budget. We think that's the transformation that software will bring to this $767 billion legal services market, and we're just getting started.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

I'm not sure how much longer you can use the Matlock terminology; maybe a couple more years. I remember that TV show; I'm just not sure how many others will.

**Michael S. Lafair**
Chief Financial Officer, CS Disco, Inc.

A

I remember it, Scott.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

Fair enough. That works. Within those modules, I know the company – especially, I think it was on your third quarter call highlighted some recent successes with the Review module specifically. But how should we think about penetration rate through those two modules today, Review and Case Builder? And when a customer adds either, how much incremental revenue opportunity is there between those two modules?

**Michael S. Lafair**
Chief Financial Officer, CS Disco, Inc.

A

CONFIDENTIAL

DISCO_003595

## CS Disco, Inc. (LAW)
Needham Growth Conference

 Corrected Transcript
11-Jan-2022

So, Scott, I'll take that one. So, we haven't discussed or disclosed actual attach rates, but we are really pleased with the increase in the number of customers that are using our multiple solutions. And our goal is to continue that and also to increase and expand the usage among the customers that have the multi-product solution and also increase the attach rate of the customers that are only using one solution. The opportunity is huge. We are in the early days. The Review business is relatively young; it was not started back in 2013 like the Ediscovery business, and so the opportunity is really, really significant. We've seen increased attach rates and we've seen expansion, so we're really excited about the future.

### Scott Berg
Analyst, Needham & Co. LLC

Q

Now, within these two modules, can you land with either the two of them or does a customer really need to start with Ediscovery first?

### Kiwi Camara
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

So, you can land with any of the products. Now, whenever someone buys DISCO Review, there also is a consequence; going to buy DISCO Ediscovery. So, in some sense, Review guarantees the sale of DISCO Ediscovery. But we have many and growing numbers of customers who land with Case Builder and then expand to either DISCO Ediscovery or DISCO Review, of course hopefully on the path to using all three. In fact, one thing, Scott, that's worth pointing out is that DISCO Case Builder has been really effective in giving us a foothold in customers who may have an entrenched relationship with a different provider of e-discovery, maybe one of those big services companies. They can get started on our platform using DISCO Case Builder and then expand to the other products from there.

### Scott Berg
Analyst, Needham & Co. LLC

Q

Got it. I know the company likes to talk about its artificial intelligence that's embedded in the platform, and your new early case assessment module seems to leverage your technology here. Can you further leverage AI in the platform do you think over time going forward?

### Kiwi Camara
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

Yeah. We think AI is absolutely core to our strategy. And maybe just as a prelude, if you think about what's going on in our platform, right, it's billions of enterprise documents, so it's documents that folks like Google don't have access to generally. And then, it's a lawyer work product on those documents, lawyers labeling those documents with tags but also doing all kinds of other things; sharing them, commenting on them, redacting them, highlighting them, using them as exhibits and so on. And so, that combination of all those documents and the lawyer work product on top of them lets us train AI models that learn very similarly to the way an associate at a law firm would learn, right? Our models become more sophisticated over time at recognizing legal issues when they're present in documents, data or communications.

And so, how could we apply that over time more than we're doing today? Well, in our Case Builder product, we could use these AI systems to help lawyers identify critical pieces of testimony across huge corpuses of transcripts. We could, in DISCO ECA, use AI to help accelerate the process of filtering potentially relevant information from information that clearly isn't. And then, in the future, we could go even further to the left. So, think about automating document retention programs or document classification programs by using our AI models and running them against enterprise data at rest. One of our law firm clients is working right now on an exciting

CONFIDENTIAL

DISCO_003596



product to apply DISCO AI in exactly that way that we hope to productize over time. Beyond that, imagine automating the work of the legal department or the compliance department in terms of detecting potentially problematic activity or communications before a dispute or investigation arises. Again, that can be done with our AI models in a way that is much more scalable than some compliance lawyers periodically auditing your Bloomberg chat.

And then, going even further, imagine putting our AI models in the file save path, right? So, before you create that document that's going to be bad evidence or before you send the e-mail or the chat message, could we use our AI systems to warn you that there may be some legally problematic components of the thing that you're about to create. Now, many of these are far in the future, Scott, but I think you get some feel of how this idea that you can train an AI model to think like a lawyer can be applied time and time again across more and more areas of legal work.

### Scott Berg
*Analyst, Needham & Co. LLC*

Q

Certainly look forward to watching that product strategy unfold. Moving to go-to-market just a little bit. One of the things that's really impressed me about your model is I think you have an advantage or an advantageous go-to-market model, especially with your relationships with law firms. How should we think about law firms as clients or maybe not clients and why do they like your platform so much?

