# EXHIBIT 21

UNITED STATES DISTRICT COURT                    08:28

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

--o0o--

LYNN GAMBRILL, Individually and

On Behalf of All Others Similarly

Situated,

Plaintiff,

Vs.          Case No.  1:24-CV-00028-DAE

CS DISCO, INC., KIWI CAMARA, and

MICHAEL LAFAIR,

Defendants.

_____/

--o0o--

THURSDAY, SEPTEMBER 11, 2025

--o0o--

VIDEOTAPED DEPOSITION

OF

ZACHARY NYE, Ph.D.

--o0o--

Reported By:  CAROL S. NYGARD

California CSR No. 4018

Nevada CCR 915

Page 1

APPEARANCES:

For the Plaintiffs:

THE ROSEN FIRM, P.A.
BY: JONATHAN STERN, ESQ.
275 Madison Avenue
40th Floor
New York, New York  10116
jstern@rosenlegal.com

For the Defendants:

COOLEY, LLP
BY: TIJANA BRIEN, ESQ.
   ANUVA GANAPATHI, ESQ.
   RACHEL IVANOWSKY, ESQ.
3175 Hanover Street
Palo Alto, California  94304
650.843.5000
tbrien@cooley.com
aganapathi@cooley.com
rivanowsky@cooley.com

Videographer:
SHAWNA HYNES

Page 2

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

--oOo--

LYNN GAMBRILL, Individually and
On Behalf of All Others Similarly
Situated,

        Plaintiff,

     Vs.        Case No.  1:24-CV-00028-DAE

CS DISCO, INC., KIWI CAMARA, and
MICHAEL LAFAIR,

        Defendants.

_____/

            --oOo--

     BE IT REMEMBERED, that on Thursday, September 11, 2025, at 9:13 a.m., at Cooley, LLP, 3175 Hanover Street, Palo Alto, California, before me, Carol S. Nygard, a Certified Shorthand Reporter of the State of California, there personally appeared,

        ZACHARY NYE, Ph.D.,

called as a witness by the Defendants, who, being by me first duly sworn, was thereupon examined and interrogated as hereinafter set forth:          09:12

     VIDEOGRAPHER:  Good morning.          09:12

     We are going on the record at 9:13 a.m. on          09:13 September 11th, 2025.          09:13

Page 4

            INDEX

       EXAMINATION BY COUNSEL

                 Page No.

Examination by Ms. Brien          7

            EXHIBITS

Exhibit No.          Description          Page No.

Exhibit Number 1   Defendants CS DISCO, Inc.,
        Kiwi Camara,and Michael
        LaFair's Notice of
        Deposition of Zachary Nye          7

Exhibit Number 2   Report of Zachary Nye, Ph.D.          8

Exhibit Number 3   Plaintiffs' Opposed Motion and
        Memorandum of Law in Support
        of Motion for Class
        Certification and Appointment
        of Class Representatives and
        Class Counsel          104

Exhibit Number 4   Q2 2021 CS DISCO, Inc.
        Earnings Call- Final          113

Page 3

     Please note that the microphones are sensitive   09:13 and may pick up whispering and private conversations.     09:13

     Please mute your phones at this time.          09:13

     Audio and video recording will continue to          09:13 take place unless all parties agree to go off the          09:13 record.          09:13

     This is media unit one of the video-recorded          09:13 deposition of Zachary Nye, Ph.D. taken by counsel for          09:13 Defendant in the matter of Lynn Gambrill, et al., versus   09:14 CS DISCO, Inc., et al., filed in the United States          09:14 District Court, Western District of Texas, Austin          09:14 Division, Case Number 1:24-CV-00028-DAE.          09:14

     The location of the deposition is 3175 Hanover   09:14 Street, Palo Alto, California 94304.          09:14

     My name is Shawna Hynes, representing Veritext   09:14 Legal Solutions, and I'm the videographer.          09:14

     I am not related to any party in this action,          09:14 nor am I financially interested in the outcome.          09:14

     If there are any objections to proceeding,          09:14 please state them at the time of your appearance.          09:14

     Counsel and all present will now state their          09:14 appearances and affiliations for the record beginning          09:14 with the noticing attorney.          09:14

     MS. BRIEN:  Good morning.          09:14

     Tijana Brien with Cooley on behalf of the          09:15

Page 5

2 (Pages 2 - 5)

Defendants.

MS. GANAPATHI: Good morning.

Anuva Ganapathi with Cooley on behalf of Defendants.

MS. IVANOWSKY: Rachel Ivanowsky with Cooley on behalf of Defendants.

MR. STERN: Jonathan Stern with the Rosen Law Firm on behalf of the Plaintiff.

VIDEOGRAPHER: Thank you.

Would the Court Reporter please introduce yourself and administer the oath to the witness.

THE REPORTER: My name is Carol Nygard, California CSR Number 4018.

Can I have you raise your right hand, please.

(Thereupon the oath was administered to the witness by the Reporter.)

MS. BRIEN: All right. Good morning, Dr. Nye. Thank you for being here today.

We are going to go ahead and mark our first exhibit, which you're going to have lucky Exhibit Number 1.

And apologies in advance for tossing these at you. Oh.

THE WITNESS: Good throw.

MS. BRIEN: Oops. Sorry.

Page 6

THE WITNESS: No problem.

MS. BRIEN: Can you reach that? I'll get better at my frisbee.

Okay. So this is the Notice of your deposition.

(Exhibit Number 1 was marked for Identification.)

EXAMINATION

BY MS. BRIEN:

Q. Have you seen this Notice before?

A. Yes.

Q. And who sent you this Notice?

A. Mr. Stern to my left.

Q. Okay. And you're appearing for your testimony today pursuant to this Notice?

A. Yes, I am.

Q. And you've been deposed before?

A. I have.

Q. Approximately how many times?

A. Somewhere between 80 and 90 times.

Q. Okay. So I'm going to skip over most of the rules because nobody wants to hear those all over again.

But you do understand that you're testifying today under oath subject to the penalty of perjury?

A. I do.

Page 7

Q. Okay. And is there any reason that you cannot provide truthful and accurate testimony today?

A. No.

MS. BRIEN: Okay. Great.

So I would like to talk to you about your expert report today.

THE WITNESS: Okay.

MS. BRIEN: And so we're going to go ahead and mark that as Exhibit 2.

(Exhibit Number 2 was marked for Identification.)

THE WITNESS: Good slide there.

BY MS. BRIEN:

Q. Okay. And so this is your expert report that you submitted in this case dated August 4th, 2025; is that correct?

A. Yes, that's correct.

Q. And, if I could have you turn to page 39, at the bottom is that your signature?

A. Yes, that is it.

Q. Okay. And do you understand that Plaintiff filed your expert report with the Court in support of his motion for class certification?

A. I do.

Q. Okay. And have you read Plaintiffs' motion

Page 8

for class certification?

A. No.

Q. Okay. Is there anything in your report that you would like to change at this time?

A. No.

Q. Okay. Are there any opinions that you've been asked to offer in this case that are not currently in your report?

A. No.

Q. Are there any opinions that you intend to testify to in this case that are not identified in this report?

MR. STERN: Objection. Vague.

THE WITNESS: I -- I -- so I -- I may be asked to opine on other issues down the road. I have not been asked, but -- in these types of cases in the merits phase sometimes I'm asked to opine on loss causation, and damages and economic materiality.

BY MS. BRIEN:

Q. And so at this point you have not been asked to opine on anything other than what's set forth in your report in this case?

A. That's correct.

Q. Does your report contain the complete basis for all of the opinions that are set forth in your

Page 9

3 (Pages 6 - 9)

report? 09:18

A. It does. 09:18

Q. Okay. Does the report contain the complete basis for all the opinions that you intend to offer in this case? 09:18 09:18 09:19

MR. STERN: Objection to form. 09:19

THE WITNESS: That I intend -- 09:19

I'm -- 09:19

Again, I may be asked down the road to opine on further issues. To the extent necessary, I may rely on other materials. 09:19 09:19 09:19

BY MS. BRIEN: 09:19

Q. Okay. Do you have any intent at this point to amend or add to your opinions in this report? 09:19 09:19

A. No. 09:19

Q. Okay. So let's go to page 3 of your report to the section titled "Summary of Opinions." 09:19 09:19

Let me know when you're there. 09:19

A. I am there. 09:19

Q. And you offer two opinions in this report; is that correct? 09:19 09:19

A. Yes. 09:19

Q. Can you tell me at a high level what your first opinion is? 09:19 09:19

A. That the market for -- are we saying "DISCO" 09:19

Page 10

or "CS DISCO"? 09:19

Q. Whatever you prefer. 09:19

A. Let's just say "DISCO." 09:19

The market for DISCO stock was generally efficient during the class period. 09:19 09:20

Q. Okay. And when you say "generally efficient," what's that mean? 09:20 09:20

A. I describe it in Section 6, I believe, of my report, and I think -- it's the Halliburton 2 Supreme Court decision. 09:20 09:20 09:20

Let me just try to find the quote. 09:20

Oh. 09:20

Yeah, so it's in paragraph 14, and this is the Supreme Court language that I'm quoting, "The fraud-on-the-market theory is based on the fairly modest premise that market professionals generally consider most publicly-announced material statements about companies, thereby affecting stock market prices." 09:20 09:20 09:20 09:21 09:21 09:21

So that's what I have in mind. 09:21

Q. Okay. And what about your second opinion? Can you describe that for me at a high level? 09:21 09:21

A. Generally it's that in this case damages can be estimated using a methodology that is common to the class and in a manner consistent with Plaintiffs' theory of liability, and that is the event study or 09:21 09:21 09:21 09:21

Page 11

out-of-pocket damages estimation methodology that I outline in Section 7 of my report. 09:21 09:21

Q. Okay. And we'll definitely get into that in a bit more detail shortly. 09:21 09:21

Do you know who the Defendants in this case are? 09:21 09:21

A. It's the company CS DISCO, and I believe its former CEO and -- then current CFO, or at least I don't know if the CFO is still there right now, was at the time of the motion to dismiss order, which is what I have in mind. 09:21 09:21 09:22 09:22 09:22

Q. And do you know who the lead Plaintiff is? 09:22

A. I don't. 09:22

Q. So it's safe to say you've never met him or had any interactions with him? 09:22 09:22

A. That is correct. 09:22

Q. Are you familiar with anyone by the name of Bert Pluymen? 09:22 09:22

A. I'm not familiar with Mr. Pluymen. 09:22

Q. And before you were contacted about serving as an expert, had you heard of CS DISCO? 09:22 09:22

A. I had not. 09:22

Q. So you have never owned CS DISCO stock? 09:22

A. Not directly. 09:22

Q. When were you first contacted about serving as 09:22

Page 12

an expert in this litigation? 09:22

A. Can't recall the exact date. It's usually two or three months ahead of the due date of a report, so -- July -- maybe sometime in May 2025 is my guess. 09:22 09:22 09:22

Q. Okay. And were you formally retained by Plaintiff? 09:23 09:23

A. I believe so. 09:23

Q. And was that around the same time as you were first contacted? 09:23 09:23

A. Yeah, it would have been around that time, yes. 09:23 09:23

Q. Okay. Do you have an engagement letter with Plaintiff? 09:23 09:23

A. No. 09:23

Q. Do you have an engagement letter with the Rosen Law Firm? 09:23 09:23

A. I may. I'm not sure. I can't recall. 09:23

Q. Is it generally your practice to have engagement letters? 09:23 09:23

A. Not -- not always. Sometimes. It just kind of depends on the client. 09:23 09:23

Q. Are there certain situations where you would have an engagement letter? 09:23 09:23

A. Well, I have had engagement letters, but it's -- sometimes -- 09:23 09:23

Page 13

4 (Pages 10 - 13)

It's kind of random, just whatever the client wants. We have a long history with many of our clients, and so it's not always necessary to have an engagement letter.

Q. Okay. So, if you have a history with a client, then you might not get an engagement letter for each particular matter?

A. Yes, I think that's safe to say.

Q. And then who is paying you, the Plaintiff or the Rosen Law Firm?

A. I believe it's the Rosen Law Firm.

Q. Okay. And I think I know the answer to this, but were you familiar with the Rosen Law Firm before you were engaged?

A. I was. I've worked on a few cases with them in the past.

Q. Okay. Do you know how many cases you've worked with them on?

A. It's hard to tell exactly because sometimes there's cocounsel on a case that I am not directly involved with. I'm usually only really involved with the lead Plaintiffs' counsel, but kind of surrounding cocounsel I don't -- they'll be on a case, but I don't know -- I don't work with them directly.

I would say directly -- two cases come to mind

Page 14

working with the Rosen Law Firm.

Q. And does that include this case or outside of this case?

A. Outside of this case.

Q. Okay. So three cases total?

A. It could be more, but that's what I'm remembering right now as direct contacts.

Q. Do you recall the other two -- the other two cases?

A. Yeah. One was against Zillow, the real estate, you know, application.

The other one was --

Oh, what was it called?

Walter Investment Management, I think, or -- something like that. It was Walter something.

I think they were like a mortgage -- payment processor, I think. I could be totally misremembering this, but that's what comes to mind.

Q. And were both of those securities class actions?

A. Yes, they were.

Q. And your work in those matters, was it specific to class certification or did it go beyond that?

A. In those cases they were -- both definitely

Page 15

involved class certification. I think that's -- I think they settled after the classes were certified, so I don't know -- I don't remember getting into the damages estimation and loss causation analyses in those cases.

Q. And I believe based on your report you were being paid at $1,040 per hour for your work in this matter; is that correct?

A. That's correct.

Q. And is that the rate you typically charge for this type of work?

A. For -- yeah, it went up this year, so this is -- since January 1st that's been my hourly billing rate.

Q. Okay. And so does it change on an annual basis?

A. I kind of go every two years.

Q. And is your rate for this year going to apply to this matter for the duration of the matter, even if it goes into the next few years?

A. If it goes --

For the next probably two years, so, what, the end of -- we're 2025, '26 --

So at the beginning of '27, if we're still talking, I probably will raise my rate.

Q. Okay. And do you charge a different type of

Page 16

rate for other types of consulting work or do you charge the same hourly rate regardless of what you do?

A. Same rate.

Q. Do you receive any additional compensation based on billings that you generate from your expert work?

A. So first just want to be -- state my report, nothing's contingent on the outcome of the case, but I do collect a percentage of my staff's billing on top of my own hourly rate.

Q. And do you collect your entire hourly rate or is that paid to your consulting group and then you receive a salary or a portion of that?

A. I receive a percentage of my hourly rate with the other half effectively going to the company.

Q. Okay. Is there any other compensation that you're earning from your engagement on this matter?

A. No.

Q. Do you know what the total amount you've billed for your work in this matter is thus far?

A. I do not.

Q. Do you know approximately what it is?

A. I don't. I -- I -- I don't recall.

Q. Do you think it's less than a hundred thousand, more than a hundred thousand?

Page 17

5 (Pages 14 - 17)

A. It's probably more than a hundred thousand for my team, my whole staff.

Q. Is it less than 500,000?

A. I think -- yes.

Q. Okay. So somewhere between a hundred thousand and 500,000?

A. I think that's a fair range, yeah.

Q. Okay. Do you know how many hours you have spent on this matter?

A. I don't recall specifically.

It's usually about a hundred hours for the opening report for me to -- you know, check all the event study. Basically, the reading of the event studies, I think, takes the longest time.

Q. So a hundred hours spent by you directly?

A. Around that, yeah.

Q. Okay. And what about members of your team?

Do you know about how many hours they've spent?

A. Similar amounts is usually --

We're all kind of working side-by-side on a given project.

Q. And is this sort of a -- a typical amount of hours that you would spend on this type of engagement?

A. Yes.

Page 18

Q. And I think we already talked about this, but other individuals assisted you in preparing your report?

A. Yes, they did.

Q. How many individuals?

A. Probably four others.

Q. And who are they?

A. Faye Fort, F-o-r-t, and she's a Vice President at our firm, and the Project Manager, I would say, for this that worked directly under me, and then she would work with the two analysts we have, that's Dave Bentley and Ruth Lambert, and they're running, you know, regressions, and downloading the stock prices, and compiling the analyst reports, things like that.

And then I think Beth Charlesworth, all one word, also helped review the event study and the report at the end, like proofreading it.

Q. And is this your typical team or do you work with other individuals on different matters?

A. Typical team.

Q. Okay. And what is their -- what is their background?

A. Oh. So Faye --

Well, all of them have been working at least 10 years, I think.

Beth has been working at our firm for close to

Page 19

50. Faye has been there pushing 30 years, and they all have advanced degrees.

Faye has a Masters in Operations Research from Stanford. Beth has an MBA from Stanford. Dave, I think, has a Masters Degree from -- I can't remember the college -- and then Ruth has a Ph.D. in -- it's like Aerospace and Fluid Dynamics or something like that, so she's -- she's the smartest one on our team, I think.

Q. And do you know what their billing rates are?

A. I think -- the analysts are around 450 per hour, and I think the Vice Presidents, which would be Beth and Faye, are 8- -- 825 maybe, 850, something like that.

Q. Do you know if you've been paid by the Rosen firm yet?

A. I don't know.

Q. And I think you already said that your compensation is not contingent on the outcome of the litigation?

A. That's correct.

Q. And it's not contingent on the outcome of your opinion?

A. No, it's not.

Q. And there's no other additional compensation, like a bonus based on billings, that you would receive

Page 20

for this work?

A. No bonuses.

It's the --

My pay, again, is I get it -- my percentage of my hourly rate and then a percentage, a lower percentage, of the staff's hours.

Q. So like a draw from that, but no -- no bonus for what ultimately happens?

A. No, no bonus.

Q. Okay. Do you know what percentage of your income comes from working with the Rosen Law Firm?

A. I don't.

Q. Can you sort of qualitatively describe it?

Would you say it's significant, insignificant?

A. It varies from year-to-year.

We have many cases actively, you know, that we're working on, so it's -- you know, valued custo -- or valued client, but I don't consider that -- them to be like -- a huge portion of our overall revenues.

Q. So, moving on, did you meet with anyone to prepare for your deposition today?

A. I met with Jonathan Stern yesterday for half an hour.

Q. And was that the only time you met to prepare for your deposition?

Page 21

6 (Pages 18 - 21)

A. Yes. 09:33

I worked myself rereading my materials, but -- 09:33 most of the time it's just me reading. 09:33

Q. And did you meet with members of your team to 09:33 prepare for the deposition? 09:33

A. No, I did not. 09:33

Q. During your prep did you review any documents? 09:33

A. Well, I reviewed my report, the Court's 09:33 decision on the motion to -- to dismiss, the Complaint 09:33 -- and that's it. 09:33

Q. Were any of those documents you had seen sort 09:33 of for the first time while preparing? 09:34

A. No, I reviewed them before. 09:34

Q. Okay. So then let's go to Exhibit 1 of your 09:34 report, which is your resume. 09:34

A. Okay. 09:34

Q. Is this the same resume that you provide to 09:34 prospective clients? 09:34

A. I don't provide resumes really to prospective 09:34 clients. 09:34

Q. Okay. 09:34

A. I mean, I guess I have in the past, but it's 09:34 just very atypical. 09:34

Q. So what do you typically provide to 09:34 prospective clients? 09:34

Page 22

A. Well, if somebody asks for my C.V., which has 09:34 happened once over the past 10 years, then I -- I would 09:34 probably send them something like this. 09:34

I would send them this or a version of this at 09:34 the point in time, because it changes every time I do a 09:34 litigation or testimony. 09:35

Q. Okay. So you'd provide the most current 09:35 version you have? 09:35

A. Correct. 09:35

Q. Okay. And so you are Vice President of 09:35 Stanford Consulting Group, and you've been there for 09:35 quite a while. 09:35

Can you tell me about the type of work that 09:35 Stanford Consulting Group does? 09:35

A. Sure. 09:35

It's -- I think the first paragraph of my 09:35 report summarizes it, and basically we're a group of 09:35 professionals, economists and business school types, 09:35 that have -- 09:35

My father founded it in 1981, and I grew up, 09:35 you know, in the snack room, and, you know, seeing what 09:35 they were doing, and eventually thought it would be a 09:35 good career path for myself, and so I went through all 09:35 the schooling, had to get a Masters Degree and a Ph.D. 09:35 in Financial Economics. 09:35

Page 23

And ultimately we provide consulting and 09:35 advisory services to clients. Mostly it's related to 09:35 litigation these days, but it varies from year-to-year. 09:36

Q. And so has all of the consulting work that 09:36 you've done been with Stanford Consulting Group? 09:36

A. I think -- that's fair to say. 09:36

Q. And so I heard you say that most of it now is 09:36 litigation consulting. 09:36

What percentage of Stanford Consulting Group's 09:36 earnings come from litigation consulting at this point? 09:36

A. Right now -- I think we're -- all of our 09:36 active projects are litigation consulting. 09:36

Q. Okay. 09:36

A. It hasn't been -- 09:36

It's not always that way. Sometimes we've 09:36 done work for big insurance companies doing data 09:36 analysis and working for the regulators, but that's 09:36 really old stuff I haven't -- I haven't done in my 09:36 career, but that was the old guard would do stuff like 09:36 that. 09:36

Q. For how many years do you think it's been 09:36 almost entirely litigation consulting? 09:37

A. I would say litigation consulting for my 09:37 career has been at least 90 percent of our work 09:37 consistently, and -- 09:37

Page 24

I'm trying to think. 09:37

Maybe -- maybe the past four years have been 09:37 pretty much litigation consulting, damage analysis, and 09:37 -- loss causation work and market efficiency analyses. 09:37

Q. And have you always served in a consulting and 09:37 testifying expert role at Stanford Consulting Group or 09:37 did you have prior sort of analyst-type roles at some 09:37 point? 09:37

A. I -- I had prior analyst-type roles until I 09:37 think I got my Ph.D. in 2009. Even then I was 09:37 supporting other experts until like -- I think around 09:37 2012 is when I got my first case as a -- as the 09:38 testifying expert. 09:38

Q. Okay. And so, looking at this list of 09:38 testimony that you have in your C.V., is this a 09:38 comprehensive list of testimony that you've provided? 09:38

A. I think so, yeah. 09:38

Q. Okay. And, you know, can you tell me which 09:38 portion of this was class certification work versus sort 09:38 of merit stage/damages work? 09:38

A. I think -- 09:38

Well, I -- I can go through every case and 09:38 probably remember what kind of case it is and what stage 09:38 it got to, but what I would say generally is that, if 09:38 I'm -- if I've done a merit stage work, I -- I probably 09:38

Page 25

7 (Pages 22 - 25)

Case 1:24-cv-00028-DAE    Document 97-23    Filed 10/03/25    Page 9 of 96

also did the -- almost certainly did the class certification work.

Q.   Okay.  And how many class certification cases approximately have you testified in?

A.   I don't know a specific number.

I did count it for some reason a couple years ago.  I think it was in the -- close to 40 maybe.

I mean, that's --

There's more cases that we work on, but they settle prior to class certification, so --

But I think -- I think it's around --

That might have been opinions related to -- whether damages can be estimated using methodology common to the class and consistent with Plaintiffs' theory of liability, and that was -- that kind of became a thing after Comcast is my understanding, and that was kind of early in my career, so I might have more that I'm not thinking of, but I think I'm around -- around 40 of those opinions where Courts have accepted my damage methodology.

Q.   Okay.  And focusing really on securities cases only, were you engaged by Plaintiffs in each of those cases?

A.   I was.

Q.   Okay.

Page 26

A.   And I always say this.  I'm open to working for Defendants.  I've been called very few times by -- by Defense counsel.

I'm open to working for Defendants, but I just don't seem to get those calls.

Q.   And have you testified about market efficiency before?

A.   Many times.

Q.   How many times approximately?

A.   Probably around 40 times.

Q.   Okay.

A.   Maybe more because these lists tend to be the cases that didn't settle before the decision -- or my deposition, I should say.

Q.   Has your testimony ever been excluded by a Court?

A.   No.

Q.   Has your testimony ever been criticized by a Court?

A.   I don't think so.

Q.   Have you ever opined in a securities class action that there is not a methodology capable of calculating damages on a classified basis?

A.   So I have encountered many cases that I've turned down.  So I've --

Page 27

For the cases that I have -- you know, on this list, I've issued an opinion that damages can be calculated using the event study methodology based on the theory of liability pled and the underlying facts.

But I have encountered other cases that I have -- conveyed to the client that I don't think that this would be a case where damages could be estimated or maybe there's no damages, and then I don't -- I'm not asked to then write a report to that effect.

Q.   And can you think of any examples of situations where you felt that damages could not be calculated on a classified basis?

MR. STERN:  Objection to the extent that it doesn't reveal privileged attorney/client communications.

MS. BRIEN:  And I, of course, do not want you to reveal attorney/client communications.

THE WITNESS:  Fair enough.

It --

You know, I think -- what comes to mind, just hypothetically, is when you've got a loss that seems to be caused by something unrelated to the fraud, and, you know, upon a preliminary analysis that, you know, appears to be the case, I convey that to the client, that I don't think that I can opine to damages or loss

Page 28

causation based on what's alleged to be the fraud revelation.

BY MS. BRIEN:

Q.   And do you have any examples of sort of where the fraud would have been unrelated to -- or the alleged fraud would have been unrelated to what ultimately led to the damages in the case?

A.   I tried to give an example there, just a general example, but it could really be for any reason.  It could be that the company's operations in China were melting down and there's clear evidence that the analysts and the news commentators attributed that decline to that adverse business outcome relative to some other alleged revelation of the relevant truth.

Q.   Okay.  Yeah, I'm just trying to understand sort of where -- where you draw the line on how related it has to be for you to feel comfortable that there's a classified way to calculate damages.

MR. STERN:  Objection to form.

THE WITNESS:  I mean, it's usually very straightforward.  It's just there's an allegation that something was concealed or misrepresented, and usually in the cases I've testified on it's very clear that that's what caused the decline, because all the analysts and news commentators freaked out and said that was the

Page 29

8 (Pages 26 - 29)

case.                                                   09:43

So that's like a direct match, I would say, or   09:44

directly -- causal connection. That's what I'm looking   09:44

for.                                                    09:44

BY MS. BRIEN:                                           09:44

Q.   Okay. And I think you said there were many   09:44

situations, and I don't want to put words in your mouth,   09:44

where you had these meetings and came to the conclusion   09:44

that you couldn't calculate damages on a class-wide   09:44

basis.                                                  09:44

Can you approximate about how many times   09:44

you've come to that conclusion?                         09:44

A.   No, I can't recall specific number, but it's   09:44

happened enough -- many times.                          09:44

Q.   Okay. Have you ever opined in a securities   09:44

class action that a company stock did not trade in an   09:44

efficient market?                                       09:44

A.   Similar answer in that all the cases that I   09:44

have issued an opinion, as I've demonstrated in those   09:44

reports, there's strong evidence of market efficiency   09:44

for those specific stocks in those specific class   09:44

periods, but I have encountered cases that I've turned   09:44

down or conveyed an opinion that I think market   09:44

efficiency would not be easily demonstrated or -- and I   09:45

was not asked to write a report in those cases.   09:45

Page 30

Q.   And have you ever opined in a securities class   09:45

action that there was no price impact of an alleged   09:45

misstatement?                                           09:45

A.   I think --                                         09:45

There's been cases not on the price impact   09:45

side, I don't think, but on the loss causation side a   09:45

few times I've -- I've conservatively not included price   09:45

declines that are alleged to be loss causation events   09:45

for various reasons.                                    09:45

But usually there seems to be a lot of   09:45

confounding information that is hard to disentangle or   09:45

that the return is -- and that really is the confounding   09:45

use.                                                    09:45

Q.   So there have been situations where the   09:45

Plaintiffs might have alleged multiple corrective   09:46

disclosures and you would not opine as to loss causation   09:46

with respect to some of them because you didn't feel   09:46

like you could?                                         09:46

A.   That's correct.                                    09:46

It's not that I'm saying there's no loss   09:46

causation. It's that I'm not including them in the   09:46

estimate of price inflation -- because they're always   09:46

related.                                                09:46

It's just a matter of how much of the observed   09:46

price decline on a given date is the result of the --   09:46

Page 31

the fraud revelation as opposed to other confounding   09:46

factors, and sometimes it's very easy -- or it's capable   09:46

even, the event study methodology can disentangle the   09:46

various components of information disclosed and their   09:46

value impacts reliably and scientifically, but in others   09:46

where it's -- perhaps more challenging to -- to use the   09:46

tools of financial economics.                           09:46

For the sake of conservatism I haven't   09:47

endeavored to disentangle those -- individual components   09:47

of information.                                         09:47

Q.   And, without divulging attorney/client   09:47

privileged information, can you give me a more specific   09:47

example where that might have been the case?   09:47

A.   I think there was an example, I can't remember   09:47

the case name, but it was a -- the timing was off, like   09:47

the -- there was an allegation of -- against I think the   09:47

CEO of a company, and there was like significant price   09:47

decline on -- on a given day, but the announcement was   09:47

like after market close on that day.                    09:47

So it was not --                                        09:47

The -- the disclosure's timing didn't line up   09:47

with the price decline that was observed or alleged to   09:47

be loss inducing.                                       09:48

Q.   So the price decline occurred before the   09:48

information was actually announced?                     09:48

Page 32

A.   It was before or after. It was just that it   09:48

wasn't -- there wasn't strong evidence of loss causation   09:48

in that example that I'm thinking of.                   09:48

Q.   Okay. So I guess I'm trying to understand how   09:48

that was a situation where there were confounding   09:48

factors. It seems like it's just kind of a mismatch in   09:48

the timing.                                             09:48

A.   Yeah.                                              09:48

So it's not it's not a confounding use thing.   09:48

It's just another example of a case where I did not   09:48

opine to loss causation on -- on an alleged corrective   09:48

event.                                                  09:48

Q.   Okay. I'm just trying to understand in sort   09:48

of what types of confounding factors or how many types   09:48

of, you know, confounding factors might make it   09:48

difficult to opine on loss causation.                   09:48

A.   Well, it -- it just depends. It's context   09:48

specific.                                               09:49

Every disclosure is different. Life evolves,   09:49

you know, the way it does, and I -- part of that's what   09:49

the event study does, it looks at specific concrete   09:49

informational disclosures and price reactions and tries   09:49

to make sense of it.                                    09:49

Q.   Have there ever been situations where you've   09:49

taken on an engagement, and, as you've dug into the   09:49

Page 33

9 (Pages 30 - 33)

information, you've determined that you can no longer offer the opinion the client was looking for?

A. I don't recall that happening.

I'm -- I'm pretty diligent with my --

I think my track record is a product of my preliminary work. Before I get too deep in a case I make sure that it's something that I -- feel I can reliably and scientifically, you know, opine to -- to the issues at -- at hand.

Q. Okay. And so we talked about the fact that you were assisted by others in preparing your report.

Did you review their work for accuracy?

A. Yes.

Q. And did you personally draft the report that you submitted?

A. Over the years, yes. It's -- it's a --

Because of the structure of -- and what we're asked to opine to, and what's been accepted, given the caselaw, it's -- it's a -- a report that has evolved over many years to effectively convey the economic evidence that's relevant for establishing market efficiency.

As is in the report, you can see that there's Cammer factors 1 through 5, and then there's the Krogman factors, or there's a few other cases that -- that

Page 34

people ascribe to these factors.

There's three more additional factors that we analyze, and that is pretty -- that is constant across all of the cases I am asked to examine market efficiency.

So because of that we -- you'll -- you'll find, I'm sure you've seen, like the report is similar from case-to-case, but it's always specifically tailored to the company and stock at issue, and the class period, and the event study is always entirely unique because it's just chronology of history for a different company at a different time.

Q. So you start with sort of a template or a form report that you have spent years crafting; is that correct?

A. Yeah, and that has been approved by Courts -- well, many times, more than my 40.

It's -- it's something that my firm has been doing for a long time.

Q. And so, focusing on the case-specific portions of your report, did you personally draft those parts of the report?

A. I relied on the analysts to do much of the quantitative exhibits and to fill in the numbers, but I did check -- we all check the numbers like a crazy

Page 35

amount of times just to make sure it's accurate.

And then the event study, I think Dave Bentley put together the analysts' reports, and then I worked on the little synopses of each analyst report and the remarks explaining what happens, my conclusion basically with respect to -- the disclosures on that day and whether it's consistent with market efficiency.

Q. Okay. Is that a -- a particular analyst report synopsis you're referring to in your report?

A. I think it's Exhibit 12.

Q. Okay. What about with respect to, you know, deciding which of Plaintiffs' allegations to include in your report?

Was that something that you decided or did you have help with that?

A. I think the Court decided it in the -- the decision on the motion to dismiss and that -- you know, some of the misstatements on the front end were -- seemed to be --

My understanding from counsel, is that the early misrepresentations were no longer actionable and that the -- I think the harassment claims were no longer actionable, which truncated the back-end of the class period.

Yeah, so I relied on counsel and -- and the

Page 36

decision on the motion to dismiss.

Q. Did you review your report with Plaintiffs' counsel before it was completed?

A. Sorry. What?

Q. Did you --

Or did Plaintiffs' counsel review your report before it was finalized?

A. Yes.

Q. About how many times?

A. I just recall one round of review.

Q. And was that shortly before it was finalized or in an earlier stage?

A. I recall it being shortly before it was due.

MS. BRIEN: Okay. So let's turn to Exhibit 2 of your report.

MR. STERN: Do you have the page of that?

MS. BRIEN: Oh. Well, so it's page 53 of 175 if you do like the --

MR. STERN: At the top?

MS. BRIEN: -- the Court stamping.

MR. STERN: Okay. Yeah.

BY MS. BRIEN:

Q. So did you --

Are you there?