### Kiwi Camara
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

So, our partnerships with the law firms are absolutely core to our strategy. But maybe just taking a step back, the really foundational thing about our go-to-market strategy is we built it to leverage our core strength. And our core strength at DISCO is combining world-class engineering with a deep love and respect for the law and understanding of how lawyers work and think to build these product experiences that when you put them in front of end user lawyers, the people doing the work, the lawyers say wow, this is like magic; where has this been all my life? I absolutely love it.

So, how do you build a business model around it? Well, first is usage-based billing which Mike has talked about, right? Make it really easy for people to start, grow their business over time where the growth is powered by their delight in using the product. But the second piece of that takes us to your question, Scott, which is in legal, all the customers collaborate with each other in this highly networked and interconnected system. Customers or legal departments will use multiple law firms, and the lawyers at those law firms will represent multiple clients. And because all of those users are delighted by the product, it spreads through that network, from legal department to law firm then to other legal department then to other law firm. And then, on top of that, lawyers have a typical career progression where they may start out as associates of law firms and then become in-house counsel as they become more senior. And often, when they do that, they carry the DISCO product with them. And so, that's how we take advantage of law firms as partners to accelerate our growth.

In terms of why law firms love us, well, first, there's that end user experience. I mean, setting aside the business case, the lawyers just want to use our platform; it's like giving them Google instead of a library. But on top of that, we help law firms be more effective in competing in the hyper-competitive market for legal services because our products let them handle these disputes, investigations, other legal matters much more efficiently than they could have done before. You think about 200 law firms competing for business; something that helps a partner win business is super-compelling to the law firm. And then finally, these are bill-by-the-hour businesses, and what automation allows is for those billers to shift their time to higher-value services where they're much less likely to

CONFIDENTIAL

DISCO_003597

**CS Disco, Inc.** *(LAW)*
Needham Growth Conference

Corrected Transcript
11-Jan-2022

face rate pressure or write-offs so they get higher realization rates when they use DISCO to automate away lower-value services.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Got it. We've received a couple questions from the audience on this, and I'll save those till the end but it kind of gets to the heart a little bit. The next question is you price the e-discovery functionality on a per-gig basis today. Why is this the right model, do you think?

**Michael S. Lafair**
*Chief Financial Officer, CS Disco, Inc.*

A

So, that's a really good question. The reason it's the right model is some of our friends at other companies like a Workday or NetSuite which typically have very long-term agreements, that's a very long-term sales cycle. The beauty of our model on a gigabyte basis is you can get in the door at a large company and you can get one, say an assistant general counsel or one of the litigators to say this looks really, really cool; let's try it out because maybe they heard about it from one of their friends, just what Kiwi was just talking about. And so, they can try it out and then others within that department can spread it within the department, and that customer may be a small customer in, say, 2019 and today they could be a very, very large customer. So, we like the model. It's a very quick sales cycle and we also like it because once the product is in people's hands, they love it and they buy more and they expand their usage with us over time.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Got it. I think a natural kind of a continuation from that is what happens to the data when the matter or a matter is resolved? Is the data deleted? If so, how should we think about a customer's data usage or size usage over time with fluctuations of matters that come on and obviously leave the platform?

**Kiwi Camara**
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

So, what happens to a specific piece of data when a matter is resolved depends on the nature of the data and whether it's likely to be involved in other legal matters in the future. So, to give you some examples, if I'm a manufacturer and I make a product, maybe it's a pharmaceutical or maybe it's a consumer product, and I expect to be faced with consumer product lawsuits and product defect lawsuits, things like that on an ongoing basis over time, then the core data may never leave the platform; just matters come and go, but they're drawing on that same pool of enterprise data that's living in DISCO. At the other extreme, imagine like a single plaintiff employment lawsuit where both the employee and the alleged harasser or whoever it is have left the company while the lawsuit is in process. Well, chances are that that data is not going to be relevant again in later legal matters, and so that data may leave the platform. The way to think about it is the data that sits on our platform is the data that's relevant or potentially relevant to the ongoing legal matters that a company will face in the future.

**Scott Berg**
*Analyst, Needham & Co. LLC*

Q

Okay. Do your other modules follow the same pricing module or do they leverage something else?

**Michael S. Lafair**
*Chief Financial Officer, CS Disco, Inc.*

A

CONFIDENTIAL

DISCO_003598

## CS Disco, Inc. (LAW)
Needham Growth Conference

No, Scott. They're also usage-based.