A. I am.

Page 37

10 (Pages 34 - 37)

Q.  Okay.  Great.  09:54

My understanding is that this contains a list 09:54 of documents that were reviewed in preparation of this 09:54 report; is that correct? 09:55

A.  It's a summary of the documents reviewed and I 09:55 think relied on in forming my opinions. 09:55

Q.  And I understand that a lot of these are 09:55 categories of documents rather than specific documents, 09:55 but does this list identify sort of every category of 09:55 documents that you reviewed in preparing your report? 09:55

A.  Yes. 09:55

Q.  And did you personally review all of these 09:55 materials or did someone else? 09:55

A.  I personally reviewed -- most of the items 09:55 listed here -- at least if not immediately -- 09:55

Like some of the articles I've cited a million 09:55 times, I've read many times, but I may not have read it 09:55 for this round, but I know the punch line, so I just 09:55 cited to it. 09:55

I did not read all of the SEC filings for CS 09:55 DISCO nor did anybody on my staff, but we -- the point 09:56 was more that SEC fillings were readily available to 09:56 investors throughout the class period, so that's what's 09:56 -- why it's listed there. 09:56

Q.  Did you review or did others on your team 09:56

Page 38

review certain of the SEC filings in the case? 09:56

A.  Yes. 09:56

Q.  And how was the decision made what to review? 09:56

A.  It was related to the event study that was 09:56 conducted to analyze Cammer Factor 5, which is the cause 09:56 and effect relationship between corporate disclosures 09:56 and stock price reactions. 09:56

In that event study, as I state in my report, 09:56 my a priori event selection criteria was quarterly and 09:56 annual earnings announcements and guidance changes, and 09:56 those also typically have an SEC Form 10-Q or 10-K 09:56 associated with them, and so we would have reviewed the 09:56 ones that were published or disclosed around the -- 09:56 five, I believe, events we examined. 09:57

Q.  Okay.  So with respect to the five events that 09:57 you examined, you would have reviewed not just the 09:57 earnings call transcript, but also the announcement, you 09:57 know, the press release announcing earnings and also 09:57 whatever the relevant SEC filing was, the Q or the K? 09:57

A.  Yes, not every word of the Q and K, but 09:57 usually the top end, which describes the -- you know, 09:57 new information or the -- incremental information, not 09:57 all the tables, risk factor disclosures necessarily. 09:57

Q.  Okay.  So typically -- 09:57

Or not typically.  Strike that. 09:57

Page 39

With respect to the -- the five events that 09:57 you looked at, did you or someone on your team look at 09:57 the risk factors in the SEC filings? 09:57

A.  I can't recall -- I can't recall doing that 09:57 myself.  Maybe somebody on my staff did. 09:58

Q.  Okay.  And so, looking at these in a little 09:58 bit more detail, you have two categories, you've got the 09:58 from counsel category and then the obtained by Stanford 09:58 Consulting Group category. 09:58

The first category of documents, did you 09:58 obtain those from the Rosen Law Firm? 09:58

A.  I think the Complaint we got from the Rosen 09:58 firm.  I believe I went on PACER and downloaded the 09:58 order -- opinion and order on Defendants' motions to 09:58 dismiss. 09:58

Q.  Did counsel provide you any other documents? 09:58

A.  No. 09:58

Q.  And with respect to the -- Amended Class 09:58 Action Complaint, is that the operative Complaint in 09:58 this case? 09:58

A.  I believe so. 09:58

Q.  And did you review that document in its 09:59 entirety? 09:59

A.  Yes. 09:59

Q.  And I think you mentioned that you -- reviewed 09:59

Page 40

the order on the motion to dismiss and that allowed you 09:59 to identify which portions of the Amended Complaint sort 09:59 of remained relevant in this case? 09:59

A.  I think -- I think it was done -- 09:59

Also my discussions with counsel and -- which 09:59 is -- my understanding is based solely off that, yeah. 09:59

I did review the order, and I quote from the 09:59 order in my report when I'm opining on price impact. 09:59

Q.  Did you review any Court opinions while 09:59 preparing your report? 09:59

A.  I cite to a few of them in my report, like the 09:59 Halliburton 2 decision we were talking about, there's 10:00 Basic versus Levinson and the -- Cammer decision. 10:00

I don't think I reviewed them fresh.  I think 10:00 I'm relying -- I am relying on my past understanding of 10:00 those cases. 10:00

Q.  So you're relying on the sort of prior 10:00 versions of this report that had already previously 10:00 summarized these decisions? 10:00

A.  Well, I think it's relying on my experience is 10:00 the way I would say it. 10:00

Q.  Okay.  Do you have any legal training? 10:00

A.  No. 10:00

Q.  So you are not qualified to render any sort of 10:00 opinion on the legal significance or meaning of these 10:00

Page 41

11 (Pages 38 - 41)

Court decisions?                                    10:00

A.   I -- I don't believe so.  I never do.         10:00

I never have an opinion on legal matters.          10:00

Q.   Okay.  And, moving on to the second category,   10:00
which is "Documents obtained by Stanford Consulting   10:00
Group," you have a category for "Analyst Reports."    10:00

Which analyst reports did you review?           10:01

A.   Again, the ones that surround the events     10:01
studied for the Cammer Factor 5 analysis in Exhibit 12.  10:01

Q.   Sorry.  Apologies for interrupting you.      10:01

And would you have reviewed all available         10:01
analyst reports that accompanied those five events?   10:01

A.   All the ones that were available to us from   10:01
our data vendors.                                   10:01

Not -- as I note in my report, not all analyst   10:01
reports are -- maintained historically.  Some are not   10:01
disseminated.                                       10:01

Goldman Sachs is one that comes to mind.  They   10:01
do not provide it on a historical basis, but Defendants,   10:01
the corporations, tend to preserve them, and so they   10:01
tend to show up later on in the case when -- the Defense   10:01
economist brings forth those analyst reports.       10:01

Anyway, we look at everything we -- we can.    10:02

Q.   Okay.  So you're not making any selective    10:02
decisions about what to review?                     10:02

Page 42

A.   We are not making selective decisions about   10:02
the analyst reports or the news.  We are considering all   10:02
of it.                                              10:02

Q.   And understanding that analyst reports        10:02
sometimes issue analyst reports before, you know,   10:02
earnings and after, are you -- you know, sort of using a   10:02
date range to decide which analyst reports are relevant   10:02
to a particular event that you're looking at?       10:02

A.   I know we go out typically T, being the -- the   10:02
date of the event, or the impact date.  I think we'll   10:02
go --                                               10:02

No, I think it's a disclosure.                  10:02

So we'll go T plus 3, and I don't think we go   10:02
minus 1.  Sometimes we might go back a day, but it's   10:02
like a three or four-day window around the event.   10:02

Q.   So you'll go three or four days after the    10:02
event, and you'll review all those analyst reports?   10:02

A.   Right.                                        10:03

Sometimes we'll go out further if it's clear    10:03
that an analyst just delayed their reporting of an   10:03
earnings announcement, say like four or five days out or   10:03
something like that.                                10:03

Q.   Okay.  And I believe that certain analyst    10:03
reports were produced by you after your report.     10:03

Are those all of the analyst reports that you   10:03

Page 43

looked at?                                          10:03

A.   Yes.                                          10:03

Q.   Okay.  And did you rely on these reports in   10:03
connection with your market efficiency opinion?     10:03

A.   Yes.                                          10:03

Q.   What about with respect to your damages      10:03
opinion?                                            10:03

A.   Well, I haven't implemented the damage       10:03
methodology yet, so I wouldn't say that I'm -- relying   10:03
on the analyst reports, because I haven't actually   10:03
estimated damages or analyzed loss causation.       10:03

Q.   And how do you look at the analyst reports   10:04
when you get to that step?                          10:04

What are you looking for?                       10:04

A.   I'm -- I'm not looking for anything.  It's   10:04
just -- it's the event study.                       10:04

I'm trying to make sense of why a given         10:04
security price changed in the informational context that   10:04
evolved during a given event window.                10:04

So, yeah, I'm just -- I'm looking for what --   10:04
what the analysts and news commentators considered to be   10:04
important disclosures that influenced the security's   10:04
pricing.                                            10:04

Q.   And is there a reason that you didn't review   10:04
all of the analyst reports during the class period but   10:04

Page 44

focused only on the ones close in time to the event   10:04
study dates that you're looking at?                 10:04

A.   The reason is that -- that I'm only doing an   10:04
event study of five dates during the class period, and   10:04
it's my standard methodology, and I'm not analyzing --   10:05
loss causation or damages, so -- in this case, though,   10:05
there's really only one decline, and it's the same date   10:05
as the back -- my final event.                      10:05

So I did not con- -- look at that -- that      10:05
event study through the lens of estimating damages or   10:05
assessing loss causation.  I was more concerned with the   10:05
total mix of information and how it influenced stock   10:05
price.                                              10:05

Q.   So then, turning to the category "News       10:05
Articles and Conference Call Transcripts for DISCO," how   10:05
many news articles did you review?                  10:05

A.   I can't recall, but they're all listed in my   10:05
document production.  I think there's hundreds of them.   10:05

Q.   And how did you choose which ones you would   10:05
review?                                             10:06

A.   It would be the ones surrounding the five    10:06
earnings-related events examined under my Cammer Factor   10:06
5 analysis.                                          10:06

Q.   And so would these articles -- or would you   10:06
have also been relying on these articles for your market   10:06

Page 45

12 (Pages 42 - 45)

efficiency opinion only? 10:06

A. That's correct. 10:06

And it's Cammer, C-a-m-m-e-r. 10:06

Q. And for the earnings -- 10:06

Well, for the call transcripts, it sounds like 10:06 you focused on the earnings call transcript -- or 10:06 transcripts from September 2021 to August 2022; is that 10:06 right? 10:06

A. Yes. 10:06

Q. And you reviewed every single one of them 10:06 during that class period? 10:06

A. I think so, because we looked at all their 10:06 earnings announcements. 10:06

Q. What about other investor conferences, did you 10:07 look at any of those? 10:07

A. I don't recall any. I don't think any 10:07 overlapped with the five events we examined. 10:07

Q. Okay. Did you -- or why did you decide to 10:07 focus on the earnings call transcripts? 10:07

A. 'Cause I'm -- I'm doing an event study of the 10:07 five earnings-related announcements during the class 10:07 period. 10:07

Q. And is that typically the way that you do your 10:07 event study? 10:07

A. It is. 10:07

Page 46

Q. And did you read each of the earnings call 10:07 transcripts in their entirety? 10:07

A. Yes. 10:07

Q. And, with respect to the earnings call 10:07 transcripts, did you rely on those solely for your 10:07 market efficiency opinion? 10:07

A. Yes, I think that's fair. 10:07

Q. Okay. Next category is -- well, "Daily 10:07 Closing Bid and Ask Prices for CS DISCO Stock and for 10:08 Sample Companies." 10:08

How many sample companies' data did you 10:08 review? 10:08

A. I think a hundred. 10:08

Q. And how did you determine which companies to 10:08 include? 10:08

A. I think it's a random number generator that 10:08 pulls random stocks from the universe of in this case 10:08 New York Stock Exchange listed companies. 10:08

Q. Do you put in any sort of restrictions or 10:08 filters before its randomly generated? 10:08

A. I can't re- -- 10:08

I think we do. I just can't recall what they 10:08 are. Sometimes stocks don't have -- they might be 10:08 delisted, or -- but I -- I think we do have some 10:08 filters, but I can't recall what they are right now. 10:08

Page 47

Q. Okay. And, with respect to this data, was 10:08 this used solely to inform your market efficiency 10:08 opinion? 10:09

A. Yes. 10:09

Q. Okay. And then it lists -- Exhibit 2 lists 10:09 "Total Returns and Market Capitalization for Comparables 10:09 and/or Competitors of CS DISCO." 10:09

Do you see that? 10:09

A. I do. 10:09

Q. How many competitors' data did you review? 10:09

A. So I think that's every company in the Nasdaq 10:09 and the New York Stock Exchange. 10:09

Q. Okay. So you looked at every company listed 10:09 in the New York Stock Exchange? 10:09

A. I think so, yeah, because we're calculating 10:09 the percentiles of where CS DISCO fell in terms of its 10:09 market capitalization across those two stock exchanges. 10:09

Q. Okay. So you didn't actually determine which 10:09 of these companies were comparable or competitors of CS 10:09 DISCO? 10:10

A. No. 10:10

Yeah, and I won't change that description. 10:10

Q. Okay. And was this data used to inform solely 10:10 your market efficiency opinion? 10:10

A. It -- 10:10

Page 48

Only market efficiency, yes, that's right. 10:10

MS. BRIEN: So I'm going to move on to a new 10:10 topic. I don't know how you're feeling, if you guys 10:10 want a break. Happy to do a break or happy to keep 10:10 going. 10:10

MR. STERN: Let's take a break. 10:10

THE WITNESS: Sure. 10:10

VIDEOGRAPHER: Off the record. The time is 10:10 . 10:10

(Thereupon a recess was taken at a.m. 10:10 and the deposition resumed at a.m.) 10:19

VIDEOGRAPHER: This marks the beginning of 10:19 media number two in the deposition of Zachary Nye, Ph.D. 10:19

Back on the record, the time is . 10:19

BY MS. BRIEN:

Q. Okay. So I would like to now turn to your 10:19 opinions, Dr. Nye, and specifically your market 10:19 efficiency opinion, which I believe starts on page 6 of 10:19 your expert report, which is Exhibit 2 to this 10:19 deposition. 10:19

Do you have that? 10:19

A. I do. 10:19

Q. And you found that the market for DISCO stock 10:19 was efficient through the class period; is that correct? 10:19

A. That's correct. 10:19

Page 49

13 (Pages 46 - 49)

Q. Can you describe generally what you consider an efficient market to be?

A. As I note in the report here, specifically paragraphs -- I guess it's 14, there's a few definitions of "market efficiency" that academics traditionally have pondered.

The most --

I guess the most appropriate or closely related relative to the spirit of, I think, the Cammer decision, it's called "semi-strong form market efficiency," and that is when security prices fully reflect all publicly-available information.

However, that's actually a pretty strong definition when you think about it, like perfectly, you know, fully reflect, and it turns out to be --

After much reflection by academics, they realize that we can't really prove this because we don't actually know what -- how it should fully reflect how -- like given a piece of information, what's to say this is the accurate or fully informationally efficient value versus something that's 10 cents or a dollar different.

So academics moved away from that concept of what's also called fundamental market efficiency towards informational efficiency, which I think is the spirit of -- of these types of endeavors in securities

Page 50

litigation.

It's basically determining if stock prices or security prices reflect information as it's disclosed over time.

And then there's the other, what I talked about earlier, the -- the more legal definition that I understand to be the controlling inquiry for class certification is, I think, described -- I understand to be described by the Halliburton 2 Court, which stated, again, that the fraud-on-the-market theory is based on the fairly modest premise that market professionals generally consider most publicly-announced material statements about companies, thereby affecting stock market prices -- and that I understand to be -- the definition of what "general" or "generally-efficient markets" looks like.

Q. So I'm going to need you to unpack this for me a little bit.

A. Sure.

Q. So are you saying that you are not using the semi-strong definition of "market efficiency"?

A. Not in its -- like strictest sense, yes, that's --

I could provide evidence of market efficiency through the analysis conveyed here, and I think it

Page 51

strongly demonstrates a market in which CS DISCO investors generally consider most publicly-announced material statements about CS DISCO thereby affecting CS DISCO's stock price.

Q. And so what you're saying is that you don't believe that all publicly-available information is being incorporated?

MR. STERN: Objection to form.

THE WITNESS: I think the economic evidence points to that.

What I'm trying to convey here is that it's impossible to prove beyond a shadow of a doubt that all publicly-available information is fully reflected in any stock's price at any given point in time.

I think that this case and the -- the results of my analyses are strongly demonstrative that CS DISCO traded in an efficient market and that its stock price did react quickly to material information disclosures and had numerous characteristics that facilitate market efficiency.

BY MS. BRIEN:

Q. Okay. So is it fair to say that the -- the issue you're having is with the word "all"; right?

How do you know what all the possible publicly available information is out there so how can you opine

Page 52

on the fact that it's all publicly-available information that's being incorporated?

A. That's part of it, but I think the bigger point is what's -- nobody has the definition of what a stock price -- its true value is, what -- and esoterically what it should be given the information set that's publicly available at a given time.

That's just not something that's observable, and -- yeah, finance has not solved that problem yet.

Q. And so how do you get comfortable that there is market efficiency here?

A. Because the Court -- Courts and caselaw provide some guidelines for what's considered efficient, for instance the Cammer Courts 2 percent threshold with respect to weekly volume as a percentage of shares outstanding.

Here CS DISCO is in excess of that 2 percent threshold, which the Cammer Court described as -- I think it's like "strongly demonstrating efficiency" or --

But let me just get to that.

"Strong presumption" maybe?

There we go, yeah.

"Strong presumption of market efficiency under the Cammer Court's guidelines."

Page 53

14 (Pages 50 - 53)

So -- I think the caselaw has evolved, and there's now probably over a thousand of these decisions that's over 30 or 40 years that -- convey what reasonable cutoffs for market efficiency are.

I've done a lot of these cases, and based on my experience CS DISCO meets those criterions and -- with flying colors -- as described in my report.

Q. And based on your analysis CS DISCO stock did react to the disclosure of public information; correct?

A. Yes.

Q. And I guess in terms of when we're talking about "publicly-available information," what do you consider to be "publicly-available information"?

A. Well, that -- that's a -- good question.

It --

I think it's dependent on a few things. There's, obviously, stuff that's publicly available, such as information you hear on T.V. or available on the Internet, but sometimes information can be behind a pay wall, and so that might impede its ability to be fully reflected. I know there have been cases that have examined that issue.

And --

I'm trying to think of another example. There's --

I think --

Yeah, analyst reports to a certain extent. You know, like Goldman Sachs, I just gave the example earlier. They're not publicized to everybody. They're publicized to a very select group of people.

And in a perfectly efficient market that would be sufficient to allow that information to be -- to impact a security's price because it only takes a few investors to trade and impound that information into the stock price, but practically speaking on a day-to-day basis it may not, it may take longer for that -- less disseminated information to make its way into the price.

Q. Okay. So you -- you don't believe that analyst reports are sort of rapidly incorporated into the stock price?

A. I -- I think they are. I'm just giving it's kind of spectrum.

So, if some --

Some analyst reports are much more widely publicized and disseminated than others, and so I'm just drawing a distinction that --

Well, there's that theoretical models. There's empirical evidence in the asset-pricing literature that they show that complex and harder-to-understand information takes a longer period

of time to be fully reflected in a stock price, and -- the degree of -- of publicity, I think, matters, too.

Q. Okay. So basically it may not be that generally all analyst reports are rapidly incorporated, but depending on the type of analyst and their report it might be?

A. Well, I'm being careful because I have to -- the "rapidly," what does that mean; right?

Q. What -- what do you consider "rapidly" to mean?

A. "Rapidly" could -- could mean by the end of the day, it could mean 10 seconds.

I think it kind of varies depending on the context, and I'm more interested in the like empirics of the whole thing, like what actually happened, how long did it take.

I can see an informational event. Sometimes it's a sudden spike, and sometimes it's a gradual, you know, burn.

And through the event studies I've conducted, usually when it's a slower reaction you can see subsequent digestion, if you will, of the news throughout the -- market and -- and the commentary from analysts and the news media.

Q. And I think your report uses -- rather than

using the word "rapidly" uses the words "relatively quickly;" is that right?

A. I can't recall.

Q. Okay. Well, let's take a look at paragraph 15 of your report, where you -- it's on page 8, and it's the second-to-last sentence of paragraph 15.

You state, "If the security price responds relatively quickly, the response supports the conclusion that the market for the security is efficient."

Do you see that?

A. I do.

Q. And how do you define "relatively quickly"?

A. I think it's --

I know it depends on the -- what actually happened.

So here I'm using one-day event windows to document whether there's a one-day price reaction and whether it's significant or not, and then examining the information that set and how it changed, and I find that, what, on two of the five days there's, you know, very obvious good news in May, and then there's very, obviously, bad news in August of '22.

Those are -- coincide with statistically significant price changes, and -- and that is, I think, evidence of market efficiency that's been accepted

15 (Pages 54 - 57)

widely, but I'm not saying that that necessarily is when 10:31 that -- those pieces of information were fully reflected 10:31 in the stock price, because just in my experience, and 10:31 I've encountered many times where there's subsequent 10:31 reactions on, you know, the second or third day, or even 10:32 longer, that is still being influenced by the event that 10:32 occurred a couple days before. 10:32

Q. And so why did you use a one-day window in 10:32 this event study? 10:32

A. Because that's -- commonly applied in the 10:32 literature, and it's -- evidence of -- 10:32

It's a long enough window such that I think 10:32 you can see the price reaction. 10:32

If you have too short of a window, so if you 10:32 choose 10 minutes, it might occur after 10 minutes, 10:32 right, just because of life. 10:32

So you've got to make sure the window is long 10:32 enough to observe the price reaction, and a day has been 10:32 accepted and is used in many academic papers and in 10:32 securities litigation. 10:32

That said, longer windows have also been 10:32 accepted and used, so I use -- I always -- for market 10:32 efficiency and class certification I use a day, with the 10:33 caveat that I'm not saying that the full price reaction 10:33 occurs within a day. 10:33

Page 58

It's just that there's a material or a 10:33 significant price change at that daily -- or one-day 10:33 level that I think is evidence of a relatively -- quick 10:33 response. 10:33

Q. So is it typical, though, in your experience 10:33 for the information to be incorporated within a day into 10:33 the stock price? 10:33

MR. STERN: Objection to form. 10:33

THE WITNESS: It depends. 10:33

You know, many times, yeah, it'll be within a 10:33 day, you can see it, and then -- 10:33

Yeah, I think it's typical, if you will, but 10:33 it's not always the case. 10:33

BY MS. BRIEN: 10:33

Q. And how do you know that subsequent reactions 10:33 to information, especially if information is being 10:33 repeated over, you know, several days, are reactions to 10:33 that information, you know, having been disclosed 10:34 several days prior versus just kind of re-reacting to 10:34 repetition of information? 10:34

A. So what's considered a "repetition of 10:34 information" I've found is a very hotly debated topic in 10:34 my circles. 10:34

So what I -- 10:34

First of all, the way you answer this question 10:34

Page 59

is by conducting the event study, carefully considering 10:34 all the news flow and the price changes, and -- and it 10:34 -- may be that analysts will reassess, or consider or 10:34 realize that there's more to it, that there's knock-on 10:34 effects, or after the conference call they appreciate 10:34 more than they got from the press release. 10:34

So there can be kind of a sequence of events 10:34 that play out over, you know, one, two, three days, that 10:34 leads to that multiday reaction. 10:34

Q. And in those situations -- 10:35

Actually, strike that. 10:35

So then taking a look at the same paragraph 10:35 that we were just on, you note that "An empirical test 10:35 of market efficiency is to examine price responsiveness 10:35 to the release of new and material information about the 10:35 company in question." 10:35

Do you see that? 10:35

A. I do. 10:35

Q. Does information have to be both new and 10:35 material to allow you to test market efficiency? 10:35

A. No. 10:35

Q. So information could be new and immaterial and 10:35 still allow you to examine price responsiveness? 10:35

A. Well, what I was thinking is if it's 10:35 information that's expected or stale, and it shouldn't 10:36

Page 60

influence the price, and then you observe relatively 10:36 constant price over the next day, that would also be 10:36 evidence of market efficiency. 10:36

Q. Got it. 10:36

So the lack of price movement is? 10:36

A. Right. 10:36

Q. But you would expect that information would 10:36 need to be both new and material to impact the stock 10:36 price? 10:36

A. Material -- 10:36

Not in a legal sense, but material like 10:36 analysts talk about it, it has a -- material effect on 10:36 the company's financial condition, thereby affecting the 10:36 company's prospects and/or risk such that it would be 10:36 expected to change the stock price. 10:36

Q. And how -- how do you define what is "new 10:36 information"? 10:37

A. It would be information that is incremental, 10:37 not expected -- new. I mean, it kind of speaks for 10:37 itself. 10:37

Q. And so, if it's information that was 10:37 previously out there, it would not be new information? 10:37

A. With -- 10:37

Yes, but in a vacuum. If it's exactly the 10:37 same information, you wouldn't expect the price to 10:37

Page 61

16 (Pages 58 - 61)

change, but -- again, I realize you have to be very 10:37 careful with what you -- with assertions made by certain 10:37 other economists that this is not new information, when, 10:37 indeed, it's very clear that there's incremental 10:37 information in a given disclosure. 10:37

Q. Okay. So then, turning to your event study, 10:37 did you find based on your event study that there was a 10:37 clear cause and effect relationship between new public 10:38 information disclosed about CS DISCO and CS DISCO stock 10:38 price? 10:38

A. Yes. 10:38

Q. And so I'd like to talk more specifically 10:38 about the analysis that you conducted, which I believe 10:38 is reflected in Exhibit 12 of your report. 10:38

A. Okay. 10:38

Q. Is that right? 10:38

A. Yes. 10:38

Q. And that's page 106. 10:38

So I guess describe for me what exactly 10:38 Exhibit 12 is. 10:38

A. It's my event study. 10:38

Q. And what is it -- 10:38

What does it show? 10:38

A. It shows -- 10:38

The first page is a summary of the five 10:38

Page 62

earnings-related disclosures or events that I examined. 10:38 Specifically it's the second quarter of '21, the third 10:38 quarter of '21, the fourth quarter of '21, the first 10:39 quarter of '22, and the second quarter of '22 earnings 10:39 results and conference calls, and I -- I chronicled the 10:39 -- price response to those disclosures both in actual 10:39 terms and in their residual terms, which is net of 10:39 market and industry effects as estimated by my 10:39 regression analysis. 10:39

And then the final column is the "Confidence 10:39 Level," which is -- really the -- what, the -- 10:39 conditional probability of observing a return in 10:39 absolute magnitude that's greater than that observed. 10:39

Q. Sorry. 10:39

Are you reading from something or you're 10:39 just -- 10:39

A. No, I'm just talking. 10:39

Q. Okay. 10:40

A. Yeah. 10:40

And I'm summarizing this confidence level, and 10:40 it -- it is a measure of the statistical significance. 10:40

Q. Okay. So for -- for a layperson, the 10:40 confidence level is the measure of the statistical 10:40 significance? 10:40

A. Well, it's a -- it is what it is. 10:40

Page 63

It's -- 10:40

Like I said, it's the conditional probability 10:40 of observing a return greater than or equal to that 10:40 observed. 10:40

"Statistical significance" is defined by 10:40 certain thresholds. 10:40

So if you want to say -- if you want to just 10:40 define it as 95 percent has to be achieved in order to 10:40 qualify as being statistically significant, well, then 10:40 you look and say, "Well, the last two, they're above 95 10:40 percent, so I'm going to say those two are statistically 10:40 significant." 10:40

And that's a little bit of a -- it's a lot a 10:40 bit of debate in social sciences about what should be 10:40 considered statistically significant. 10:41

A lot of reports will -- will lower the 10:41 threshold at the academic articles to 90 percent, and 10:41 then many social science publications will not report on 10:41 the statistical significance but really just report the 10:41 confidence level or the P value in describing the -- the 10:41 observations analyzed by the -- that publication. 10:41

Q. Is there any debate whether 95 percent is too 10:41 low? 10:41

A. Too low. 10:41

I think that there's a debate that it's too 10:41

Page 64

high, that it's not -- it's a -- it's a very high 10:41 threshold and not necessarily helpful. 10:41

It's not unhelpful. It's just that you don't 10:41 want to -- rule out things that could easily have been 10:41 caused by some kind of impetus. In this context, it's 10:41 information. 10:42

Q. But safe to say that, if it's at the 95 or 10:42 higher threshold, people would generally agree that 10:42 that's statistically significant? 10:42

A. I think so, yeah. 10:42

Q. Okay. And you -- 10:42

So you examined all earnings disclosures 10:42 during the class period; is that correct? 10:42

A. Yes, I believe so. 10:42

Q. And that's typically your practice? 10:42

A. It is. 10:42

Q. Do you ever look at other types of event dates 10:42 when you're conducting this type of analysis? 10:42

A. It depends on the -- on the company, when the 10:42 timeframe and basic -- 10:42

And early on in my career I did corrective 10:42 events as well, but I moved away from that because it 10:42 was -- it just seemed to be unhelpful to have all the 10:42 corrective events in there as well because some -- 10:42

Yeah, I just -- I don't do that anymore for 10:42

Page 65

17 (Pages 62 - 65)

years, for like 10 years.

And what --

If it's like --

I've encountered a few development stage drug companies in which they're -- they're losing money, they're in no way going to make any money unless they get that lottery ticket of FDA approval, and so I've looked at the earnings announcements in addition to -- I think it's like 8-Ks or press releases on the company's website that deal with drug development.

So I've done a couple of those in the past 10 years.

But mostly 99 percent of my event studies are just the earnings-related announcements.

Q. And so one of the earnings announcements that you're looking at in here is also the corrective --

A. Yes.

Q. -- disclosure alleged in this case.

So I just want to clarify, because I think you said that you -- previously you still include the corrective events.

Are you saying that's in situations where the corrective events are not also earnings results announcements?

A. That's right.

Page 66

I always do the earnings-related events, but first couple reports, because it was back in the day when you'd do that, I included the incrementally -- or mutually exclusive dates that were not earnings announcements.

Q. Is there a certain number of events you're looking for to be able to feel good about your analysis?

A. In what way?

Q. So there's five events here.

A. Right.

Q. Let's say it's a shorter class period and there's only two earnings calls.

Do you still then try to look for additional events to look at or do you just look at the two earnings calls?

A. I've done -- I've done that.

Sometimes I'll go out the quarter following the class period or maybe the quarter before and the quarter after.

But I have issued reports that the class has been certified, I think with three -- maybe three was the smallest number I've done, and it's just because my methodology's the same.

It's just there's sometimes a small class period only has two or three earnings-related events.

Page 67

Q. And is there a reason you don't look at the specific challenge statements as part of the events that you're looking at?

A. Not --

I do this because this is accepted, it's been accepted dozens of times, so I feel comfortable that this is helpful information to the Court, my methodology.

I could include many other types of events, including corrective disclosures and misstatements.

What I will say, though, is that most misstatements I find, at least in my experience, they're typically failure to disclose, and so there's no real reason to -- there's no -- you wouldn't expect necessarily a price reaction on those dates when they omit -- omit information.

Q. And is that even where there is an affirmative statement but there is an omission as part of that statement?

A. Well, when you say "affirmative," what do you mean by that?

Q. Well, what I mean is there is something being disclosed.

For example, here we've got, you know, challenge statements as part of the second quarter, 2021

Page 68

earnings results, but within that Plaintiffs have allegations around, you know, you said this, but you failed to say that.

A. Right.

Q. In that situation would you expect there to be a stock price reaction?

A. It depends on -- what was disclosed in -- in what context.

You know, not just the event study would -- tell me the answer to that question, so --

But I haven't -- for the purposes of assessing market efficiency, I said this earlier, but I'll repeat it, I'm not concerned with the various informational, or -- value impacts, or price impacts, if you will, of specific statements.

I'm concerned about -- with the --

I'm concerned with the total mix of information, how it changed, and whether the stock price reaction is consistent with how the total mix of information changed it or evolved it.

Q. Right.

You're testing the -- the cause and effect relationship?

A. Of all of the information disclosed, not in --

And in earnings dates there's usually a lot of

Page 69

18 (Pages 66 - 69)

information disclosed. I'm not going in and isolating the price impact of every statement.

Q. Within that?

A. Yeah.

Q. Okay. So certainly there are likely other days outside of these earnings releases on which DISCO could have released new value relevant information, but you're just not looking at that at this point?

A. It's -- it's --

Yeah, event studies have been conducted on every conceivable corporate action you can imagine.

There are hundreds of papers --

And, no, but I stuck to my tried and true methodology, which was to look at the earnings-related announcements.

Q. Okay. And in this situation you found that with respect to two announcements there was a -- statistically significant stock price reaction at a 95 or above confidence interval?

A. That's correct, but I found at five out of five dates in which the price change was consistent with the information and how it changed.

Q. Do you mind just explaining that to me?

A. So on the first three days there's a mix of information, some good, some bad, and that

Page 70

countervailing effect, or cancelling effect, of the -- of the information disclosed, 'cause some of it was you meet expectations in terms of revenues and -- but you had, you know, worse guidance, or, you know, conservative guidance for the next quarter, or described something that was -- received poorly or negatively by the analyst, and I chronicle that.

And so those two effects balance out and mute the price reaction, such that an insignificant reaction is not -- or is consistent with market efficiency.

Q. So you went through each of these events and all of the disclosures and looked at everything that was announced, and I believe that's what's set forth sort of in the pages that follow in Exhibit 12, --

A. Right.

Q. -- and you assessed whether you would have anticipated a market reaction, and to the extent, you know, the market reacted in the way that you thought it should, you got comfortable that there was market efficiency?

A. Yeah, I think that's -- an okay synopsis, but yeah, I think my --

Q. Feel free to restate it --

A. -- event study --

Well, it's --

Page 71

My event study speaks for itself, my report speaks for itself, and it is --

Yes, on days where there was predominantly positive information that was, you know, received as being economically material by the analysts and news commentators, if there was a significant price increase, on days when there was predominantly negative information, there was a significant price decrease.

I'm looking at the first day, and it's largely met expectations, so you wouldn't expect a significant price change in an efficient market when the company's results meet expectations going into the disclosure.

So that's consistent with efficiency.

And the same is true with the second and third dates, but there's also a mix of good and bad news that cancel out.

Q. Okay. And so for each of these event dates, looking at Exhibit 12, you walk through the various items of value relevant information that were disclosed in your opinion, and then you reach a conclusion on whether or not you would have expected the market to react?

A. Well, I don't think it's my opinion on what's value relevant. I'm -- I'm documenting what was disclosed by the company through its press releases and

Page 72

conference calls and in some instances the SEC filings, and then I'm showing how the analysts received it and how the news commentators received it.

And so that's the evidence, I think, that's dictating the value relevance of the various pieces of information disclosed on these five dates.

Q. And, when you're looking at the analyst reports, is everything identified by an analyst value-relevant information?

A. I think in some sense, yes.

It's not a --

I mean, they wouldn't really be talking about it otherwise, but the -- "value relevant" doesn't mean it's --

When I mean it, it's not going to cause a price change necessarily. Something can still have value relevance, it can be part of why the stock is at its current level, and, if that had changed, it would cause it, but it's -- it just maintained expectations on a given day.

Q. And if the company discloses something and none of the analysts pick it up, does that suggest to you that it's not value-relevant information?

A. Not necessarily.

I found that analyst reports are --

Page 73

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Having done this for, you know, many years, 10:53 they are queued up for these predetermined events, like 10:53 earnings announcements, and they're all ready to go, and 10:53 they publish them very quickly. 10:53

When it's something that is kind of out of the 10:53 blue, they can take a while, and sometimes they will 10:53 actually not publish until the next earnings 10:53 announcement. 10:53

They'll say, "Hey, when -- two weeks ago this 10:53 happened, that was pretty bad, huh?" 10:53

So it's kind of -- 10:53

It's not -- 10:53

They're not like a -- you know -- 10:53

What's the word? 10:53

Johnny on the spot. 10:53

Sometimes they -- they are -- they'll have a 10:53 report, but sometimes they'll wait. 10:53

So it's not always -- 10:53

And that's relevant, I think, to your 10:53 question, because I've encountered, you know, certain 10:53 cases where people say "Oh, the analyst talked about 10:53 it." 10:53

It's like, yeah, "Well, they talked about it a 10:53 week later or something like that," you know, and 10:53 that -- 10:53

Page 74

And, even if they don't pick it up, sometimes 10:53 like sensitive things like investigations, like analysts 10:53 won't necessarily talk about that until there's more 10:53 finality to it, so like subpoenas and things like that. 10:54

So it's really context specific, and I think 10:54 the event study is how you uncover these nuances. 10:54

Q.   And I think you already tried to describe 10:54 this, but I'm going to ask you to repeat it again. 10:54

When you talk about an "actual return" versus 10:54 a "residual return," what are you looking at there? 10:54

A.   So the "actual return" is the percentage 10:54 change in the stock price that you can see on -- on the 10:54 Internet, like on -- on your app on your phone; right? 10:54

The "residual return" is -- the product of my 10:54 regression analysis, which is just a statistical model 10:54 of how in this case CS DISCO's stock price returns or 10:54 the percentage changes evolve on a daily basis as a 10:55 function of the market index, here the S&P 500, and then 10:55 also an industry index, which I can't remember what I 10:55 used. 10:55

Let me find it. 10:55

The Bloomberg U.S. 3000 Software and Tech 10:55 Services Price Return Index. 10:55

And so that allows you to control -- the 10:55 regression allows you to control for this market and 10:55

Page 75

industry influences on a daily basis. 10:55

You can subtract those influences, which gives 10:55 you the residual return or the company-specific return. 10:55

Q.   So the "residual return" is, based on your 10:55 calculation, what the actual market reaction is to 10:55 company-specific news rather than other factors outside 10:56 of the company? 10:56

A.   Net of market and industry forces, yes.  Yes. 10:56

Q.   Okay.  So then let's turn to paragraph 52 of 10:56 your report where you talk about this analysis that you 10:56 performed. 10:56

A.   Okay.  I'm there. 10:56

Q.   And can you just generally describe to me how 10:56 you would define "statistical significance"? 10:56

A.   I've described it already, and it's -- can 10:56 have many different meanings, depending on what 10:56 threshold you choose to define as quote/unquote is 10:56 "statistically significant." 10:56

In this example is my standard practice.  I'm 10:57 using a 95 percent confidence level, and it -- 10:57

Really all that means is that the return 10:57 you're observing is among the 5 percent largest in terms 10:57 of absolute magnitude. 10:57

So it's a really big either positive or 10:57 negative return, and it's rare, because you don't see a 10:57

Page 76

lot of big returns; right? 10:57

You see mostly ground zero, back-and-forth, 10:57 kind of random, and that's because life's random, and 10:57 that's why stock prices look random, is because every 10:57 day's a little different, some's good, some's bad, you 10:57 know, over time. 10:57

In different contexts significance can have 10:57 different importance as well. 10:57

My understanding is that certain Courts have 10:57 limited loss causation historically to a 95 percent 10:57 threshold, but I'm aware of other Courts that have 10:57 considered 90 percent confidence levels as evidence of 10:57 loss causation or price impact. 10:58

I also know of certain Courts that have used 10:58 no threshold of statistical significance in order to 10:58 limit price impact or loss causation, and I think that's 10:58 probably the most correct as an economist, because in an 10:58 efficient market statistical significance has no bearing 10:58 on anything.  It doesn't mean that -- 10:58

All it means is a return, if it's in an 10:58 efficient market, if it's significant, it's just a big 10:58 return because the information disclosed is really 10:58 important, but little pieces of information, like not 10:58 huge news, can cause smaller -- proportionately smaller 10:58 price changes. 10:58

Page 77

20 (Pages 74 - 77)

And so it's all --

It's causation by virtue of market efficiency, and significance has nothing to do from an economic perspective with respect to causation.