---

**Scott Berg**
Analyst, Needham & Co. LLC

Q

Okay, fair enough. You kind of mentioned earlier, Kiwi, about larger-sized. The larger-sized seem to be heavily involved with practices focusing on e-discovery and litigation. How do they fit into your partner strategy because on one hand, they generate a lot of revenues from those customers obviously doing it manually but on the other hand, they're kind of like a frenemy of yours because their software can actually be beneficial to what they do? How should we think about that frenemy relationship?

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

I was delighted, Scott, when you use frenemy. I've been so into this now, I've started using business school speak, and so I was tempted to call coopetition or something like that. But look, here's how we think about the services providers. First of all, we've seen some of the more forward-thinking kind of national innovative services providers who are seeking differentiation adopt DISCO recently, so you'll see we've publicly announced CDS and Complete Legal joining the DISCO family. And those new additions are on top of an older core of about a couple dozen of these more local and regional services providers who over the years have adopted DISCO as their main offering or part of their offerings. And typically, the motivation is a desire to have technology differentiation in what is a crowded market of services providers as a way for these companies to get ahead of the future, deliver better results for their customers, and very frequently accelerate their growth rates relative to what they were without DISCO.

Now, that said, the very largest services providers, folks like Deloitte or EY or Consilio or Epiq have obviously not made the switch to DISCO. We believe – well, we know because it's the vast majority of our business – that we can succeed at competing with them in the market and displacing them. Almost always, when a new customer switches to DISCO or when a customer expands its spend, that is at the expense of that customer's previous relationship with one of these big services providers we compete with them all the time. We would certainly be open as time passes to partnering with these kinds of providers as they see more of the writing on the wall, that software is coming to eat services. That could be a really efficient way of accelerating our growth in the future.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

Okay. Well, software is eating the world, so I can imagine in legal services here at some point, too. I know from our past discussions that the legal environment basically froze in the second quarter of 2020. Early in the COVID pandemic, a lot of courts certainly shut down or suspended their businesses early on. Has the environment normalized yet to make your business maybe more predictable or does some volatility still kind of exist around some of the variants and stuff that we have out there today?

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

Well, Scott, let me separately talk about COVID and then what are the causes of variance in our business. My basic answer is I think those are not very related. In terms of COVID, the impact for us, what we saw on the ground was really very limited to the quarter that you pointed out, the second quarter of 2020 when lots of courts shut down. We've gotten this question from many people in the past, and we certainly can understand why one might think there is this kind of either slowdown or acceleration in work in our platform because of what's going on in the courts. But I can tell you, as I've said on the past earnings calls, that we just don't hear this from customers

---

CONFIDENTIAL

on the ground. What we hear from customers is that the timing of legal matters more or less can't be controlled; it's governed by when a new lawsuit is filed or a new investigation is opened up. And aside from that one quarter during COVID, it sort of it is what it is.

In terms of what drives variability in our results, it is the usage-based nature of our business. And we've talked about that in our earnings call for Q2 where I talked about just everything going right across every line of our business. We talked about it in Q3 earnings call where we gave some examples of particular customers, and that is an enduring attribute of our business model that you'll see continue. Any customer's usage can go up and down over time based on the kinds of legal exposure the customer has and how much data or documents those legal matters involve.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

We're going to take a couple questions from the audience here. The first question is what level of visibility does the company have into annual revenues at the beginning of any year? You guys are in a quiet period and not guiding to next fiscal year or anything, but just in general on a 12-month basis. And the question is based on given the consumption-driven nature of the business, how should we think about that visibility?

**Michael S. Lafair**
Chief Financial Officer, CS Disco, Inc.

A

So, we've talked about this before in the past. We feel fairly confident in our ability to project the revenue over an annualized basis. There's a lot of variability that we've talked about in the business that can impact quarter-to-quarter, but we have a lot of historical data going back to 2013 that gives us a ton of insight into the trends, customer growth, dollar net retention that we're able to model out also sales rep productivity. So, we feel really good about our kind of annualized. I've been here for almost four years and our ability to project on an annualized basis is actually really, really good.

Quarter-to-quarter, the variability of our business, it can go both ways. I mean, you could have a case that's in our system and there could be a discovery motion, and it could create a huge, huge uptick in business kind of at the end of the quarter that may impact the quarter, and it could go the other way. A case could settle; the parties could settle; it could be a fairly large case and that could affect variability. But the reality is all of these clients have ongoing legal matters and one case may settle one particular quarter or there may be a large discovery motion that kind of increases it. But over the long-term, 12-month period, we feel pretty confident.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

There were some pretty strong growth quarters in calendar 2021. Are there any one-off benefits that won't repeat in calendar 2022?