Q. Okay. And, just turning to paragraph 53, so the next paragraph of your report, you note that -- really the last full sentence on that page, "On the event dates associated with a company's specific return that is not statistically significant at above the 90 percent, the confidence level, the company's disclosures were generally in line with the market's prior expectations and/or conveyed a mix of offsetting positive and negative information such that the price reaction is consistent with that expected in an efficient market."

Do you see that?

A. I do see that.

Q. So is it your opinion that on days where there is a confidence level of 90 percent or below, the disclosures were generally in line with prior expectations or conveyed a mix of offsetting information?

A. Yes.

Q. And you did that analysis solely with respect to the five events that you looked at?

Page 78

A. Yes.

Q. And I guess I just want to turn to Exhibit 11B of your report, which is -- it starts on page 99 of the Court numbering.

A. Okay. I'm there.

Q. What exactly is Exhibit 11B?

A. This is the output of my regression analysis, and it's conveying kind of how you get from a -- the actual return to the residual or company-specific return, and then the last three columns are assessing -- the conditional probability of observing those returns, and that's in the "Confidence Level" column on the far right.

Q. Got it.

So there are a number of confidence levels that are 95 or above, many that are, obviously, under 95, and then some that are sort of within the 90 to 95 percent confidence level.

Did you look at each of these 95 and above days to determine what news was out there each day?

A. No, we only looked at the five earnings-related events as is standard practice.

Q. And so you generally would not look at all statistically-significant stock drops or stock movements to see what was going on on those days?

Page 79

A. I do not typically do that.

Q. And so on this regression analysis, if any of the days have a confidence level of less than 95 percent, does that mean that they did not have statistically-significant stock price movement on those days?

A. At the 95 percent level they are not statistically significant. If it's above 90, then it would be statistically significant at the 90 percent level.

If it's above 10 percent, then it would be statistically significant at the 10 percent level.

Q. And I think you mentioned that there were some Courts that you thought had applied statistical significance regardless of what the confidence level was?

A. Yeah.

So there's a couple cases out there that have gone pretty far with what I understand we call it a "leakage theory," and those are like gradual long run price declines, and the theory in those cases is that the truth was gradually revealed, and it's an efficient market, so it's not like there was a sudden spike down. It kind of crept down, and that was -- I think made it through appeals.

Page 80

I'm thinking of I think Household or Glickenhouse, is that case in the Seventh Circuit, I think.

That was a case, and I think there was another one more recently, but I can't remember the name.

Q. And is that a theory that's being presented in this case?

A. No.

Q. Okay.

A. Not that I understand to be the case.

Q. So in an efficient market would a stock price react to the release of previously-disclosed information?

A. Again, it depends on whether it's really truly new, or stale or previously known.

In theory in a perfect -- a semi-strong form of efficient market, the repetition of information should not cause a -- subsequent price reaction.

Q. And, you know, for purposes of market efficiency, if you are seeing analyst reports that are issued the same day as the release of company-specific information, would you consider that evidence that the market is absorbing the company-specific news that day?

A. It's -- it's evidence, I think -- supporting the notion that the market is absorbing information.

Page 81

21 (Pages 78 - 81)

I don't think that it's a necessary condition for concluding that the market is absorbing information on another day.

Q.   Sorry.

Do you mind rephrasing that so I can make sure I'm following what you said?

A.   I'm just trying to be careful to say that I don't think that it's always --

In order to conclude that the market's absorbing information and stock prices are adjusting appropriately, I don't think it's always required that analyst reports need to be issued on a given subject.

Q.   So how would you be able to determine whether information -- is being absorbed by the market?

A.   I think that's the point of doing this step first, is establishing whether the market's efficient.

If everyone can agree that the market is efficient, then it's reflecting information over time, in a, you know, reasonable timeframe or relatively quickly, as I state, such that observed price reactions are the product of the disclosure of new information over time.

And it doesn't always require an analyst report to be published in order to consider, say, a -- corporate disclosure -- to be economically material and

Page 82

to have price impact.

Q.   Okay. So let's turn to paragraph 56 of your report.

A.   Okay. I'm there.

Q.   I'm not yet.

A.   Okay.

Q.   Okay. So what is paragraph 56 of your report?

A.   I think paragraphs 55 and 56 I consider to be my opinion on price impact associated with the alleged misstatements and omissions.

Q.   And why did you include a price impact opinion in your report?

A.   Because I was asked to, and I think there's strong evidence, as conveyed here, and -- and it also overlaps with my event study of the final earnings disclosure, so I -- I have a full event study of that date.

Yeah, I think it's evidence of price impact.

Q.   Have you submitted a price impact opinion in class certification reports before?

A.   Yes.

Q.   In opening reports?

A.   Yes.

Q.   And is there a reason it's not included in your summary of opinion?

Page 83

A.   No, not really.

I could have put it in there, but it's -- it's in my Cammer 5 because it's part of my event study, so I think that's why I just included it here.

It's like a corollary of my event study.

Q.   And paragraphs 55 and 56, do those two paragraphs set forth the entirety of your price impact opinion?

MR. STERN: Object -- objection to form.

THE WITNESS: As well as Exhibit 12.

BY MS. BRIEN:

Q.   And --

A.   And -- sorry.

I think the description of my regression models, which would be Appendix A and Exhibit 11.

Q.   And, as part of your price impact opinion, you did not provide any analysis of price impact on the alleged misrepresentation dates.

Why is that?

A.   Because --

I mean, first of all, my understanding, as I cite here, is that price impact can be demonstrated by price increase upon a misrepresentation or via the price decline upon the corrective event or revelation of truth, as alleged, of course.

Page 84

So that -- that's --

Sorry.

What was the question again?

Q.   Why did you not provide any analysis of price impact on the alleged misrepresentation dates?

A.   Right.

Okay. So the other part of this is that my understanding, based on my reading of the Complaint and the decision on Defendants' motions to dismiss, as well as my conversations with counsel for Plaintiff, is that this is a price maintenance theory of liability in which Defendants failed to disclose material adverse information regarding their revenue growth prospects, and that -- and, as such, a direct examination of the alleged misrepresentations would not be -- determinative of price impact.

Q.   But you didn't take any steps to determine whether there was front-end price impact on the misrepresentation dates?

A.   I didn't -- directly examine them for the reason I just stated.

I mean, I did examine them largely through my event study, as you pointed out the early couple dates of misstatements in there -- but I didn't do that for the purpose of analyzing price impact.

Page 85

22 (Pages 82 - 85)

Q.   And you did not look at all of the alleged misrepresentation dates; correct?

A.   Correct.

Q.   And, understanding that you have not actually read Plaintiffs' motion for class certification, which I'm happy to show you, you know, they note the misleading statements at issue in this case would not be expected to cause CS DISCO's stock price to increase when Camara, the former CEO, uttered them.

Do you agree with that statement?

A.   Yes, for the reason I just stated.

Q.   And how -- how did you come to this opinion?

A.   From reviewing the Complaint, the decision on Defendants' motions to dismiss, conversations with counsel for Plaintiffs -- and that's -- that's about it.

Q.   Did you --

A.   And my experience.  I guess I should say that, too.

Q.   Did you review information that was publicly known about CS DISCO prior to the class period to -- as part of that opinion?

A.   So, no, I didn't.

And, if I may, I just want to clarify the reason for that is that I think price impact, or loss causation, or damages is all under the assumption that

Page 86

Plaintiffs' theory of liability is true, and here they've alleged a failure to disclose material adverse information, and the loss-inducing corrective event, and I think that the evidence economically through my event study is consistent with that theory of liability and -- and demonstrative of price impact under the assumptions made.

Q.   So you took Plaintiffs' allegations as true for purposes of your price impact opinion?

A.   As always.

I don't have any basis to say that they're true or false.  All of my damage opinions are -- in my entire career, and I think I've been instructed to assume that the -- in all my cases that Plaintiffs' theories and allegations are true and correct and will be demonstrated at trial.

Q.   So Plaintiffs claim that certain information was omitted and you did not take any steps to confirm whether such information was, in fact, omitted?

MR. STERN:  Objection.  Asked and answered.

THE WITNESS:  No, I -- I have done my event study, and so I have found no evidence to date that the market was aware of the -- exposure to certain large review projects that CS DISCO actually had, whereas -- investors, based on what I know right now, which is just

Page 87

through my event study, seemed to be aware just of the general prospects and revenue growth rate of the firm as a whole, but not the detailed information underlying their -- the breakdown of their -- their various business products and exposures to large potentially -- spikey or -- unstable revenue streams.

BY MS. BRIEN:

Q.   So do you understand what portion of large review projects made up CS DISCO's revenue?

MR. STERN:  Objection.

THE WITNESS:  I --

All I know about -- their -- their exposure to large revenue projects is their guidance reduction in August of 2022, which they ascribed to the -- the few large revenue projects that were no longer in their forward guidance, and that reduced guidance by, gosh, it's in the --

Let me find it.

I'm just trying to find the prior guidance.

They lowered it to -- the revenue guidance for 2022 to a range of 132 million to 136 million, and previously I want to say they had been guiding more like 150 million, but I can't seem to find --

I think the analysts talk about it, but it was considered to be a significant reduction that was a

Page 88

product or result of the -- future exclusion of large review projects from guidance

Q.   And I think before that you were referring to "large revenue projects," I think you meant to refer to "large review projects" throughout your answer?

A.   I -- I -- yes, I think so.

Q.   And how do you define "large review projects"?

A.   Oh, I just --

I know the company is --

I just have observed what the company stated, which was they characterized them as "large review projects," I believe.

Q.   And so is there a threshold that you're aware of that makes something a large review versus not a large review?

A.   Oh, no, not for me.

I'm not the one to characterize them as "large," but my understanding is that the -- the company said.

Q.   And so -- in terms of the corrective disclosure that's alleged from August 12, 2022 -- it sounds like your assessment is that it was the company's disclosure of its revised guidance that caused the stock price to decline?

A.   Hmm.

Page 89

23 (Pages 86 - 89)

Yeah, generally speaking that's -- that's -- 11:18 that's my opinion. 11:18

I just am -- 11:18

In my remark I also -- and this is on page 67 of Exhibit 12 -- I also describe it as, you know, a causal factor being the revenue guide down and the management commentary on revenue predictability that I think -- well, I know analysts did not like at all, and caused the price to decline.

Q. Do you know when DISCO issued the projections that it was revising down?

A. What I'm talking about is when they provided their third quarter and full year 2022 financial outlook and that was disclosed in a press release August 11th, 2022 at 4:05 p.m.

Q. But that was a downward revision of prior guidance; correct?

A. Oh, yes.

Q. And do you know when the guidance that was being revised down was initially issued?

A. I don't recall. I can find it. It's -- it's in my materials, but --

I believe --

It wouldn't surprise me if it was earlier, before the class period.

Page 90

Q. What if it actually was after all of the challenge statements in this case had been made?

A. It doesn't matter to me.

Q. In what way doesn't it matter to you?

A. With respect to price impact, I suppose?

Q. Yes.

A. With respect to price impact, Plaintiffs are alleging that Defendants knew the -- company's difficulties with predicting revenue and their exposure to large review projects at the beginning of the class period, and -- and earlier, but because of the nature of the Court's order, the first actionable misstatement is in August of '21, I think -- or September of '21.

That's what it is.

Q. And how is the downward revision of guidance following the statements in question that had been made --

Let me strike that.

And so did you review the company's disclosures during and/or before the class period to determine whether Defendants disclosed difficulties with predicting revenue?

A. I know from the Complaint and the Court's order that there were disclosures related to case-specific volatility, I believe, in revenues and --

Page 91

but also that that volatility would wash out in the aggregate, which under Plaintiffs' theory, as upheld by the Court, it's my understanding at least that the Defendants misrepresented the company's revenue growth prospects as being -- of consisting of -- mature, stable spend by their clients in the corporate litigation departments of -- across the country, which analysts considered to be -- I think it was can accord the described -- that thought based on the company's representations prior in the class period that corporate litigation would create a fairly linear and resilient backdrop, but it was -- not the case, and it came as quite a surprise given the guidance reduction.

Similarly, Cowan said that this guide down reveals that CS DISCO is much more dependent on large customer consumption behavior than we had thought and that strong growth last year appears to have been turbocharged by its review product, and that the big recalibration and guide shows there's limited visibility in nearer-term usage trends.

Did that answer your question?

Q. I don't know that it does, but it was a nice try.

Did you -- did you specifically review all of the company's disclosures with respect to revenue

Page 92

volatility and that -- you know, difficulties in predicting revenue as part of your analysis?

A. No, I didn't review every statement by the company throughout the class period.

I, again, am relying on Plaintiffs' theory of liability as the foundation for my opinion on price impact, and I -- and I think that the economic evidence is consistent with price impact associated with the alleged misstatements and omissions.

Q. So I think I heard you read from certain analysts that indicated that dependence on large --

Here. Let me actually just read it to you.

"Large customer consumption behavior was -- served greater than expected."

Do you understand that DISCO has multiple different products that it -- you know, provides to customers and collects revenue for?

A. I do.

Q. And do you understand what those products are?

A. I think so.

Q. And do you understand what "portion review" is when it comes to it's sort of usage-based revenue?

A. No, I don't, and investors didn't know either, as far as I understand.

Q. But, if revenue from large review customers

Page 93

24 (Pages 90 - 93)

as -- you know, the definition that's -- that's being used in this case, was, you know, let's say less than 10 percent, how would it -- you know, impact investors to learn that there was potential volatility in that revenue stream?

MR. STERN: Objection to form.

THE WITNESS: I don't know. I'd have to consider it carefully, I think.

It sounds like a complex situation, so I just want to be careful.

BY MS. BRIEN:

Q. Okay. So do you want to take a minute to consider it?

A. I don't know if I can answer that quickly, but it's -- it's --

I'd have to --

I mean, you're asking me to make a pretty big conclusion based on a limited hypothetical.

Can you flesh it out more?

Maybe we can -- get into the details.

Q. Yeah.

So what -- what I'm really trying to understand is whether your conclusion on the market's reaction on August 12th, 2022 was tied to a reaction to potential impact of large review customers or whether it

Page 94

was tied to a reaction to, you know, sort of general greater than expected revenue volatility from large customers.

MR. STERN: Objection. Unclear.

THE WITNESS: I don't know that --

I mean, all I can --

As an economist I can just conduct an event study and present the -- the economic facts.

I mean, how the analysts reacted, I think, is pretty clear, and I don't a hundred percent see the difference between your two categories there.

What is the distinction?

BY MS. BRIEN:

Q. Well, they're two different --

A. Isn't it review though?

It's -- it's large review versus case volatility associated with review?

Q. No.

A. Okay. What is it?

Sorry. Repeat the question, please.

Q. Yeah, sure. I will repeat it.

So if revenue --

Sorry.

Let me just actually get to my question.

So there is, of course, a difference between

Page 95

large review customers and large customers more generally, because DISCO, obviously, has different products, and some customers might use only review, some customers might bring in revenue through other products.

A. Okay.

Q. And I -- I understand that your position is that the downward projection -- or the downward revision and guidance on August 12th, 2022 caused the stock drop on August 12th, 2022, and in support of that I believe one of the analyst reports that you cited from notes -- and that is the Cohen report, "Law is much more dependent on large customer consumption behavior than we had thought."

And what I'm really trying to understand is, is that large customer consumption behavior generally or is that specific to review?

MR. STERN: Objection. Calls for speculation.

THE WITNESS: So what I'm checking is the company statements on this date, because Cowan is -- is describing their reaction to the company statements, and as I sit here right now, it appears to me that the company's describing specifically volatility associated with the review business, not just other large customers, but it's in the review business.

You were drawing a distinction between just

Page 96

large customers versus large review customers; right?

BY MS. BRIEN:

Q. That's right.

A. Okay.

Q. Okay. So then in paragraph 56 of your report, you state that "The subject of the alleged misstatements and omissions, the undisclosed risk that DISCO's customers spend growth was driven by only a handful of large review projects -- was clearly the root cause of the stock price decline that day."

Do you see that?

A. I do.

Q. What is the difference between "causation" and "price impact" in your mind?

A. As an economist I don't know. It's -- it's definitely discussing the economic effect or impact of informational disclosures.

I mean, price impact does overlap with the merits; right?

That's -- that was the point of Goldman, so -- or that's my understanding at least.

So it's -- it's a similar concept as an economist. It may have totally unique connotations from a legal perspective, but for me it usually involves doing an event study and looking at the causal

Page 97

25 (Pages 94 - 97)

connection between -- information and security price 11:32 changes. 11:32

Q. And so, when you say here that the subject of 11:32 the alleged misstatements and omissions was clearly the 11:32 root cause of the stock price decline that day, are you 11:32 rendering an opinion on causation? 11:32

MR. STERN: Objection. Calls for a legal 11:33 conclusion. 11:33

THE WITNESS: I -- I -- 11:33

Yeah, I don't know from a legal perspective 11:33 whether it's causation or price impact. I'm -- I'm 11:33 saying there's evidence -- 11:33

This is demonstrative of price impact, this 11:33 event, 'cause it's consistent with Plaintiffs' theory of 11:33 liability. That's really the crux of my opinion. 11:33

BY MS. BRIEN: 11:33

Q. And in terms of what methodology you used to 11:33 determine that, that was solely your event study? 11:33

A. The event study as well as the assumption that 11:33 Plaintiffs' theory of liability is true, correct, and 11:33 will be demonstrated at trial. 11:33

Q. And so is it your opinion that if the back-end 11:33 disclosure discusses the same subject as, you know, sort 11:33 of the alleged misstatements, that necessarily means 11:33 that there's price impact? 11:33

Page 98

MR. STERN: Objection. Calls for a legal 11:34 conclusion. 11:34

THE WITNESS: I know that that's -- the -- 11:34 described as -- as how to demonstrate loss causation at 11:34 the merits phase by various Circuit Courts, so whether 11:34 that's the same for price impact or not, but I think 11:34 that the -- I chose this language to be consistent with 11:34 my understanding of what's relevant for establishing -- 11:34 a causal connection between information and price 11:34 changes. 11:34

BY MS. BRIEN: 11:34

Q. So what I'm trying to understand is, is it 11:34 your opinion that because both the alleged omission, 11:34 which Plaintiffs allege had to do with review, setting 11:34 aside whether the alleged misstatements did, and the 11:34 back end had to do with derisking review, that that 11:35 leads to the conclusion that there's price impact? 11:35

A. Can you please repeat the question? 11:35

Q. Yes. 11:35

Is it your opinion that, because the alleged 11:35 misstatements have to do with the omission of large 11:35 review customer concentration, at least as Plaintiff 11:35 alleges, and the back -- or the corrective disclosure 11:35 has to do with derisking of review, that there's price 11:35 impact? 11:35

Page 99

A. I'm not sure I would characterize the back-end 11:35 event as "solely derisking for review." 11:35

So I guess I wouldn't -- I'd say no, that's 11:35 not why there's price impact. 11:35

Q. Okay. How would you characterize the back-end 11:35 event? 11:35

A. I think it's -- the revelation to the market 11:35 by virtue of the company's commentary on the 11:36 predictability of the revenue stream and their lowering 11:36 of guidance that -- contrary to prior statements which 11:36 were -- are alleged in the Complaint that they have a -- 11:36 that that is -- as customers grow and mature, they 11:36 become a more -- consistent stream of -- of income, of 11:36 revenue, and that, while there may be case-by-case 11:36 volatility, that volatility washes out in the aggregate 11:36 as the company grows. 11:36

That in context of rapidly-increasing revenues 11:36 -- that become a fail to disclose those -- those record 11:36 or high growth rates in the first quarters of the class 11:36 period with the product, at least in significant part to 11:37 a handful of large review projects, that would not be 11:37 consistent, or stable, or resilient as -- as -- at least 11:37 under Plaintiffs' theory Defendants' misrepresented to 11:37 investors. 11:37

And that -- in the truth as revealed on -- on 11:37

Page 100

the alleged corrected event date was that the company is 11:37 much more volatile, it is not washing out in the 11:37 aggregate, and by removing a significant chunk of review 11:37 contracts from the guidance, signalling that this was 11:37 not a normal situation, there was another analyst that 11:37 has that also, it might have been Cowan that said it's 11:37 weird that the company says this case-by-case volatility 11:37 is normal and would wash out, but they're removing it 11:37 from forward guidance as if it's not there anymore. 11:37

So it was really a disclosure of the company's 11:38 worst prospects, and significantly so, in terms of 11:38 revenue growth and the stability of that revenue growth 11:38 going forward, and I think the market commentary 11:38 supports that conclusion quite well. 11:38

Q. Did you look at the actual statements that are 11:38 being challenged here or are you just summarizing from 11:38 Plaintiffs' allegations? 11:38

A. I've looked at the actual statements, I mean, 11:38 in the Complaint and the Court's order. 11:38

Q. Okay. Was DISCO's 2022 guidance the subject 11:38 of any of the challenge statements? 11:38

A. I think so. I mean, it's not just the formal 11:38 guidance. It's the company's -- representation of its 11:39 prospects -- more generally, which were definitely being 11:39 -- or are part of the -- 11:39

Page 101

26 (Pages 98 - 101)

Or sorry. 11:39

The subject of those alleged 11:39 misrepresentations and omissions I think are -- are -- 11:39 is definitely the company's forward prospects and the 11:39 stability of their revenue streams. 11:39

Q. And it's your position that DISCO's statements 11:39 suggested that there would not be revenue volatility and 11:39 that revenue would be stable? 11:39

A. I think the misstatements are what they are 11:39 and the -- and the Court has already summarized them in 11:39 that -- that Plaintiff has sufficiently alleged that 11:39 Defendants' prior representations that customer spending 11:40 was driven by gradual adoption across a wide range of 11:40 matters with the result being a steady mature spend by 11:40 customers were either false or misled investors if it is 11:40 true that customer spending was actually spikey and 11:40 driven by only a few large revenue projects. 11:40

It's absolutely true that the company, as the 11:40 Court notes, described case-specific revenue volatility 11:40 given the nature of the legal industry and that things 11:40 might settle early. 11:40

You might get a bad lawsuit out of the blue 11:40 causing kind of spurts, but, you know, the company -- 11:40 described it as -- something that would wash out in the 11:40 aggregate and thereby allowing them to predict 30-plus 11:40

Page 102

percent revenue growth, which was their stated goal for, 11:40 I think, the entire class period, when in reality a 11:41 significant portion of that was -- kind of ad hoc, large 11:41 revenue projects that were not reliable in the long run 11:41 such that they had to remove them from guidance. 11:41

Q. But you're depending on the Plaintiffs' 11:41 allegations in the Amended Complaint, and really what 11:41 you just read to me was the Court's recitation of 11:41 Plaintiffs' allegations in the Amended Complaint to make 11:41 your conclusion about whether there was price impact or 11:41 not? 11:41

MR. STERN: Objection. Mischaracterizes the 11:41 order. 11:41

THE WITNESS: Yeah, as I stated a few times, 11:41 I'm assuming Plaintiffs' theory of liability is true. 11:41

MR. STERN: We've been going for a while. 11:41

MS. BRIEN: Yeah. 11:41

MR. STERN: I don't know if this is a good 11:41 time. 11:42

MS. BRIEN: And I think our lunch is about to 11:42 get delivered, so I'm happy to take a break and go off 11:42 the record. 11:42

MR. STERN: Good. 11:42

VIDEOGRAPHER: Off the record, the time is 11:42 11:42 .

Page 103

11:42    (Thereupon a recess was taken at a.m. 11:42

and the deposition resumed at 12:18 a.m.) 12:17

VIDEOGRAPHER: This marks the beginning of 12:17 media number three in the deposition of Zachary Nye, 12:18 Ph.D. 12:18

12:18    Back on the record, the time is 12:18 .

BY MS. BRIEN: 12:18

Q. Okay. So I would like to spend a little bit 12:18 of time talking about the challenge statements in this 12:18 case, and I think the easiest way to do that is to have 12:18 you take a look at Plaintiffs' Class Certification 12:18 Motion, which we're going to mark as Exhibit 3. 12:18

(Exhibit Number 3 was marked for 12:18 Identification.) 12:18

MR. STERN: Thank you. 12:18

BY MS. BRIEN: 12:18

Q. Okay. I think you said that this is a 12:19 document that you have not previously reviewed; correct? 12:19

A. Correct. 12:19

Q. Okay. So then I'm going to ask you to turn to 12:19 page 2, Plaintiffs' motion, which is their statement of 12:19 facts. 12:19

A. Okay. I'm there. 12:19

Q. And give you a moment to review that, but 12:19 essentially it lays out the challenge statements in this 12:19

Page 104

case. There are four of them, two on September 2nd and 12:19 two on January 11th. 12:19

A. Okay. 12:19

Q. Okay. So let's take a look at the first 12:19 challenge statement, which is the paragraph beginning 12:19 "On September 2nd, Defendants Camara and LaFair 12:19 participated in an earnings call for the second quarter 12:19 of 2021 in which Camara stated in its opening remarks, 12:19 among other things, 'So in three quarters we saw this 12:19 company ramp from zero to a multimillion dollar level of 12:20 spend. That journey has historically taken our 12:20 customers --" well, I think that's a typo "-- customers 12:20 several years." 12:20

Do you see that? 12:20

A. I do. 12:20

Q. Are you aware that that is one of the 12:20 challenge statements in this case? 12:20

A. I believe it is. 12:20

Q. Is there any reference to DISCO's 2022 12:20 guidance in this statement? 12:20

MR. STERN: Objection. The document speaks 12:20 for itself. 12:20

THE WITNESS: Sorry. 12:20

Just this sentence? 12:20

BY MS. BRIEN: 12:20

Page 105

27 (Pages 102 - 105)

Q. Yeah, in this sentence.

A. All right. This sentence doesn't talk about the specific 2022 guidance. It does relate to the company's forward prospects, of course.

Q. In what way?

A. It's talking about a success story, about a recent customer ramping up in an abnormally quick time to a multimillion dollar level, and then --

Yeah, I think it's positive information regarding the company's recent history with their customers.

Q. But no specific reference to what 2022 guidance would look like or what future performance would look like?

MR. STERN: Objection. Asked and answered.

THE WITNESS: No specific reference.

I do think this would be something that investors would consider when saying their expectations of the company's forward cash flows.

BY MS. BRIEN:

Q. Is there any reference to stability or predictability of revenue?

MR. STERN: Objection. Speaks for itself.

THE WITNESS: Those words are not in this sentence.

Page 106

BY MS. BRIEN:

Q. Okay. And then the next challenge statement follows this one. It says, "On the same call Camara stated, among other things, that" -- and I'll -- I'll let you read that paragraph there.

A. Okay.

Q. Is there any reference to current revenue stability in this statement?

MR. STERN: Objection. The document speaks for itself.

THE WITNESS: I think so.

It's talking about current and future as the company grows, as the customer rates grows the case-specific volatility washes out, implying a stable revenue stream that grows in the future.

BY MS. BRIEN:

Q. Yeah, so it says, "We would expect that as our base grows more of the specific customer usage fluctuations will wash out in the aggregate."

So where's the reference to current stability?

A. I mean, the first part of the sentence says "Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller."

So that's the present.

Page 107

They also describe the -- a -- a -- adoption journey that implies that basically every company that uses it grows from -- into a seven-figure customer at maturity, at which point it's stable.

Q. So is it your position that the word "now" in that sentence is referring to current impacts of customers' fluctuation in usage and overall revenue?

A. Yeah, I think it implies that.

Q. Okay. Even though it's in the future tense?

A. "Now" means now.

Q. It's not just the start of a statement, "Now we're going talk about X"?

MR. STERN: Objection. Mischaracterizes the statement.

THE WITNESS: It -- to me reads as a description of present, and then into the future it gets even more stable as the fluctuations become smaller and less and less important as the diversification across the customer base effectively takes hold.

BY MS. BRIEN:

Q. And is there anything in this statement that suggests stability of a particular customer?

A. I mean, the first part is talking about the adoption journey that has historically taken several years, and it -- seems to imply pretty -- typical, or,

Page 108

you know, progression from a five-figure to a seven-figure customer, so -- that, I think, implies at maturity that customers spend on DISCO products would be relatively stable.

Q. Is there any indication in this statement about which of DISCO's customers are at this point mature?

A. It doesn't break out the percentages, no, but it definitely implies there are mature customers in -- probably more than one mature seven-figure customer.

Q. Does this statement suggest when DISCO expects that it will be in a position that specific customer usage fluctuations will wash out in the aggregate?

A. Well, I think -- I think it implies that that's happening to a certain extent here, at -- at the present, but that it's going to get even more stable over time.

Q. And what time is that?

A. In the future.

So now it's --

Now as DISCO grows, it's growing its overall revenue base, it has, you know, millions of dollars in revenue that is disclosed by this time, hundreds of millions, right, or close to a hundred million or more than a hundred million, I think.

Page 109

28 (Pages 106 - 109)

The impact of a particular customer's 12:27 fluctuation and usage on our overall revenue becomes 12:27 smaller and smaller. 12:27

And then as we go even further out -- more of 12:27 the fluctuations wash out in the aggregate. 12:27

So, again, I think it's describing a -- as the 12:27 customer base grows larger and larger, the 12:27 diversification benefits allow the good quarters for 12:27 some company to wash out with a bad quarter for another 12:27 company thereby capturing the mean growth rate of their 12:27 -- I guess overall client use, average usage. 12:28

Q. And are you familiar with the concept of 12:28 diversification and financial economics? 12:28

A. Yeah, just -- that's what I'm describing 12:28 now -- or trying to. 12:28

Q. And would you agree that as a general matter, 12:28 as the number of customers for a company increases, 12:28 changes in any given customer's revenue are going to 12:28 have a smaller impact on the revenue volatility? 12:28

A. Yeah, on average. 12:28

Of course, you can have perfect storms, and 12:28 they happen every once in a while, where no matter how 12:28 much you've diversified the whole economy still tanks, 12:28 you know, that kind of stuff. 12:28

But, nonetheless, is -- all else equal, a 12:28

Page 110

diversified portfolio will have less volatility for a 12:28 given level of mean return than a single stock. 12:28

Q. And is it your position that these statements 12:28 suggested to the market that it should expect some level 12:29 of revenue performance in the future? 12:29

A. Some level of revenue performance in the 12:29 future? 12:29

Q. How about -- let me rephrase. 12:29

Is it your position that these statements 12:29 suggest to the market that it should expect similar 12:29 revenue performance in the future? 12:29

A. Taken as a whole, I think for sure the 12:29 representations describe a -- the company as having 12:29 rapid growth, and that, while there will be fluctuations 12:29 quarter-to-quarter, they would have good visibility into 12:29 the annual amounts, projections, and I think the company 12:29 had projected at the opening about 30 percent revenue 12:29 growth and had been meeting that goal. 12:29

Generally speaking, they're up and down, but 12:30 they were -- they were having very good quarters 12:30 initially with respect to their year-over-year revenue 12:30 growth. 12:30

The first quarter was like up 88 percent or 12:30 something like that. It was a huge quarter. 12:30

And then the second quarter in -- I think it 12:30

Page 111

was less so, but still in line with the expectations of 12:30 around 30 percent. 12:30

So, yeah, I think they had set an expectation 12:30 of -- about 30 percent revenue growth going forward. 12:30

Q. And you're talking about 2021 revenue? 12:30

A. Yes, but just generally their goal of -- of 12:30 that type of year-over-year growth. 12:30

Q. Is there a challenge statement in this case 12:30 around 30 percent revenue growth in the future? 12:30

A. I think it's related for sure. 12:30

It's about the expectations -- formed by 12:30 investors based on an alleged misrepresentation of the 12:30 company's prospects and the -- 12:30

Because the vol- -- the -- the blowout 12:31 quarters initially were the product, as alleged, of the 12:31 large -- much more volatile nonrecurring large review 12:31 projects that eventually -- were removed from guidance 12:31 because they either went away or were not reliable 12:31 enough to include in -- in forecasts. 12:31

Q. So you read the entirety of this 12:31 September 2nd, 2021 earnings transcript; correct? 12:31

A. Yes. 12:31

MS. BRIEN: So let's take a look at that. 12:31

Great. 12:31

So we'll mark that as Exhibit 5? 12:31

Page 112

THE REPORTER: 4. 12:31

MS. BRIEN: 4? 12:31

(Exhibit Number 4 was marked for 12:31 Identification.) 12:32

MS. BRIEN: Oh, sorry. 12:32

THE WITNESS: Thank you. 12:32

BY MS. BRIEN: 12:32

Q. Okay. And this is from your production of 12:32 documents. It is a copy of the Q2 2021 CS DISCO 12:32 earnings call transcript. 12:32

Do you see that? 12:32

A. I do. 12:32

Q. And this is a document that you've reviewed 12:32 before? 12:32

A. Yes. 12:32

Q. Okay. And I'd like to point you to -- 12:32

Well, it's based -- or Bates stamped 12:32 SCG_0000933, and I'd like to point you to the page 12:32 ending in 936. 12:32

And we'll just have you look down to the fifth 12:32 and sixth paragraph. 12:32

This is a statement by Michael LaFair, and he 12:32 notes, "As I mentioned previously, we have a usage-based 12:33 business model, so there's inherent volatility from 12:33 quarter-to-quarter as customers' legal matters begin and 12:33

Page 113

29 (Pages 110 - 113)

expand and shrink and as activity in those matters 12:33 increases and decreases usage of our different products. 12:33 We saw how this volatility can create outsized growth in 12:33 Q2 where we saw 88 percent year-over-year revenue 12:33 growth. As you can see from our guidance, you should 12:33 not expect this level of outside performance in every 12:33 quarter." 12:33

So I guess I'd like to understand how you 12:33 think that the September 2nd statements suggest to the 12:33 market certain expectations around similar performance 12:33 in the future. 12:33

A. Well, single snippet of a -- what have we got, 12:33 30 pages here? 12:34

I think in the -- on the next page, I think 12:34 Kiwi Camara is discussing -- the alleged statements 12:36 here, the adoption journey that we talked about earlier, 12:36 and then describes -- you know, using that analogy of 12:36 basically -- not analogy, an example, of a prior DISCO 12:36 user at a -- one law firm moving over to another law 12:36 firm in a new position and basically quickly ramped up 12:36 that new law firm's use of DISCO's platform, and -- and 12:36 he says so what we're seeing -- and he says, "What we're 12:36 seeing in Q2, and in general in the more recent 12:36 quarters, is that customers have taken this journey, 12:36 which used to take multiple years and shortened it 12:36

Page 114

dramatically. So what we're seeing with that customer 12:36 is a customer that went from zero in Q4 of last year to 12:36 multimillion dollars of revenue over three quarters." 12:36

And I'll complete it "Over the course of that 12:36 journey has shifted their Ediscovery program to DISCO, 12:37 both in terms of adopting our DISCO Ediscovery product 12:37 and then more recently DISCO review. We think this is 12:37 something that is super promising about the business." 12:37

So I think this is kind of describing the -- 12:37 volatility that created this huge growth in Q2 as -- as 12:37 something that -- you shouldn't expect all the time. 12:37

It definitely doesn't describe it, the 12:37 volatility, as being a negative. It's describing it as 12:37 a positive, that you shouldn't expect this 88 percent 12:37 every quarter, and I think, if I recall correctly, it 12:37 was more like a 30 percent growth rate was the -- was 12:37 the target or the expectation set forth, maybe 35 12:37 percent or something like that. 12:37

So this was a blowout quarter, and it was 12:37 received, so they're tempering expectations with respect 12:38 to the future growth, still high but not 88 percent on 12:38 an ongoing basis. 12:38

Q. So I guess I'm having a hard time following 12:38 you because you keep coming back to this 30 percent 12:38 growth rate, which is not at issue in this case, and I'd 12:38

Page 115

like to understand if it's your position that the 12:38 August 12th, 2022 disclosure is corrective because DISCO 12:38 did not meet the 30 percent growth rate when it 12:38 disclosed those results. 12:38

MR. STERN: Objection. Mischaracterizes 12:38 testimony. 12:38

THE WITNESS: So the 30 percent, just an 12:38 example, coming from in my Exhibit 12 page 61 of 68 12:38 Jeffries (ph.), and they're describing the event they 12:38 say "Law," which is CS DISCO, "delivered a narrow beat, 12:38 but lowered it's '22 guide by 15 percent, 17 percent 12:38 versus 32 percent prior." 12:38

So that's what I was referring to, is that 12:38 they had a prior guidance of 32 percent year-over-year, 12:38 which I believe was consistent with the prior '21 12:39 guidance as well. 12:39

So that was their trajectory that they had 12:39 been hoping and guiding towards, and the allegations are 12:39 simply that that was unrealistic given the high exposure 12:39 to the nonrecurring large review projects. 12:39

Q. But the 30 percent growth rate is not one of 12:39 the challenge statements in this case; correct? 12:39

MR. STERN: Objection. Document speaks for 12:39 itself. 12:39

THE WITNESS: It seems to me that the 12:39

Page 116

misrepresentations relate to the company's forward 12:39 prospects in revenue growth, so that's why I think it's 12:39 relevant to the -- the case. 12:39
BY MS. BRIEN: 12:39

Q. It is not one of the challenge statements in 12:39 this case; correct? 12:39

MR. STERN: Objection. Asked and answered. 12:39

THE WITNESS: I don't -- 12:39

MS. BRIEN: He didn't answer it. 12:39

MR. STERN: He did answer it. You just don't 12:39 like the answer so you want a different one. 12:39

MS. BRIEN: I'm going to ask you to reserve 12:39 your speaking objections. 12:40

THE WITNESS: I don't know what you mean by 12:40 "challenged." 12:40

I think it's challenged in the sense that it's 12:40 the -- definitely part of the subject matter of 12:40 misrepresentations. 12:40
BY MS. BRIEN: 12:40

Q. So is it your position that you look at the 12:40 general statements of the company in assessing whether 12:40 there's price impact or do you look at the actual 12:40 statements that remain in this case as alleged 12:40 misstatements? 12:40

MR. STERN: Objection. Mischaracterizes 12:40

Page 117

30 (Pages 114 - 117)

testimony.