**Michael S. Lafair**
Chief Financial Officer, CS Disco, Inc.

A

I would just say – I mean, that's verging on a little bit of guidance for 2022, and we're going to get there but not right now.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

CONFIDENTIAL

DISCO_003600

## CS Disco, Inc. (LAW)
Needham Growth Conference

**Corrected Transcript**
11-Jan-2022

Can you have the company walk through the growth algorithm? How much do you expect from existing customers in a typical year versus net-new, if that's predictable?

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

Well, we've disclosed some net revenue retention stats in the S-1 and in our prior filings, so I would direct people to that for some of their kind of numerical color there. In terms of how we think about like what are the real engines of growth not just next year but going forward, certainly adding lots of new customers as we've done for a long time now is a core part of that. And when you see us amp up our investments in marketing programs, in SDRs, and in field and inside sales, that's what's going to fuel a lot of that growth. Now, on top of the new customer adoption, you have this dynamic where customers because DISCO, like it's often their second journey, like the human being, it's their second journey on the DISCO adoption curve, they start out at bigger sizes and grow more quickly. And we talked about some examples of that in some of the earlier earnings calls where customers may get to that six-figure or seven-figure spend a lot more quickly than they historically have done.

And then, the third big driver of growth is cross-sell of the new products and our intent to continue adding to the product portfolio over time. As Mike talked about it, that can result in a material uptick in existing customer growth because you have customers who spend $1 in Ediscovery spending $3 when they buy all three of our products. It's a multiplier effect instead of plus 20% or something like that.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

Next question is on Ediscovery. Is expansion of Ediscovery use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

Well – go ahead, Mike.

**Michael S. Lafair**
Chief Financial Officer, CS Disco, Inc.

A

No. Go ahead, Kiwi.

**Kiwi Camara**
Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.

A

I would say there's not as much variance in the ultimate wallet size of the customer, so like how big will the customer be when they get to maturity. But there is more variance in how quickly they get there. So, over the last few earnings calls, right, we've talked about the extreme positive examples where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that. And then, there are also examples of customers that take four years, five years, even six years to get to their mature spend. So, I would say the wallets are pretty consistent across the kinds of customers who we target and sell to, which is typically the high end of the market. But how long that journey takes varies more customer-to-customer.

**Scott Berg**
Analyst, Needham & Co. LLC

Q

CONFIDENTIAL

## CS Disco, Inc. (LAW)
Needham Growth Conference

Last question, and it looks like we have time for here is can you talk about the importance of building your platform from the ground-up, by lawyers for lawyers compared to the approach that other newer cloud providers in the space have taken?

### Kiwi Camara
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

A

Yes, I can. That's at the very heart of what we believe, Scott, and you'll see it. Like, if you watch the speeches given by leaders of some of these other companies, they may say things like you wouldn't want doctors to build your medical imaging equipment; you want engineers to. And you can see how that might sound sensible on its surface, but we think it's dead-wrong. We think that the secret to cracking this legal market, which has been a graveyard, right, of companies who've tried in the past, the secret to cracking this market is to build product experiences that fully solve the lawyer's problem, that anticipate the way the lawyer wants to work so that when you put it in front of them they say wow, this is magic; where has this been all my life?

That's the secret, the special sauce that I think DISCO does better than anybody else in this space, established or startup. It's that ability to combine world-class engineering with a deep love and respect for the law to build these product experiences that lawyers think are magical. And then, what we figured out on top of that is how to turn that into a business model where we have this usage-based growth engine that turns that end user lawyer delight into repeatable and scalable growth. But, yeah, we think that is absolutely core to what we do.

### Scott Berg
*Analyst, Needham & Co. LLC*

Got it. With that, that's all the time that we have. I wanted to thank everyone for joining us today. Kiwi, Michael, thank you so much. Good luck with the rest of the meetings and we look forward to speaking with you on the quarter call.

### Kiwi Camara
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

Thanks so much.

### Michael S. Lafair
*Chief Financial Officer, CS Disco, Inc.*

Thank you.

### Kiwi Camara
*Co-Founder, Chief Executive Officer & Director, CS Disco, Inc.*

Bye-bye.

### Scott Berg
*Analyst, Needham & Co. LLC*

Take care.



CONFIDENTIAL

DISCO_003602

**CS Disco, Inc.** (LAW)
Needham Growth Conference

 Corrected Transcript
11-Jan-2022

Disclaimer

The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2022 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

CONFIDENTIAL

DISCO_003603