THE WITNESS:  The alleged misstatements that remain in this case, which are most certainly from an economic prospective related to the company's revenue growth and future prospects.

BY MS. BRIEN:

Q.   But the 30 percent growth rate that you keep referring to is not one of the alleged misstatements in this case?

MR. STERN:  Objection.  Asked and answered.

THE WITNESS:  Yeah, same answers.

It's related to the alleged misstatements because it is the target that the company had set.

BY MS. BRIEN:

Q.   It is not one of the challenge statements in this case?

MR. STERN:  Objection.  Asked and answered.

THE WITNESS:  I don't know that it is not one of the challenge statements.  It is -- it is related to the challenge statements at -- in terms of subject matter for sure, and I don't know that it makes it not challenged.

I'm not a lawyer, so that's just my --

I'm not going to say that's not challenged because I don't know.

Page 118

BY MS. BRIEN:

Q.   Okay.  There are four statements that remain in this case; correct?

MR. STERN:  Objection.  Asked and --

THE WITNESS:  I think so.

BY MS. BRIEN:

Q.   Does a single one of them mention a 30 percent growth rate?

A.   I don't recall right now.

I don't think they say specifically a 30 or 32 percent growth rate, but they definitely involve and relate to the company's revenue growth and future prospects.

Q.   Do any of the challenge statements mention 2022 guidance?

MR. STERN:  Objection.  Asked and answered.

THE WITNESS:  I don't recall if they specifically mention '22 guidance, but, again, they definitely relate to the company's revenue growth and for future prospects.

BY MS. BRIEN:

Q.   And what is it that Plaintiff alleges Defendants failed to disclose to the market when they made the challenge statements in question?

MR. STERN:  Objection.  Complaint speaks for

Page 119

itself.

THE WITNESS:  I mean, I'm just looking at the -- motion for class certification that you handed me, which states on page 3 in the middle paragraph -- that "The company's revised annual revenue projections -- revealed that its previous projections relied on the assumption that CS DISCO would continue to receive seven figure per quarter revenues from a small number of large review matters, matters which had disappeared in the preceding months."

So the Complaint obviously speaks for itself, but I think that's a summary that at least describes the -- what was -- what was allegedly misrepresented or -- Defendants failed to disclose earlier in the class period.

Q.   And is that information that Defendants could have disclosed earlier in the class period?

A.   I have no idea.  I have no opinion on liability.  I'm an economist.

Q.   And is the corrective disclosure --

Well, let me strike that.

What did DISCO disclose in the corrective disclosure?

MR. STERN:  Objection.  Complaint speaks for itself.

Page 120

THE WITNESS:  Well, my event study I think chronicles everything that was disclosed on August 11th, 2022, which is the alleged corrective event date.

As we discussed a few times today, there was -- there was an earnings announcement that the company reported in line two second quarter 2022 results, but significantly lowered second half 2022 guidance, and they also provided commentary about revenue predictability and -- their exposure to revenue -- sorry -- large review customers that would -- that would be removed from guidance going forward -- and there's more -- there's more details, but that, I think, summarizes the big topics.

BY MS. BRIEN:

Q.   So is everything that you believe is corrective set forth in Exhibit 12 --

MR. STERN:  Objection.  Mischaracterizes --

BY MS. BRIEN:

Q.   -- of your report?

MR. STERN:  Sorry.

Objection.  Mischaracterizes the report.

THE WITNESS:  I don't have an opinion on what's corrective or not.

I -- I --

Exhibit 12 is -- mostly about market

Page 121

31 (Pages 118 - 121)

efficiency. 12:46

I do have the price impact opinion here, so I 12:46 -- it also used the final date as the basis for my 12:46 opinion. I think that the price decline is 12:46 demonstrative of price impact associated with the 12:46 alleged misstatements and omissions, but I -- I take 12:46 Plaintiffs' theory of liability as -- as alleged to be 12:46 true as an assumption underlying that opinion. 12:46

BY MS. BRIEN: 12:46

Q.    So the August -- 12:46

Now I'm getting confused on whether it's the 12:46 12th or the 11th, of 2022. 12:46

The August 11th, 2022, you know, statement, in 12:46 that DISCO actually disclosed that it did meet guidance 12:46 for Q2 of 2022; correct? 12:46

A.    I could look it up. I think they met 12:47 expectations, and sometimes market expectations are -- 12:47 or consensus expectations can be a little bit different 12:47 than the prior guidance, but they definitely were in 12:47 line with analysts' consensus expectations regarding 12:47 revenue and -- I think EBITDA, E-B-I-T-D-A. 12:47

Q.    And the downward revision and guidance related 12:47 to the remaining quarters of 2022; correct? 12:47

A.    So there was -- there is discussion of the 12:47 analysts that -- and I think it's because the company 12:47

Page 122

said it as well -- that the second quarter of '22 was 12:47 also adversely hit by the large review contracts winding 12:47 up -- or winding down, I should say, and as a result the 12:48 quarter wasn't as high as it would have been. 12:48

So it's not just the -- the big impact is the 12:48 forward guidance. It's the second half of '22 guidance 12:48 being lowered, but I think there is also, if you read 12:48 the analysts' reports, you'll see that there's some 12:48 discussion of at least acknowledging that the second 12:48 quarter revenues were hit by review as well. 12:48

Q.    Did the corrective disclosure say anything 12:48 about 2021 revenue? 12:48

MR. STERN: Objection. The document speaks 12:48 for itself. 12:48

THE WITNESS: No, it did not. 12:48

BY MS. BRIEN: 12:48

Q.    Did it say anything about -- 12:48

Never mind. Strike that. 12:49

All right. Let's turn to your damages 12:49 methodology. 12:49

And I believe that starts on paragraph 61. 12:49

A.    I'm there. 12:49

Q.    And you were asked to render an opinion of 12:49 whether damages under Section 10b can be calculated on a 12:49 classified basis; correct? 12:49

Page 123

A.    And in a manner consistent with Plaintiffs' 12:49 theory of liability, yes. 12:49

Q.    And what is Plaintiffs' theory of liability? 12:50

A.    What we've been discussing, it is my 12:50 understanding a price maintenance case in which the 12:50 company's failure to disclose adverse economically 12:50 material information prevented the stock price from 12:50 declining at the outset of the class period had the 12:50 truth been known, thereby creating price inflation in 12:50 DISCO's stock price throughout the class period, which 12:50 was corrected as the relevant truth as alleged was 12:50 disclosed to the market, thereby causing an 12:50 approximately 50 percent decline in the company's stock 12:50 price. 12:50

Q.    And what is the adverse economically material 12:50 information that was not disclosed? 12:50

A.    I think it's the company's exposure to -- 12:50 unstable revenues from large review projects that were 12:51 not mature, stable, or continuous, or resilient spend by 12:51 customers that could be counted on in the future and 12:51 that would form a foundation for the company's revenue 12:51 growth expectations, and that, had the market known what 12:51 they learned on August 11th of 2022, Disco's stock price 12:51 would have declined at the outset as it did then. 12:51

Q.    So is it your position that the information 12:51

Page 124

that was disclosed on August 11th, 2022 could have been 12:52 disclosed previously? 12:52

A.    I don't know. I haven't analyzed that. 12:52

I think that's part of Plaintiffs' theory of 12:52 liability, which I've assumed to be true. 12:52

Q.    And your understanding of Plaintiffs' theory 12:52 of liability, what is that based on? 12:52

A.    My reading of the Complaint, discussions with 12:52 counsel for Plaintiff, and my review of the Court's 12:52 order on Defendants' motions to dismiss. 12:52

Q.    Did you undertake any analysis to determine 12:52 whether any facts exist that undercut the allegations in 12:52 the Complaint? 12:52

A.    No, I've not done that. 12:52

Q.    Okay. And what is the methodology that you 12:52 propose for calculating damages on a classified basis? 12:52

A.    It's the -- what's considered the standard 12:53 operating procedure in a securities litigation under 12:53 Section 10b for estimating damages as a result of 12:53 actionable misstatements and omissions. 12:53

It's the event study methodology, also known 12:53 as the out-of-pocket damages estimation methodology 12:53 that's been approved hundreds of times, that I've had 12:53 approved by Courts, I think, over 40 times -- for very 12:53 similar theories of liability. 12:53

Page 125

32 (Pages 122 - 125)

Again, it's misstatements and omissions, 12:53 inflated stock price is the theory, and inflation comes 12:53 out in a corrective event. 12:53

The event study is perfectly designed to 12:53 estimate the value impact of that revelation of truth. 12:53

Q. And are you committing to using this 12:53 out-of-pocket methodology to calculate damages in this 12:53 case? 12:53

MR. STERN: Objection. What does "committing" 12:53 refer to? 12:54

BY MS. BRIEN: 12:54

Q. If you were asked to calculate the damages in 12:54 this case, will you be relying on the out-of-pocket 12:54 methodology to calculate damages? 12:54

A. Almost certainly, but I'm open to considering 12:54 other alternatives should the discovery evidence warrant 12:54 it, but I don't anticipate that. 12:54

Q. What's a situation where you might have to go 12:54 to another alternative? 12:54

A. I can't think of one. I'm just being 12:54 open-minded. 12:54

Q. And how does your proposed methodology depend 12:54 on the facts of Plaintiffs' case? 12:54

MR. STERN: Objection. Vague. 12:54

THE WITNESS: It depends on -- 12:54

Page 126

So there's -- 12:54

The big way it depends on Plaintiffs' case is 12:54 if there's no liability there's no damages, so -- if 12:54 Plaintiffs can demonstrate liability, then my 12:54 methodology can be fashioned in a manner that's 12:55 consistent with that theory of liability -- or finding 12:55 of liability. 12:55

BY MS. BRIEN: 12:55

Q. The methodology that you outlined in your 12:55 report, is it tailored to this case or is it the same 12:55 methodology that you propose in any Section 10b-5 case? 12:55

MR. STERN: Objection to form. 12:55

THE WITNESS: So the methodology is -- is 12:55 widely applicable and used. 12:55

Again, it's considered by multiple Circuit 12:55 Courts to be the standard operating procedure in pending 12:55 litigation. 12:55

The application of it will be absolutely case 12:55 specific when employed, so it's just a matter of I 12:55 haven't been asked to estimate damages. 12:55

But this is the method that has been approved 12:55 more times than I can count. I've used reliably passed 12:55 Daubert challenges, passed motions for summary judgment. 12:55

You know, it's -- it's -- wholly tailored to 12:55 the facts of the case when employed. 12:55

Page 127

BY MS. BRIEN: 12:56

Q. But you have not at this point applied the 12:56 methodology or tailored it to this case? 12:56

A. I've tailored it to the -- 12:56

I've not applied it to any facts, but I've -- 12:56 I've considered the theory of liability, and I think 12:56 that the event study methodology is -- can be used in a 12:56 manner that can estimate damages consistent with the 12:56 pled theory of liability in the Complaint as upheld by 12:56 the Court's order on the motion to dismiss. 12:56

Q. So is this damages methodology applicable in 12:56 any case in which a Plaintiff alleges some sort of 12:56 causal relationship between a misrepresentation and a 12:56 subsequent loss? 12:56

MR. STERN: Objection. Vague and ambiguous. 12:56

THE WITNESS: No, I don't think it's always 12:57 the case. 12:57

I mean, I've worked on other cases that don't 12:57 have these types of securities claims, and I've 12:57 estimated damages using a different model. 12:57

BY MS. BRIEN: 12:57

Q. Okay. Is this damages methodology applicable 12:57 in any securities class action in which a Plaintiff 12:57 alleges a causal relationship between the 12:57 misrepresentation and subsequent loss? 12:57

Page 128

MR. STERN: Objection. Goes beyond the scope 12:57 of the testimony. 12:57

THE WITNESS: I don't -- I don't know that I 12:57 could go that far, but it certainly is commonly 12:57 applicable in -- you know, for estimating damages under 12:57 Section 10b for -- for stock price inflation theories of 12:57 liability. 12:57

BY MS. BRIEN: 12:57

Q. Can you think of any Section 10b case in which 12:57 this proposed methodology would not apply? 12:57

A. I mean, I can imagine something, but it's -- 12:57 you know, it's -- it would be so different than what 12:58 we're facing now. 12:58

I think the event study methodology's 12:58 perfectly applicable to -- to the case at hand with -- 12:58 with CS DISCO and the pled theory of liability. 12:58

Q. So what -- what can you imagine? 12:58

A. So a class action in that there's -- somehow 12:58 the class is certified, maybe it's -- 12:58

Maybe it's not even a class action, so there 12:58 would be a case where you have to model the stock price 12:58 using a discounted cash flow analysis rather than an 12:58 event study. 12:58

Q. And what kind of facts would lead you to need 12:58 to go and use that methodology over an event study? 12:58

Page 129

33 (Pages 126 - 129)

A. I don't know. I'm just --

There are other ways to value a company, and so -- I'm just thinking that there could be instances where -- you would want to -- you could consider doing a discounted cash flow model or using option pricing theory if they're non-lineary to a security's payout structure to estimate damages, but not here, not here.

The event study is, I think, the way to go.

Q. Have you ever used anything other than the out-of-pocket method for calculating damages in a securities case?

MR. STERN: Objection as to the definition of "securities case."

THE WITNESS: I mean, I'm trying to think. I have, and not a Section 10b case, I don't think.

BY MS. BRIEN:

Q. Okay. So you've not used anything besides the out-of-pocket method for calculating damages in a Section 10b case?

MR. STERN: Objection. Mischaracterizes testimony.

THE WITNESS: I get confused a little bit. I have --

For a Section 10b securities litigation my recollection right now is that I've used an event study

Page 130

to estimate damages in every time I've been asked.

In another case recently that involved stock dilution claims, I -- I don't believe it was a 10b case, it was a class action, but I used a different -- I used an option pricing theory and some capital structure theorems in order to estimate damages under a but-for world that did not allow the dilution that occurred in the real world to occur.

BY MS. BRIEN:

Q. And you have not calculated damages in this case yet; correct?

A. Correct.

Q. Have you determined whether Plaintiff suffered any damages in this case?

A. No.

Q. Is it possible that you could apply the out-of-pocket damages methodology and it would result in zero damages?

MR. STERN: Objection. Unclear what -- if it's referring to Plaintiff or the class.

THE WITNESS: It is possible for there to be zero damages after you apply the model.

BY MS. BRIEN:

Q. And I think you may have already answered this, so I apologize for asking you again, but, if you

Page 131

are ultimately asked to opine on loss causation or damages, are you going to assume the allegations in the Complaint are true?

A. Yes, as modified by the Court's orders at that point, and right now I think it's just a motion to dismiss order, but if there's some -- subsequent orders, say the class certification order comes up with some new limitation, then I would adhere to that ruling.

VIDEOGRAPHER: Real quick. Sorry. Your hair's rubbing against the mic.

MS. BRIEN: Sorry.

VIDEOGRAPHER: And can you raise yours higher up?

MR. STERN: Yeah.

VIDEOGRAPHER: Thank you -- if you can.

Thank you.

BY MS. BRIEN:

Q. So to calculate out-of-pocket damages, do you need a methodology to calculate the artificial inflation at the time of the purchase?

A. I mean, that's what the event study's calculating, is price inflation -- or estimating price inflation throughout the class period.

Q. And you also need to calculate a reduction in the inflation at the time of sale?

Page 132

A. Well, it may not have reduced by the time of sale, so sometimes people need what's called "in and out." They'll buy inflation and sell at the same inflation.

So there's no damages associated with that transaction, but, yes, in some cases there's many corrective events, there's affirmative misstatements that cause inflation to go up, then correct it to go down, and so it can get a little complicated.

Here, though, I don't envision that being a problem, given that one alleged corrected disclosure, at least that's actionable as I understand it.

Q. And does your report currently include a method of estimating a reduction in inflation at the time of the sale?

A. I don't --

I think I might not understand or appreciate what you mean by that.

Q. Apologies.

"The sale" is vague, so let me -- let me try again.

Your report does not include a method for estimating any reduction in the alleged artificial inflation in the Complaint?

MR. STERN: Objection to form.

Page 133

34 (Pages 130 - 133)

THE WITNESS: The --

I mean, the artificial inflation I haven't estimated it, but it's always -- using the out-of-pocket method it always comes out -- by the final corrective disclosure or corrective event, so that would be zero inflation at the -- after the filing of the class period, and that's just by assumption given the theory of liability pled, I guess you would say.

BY MS. BRIEN:

Q. So is it your opinion that the reduction in inflation is going to equal whatever -- the stock price drop was at the end of the class period?

A. I think I understand.

You're asking me whether that final drop can be reflective of price inflation earlier in the class period?

Q. Right.

A. That's right?

It may be.

So it's something that I would consider when implementing the model, is whether there would be a -- any reason for implementing a haircut or reduction as a result of -- to the observed price decline, because ultimately to be consistent with Plaintiffs' theory of liability the analyst or the expert needs to -- capture

Page 134

or isolate the portion of the -- price decline on the corrective event day that is due to the revelation of the relevant truth previously concealed as opposed to other factors unrelated to the fraud.

Q. And what you're describing there, is that kind of the concept of back-casting?

A. Yes.

I mean, I wasn't, but generally speaking, it is -- it is working backward in time, which has been endorsed by several Circuit Courts as a reliable and scientific way to estimate damages under Section 10b, but there can be nuances to it.

There can be theories of liability that would imply time varying price inflation bans. I've seen that. I've worked on cases that have involved that.

And so it would -- it could fluctuate over time.

Q. And have you looked at whether that would be necessary in this case?

A. I -- I've considered it loosely, but I -- and I don't -- think it's necessary, but I'm not -- I haven't fully analyzed damages -- or really at all, so I'm open to --

I would fully consider whether there would be a need to either isolate a portion of the decline due

Page 135

to -- you know, from non-fraud-related factors and whether Plaintiffs' theory of liability would apply a time-varying component from -- from the start date to the end of the class period.

Yeah, and that's it.

Q. So inflation can vary throughout the class period, right, and it may not always match the back-end?

A. It can, yeah.

Q. And that's because, you know, at different points in time the information that should have been disclosed could be different?

A. Well, that's -- that's always true.

For instance, the class --

Prior to the class period, there's by assumption zero inflation because there's no alleged wrongdoing or mis- -- misrepresentation prior to the class period.

So I think the answer to your question is, yes, but you've got to be careful when considering what could be disclosed at any point in time, and, more to the point, as an economist it's not my role. That's a liability question.

What I can do is provide evidence of economic losses using reliable and scientific methods that have been accepted in academia and securities litigation for

Page 136

decades.

And my -- my work will be under the assumption of that Plaintiffs' theory of liability is correct.

Q. But at this point have you determined whether the -- alleged price inflation -- well, the alleged reduction of price inflation at the back-end is the same as the price inflation at the front end?

A. Sorry.

Can you please repeat that?

Q. Yes.

Have you at this point determined whether the alleged price inflation -- the reduction in the price inflation at the back-end is the same as the price inflation at the front end or at different parts of the class period?

A. No, I haven't implemented the model, so --

But the model's perfectly capable of accounting for those types of dynamics.

Q. And how does the model do that?

A. By isolating the portion of the decline that's due to revelation of fraud on the back-end, and then, if necessary, applying graduation rates depending on facts that may be known or could be discovered that are consistent with the Plaintiffs' theory of liability.

I don't know that's the case here.

Page 137

35 (Pages 134 - 137)

Like an example that comes to mind is the old 01:09 Vivendi case that my Dad was expert on and I helped him 01:09 with for many years. That was a case where the theory 01:09 of liability depended on the -- purchase accounting 01:09 fraud over time, and so -- we graduated it such that 01:09 there was a point of maximum inflation based on the 01:10 discovery evidence where it was clear that the 01:10 Defendants knew there was a huge liquidity crisis in 01:10 Vivendi, and then prior to that, rather than using that 01:10 maximum inflation, which was just the sum of the drops, 01:10 graduated the inflation downward with the -- as the 01:10 purchase accounting fraud evolved over time, and that 01:10 was because of Plaintiffs' allegations. 01:10

That was a model that was consistent with 01:10 their theory of liability, and it required that type of 01:10 graduation. 01:10

Q. And so how did you determine what the 01:10 graduation -- well, I guess you didn't -- but how did 01:10 they determine what the graduation -- 01:10

A. I helped. 01:10

Q. In the snack closet? 01:10

A. I was old enough. It's okay. 01:10

Q. Well, okay. 01:10

So then how did you determine what the 01:10 graduation should be? 01:10

Page 138

A. We did three -- not examples, but we did three 01:10 methods of graduating it, purchase accounting, I think 01:11 there was some -- it might have been oil -- 01:11

No, that was Enron. That was a different one. 01:11

Maybe it was just purchase accounting. 01:11

In Enron we had the three things and the Court 01:11 weighed in on one. 01:11

And -- well, the way we determined it, it was 01:11 because it was -- in working with the attorneys it 01:11 seemed like it was the way that they pled the fraud as 01:11 it -- evolving over time, and, yeah, it was upheld by 01:11 the Court through trial and posttrial appeal. 01:11

So we felt -- 01:11

We feel proud about that one. That was -- 01:11 that was a good outcome, reliable, and scientific, and 01:11 did it all the way through. 01:11

Q. And, just turning to the first sentence of 01:11 your damages opinion, you state, "I have not as of yet 01:11 been asked to provide an opinion on loss causation or to 01:11 calculate class-wide damages in this matter." 01:11

Do you see that? 01:12

A. I do. 01:12

Q. And, you know, we talked previously about your 01:12 statement a few paragraphs before that noting that the 01:12 subject of the alleged misstatement and omission was 01:12

Page 139

clearly the root cause of the stock price decline that 01:12 day. 01:12

Can you just help me understand -- how -- you 01:12 know, what's the difference between performing a loss 01:12 causation analysis and concluding that it was clearly 01:12 the root cause? 01:12

A. Yeah. 01:12

That's the overlap of price impact and loss 01:12 causation that we were talking about earlier. 01:12

So I agree, I mean, I think -- you know, I 01:12 think there's pretty strong evidence of loss causation 01:12 here, given Plaintiffs' theory of liability, and that's 01:12 akin to my opinion that there is price impact as 01:12 demonstrated by the back-end corrective decline. 01:12

Q. And so what work did you do to get to the 01:13 opinion that there's pretty strong evidence of loss 01:13 causation here? 01:13

MR. STERN: Objection. Mischaracterizes 01:13 testimony. 01:13

THE WITNESS: It's -- 01:13

So the difference, I think, is that loss 01:13 causation primarily will be the product of full 01:13 discovery, and we don't have that here. 01:13

So based on the allegations alone, and that 01:13 may be the crux of the difference between price impact 01:13

Page 140

and loss causation. I'm speculating because I'm not an 01:13 attorney. 01:13

But I was not asked to analyze loss causation, 01:13 and I think that's because price impact -- discovery is 01:13 ongoing, which could, you know, reveal new aspects or 01:13 clarify certain parts of the allegations and cause a 01:13 modification to the theory of liability as it would 01:13 stand in the merits phase. 01:13

But based on the definition in Halliburton 2 I 01:13 think the back-end disclosure as evidenced by my event 01:13 study is demonstrative of price impact. 01:13

BY MS. BRIEN: 01:13

Q. And that's based on the allegations being 01:14 taken as true? 01:14

A. Yes, I think so. 01:14

Q. How would your proposed methodology address 01:14 any mismatch in the substance between the allegedly 01:14 omitted information and the allegedly corrective 01:14 information? 01:14

A. Well, it doesn't seem to me that there's 01:14 anything but a match, like a big giant flashing match 01:14 based on my event study. 01:14

So I think it's -- it's a product, and I would 01:14 use the event study to -- to examine whether there's a 01:14 match or a relationship or a causal connection between 01:14

Page 141

36 (Pages 138 - 141)

the alleged omissions and misstatements and the alleged corrective information.

Q. And what causes you to think that there's a big red flashing match between the corrective disclosure and the alleged omission?

A. It's just the exact same subject matter.

I mean, Plaintiffs are alleging that they failed to disclose, you know, a significant exposure to large review projects that made their revenue projections and representations about their revenue growth and forward prospects to be misleading.

The corrective disclosure is that we're lowering guidance because of the large review projects, you know, winding down, and we can't count on those going forward.

I don't see how anyone could say there's a mismatch there. That's the exact same subject matter.

Q. Is it your view that had CS DISCO disclosed at the start of the class period that guidance relied on the assumption that CS DISCO would continue to receive seven figure per quarter revenue from a small number of large review matters the same stock decline would have occurred at the start of the class period as the decline that was observed in response to the alleged corrective disclosure?

Page 142

MR. STERN: Objection to form.

THE WITNESS: I haven't analyzed that to date, but I think that that is -- would be significant adverse economically material information that would cause investors to rethink their understanding of the company's revenue growth and forward prospects and really just the stability of the company's revenue stream and growth going forward.

And that's what stock price valuation is all about, is future cash flows from future revenues and sales.

So they're much more volatile than the market understood. That creates a risk that by definition causes stock price declines, and the same is true for lowering the mean value of the forward expectations, which also causes the stock price decline in theory, and it's empirically demonstrated by the 50 percent decline that occurred when they announced a lowered guidance in August of 2022.

BY MS. BRIEN:

Q. As a general matter do you think that the magnitude of the stock price decline in response to disappointing earnings or guidance depends on the size of the miss?

A. I think it's -- it depends on the company and

Page 143

their -- where they are in their growth curve.

Q. With respect to CS DISCO, do you think the market would have reacted to a stock price decline depending on --

Or sorry.

Do you think the market would have reacted in response to disappointing earnings or guidance depending on the size of the miss?

A. The size of the miss, I think, is -- is certainly going to affect the magnitude of the price decline, but I also think that the risk element could outweigh to a greater degree that -- that miss because it's basically -- because stock price valuation of the product of not just the level of the expected cash flows but also the volatility also known as risk associated with those cash flows, and if the risk is significantly higher than investors realize, it can cause massive -- wealth effects.

Q. And is there a difference between disclosing a -- a risk and a certainty?

A. There -- there is -- by definition.

Q. And would you expect the market to react differently to the disclosure of a risk versus the disclosure of a certainty?

A. I think it depends on the -- risk that's being

Page 144

disclosed versus the certainty, and I could envision a situation in which the outcome, the certainty in the hypothetical, may not be that bad, but it presages a weakness that could result in much more value destructive outcomes in the future, so that -- that markets didn't appreciate and thereby creating a larger price decline than would happen if it was just a single one-off event that -- as opposed to a realization of a much higher degree of ongoing risk.

Q. So let's say, for example, that a company says that there's zero percent chance of a product recall when, in fact, it knows there's a 50 percent chance.

Do you think that the market would react the same to a disclosure of a 50 percent chance of a recall as it will to the eventual recall that is announced?

A. I -- I think it depends. I'd have to consider all the facts.

Q. What facts would you consider?

A. What the company is, what their industry is, whether they've got some kind of weird exposure to regulatory outcomes, or the time period, their investor concentration.

I think there's a lot to consider.

And that's the beauty of the event study, is that it does consider all those things by looking at

Page 145

37 (Pages 142 - 145)

real company efficient market stock price changes in realtime.

Q. Did you perform any analysis on what market expectations for DISCO's 2022 guidance looked like over the class period?

A. I --

Yeah, I mean, I think in my event study it shows -- or at least -- describes the analysts' and news commentators', you know, their statements regarding the company's earnings -- or sorry -- revenue growth over time.

Q. So besides reading the analyst reports which are identified in Exhibit 12, did you do anything else?

A. I don't think so.

There's a quick function in Bloomberg that you can pop up that shows the -- average earnings or revenue expectations, say, for the fourth quarter or the year over -- over and on a daily basis, but I don't --

I sometimes will look that up, but I don't think I've done that for this case yet.

Q. If DISCO's 2022 guidance was not issued until February of 2022, how could DISCO have disclosed in September of 2021 and January of 2022 the subsequent downward revision on August 11th, 2022?

A. I -- I don't think Plaintiffs' claims are

Page 146

about -- solely about the guidance, the '22 guidance.

I think it's about the company's revenue growth and how they represented that revenue growth and its prospects throughout the class period.

So the --

I think under their theory of liability the reduction in 2022 revenue guidance and EBITDA guidance is a materialization of that risk that was concealed.

Q. Of what risk?

A. The risk that they had much more exposure to large review projects that were not reliable, or consistent or continuous, and that the company had a much more revenue volatility -- and worse prospects than the market understood.

Q. Are you proposing the same damages approach regardless of whether the stock price decline is due to a corrective disclosure or the materialization of a concealed risk?

A. The event study method has been used many times for both types of events. I've used them for both types of events.

So, yes, I will use the event study methodology or the out-of-pocket estimation methodology -- if asked.

Q. What about with respect to a partially

Page 147

disclosed risk?

A. If there's a --

I don't quite know what you mean by "partially disclosed risk."

Can you clarify?

Q. Sure.

So if, for example, the risk of revenue volatility was disclosed, but the risk of large review customer volatility was not disclosed, would you use the same damages methodology to calculate it?

A. Yes, I would, and it's --

The beauty of the efficient market hypothesis and just efficient markets in general is that that disclosure of revenue volatility, case specific revenue volatility that would wash out in the aggregate, would have -- would have been priced into DISCO's stock immediately prior to the corrective event such that the new information, the new risk, the concealed risk, would be disclosed as the exposure to large review projects that were -- much more volatile than the market understood at -- at the time.

Q. Is your opinion based on the fact that only case-specific revenue volatility was disclosed?

A. I believe that's what was disclosed.

Q. And is your proposed damages model -- can it

Page 148

differentiate between risks that were disclosed and risks that were undisclosed?

A. Yes.

Q. And how would per share damages change if an undisclosed or under-disclosed risk changed?

A. It may not at all. It depends on the -- discovery evidence and theory of liability.

Yeah, I think there's not --

There's also just --

You know, damages is ultimately up to the trier of fact; right?

So there's an element of -- or the notion of actual damages versus fraud-induced damages or in a similar context the fraud-induced inflation versus actual inflation that Courts have -- certain Courts have pondered, and I'm familiar with the caselaw.

And my understanding is that economists can provide event studies to assess the price declines, however, it is the role of the trier of fact upon weighing all the evidence to determine how much of that actual inflation -- inflation caused by the market's misconception or misapprehension of a company's true risk was fraud-induced as opposed to -- a partial risk, as you were putting it.

Q. And I think in your report you talk about sort

Page 149

38 (Pages 146 - 149)

of this -- a similar concept, right, disaggregating confounding factors?

Is your event study able to isolate price movement caused by the revelation of the true facts, and I'll put that in -- alleged true facts from price movement caused by other factors?

A.   Yes, the event study, I've used it many times, and it's -- understood that it can account for confounding information or the other facts you were referring to unrelated to the fraud.

Q.   And have you already done an analysis to identify what such confounding information might be in this case?

A.   I haven't --

I mean, I conducted the regression model with an eye towards market efficiency, so I haven't -- directly tried to -- disentangle any portion of the corrective event price decline.

Q.   And I think it's in paragraph 63 where you talk about confounding factors, and you refer to, you know, sort of these other factors, including non-fraud-related company specific information.

What constitutes non-fraud-related company specific information?

A.   I think it's -- information contemporaneously

Page 150

disclosed that's not market or industry effects, but, rather, relating to the company, that is -- has nothing to do with fraud, and that -- I've seen that quite a few times in my career.

Q.   But at your --

At this point you've not done any work to separate out what is non-fraud-related company-specific information on August 11th, 2022?

A.   I mean, I haven't --

I've done the event study.  It seems to me that there is no confounding information given that what was disclosed was a revenue guidance and EBITDA guidance reduction resulting from the large review projects, which is, as I said, a bright, shiny match to the alleged misrepresentations.

So it seems to me right now that based on my event study that there's no confounding information, but I haven't fully analyzed it towards -- for, you know --

So I may --

I will keep my --

I will consider all evidence, economic evidence going forward if asked.

Q.   And you're basing this on Plaintiffs' allegation of what the allegedly omitted information is; correct?

Page 151

A.   Yes.

Q.   Has there ever been a situation where the event study model has not been able to control for non-fraud-related information?

MR. STERN:  Objection to form.

THE WITNESS:  I've talked about it earlier.

There's a few cases where I've conservatively not endeavored to isolate a portion of a price decline.

I'm not saying that it was impossible, but it just -- it was something that -- for the sake of argument we decided not to pursue with the -- understanding -- or, you know, the -- in conversation with -- with the counsel that I was working with in those cases.

So I think that the -- event study methodology is remarkably reliable with respect to disentangling confounding information, and you can do it --

It's not just a regression analysis.  It's -- There's a -- once you get that company-specific component, then all of the tools of financial economics are available and that's, you know, understood.  The event study goes into that disentangling analysis, if it's required, because an event study is studying the event at issue, and, if it's here a fraud-related component, you can use discounted cash flow modeling to

Page 152

try and break out some of the more quantitative pieces from the disclosure, especially an earnings announcement.

There's looking at the voluminous corporate finance literature or basically academic literature associated with finance that has studied many types of corporate events and chronicled their conditional average responses to those.

That can be helpful with this entangling.

Discovery evidence has been very important in some of my prior cases with respect to determining how much of the -- the -- a company's negative news was associated with the fraud-related part of the business.

I mentioned option pricing theory earlier.  I've used that to disentangle information before.

And there's also -- oh, yeah -- comparable companies, so looking at multiples, that can help disentangle various business components, if -- if required to try and -- hone in on the fraud-related portion of the drop.

So I just want to make clear there that it's not just a regression model.  The event study has all the tools of finance available to it in order to isolate that portion of the decline you're concerned with.

MR. STERN:  Would this be a good place for a

Page 153

39 (Pages 150 - 153)

break?                                                    01:34

MS. BRIEN:  Yes.  Take a break.                 01:34

VIDEOGRAPHER:  Off the record.  The time is     01:34

1:34.                                                    01:34

(Thereupon a recess was taken at 1:34 p.m.          01:34

and the deposition resumed at 1:48 p.m.)          01:47

VIDEOGRAPHER:  This marks the beginning of       01:47

media number four in the deposition of Zachary Nye,       01:48

Ph.D.                                                    01:48

Back on the record, the time is 1:48.          01:48

BY MS. BRIEN:                                         01:48

Q.   All right.  Thank you, Dr. Nye, for being       01:48
here.  I just have a few more questions.                 01:48

A.   Okay.                                          01:48

Q.   We talked a little bit earlier today about       01:48
sort of the timing of an efficient market absorbing       01:48
information.                                             01:48

Is it fair to say that in most situations a       01:48
market -- or the market absorbs information in a matter   01:48
of minutes?                                             01:48

A.   No.                                            01:48

Q.   It's not?                                      01:48

A.   I don't think that's true.                     01:48

Q.   So what would you say is the typical rate of    01:48
absorption of an efficient market?                      01:48

Page 154

A.   I think it depends on the information         01:48
disclosed, as I've talked about, the complexity and the    01:48
publicity of the information that has been shown         01:48
empirically to matter.                                  01:48

There are --                                    01:48

There's many articles that talk about length     01:48
-- lengths of time for the stock prices to fully reflect   01:48
information.                                            01:49

The intraday pricing articles, they also tend    01:49
to show when it's a well understood and predetermined      01:49
announcement that there is a beginning of a reaction       01:49
within minutes, say 10 or 15 minutes, but they all        01:49
universally show that the price reaction is continuing     01:49
into the day at least.                                  01:49

Q.   Would you say that in the majority of         01:49
situations the market absorbs information within one       01:49
day?                                                    01:49

A.   I wouldn't even go that far.                   01:49

I think it depends on the kind of information.  01:49

I think that the one-day marker is -- an        01:49
accepted threshold just for -- because it's -- there       01:49
will at least be a price impact from information.          01:49

But what I'm careful with is the full price      01:49
impact.  I don't think it's necessarily true that within   01:49
one day information will commonly be fully reflected in    01:49

Page 155

the stock price.                                       01:50

Q.   And how long would you say is the longest that   01:50
it could take information to be absorbed in an efficient   01:50
market?                                                    01:50

A.   There are theoretical models that show that     01:50
the price paths can go on for theoretically days or        01:50
weeks because of the complexity of the information.        01:50

Granted they're theoretical models.           01:50

And then there's empirical literature that      01:50
shows prices continue to react months after.            01:50

While that can -- has been theorized to be a     01:50
behavioral dynamic due to biases in human beings,          01:50
there's also a strain of literature that posits that       01:50
that would be -- the product of a more complex            01:50
risk-based explanation for returns over time.            01:50

But typically for companies that are traded on   01:50
the national market system, which is the Nasdaq, the       01:51
American Stock Exchange -- or ICMX now, the Nasdaq, New    01:51
York Stock Exchange -- and there's more, there's more      01:51
crossing networks now that are involved, I tend to use     01:51
one-day windows unless there's a reason to go beyond it   01:51
in that there will be event study evidence to show that   01:51
the second or third day is -- a product or caused by       01:51
further analysis by analysts or further events that stem   01:51
from the prior -- the initial disclosure.                01:51

Page 156

Q.   Have you seen any evidence with respect to CS    01:51
DISCO that you would need to go beyond the one-day event   01:51
window?                                                    01:51

A.   I haven't considered that to date because I --   01:51
because I have not estimated damages.                   01:52

MS. BRIEN:  Okay.  No further questions.        01:52

THE WITNESS:  Okay.                           01:52

MS. BRIEN:  Thank you so much for your time.    01:52

THE WITNESS:  Appreciate it.                  01:52

VIDEOGRAPHER:  We are off the record at 1:52    01:52
p.m., and this concludes today's testimony given by       01:52
Zachary Nye, Ph.D.                                     01:52

The total number of media used was four and     01:52
will be retained by Veritext Legal Solutions.           01:52

(Thereupon the deposition was adjourned at

1:52 p.m.)

Signed under penalty of perjury:

_____

ZACHARY NYE, Ph.D.

_____

DATE

JOB NO. 7564478

Page 157

40 (Pages 154 - 157)

I, CAROL S. NYGARD, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings review of the transcript [XX ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any witness or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name:

Dated:September 12, 2025

*Carol S. Nygard*

CAROL S. NYGARD CSR #4018

Page 158

JONATHAN STERN

jstern@rosenlegal.com

September 12, 2025

RE: Gambrill, Lynn v. CS Disco, Inc

9/11/2025, Zachary Nye , Ph.D, (#7564478).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

_XX_ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 159

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 160

Gambrill, Lynn v. CS Disco, Inc

Zachary Nye , Ph.D (#7564478)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Zachary Nye , Ph.D)          Date

Page 161

41 (Pages 158 - 161)

**[& - 30]**

| & | | | |
|---|---|---|---|
| **&** 159:24 160:9 | | | |

**113** 3:16
**11b** 79:2,6
**11th** 4:25 90:14
105:2 121:2
122:12,13
124:23 125:1
146:24 151:8

**0**

**0** 49:9,10
103:10,20
**0000933** 113:18
**00028** 1:8 4:8
5:12

**1**

**1** 3:8 6:21 7:6
22:14 34:24
43:14 49:1
103:1,11,21
104:1 160:1
**1,040** 16:6
**10** 19:24 23:2
39:11,11 49:10
50:21 56:12
58:15,15 66:1
66:11 80:11,12
94:2 104:11
155:12
**10116** 2:5
**104** 3:15
**106** 62:18
**10b** 123:24
125:19 127:11
129:6,9 130:15
130:19,24
131:3 135:11
**11** 1:13 4:15
49:12 84:15
104:12

**12** 36:10 42:9
49:13 62:14,20
71:14 72:18
84:10 89:21
90:5 104:13
116:8 121:16
121:25 146:13
158:21 159:3
**12th** 94:24 96:8
96:9 116:2
122:12
**13** 49:14
104:14
**132** 88:21
**136** 88:21
**14** 11:13 49:15
50:4 104:15
**15** 49:17 57:4,6
104:16 116:11
155:12
**150** 88:23
**16** 49:18
104:17
**17** 49:19
104:18 116:11
**175** 37:17
**18** 49:20
104:19

**19** 49:21
104:20
**1981** 23:20
**1:24** 1:8 4:8
5:12
**1st** 16:12

**2**

**2** 3:11 8:9,10
11:9 37:14
41:12 48:5
49:2,21 51:9
53:14,17 103:2
103:12,22
104:2,22 141:9
**20** 49:22
104:21
**2009** 25:10
**2012** 25:12
**2021** 3:16 46:7
68:25 105:8
112:5,21 113:9
123:12 146:23
**2022** 46:7
88:14,21 89:21
90:13,15 94:24
96:8,9 101:20
105:19 106:3
106:12 116:2
119:15 121:3,6
121:7 122:12
122:13,15,23
124:23 125:1
143:19 146:4
146:21,22,23
146:24 147:7

151:8
**2025** 1:13 4:15
4:25 8:15 13:4
16:22 158:21
159:3
**2025.520** 159:9
159:12
**21** 49:23 63:2,3
63:3 91:13,13
104:22 116:15
**22** 49:24 57:22
63:4,4 104:23
116:11 119:18
123:1,6 147:1
**23** 49:24
104:24
**24** 49:25
104:25
**25** 49:25
103:24 104:25
**26** 16:22
**27** 16:23
**275** 2:4
**2nd** 105:1,6
112:21 114:9

**3**

**3** 3:12 10:16
43:13 49:3
103:3,13,23
104:3,13,14
120:4
**30** 20:1 54:3
102:25 111:17
112:2,4,9
114:13 115:16

**[30 - acknowledging]**

115:24 116:3,7 116:21 118:7 119:7,10 160:1
**3000** 75:22
**3175** 2:10 4:15 5:13
**32** 116:12,14 119:10
**34821** 158:24
**35** 115:17
**39** 8:18

**4**

**4** 3:16 49:4 103:4,14,24 104:4 113:1,2 113:3
**40** 26:7,18 27:10 35:17 54:3 125:24
**4018** 1:23 6:13 158:25
**40th** 2:4
**450** 20:10
**4:05** 90:15
**4th** 8:15

**5**

**5** 34:24 39:5 42:9 45:23 49:5 76:22 84:3 103:5,15 104:5 112:25 127:11
**50** 20:1 124:13 143:17 145:12

145:14
**500** 75:18
**500,000** 18:3,6
**52** 76:9
**53** 37:17 78:5
**55** 83:8 84:6
**56** 83:2,7,8 84:6 97:5

**6**

**6** 11:8 49:6,20 103:6,16 104:6
**61** 116:8 123:21
**63** 150:19
**650.843.5000** 2:11
**67** 90:4
**68** 116:8

**7**

**7** 3:4,10 12:2 49:7 103:7,17 104:8
**7564478** 157:23 159:5 161:2

**8**

**8** 3:11 20:12 49:8 57:5 66:9 103:8,18 104:9
**80** 7:20
**825** 20:12
**850** 20:12
**88** 111:23 114:4 115:14 115:21

**9**

**9** 49:9,12,15 103:9,19 104:10
**9/11/2025** 159:5
**90** 7:20 24:24 64:17 77:12 78:9,19 79:17 80:8,9
**915** 1:23
**936** 113:19
**94304** 2:10 5:14
**95** 64:8,10,22 65:7 70:18 76:20 77:10 79:16,17,17,19 80:3,7
**99** 66:13 79:3

**a**

**a.m.** 4:15,24 49:10,12 104:1 104:2
**ability** 54:20
**able** 67:7 82:13 150:3 152:3
**abnormally** 106:7
**above** 64:10 70:19 78:9 79:16,19 80:8 80:11 159:6
**absolute** 63:13 76:23

**absolutely** 102:18 127:18
**absorbed** 82:14 156:3
**absorbing** 81:23,25 82:2 82:10 154:16
**absorbs** 154:19 155:16
**absorption** 154:25
**academia** 136:25
**academic** 58:19 64:17 153:5
**academics** 50:5 50:16,22
**accepted** 26:19 34:18 57:25 58:19,22 68:5 68:6 136:25 155:21
**accompanied** 42:12
**accord** 92:8
**account** 150:8
**accounting** 137:18 138:4 138:12 139:2,5
**accuracy** 34:12
**accurate** 8:2 36:1 50:20
**achieved** 64:8
**acknowledging** 123:9

**[action - american]**

action  5:17 27:22 30:16 31:2 40:19 70:11 128:23 129:18,20 131:4 158:17 158:18
actionable 36:21,23 91:12 125:20 133:12
actions  15:20
active  24:12
actively  21:16
activity  114:1
actual  63:6 75:9,11 76:5 79:9 101:15,18 117:22 149:13 149:15,21
actually  32:25 44:10 48:18 50:13,18 56:15 57:14 60:11 74:7 86:4 87:24 91:1 93:12 95:24 102:16 122:14
ad  103:3
add  10:14
addition  66:8
additional  17:4 20:24 35:2 67:13
address  141:16

adhere  132:8
adjourned 157:15
adjusting  82:10
administer 6:11 158:3
administered 6:15
adopting  115:6
adoption 102:13 108:1 108:24 114:16
advance  6:22
advanced  20:2
adverse  29:13 85:12 87:2 124:6,15 143:3
adversely 123:2
advisory  24:2
aerospace  20:7
affect  144:10
affecting  11:18 51:13 52:3 61:13
affiliations 5:22
affirmative 68:17,20 133:7
aganapathi 2:12
aggregate  92:2 100:15 101:3 102:25 107:19 109:13 110:5

148:15
ago  26:7 74:9
agree  5:5 65:8 82:17 86:10 110:16 140:10
ahead  6:19 8:8 13:3
akin  140:13
al  5:9,10
allegation 29:21 32:16 151:24
allegations 36:12 69:2 87:8,15 101:17 103:7,9 116:18 125:12 132:2 138:13 140:24 141:6,13
allege  99:14
alleged  29:1,5 29:14 31:2,8 31:15 32:22 33:11 66:18 83:9 84:18,25 85:5,15 86:1 87:2 89:21 93:9 97:6 98:4 98:24 99:13,15 99:20 100:11 101:1 102:2,11 112:12,15 114:15 117:23 118:2,8,12 121:3 122:6,7

124:11 133:11 133:23 136:15 137:5,5,12 139:25 142:1,1 142:5,24 150:5 151:15
allegedly 120:13 141:17 141:18 151:24
alleges  99:23 119:22 128:12 128:24
alleging  91:8 142:7
allow  55:7 60:20,23 110:8 131:7
allowed  41:1
allowing 102:25
allows  75:24,25
alternative 126:19
alternatives 126:16
alto  2:10 4:16 5:14
ambiguous 128:15
amend  10:14
amended  40:18 41:2 103:7,9
american 156:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[amount - approved]**

amount 17:19 18:23 36:1
amounts 18:20 111:16
analogy 114:17 114:18
analyses 16:4 25:4 52:16
analysis 24:17 25:3 28:23 42:9 45:23 51:25 54:8 62:13 63:9 65:18 67:7 75:15 76:10 78:24 79:7 80:2 84:17 85:4 93:2 125:11 129:22 140:5 146:3 150:11 152:18 152:22 156:24
analyst 19:13 25:7,9 36:4,8 42:6,7,12,15,22 43:2,4,5,7,17 43:20,23,25 44:10,12,25 55:2,14,19 56:4,5 71:7 73:7,8,25 74:21 81:20 82:12,23 96:10 101:5 134:25 146:12

analysts 19:10 20:10 29:12,24 35:23 36:3 44:21 56:24 60:3 61:12 72:5 73:2,22 75:2 88:24 90:8 92:7 93:11 95:9 122:20,25 123:8 146:8 156:24
analyze 35:3 39:5 141:3
analyzed 44:11 64:21 125:3 135:22 143:2 151:18
analyzing 45:5 85:25
announced 11:17 32:25 51:12 52:2 71:13 143:18 145:15
announcement 32:18 39:17 43:21 74:8 121:5 153:3 155:11
announcements 39:10 46:13,21 66:8,14,15,24 67:5 70:15,17 74:3

announcing 39:18
annual 16:14 39:10 111:16 120:5
answer 14:12 30:18 59:25 69:10 89:5 92:21 94:14 117:9,10,11 136:18
answered 87:20 106:15 117:7 118:10 118:17 119:16 131:24
answers 118:11
anticipate 126:17
anticipated 71:17
anuva 2:9 6:3
anybody 38:21
anymore 65:25 101:9
anyway 42:23
apologies 6:22 42:10 133:19
apologize 131:25
app 75:13
appeal 139:12
appeals 80:25
appearance 5:20

appearances 2:1 5:22
appeared 4:18
appearing 7:14 159:18 160:7
appears 28:24 92:17 96:21
appendix 84:15
applicable 127:14 128:11 128:22 129:5 129:15
application 15:11 127:18
applied 58:10 80:14 128:2,5
apply 16:17 129:10 131:16 131:22 136:2
applying 137:22
appointment 3:14
appreciate 60:5 133:17 145:6 157:9
approach 147:15
appropriate 50:8
appropriately 82:11
approval 66:7
approved 35:16 125:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [approved - based]

125:24 127:21

**approximate** 30:11

**approximately** 7:19 17:22 26:4 27:9 124:13

**argument** 152:11

**articles** 38:16 45:15,16,24,25 64:17 155:6,9

**artificial** 132:19 133:23 134:2

**ascribe** 35:1

**ascribed** 88:14

**aside** 99:15

**asked** 9:7,14,16 9:17,20 10:9 28:9 30:25 34:18 35:4 83:13 87:20 106:15 117:7 118:10,17 119:4,16 123:23 126:12 127:20 131:1 132:1 139:19 141:3 147:24 151:22

**asking** 94:17 131:25 134:14

**asks** 23:1

**aspects** 141:5

**assertions** 62:2

**assess** 149:18

**assessed** 71:16

**assessing** 45:11 69:11 79:10 117:21

**assessment** 89:22

**asset** 55:23

**assisted** 19:2 34:11

**associated** 39:12 78:8 83:9 93:8 95:17 96:22 122:5 133:5 144:15 153:6 153:13

**assume** 87:14 132:2

**assumed** 125:5

**assuming** 103:15

**assumption** 86:25 98:19 120:7 122:8 134:7 136:15 137:2 142:20

**assumptions** 87:6

**attorney** 5:23 28:14,17 32:11 141:2

**attorneys** 139:9

**attributed** 29:12

**atypical** 22:23

**audio** 5:4

**august** 8:15 46:7 57:22 88:14 89:21 90:14 91:13 94:24 96:8,9 116:2 121:2 122:10,13 124:23 125:1 143:19 146:24 151:8

**austin** 1:3 4:3 5:11

**authorized** 158:2

**available** 38:22 42:11,13 50:12 52:6,13,25 53:1,7 54:12 54:13,17,18 152:21 153:23

**avenue** 2:4

**average** 110:11 110:20 146:16 153:8

**aware** 77:11 87:23 88:1 89:13 105:16

### b

**b** 122:21 160:1

**back** 36:23 43:14 45:8 49:15 67:2 77:2 98:22 99:16,23 100:1 100:5 104:6 115:24 135:6 136:7 137:6,13 137:21 140:14 141:10 154:10

**backdrop** 92:12

**background** 19:21

**backward** 135:9

**bad** 57:22 70:25 72:15 74:10 77:5 102:22 110:9 145:3

**balance** 71:8

**bans** 135:14

**base** 107:18,22 108:19 109:22 110:7

**based** 11:15 16:5 17:5 20:25 28:3 29:1 41:6 51:10 54:5,8 62:7 76:4 85:8 87:25 92:9

**[based - buy]**

93:22 94:18 112:12 113:17 113:23 125:7 138:6 140:24 141:9,13,22 148:22 151:16 156:15

**basic** 41:13 65:20

**basically** 18:13 23:17 36:5 51:2 56:3 108:2 114:18 114:20 144:13 153:5

**basing** 151:23

**basis** 9:24 10:4 16:15 27:23 28:12 30:10 42:19 55:11 75:17 76:1 87:11 115:22 122:3 123:25 125:16 146:18

**bates** 113:17

**bearing** 77:18

**beat** 116:10

**beauty** 145:24 148:12

**beginning** 5:22 16:23 49:13 91:10 104:3 105:5 154:7 155:11

**behalf** 1:5 4:5 5:25 6:3,6,8

**behavior** 92:16 93:13 96:12,15

**behavioral** 156:12

**beings** 156:12

**believe** 11:8 12:7 13:7 14:11 16:5 39:14 40:13,21 42:2 43:23 49:20 52:6 55:13 62:13 65:14 71:13 89:12 90:23 91:25 96:9 105:18 116:15 121:15 123:21 131:3 148:24

**benefits** 110:8

**bentley** 19:10 36:2

**bert** 12:18

**beth** 19:14,25 20:4,12

**better** 7:3

**beyond** 15:23 52:12 129:1 156:21 157:2

**biases** 156:12

**bid** 47:9

**big** 24:16 76:24 77:1,21 92:18 94:17 121:13

123:5 127:2 141:21 142:4

**bigger** 53:3

**billed** 17:20

**billing** 16:12 17:9 20:9

**billings** 17:5 20:25

**bit** 12:4 40:7 51:18 64:13,14 104:9 122:18 130:22 154:15

**bloomberg** 75:22 146:15

**blowout** 112:14 115:19

**blue** 74:6 102:22

**bonus** 20:25 21:7,9

**bonuses** 21:2

**bottom** 8:19

**break** 49:4,4,6 103:21 109:8 153:1 154:1,2

**breakdown** 88:4

**brien** 2:8 3:4 5:24,25 6:17 6:25 7:2,9 8:4 8:8,13 9:19 10:12 28:16 29:3 30:5 37:14,17,20,22 49:2,17 52:21

59:14 84:11 88:7 94:11 95:13 97:2 98:16 99:11 103:17,20 104:8,17 105:25 106:20 107:1,16 108:20 112:23 113:2,5,7 117:4,9,12,19 118:6,14 119:1 119:6,21 121:14,18 122:9 123:16 126:11 127:8 128:1,21 129:8 130:16 131:9 131:23 132:11 132:17 134:9 141:12 143:20 154:2,11 157:6 157:8

**bright** 151:14

**bring** 96:4

**brings** 42:22

**burn** 56:19

**business** 23:18 29:13 88:5 96:23,24 113:24 115:8 153:13,18

**buy** 133:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[c - causal]

| c | | | |
|---|---|---|---|
| **c** 46:3 | **camara** 1:9 3:9 | 11:22 12:5 | 148:14,23 |
| **c.v.** 23:1 25:15 | 4:9 86:9 105:6 | 14:20,23 15:2 | 150:13 158:13 |
| **ca** 159:9,12,21 | 105:8 107:3 | 15:3,4 17:8 | **caselaw** 34:19 |
| **calculate** 29:18 | 114:15 | 25:12,22,23 | 53:12 54:1 |
| 30:9 126:7,12 | **cammer** 34:24 | 28:7,24 29:7 | 149:16 |
| 126:14 132:18 | 39:5 41:13 | 30:1 32:13,15 | **cases** 9:16 |
| 132:19,24 | 42:9 45:22 | 33:10 34:6 | 14:15,17,25 |
| 139:20 148:10 | 46:3 50:9 | 35:8,8,20 39:1 | 15:5,9,25 16:4 |
| **calculated** 28:3 | 53:14,18,25 | 40:20 41:3 | 21:16 26:3,9 |
| 28:12 123:24 | 84:3 | 42:21 45:6 | 26:21,23 27:13 |
| 131:10 | **cancel** 72:16 | 47:17 52:15 | 27:24 28:1,5 |
| **calculating** | **cancelling** 71:1 | 59:13 66:18 | 29:23 30:18,22 |
| 27:23 48:15 | **capable** 27:22 | 75:16 81:2,4,7 | 30:25 31:5 |
| 125:16 130:10 | 32:2 137:17 | 81:10 86:7 | 34:25 35:4 |
| 130:18 132:22 | **capital** 131:5 | 91:2,25 92:12 | 41:16 54:5,21 |
| **calculation** | **capitalization** | 94:2 95:16 | 74:21 80:18,21 |
| 76:5 | 48:6,17 | 100:14,14 | 87:14 128:18 |
| **california** 1:23 | **capture** 134:25 | 101:7,7 102:19 | 133:6 135:15 |
| 2:10 4:16,18 | **capturing** | 104:11 105:1 | 152:7,14 |
| 5:14 6:13 | 110:10 | 105:17 107:14 | 153:11 |
| 158:2 | **career** 23:23 | 112:8 115:25 | **cash** 106:19 |
| **call** 3:16 39:17 | 24:19,24 26:17 | 116:22 117:3,6 | 129:22 130:5 |
| 45:15 46:5,6 | 65:21 87:13 | 117:23 118:3,9 | 143:10 144:14 |
| 46:19 47:1,4 | 151:4 | 118:16 119:3 | 144:16 152:25 |
| 60:5 80:19 | **careful** 56:7 | 124:5 126:8,13 | **casting** 135:6 |
| 105:7 107:3 | 62:2 82:7 | 126:23 127:2 | **categories** 38:8 |
| 113:10 | 94:10 136:19 | 127:10,11,18 | 40:7 95:11 |
| **called** 4:20 | 155:23 | 127:25 128:3 | **category** 38:9 |
| 15:13 27:2 | **carefully** 60:1 | 128:12,17 | 40:8,9,10 42:4 |
| 50:10,23 133:2 | 94:8 | 129:9,15,21 | 42:6 45:14 |
| **calls** 27:5 63:5 | **carol** 1:22 4:17 | 130:11,13,15 | 47:8 |
| 67:12,15 73:1 | 6:12 158:1,25 | 130:19 131:2,3 | **causal** 30:3 |
| 96:17 98:7 | **case** 1:8 4:8 | 131:11,14 | 90:6 97:25 |
| 99:1 | 5:12 8:15 9:7 | 135:19 137:25 | 99:9 128:13,24 |
| | 9:11,22 10:5 | 138:2,3 146:20 | 141:25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[causation - claims]

causation  9:17 16:4 25:4 29:1 31:6,8,16,21 33:2,11,16 44:11 45:6,11 77:10,13,16 78:2,4 86:25 97:13 98:6,11 99:4 132:1 139:19 140:5,9 140:11,17,22 141:1,3
cause  39:5 46:20 62:8 69:22 71:2 73:15,19 77:24 81:18 86:8 97:9 98:5,14 133:8 140:1,6 141:6 143:4 144:17
caused  28:22 29:24 65:5 89:23 90:9 96:8 149:21 150:4,6 156:23
causes  142:3 143:14,16
causing  102:23 124:12
caveat  58:24
ccp  159:9,12
ccr  1:23
cents  50:21

ceo  12:8 32:17 86:9
certain  13:22 39:1 43:23 55:2 62:2 64:6 67:6 74:20 77:9,14 87:17 87:23 93:10 109:15 114:10 141:6 149:15
certainly  26:1 70:5 118:3 126:15 129:4 144:10
certainty  144:20,24 145:1,2
certification  3:14 8:23 9:1 15:23 16:1 25:19 26:2,3 26:10 51:8 58:23 83:20 86:5 104:12 120:3 132:7
certified  4:17 16:2 67:21 129:19 158:1
certify  158:3,16
cfo  12:8,9
challenge  68:2 68:25 91:2 101:21 104:10 104:25 105:5 105:17 107:2

112:8 116:22 117:5 118:15 118:19,20 119:14,24
challenged  101:16 117:15 117:16 118:22 118:24
challenges  127:23
challenging  32:6
chance  145:11 145:12,14
change  9:4 16:14 48:22 59:2 61:15 62:1 70:21 72:11 73:16 75:12 149:4 161:4,7,10,13 161:16,19
changed  44:18 57:19 69:18,20 70:22 73:18 149:5
changes  23:5 39:10 57:24 60:2 75:17 77:25 98:2 99:10 110:18 146:1
characteristics  52:19

characterize  89:17 100:1,5
characterized  89:11
charge  16:9,25 17:1
charlesworth  19:14
check  18:12 35:25,25
checking  96:18
china  29:10
choose  45:19 58:15 76:17
chose  99:7
chronicle  71:7
chronicled  63:5 153:7
chronicles  121:2
chronology  35:11
chunk  101:3
circles  59:23
circuit  81:2 99:5 127:15 135:10
cite  41:11 84:22
cited  38:16,19 96:10
civil  159:19,21
claim  87:17
claims  36:22 128:19 131:3 146:25

Page 8

**[clarify - company's]**

clarify  66:19
86:23 141:6
148:5
class  3:13,14,15
8:23 9:1 11:5
11:24 15:19,23
16:1 25:19
26:1,3,10,14
27:21 30:9,16
30:21 31:1
35:9 36:23
38:23 40:18
44:25 45:4
46:11,21 49:25
51:7 58:23
65:13 67:11,18
67:20,24 83:20
86:5,20 90:25
91:10,20 92:10
93:4 100:19
103:2 104:12
120:3,14,17
124:8,10
128:23 129:18
129:19,20
131:4,20 132:7
132:23 134:6
134:12,15
136:4,6,13,14
136:17 137:15
139:20 142:19
142:23 146:5
147:4
classes  16:2

classified  27:23
28:12 29:18
123:25 125:16
clear  29:11,23
43:19 62:4,8
95:10 138:7
153:21
clearly  97:9
98:4 140:1,5
client  13:21
14:1,6 21:18
28:6,14,17,24
32:11 34:2
110:11
clients  14:2
22:18,20,25
24:2 92:6
close  19:25
26:7 32:19
45:1 109:24
closely  50:8
closet  138:21
closing  47:9
cocounsel
14:20,23
code  159:9,12
159:19,21
cohen  96:11
coincide  57:23
collect  17:9,11
collects  93:17
college  20:6
colors  54:7
column  63:10
79:12

columns  79:10
comcast  26:16
come  14:25
24:10 30:12
86:12
comes  15:18
21:11 28:20
42:18 93:22
126:2 132:7
134:4 138:1
comfortable
29:17 53:10
68:6 71:19
coming  115:24
116:8
commentary
56:23 90:7
100:8 101:13
121:8
commentators
29:12,25 44:21
72:6 73:3
146:9
committing
126:6,9
common  11:23
26:14
commonly
58:10 129:4
155:25
communicati...
28:15,17
companies
11:18 24:16
47:10,11,14,18

48:19 51:13
66:5 153:17
156:16
company  12:7
17:15 30:16
32:17 35:9,11
48:11,13 60:16
65:19 72:25
73:21 76:3,6,7
79:9 81:21,23
89:9,10,18
93:4 96:19,20
100:16 101:1,7
102:18,23
105:10 107:13
108:2 110:9,10
110:17 111:13
111:16 117:21
118:13 121:5
122:25 130:2
143:25 145:10
145:19 146:1
147:12 150:22
150:23 151:2,7
152:19
company's
29:10 61:13,14
66:9 72:11
78:8,10 89:22
91:8,19 92:4,9
92:25 96:22
100:8 101:10
101:23 102:4
106:4,10,19
112:13 117:1

Page 9

**[company's - considering]**

| | | | |
|---|---|---|---|
| 118:4 119:12 119:19 120:5 124:6,13,17,21 143:6,7 146:10 147:2 149:22 153:12 | **complexity** 155:2 156:7 | 99:2,17 101:14 103:10 | **connection** 30:3 44:4 98:1 99:9 141:25 |

118:4 119:12
119:19 120:5
124:6,13,17,21
143:6,7 146:10
147:2 149:22
153:12
**comparable**
48:19 153:16
**comparables**
48:6
**compensation**
17:4,16 20:18
20:24
**competitors**
48:7,10,19
**compiling**
19:13
**complaint** 22:9
40:12,19,19
41:2 85:8
86:13 91:23
100:11 101:19
103:7,9 119:25
120:11,24
125:8,13 128:9
132:3 133:24
**complete** 9:24
10:3 115:4
**completed** 37:3
159:7,17 160:6
**completion**
158:14 160:10
**complex** 55:24
94:9 156:14

**complexity**
155:2 156:7
**complicated**
133:9
**component**
136:3 152:20
152:25
**components**
32:4,9 153:18
**comprehensive**
25:16
**con** 45:9
**concealed**
29:22 135:3
147:8,18
148:18
**conceivable**
70:11
**concentration**
99:22 145:22
**concept** 50:22
97:22 110:12
135:6 150:1
**concerned**
45:11 69:13,16
69:17 153:24
**conclude** 82:9
**concludes**
157:11
**concluding**
82:2 140:5
**conclusion** 30:8
30:12 36:5
57:8 72:20
94:18,23 98:8

99:2,17 101:14
103:10
**concrete** 33:21
**condition** 61:13
82:1
**conditional**
63:12 64:2
79:11 153:7
**conduct** 95:7
**conducted** 39:5
56:20 62:13
70:10 150:15
**conducting**
60:1 65:18
**conference**
45:15 60:5
63:5 73:1
**conferences**
46:14
**confidence**
63:10,20,23
64:20 70:19
76:20 77:12
78:10,19 79:12
79:15,18 80:3
80:15
**confirm** 87:18
**confounding**
31:11,12 32:1
33:5,9,14,15
150:2,9,12,20
151:11,17
152:17
**confused**
122:11 130:22

**connection**
30:3 44:4 98:1
99:9 141:25
**connotations**
97:23
**consensus**
122:18,20
**conservatism**
32:8
**conservative**
71:5
**conservatively**
31:7 152:7
**consider** 11:16
21:18 50:1
51:12 52:2
54:13 56:9
60:3 81:22
82:24 83:8
94:8,13 106:18
130:4 134:20
135:24 145:16
145:18,23,25
151:21
**considered**
44:21 53:13
59:21 64:15
77:12 88:25
92:8 125:17
127:15 128:6
135:20 157:4
**considering**
43:2 60:1
126:15 136:19

Page 10

[consistent - countervailing]

**consistent**
11:24 26:14
36:7 69:19
70:21 71:10
72:13 78:14
87:5 93:8
98:14 99:7
100:13,22
116:15 124:1
127:6 128:8
134:24 137:24
138:14 147:12
**consistently**
24:25
**consisting** 92:5
**constant** 35:3
61:2
**constitutes**
150:23
**consulting** 17:1
17:12 23:11,14
24:1,4,5,8,9,10
24:12,22,23
25:3,5,6 40:9
42:5
**consumption**
92:16 93:13
96:12,15
**contact** 159:9
159:20
**contacted**
12:20,25 13:9
**contacts** 15:7
**contain** 9:24
10:3

**contains** 38:2
**contemporan...**
150:25
**context** 33:17
44:18 56:14
65:5 69:8 75:5
100:17 149:14
**contexts** 77:7
**contingent** 17:8
20:18,21
**continue** 5:4
120:7 142:20
156:10
**continuing**
155:13
**continuous**
124:19 147:12
**contracts** 101:4
123:2
**contrary**
100:10
**control** 75:24
75:25 152:3
**controlling**
51:7
**conversation**
152:12
**conversations**
5:2 85:10
86:14
**convey** 28:24
34:20 52:11
54:3
**conveyed** 28:6
30:23 51:25

78:12,21 83:14
**conveying** 79:8
**cooley** 2:8 4:15
5:25 6:3,5
**cooley.com**
2:11,12,12
**copy** 113:9
**corollary** 84:5
**corporate** 39:6
70:11 82:25
92:6,10 153:4
153:7
**corporations**
42:20
**correct** 8:16,17
9:23 10:21
12:16 16:7,8
20:20 23:9
31:19 35:15
38:4 46:2
49:25,25 54:9
65:13 70:20
77:17 86:2,3
87:15 90:17
98:20 104:19
104:20 112:21
116:22 117:6
119:3 122:15
122:23 123:25
131:11,12
133:8 137:3
151:25
**corrected** 101:1
124:11 133:11

**corrections**
159:14,15
160:3,4
**corrective**
31:15 33:11
65:21,24 66:16
66:21,23 68:10
84:24 87:3
89:20 99:23
116:2 120:20
120:22 121:3
121:16,23
123:11 126:3
133:7 134:4,5
135:2 140:14
141:18 142:2,4
142:12,24
147:17 148:17
150:18
**correctly**
115:15
**counsel** 3:2,15
5:8,21 14:22
27:3 36:20,25
37:3,6 40:8,16
41:5 85:10
86:15 125:9
152:13 159:18
159:22 160:7
**count** 26:6
127:22 142:14
**counted** 124:20
**countervailing**
71:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[country - date]**

| | | | |
|---|---|---|---|
| **country** 92:7 | **crazy** 35:25 | 108:6 | **daily** 47:8 59:2 |
| **couple** 26:6 | **create** 92:11 | **currently** 9:7 | 75:17 76:1 |
| 58:7 66:11 | 114:3 | 133:13 | 146:18 |
| 67:2 80:18 | **created** 115:10 | **curve** 144:1 | **damage** 25:3 |
| 85:23 | **creates** 143:13 | **custo** 21:17 | 26:19 44:8 |
| **course** 28:16 | **creating** 124:9 | **customer** 92:16 | 87:12 |
| 84:25 95:25 | 145:6 | 93:13 96:12,15 | **damages** 9:18 |
| 106:4 110:21 | **crept** 80:24 | 99:22 102:12 | 11:22 12:1 |
| 115:4 | **crisis** 138:8 | 102:16 106:7 | 16:3 25:20 |
| **court** 1:1 4:1 | **criteria** 39:9 | 107:13,18 | 26:13 27:23 |
| 5:11 6:10 8:22 | **criterions** 54:6 | 108:3,19,22 | 28:2,7,8,11,25 |
| 11:10,14 27:16 | **criticized** 27:18 | 109:2,10,12 | 29:7,18 30:9 |
| 27:19 36:16 | **crossing** 156:20 | 110:7 115:1,2 | 44:6,11 45:6 |
| 37:20 41:9 | **crux** 98:15 | 148:9 | 45:10 86:25 |
| 42:1 51:9 | 140:25 | **customer's** | 123:19,24 |
| 53:12,18 68:7 | **cs** 1:9 3:8,16 | 107:23 110:1 | 125:16,19,22 |
| 79:4 92:3 | 4:9 5:10 11:1 | 110:18 | 126:7,12,14 |
| 102:10,19 | 12:7,21,23 | **customers** | 127:3,20 128:8 |
| 139:6,12 | 38:20 47:9 | 93:17,25 94:25 | 128:11,20,22 |
| **court's** 22:8 | 48:7,16,19 | 95:3 96:1,1,3,4 | 129:5 130:7,10 |
| 53:25 91:12,23 | 52:1,3,3,16 | 96:24 97:1,1,8 | 130:18 131:1,6 |
| 101:19 103:8 | 53:17 54:6,8 | 100:12 102:15 | 131:10,14,17 |
| 125:9 128:10 | 62:9,9 75:16 | 105:12,12 | 131:18,22 |
| 132:4 | 86:8,20 87:24 | 106:11 108:7 | 132:2,18 133:5 |
| **courts** 26:19 | 88:9 92:15 | 109:3,6,9 | 135:11,22 |
| 35:16 53:12,14 | 113:9 116:10 | 110:17 113:25 | 139:18,20 |
| 77:9,11,14 | 120:7 129:16 | 114:24 121:10 | 147:15 148:10 |
| 80:14 99:5 | 142:18,20 | 124:20 | 148:25 149:4 |
| 125:24 127:16 | 144:2 157:1 | **cutoffs** 54:4 | 149:10,13,13 |
| 135:10 149:15 | 159:4 161:1 | **cv** 1:8 4:8 5:12 | 157:5 |
| 149:15 | **csr** 1:23 6:13 | | **data** 24:16 |
| **cowan** 92:14 | 158:25 | **d** | 42:14 47:11 |
| 96:19 101:6 | **current** 12:8 | **d** 122:21 | 48:1,10,23 |
| **crafting** 35:14 | 23:7 73:18 | **dad** 138:2 | **date** 13:2,3 |
| | 107:7,12,20 | **dae** 1:8 4:8 | 31:25 43:7,10 |
| | | 5:12 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[date - demonstrative]**

| | | | |
|---|---|---|---|
| 43:10 45:7 83:17 87:22 96:19 101:1 121:3 122:3 136:3 143:2 157:4,21 158:19 159:16 160:5 161:24 | day's 77:5 days 24:3 43:16 43:21 57:20 58:7 59:17,19 60:8 70:6,24 72:3,7 78:18 79:20,25 80:3 80:6 156:6 | 135:25 137:20 140:1,14 142:22,23 143:16,17,22 144:3,11 145:7 147:16 150:18 152:8 153:24 | defined 64:5 definitely 12:3 15:25 97:16 101:24 102:4 109:9 115:12 117:17 119:11 119:19 122:19 |
| dated 8:15 158:21 | deal 66:10 debate 64:14 64:22,25 | declined 124:24 declines 31:8 80:21 143:14 149:18 | definition 50:14 51:6,15 51:21 53:4 94:1 130:12 141:9 143:13 144:21 |
| dates 45:2,4 65:17 67:4 68:15 69:25 70:21 72:15,17 73:6 78:8 84:18 85:5,19 85:23 86:2 | debated 59:22 decades 137:1 decide 43:7 46:18 decided 36:14 36:16 152:11 | declining 124:8 decrease 72:8 decreases 114:2 deep 34:6 | definitions 50:4 degree 20:5 23:24 56:2 144:12 145:9 |
| daubert 127:23 dave 19:10 20:4 36:2 | deciding 36:12 decision 11:10 22:9 27:13 36:17 37:1 39:3 41:12,13 50:10 85:9 86:13 | defendant 5:9 defendants 1:10 2:7 3:8 4:10,20 6:1,4,6 12:5 27:2,4 40:14 42:19 85:9,12 86:14 91:8,21 92:4 100:23 102:12 105:6 119:23 120:14,16 125:10 138:8 | degrees 20:2 delayed 43:20 delisted 47:24 delivered 103:21 116:10 demonstrate 99:4 127:4 demonstrated 30:19,24 84:22 87:16 98:21 140:14 143:17 |
| day 32:18,19 36:6 43:14,15 55:10,10 56:12 57:16,17 58:5 58:8,18,23,25 59:2,6,11 61:2 67:2 72:9 73:20 79:20 81:21,23 82:3 97:10 98:5 135:2 140:2 155:14,17,20 155:25 156:21 156:23 157:2 | decisions 41:19 42:1,25 43:1 54:2 decline 29:13 29:24 31:25 32:18,22,24 45:7 84:24 89:24 90:9 97:10 98:5 122:4 124:13 134:23 135:1 | defense 27:3 42:21 define 57:12 61:16 64:8 76:14,17 89:7 | demonstrates 52:1 demonstrating 53:19 demonstrative 52:16 87:6 98:13 122:5 |

**[demonstrative - disclosed]**

141:11
**departments** 92:7
**depend** 126:22
**depended** 138:4
**dependence** 93:11
**dependent** 54:16 92:15 96:12
**depending** 56:5 56:13 76:16 103:6 137:22 144:4,7
**depends** 13:21 33:17 57:14 59:9 65:19 69:7 81:14 126:25 127:2 143:23,25 144:25 145:16 149:6 155:1,19
**deposed** 7:17
**deposition** 1:15 3:10 5:8,13 7:5 21:21,25 22:5 27:14 49:12,14 49:22 104:2,4 154:6,8 157:15 158:13 159:19 159:23,25 160:8,10
**derisking** 99:16 99:24 100:2

**describe** 11:8 11:21 21:13 50:1 62:19 75:7 76:13 90:5 108:1 111:13 115:12
**described** 51:8 51:9 53:18 54:7 71:5 76:15 92:9 99:4 102:19,24
**describes** 39:21 114:17 120:12 146:8
**describing** 64:20 96:20,22 110:6,14 115:9 115:13 116:9 135:5
**description** 3:7 48:22 84:14 108:16
**designed** 126:4
**destructive** 145:5
**detail** 12:4 40:7
**detailed** 88:3
**details** 94:20 121:12
**determinative** 85:15
**determine** 47:14 48:18 79:20 82:13 85:17 91:21

98:18 125:11 138:17,19,24 149:20
**determined** 34:1 131:13 137:4,11 139:8 159:18,23 160:7
**determining** 51:2 153:11
**development** 66:4,10
**dictating** 73:5
**difference** 95:11,25 97:13 140:4,21,25 144:19
**different** 16:25 19:18 33:19 35:11,12 50:21 76:16 77:5,7,8 93:16 95:14 96:2 114:2 117:11 122:18 128:20 129:12 131:4 136:9,11 137:14 139:4
**differentiate** 149:1
**differently** 144:23
**difficult** 33:16
**difficulties** 91:9 91:21 93:1

**digestion** 56:22
**diligent** 34:4
**dilution** 131:3 131:7
**direct** 15:7 30:2 85:14
**direction** 158:9
**directly** 12:24 14:20,24,25 18:15 19:9 30:3 85:20 150:17
**disaggregating** 150:1
**disappeared** 120:9
**disappointing** 143:23 144:7
**disclose** 68:13 85:12 87:2 100:18 119:23 120:14,22 124:6 142:8
**disclosed** 32:4 39:13 51:3 59:18 62:9 68:23 69:7,24 70:1 71:2 72:19,25 73:6 77:22 81:12 90:14 91:21 109:23 116:4 120:17 121:2 122:14 124:12 124:16 125:1,2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[disclosed - downloading]**

136:11,20
142:18 145:1
146:22 148:1,4
148:8,9,19,23
148:24 149:1,5
151:1,12 155:2
**discloses** 73:21
**disclosing**
144:19
**disclosure**
33:19 43:12
54:9 62:5
66:18 72:12
82:21,25 83:16
89:21,23 98:23
99:23 101:10
116:2 120:20
120:23 123:11
133:11 134:5
141:10 142:4
142:12,25
144:23,24
145:14 147:17
148:14 153:2
156:25
**disclosure's**
32:21
**disclosures**
31:16 33:22
36:6 39:6,23
44:22 52:18
63:1,6 65:12
68:10 71:12
78:10,20 91:20
91:24 92:25

97:17
**disco** 1:9 3:8,16
4:9 5:10 10:25
11:1,3,4 12:7
12:21,23 38:21
45:15 47:9
48:7,16,20
49:24 52:1,3
52:16 53:17
54:6,8 62:9,9
70:6 86:20
87:24 90:10
92:15 93:15
96:2 107:22
109:3,11,21
113:9 114:18
115:5,6,7
116:2,10 120:7
120:22 122:14
129:16 142:18
142:20 144:2
146:22 157:2
159:4 161:1
**disco's** 52:4
75:16 86:8
88:9 97:7
101:20 102:6
105:19 109:6
114:21 124:10
124:23 146:4
146:21 148:16
**discounted**
129:22 130:5
152:25

**discovered**
137:23
**discovery**
126:16 138:7
140:23 141:4
149:7 153:10
**discussed** 121:4
**discusses** 98:23
**discussing**
97:16 114:15
124:4
**discussion**
122:24 123:9
**discussions**
41:5 125:8
**disentangle**
31:11 32:3,9
150:17 153:15
153:18
**disentangling**
152:16,22
**dismiss** 12:10
22:9 36:17
37:1 40:15
41:1 85:9
86:14 125:10
128:10 132:6
**disseminated**
42:17 55:12,20
**distinction**
55:21 95:12
96:25
**district** 1:1,2
4:1,2 5:11,11

**diversification**
108:18 110:8
110:13
**diversified**
110:23 111:1
**division** 1:3 4:3
5:12
**divulging** 32:11
**document**
40:22 45:18
57:17 104:19
105:21 107:9
113:13 116:23
123:13
**documenting**
72:24
**documents**
22:7,11 38:3,5
38:8,8,10
40:10,16 42:5
113:9
**doing** 23:22
24:16 35:19
40:4 45:3
46:20 82:15
97:25 130:4
**dollar** 50:21
105:10 106:8
**dollars** 109:22
115:3
**doubt** 52:12
**downloaded**
40:13
**downloading**
19:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[downward - element]

| downward | e | easily 30:24 | effects 60:5 |
|---|---|---|---|
| 90:16 91:15 | e 46:3 122:21 | 65:4 | 63:8 71:8 |
| 96:7,7 122:22 | 159:9,12 160:1 | easy 32:2 | 144:18 151:1 |
| 138:11 146:24 | 161:3,3,3 | ebitda 122:21 | efficiency 25:4 |
| dozens 68:6 | earlier 37:12 | 147:7 151:12 | 27:6 30:20,24 |
| dr 6:17 49:19 | 51:6 55:4 | economic 9:18 | 34:22 35:5 |
| 154:12 | 69:12 90:24 | 34:20 52:9 | 36:7 44:4 46:1 |
| draft 34:14 | 91:11 114:16 | 78:3 93:7 95:8 | 47:6 48:2,24 |
| 35:21 | 120:14,17 | 97:16 118:4 | 49:1,20 50:5 |
| dramatically | 134:15 140:9 | 136:23 151:21 | 50:11,23,24 |
| 115:1 | 152:6 153:14 | economically | 51:21,24 52:20 |
| draw 21:7 | 154:15 | 72:5 82:25 | 53:11,19,24 |
| 29:16 | early 26:17 | 87:4 124:6,15 | 54:4 57:25 |
| drawing 55:21 | 36:21 65:21 | 143:4 | 58:23 60:14,20 |
| 96:25 | 85:23 102:21 | economics | 61:3 69:12 |
| driven 97:8 | earning 17:17 | 23:25 32:7 | 71:10,20 72:13 |
| 102:13,17 | earnings 3:16 | 110:13 152:20 | 78:2 81:20 |
| drop 96:8 | 24:10 39:10,17 | economist | 122:1 150:16 |
| 134:12,14 | 39:18 43:6,21 | 42:22 77:17 | efficient 11:5,6 |
| 153:20 | 45:22 46:4,6 | 95:7 97:15,23 | 30:17 49:25 |
| drops 79:24 | 46:13,19,21 | 120:19 136:21 | 50:2,20 51:15 |
| 138:10 | 47:1,4 63:1,4 | economists | 52:17 53:13 |
| drug 66:4,10 | 65:12 66:8,14 | 23:18 62:3 | 55:6 57:9 |
| due 13:3 37:13 | 66:15,23 67:1 | 149:17 | 72:11 77:18,21 |
| 135:2,25 | 67:4,12,15,25 | economy | 78:15 80:22 |
| 137:21 147:16 | 69:1,25 70:6 | 110:23 | 81:11,17 82:16 |
| 156:12 | 70:14 74:3,7 | ediscovery | 82:18 146:1 |
| dug 33:25 | 79:22 83:15 | 115:5,6 | 148:12,13 |
| duly 4:21 158:2 | 105:7 112:21 | effect 28:9 39:6 | 154:16,25 |
| 158:7 | 113:10 121:5 | 61:12 62:8 | 156:3 |
| duration 16:18 | 143:23 144:7 | 69:22 71:1,1 | either 76:24 |
| dynamic | 146:10,16 | 97:16 | 93:23 102:15 |
| 156:12 | 153:2 | effectively | 112:18 135:25 |
| dynamics 20:7 | easiest 104:11 | 17:15 34:20 | element 144:11 |
| 137:18 | | 108:19 | 149:12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [empirical - evidence]

empirical 55:23 60:13 156:9

empirically 143:17 155:4

empirics 56:14

employed 127:19,25

employee 158:17

encountered 27:24 28:5 30:22 58:4 66:4 74:20

endeavored 32:9 152:8

endeavors 50:25

endorsed 135:10

engaged 14:14 26:22

engagement 13:12,15,19,23 13:24 14:3,6 17:17 18:24 33:25

enron 139:4,6

entangling 153:9

entire 17:11 87:13 103:2

entirely 24:22 35:10

entirety 40:23 47:2 84:7

112:20

envision 133:10 145:1

equal 64:3 110:25 134:11

errata 159:14 159:16 160:3,5

esoterically 53:6

especially 59:16 153:2

esq 2:3,8,9,9

essentially 104:25

establishing 34:21 82:16 99:8

estate 15:11

estimate 31:22 126:5 127:20 128:8 130:7 131:1,6 135:11

estimated 11:23 26:13 28:7 44:11 63:8 128:20 134:3 157:5

estimating 45:10 125:19 129:5 132:22 133:14,23

estimation 12:1 16:4 125:22 147:23

et 5:9,10

event 11:25 18:13,13 19:15 28:3 32:3 33:12,21 35:10 36:2 39:4,8,9 43:8,10,15,17 44:16,19 45:1 45:4,8,10 46:20,24 56:17 56:20 57:16 58:6,9 60:1 62:6,7,21 65:17 66:13 69:9 70:10 71:24 72:1,17 75:6 78:8 83:15,16 84:3 84:5,24 85:23 87:3,4,21 88:1 95:7 97:25 98:14,18,19 100:2,6 101:1 116:9 121:1,3 125:21 126:3,4 128:7 129:14 129:23,25 130:8,25 132:21 134:5 135:2 141:10 141:22,24 145:8,24 146:7 147:19,22 148:17 149:18 150:3,7,18

151:10,17 152:3,15,22,23 152:24 153:22 156:22 157:2

events 31:8 39:14,15 40:1 42:8,12 45:22 46:17 60:7 63:1 65:22,24 66:21,23 67:1 67:6,9,14,25 68:2,9 71:11 74:2 78:25 79:22 133:7 147:20,21 153:7 156:24

eventual 145:15

eventually 23:22 112:17

everybody 55:4

evidence 29:11 30:20 33:2 34:21 51:24 52:9 55:23 57:25 58:11 59:3 61:3 73:4 77:12 81:22,24 83:14,18 87:4 87:22 93:7 98:12 126:16 136:23 138:7 140:11,16 149:7,20 151:21,22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[evidence - failed]**

153:10 156:22 157:1
**evidenced** 141:10
**evolve** 75:17
**evolved** 34:19 44:19 54:1 69:20 138:12
**evolves** 33:19
**evolving** 139:11
**exact** 13:2 142:6,17
**exactly** 14:19 61:24 62:19 79:6
**examination** 3:2,4 7:8 85:14
**examine** 35:4 60:14,23 85:20 85:22 141:24
**examined** 4:21 39:14,16 45:22 46:17 54:22 63:1 65:12
**examining** 57:18
**example** 29:8,9 32:13,14 33:3 33:10 54:24 55:3 68:24 76:19 114:18 116:8 138:1 145:10 148:7

**examples** 28:10 29:4 139:1
**excess** 53:17
**exchange** 47:18 48:12,14 156:18,19
**exchanges** 48:17
**excluded** 27:15
**exclusion** 89:1
**exclusive** 67:4
**exhibit** 3:7,8,11 3:12,16 6:20 6:20 7:6 8:9,10 22:14 36:10 37:14 42:9 48:5 49:21 62:14,20 71:14 72:18 79:2,6 84:10,15 90:5 104:13,14 112:25 113:3 116:8 121:16 121:25 146:13
**exhibits** 3:6 35:24
**exist** 125:12
**expand** 114:1
**expect** 61:7,25 68:14 69:5 72:10 107:17 111:4,10 114:6 115:11,14 144:22

**expectation** 112:3 115:17
**expectations** 71:3 72:10,12 73:19 78:12,21 106:18 112:1 112:11 114:10 115:20 122:17 122:17,18,20 124:22 143:15 146:4,17
**expected** 60:25 61:15,19 72:21 78:14 86:8 93:14 95:2 144:14
**expects** 109:11
**experience** 41:20 54:6 58:3 59:5 68:12 86:17
**expert** 8:6,14 8:22 12:21 13:1 17:5 25:6 25:13 49:21 134:25 138:2
**experts** 25:11
**explaining** 36:5 70:23
**explanation** 156:15
**exposure** 87:23 88:12 91:9 116:19 121:9 124:17 142:8

145:20 147:10 148:19
**exposures** 88:5
**extent** 10:10 28:13 55:2 71:17 109:15
**eye** 150:16

**f**

**f** 19:7
**facilitate** 52:19
**facing** 129:13
**fact** 34:10 53:1 87:19 145:12 148:22 149:11 149:19
**factor** 39:5,23 42:9 45:22 90:6
**factors** 32:2 33:6,14,15 34:24,25 35:1 35:2 40:3 76:6 135:4 136:1 150:2,6,20,21
**facts** 28:4 95:8 104:23 125:12 126:23 127:25 128:5 129:24 137:22 145:17 145:18 150:4,5 150:9
**fail** 100:18
**failed** 69:3 85:12 119:23 120:14 142:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[failure - formal]**

| | | | |
|---|---|---|---|
| **failure** 68:13 87:2 124:6 | 120:8 142:21 | 114:19,20 | **fluctuation** 107:23 108:7 110:2 |
| **fair** 18:7 24:6 28:18 47:7 52:22 154:18 | **filed** 5:10 8:22 | **firm's** 114:21 | **fluctuations** 107:19 108:17 109:13 110:5 111:14 |
| **fairly** 11:15 51:11 92:11 | **filing** 39:19 134:6 | **first** 4:21 6:19 10:24 12:25 13:9 17:7 22:12 23:16 25:12 40:10 59:25 62:25 63:3 67:2 70:24 72:9 82:16 84:21 91:12 100:19 105:4 107:21 108:23 111:23 139:17 | |
| **false** 87:12 102:15 | **filings** 38:20 39:1 40:3 73:1 | | **fluid** 20:7 |
| **familiar** 12:17 12:19 14:13 110:12 149:16 | **fill** 35:24 | | **flying** 54:7 |
| | **fillings** 38:22 | | **focus** 46:19 |
| | **filters** 47:20,25 | | **focused** 45:1 46:6 |
| **far** 17:20 79:12 80:19 93:24 129:4 155:18 | **final** 3:16 45:8 63:10 83:15 122:3 134:4,14 | | **focusing** 26:21 35:20 |
| **fashioned** 127:5 | **finality** 75:4 | **five** 39:14,15 40:1 42:12 43:21 45:4,21 46:17,21 57:20 62:25 67:9 70:20,21 73:6 78:25 79:21 109:1 | **follow** 71:14 |
| | **finalized** 37:7 37:11 | | **following** 67:17 82:6 91:16 115:23 |
| **father** 23:20 | **finance** 53:9 153:5,6,23 | | |
| **faye** 19:7,22 20:1,3,12 | **financial** 23:25 32:7 61:13 90:13 110:13 152:20 | | **follows** 107:3 159:8 |
| **fda** 66:7 | | | **forces** 76:8 |
| **february** 146:22 | **financially** 5:18 158:16 | **flashing** 141:21 142:4 | **forecasts** 112:19 |
| **federal** 158:13 160:1,8,9 | **find** 11:11 35:7 57:19 62:7 68:12 75:21 88:18,19,23 90:21 | **flesh** 94:19 | **foregoing** 158:4,6,10,12 |
| **feel** 29:17 31:17 34:7 67:7 68:6 71:23 139:14 | | **floor** 2:4 | **form** 10:6 29:19 35:13 39:11 50:10 52:8 59:8 81:16 84:9 94:6 124:21 127:12 133:25 143:1 152:5 |
| | | **flow** 60:2 129:22 130:5 152:25 | |
| **feeling** 49:3 | **finding** 127:6 | | |
| **fell** 48:16 | **firm** 2:3 6:8 13:16 14:10,11 14:13 15:1 19:8,25 20:15 21:11 35:18 40:11,13 88:2 | **flows** 106:19 143:10 144:14 144:16 | |
| **felt** 28:11 139:13 | | | |
| | | **fluctuate** 135:16 | |
| **fifth** 113:20 | | | **formal** 101:22 |
| **figure** 108:3 109:1,2,10 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[formally - goes]

formally  13:5
formed  112:11
former  12:8
  86:9
forming  38:6
fort  19:7
forth  4:22 9:21
  9:25 42:22
  71:13 77:2
  84:7 115:17
  121:16 158:5
forward  88:16
  101:9,13 102:4
  106:4,19 112:4
  117:1 121:11
  123:6 142:11
  142:15 143:6,8
  143:15 151:22
found  49:24
  59:22 70:16,20
  73:25 87:22
foundation
  93:6 124:21
founded  23:20
four  19:5 25:2
  43:15,16,21
  105:1 119:2
  154:8 157:13
fourth  63:3
  146:17
fraud  11:15
  28:22 29:1,5,6
  32:1 51:10
  135:4 136:1
  137:21 138:5

138:12 139:10
149:13,14,23
150:10,22,23
151:3,7 152:4
152:24 153:13
153:19
frcp  160:1
freaked  29:25
free  71:23
fresh  41:14
frisbee  7:3
front  36:18
  85:18 137:7,14
full  58:24 78:7
  83:16 90:13
  140:22 155:23
fully  50:12,15
  50:18,20 52:13
  54:20 56:1
  58:2 135:22,24
  151:18 155:7
  155:25
function  75:18
  146:15
fundamental
  50:23
further  10:10
  43:19 110:4
  156:24,24
  157:6 158:12
  158:16
future  89:1
  106:13 107:12
  107:15 108:9
  108:16 109:19

111:5,7,11
112:9 114:11
115:21 118:5
119:12,20
124:20 143:10
143:10 145:5

### g

gambrill  1:5
  4:5 5:9 159:4
  161:1
ganapathi  2:9
  6:2,3
general  29:9
  51:15 88:2
  95:1 110:16
  114:23 117:21
  143:21 148:13
generally  11:4
  11:6,16,22
  13:18 25:24
  50:1 51:12,15
  52:2 56:4 65:8
  76:13 78:11,20
  79:23 90:1
  96:2,15 101:24
  111:19 112:6
  135:8
generate  17:5
generated
  47:20
generator
  47:16
getting  16:3
  122:11

giant  141:21
give  29:8 32:12
  104:25
given  18:22
  31:25 32:18
  34:18 44:17,19
  50:19 52:14
  53:6,7 62:5
  73:20 82:12
  92:13 102:20
  110:18 111:2
  116:19 133:11
  134:7 140:12
  151:11 157:11
  158:11
gives  76:2
giving  55:16
glickenhouse
  81:2
go  5:5 6:19 8:8
  10:16 15:23
  16:16 22:14
  25:22 43:9,11
  43:13,13,14,16
  43:19 53:23
  67:17 74:3
  103:21 110:4
  126:18 129:4
  129:25 130:8
  133:8,8 155:18
  156:6,21 157:2
goal  103:1
  111:18 112:6
goes  16:19,20
  129:1 152:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[going - happens]**

**going** 4:24 6:19 6:20 7:21 8:8 16:17 17:15 49:2,5 51:17 64:11 66:6 70:1 72:12 73:15 75:8 79:25 101:13 103:16 104:13 104:21 108:12 109:16 110:18 112:4 117:12 118:24 121:11 132:2 134:11 142:15 143:8 144:10 151:22
**goldman** 42:18 55:3 97:20
**good** 4:23 5:24 6:2,17,24 8:12 23:23 54:14 57:21 67:7 70:25 72:15 77:5 103:18,23 110:8 111:15 111:20 139:15 153:25
**gosh** 88:16
**gradual** 56:18 80:20 102:13
**gradually** 80:22
**graduated** 138:5,11

**graduating** 139:2
**graduation** 137:22 138:16 138:18,19,25
**granted** 156:8
**great** 8:4 38:1 112:24
**greater** 63:13 64:3 93:14 95:2 144:12
**grew** 23:20
**ground** 77:2
**group** 17:12 23:11,14,17 24:5 25:6 40:9 42:6 55:5
**group's** 24:9
**grow** 100:12
**growing** 109:21
**grows** 100:16 107:13,13,15 107:18,22 108:3 109:21 110:7
**growth** 85:13 88:2 92:4,17 97:8 100:19 101:12,12 103:1 110:10 111:14,18,22 112:4,7,9 114:3,5 115:10 115:16,21,25 116:3,21 117:2

118:5,7 119:8 119:11,12,19 124:22 142:11 143:6,8 144:1 146:10 147:3,3
**guard** 24:19
**guess** 13:4 22:22 33:4 50:4,8 54:11 62:19 79:2 86:17 100:3 110:11 114:8 115:23 134:8 138:18
**guidance** 39:10 71:4,5 88:13 88:16,16,19,20 89:2,23 90:17 90:19 91:15 92:13 96:8 100:10 101:4,9 101:20,23 103:5 105:20 106:3,13 112:17 114:5 116:14,16 119:15,18 121:7,11 122:14,19,22 123:6,6 142:13 142:19 143:18 143:23 144:7 146:4,21 147:1 147:1,7,7 151:12,12

**guide** 90:6 92:14,19 116:11
**guidelines** 53:13,25
**guiding** 88:22 116:18
**guys** 49:3

**h**

**h** 161:3
**hair's** 132:10
**haircut** 134:22
**half** 17:15 21:22 121:7 123:6
**halliburton** 11:9 41:12 51:9 141:9
**hand** 6:14 34:9 129:15
**handed** 120:3
**handful** 97:8 100:21
**handled** 159:8
**hanover** 2:10 4:16 5:13
**happen** 110:22 145:7
**happened** 23:2 30:14 56:15 57:15 74:10
**happening** 34:3 109:15
**happens** 21:8 36:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[happy - including]**

**happy** 49:4,4
 86:6 103:21
**harassment**
 36:22
**hard** 14:19
 31:11 115:23
**harder** 55:25
**hear** 7:22 54:18
**heard** 12:21
 24:7 93:10
**help** 36:15
 140:3 153:17
**helped** 19:15
 138:2,20
**helpful** 65:2
 68:7 153:9
**hereinafter**
 4:22
**hey** 74:9
**high** 10:23
 11:21 65:1,1
 100:19 115:21
 116:19 123:4
**higher** 65:8
 132:12 144:17
 145:9
**historical** 42:19
**historically**
 42:16 77:10
 105:11 108:24
**history** 14:2,5
 35:11 106:10
**hit** 123:2,10
**hmm** 89:25

**hoc** 103:3
**hold** 108:19
**hone** 153:19
**hoping** 116:18
**hotly** 59:22
**hour** 16:6
 20:11 21:23
**hourly** 16:12
 17:2,10,11,14
 21:5
**hours** 18:8,11
 18:15,18,24
 21:6
**household** 81:1
**huge** 21:19
 77:24 111:24
 115:10 138:8
**huh** 74:10
**human** 156:12
**hundred** 17:24
 17:25 18:1,5
 18:11,15 47:13
 95:10 109:24
 109:25
**hundreds**
 45:18 70:12
 109:23 125:23
**hynes** 2:15 5:15
**hypothesis**
 148:12
**hypothetical**
 94:18 145:3
**hypothetically**
 28:21

**i**

**icmx** 156:18
**idea** 120:18
**identification**
 7:7 8:11
 104:15 113:4
**identified** 9:11
 73:8 146:13
**identify** 38:9
 41:2 150:12
**imagine** 70:11
 129:11,17
**immaterial**
 60:22
**immediately**
 38:15 148:17
**impact** 31:2,5
 41:8 43:10
 55:8 61:8 70:2
 77:13,16 83:1
 83:9,11,18,19
 84:7,16,17,22
 85:5,16,18,25
 86:24 87:6,9
 91:5,7 93:7,8
 94:3,25 97:14
 97:16,18 98:11
 98:13,25 99:6
 99:17,25 100:4
 103:10 107:22
 110:1,19
 117:22 122:2,5
 123:5 126:5
 140:8,13,25
 141:4,11

 155:22,24
**impacts** 32:5
 69:14,14 108:6
**impede** 54:20
**impetus** 65:5
**implemented**
 44:8 137:16
**implementing**
 134:21,22
**implies** 108:2,8
 109:2,9,14
**imply** 108:25
 135:14
**implying**
 107:14
**importance**
 77:8
**important**
 44:22 77:23
 108:18 153:10
**impossible**
 52:12 152:9
**impound** 55:9
**include** 15:2
 36:12 47:15
 66:20 68:9
 83:11 112:19
 133:13,22
**included** 31:7
 67:3 83:24
 84:4 159:14
 160:3
**including** 31:21
 68:10 150:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[income - investment]

| | | | |
|---|---|---|---|
| **income** 21:11 100:13 | **inflated** 126:2 | 62:5,9 65:6 | **initial** 156:25 |
| **incorporated** 52:7 53:2 55:14 56:4 59:6 | **inflation** 31:22 124:9 126:2 129:6 132:19 132:22,23,25 | 68:7,16 69:18 69:20,24 70:1 70:7,22,25 71:2 72:4,8,19 | **initially** 90:20 111:21 112:15 |
| **increase** 72:6 84:23 86:8 | 133:3,4,8,14,24 134:2,6,11,15 | 73:6,9,23 77:22,23 78:13 | **inquiry** 51:7 |
| **increases** 110:17 114:2 | 135:14 136:6 136:15 137:5,6 | 78:22 81:13,17 81:22,25 82:2 | **insignificant** 21:14 71:9 |
| **increasing** 100:17 | 137:7,12,13,14 138:6,10,11 | 82:10,14,18,21 85:13 86:19 | **instance** 53:14 136:13 |
| **incremental** 39:22 61:18 62:4 | 149:14,15,21 149:21 | 87:3,17,19 88:3 98:1 99:9 | **instances** 73:1 130:3 |
| **incrementally** 67:3 | **influence** 61:1 | 106:9 120:16 124:7,16,25 | **instructed** 87:13 |
| **index** 3:1 75:18 75:19,23 | **influenced** 44:22 45:12 58:6 | 136:10 141:18 141:19 142:2 | **insurance** 24:16 |
| **indicated** 93:11 | **influences** 76:1 76:2 | 143:4 148:18 150:9,12,22,24 | **intend** 9:10 10:4,7 |
| **indication** 109:5 | **inform** 48:2,23 | 150:25 151:8 151:11,17,24 | **intent** 10:13 |
| **individual** 32:9 | **information** 31:11 32:4,10 | 152:4,17 153:15 154:17 | **interactions** 12:15 |
| **individually** 1:5 4:5 | 32:12,25 34:1 39:22,22 45:12 | 154:19 155:1,3 155:8,16,19,22 | **interested** 5:18 56:14 158:17 |
| **individuals** 19:2,4,18 | 50:12,19 51:3 52:6,13,18,25 | 155:25 156:3,7 | **internet** 54:19 75:13 |
| **induced** 149:13 149:14,23 | 53:1,6 54:9,12 54:13,18,19 | **informational** 33:22 44:18 | **interrogated** 4:22 |
| **inducing** 32:23 87:3 | 55:7,9,12,25 57:19 58:2 | 50:24 56:17 69:13 97:17 | **interrupting** 42:10 |
| **industry** 63:8 75:19 76:1,8 102:20 145:19 151:1 | 59:6,16,16,18 59:20,22 60:15 60:19,22,25 61:7,17,18,21 61:22,25 62:3 | **informational...** 50:20 **inherent** 113:24 | **interval** 70:19 **intraday** 155:9 **introduce** 6:10 **investigations** 75:2 **investment** 15:14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[investor - language]

**investor** 46:14 145:21
**investors** 38:23 52:2 55:9 87:25 93:23 94:3 100:24 102:15 106:18 112:12 143:5 144:17
**involve** 119:11
**involved** 14:21 14:21 16:1 131:2 135:15 156:20
**involves** 97:24
**isolate** 135:1,25 150:3 152:8 153:23
**isolating** 70:1 137:20
**issue** 35:9 43:5 52:23 54:22 86:7 115:25 152:24
**issued** 28:2 30:19 67:20 81:21 82:12 90:10,20 146:21
**issues** 9:15 10:10 34:9
**it'll** 59:10
**items** 38:14 72:19

**ivanowsky** 2:9 6:5,5

**j**

**january** 16:12 105:2 146:23
**jeffries** 116:9
**job** 157:23
**johnny** 74:15
**jonathan** 2:3 6:7 21:22 159:1
**journey** 105:11 108:2,24 114:16,24 115:5
**jstern** 2:5 159:2
**judgment** 127:23
**july** 13:4

**k**

**k** 39:11,19,20
**keep** 49:4 115:24 118:7 151:20
**kind** 13:20 14:1 14:22 16:16 18:21 25:23 26:15,17 33:6 55:17 56:13 59:19 60:7 61:19 65:5 74:5,11 77:3 79:8 80:24 102:23 103:3

110:24 115:9 129:24 135:5 145:20 155:19
**kiwi** 1:9 3:9 4:9 114:15
**knew** 91:8 138:8
**knock** 60:4
**know** 10:18 12:5,9,12 14:12,17,24 15:11 16:3 17:19,22 18:8 18:12,18 19:11 20:9,14,16 21:10,16,17 23:21,21 25:18 26:5 28:1,20 28:23,23 33:15 33:20 34:8 36:11,17 38:18 39:18,21 43:5 43:6,9 49:3 50:15,18 52:24 54:21 55:3 56:19 57:14,20 58:5 59:10,15 59:17,18 60:8 68:24 69:2,9 71:4,4,18 72:4 74:1,13,20,24 77:6,14 81:19 82:19 86:6 87:25 88:12 89:9 90:5,8,10

90:19 91:23 92:22 93:1,16 93:23 94:1,2,3 94:7,14 95:1,5 97:15 98:10,23 99:3 102:23 103:18 109:1 109:22 110:24 114:17 117:14 118:18,21,25 122:13 125:3 127:24 129:3,5 129:12 130:1 136:1,9 137:25 139:23 140:4 140:10 141:5 142:8,14 146:9 148:3 149:10 150:21 151:18 152:12,21
**known** 81:15 86:20 124:9,22 125:21 137:23 144:15
**knows** 145:12
**krogman** 34:24
**ks** 66:9

**l**

**lack** 61:5
**lafair** 1:9 4:9 105:6 113:22
**lafair's** 3:9
**lambert** 19:11
**language** 11:14 99:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[large - longer]

| | | | |
|---|---|---|---|
| **large** 87:23 88:5,8,13,15 89:1,4,5,7,11 89:14,15,18 91:10 92:15 93:11,13,25 94:25 95:2,16 96:1,1,12,15,23 97:1,1,9 99:21 100:21 102:17 103:3 112:16 112:16 116:20 120:8 121:10 123:2 124:18 142:9,13,22 147:11 148:8 148:19 151:13 **largely** 72:9 85:22 **larger** 110:7,7 145:6 **largest** 76:22 **law** 3:13 6:7 13:16 14:10,11 14:13 15:1 21:11 40:11 96:11 114:19 114:19,21 116:10 **lawsuit** 102:22 **lawyer** 118:23 **layperson** 63:22 **lays** 104:25 | **lead** 12:12 14:22 129:24 **leads** 60:9 99:17 **leakage** 80:20 **learn** 94:4 **learned** 124:23 **led** 29:6 **left** 7:13 **legal** 5:16 41:22,25 42:3 51:6 61:11 97:24 98:7,10 99:1 102:20 113:25 157:14 159:7 **length** 155:6 **lengths** 155:7 **lens** 45:10 **letter** 13:12,15 13:23 14:4,6 **letters** 13:19,24 **level** 10:23 11:21 59:3 63:11,20,23 64:20 73:18 76:20 78:10,19 79:12,18 80:3 80:7,10,12,15 105:10 106:8 111:2,4,6 114:6 144:14 **levels** 77:12 79:15 | **levinson** 41:13 **liability** 11:25 26:15 28:4 85:11 87:1,5 93:6 98:15,20 103:15 120:19 122:7 124:2,3 125:5,7,25 127:3,4,6,7 128:6,9 129:7 129:16 134:8 134:25 135:13 136:2,22 137:3 137:24 138:4 138:15 140:12 141:7 147:6 149:7 **life** 33:19 58:16 **life's** 77:3 **likely** 70:5 **limit** 77:16 **limitation** 132:8 **limited** 77:10 92:19 94:18 **line** 29:16 32:21 38:18 78:11,20 112:1 121:6 122:20 159:15 160:4 161:4,7,10,13 161:16,19 **linear** 92:11 **lineary** 130:6 | **liquidity** 138:8 **list** 25:14,16 28:2 38:2,9 **listed** 38:15,24 45:17 47:18 48:13 **lists** 27:12 48:5 48:5 **literature** 55:24 58:11 153:5,5 156:9 156:13 **litigation** 13:1 20:19 23:6 24:3,8,10,12,22 24:23 25:3 51:1 58:20 92:6,11 125:18 127:17 130:24 136:25 **little** 36:4 40:6 51:18 64:13 77:5,23 104:9 122:18 130:22 133:9 154:15 **llp** 2:8 4:15 **location** 5:13 **locked** 159:12 160:1 **long** 14:2 35:19 56:15 58:12,17 80:20 103:4 156:2 **longer** 34:1 36:21,22 55:11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[longer - market]**

| | | m | mark 6:19 8:9 |
|---|---|---|---|

55:25 58:6,21 88:15
**longest** 18:14 156:2
**look** 40:2 42:23 44:12 45:9 46:15 57:4 60:12 64:10 65:17 67:13,14 67:14 68:1 70:14 77:4 79:19,23 86:1 101:15 104:12 105:4 106:13 106:14 112:23 113:20 117:20 117:22 122:16 146:19
**looked** 40:2 44:1 46:12 48:13 66:8 71:12 78:25 79:21 101:18 135:18 146:4
**looking** 25:14 30:3 34:2 40:6 43:8 44:14,15 44:20 45:2 66:16 67:7 68:3 70:8 72:9 72:18 73:7 75:10 97:25 120:2 145:25 153:4,17

**looks** 33:21 51:16
**loosely** 135:20
**losing** 66:5
**loss** 9:17 16:4 25:4 28:21,25 31:6,8,16,20 32:23 33:2,11 33:16 44:11 45:6,11 77:10 77:13,16 86:24 87:3 99:4 128:14,25 132:1 139:19 140:4,8,11,16 140:21 141:1,3
**losses** 136:24
**lot** 31:10 38:7 54:5 64:13,16 69:25 77:1 145:23
**lottery** 66:7
**low** 64:23,24
**lower** 21:5 64:16
**lowered** 88:20 116:11 121:7 123:7 143:18
**lowering** 100:9 142:13 143:15
**lucky** 6:20
**lunch** 103:20
**lynn** 1:5 4:5 5:9 159:4 161:1

**m** 46:3,3
**machine** 158:8
**made** 39:3 62:2 80:24 87:7 88:9 91:2,17 119:24 142:9 158:8
**madison** 2:4
**magnitude** 63:13 76:23 143:22 144:10
**maintained** 42:16 73:19
**maintenance** 85:11 124:5
**majority** 155:15
**make** 33:15,23 34:7 36:1 44:17 55:12 58:17 66:6 82:5 94:17 103:9 153:21 159:14 160:3
**makes** 89:14 118:21
**making** 42:24 43:1
**management** 15:14 90:7
**manager** 19:8
**manner** 11:24 124:1 127:5 128:8

**mark** 6:19 8:9 104:13 112:25
**marked** 7:6 8:10 104:14 113:3
**marker** 155:20
**market** 10:25 11:4,15,16,18 25:4 27:6 30:17,20,23 32:19 34:21 35:4 36:7 44:4 45:25 47:6 48:2,6,17,24 49:1,19,24 50:2,5,11,23 51:10,11,14,21 51:24 52:1,17 52:19 53:11,24 54:4 55:6 56:23 57:9,25 58:22 60:14,20 61:3 63:8 69:12 71:10,17 71:18,19 72:11 72:21 75:18,25 76:5,8 77:18 77:21 78:2,15 80:23 81:11,17 81:19,23,25 82:2,14,17 87:23 100:7 101:13 111:4 111:10 114:10 119:23 121:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[market - methodology]

122:17 124:12 124:22 143:12 144:3,6,22 145:13 146:1,3 147:14 148:12 148:20 150:16 151:1 154:16 154:19,19,25 155:16 156:4 156:17

**market's** 78:11 82:9,16 94:23 149:21

**markets** 51:16 145:6 148:13

**marks** 49:13 104:3 154:7

**massive** 144:17

**masters** 20:3,5 23:24

**match** 30:2 136:7 141:21 141:21,25 142:4 151:14

**material** 11:17 51:12 52:3,18 59:1 60:15,20 61:8,10,11,12 72:5 82:25 85:12 87:2 124:7,15 143:4

**materiality** 9:18

**materialization** 147:8,17

**materials** 10:11 22:2 38:13 90:22

**matter** 5:9 14:7 16:7,18,18 17:17,20 18:9 31:24 91:3,4 110:16,22 117:17 118:21 127:19 139:20 142:6,17 143:21 154:19 155:4

**matters** 15:22 19:18 42:3 56:2 102:14 113:25 114:1 120:9,9 142:22

**mature** 92:5 100:12 102:14 109:7,9,10 124:19

**maturity** 108:4 109:3

**maximum** 138:6,10

**mba** 20:4

**mean** 11:7 22:22 26:8 29:20 56:8,10 56:11,12 61:19 68:21,22 73:12 73:13,15 77:19 80:4 84:21 85:22 94:17

95:6,9 97:18 101:18,22 107:21 108:23 110:10 111:2 117:14 120:2 128:18 129:11 130:14 132:21 133:18 134:2 135:8 140:10 142:7 143:15 146:7 148:3 150:15 151:9

**meaning** 41:25

**meanings** 76:16

**means** 76:21 77:20 98:24 108:10

**meant** 89:4

**measure** 63:21 63:23

**media** 5:7 49:14 56:24 104:4 154:8 157:13

**meet** 21:20 22:4 71:3 72:12 116:3 122:14

**meeting** 111:18

**meetings** 30:8

**meets** 54:6

**melting** 29:11

**members** 18:17 22:4

**memorandum** 3:13

**mention** 119:7 119:14,18

**mentioned** 40:25 80:13 113:23 153:14

**merit** 25:20,25

**merits** 9:16 97:19 99:5 141:8

**met** 12:14 21:22,24 72:10 122:16

**method** 127:21 130:10,18 133:14,22 134:4 147:19

**methodology** 11:23 12:1 26:13,20 27:22 28:3 32:3 44:9 45:5 68:8 70:14 98:17 123:20 125:15 125:21,22 126:7,14,22 127:5,9,11,13 128:3,7,11,22 129:10,25 131:17 132:19 141:16 147:23 147:23 148:10 152:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[methodology's - nature]

| | | | |
|---|---|---|---|
| **methodology's** 67:23 129:14 | **misconception** 149:22 | **mix** 45:12 69:17,19 70:24 72:15 78:12,21 | 132:5 |
| **methods** 136:24 139:2 | **misleading** 86:7 142:11 | **model** 75:15 113:24 128:20 | **motions** 40:14 85:9 86:14 125:10 127:23 |
| **mic** 132:10 | **misled** 102:15 | 129:21 130:5 | **mouth** 30:7 |
| **michael** 1:9 3:9 4:9 113:22 | **mismatch** 33:6 141:17 142:17 | 131:22 134:21 137:16,19 | **move** 49:2 |
| **microphones** 5:1 | **misremember...** 15:17 | 138:14 148:25 150:15 152:3 | **moved** 50:22 65:22 |
| **middle** 120:4 | **misrepresent...** 84:18,23 85:5 | 153:22 | **movement** 61:5 80:5 150:4,6 |
| **million** 38:16 88:21,21,23 | 85:19 86:2 112:12 128:13 | **model's** 137:17 | **movements** 79:24 |
| 109:24,25 | 128:25 136:16 | **modeling** 152:25 | **moving** 21:20 42:4 114:19 |
| **millions** 109:22 109:24 | **misrepresent...** 36:21 85:15 | **models** 55:22 84:15 156:5,8 | **multiday** 60:9 |
| **mind** 11:19 12:11 14:25 | 102:3 117:1,18 151:15 | **modest** 11:15 51:11 | **multimillion** 105:10 106:8 115:3 |
| 15:18 28:20 42:18 70:23 | **misrepresented** 29:22 92:4 | **modification** 141:7 | **multiple** 31:15 93:15 114:25 |
| 82:5 97:14 123:18 138:1 | 100:23 120:13 | **modified** 132:4 | 127:15 |
| **minded** 126:21 | **misstatement** 31:3 91:12 | **moment** 104:25 | **multiples** 153:17 |
| **minus** 43:14 | 139:25 | **money** 66:5,6 | **mute** 5:3 71:8 |
| **minute** 94:12 | **misstatements** 36:18 68:10,12 | **months** 13:3 120:10 156:10 | **mutually** 67:4 |
| **minutes** 58:15 58:15 154:20 | 83:10 85:24 | **morning** 4:23 5:24 6:2,17 | **n** |
| 155:12,12 | 93:9 97:6 98:4 98:24 99:15,21 | **mortgage** 15:16 | **name** 5:15 6:12 12:17 32:15 |
| **mis** 136:16 | 102:9 117:24 | **motion** 3:12,13 | 81:5 158:20 |
| **misapprehen...** 149:22 | 118:2,8,12 122:6 125:20 | 8:23,25 12:10 22:9 36:17 | **narrow** 116:10 |
| **mischaracteri...** 103:12 108:13 | 126:1 133:7 142:1 | 37:1 41:1 86:5 104:13,22 | **nasdaq** 48:11 156:17,18 |
| 116:5 117:25 121:17,21 | | 120:3 128:10 | **national** 156:17 |
| 130:20 140:18 | | | **nature** 91:11 102:20 |

[nearer - observed]

**nearer** 92:20
**necessarily**
  39:23 58:1
  65:2 68:15
  73:16,24 75:3
  98:24 155:24
**necessary**
  10:10 14:3
  82:1 135:19,21
  137:22 159:14
  160:3
**need** 51:17 61:8
  82:12 129:24
  132:19,24
  133:2 135:25
  157:2
**needs** 134:25
**negative** 72:7
  76:25 78:13
  115:13 153:12
**negatively** 71:6
**neither** 158:16
**net** 63:7 76:8
**networks**
  156:20
**nevada** 1:23
**never** 12:14,23
  42:2,3 123:18
**new** 2:5,5 39:22
  47:18 48:12,14
  49:2 60:15,19
  60:22 61:8,16
  61:19,22 62:3
  62:8 70:7
  81:15 82:21

  114:20,21
  132:7 141:5
  148:18,18
  156:18
**news** 29:12,25
  43:2 44:21
  45:14,16 56:22
  56:24 57:21,22
  60:2 72:5,15
  73:3 76:6
  77:24 79:20
  81:23 146:8
  153:12
**nice** 92:22
**non** 130:6
  136:1 150:22
  150:23 151:7
  152:4
**nonrecurring**
  112:16 116:20
**normal** 101:5,8
**notating**
  159:15 160:4
**note** 5:1 42:15
  50:3 60:13
  78:6 86:6
**notes** 96:10
  102:19 113:23
**nothing's** 17:8
**notice** 3:9 7:4
  7:10,12,15
**noticing** 5:23
**noting** 139:24
**notion** 81:25
  149:12

**nuances** 75:6
  135:12
**number** 3:8,11
  3:12,16 5:12
  6:13,20 7:6
  8:10 26:5
  30:13 47:16
  49:14 67:6,22
  79:15 104:4,14
  110:17 113:3
  120:8 142:21
  154:8 157:13
  159:15 160:4
**numbering**
  79:4
**numbers** 35:24
  35:25
**numerous**
  52:19
**nye** 1:16 3:10
  3:11 4:19 5:8
  6:17 49:14,19
  104:4 154:8,12
  157:12,19
  159:5 161:2,24
**nygard** 1:22
  4:17 6:12
  158:1,25

**o**

**o** 19:7
**o0o** 1:4,12,14
  1:17 4:4,12
**oath** 6:11,15
  7:24

**oaths** 158:3
**object** 84:9
**objection** 9:13
  10:6 28:13
  29:19 52:8
  59:8 84:9
  87:20 88:10
  94:6 95:4
  96:17 98:7
  99:1 103:12
  105:21 106:15
  106:23 107:9
  108:13 116:5
  116:23 117:7
  117:25 118:10
  118:17 119:4
  119:16,25
  120:24 121:17
  121:21 123:13
  126:9,24
  127:12 128:15
  129:1 130:12
  130:20 131:19
  133:25 140:18
  143:1 152:5
**objections** 5:19
  117:13
**observable**
  53:8
**observations**
  64:21
**observe** 58:18
  61:1
**observed** 31:24
  32:22 63:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[observed - opinions]**

| | | | |
|---|---|---|---|
| 64:4 82:20 89:10 134:23 142:24 | 11:20 12:3 13:5,12 14:5 14:12,17 15:5 16:14,25 17:16 18:5,8,17 19:20 21:10 22:14,16,21 23:7,10 24:13 25:14,18 26:3 26:21,25 27:11 29:15 30:6,15 33:4,13 34:10 36:8,11 37:14 37:21 38:1 39:15,24 40:6 41:22 42:4,24 43:23 44:3 46:18 47:8 48:1,5,13,18,23 49:18 52:22 55:13 56:3 57:4 62:6,15 63:18,22 65:11 70:5,16 71:21 72:17 76:9,12 78:5 79:5 81:9 83:2,4,6,7 85:7 94:12 95:19 96:5 97:4,5 100:5 101:20 104:9,18,21,24 105:3,4 107:2 107:6 108:9 113:8,16 119:2 125:15 128:22 | 130:17 138:22 138:23 154:14 157:6,7 | operations  20:3 29:10 |
| observing 63:12 64:3 76:22 79:11 | | old  24:18,19 138:1,22 | operative  40:19 |
| obtain  40:11 | | omission  68:18 99:13,21 139:25 142:5 | opine  9:15,17 9:21 10:9 28:25 31:16 33:11,16 34:8 34:18 52:25 132:1 |
| obtained  40:8 42:5 | | omissions 83:10 93:9 97:7 98:4 102:3 122:6 125:20 126:1 142:1 | opined  27:21 30:15 31:1 |
| obvious  57:21 | | omit  68:16,16 | opining  41:8 |
| obviously 54:17 57:22 79:16 96:2 120:11 | | omitted  87:18 87:19 141:18 151:24 | opinion  10:24 11:20 20:22 28:2 30:19,23 34:2 40:14 41:25 42:3 44:4,7 46:1 47:6 48:3,24 49:20 72:20,23 78:18 83:9,11 83:19,25 84:8 84:16 86:12,21 87:9 90:2 93:6 98:6,15,22 99:13,20 120:18 121:22 122:2,4,8 123:23 134:10 139:18,19 140:13,16 148:22 |
| occur  58:15 131:8 | | once  23:2 110:22 152:19 | |
| occurred  32:24 58:7 131:7 142:23 143:18 | | ones  39:13 42:8 42:13 45:1,19 45:21 | |
| occurs  58:25 | | ongoing  115:22 141:5 145:9 | |
| offer  9:7 10:4 10:20 34:2 | | oops  6:25 | |
| office  159:11 | | open  27:1,4 126:15,21 135:23 | |
| offsetting  78:12 78:21 | | opening  18:12 83:22 105:8 111:17 | |
| oh  6:23 11:12 15:13 19:22 37:17 74:21 89:8,16 90:18 113:5 153:16 | | operating 125:18 127:16 | opinions  9:6,10 9:25 10:4,14 10:17,20 26:12 |
| oil  139:3 | | | |
| okay  7:4,14,21 8:1,4,7,14,21 8:25 9:3,6 10:3 10:13,16 11:6 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[opinions - percent]**

26:19 38:6
41:9 49:19
87:12
**opposed** 3:12
32:1 135:3
145:8 149:23
**option** 130:5
131:5 153:14
**order** 12:10
40:14,14 41:1
41:7,8 64:8
77:15 82:9,24
91:12,24
101:19 103:13
125:10 128:10
131:6 132:6,7
153:23
**orders** 132:4,6
**original** 158:13
159:10,20,22
**outcome** 5:18
17:8 20:18,21
29:13 139:15
145:2
**outcomes** 145:5
145:21
**outline** 12:2
**outlined** 127:9
**outlook** 90:13
**output** 79:7
**outset** 124:8,24
**outside** 15:2,4
70:6 76:6
114:6

**outsized** 114:3
**outstanding**
53:16
**outweigh**
144:12
**overall** 21:19
107:22,24
108:7 109:21
110:2,11
**overlap** 97:18
140:8
**overlapped**
46:17
**overlaps** 83:15
**own** 17:10
**owned** 12:23

**p**

**p** 64:20
**p.a.** 2:3
**p.m.** 90:15
154:5,6 157:11
157:16
**pacer** 40:13
**page** 3:3,7 8:18
10:16 37:16,17
49:20 57:5
62:18,25 78:7
79:3 90:4
104:22 113:18
114:14 116:8
120:4 159:15
160:4 161:4,7
161:10,13,16
161:19

**pages** 71:14
114:13 159:14
159:17,17
160:3,6,6
**paid** 16:6 17:12
20:14
**palo** 2:10 4:16
5:14
**papers** 58:19
70:12
**paragraph**
11:13 23:16
57:4,6 60:12
76:9 78:5,6
83:2,7 97:5
105:5 107:5
113:21 120:4
123:21 150:19
**paragraphs**
50:4 83:8 84:6
84:7 139:24
**part** 33:20 53:3
68:2,18,25
73:17 84:3,16
85:7 86:21
93:2 100:20
101:25 107:21
108:23 117:17
125:4 153:13
**partial** 149:23
**partially**
147:25 148:3
**participated**
105:7

**particular** 14:7
36:8 43:8
107:23 108:22
110:1
**parties** 5:5
**parts** 35:21
137:14 141:6
**party** 5:17
158:18
**passed** 127:22
127:23
**past** 14:16
22:22 23:2
25:2 41:15
66:11
**path** 23:23
**paths** 156:6
**pay** 21:4 54:19
**paying** 14:9
**payment** 15:16
**payout** 130:6
**pdf** 159:12
160:1
**penalty** 7:24
157:17 159:16
160:5
**pending** 127:16
**people** 35:1
55:5 65:8
74:21 133:2
**percent** 24:24
53:14,17 64:8
64:11,17,22
66:13 76:20,22
77:10,12 78:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[percent - point]**

78:19 79:18
80:4,7,9,11,12
94:3 95:10
103:1 111:17
111:23 112:2,4
112:9 114:4
115:14,16,18
115:21,24
116:3,7,11,11
116:12,14,21
118:7 119:7,11
124:13 143:17
145:11,12,14
**percentage**
17:9,14 21:4,5
21:6,10 24:9
53:15 75:11,17
**percentages**
109:8
**percentiles**
48:16
**perfect** 81:16
110:21
**perfectly** 50:14
55:6 126:4
129:15 137:17
**perform** 146:3
**performance**
106:13 111:5,6
111:11 114:6
114:10
**performed**
76:11
**performing**
140:4

**period** 11:5
35:9 36:24
38:23 44:25
45:4 46:11,22
49:25 55:25
65:13 67:11,18
67:25 86:20
90:25 91:11,20
92:10 93:4
100:20 103:2
120:15,17
124:8,10
132:23 134:7
134:12,16
136:4,7,14,17
137:15 142:19
142:23 145:21
146:5 147:4
159:18 160:7
**periods** 30:22
**perjury** 7:24
157:17 159:17
160:6
**personally** 4:18
34:14 35:21
38:12,14
**perspective**
78:4 97:24
98:10
**pertains** 158:12
**ph** 116:9
**ph.d** 159:5
161:2,24
**ph.d.** 1:16 3:11
4:19 5:8 20:6

23:24 25:10
49:14 104:5
154:9 157:12
157:19
**phase** 9:17 99:5
141:8
**phone** 75:13
**phones** 5:3
**pick** 5:2 73:22
75:1
**piece** 50:19
**pieces** 58:2
73:5 77:23
153:1
**place** 5:5
153:25 158:5
**plaintiff** 1:7 4:7
6:8 8:21 12:12
13:6,13 14:9
85:10 99:22
102:11 119:22
125:9 128:12
128:23 131:13
131:20
**plaintiffs** 2:2
3:12 8:25
11:24 14:22
26:14,22 31:15
36:12 37:2,6
69:1 86:5,15
87:1,8,14,17
91:7 92:2 93:5
98:14,20 99:14
100:23 101:17
103:6,9,15

104:12,22
122:7 124:1,3
125:4,6 126:23
127:2,4 134:24
136:2 137:3,24
138:13 140:12
142:7 146:25
151:23
**platform**
114:21
**play** 60:8
**please** 5:1,3,20
6:10,14 95:20
99:18 137:9
**pled** 28:4 128:9
129:16 134:8
139:10
**plus** 43:13
102:25
**pluymen** 12:18
12:19
**pocket** 12:1
125:22 126:7
126:13 130:10
130:18 131:17
132:18 134:3
147:23
**point** 9:20
10:13 23:5
24:10 25:8
38:21 52:14
53:4 70:8
82:15 97:20
108:4 109:6
113:16,18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [point - price]

128:2 132:5 136:20,21 137:4,11 138:6 151:6

**pointed**  85:23

**points**  52:10 136:10

**pondered**  50:6 149:16

**poorly**  71:6

**pop**  146:16

**portfolio**  111:1

**portion**  17:13 21:19 25:19 88:8 93:21 103:3 135:1,25 137:20 150:17 152:8 153:20 153:24

**portions**  35:20 41:2

**position**  96:6 102:6 108:5 109:12 111:3,9 114:20 116:1 117:20 124:25

**positive**  72:4 76:24 78:13 106:9 115:14

**posits**  156:13

**possible**  52:24 131:16,21

**posttrial** 139:12

**potential**  94:4 94:25

**potentially** 88:5

**practically** 55:10

**practice**  13:18 65:15 76:19 79:22

**preceding** 120:10

**predetermined** 74:2 155:10

**predict**  102:25

**predictability** 90:7 100:9 106:22 121:9

**predicting**  91:9 91:22 93:2

**predominantly** 72:3,7

**prefer**  11:2

**preliminary** 28:23 34:6

**premise**  11:16 51:11

**prep**  22:7

**preparation** 38:3

**prepare**  21:21 21:24 22:5

**preparing**  19:2 22:12 34:11 38:10 41:10

**presages**  145:3

**present**  5:21 95:8 107:25 108:16 109:16

**presented**  81:6

**preserve**  42:20

**president**  19:7 23:10

**presidents** 20:11

**press**  39:18 60:6 66:9 72:25 90:14

**presumption** 53:22,24

**pretty**  25:3 34:4 35:3 50:13 74:10 80:19 94:17 95:10 108:25 140:11,16

**prevented** 124:7

**previous**  120:6

**previously** 41:18 61:22 66:20 81:12,15 88:22 104:19 113:23 125:2 135:3 139:23

**price**  31:2,5,7 31:22,25 32:17 32:22,24 33:22 39:7 41:8 44:18 45:13

52:4,14,17 53:5 55:8,10 55:12,15 56:1 57:7,17,24 58:3,13,18,24 59:2,7 60:2,14 60:23 61:1,2,5 61:9,15,25 62:10 63:6 68:15 69:6,14 69:18 70:2,18 70:21 71:9 72:6,8,11 73:16 75:12,16 75:23 77:13,16 77:25 78:13 80:5,21 81:11 81:18 82:20 83:1,9,11,18,19 84:7,16,17,22 84:23,23 85:4 85:11,16,18,25 86:8,24 87:6,9 89:24 90:9 91:5,7 93:6,8 97:10,14,18 98:1,5,11,13,25 99:6,9,17,24 100:4 103:10 117:22 122:2,4 122:5 124:5,7 124:9,10,14,23 126:2 129:6,21 132:22,22 134:11,15,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[price - provide]**

135:1,14 137:5 137:6,7,12,12 137:13 140:1,8 140:13,25 141:4,11 143:9 143:14,16,22 144:3,10,13 145:7 146:1 147:16 149:18 150:3,5,18 152:8 155:13 155:22,23 156:1,6

**priced** 148:16

**prices** 11:18 19:12 47:9 50:11 51:2,3 51:14 77:4 82:10 155:7 156:10

**pricing** 44:23 55:23 130:5 131:5 153:14 155:9

**primarily** 140:22

**prior** 25:7,9 26:10 41:17 59:19 78:11,20 86:20 88:19 90:16 92:10 100:10 102:12 114:18 116:12 116:14,15 122:19 136:14

136:16 138:9 148:17 153:11 156:25 158:6

**priori** 39:9

**private** 5:2

**privileged** 28:14 32:12

**probability** 63:12 64:2 79:11

**probably** 16:21 16:24 18:1 19:5 23:3 25:23,25 27:10 54:2 77:17 109:10

**problem** 7:1 53:9 133:11

**procedure** 125:18 127:16 159:19,21

**proceeding** 5:19

**proceedings** 158:4,6,8,14

**processor** 15:17

**produced** 43:24

**product** 34:5 75:14 82:21 89:1 92:18 100:20 112:15 115:6 140:22 141:23 144:14

145:11 156:14 156:23

**production** 45:18 113:8

**products** 88:5 93:16,19 96:3 96:4 109:3 114:2

**professionals** 11:16 23:18 51:11

**program** 115:5

**progression** 109:1

**project** 18:22 19:8

**projected** 111:17

**projection** 96:7

**projections** 90:10 111:16 120:5,6 142:10

**projects** 24:12 87:24 88:9,13 88:15 89:2,4,5 89:7,12 91:10 97:9 100:21 102:17 103:4 112:17 116:20 124:18 142:9 142:13 147:11 148:19 151:13

**promising** 115:8

**proofreading** 19:16

**proportionately** 77:24

**propose** 125:16 127:11

**proposed** 126:22 129:10 141:16 148:25

**proposing** 147:15

**prospective** 22:18,19,25 118:4

**prospects** 61:14 85:13 88:2 92:5 101:11,24 102:4 106:4 112:13 117:2 118:5 119:13 119:20 142:11 143:6 147:4,13

**proud** 139:14

**prove** 50:17 52:12

**provide** 8:2 22:17,19,24 23:7 24:1 40:16 42:19 51:24 53:13 84:17 85:4 136:23 139:19 149:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[provided - reaction]**

**provided** 25:16 90:12 121:8 159:19 160:8
**provides** 93:16
**public** 54:9 62:8
**publication** 64:21
**publications** 64:18
**publicity** 56:2 155:3
**publicized** 55:4 55:5,20
**publicly** 11:17 50:12 51:12 52:2,6,13,24 53:1,7 54:12 54:13,17 86:19
**publish** 74:4,7
**published** 39:13 82:24
**pulls** 47:17
**punch** 38:18
**purchase** 132:20 138:4 138:12 139:2,5
**purpose** 85:25
**purposes** 69:11 81:19 87:9
**pursuant** 7:15
**pursue** 152:11
**pushing** 20:1
**put** 30:7 36:3 47:19 84:2

150:5
**putting** 149:24

**q**

**q2** 3:16 113:9 114:4,23 115:10 122:15
**q4** 115:2
**qualified** 41:24
**qualify** 64:9
**qualitatively** 21:13
**quantitative** 35:24 153:1
**quarter** 63:2,3 63:3,4,4 67:17 67:18,19 68:25 71:5 90:13 105:7 110:9 111:15,15,23 111:24,25 113:25,25 114:7 115:15 115:19 120:8 121:6 123:1,4 123:10 142:21 146:17
**quarterly** 39:9
**quarters** 100:19 105:9 110:8 111:20 112:15 114:24 115:3 122:23
**question** 54:14 59:25 60:16 69:10 74:20

85:3 91:16 92:21 95:20,24 99:18 119:24 136:18,22
**questions** 154:13 157:6
**queued** 74:2
**quick** 59:3 106:7 132:9 146:15
**quickly** 52:18 57:2,8,12 74:4 82:20 94:14 114:20
**quite** 23:12 92:13 101:14 148:3 151:3
**quote** 11:11 41:7 76:17
**quoting** 11:14

**r**

**r** 19:7 46:3 161:3,3
**r&s** 160:1,9
**rachel** 2:9 6:5
**raise** 6:14 16:24 132:12
**ramp** 105:10
**ramped** 114:20
**ramping** 106:7
**random** 14:1 47:16,17 77:3 77:3,4
**randomly** 47:20

**range** 18:7 43:7 88:21 102:13
**rapid** 111:14
**rapidly** 55:14 56:4,8,9,11 57:1 100:17
**rare** 76:25
**rate** 16:9,13,17 16:24 17:1,2,3 17:10,11,14 21:5 88:2 110:10 115:16 115:25 116:3 116:21 118:7 119:8,11 154:24
**rates** 20:9 100:19 107:13 137:22
**rather** 38:8 56:25 76:6 129:22 138:9 151:2
**reach** 7:2 72:20
**react** 52:18 54:9 72:22 81:12 144:22 145:13 156:10
**reacted** 71:18 95:9 144:3,6
**reacting** 59:19
**reaction** 56:21 57:17 58:13,18 58:24 60:9 68:15 69:6,19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[reaction - regression]

70:18 71:9,9
71:17 76:5
78:14 81:18
94:24,24 95:1
96:20 155:11
155:13
**reactions** 33:22
39:7 58:5
59:15,17 82:20
**read** 8:25 38:17
38:17,20 47:1
86:5 93:10,12
103:8 107:5
112:20 123:7
**readily** 38:22
**reading** 18:13
22:3 63:15
85:8 125:8
146:12 159:24
160:9
**reads** 108:15
**ready** 74:3
**real** 15:10
68:13 131:8
132:9 146:1
**reality** 103:2
**realization**
145:8
**realize** 50:17
60:4 62:1
144:17
**really** 14:21
22:19 24:18
26:21 29:9
31:12 45:7

50:17 63:11
64:19 73:12
75:5 76:21,24
77:22 78:7
81:14 84:1
94:22 96:14
98:15 101:10
103:7 135:22
143:7
**realtime** 146:2
**reason** 8:1 26:6
29:9 44:24
45:3 68:1,14
83:24 85:21
86:11,24
134:22 156:21
161:6,9,12,15
161:18,21
**reasonable**
54:4 82:19
**reasons** 31:9
**reassess** 60:3
**recalibration**
92:19
**recall** 13:2,17
15:8 17:23
18:10 30:13
34:3 37:10,13
40:4,4 45:17
46:16 47:22,25
57:3 90:21
115:15 119:9
119:17 145:11
145:14,15

**receive** 17:4,13
17:14 20:25
120:7 142:20
**received** 71:6
72:4 73:2,3
115:20
**recent** 106:7,10
114:23
**recently** 81:5
115:7 131:2
**recess** 49:10
104:1 154:5
**recitation**
103:8
**recollection**
130:25
**record** 4:24 5:6
5:22 34:5 49:8
49:15 100:18
103:22,24
104:6 154:3,10
157:10 158:7
158:10
**recorded** 5:7
**recording** 5:4
**red** 142:4
**reduced** 88:16
133:1
**reduction**
88:13,25 92:13
132:24 133:14
133:23 134:10
134:22 137:6
137:12 147:7
151:13

**refer** 89:4
126:10 150:20
**reference**
105:19 106:12
106:16,21
107:7,20
**referenced**
159:6
**referring** 36:9
89:3 108:6
116:13 118:8
131:20 150:10
**reflect** 50:12,15
50:18 51:3
155:7
**reflected** 52:13
54:21 56:1
58:2 62:14
155:25
**reflecting**
82:18
**reflection**
50:16
**reflective**
134:15
**regarding**
85:13 106:10
122:20 146:9
**regardless** 17:2
80:15 147:16
**regression** 63:9
75:15,25 79:7
80:2 84:14
150:15 152:18
153:22

Page 36

**[regressions - reports]**

| | | | |
|---|---|---|---|
| **regressions** 19:12 | **release** 39:18 60:6,15 81:12 81:21 90:14 | **remaining** 122:23 | 10:1,3,14,16,20 11:9 12:2 13:3 |
| **regulators** 24:17 | **released** 70:7 159:22 | **remark** 90:4 | 16:5 17:7 18:12 19:2,15 |
| **regulatory** 145:21 | **releases** 66:9 70:6 72:25 | **remarkably** 152:16 | 22:8,15 23:17 28:9 30:25 |
| **relate** 106:3 117:1 119:12 119:19 | **relevance** 73:5 73:17 | **remarks** 36:5 105:8 | 34:11,14,19,23 35:7,14,21,22 |
| **related** 5:17 24:2 26:12 29:16 31:23 39:4 45:22 46:21 50:9 63:1 66:14 67:1,25 70:14 79:22 91:24 112:10 118:4 118:12,19 122:22 136:1 150:22,23 151:7 152:4,24 153:13,19 | **relevant** 29:14 34:21 39:19 41:3 43:7 70:7 72:19,24 73:9 73:13,23 74:19 99:8 117:3 124:11 135:3 | **remember** 16:3 20:5 25:23 32:14 75:19 81:5 | 36:4,9,9,13 37:2,6,15 38:4 38:10 39:8 41:8,10,11,18 42:15 43:24 49:21 50:3 54:7 56:5,25 57:5 62:14 64:18,19 72:1 74:17 76:10 78:6 79:3 82:24 83:3,7 83:12 96:11 97:5 121:19,21 127:10 133:13 133:22 149:25 |
| | | **remembered** 4:14 | |
| | | **remembering** 15:7 | |
| | **reliable** 103:4 112:18 135:10 136:24 139:15 147:11 152:16 | **remove** 103:5 | |
| | | **removed** 112:17 121:11 | |
| | **reliably** 32:5 34:8 127:22 | **removing** 101:3,8 | |
| | | **render** 41:24 123:23 | |
| | **relied** 35:23 36:25 38:6 120:6 142:19 | **rendering** 98:6 | |
| **relating** 151:2 | | **repeat** 69:12 75:8 95:20,21 99:18 137:9 | **reported** 1:22 121:6 |
| **relationship** 39:6 62:8 69:23 128:13 128:24 141:25 | **rely** 10:10 44:3 47:5 | | |
| | | **repeated** 59:17 | **reporter** 4:17 6:10,12,16 113:1 158:2 |
| | **relying** 41:15 41:15,17,20 44:9 45:25 93:5 126:13 | **repetition** 59:20,21 81:17 | |
| **relative** 29:13 50:9 158:17 | | **rephrase** 111:8 | **reporting** 43:20 |
| **relatively** 57:1 57:8,12 59:3 61:1 82:19 109:4 | **remain** 117:23 118:3 119:2 | **rephrasing** 82:5 | **reports** 19:13 30:20 36:3 42:6,7,12,16,22 43:2,4,5,7,17 |
| | **remained** 41:3 | **report** 3:11 8:6 8:14,22 9:3,8 9:12,22,24 | |

[reports - review]

| | | | |
|---|---|---|---|
| 43:24,25 44:3 44:10,12,25 55:2,14,19 56:4 64:16 67:2,20 73:8 73:25 81:20 82:12 83:20,22 96:10 123:8 146:12 | **respect** 31:17 36:6,11 39:15 40:1,18 44:6 47:4 48:1 53:15 70:17 78:4,24 91:5,7 92:25 111:21 115:20 144:2 147:25 152:16 153:11 157:1 | **resumed** 49:12 104:2 154:6 | 101:12,12 102:5,7,8,17,19 103:1,4 106:22 107:7,15,22,24 108:7 109:22 109:23 110:2 110:18,19 |
| | | **resumes** 22:19 | |
| | | **retained** 13:5 157:14 | |
| **representation** 101:23 | | **rethink** 143:5 | |
| | | **return** 31:12 63:12 64:3 75:9,10,11,14 75:23 76:3,3,4 76:21,25 77:20 77:22 78:8 79:9,10 111:2 159:17 160:6 | 111:5,6,11,17 111:21 112:4,5 112:9 114:4 115:3 117:2 118:4 119:12 119:19 120:5 121:8,9 122:21 123:12 124:21 142:9,10,21 143:6,7 146:10 146:16 147:2,3 147:7,13 148:7 148:14,14,23 151:12 |
| **representations** 92:10 102:12 111:13 142:10 | **responds** 57:7 | | |
| | **response** 57:8 59:4 63:6 142:24 143:22 144:7 | | |
| **representatives** 3:14 | | | |
| **represented** 147:3 | **responses** 153:8 | **returns** 48:6 75:16 77:1 79:11 156:15 | |
| | **responsiveness** 60:14,23 | | |
| **representing** 5:15 | | **reveal** 28:14,17 141:5 | |
| | **restate** 71:23 | | **revenues** 21:19 71:3 91:25 100:17 120:8 123:10 124:18 143:10 |
| **requested** 158:15 160:1,9 160:10 | **restrictions** 47:19 | **revealed** 80:22 100:25 120:6 | |
| | | **reveals** 92:15 | |
| **require** 82:23 | **result** 31:25 89:1 102:14 123:3 125:19 131:17 134:23 145:4 | **revelation** 29:2 29:14 32:1 84:24 100:7 126:5 135:2 137:21 150:4 | |
| **required** 82:11 138:15 152:23 153:19 159:20 | | | |
| | | | **review** 19:15 22:7 34:12 37:2,6,10 38:12,25 39:1 39:3 40:22 41:7,9 42:7,25 43:17 44:24 45:16,20 47:12 48:10 86:19 |
| **rereading** 22:2 | **resulting** 151:13 | **revenue** 85:13 88:2,6,9,13,15 88:20 89:4 90:6,7 91:9,22 92:4,25 93:2 93:17,22,25 94:5 95:2,22 96:4 100:9,14 | |
| **research** 20:3 | | | |
| **reserve** 117:12 | **results** 52:15 63:5 66:23 69:1 72:12 116:4 121:6 | | |
| **residual** 63:7 75:10,14 76:3 76:4 79:9 | | | |
| **resilient** 92:11 100:22 124:19 | **resume** 22:15 22:17 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[review - sec]**

87:24 88:9 89:2,5,7,11,14 89:15 91:10,19 92:18,24 93:3 93:21,25 94:25 95:15,16,17 96:1,3,16,23,24 97:1,9 99:14 99:16,22,24 100:2,21 101:3 104:25 112:16 115:7 116:20 120:9 121:10 123:2,10 124:18 125:9 142:9,13,22 147:11 148:8 148:19 151:13 158:14 159:8 159:10,13 160:2

**reviewed**  22:8 22:13 38:3,5 38:10,14 39:12 39:16 40:25 41:14 42:11 46:10 104:19 113:13

**reviewing** 86:13

**revised**  89:23 90:20 120:5

**revising**  90:11

**revision**  90:16 91:15 96:7

122:22 146:24

**right**  6:14,17 12:9 15:7 24:11 43:18 46:8 47:25 49:1 52:23 56:8 57:2 58:16 61:6 62:16 66:25 67:10 69:4,21 71:15 75:13 77:1 79:13 85:6 87:25 96:21 97:1,3 97:19 106:2 109:24 119:9 123:19 130:25 132:5 134:17 134:18 136:7 149:11 150:1 151:16 154:12

**risk**  39:23 40:3 61:14 97:7 143:13 144:11 144:15,16,20 144:23,25 145:9 147:8,9 147:10,18 148:1,4,7,8,18 148:18 149:5 149:23,23 156:15

**risks**  149:1,2

**rivanowsky** 2:12

**road**  9:15 10:9

**role**  25:6 136:21 149:19

**roles**  25:7,9

**room**  23:21

**root**  97:9 98:5 140:1,6

**rosen**  2:3 6:7 13:16 14:10,11 14:13 15:1 20:14 21:11 40:11,12

**rosenlegal.com** 2:5 159:2

**round**  37:10 38:18

**rubbing**  132:10

**rule**  65:4

**rules**  7:22 160:8

**ruling**  132:8

**run**  80:20 103:4

**running**  19:11

**ruth**  19:11 20:6

**s**

**s**  1:22 4:17 158:1,25 161:3

**s&p**  75:18

**sachs**  42:18 55:3

**safe**  12:14 14:8 65:7

**sake**  32:8 152:10

**salary**  17:13

**sale**  132:25 133:2,15,20

**sales**  143:11

**sample**  47:10 47:11

**saw**  105:9 114:3,4

**saying**  10:25 31:20 51:20 52:5 58:1,24 66:22 98:12 106:18 152:9

**says**  101:7 107:3,17,21 114:22,22 145:10

**scg**  113:18

**schedule** 159:10

**school**  23:18

**schooling**  23:24

**science**  64:18

**sciences**  64:14

**scientific** 135:11 136:24 139:15

**scientifically** 32:5 34:8

**scope**  129:1

**sealed**  159:20

**sec**  38:20,22 39:1,11,19 40:3 73:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[second - signature]**

second   11:20
42:4 57:6 58:5
63:2,4 68:25
72:14 105:7
111:25 121:6,7
123:1,6,9
156:23
seconds   56:12
section   10:17
11:8 12:2
123:24 125:19
127:11 129:6,9
130:15,19,24
135:11
securities   15:19
26:21 27:21
30:15 31:1
50:25 58:20
125:18 128:19
128:23 130:11
130:13,24
136:25
security   44:18
50:11 51:3
57:7,9 98:1
security's
44:22 55:8
130:6
see   34:23 48:8
56:17,21 57:10
58:13 59:11
60:17 75:12
76:25 77:2
78:16,17 79:25
95:10 97:11

105:14 113:11
114:5 123:8
139:21 142:16
seeing   23:21
81:20 114:22
114:23 115:1
seem   27:5
88:23 141:20
seemed   36:19
65:23 88:1
139:10
seems   28:21
31:10 33:6
108:25 116:25
151:10,16
seen   7:10 22:11
35:7 135:14
151:3 157:1
select   55:5
selection   39:9
selective   42:24
43:1
sell   133:3
semi   50:10
51:21 81:16
send   23:3,4
sense   33:23
44:17 51:22
61:11 73:10
117:16
sensitive   5:1
75:2
sent   7:12
sentence   57:6
78:7 105:24

106:1,2,25
107:21 108:6
139:17
separate   151:7
september   1:13
4:15,25 46:7
91:13 105:1,6
112:21 114:9
146:23 158:21
159:3
sequence   60:7
served   25:5
93:14
services   24:2
75:23
serving   12:20
12:25
set   4:22 9:21,25
53:6 57:19
71:13 84:7
112:3 115:17
118:13 121:16
158:5
setting   99:14
settle   26:10
27:13 102:21
settled   16:2
seven   108:3
109:2,10 120:7
142:21
seventh   81:2
several   59:17
59:19 105:13
108:24 135:10

shadow   52:12
share   149:4
shares   53:15
shawna   2:15
5:15
shifted   115:5
shiny   151:14
short   58:14
shortened
114:25
shorter   67:11
shorthand   4:17
158:1,8
shortly   12:4
37:11,13
show   42:21
55:24 62:23
86:6 155:10,13
156:5,22
showing   73:2
shown   155:3
shows   62:24
92:19 146:8,16
156:10
shrink   114:1
side   18:21,21
31:6,6
sign   159:16
160:5
signalling
101:4
signature   8:19
158:24 159:22
159:24,24
160:9

**[signed - spend]**

signed 157:17
significance 41:25 63:21,24 64:5,19 76:14 77:7,15,18 78:3 80:15
significant 21:14 32:17 57:18,24 59:2 64:9,12,15 65:9 70:18 72:6,8,10 76:18 77:21 78:9 79:24 80:5,8,9,12 88:25 100:20 101:3 103:3 142:8 143:3
significantly 101:11 121:7 144:16
similar 18:20 30:18 35:7 97:22 111:10 114:10 125:25 149:14 150:1
similarly 1:5 4:5 92:14
simply 116:19
single 46:10 111:2 114:12 119:7 145:7
sit 96:21
situated 1:6 4:6

situation 33:5 69:5 70:16 94:9 101:5 126:18 145:2 152:2
situations 13:22 28:11 30:7 31:14 33:24 60:10 66:22 154:18 155:16
sixth 113:21
size 143:23 144:8,9
skip 7:21
slide 8:12
slower 56:21
small 67:24 120:8 142:21
smaller 77:24 77:24 107:24 107:24 108:17 110:3,3,19
smallest 67:22
smartest 20:8
snack 23:21 138:21
snippet 114:12
social 64:14,18
software 75:22
solely 41:6 47:5 48:2,23 78:24 98:18 100:2 147:1

solutions 5:16 157:14 159:7
solved 53:9
some's 77:5,5
somebody 23:1 40:5
sorry 6:25 37:4 42:10 63:14 82:4 84:13 85:2 95:20,23 102:1 105:23 113:5 121:10 121:20 132:9 132:11 137:8 144:5 146:10
sort 18:23 21:13 22:11 25:7,19 29:4 29:16 33:13 35:13 38:9 41:2,17,24 43:6 47:19 55:14 71:13 79:17 93:22 95:1 98:23 128:12 149:25 150:21 154:16
sounds 46:5 89:22 94:9
speaking 55:10 90:1 111:19 117:13 135:8
speaks 61:19 72:1,2 105:21 106:23 107:9

116:23 119:25 120:11,24 123:13
specific 15:23 26:5 30:13,21 30:21 32:12 33:18,21 35:20 38:8 68:2 69:15 75:5 76:3,6 78:8 79:9 81:21,23 91:25 96:16 102:19 106:3 106:12,16 107:14,18 109:12 127:19 148:14,23 150:22,24 151:7 152:19
specifically 18:10 35:8 49:19 50:3 62:12 63:2 92:24 96:22 119:10,18
spectrum 55:17
speculating 141:1
speculation 96:17
spend 18:24 92:6 97:8 102:14 104:9 105:11 109:3 124:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[spending - stock]**

| | | | |
|---|---|---|---|
| **spending** 102:12,16 | 125:17 127:16 | 102:6 104:10 | 96:17 98:7 |
| **spent** 18:9,15 18:19 35:14 | **stanford** 20:4,4 23:11,14 24:5 24:9 25:6 40:8 42:5 | 104:25 105:17 111:3,9 114:9 114:15 116:22 117:5,21,23 | 99:1 103:12,16 103:18,23 104:16 105:21 106:15,23 |
| **spike** 56:18 80:23 | **start** 35:13 108:11 136:3 142:19,23 | 118:15,19,20 119:2,14,24 146:9 | 107:9 108:13 116:5,23 117:7 117:10,25 |
| **spikey** 88:6 102:16 | **starts** 49:20 79:3 123:21 | **states** 1:1 4:1 5:10 120:4 | 118:10,17 119:4,16,25 |
| **spirit** 50:9,24 | **state** 4:18 5:20 5:21 17:7 39:8 | **statistical** 63:21,23 64:5 | 120:24 121:17 121:20 123:13 |
| **spot** 74:15 | 57:7 82:20 | 64:19 75:15 | 126:9,24 |
| **spurts** 102:23 | 97:6 139:18 | 76:14 77:15,18 | 127:12 128:15 |
| **stability** 101:12 102:5 106:21 107:8,20 108:22 143:7 | 158:2 159:9,12 **stated** 51:9 85:21 86:11 89:10 103:1,14 105:8 107:4 | 80:14 **statistically** 57:23 64:9,11 64:15 65:9 70:18 76:18 | 129:1 130:12 130:20 131:19 132:14 133:25 140:18 143:1 152:5 153:25 |
| **stable** 92:5 100:22 102:8 107:14 108:4 108:17 109:4 109:16 124:19 | **statement** 68:18,19 70:2 86:10 93:3 104:22 105:5 105:20 107:2,8 | 78:9 79:24 80:5,8,9,12 **steady** 102:14 **stem** 156:24 | 159:1 **stipulation** 159:21 **stock** 11:4,18 |
| **staff** 18:2 38:21 40:5 | 108:11,14,21 109:5,11 112:8 113:22 122:13 | **step** 44:13 82:15 | 12:23 19:12 30:16 35:9 |
| **staff's** 17:9 21:6 | 139:24 | **steps** 85:17 87:18 | 39:7 45:12 47:9,18 48:12 |
| **stage** 25:20,23 25:25 37:12 66:4 | **statements** 11:17 51:13 52:3 68:2,25 | **stern** 2:3 6:7,7 7:13 9:13 10:6 21:22 28:13 | 48:14,17 49:24 51:2,13 52:4 52:17 53:5 |
| **stale** 60:25 81:15 | 69:15 86:7 91:2,16 96:19 | 29:19 37:16,19 37:21 49:6 | 54:8 55:10,15 56:1 58:3 59:7 |
| **stamped** 113:17 | 96:20 100:10 101:15,18,21 | 52:8 59:8 84:9 87:20 88:10 | 61:8,15 62:9 69:6,18 70:18 |
| **stamping** 37:20 **stand** 141:8 **standard** 45:5 76:19 79:22 | | 94:6 95:4 | 73:17 75:12,16 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[stock - sure]**

77:4 79:24,24
80:5 81:11
82:10 86:8
89:23 96:8
97:10 98:5
111:2 124:7,10
124:13,23
126:2 129:6,21
131:2 134:11
140:1 142:22
143:9,14,16,22
144:3,13 146:1
147:16 148:16
155:7 156:1,18
156:19
**stock's** 52:14
**stocks** 30:21
  47:17,23
**storms** 110:21
**story** 106:6
**straightforward**
  29:21
**strain** 156:13
**stream** 94:5
  100:9,13
  107:15 143:8
**streams** 88:6
  102:5
**street** 2:10 4:16
  5:14
**strictest** 51:22
**strike** 39:25
  60:11 91:18
  120:21 123:18

**strong** 30:20
  33:2 50:10,13
  51:21 53:22,24
  81:16 83:14
  92:17 140:11
  140:16
**strongly** 52:1
  52:16 53:19
**structure** 34:17
  130:7 131:5
**stuck** 70:13
**studied** 42:9
  153:6
**studies** 18:14
  56:20 66:13
  70:10 149:18
**study** 11:25
  18:13 19:15
  28:3 32:3
  33:21 35:10
  36:2 39:4,8
  44:16 45:2,4
  45:10 46:20,24
  58:9 60:1 62:6
  62:7,21 69:9
  71:24 72:1
  75:6 83:15,16
  84:3,5 85:23
  87:5,22 88:1
  95:8 97:25
  98:18,19 121:1
  125:21 126:4
  128:7 129:14
  129:23,25
  130:8,25

141:11,22,24
  145:24 146:7
  147:19,22
  150:3,7 151:10
  151:17 152:3
  152:15,22,23
  153:22 156:22
**study's** 132:21
**studying**
  152:23
**stuff** 24:18,19
  54:17 110:24
**subject** 7:24
  82:12 97:6
  98:3,23 101:20
  102:2 117:17
  118:20 139:25
  142:6,17
**submitted** 8:15
  34:15 83:19
**subpoenas** 75:4
**subscribed**
  158:20
**subsequent**
  56:22 58:4
  59:15 81:18
  128:14,25
  132:6 146:23
**substance**
  141:17
**subtract** 76:2
**success** 106:6
**sudden** 56:18
  80:23

**suffered** 131:13
**sufficient** 55:7
**sufficiently**
  102:11
**suggest** 73:22
  109:11 111:10
  114:9
**suggested**
  102:7 111:4
**suggests** 108:22
**sum** 138:10
**summarized**
  41:19 102:10
**summarizes**
  23:17 121:13
**summarizing**
  63:20 101:16
**summary** 10:17
  38:5 62:25
  83:25 120:12
  127:23
**super** 115:8
**support** 3:13
  8:22 96:9
**supporting**
  25:11 81:24
**supports** 57:8
  101:14
**suppose** 91:5
**supreme** 11:9
  11:14
**sure** 13:17
  23:15 34:7
  35:7 36:1 49:7
  51:19 58:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[sure - things]**

82:5 95:21 100:1 111:12 112:10 118:21 148:6
**surprise** 90:24 92:13
**surround** 42:8
**surrounding** 14:22 45:21
**sworn** 4:21 158:7
**synopses** 36:4
**synopsis** 36:9 71:21
**system** 156:17

**t**

**t** 19:7 43:9,13 122:21 161:3,3
**t.v.** 54:18
**tables** 39:23
**tailored** 35:8 127:10,24 128:3,4
**take** 5:5 49:6 55:11 56:16 57:4 74:6 85:17 87:18 94:12 103:21 104:12 105:4 112:23 114:25 122:6 154:2 156:3
**taken** 5:8 33:25 49:10 104:1 105:11 108:24

111:12 114:24 141:14 154:5 158:4
**takes** 18:14 55:8,25 108:19
**talk** 8:5 61:12 62:12 75:3,9 76:10 88:24 106:2 108:12 149:25 150:20 155:6
**talked** 19:1 34:10 51:5 74:21,23 114:16 139:23 152:6 154:15 155:2
**talking** 16:24 41:12 54:11 63:17 73:12 90:12 104:10 106:6 107:12 108:23 112:5 140:9
**tanks** 110:23
**target** 115:17 118:13
**tbrien** 2:11
**team** 18:2,17 19:17,19 20:8 22:4 38:25 40:2
**tech** 75:22
**tell** 10:23 14:19 23:13 25:18

69:10
**tempering** 115:20
**template** 35:13
**tend** 27:12 42:20,21 155:9 156:20
**tense** 108:9
**term** 92:20
**terms** 48:16 54:11 63:7,7 71:3 76:22 89:20 98:17 101:11 115:6 118:20
**test** 60:13,20
**testified** 26:4 27:6 29:23
**testify** 9:11
**testifying** 7:23 25:6,13 158:7
**testimony** 7:14 8:2 23:6 25:15 25:16 27:15,18 116:6 118:1 129:2 130:21 140:19 157:11 158:10
**testing** 69:22
**texas** 1:2 4:2 5:11
**thank** 6:9,18 104:16 113:6 132:15,16 154:12 157:8

**theorems** 131:6
**theoretical** 55:22 156:5,8
**theoretically** 156:6
**theories** 87:15 125:25 129:6 135:13
**theorized** 156:11
**theory** 11:15,24 26:15 28:4 51:10 80:20,21 81:6,16 85:11 87:1,5 92:2 93:5 98:14,20 100:23 103:15 122:7 124:2,3 125:4,6 126:2 127:6 128:6,9 129:16 130:6 131:5 134:7,24 136:2 137:3,24 138:3,15 140:12 141:7 143:16 147:6 149:7 153:14
**they're** 130:6
**thing** 26:16 33:9 56:15
**things** 19:13 54:16 65:4 75:2,4 102:20 105:9 107:4 139:6 145:25

Page 44

[think - time]

**think**  11:9 14:8
14:12 15:14,16
15:17 16:1,1
17:24 18:4,7
18:14 19:1,14
19:24 20:5,8
20:10,11,17
23:16 24:6,11
24:21 25:1,10
25:11,17,21
26:7,11,11,18
27:20 28:6,10
28:20,25 30:6
30:23 31:4,6
32:14,16 34:5
36:2,10,16,22
38:6 40:12,25
41:4,4,14,14,20
43:10,12,13
45:18 46:12,16
47:7,13,16,22
47:24 48:11,15
50:9,14,24
51:8,25 52:9
52:15 53:3,19
54:1,16,24
55:1,16 56:2
56:13,25 57:13
57:24 58:12
59:3,12 64:25
65:10 66:9,19
67:21 71:21,22
72:23 73:4,10
74:19 75:5,7
77:16 80:13,24

81:1,3,4,24
82:1,8,11,15
83:8,13,18
84:4,14 86:24
87:4,13 88:24
89:3,4,6 90:8
91:13 92:8
93:7,10,20
94:8 95:9 99:6
100:7 101:13
101:22 102:3,9
103:2,20
104:11,18
105:12 106:9
106:17 107:11
108:8 109:2,14
109:14,25
110:6 111:12
111:16,25
112:3,10 114:9
114:14,14
115:7,9,15
117:2,16 119:5
119:10 120:12
121:1,12 122:4
122:16,21,25
123:7 124:17
125:4,24
126:20 128:6
128:16 129:9
129:14 130:8
130:14,15
131:24 132:5
133:17 134:13
135:21 136:18

139:2 140:10
140:11,21
141:4,10,15,23
142:3 143:3,21
143:25 144:2,6
144:9,11,25
145:13,16,23
146:7,14,20,25
147:2,6 149:8
149:25 150:19
150:25 152:15
154:23 155:1
155:19,20,24
**thinking**  26:18
33:3 60:24
81:1 130:3
**third**  58:5 63:2
72:14 90:13
156:23
**thought**  23:22
71:18 80:14
92:9,16 96:13
**thousand**  17:25
17:25 18:1,5
54:2
**three**  13:3 15:5
35:2 43:15,16
60:8 67:21,21
67:25 70:24
79:10 104:4
105:9 115:3
139:1,1,6
**threshold**
53:14,18 64:17
65:2,8 76:17

77:11,15 89:13
155:21
**thresholds**  64:6
**throw**  6:24
**thursday**  1:13
4:14
**ticket**  66:7
**tied**  94:24 95:1
**tijana**  2:8 5:25
**time**  5:3,20 9:4
12:10 13:8,10
18:14 21:24
22:3,12 23:5,5
35:12,19 45:1
49:8,15 51:4
52:14 53:7
56:1 77:6
82:18,22
103:19,24
104:6,10 106:7
109:17,18,23
115:11,23
131:1 132:20
132:25 133:1
133:15 135:9
135:14,17
136:3,10,20
138:5,12
139:11 145:21
146:11 148:21
154:3,10 155:7
156:15 157:8
158:5 159:10
159:18,25
160:7

Page 45

**[timeframe - typical]**

**timeframe** 65:20 82:19

**times** 7:19,20 27:2,8,9,10 30:11,14 31:7 35:17 36:1 37:9 38:17,17 58:4 59:10 68:6 103:14 121:4 125:23 125:24 127:22 147:20 150:7 151:4

**timing** 32:15,21 33:7 154:16

**titled** 10:17

**today** 6:18 7:15 7:24 8:2,6 21:21 121:4 154:15

**today's** 157:11

**together** 36:3

**took** 87:8

**tools** 32:7 152:20 153:23

**top** 17:9 37:19 39:21

**topic** 49:3 59:22

**topics** 121:13

**tossing** 6:22

**total** 15:5 17:19 45:12 48:6 69:17,19 157:13

**totally** 15:17 97:23

**towards** 50:23 116:18 150:16 151:18

**track** 34:5

**trade** 30:16 55:9

**traded** 52:17 156:16

**traditionally** 50:5

**training** 41:22

**trajectory** 116:17

**transaction** 133:6

**transcribed** 158:9

**transcript** 39:17 46:6 112:21 113:10 158:10,13,15 159:6,8,10,13 159:13,22 160:2,2

**transcripts** 45:15 46:5,7 46:19 47:2,5

**trends** 92:20

**trial** 87:16 98:21 139:12

**tried** 29:8 70:13 75:7 150:17

**trier** 149:11,19

**tries** 33:22

**true** 53:5 70:13 72:14 87:1,8 87:12,15 98:20 102:16,18 103:15 122:8 125:5 132:3 136:12 141:14 143:14 149:22 150:4,5 154:23 155:24 158:10

**truly** 81:14

**truncated** 36:23

**truth** 29:14 80:22 84:25 100:25 124:9 124:11 126:5 135:3

**truthful** 8:2

**try** 11:11 67:13 92:23 133:20 153:1,19

**trying** 25:1 29:15 33:4,13 44:17 52:11 54:24 82:7 88:19 94:22 96:14 99:12 110:15 130:14

**turbocharged** 92:18

**turn** 8:18 37:14 49:18 76:9

79:2 83:2 104:21 123:19

**turned** 27:25 30:22

**turning** 45:14 62:6 78:5 139:17

**turns** 50:15

**two** 10:20 13:2 14:25 15:8,8 16:16,21 19:10 40:7 48:17 49:14 57:20 60:8 64:10,11 67:12,14,25 70:17 71:8 74:9 84:6 95:11,14 105:1 105:2 121:6

**type** 16:10,25 18:24 23:13 25:7,9 56:5 65:18 112:7 138:15

**types** 9:16 17:1 23:18 33:14,14 50:25 65:17 68:9 128:19 137:18 147:20 147:21 153:6

**typical** 18:23 19:17,19 59:5 59:12 108:25 154:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[typically - valued]**

| | | | |
|---|---|---|---|
| **typically** 16:9 22:24 39:11,24 39:25 43:9 46:23 65:15 68:13 80:1 156:16 | 55:25 80:19 81:10 88:8 93:15,19,21,24 94:23 96:6,14 99:12 114:8 116:1 133:12 133:17 134:13 140:3 | **universe** 47:17 **unpack** 51:17 **unquote** 76:17 **unrealistic** 116:19 **unrelated** 28:22 29:5,6 135:4 150:10 | **user** 114:19 **uses** 56:25 57:1 108:3 **using** 11:23 26:13 28:3 43:6 51:20 57:1,16 76:20 114:17 126:6 |
| **typo** 105:12 | **understanding** 26:16 36:20 | **unstable** 88:6 124:18 | 128:20 129:22 130:5 134:3 |
| **u** | 38:2 41:6,15 43:4 77:9 | **upheld** 92:2 128:9 139:11 | 136:24 138:9 158:8 |
| **u.s.** 75:22 **ultimately** 21:8 24:1 29:6 132:1 134:24 149:10 | 84:21 85:8 86:4 89:18 92:3 97:21 99:8 124:5 125:6 143:5 149:17 152:12 | **usage** 92:20 93:22 107:18 107:23 108:7 109:13 110:2 110:11 113:23 114:2 | **usually** 13:2 14:21 18:11,20 29:20,22 31:10 39:21 56:21 69:25 97:24 **uttered** 86:9 |
| **unclear** 95:4 131:19 **uncover** 75:6 **under** 7:24 19:9 45:22 53:24 79:16 86:25 87:6 92:2 100:23 123:24 125:18 129:5 131:6 135:11 137:2 147:6 149:5 157:17 158:9 | **understood** 143:13 147:14 148:21 150:8 152:21 155:10 **undertake** 125:11 **undisclosed** 97:7 149:2,5 **unhelpful** 65:3 65:23 **unique** 35:10 97:23 **unit** 5:7 | **use** 31:13 32:6 33:9 58:8,22 58:23 96:3 110:11 114:21 129:25 141:24 147:22 148:9 152:25 156:20 **used** 48:2,23 58:19,22 75:20 77:14 94:2 98:17 114:25 122:3 127:14 | **v** |
| | | | **v** 159:4 161:1 **vacuum** 61:24 **vague** 9:13 126:24 128:15 133:20 **valuation** 143:9 144:13 **value** 32:5 50:20 53:5 64:20 69:14 70:7 72:19,24 73:5,9,13,17,23 126:5 130:2 143:15 145:4 |
| **undercut** 125:12 **underlying** 28:4 88:3 122:8 **understand** 7:23 8:21 29:15 33:4,13 38:7 51:7,8,14 | **united** 1:1 4:1 5:10 **universally** 155:13 | 127:22 128:7 130:9,17,25 131:4,4 147:19 147:20 150:7 153:15 157:13 | **valued** 21:17 21:18 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[varies - witness]

varies  21:15
  24:3 56:13
various  31:9
  32:4 69:13
  72:18 73:5
  88:4 99:5
  153:18
vary  136:6
varying  135:14
  136:3
vendors  42:14
veritext  5:15
  157:14 159:7,9
  159:11,20
version  23:4,8
versions  41:18
versus  5:9
  25:19 41:13
  50:21 59:19
  75:9 89:14
  95:16 97:1
  116:12 144:23
  145:1 149:13
  149:14
vice  19:7 20:11
  23:10
video  5:4,7
videographer
  2:14 4:23 5:16
  6:9 49:8,13
  103:24 104:3
  132:9,12,15
  154:3,7 157:10
videotaped
  1:15

view  142:18
virtue  78:2
  100:8
visibility  92:19
  111:15
vivendi  138:2,9
vol  112:14
volatile  101:2
  112:16 143:12
  148:20
volatility  91:25
  92:1 93:1 94:4
  95:2,17 96:22
  100:15,15
  101:7 102:7,19
  107:14 110:19
  111:1 113:24
  114:3 115:10
  115:13 144:15
  147:13 148:8,9
  148:14,15,23
volume  53:15
voluminous
  153:4
vs  1:8 4:8

w

wait  74:17
waived  159:24
  159:24
waiving  159:21
walk  72:18
wall  54:20
walter  15:14,15
want  17:7
  28:16 30:7

49:4 64:7,7
  65:4 66:19
  79:2 86:23
  88:22 94:10,12
  117:11 130:4
  153:21
wants  7:22
  14:2
warrant  126:16
wash  92:1
  101:8 102:24
  107:19 109:13
  110:5,9 148:15
washes  100:15
  107:14
washing  101:2
way  24:15
  29:18 33:20
  41:21 46:23
  55:12 59:25
  66:6 67:8
  71:18 91:4
  104:11 106:5
  127:2 130:8
  135:11 139:8
  139:10,16
ways  130:2
we've  24:15
  68:24 103:16
  124:4
weakness  145:4
wealth  144:18
website  66:10
week  74:24

weekly  53:15
weeks  74:9
  156:7
weighed  139:7
weighing
  149:20
weird  101:7
  145:20
went  16:11
  23:23 40:13
  71:11 112:18
  115:2
western  1:2 4:2
  5:11
whereof  158:19
whispering  5:2
wholly  127:24
wide  30:9
  102:13 139:20
widely  55:19
  58:1 127:14
winding  123:2
  123:3 142:14
window  43:15
  44:19 58:8,12
  58:14,17 157:3
windows  57:16
  58:21 156:21
witness  4:20
  6:11,16,24 7:1
  8:7,12 9:14
  10:7 28:18
  29:20 49:7
  52:9 59:9
  84:10 87:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[witness - zillow]**

| | | | |
|---|---|---|---|
| 88:11 94:7 95:5 96:18 98:9 99:3 103:14 105:23 106:16,24 107:11 108:15 113:6 116:7,25 117:8,14 118:2 118:11,18 119:5,17 120:2 121:1,22 123:15 126:25 127:13 128:16 129:3 130:14 130:22 131:21 134:1 140:20 143:2 152:6 157:7,9 158:18 158:19 159:13 159:16 160:2,5 **witnesses** 158:6 **word** 19:15 39:20 52:23 57:1 74:14 108:5 **words** 30:7 57:1 106:24 **work** 14:24 15:22 16:6,10 17:1,6,20 19:10,17 21:1 23:13 24:4,16 24:24 25:4,19 25:20,25 26:2 26:9 34:6,12 | 137:2 140:15 151:6 **worked** 14:15 14:18 19:9 22:2 36:3 128:18 135:15 **working** 15:1 18:21 19:23,25 21:11,17 24:17 27:1,4 135:9 139:9 152:13 **world** 131:7,8 **worse** 71:4 147:13 **worst** 101:11 **write** 28:9 30:25 **wrongdoing** 136:16 _**x**_ **x** 108:12 **xx** 158:15 159:12 _**y**_ **yeah** 11:13 13:10 15:10 16:11 18:7,16 25:17 29:15 33:8 35:16 36:25 37:21 41:6 44:20 48:15,22 53:9 53:23 55:2 59:10,12 63:19 | 65:10,25 70:4 70:10 71:21,22 74:23 80:17 83:18 90:1 94:21 95:21 98:10 103:14 103:17 106:1,9 107:17 108:8 110:14,20 112:3 118:11 132:14 136:5,8 139:11 140:7 146:7 149:8 153:16 **year** 16:11,17 21:15,15 24:3 24:3 90:13 92:17 111:21 111:21 112:7,7 114:4,4 115:2 116:14,14 146:17 **years** 16:16,19 16:21 19:24 20:1 23:2 24:21 25:2 26:6 34:16,20 35:14 54:3 66:1,1,12 74:1 105:13 108:25 114:25 138:3 **yesterday** 21:22 **york** 2:5,5 47:18 48:12,14 | 156:19 _**z**_ **zachary** 1:16 3:10,11 4:19 5:8 49:14 104:4 154:8 157:12,19 159:5 161:2,24 **zero** 77:2 105:10 115:2 131:18,22 134:5 136:15 145:11 **zillow** 15:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a)  If the deposition testimony is stenographically recorded, the deposition officer shall send written notice to the deponent and to all parties attending the deposition when the Original transcript of the testimony for each session of the deposition is available for reading, correcting, and signing, unless the deponent and the attending parties agree on the record that the reading, correcting, and signing of the transcript of the testimony will be waived or that the reading, correcting, and signing of a transcript of the testimony will take place after the entire deposition has been concluded or at some other specific time.

(b)  For 30 days following each notice under subdivision (a), unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period, the deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the deposition officer. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the deposition officer and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in SSAE 16 certified facilities.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of deposition services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.