# EXHIBIT 4
## (FILED UNDER SEAL)

*Lynn Gambrill v. CS Disco, Inc., Kiwi Camara, and Michael Lafair*

Expert Report of Andrea L. Eisfeldt, Ph.D.

October 3, 2025

HIGHLY CONFIDENTIAL

# Table of Contents

I.  Qualifications.................................................................................................... 1

II.  Assignment ..................................................................................................... 2

III.  Summary of Opinions ..................................................................................... 3

IV.  Background...................................................................................................... 6

    A.  CS Disco .................................................................................................. 6

    B.  Summary of Plaintiff's Allegations ......................................................... 7

V.  Implications of Market Efficiency for Assessing Price Impact ...................... 12

VI.  From an Economic Perspective, the Alleged Misrepresentations Did Not Impact CS Disco's Stock Price ....................................................................... 14

    A.  Information Regarding the Alleged Misrepresentations Was Publicly Available Prior to the Proposed Class Period........................................... 14

        1.  Information Regarding CS Disco's Usage-Based Pricing Model Resulting in "Spiky" and "Lumpy" Revenue Was Publicly Available Prior to the Proposed Class Period................................ 15

        2.  Information That CS Disco's Review Product Could Result in Large Increases in Customer Spending Was Publicly Available Prior to the Proposed Class Period.................................................. 19

        3.  Information Regarding CS Disco's Customer Concentration Was Publicly Available Prior to the Proposed Class Period ......................................... 20

        4.  That a Large and Atypical Customer Contributed to Q2 2021 Results Was Publicly Available Prior to the Proposed Class Period ............................ 23

    B.  From an Economic Perspective, the September 2, 2021 Alleged Misrepresentations Did Not Impact CS Disco's Stock Price............................... 25

        1.  CS Disco's Disclosures Regarding Individual Customer Contribution to Revenues in Q2 2021 and the Many Drivers of Its Revenues and Revenue Growth Appear Consistent with Its ███████████, and Such Disclosures Were Acknowledged by Analysts......................................... 27

        2.  CS Disco's ████████████████████ ████████████ s of the Time of the Alleged Misrepresentations...... 30

        3.  CS Disco Reiterated the Revenue Risks of Its Usage-Based Model and Analysts Continued to Discuss the Risks of Revenue Volatility .............. 32

    C.  From an Economic Perspective, the January 11, 2022 Alleged Misrepresentations Did Not Impact CS Disco's Stock Price ........................................... 35

1. From an Economic Perspective, Large Review Matters Were Not the Single "Driver" of CS Disco's Q3 2021 Financial Results......................... 37

2. CS Disco' ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ as of the Time of the Alleged Misrepresentations...... 38

3. CS Disco Reiterated the Revenue Risks of Its Usage-Based Model, and Analysts Continued to Discuss the Risks of Revenue Volatility .............. 39

D. Intervening Events After the Alleged Misrepresentations Impacted Analyst Revenue Forecasts ......................................................................... 41

1. On February 24, 2022 and May 12, 2022 CS Disco Announced Financial Results That Exceeded Analyst Forecasts and Provided Revenue Guidance for FY 2022 ...................................................................................... 42

2. CS Disco Reiterated the Revenue Risks of Its Usage-Based Model, and Analysts Continued to Discuss the Risks of Revenue Volatility .............. 44

E. The Price Decline on August 12, 2022 Does Not Provide Reliable Economic Evidence to Infer Price Impact from the Alleged Misrepresentations ................... 46

1. The Economic Content of the Allegedly Omitted Information and That of the Alleged Corrective Disclosure Differ.................................................. 47

2. Materialization of a Publicly Known Risk Does Not Demonstrate Price Impact from Earlier Alleged Misrepresentations ..................................... 51

VII. Dr. Nye Fails to Put Forth a Damages Methodology That Is Consistent with Plaintiff's Theory of Liability ............................................................................................... 55

A. Dr. Nye Has Not Proposed a Damages Methodology That Calculates Losses Only Attributable to Plaintiff's Theory of Liability Rather Than Losses Due to Intervening Events ............................................................................ 57

B. Dr. Nye Has Not Proposed a Damages Methodology That Can Account for the Materialization of Any Purported Under-Disclosed Risk ..................................... 58

## I.    Qualifications

1.    I am the Laurence and Lori Fink Endowed Chair in Finance and Professor of Finance at the Anderson School of Management at the University of California, Los Angeles ("UCLA"), where I have been on the faculty since 2010.  Prior to that, I was a tenured professor at the Kellogg School of Management at Northwestern University, where I was on the faculty for 10 years after receiving my Ph.D. in Economics from the University of Chicago in 2000.  I am a Research Associate at the National Bureau of Economic Research ("NBER") in the Asset Pricing, Corporate Finance, Economic Fluctuations and Growth, and Conference on Research in Income and Wealth working groups.  I am or have recently been an Associate Editor at the *Journal of Finance*, the *Journal of Economic Perspectives*, the *Journal of Political Economy*, the *Journal of Monetary Economics*, the *American Economic Journal:  Macroeconomics*, and the *Review of Economic Dynamics*.  I have recently served on the Board of Directors of the American Finance Association on its strategic planning, ethics, and investment committees, and I am the incoming VP-Elect of the Western Finance Association.  I am also a founding member and later President of the Macro Finance Society.  I have taught finance to students in MBA, Ph.D., and Masters in Financial Engineering graduate programs for over 20 years.  I currently teach or have taught courses on fixed income/bond investments, corporate finance, fintech, derivatives, international finance, and a Ph.D. class in macro finance.  I teach valuation, as well as other corporate finance and investments topics in my current courses.

2.    My research, in recent years, includes studies of the value of intangible assets, banking, the impact of artificial intelligence on firm values, equity pay beyond the C-suite, and bond market pricing and trading.  I have published widely in the leading finance and economics journals, with several papers appearing as lead articles and/or winning best-paper prizes.  I have twice received the Amundi Smith Breeden prize, which is awarded to the best papers published in the *Journal of Finance* each year.  My research has also been awarded the Jensen Prize in the *Journal of Financial Economics* and the Edwin Mills Best Paper Award in *Real Estate Economics*.  I have twice received research grants from the National Science Foundation and have also received grants from the Department of the Treasury Office of Financial Research and the Banque de France.  I am an advisory board member for the Centre of Excellence in

Quantitative Finance at Imperial College London and a Visiting Scholar at the Federal Reserve Bank of San Francisco.

3.      I also have more than 14 years of asset management experience.  I was a consultant, and then Chief Economist, at Structured Portfolio Management ("SPM"), a fixed income hedge fund with $3 billion in assets under management, from 2012 to 2015.  Subsequent to my employment at SPM, I returned to UCLA and consulted for AQR Capital Management, a large, diversified asset management firm, from 2015 to 2018.  I am currently on the Academic Advisory Board of Vise AI Advisors LLC, an artificial-intelligence-powered platform for financial advisors.  In July 2022, I started a six-year term on the UCLA Investment Company Board, an investment company that manages the assets of the UCLA Foundation for the advancement of UCLA and related charitable purposes.  I am also the owner and developer of the NXTI Intangible Core Index.

4.      A copy of my CV is attached as **Appendix A**.  A list of my prior testimony is attached as **Appendix B**.

## II.      Assignment

5.      I have been retained by Cooley LLP, counsel for CS Disco, Inc. ("CS Disco" or "the Company"), Kiwi Camara, and Michael Lafair (collectively, "Defendants"), to review the Expert Report of Zachary Nye, Ph.D., dated August 4, 2025 ("Nye Report") and to evaluate (i) whether, from an economic perspective, the alleged misrepresentations impacted the price of CS Disco's common stock during the period from September 3, 2021 to August 11, 2022 (the "Proposed Class Period");[1] and (ii) whether Dr. Nye has proposed a methodology for measuring damages on a class-wide basis that is consistent with Plaintiff's theory of liability in this matter.

6.      In forming my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, asset management experience, and formal training in economics and finance.  The documents I have considered in forming my opinions are listed in **Appendix C**. My work in this matter is ongoing.  The opinions presented in this report are based on the

---

[1] Plaintiff's Opposed Motion and Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representations and Class Counsel, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, August 4, 2025 ("Plaintiff's Motion for Class Certification"), p. 1.

information available to me as of the date of this report, and I may supplement or revise my opinions as new information becomes available.

7.      I am being compensated at my standard billing rate of $1,250 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based upon the content of my opinions or the outcome of this or any other matter.

## III.      Summary of Opinions

8.      *First*, from an economic perspective, the alleged misrepresentations did not impact CS Disco's stock price.  Plaintiff contends "this case is premised on a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects.'"[2]  However, my review of public information available regarding CS Disco as well as CS Disco's ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮ found that:

  a. As a primary matter, prior to the start of the Proposed Class Period, information regarding the volatility of CS Disco's revenue and related risks was already publicly known.  In an efficient market, reiteration of such information would not impact CS Disco's stock price.  In particular, information was available that:

    i.  CS Disco's usage-based pricing model resulted in "spiky" and "lumpy" revenue;

    ii.  CS Disco's Review product resulted in large increases in revenue per customer;

    iii.  CS Disco had meaningful customer concentration;

    iv.  CS Disco had recent "extreme positive examples"[3] of rapid customer expansion that contributed to the revenue growth experienced in Q2 2021, but which would not necessarily repeat in the future.

---

[2] Plaintiff's Motion for Class Certification, p. 10.
[3] Amended Class Action Complaint, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, March 8, 2024 ("Amended Complaint"), ¶ 64.

b. From an economic perspective, the September 2, 2021 and January 11, 2022 alleged misrepresentations did not impact CS Disco's stock price at the time they were made. Notably, the economic evidence does not indicate that there was an information asymmetry such that ███████████████████████████ ███████████████████████████ than what it shared publicly (its guidance) or analysts' forecasts:

    i. The economic evidence is inconsistent with a claim that the alleged misrepresentations caused CS Disco's stock price to be artificially inflated by an asymmetry between ███████████████████ and CS Disco's disclosures. In particular, CS Disco's disclosures regarding its revenue and revenue growth appear consistent ███████████████ ███████████████████████ do not indicate that large Review matters were the single "driver" of the Company's revenue growth in Q2 2021 or Q3 2021;

    ii. CS Disco's ███████████████████████████ ██████████████ based on publicly available information following the alleged misrepresentations, which does not indicate that CS Disco's stock price would have declined had the Company disclosed its ███████████████████████████████ ██████████████ ;[4] and

    iii. Contrary to Plaintiff's claim that there was "a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects,'"[5] CS Disco and analysts continued to discuss the revenue volatility risks from CS Disco's customer base and usage-based pricing model.

---

[4] In making such an assessment, I understand that ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████

[5] Plaintiff's Motion for Class Certification, p. 10.

c. After the alleged misrepresentations were made and prior to the alleged corrective disclosure on August 11, 2022, CS Disco had two earnings announcements in which it beat its previously issued revenue guidance and analyst consensus revenue forecasts, provided guidance for fiscal year ("FY") 2022 for the first time on February 24, 2022, and raised this guidance on May 12, 2022. Following these disclosures, analysts raised their FY 2022 revenue forecasts and, notwithstanding the positive revenue news and guidance, CS Disco reiterated the revenue risks of its usage-based model, and analysts continued to discuss the risks of revenue volatility.

d. Particularly in light of the foregoing, the price decline following the August 11, 2022 alleged corrective disclosure does not provide reliable economic evidence to infer price impact from the alleged misrepresentations. Based on my review of publicly available information and CS Disco's ███████████████████████ ██████████, I find that:

    i. The economic content of the allegedly omitted information and that of the alleged corrective disclosure differ, particularly due to intervening financial results and guidance issued after the alleged misrepresentations that affected market expectations, and interim events that caused performance to fall short of these intervening expectations; and

    ii. The price decline following the August 11, 2022 alleged corrective disclosure is consistent with a materialization of previously disclosed risks.

9. *Second*, Dr. Nye fails to put forth a methodology that can calculate class-wide damages consistent with Plaintiff's theory of liability in this matter. Dr. Nye describes a "general economic framework" he might apply to calculate damages in this matter and suggests his proposed approach would rely on "backcasting," or measuring inflation at least in part using the stock price decline following the August 11, 2022 alleged corrective disclosure. However, Dr. Nye's proposed damages approach cannot measure the inflation (if any) caused by the alleged misrepresentations in this case. Specifically:

a. Dr. Nye has not shown that his proposed damages approach can measure only the damages attributable to Plaintiff's theory of liability, rather than losses due to intervening events that impacted market expectations and interim events that caused performance to fall short of these intervening expectations. In particular, after the alleged misrepresentations occurred, CS Disco released and then updated financial guidance for FY 2022, which, as I understand, is not at issue in this matter. Analysts incorporated this guidance into their forecasts for CS Disco. This means that the stock price decline following the "significantly lower 2H22 guidance"[6] in the August 11, 2022 alleged corrective disclosure cannot reliably measure inflation due to the alleged misrepresentations during the Proposed Class Period.

b. Dr. Nye's proposed damages approach cannot measure inflation (if any) arising from the alleged misrepresentations separately from the price reaction that results from the materialization of a previously disclosed (or even any under-disclosed) risk. Specifically, as an economic matter, the stock price decline following a materialization of a risk does not measure the inflation, if any, in the stock price from any concealment of potential risk but rather reflects a change in the market's perception that the probability of a risk materializing has increased to 100%. In other words, the price decline upon the materialization of an under-disclosed risk is expected to be different from the price decline that would occur if the company fully disclosed the risk, but that risk had not yet materialized.

## IV.    Background

### A.    CS Disco

10. CS Disco is a software company founded in 2013 that provides "ediscovery, legal document review and case management" services for "enterprises, law firms, legal services providers and governments."[7] On July 21, 2021, CS Disco conducted its initial public offering

---

[6] Nye Report, ¶ 56.
[7] CS Disco, Inc., Form 424B4, filed July 22, 2021 ("IPO Prospectus"), p. 1.

("IPO") at an offering price of $32 per share,[8] and its stock began trading on the New York Stock Exchange under the ticker symbol "LAW."

11.    At the time of its IPO, CS Disco offered three primary products:  (i) DISCO Ediscovery ("Ediscovery"), which launched in 2013 and "automates much of the ediscovery process"; (ii) DISCO Review ("Review"), which launched in 2017 and provides "AI-powered document review"; and (iii) DISCO Case Builder ("Case Builder"), which launched in 2020 and "offer[s] a single place to search[,] organize[,] and review witness testimony and other important legal data."[9]  In addition to its products, CS Disco also generated revenue through providing "customer support and professional services" to help its customers "maximize the value … from [CS Disco's] offerings."[10]

12.    The Company's contractual agreements with its customers consist of "usage-based" and "subscription" solutions:  Customers on "usage-based" contracts are "billed on a monthly basis based on actual usage" while subscription customers are "committed to a minimum data volume over a period of time."[11]  As of the time of its IPO, the majority of CS Disco's revenues were derived from "usage-based" contracts, with such revenue representing 88% and 86% of the Company's total revenue in 2019 and 2020, respectively.[12]  As of March 31, 2021, CS Disco had 909 customers.[13]

### B.    Summary of Plaintiff's Allegations

13.    Plaintiff alleges violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 during the Proposed Class Period.[14]  Following the Court's ruling on Defendants' Motion to Dismiss, I understand that four alleged misrepresentations remain at issue in this

---

[8] CS Disco, Inc., Form 10-K for the Fiscal Year Ended December 31, 2021, filed February 25, 2022 ("CS Disco 2021 Form 10-K"), pp. 45, 66.  In September 2021, the Company conducted a secondary public offering at a price of $53 per share.

[9] IPO Prospectus, pp. 5, 66.

[10] IPO Prospectus, p. 123.

[11] IPO Prospectus, p. 85.

[12] IPO Prospectus, p. 71.

[13] IPO Prospectus, p. 1.

[14] Amended Complaint, pp. 1–2; Plaintiff's Motion for Class Certification, p. 1.

matter, which were statements made by Defendant CEO Camara on two conference calls.[15] Plaintiff's Motion for Class Certification identifies the alleged misrepresentations as follows:

September 2, 2021:  "Defendants Camara and LaFair participated in an earnings call for the second quarter of 2021, in which Camara stated in his opening remarks, among other things, that:  'So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend.  That journey has historically taken our customary [*sic*] several years.'"

"On the same call, Camara stated, among other things, that:  'So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher [*sic*] five-figure customer [and] grow to be a six-figure customer and then grow to be a seven-figure customer at maturity.  Over the course of that journey, their specific legal usage will fluctuate, and that will cause fluctuations in the revenue received from a particular customer.  Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.'"

January 11, 2022:  "Camara participated in the 24th Annual Needham Virtual Growth Conference, and responded to a question by the presenter:  'So for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform and I think Scott that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works.  You take any one of these matters and we've got matters alive in our system; they date all the way back to 2013 the same way we have corporate customers, who have been continuous customers going all the way back to 2013.  I think one good way to think about this is looking at companies spend on their own legal department or on legal services.  While the nature of the legal matters that a company is exposed to may change from time to time and [they] unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that.  People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into.'"

"On that call, Camara responded to another question stating, among other things, that:  'I would say there's not as much variance in the ultimate wallet size of the

---

[15] Order:  (1) Granting in Part and Denying in Part Defendants' Motion to Dismiss Without Prejudice; (2) Granting Motion for Judicial Notice; and (3) Cancelling Hearing Set for February 14, 2025, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, January 30, 2025 ("Order Regarding Motion to Dismiss"), pp. 16–21; Plaintiff's Motion for Class Certification, pp. 2–3.

customer.  So, like how big will the customer be when they get to maturity.  But there's more variance in how quickly they get there.  So, over the last few earnings calls, right, we've talked about the extreme positive examples, where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that.  And then there are also examples of customers that take four years, five years, even six years to get to their mature spend.  So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.'"[16]

14.     Plaintiff alleges the above statements were misleading because CS Disco "failed to disclose that revenues were materially impacted by a small number of large Review matters that were not part of ongoing and continuous legal department spends."[17]  I understand that, based on that allegation, the Court found in its Order Regarding Motion to Dismiss that Plaintiff has alleged sufficient facts in the Amended Complaint that the at-issue statements were false or misleading "if it is true that customer spending was actually spiky and driven by only a few large Review projects."[18]  Plaintiff and Dr. Nye adopt this language in the Motion for Class Certification and the Nye Report.[19]

---

[16] Plaintiff's Motion for Class Certification, pp. 2–3; CS Disco, Inc., "Q2 2021 CS Disco Inc Earnings Call," September 2, 2021 ("CS Disco Q2 2021 Earnings Call"), pp. 4, 6; CS Disco, Inc., "24th Annual Needham Virtual Growth Conference," January 11, 2022 ("2022 Needham Conference"), pp. 3, 11.  *See also* Amended Complaint, ¶¶ 50–53, 62–65; Order Regarding Motion to Dismiss, pp. 16–21.

[17] *See, e.g.*, Amended Complaint, ¶ 63.  Plaintiff also alleges that the statements were misleading because they misrepresented that (i) "when customers increased their revenues to seven figures, that represented a stable revenue source, when in reality several of its seven figure customers were driven by one-time large Review projects"; (ii) "specific customer usage fluctuations would 'washout' when in reality, because of the disproportionate impact of a few large Review projects, the ending of those projects would have a material impact on revenues"; and (iii) "customers reached a mature stable spend, when in reality several of its largest customers at that time were spending unusually high amounts on CS Disco's Review product due to the existence of unusually large litigation matters."  *See* Amended Complaint, ¶¶ 51, 53, 65.

[18] *See* Order Regarding Motion to Dismiss, p. 21 ("Thus, as to this part of their securities claim, Plaintiffs have alleged sufficient facts that Camara's descriptions in the phone call that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers—were either false or misled investors if it is true that customer spending was actually spiky and driven by only a few large Review projects.").

[19] Plaintiff's Motion for Class Certification, p. 5; Expert Report of Zachary Nye, Ph.D., August 4, 2025 ("Nye Report"), ¶ 55, fn. 102.

15.     Plaintiff claims that the alleged misrepresentations would not have been expected to cause CS Disco's stock price to increase at the time they were made:

> Defendants' misleading statements consisted of reassurances regarding the reliability of CS Disco's revenues and ability to predict those revenues, based on historical patterns of customer spend. Thus, the misleading statements at issue in this case would not be expected to cause CS Disco's stock price to increase when Camara uttered them, but rather prevent the decline that would have occurred had Camara told the truth.[20]

16.     Plaintiff claims the alleged truth emerged on August 11, 2022 when CS Disco "adjusted downward its annual revenue guidance to $132.0 to $136.0 million."[21]  Plaintiff also identified the following statements made by CEO Camara in response to questions from analysts on the August 11, 2022 earnings call:

> Sure. It's less about lost customers and more about changes in customers' usage on the platform. Again to put this in perspective, the presence of two to three large reviews, reviews that build [*sic*] more than $1 million in a quarter would cause this to be a great quarter and two to three more reviews were caused [*sic*] to be an absolute home run quarter. So the volatility that we're talking about in the review business has to do with the presence or absence of a low single-digit number of big-ticket reviews.
> …
> I think the magnitude we're talking about in the review business and specifically what we saw a shortage of in the second quarter are a couple one, two or three large reviews billing north of $1 million per quarter. The presence or absence of one to six of those reviews can take a quarter from good to great to a complete home run and again that is volatility that's created by the big ticket sizes in review, as well as the relatively small size of the review revenue base today.
>
> In terms of our go-forward guidance, we have sought to de-risk the guidance as much as possible and to adhere to the guidance philosophy that we've articulated on each of our prior earnings calls, where we expect to be prudent in our forward guidance. Now that will result in some quarters that have outsized beats as you've seen in the past and some quarters that have more modest beats like the quarter we just reported.
> …
> Sure. So, typically and again we're talking about a small handful of reviews that build [*sic*] more than $1 million in a quarter. Those tend to be a big ticket

---

[20] Plaintiff's Motion for Class Certification, p. 19.
[21] Amended Complaint, ¶ 73.

litigation of the sort you would read about in the paper.  And the timing of them is again somewhat exogenous.  It depends on when such a litigation is initiated, when a big new investigation is initiated, it depends on rulings by the court or other decision makers say a regulator about the scope of discovery.  In the investigation, it depends on the progress or lack thereof in settlement negotiations if the timing of rulings on incremental motions and on the final disposition of the case.  So it's a lot dependent on what's going on in the specific legal process.

In terms of our guidance, what we have sought to do is to de-risk the guidance from the point of view of these kinds of large reviews.[22]

17.    Plaintiff claims that it has made an "affirmative showing of price impact" by referencing that "Dr. Nye finds a statistically significant excess stock price decline on August 12, 2022."[23] According to the Nye Report, CS Disco's stock price decline following the August 11, 2022 alleged corrective disclosure is statistically significant, and the "subject" of the alleged misstatements and omissions (i.e., the alleged misrepresentations) was purportedly the "root cause" of the stock price decline on that day:

My event study confirms that the statistically significant stock price decline on August 12, 2022 was indeed caused by the Company's disclosure of "significantly lower 2H22 guidance as [CS Disco] **de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers**."  Thus, the subject of the alleged misstatements and omissions—*i.e.*, the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects—was clearly the root cause of the stock price decline that day.[24]

18.    For purposes of this report, I refer to a "large" Review matter as a matter from which CS Disco received more than $1 million in revenue in a quarter.  This is consistent with (i) Plaintiff's claim that the August 11, 2022 alleged corrective disclosure revealed that the Company's "previous projections relied on the assumption that CS Disco would continue to receive *seven figure per quarter revenues* from a small number of large Review matters";[25] (ii) Plaintiff's identification of CEO Camara's statements during the August 11, 2022 earnings

---

[22] Amended Complaint, ¶¶ 74–76.
[23] Plaintiff's Motion for Class Certification, p. 20.
[24] Nye Report, ¶ 56 (emphasis in original).
[25] Plaintiff's Motion for Class Certification, p. 3 (emphasis added).

call referring to "large reviews billing north of $1 million per quarter";[26] and (iii) Dr. Nye's testimony that he relied on CS Disco's characterization of a "large" Review in its August 11, 2022 earnings call.[27]

## V.    Implications of Market Efficiency for Assessing Price Impact

19.    A market for a security is considered "efficient" if the security price fully reflects all available information.[28]  Financial economists distinguish between three types of efficiency:  (i) weak-form market efficiency in which the security price incorporates information from historical prices and dividends, such that historical prices and dividends cannot be used to predict future price movements; (ii) semi-strong form market efficiency in which the security price fully incorporates all publicly available information; and (iii) strong-form market efficiency in which the security price fully incorporates all information, including private information that is not publicly available.[29]  Regardless of the form of market efficiency, if the market for a security is efficient, then information within the relevant information set should be quickly and fully

---

[26] CS Disco, Inc., "Q2 2022 CS Disco Inc Earnings Call," August 11, 2022, pp. 3, 7, 9 ("Our Q2 revenue grew 14% despite a very challenging comparison in Q2 2021 when revenue grew 88% and benefited from a small number of large reviews.…  To put this a bit in perspective, if you focus on reviews that bill more than $1 million in a quarter, 2 or 3 of those reviews make the quarter a great quarter; 2 or 3 more make it a complete home run.  And so the kind of volatility that we're talking about is driven by the presence or absence of a low-single-digit number of large reviews.").

[27] Deposition of Zachary Nye, Ph.D., September 11, 2025 ("Nye Deposition"), 89:3–12 ("Q. And I think before that you were referring to 'large revenue projects,' I think you meant to refer to 'large review projects' throughout your answer? A. I -- I -- yes, I think so.  Q. And how do you define 'large review projects'? A. Oh, I just -- I know the company is -- I just have observed what the company stated, which was they characterized them as 'large review projects,' I believe.").

[28] *See*, *e.g.*, Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417 ("Fama (1970)") at p. 383 ("In general terms, the ideal is a market in which prices provide accurate signals for resource allocation:  that is, a market in which firms can make production investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time 'fully reflect' all available information.  A market in which prices always 'fully reflect' available information is called 'efficient.'").

[29] Fama (1970), p. 383.  *See also* Ross, Stephen A., et al., *Corporate Finance*, Seventh Edition (New York, NY: McGraw-Hill/Irwin, 2005), pp. 355–356.

incorporated into the price (e.g., if a market is semi-strong form efficient, then *public* information should be quickly and fully incorporated into the price).[30]

20.     From the perspective of financial economics, the price of a stock represents the value of cash flows that stockholders expect to receive in the future based on information available at the time of the trade, discounted back to the present.  Importantly, the price of a security that trades in an efficient market will thus respond to *new* and *value-relevant* information[31]—that is, information that affects the expected future cash flows or the discount rate applied to those cash flows.[32]  A consequence of market efficiency is that stock prices will not react to repetition of previously available information, or information that does not move estimates of expected future cash flows or the appropriate discount rate.[33]

21.     In this matter, Plaintiff has asserted the "fraud-on-the-market" presumption of reliance,[34] and I understand that semi-strong form market efficiency is the relevant form of market

---

[30] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 at p. 1601 ("When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response—the central issue for market efficiency.…  The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.").

[31] *See*, *e.g.*, Malkiel, Burton G., "Efficient Market Hypothesis," in *Finance*, ed. John Eatwell et al. (London: Palgrave Macmillan, 1989), pp. 127–134 ("Malkiel (1989)") at p. 127 ("Moreover, efficiency with respect to an information set … implies that it is impossible to make economic profits by trading on the basis of [that information set].").

[32] *See*, *e.g.*, Berk, Jonathan, and Peter DeMarzo, "Chapter 9: Valuing Stocks," in *Corporate Finance*, Fourth Edition (Harlow, England: Pearson Education, 2017), pp. 309–347 at p. 277 ("[T]he Law of One Price, which implies that the price of a security should equal the present value of expected future cash flows an investor will receive from owning it.…  Thus, to value a stock, we need to know the expected cash flows an investor will receive and the appropriate cost of capital with which to discount those cash flows.").

[33] Malkiel (1989), p. 127 ("Formally, the market is said to be efficient with respect to some information set … if security prices would be unaffected by revealing that information to all participants.").  *See also* Nye Deposition, 60:22–61:3 ("Q. So information could be new and immaterial and still allow you to examine price responsiveness?  A. Well, what I was thinking is if it's information that's expected or stale, and it shouldn't influence the price, and then you observe relatively constant price over the next day, that would also be evidence of market efficiency.").

[34] Plaintiff's Motion for Class Certification, pp. 10–11 ("'[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'…  Thus, whenever an 'investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action.'…  To invoke the presumption of reliance under this theory, a plaintiff must show:

efficiency.  Plaintiff also claims that CS Disco's common stock traded in an efficient market throughout the Proposed Class Period, and cites to the analyses and opinions contained in the Nye Report.[35]  Dr. Nye states that he considers "tests of efficiency that courts have commonly used in securities litigation for over 30 years" and "conclude[s] that the market for Disco stock was efficient throughout the Class Period."[36]  For purposes of my analysis in this report, I have been asked to assume the market for CS Disco's common stock was efficient throughout the Proposed Class Period, as claimed by Plaintiff and Dr. Nye.  For the purposes of this report, I also refer to the results in Dr. Nye's event study.[37]

## VI.   From an Economic Perspective, the Alleged Misrepresentations Did Not Impact CS Disco's Stock Price

### A.   Information Regarding the Alleged Misrepresentations Was Publicly Available Prior to the Proposed Class Period

22.   As discussed in **Section IV.B**, Plaintiff contends "this case is premised on a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects.'"[38]  However, as shown in the following sections, my review of public information prior to the Proposed Class Period found that the following information was already publicly available:[39] (i) CS Disco's usage-based pricing model resulted in "spiky" and "lumpy" revenue; (ii) CS Disco's Review product resulted in large increases in revenue per customer; (iii) CS Disco had

---

'(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.'").  *See also* Nye Report, ¶ 13.

[35] Plaintiff's Motion for Class Certification, pp. 11–16.

[36] Nye Report, ¶¶ 6, 15.

[37] I note that Dr. Nye uses a price return industry index in performing his event study, which excludes dividends and other sources of investment return.  I have considered the effect on Dr. Nye's event study regression using the Bloomberg US 3000 Technology Total Return Index, and my conclusions in this report are unchanged under this alternative specification.

[38] Plaintiff's Motion for Class Certification, p. 10.

[39] I note that Dr. Nye testified he did not analyze information available about CS Disco prior to the start of the Proposed Class Period when rendering his price impact opinion.  *See* Nye Deposition, 86:19–22 ("Q. Did you review information that was publicly known about CS DISCO prior to the class period to -- as part of [your] opinion?  A. So, no, I didn't.").

meaningful customer concentration; and (iv) CS Disco had recent "extreme positive examples"[40] of rapid customer expansion that contributed to the revenue growth experienced in Q2 2021, but which would not necessarily repeat in the future.

23.     As discussed in **Section V**, in an efficient market, all publicly available information is quickly and fully incorporated into stock prices and reiteration of publicly known information would not impact the stock price.  Accordingly, an evaluation of the potential price impact of allegedly omitted information should be placed into the context of the information already publicly available at the time of the alleged misrepresentations.  Thus, in **Section VI.A**, I assess the public information preceding the alleged misrepresentations, before turning to analysis at the time of the alleged misrepresentations in **Section VI.B** (September 2, 2021) and **Section VI.C** (January 11, 2022).

> 1.     **Information Regarding CS Disco's Usage-Based Pricing Model Resulting in "Spiky" and "Lumpy" Revenue Was Publicly Available Prior to the Proposed Class Period**

24.     As discussed in **Section IV.A**, CS Disco disclosed in its IPO Prospectus that the majority of its revenues were derived from "usage-based" contracts, with such revenue representing 88% and 86% of the Company's total revenue in 2019 and 2020, respectively.[41]  Additionally CS Disco disclosed—and continued to disclose in SEC filings throughout the Proposed Class Period—that such usage-based revenues could cause fluctuations in its financial results as customers on usage-based contracts could cancel their contracts or reduce their usage at any time due to the "inherent unpredictability in the timing, duration, and scope" of legal matters.[42]  CS Disco further stated in its Risk Factors disclosures—both before and during the Proposed Class Period—that:

---

[40] Amended Complaint, ¶ 64, citing 2022 Needham Conference.

[41] IPO Prospectus, p. 71.

[42] IPO Prospectus, pp. 21, 25–26, 67.  *See also* CS Disco, Inc., Form 10-Q for the Quarter Ended June 30, 2021, filed September 3, 2021 ("CS Disco Q2 2021 Form 10-Q"), pp. 44–45; CS Disco, Inc., Form 10-Q for the Quarter Ended September 30, 2021, filed November 10, 2021 ("CS Disco Q3 2021 Form 10-Q"), pp. 45–46; CS Disco 2021 Form 10-K, pp. 19–20; CS Disco Inc., Form 10-Q for the Quarter Ended March 31, 2022, filed May 13, 2022 ("CS Disco Q1 2022 Form 10-Q"), pp. 43–44; CS Disco, Inc., Form 10-Q for the Quarter Ended June 30, 2022, filed August 12, 2022 ("CS Disco Q2 2022 Form 10-Q"), pp. 25, 48–49.

> ***We expect fluctuations of our financial results, which may cause quarterly comparisons not to be meaningful.*** Our business model is usage-based and there is inherent unpredictability in the timing, duration and scope of our customers' legal matters requiring use of our solution. Our operating results have fluctuated in the past and are expected to fluctuate in the future due to a variety of factors, many of which are outside of our control … including, but not limited to: the timing of our customers' usage of our solution; the level of demand for or pricing of our solution.…

> In addition, because we were founded in 2013 and have experienced rapid expansion of our business and revenues since such time, we do not have a long history upon which to base forecasts of future revenue and operating results. Accordingly, we may be unable to accurately forecast our revenues. As a result, our past results may not be indicative of our future performance, and the variability and unpredictability of our quarterly results of operations or other operating metrics could result in our failure to meet our expectations or those of investors or analysts with respect to revenues or other metrics for a particular period.[43]

25.     In the month preceding the start of the Proposed Class Period, I found nine reports issued by analysts initiating coverage on CS Disco. Based on my review of these reports, each of the nine reports acknowledged that CS Disco's usage-based revenue model resulted in revenue volatility and unpredictability, including specific discussions that revenues could "spike" and be "lumpy" from quarter-to-quarter given that revenues would be impacted by unpredictability in individual legal matters starting and ending:

> Cowen, August 16, 2021: "Usage-based revenue accounts for the majority of sales, representing 86% of total revenue in FY20. ***Usage can fluctuate based on the number and nature of legal matters*** they have at any particular time, and this can lead to quarterly revenue fluctuations.… ***Usage tends to spike during certain stages of cases***, including the beginning of discovery phases, at deposition time, during motions of summary judgement and at trial time, all of which can create ebbs & flow of usage within a particular case. Many larger cases spiking at once was one reason for the particularly high Q/Q growth in 2Q revenue and subsequent forecast of a Q/Q decline in 3Q revenue."[44]

---

[43] IPO Prospectus, pp. 25–26 (emphasis in original).
[44] "INITIATING AT OUTPERFORM; DISCO SET TO BOOGIE TO EDISCOVERY MARKET LEADERSHIP," *Cowen*, August 16, 2021, p. 26 (original emphasis removed, emphasis added).

J.P. Morgan, August 16, 2021:  "However, there are instances when the amount of data will jump, causing quarterly revenue to do the same.  ***If a new case is ingested and put into review or if a customer transfers multiple cases from a competitor to the Disco platform all at once, then we could see a spike in quarterly revenue,*** which is exactly what happened in 2Q21.  As you can see in Figure 3, below, revenue in the June quarter is expected to be up nearly 40% sequentially, according to flash financials in S-1.  The jump was due in part to a new customer and also to usage from existing customers that happened to ratchet up during the period.  There are situations where revenue could decline sequentially as well, as we are modeling in 3Q21, due to the non-recurrence of the initial ingestion fee or if cases are moved to archive or are taken off the platform completely after a ruling."[45]

Bank of America, August 16, 2021:  "***Usage based pricing model could result in lumpiness in growth trends[.]***  Disco's pricing model is primarily usage based, where customers pay Disco based on the quantity of data being put on the platform.  We estimate that 86% of total revenue is based on usage, with the remaining being contracts based on minimum volume commitments and overage.  Furthermore, it is difficult to forecast future legal matters, the size of data that could be needed, and/or the length of time the data needs to be on the Disco platform."[46]

Citi, August 16, 2021:  "The ***usage-based revenue model adds risk for quarterly lumpiness***….  CS Disco's usage-based revenue model is levered to an increase in overall legal review volumes, although we do expect it to be an area of volatility and investor debate.…  ***Usage-based model risk exacerbated by customer concentration[.]  The unpredictability of Disco's usage-based pricing model was a recurring area of feedback in our initial conversations with investors.***  Disco's revenue is tied to the amount of data that is stored or reviewed, which is unpredictable even for the end users.…  The conclusion of a major lawsuit could lead to a significant reduction in spending.  In 2Q21, a single customer accounted for nearly $3M of revenue, representing ~10% of the business.  While this will likely decline as contribution from other customers increase in the ensuing quarters, customer concentration adds incremental risk to the usage-based model."[47]

Canaccord Genuity, August 16, 2021:  "The key thing to understand about the numbers here is that Disco is a usage-based revenue model.…  Where is [*sic*] gets

---

[45] "Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," *J.P. Morgan*, August 16, 2021, p. 8 (emphasis added).

[46] "Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," *Bank of America Global Research*, August 16, 2021, p. 3 (emphasis in original).

[47] "Establishing new cloud-based precedent; initiating Buy/High Risk," *Citi*, August 16, 2021, pp. 1, 3, 21–22 (emphasis added).

a bit complicated is that legal matters naturally and eventually come to an end. ***That means on a customer level basis, there can be some month-to-month variability in spend***. This probably creates some forecasting headaches at a micro-level, but when you consider the portfolio effect of more than 900 customers, it tends to smooth things out on an aggregate basis."[48]

Loop Capital, August 16, 2021: "***Higher quarter variability as a result of the company's usage-based model***. There is inherent variability in DISCO's business model due to the unpredictable nature of client need for legal discovery services. Whether it be the timing or duration of client usage, the fluctuating demand for services, or the ability to sustain high levels of usage from existing and future customers, we believe quarterly comparisons of DISCO's financials will not be meaningful as a result of this variability."[49]

Jefferies, August 16, 2021: "***Lack of Stickiness and Greater Variability in the Model***. About 86% of revenue comes from monthly usage-based customers, with the remainder coming from subscriptions. We believe that eDiscovery software can be replaced when a new matter comes along. We estimate that gross retention rates are high at 97%, but ***there is a risk customers could switch easily. Additionally, there is more variability within the model given the usage-based pricing***."[50]

Needham, August 16, 2021: "***Usage-based pricing model could create revenue volatility***. Disco utilizes a usage-based pricing model for 86% of its revenue. This usage-based pricing can create significant revenue variability tied to the timing of court cases and document discovery. As a result, it can be difficult to predict future revenue based on historic data or revenue timing even on new contracts. Also, when large, existing litigation matters end, this scenario creates the opportunity for chunks of revenue to fall off."[51]

Stifel, August 16, 2021: "***Revenue growth can fluctuate due to usage-based model, as compared to more traditional subscription model***. CS Disco benefits from its usage-based model when customers continue to add data to the platform for processing as part of legal proceedings. The issue with a usage-based model

---

[48] "Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," *Canaccord Genuity*, August 16, 2021, p. 5 (emphasis added).

[49] "Initiating Coverage with a Buy Rating and $60 PT," *Loop Capital*, August 16, 2021, p. 3 (emphasis in original).

[50] "DISCO Gets The Party Started; Initiate Hold," *Jefferies*, August 16, 2021, p. 11 (emphasis added).

[51] "Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," *Needham*, August 16, 2021, p. 4 (emphasis in original).

is that usage can be unpredictable at times and a slowdown in legal activity from customers can negatively impact CS Disco's top line."[52]

## 2. Information That CS Disco's Review Product Could Result in Large Increases in Customer Spending Was Publicly Available Prior to the Proposed Class Period

26. Analysts acknowledged that, unlike the Ediscovery product that is priced based on gigabytes under management, CS Disco priced its Review product by "document or at an equivalent hourly rate."[53]  In addition, analysts noted that CS Disco's revenue from a customer could increase two- to three-fold when a customer adopted the Review product:

Citi, August 16, 2021:  "***2-3x revenue per customer from Disco Review** –* Disco Review is a managed review offering that launched in November 2019.  … Review grew more than 150% in 2020 and provides about 2-3x bigger spend than currently from ediscovery software customers."[54]

Cowen, August 16, 2021:  "Review provides a 2-3x uplift in spend."[55]

Needham, August 16, 2021:  "When [DISCO Review is] adopted, customer spending increases by 2-3x.  Adoption rates are currently in the low-teens but are growing.  Disco reports that mature customers are more likely to add on Review."[56]

J.P. Morgan, August 16, 2021:  "We heard from some customers that were using both E-discovery and Review that their spend on Review was not quite as high as with E-discovery but that there was potential to match it.  We believe that for a

---

[52] "Initiating Coverage of CS Disco with a Buy Rating and $60 Target Price," *Stifel*, August 16, 2021, p. 9 (emphasis in original).

[53] *See*, *e.g.*, "Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," *Canaccord Genuity*, August 16, 2021, p. 16.

[54] "Establishing new cloud-based precedent; initiating Buy/High Risk," *Citi*, August 16, 2021, p. 16 (emphasis in original, emphasis added).

[55] "INITIATING AT OUTPERFORM; DISCO SET TO BOOGIE TO EDISCOVERY MARKET LEADERSHIP," *Cowen*, August 16, 2021, pp. 13, 23 (emphasis added).

[56] "Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," *Needham*, August 16, 2021, p. 9 (emphasis added).

customer that has fully deployed Ediscovery and the two additional products, $1 of E-discovery could lead to $2-2.5 in revenue in total."[57]

### 3. Information Regarding CS Disco's Customer Concentration Was Publicly Available Prior to the Proposed Class Period

27.     In its IPO Prospectus, CS Disco disclosed information concerning its customer concentration, including that it had 909 customers as of March 31, 2021 and that the largest 157 customers (i.e., the top 17% of customers) accounted for approximately 75% of total revenues.[58] In other words, approximately $55.4 million of revenue in the 12 months ended March 31, 2021 came from the top 157 customers.[59] CS Disco acknowledged it was "susceptible to risks associated with customer concentration," and included the following Risk Factor in its IPO Prospectus:

> ***A limited number of customers represent a substantial portion of our revenue. If we fail to retain these customers, our revenue could decline significantly.***
>
> We derive a substantial portion of our revenue from sales to our top 10% customers.  As a result, our revenue could fluctuate materially and could be materially and disproportionately impacted by purchasing decisions of these customers or any other significant future customer.  Any of our significant customers may decide to purchase less than they have in the past, may alter their purchasing patterns at any time with limited notice, or may decide not to continue to use our solution at all, any of which could cause our revenue to decline and adversely affect our financial condition and results of operations.  If we do not further diversify our customer base, we will continue to be susceptible to risks associated with customer concentration.[60]

28.     Notably, although a substantial portion of CS Disco's revenues were concentrated in its top customers, customer concentration risk would be expected to diminish as the customer base grew and the Company's sources of revenues became more diversified.  A fundamental concept in financial economics is that diversification reduces volatility and risk, as Dr. Nye also

---

[57] "Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," *J.P. Morgan*, August 16, 2021, p. 8.

[58] IPO Prospectus, p. 67.

[59] CS Disco generated $73.9 million in revenues in the 12 months ended March 31, 2021.  *See* IPO Prospectus, p. 16.

[60] IPO Prospectus, p. 27 (emphasis in original).

acknowledged.[61]  For example, to achieve diversification and mitigate risk, investors can include multiple asset classes, industries, and geographies in their investment portfolios, rather than holding only a small number of individual stocks.[62]  A diversified portfolio smooths out volatility by potentially offsetting poor performance in one asset with better performance in other assets.

29.    Similarly, analysts acknowledged that a substantial portion of CS Disco's revenues were due to a small number of large customers, and that the Company's customer concentration risk was expected to decrease or "wash out" as CS Disco grew over time and more customers were added:

> Canaccord Genuity, August 16, 2021:  "Usage-based business model.  Easy to understand/predictable pricing is a hallmark of the model, but investors should understand this is a usage-based revenue model.  This means that even if the trendline for spend is up – customers often increase initial commitments by >10x over time – *per customer spend usually sees short-term fluctuations.  This noise should wash out when you consider the portfolio effect of a customer list that's growing and tops 900 today*, but it's something to be aware of.
> …
> Customer data points.  As of the end of Q1'21, Disco had 909 customers, of which *~1% were spending more than $1M per year, ~2.5% over $500K,* ~7.5% over $250K, ~15% over $100K, and ~30% over $50K.…  In terms of customer concentration, *the firm's top 20 customers account for about 30% of revenue*

---

[61] *See*, *e.g.*, Brealey, Myers, et al., *Principles of Corporate Finance*, Tenth Edition (New York, NY: McGraw-Hill/Irwin, 2011), pp. 169–170 (original emphasis removed) ("Even a little diversification can provide a substantial reduction in variability.…  Diversification works because prices of different stocks do not move exactly together.  Statisticians make the same point when they say that stock price changes are less than perfectly correlated.…  The risk that potentially can be eliminated by diversification is called specific risk.  Specific risk stems from the fact that many of the perils that surround an individual company are peculiar to that company and perhaps its immediate competitors.").  I note that Dr. Nye seems to agree that diversification would lead to lower volatility.  *See* Nye Deposition, 110:16–111:2 ("Q. And would you agree that as a general matter, as the number of customers for a company increases, changes in any given customer's revenue are going to have a smaller impact on the revenue volatility?  A. Yeah, on average.  Of course, you can have perfect storms, and they happen every once in a while, where no matter how much you've diversified the whole economy still tanks, you know, that kind of stuff.  But, nonetheless, is -- all else equal, a diversified portfolio will have less volatility for a given level of mean return than a single stock.").
[62] *See*, *e.g.*, The Vanguard Group, "Diversifying Your Portfolio," https://investor.vanguard.com/investor-resources-education/portfolio-management/diversifying-your-portfolio; Financial Industry Regulatory Authority, "Asset Allocation and Diversification," https://www.finra.org/investors/investing/investing-basics/asset-allocation-diversification.

*and its Top 10 account for about 20%,* but no customer accounts for more than 5% of revenue, and we expect diversification will improve as the customer base scales."[63]

Citi, August 16, 2021:  "*Usage-based model risk exacerbated by customer concentration[.]*  The unpredictability of Disco's usage-based pricing model was a recurring area of feedback in our initial conversations with investors.  Disco's revenue is tied to the amount of data that is stored or reviewed, which is unpredictable even for the end users.…  The conclusion of a major lawsuit could lead to a significant reduction in spending.  In 2Q21, a single customer accounted for nearly $3M of revenue, representing ~10% of the business.  While this will likely decline as contribution from other customers increase in the ensuing quarters, customer concentration adds incremental risk to the usage-based model."[64]

Loop Capital, August 16, 2021:  "*Some customer concentration issues as 20% of revenue came from top 10 customers.*  Given that a substantial portion of DISCO's revenue comes from a small percentage of their customer base, there is a risk of revenue fluctuation that can result from the usage and purchasing decisions of large current or future customers.  Depending on the magnitude of the purchasing decisions, sequential revenue growth could be greatly substantial. Additionally, changes in purchasing patterns by these customers may come with limited notice, impacting DISCO's forecasting capabilities and future projections. However, as the company scales its business, we expect increased diversification of its customer base and less reliance on larger customers."[65]

Bank of America, August 16, 2021:  "Finally, due to the overall scale of Disco, large data sets from legal matters being put on or taken off the platform *could cause lumpiness in revenue*.  However, *we do see the potential for revenue lumpiness likely dissipating as the business scales over time*."[66]

Jefferies, August 16, 2021:  "The top 20 customers comprised over 30% of revenue in 2020.  DISCO had 909 total customers as of the first quarter 2021.  As

---

[63] "Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," *Canaccord Genuity*, August 16, 2021, pp. 1, 5–6 (original emphasis removed, emphasis added).

[64] "Establishing new cloud-based precedent; initiating Buy/High Risk," *Citi*, August 16, 2021, pp. 21–22 (emphasis in original).

[65] "Initiating Coverage with a Buy Rating and $60 PT," *Loop Capital*, August 16, 2021, p. 4 (emphasis in original).

[66] "Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," *Bank of America Global Research*, August 16, 2021, pp. 3–4 (emphasis added).

such, *2% of customers generate over 30% revenues, which is fairly concentrated*."[67]

### 4.    That a Large and Atypical Customer Contributed to Q2 2021 Results Was Publicly Available Prior to the Proposed Class Period

30.    In its IPO Prospectus, CS Disco released preliminary Q2 2021 financial results, including its anticipated Q2 2021 revenues.[68]  In addition, analyst discussion prior to the Proposed Class Period identified and discussed that a large and atypical customer accounted for nearly 10% of the preliminary Q2 2021 revenues it previewed:

> Citi, August 16, 2021:  "As Disco cultivates its base of users, it may also benefit from larger initial land/rapid ramp as a result of experienced users adopting Disco at new companies.  *The key customer behind the 2Q21 outperformance is a great example of this dynamic, as experienced user joined a new corporation in 4Q20 and quickly took the company to a $3M/quarter spend by 2Q21*.…  In 2Q21, a *single customer accounted for nearly $3M of revenue, representing ~10% of the business*."[69]

> J.P. Morgan, August 16, 2021:  "If a new case is ingested and put into review or if a customer transfers multiple cases from a competitor to the Disco platform all at once, then we could see a spike in quarterly revenue, which is exactly what happened in 2Q21.  …[R]evenue in the June quarter is expected to be up nearly 40% sequentially, according to flash financials in S-1.  The *jump was due in part to a new customer* and also to usage from existing customers that happened to ratchet up during the period."[70]

31.    Based on my review of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ mentioned in the September 2, 2021 alleged misrepresentation, which "in 3 quarters … ramp[ed] from 0 to a multimillion dollar level of spend."[71]  Thus, prior to the start of the Proposed Class

---

[67] "DISCO Gets The Party Started; Initiate Hold," *Jefferies*, August 16, 2021, p. 11 (emphasis added).

[68] IPO Prospectus, p. 11.

[69] "Establishing new cloud-based precedent; initiating Buy/High Risk," *Citi*, August 16, 2021, pp. 16, 22 (emphasis added).

[70] "Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," *J.P. Morgan*, August 16, 2021, p. 8 (emphasis added).

[71] CS Disco Q2 2021 Earnings Call, p. 5 ("A great example of what has driven the acceleration in growth this quarter is a well-known consumer brand that in Q4 of last year hired a new Deputy

Period, it was publicly available information that a new, large customer contributed to the revenue and revenue growth of CS Disco's preliminary Q2 2021 financial results.

32.    In addition, analyst commentary prior to the Proposed Class Period indicated that this customer's ramping quickly from 4Q 2020 to 2Q 2021 was atypical compared to other CS Disco customers.  In particular, analysts discussed the trajectory of customer spending, noting that the adoption journey varied among customers and could often take multiple years:

> Needham, August 16, 2021:  "***In 2018, Disco had no customers with $1mm+ in revenue, but 2020, there were nine.…  It can often take Disco multiple years to fully penetrate an existing client.***  The long duration of court cases (which can extend multiple years on appeals) as well as the decentralized nature of law work can result in expansion even among clients of 3-4 years. ***Because of the long ramp, Disco has only recently started to see $1mm+ revenue customers.***  As Disco's customer base matures, we expect to see more customers in the higher range of spending.  Over time, we believe Disco could see customers generating upwards of $10mm in annual revenue as it expands within an organization and becomes its primary platform for eDiscovery, document review, and other legal work.  …[N]ew customers often spend very little in their first year."[72]

> Cowen, August 16, 2021:  "LAW has many customers spending low-7-figures per year, and we think its largest customer is currently generating mid-7-figures in [annual recurring revenue].  …[W]e see the potential for LAW to reach such 8-figure deals over time.  ***LAW has also seen strong growth in its largest customers over the past three years, with its 20th largest customer growing from ~$300K in 2018 to ~$500k in 2019, ~600K+ in 2020, and we think this currently is closer to ~$1M today.…***
>
> We note that, in recent quarters, new customers have been ramping faster in their first year than historically, which is a net positive for revenue but makes driving

---

General Counsel from a major technology company that had been a long-standing DISCO customer.  He ran a sole source procurement for e-discovery when he started his new job.  And between the fourth quarter of 2020 and the first quarter of 2021, his new company migrated their e-discovery program to DISCO Ediscovery.  Then in the second quarter of 2021, this company experienced a series of major legal issues that caused them to accelerate their adoption of our second product, DISCO Review.  So in 3 quarters, we saw this company ramp from 0 to a multimillion dollar level of spend.").  Based on my review of ███████████████████
███████████████████████████████████████████████████
███ *See* DISCO_001585; DISCO_001586; DISCO_001587.  As discussed in more detail in ¶ 37, ████████████████████████████████████████

[72] "Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," *Needham*, August 16, 2021, pp. 4, 6 (emphasis added).

up [annual recurring revenue] in year 2 a little harder, creating some headwinds to [net revenue retention] calculations."[73]

### B.   From an Economic Perspective, the September 2, 2021 Alleged Misrepresentations Did Not Impact CS Disco's Stock Price

33.    As discussed in **Section IV.B**, Plaintiff and Dr. Nye claim that the "truth" that should have been disclosed is that "Disco's ***customer spend growth*** was driven by only a handful of large Review projects"; that "***customer spending*** was actually 'spiky and driven by only a few large Review projects'"; and that "its previous projections relied on the assumption that CS Disco would continue to receive seven figure per quarter revenues from a small number of large Review matters."[74]  Plaintiff claims that "the misleading statements at issue in this case would not be expected to cause CS Disco's stock price to increase when Camara uttered them, but rather prevent the decline that would have occurred had Camara told the truth."[75]  Dr. Nye's event study does not provide any economic evidence that any Company-specific information, including the alleged misrepresentations, caused CS Disco's stock price to increase on September 3, 2021.[76]  Specifically, CS Disco's stock return on September 3, 2021, following the

---

[73] "INITIATING AT OUTPERFORM; DISCO SET TO BOOGIE TO EDISCOVERY MARKET LEADERSHIP," *Cowen*, August 16, 2021, pp. 24, 28 (emphasis added).

[74] *See* Nye Report, ¶ 55–56 (original emphasis removed, emphasis added).  *See also* Amended Complaint, ¶¶ 48–49; Plaintiff's Motion for Class Certification, p. 3.

[75] Plaintiff's Motion for Class Certification, p. 19.

[76] Dr. Nye testified that he did not directly analyze whether the alleged misrepresentations had a price impact.  *See* Nye Deposition, 85:17–25 ("Q. But you didn't take any steps to determine whether there was front-end price impact on the misrepresentation dates?  A. I didn't -- directly examine them for the reason I just stated.  I mean, I did examine them largely through my event study, as you pointed out the early couple dates of misstatements in there -- but I didn't do that for the purpose of analyzing price impact.").

September 2, 2021 alleged misrepresentations made after market hours, is 0.3%, which is not statistically significant at the 95% confidence level using a two-tailed test.[77, 78]

34.     Moreover, other economic evidence does not indicate that the allegedly omitted information would have impacted CS Disco's stock price at the time of the September 2, 2021 alleged misrepresentations or that there was an information asymmetry such that ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Specifically, I find that (i) CS Disco's disclosures on the conference call regarding its revenues and revenue growth appear consistent with its ████████████████████████████████████, and ████████ do not indicate that large Review matters were the single "driver" of its revenue growth in Q2 2021;[79] (ii) CS Disco's ████████████████████████████████████████████████████████████████ based on publicly available information following the alleged misrepresentations, which does not

---

[77] Dr. Nye found that CS Disco's residual return on September 3, 2021 was 0.3% and not statistically significant at the 95% level. *See* Nye Report, Exhibit 11B. Based on my review of public information disclosed on this date, I did not find negative, firm-specific information that would have offset a potential positive stock price change resulting from the alleged misrepresentations. Instead, CS Disco's results for the Q2 2021 were in line with the preliminary results it provided in its IPO Prospectus, and CS Disco also issued financial guidance for Q3 2021 that was above the median analyst consensus forecast. For Q2 2021, CS Disco reported total revenue of $29.5 million, compared with the preliminary range of $28.5–$29.8 million in the IPO Prospectus; GAAP net loss of $3.1 million, compared with the preliminary range of $2.4–$4.4 million loss in the IPO Prospectus; and adjusted EBITDA of negative $1.6 million, compared with the preliminary range of negative $2.7–$1.1 million in the IPO Prospectus. CS Disco also provided guidance for Q3 2021 and FY 2021 of revenues between $25.5–$25.9 million and $103.5–$104.3 million, respectively, compared to median analyst consensus forecasts of $24.4 million and $101.4 million. *See* CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "CS Disco Announces Second Quarter 2021 Financial Results," September 2, 2021 ("CS Disco Q2 2021 Press Release"), p. 1; IPO Prospectus, p. 11; *LSEG Workspace*.

[78] Consistent with the lack of a statistically significant stock price movement, I find that (i) as discussed in **Section VI.A.4**, the fact that there was a customer that "ramped from zero to multi-million dollar level of spend" was already publicly available and previously discussed by analysts; and (ii) as discussed in **Section VI.A.3**, the statement that "as our base grows, more of these specific customer usage fluctuations washout in the aggregate" is consistent with analyst expectations prior to the Proposed Class Period. In an efficient market, repetition or reiteration of publicly known information would not impact the stock price. Thus, assuming that the market for CS Disco's stock was efficient, the repetition of publicly known information in the alleged misrepresentations on September 2, 2021 would not have impacted CS Disco's stock price.

[79] Plaintiff and Dr. Nye do not quantify what it would mean for customer spending to be "driven" by large Review matters.

indicate that CS Disco's stock price would have declined had the Company disclosed ███████ ███████████████████████████████████████████████████████; and (iii) CS Disco and analysts continued to discuss the revenue volatility risks with CS Disco's customer base and usage-based pricing model.

> **1.      CS Disco's Disclosures Regarding Individual Customer Contribution to Revenues in Q2 2021 and the Many Drivers of Its Revenues and Revenue Growth Appear Consistent with Its ██████████████, and Such Disclosures Were Acknowledged by Analysts**

35.      As discussed below, CS Disco disclosed information concerning the two large Review matters that contributed to its Q2 2021 revenues, as well as information on the many drivers of its revenues and revenue growth, and such disclosures were acknowledged by analysts.  Based on my review of ███████████████████████████████████, CS Disco's disclosures appear consistent with its ███████.

36.      First, on the September 2, 2021 earnings conference call, CS Disco disclosed two examples of rapid customer adoption that contributed to its revenue outperformance in Q2 2021. Defendant CEO Camara described the first customer as one that "in the second quarter of 2021 … experienced a series of major legal issues that caused them to ***accelerate their adoption of our second product, DISCO Review***" and as a result had "in 3 quarters … ramp[ed] from 0 to a multimillion dollar level of spend."[80]  The Company also disclosed that a second customer had "joined … in Q2 and grew to be a $1 million-plus customer in the quarter."[81]  Based on my review of CS Disco's ████████████████████████████████████████████████████████████████████████████████████████████████████████████[82]

---

[80] CS Disco Q2 2021 Earnings Call (emphasis added), p. 4.

[81] CS Disco Q2 2021 Earnings Call, p. 4.  CS Disco discussed that this customer contributed over $1 million in revenue out of the $29.5 million in total revenues in Q2 2021.  *See* CS Disco Q2 2021 Press Release, p. 4.

[82] *See* DISCO_001585; DISCO_001586; DISCO_001587; DISCO_001588.  I note that, to the extent there was any alleged misrepresentation regarding a failure to disclose that "Disco's customer spend growth was driven by only a handful of large Review projects," ████████ ██████████████████████████████

37.

███████████████████████████████████████████ .[83] ████████████████████████

████████████████████████████████████████████████████████

██████

38.    Based on publicly available information that these two customers accounted for over $3 million and $1 million in total revenues, respectively, in Q2 2021 (*see* **Section VI.A.4**), it was publicly available that these two customers contributed approximately 13.5% of total revenues in Q2 2021 and accounted for approximately 28.9% of the year-over-year revenue growth experienced in Q2 2021.[84]  In other words, CEO Camara's statements appear consistent with what CS Disco's ██████████ showed about "large" Review matters.

39.    Moreover, analysts discussed the "atypical" customer ramp for these two customers, and noted that such large customer activity should not be expected to reoccur in future periods:

> Canaccord Genuity, September 2, 2021:  "***Atypical customer ramp.***  Disco discussed a well-known consumer brand that in Q4 of last year hired a new deputy counsel from an existing Disco customer.  That new leader migrated his current firm to Disco in Q4 and Q1, and then in Q2 that customer had acceleration in legal issues that led them to take on Disco's Review product.  That process took this customer from zero to a multi-million-dollar customer in three quarters, a process that can typically take several years.  Two important takeaways here: (1) this speaks to the virality that can occur as corporate attorneys move from one firm to the next and (2) ***the sequential revenue growth we saw in Q2 had some unusually strong large customer activity that investors should not expect to reoccur in future periods***."[85]

> Bank of America, September 3, 2021:  "The strong Q2 revenue growth of +88% demonstrates the potential of Disco's usage based revenue model to drive healthy growth trends and fast new customer ramp, which was seen with ***a new Q2 customer (travel industry) quickly eclipsing the $1m+ threshold.***  And while the usage model does comes [*sic*] with ***lower visibility*** than some of its enterprise

---

[83] *See* DISCO_001588. ████████████████████████████████████████
██████████████████████████████. *See* DISCO_001585; DISCO_001586; DISCO_001587.

[84] Revenue in Q2 2021 was $29.5 million and year-over-year revenue growth was $13.8 million. *See* **Exhibit 1**.

[85] "Enterprise Software - Software as a Service," *Canaccord Genuity*, September 2, 2021, p. 1 (emphasis added).

software peers, nonetheless, we are confident that the business is a share gainer in a large legal tech opportunity."[86]

Cowen, September 3, 2021: "[Management] mentioned a large consumer co. that rapidly ramped spend from $0 to multi-million over the past 3 [quarters] and a large travel co. that went from $0 to >$1M over the past 4 [quarters] (a cycle that historically took 3-5 yrs)."[87]

40.    Second, on the September 2, 2021 conference call, CEO Camara disclosed CS Disco's "drivers" of its revenues and revenue growth, including that there was "no particular driver of the outperformance in Q2":

> So I think if you look at Q2, that 88% year-on-year growth gives you a sense of just how good, good can be when absolutely everything in our business fires on all cylinders.  There was no particular driver of the outperformance in Q2. Whether you look at new customers, whether you look at increased growth from existing customers, whether you look at faster adoption journeys like the 2 examples we talked about in our prepared remarks, whether you think about growth internationally or growth in the United States, whether you think about growth in the core DISCO Ediscovery product or increased adoption in DISCO Review, all of these things were really firing on all cylinders.  And there isn't a single driver of growth in Q2.[88]

CS Disco's Q2 2021 Form 10-Q also disclosed that 27% of its year-over-year revenues came from existing customers and 73% from new customers.[89]  Based on my review of CS Disco's ██████████████████████████, there was no single driver of CS Disco's revenues or revenue growth, ████████████████████████████████████████████.  In particular, as shown in **Exhibit 1** and discussed above, █████████████████████ ██████████████████████████████████████████████████████;█████████

---

[86] "Great start as a public company; Reit Buy, PO to $70," *Bank of America Global Research*, September 3, 2021, p. 1 (emphasis added).

[87] "JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021, p. 1.

[88] CS Disco Q2 2021 Earnings Call, p. 7.

[89] CS Disco Q2 2021 Form 10-Q, p. 28 ("Total revenue increased by $13.8 million, or 88%, for the three months ended June 30, 2021 compared to the same period in 2020.  Approximately 27% of the increase related to additional usage and adoption of our solution by our existing customers.  The remaining 73% increase in revenue related to new customers added during the period.").

███████████████████████████████████████████████████

██████████████████████████████████

41.    Analysts acknowledged CS Disco's growth across all of its products, including Review:

Canaccord Genuity, September 2, 2021:  "**Outperformance across every aspect of the business.**  This is how management characterized Q2 execution, which is reflective of strong new logo additions, expanding usage in existing accounts, and healthy adoption of newer products like Review and Case Builder."[91]

Loop Capital, September 2, 2021:  "Simply put, the company had a 'once-in-a-lifetime' quarter.  Its y/y revenue growth accelerated from 35% in Q1 to 88% in Q2.  All aspects of its business showed strength in the quarter."[92]

Cowen, September 3, 2021:  "[Management] indicated the outsized growth (up an unusually strong 40% Q/Q) benefited from a perfect tsunami of strength, incl. 1) strong consumption trends (driven by litigation matter volumes); 2) increased cross-sell activity of new products, namely Document Review (which can increase ASPs by 2-3x); 3) accelerating lead [generation] & new customer signings; 4) increased win rates; and 5) rising int'l adoption."[93]

### 2.    CS Disco's ██████████████████████ ██████████ as of the Time of the Alleged Misrepresentations

42.    As discussed in **Section IV.B**, Plaintiff claims there was "a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects.'"[94]  Dr. Nye refers to "the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects."[95]  If there were an asymmetry between external and internal information causing the market to underestimate the risks to future revenues, I would expect

---

[90] Based on the ███████████████████████, CS Disco█████████████████████ ██████████████████████████████████████████████  *See* DISCO_001583.

[91] "Enterprise Software - Software as a Service," *Canaccord Genuity*, September 2, 2021, p. 1 (emphasis in original).

[92] "Strong Start as a Public Company," *Loop Capital*, September 2, 2021, p. 1.

[93] "JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021, p. 1.

[94] Plaintiff's Motion for Class Certification, p. 10.

[95] Nye Report, ¶ 56 (emphasis added).

such an asymmetry to be reflected in █████████████████████████████████ ████████████████████████████ I do not observe this in ████████.

43.    Based on my review of CS Disco's ████████████████████████████████ following the alleged misrepresentations on September 2, 2021, CS Disco's ████████████ ██████████████████████████████████. Thus, the economic evidence does not indicate that the alleged misrepresentations resulted in ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████

44.    Specifically, based on ████████████████████████████, as of the time of the September 2, 2021 alleged misrepresentations, █████████████████████████████████ ████████████████████████████████████████████ ████████.[96]  As shown in **Exhibit 2**, ██████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████  ████████████ ████████████████████████████████████████.[98]

45.    ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████

---

[96] *See* ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

[97] I used analyst consensus forecasts as of September 9, 2021 (one week after the September 2, 2021 alleged misrepresentations) to allow time for analysts to update their forecasts following the earnings announcement.  *See* **Exhibit 2**.

[98] In the September 2, 2021 earnings press release, CS Disco provided revenue guidance of $25.5–$25.9 million for Q3 2021 and revenue guidance for FY 2021 of $103.5–$104.3 million (implying revenue guidance for Q4 2021 of $26.9–$28.1 million).  *See* CS Disco Q2 2021 Press Release, p. 1.

[99] I am not aware of an ██████████████████████████████████████████████

46.    As discussed above, stock prices should reflect the value of appropriately discounted expected future cash flows in an efficient market.[100]  If a different disclosure would not move forecasted or expected cash flows down, or move the discount rate up, then according to standard financial economic theory such information would not negatively affect the stock price. Therefore, the economic evidence does not indicate that CS Disco's stock price would have declined had the Company disclosed ███████████████████████████████ ████████████████████████████ █ ████████████████████████████ ███████████████████ relative to CS Disco's publicly provided guidance or analysts' forecasts.

### 3.    CS Disco Reiterated the Revenue Risks of Its Usage-Based Model and Analysts Continued to Discuss the Risks of Revenue Volatility

47.    As discussed in **Section IV.B**, I understand Plaintiff contends that "this case is premised on a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects.'"[102]  However, as discussed in **Section VI.A**, prior to the start of the Proposed Class Period, analysts already discussed that customer spending could be spiky, that use of Review could substantially increase customer spending, and that CS Disco was subject to customer concentration risk due to a few large customers accounting for a substantial portion of its revenues.  In addition to its discussion of the growth journeys of its two largest customers, CS Disco also reiterated on the September 2, 2021 conference call that it had a "usage-based business model" that subjected it to "inherent volatility from quarter-to-quarter as customers' legal matters begin and expand and shrink,"[103] which analysts again acknowledged.  The

---

[100] *See* fn. 32.

[101] I understand that CS Disco's ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████

[102] Plaintiff's Motion for Class Certification, p. 10.

[103] CS Disco Q2 2021 Earnings Call, p. 5.  CS Disco made similar statements on conference calls throughout the Proposed Class Period.  *See* CS Disco, Inc., "Q3 2021 CS Disco Inc Earnings Call," November 9, 2021 ("CS Disco Q3 2021 Earnings Call"), p. 4 ("As we mentioned on our last earnings call, we primarily have a usage-based model that is driven by the number and nature of matters, volume of data, length of time on the platform and other factors."); 2022

continued discussion of CS Disco's revenue volatility risk is inconsistent with Plaintiff's claim that a failure to disclose that CS Disco's revenue was "spiky and driven by only a few large Review projects" impacted its stock price.[104]

48.　　Specifically, analysts continued to acknowledge the risk for volatility in the Company's financial results due to its usage-based business model and customer concentration:

> <u>Jefferies, September 3, 2021</u>:  "**Key Areas to Watch — Volatility Associated With Usage-Based Pricing; Conservative Guidance.**  LAW's pricing model is usage-based and subject to volatility, therefore we do not expect the growth levels seen in Q2 to be sustained."[105]

> <u>Loop Capital, September 2, 2021</u>:  "[W]e note that LAW employs a usage-based revenue model (vs. subscription-based one), which is driven by highly variable factors (such as the amount of data ingestion and data type).  This leads to a ***high level of variability in its quarterly result***s.  While no revenue is recurring in nature, some level of base usage should continue.  We note that as the company continues to scale, the degree of quarterly variability should decline.…

> Primary risks include:  1) company's usage-based model leading to a ***high level of variability in its quarterly results***; 2) ***lower revenue visibility*** due to lack of long-term customer commitments; … 4) some customer concentration issue."[106]

---

Needham Conference, p. 10 ("In terms of what drives variability in our results, it is the usage-based nature of our business and we've talked about that in our earnings call for Q2, where I talked about just everything going right across every line of our business.  We talked about it in [the] Q3 earnings call, where we gave some examples of particular customers and that is an enduring attribute of our business model that you'll see continue.  Any customer[']s usage can go up and down over time based on the kinds of legal exposure the customer has and how much data or documents those legal matters involve."); CS Disco, Inc., "Q4 2021 CS Disco Inc Earnings Call," February 24, 2022 ("CS Disco Q4 2021 Earnings Call"), p. 8 ("I will reiterate that our usage-based model can lead to fluctuations in revenue depending on the number and nature of matters on the platform, volume of data, length of time on the platform and other factors."); CS Disco, Inc., "Q1 2022 CS Disco Inc Earnings Call," May 12, 2022 ("CS Disco Q1 2022 Earnings Call"), p. 5 ("I'd like to reiterate that our business is primarily a usage-based model that is driven by the number and nature of matters, volume of data, length of time on the platform and other factors that may impact revenue in any given quarter.").

[104] Plaintiff's Motion for Class Certification, p. 10.

[105] "Law and Order in This Q," *Jefferies*, September 3, 2021, p. 1 (emphasis in original).

[106] "Strong Start as a Public Company," *Loop Capital*, September 2, 2021, pp. 1, 8 (emphasis added).

Bank of America, September 3, 2021:  "Risks to our PO are: 1) usage based pricing model *could result in lumpy revenue*."[107]

Cowen, September 3, 2021:  "Risks to the Price Target Usage based revenue model:  LAW's model is largely usage-based which *could drive meaningful volatility in quarterly revenue*.  Consumption revenue can be impacted by the timing of cases which are less predictable.  In turn, because of its pricing model, LAW carries minimal committed backlog or deferred revenue on its balance sheet, giving it less visibility than a traditional SaaS model.…  Revenue concentration: … ~30% of revenue comes from its top 20 customers, creating some level of customer concentration risk."[108]

49.    I note that Dr. Nye appears to have interpreted the September 2, 2021 alleged misrepresentations as a discussion about CS Disco's current revenue stability.[109]  However, as discussed above, my review of analyst reports published before and after the September 2, 2021 alleged misrepresentations found that analysts continued to discuss CS Disco's ongoing revenue volatility due to its usage-based model.  For example, Loop Capital identified on August 16, 2021 that "[CS Disco's] usage-based model does lead to short-term variability in its results and also to its margins, although we believe this potential quarterly variability should become

---

[107] "Great start as a public company; Reit Buy, PO to $70," *Bank of America Global Research*, September 3, 2021, p. 8 (emphasis added).

[108] "JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021, p. 8 (original emphasis removed, emphasis added).

[109] *See* Nye Deposition 107:2–108:19 ("Q. Okay.  And then the next challenge statement follows this one.  It says, 'On the same call Camara stated, among other things, that' -- and I'll – I'll let you read that paragraph there.  A. Okay.  Q. Is there any reference to current revenue stability in this statement? … THE WITNESS:  I think so.  It's talking about current and future as the company grows, as the customer rates grows the case-specific volatility washes out, implying a stable revenue stream that grows in the future. … Q. Yeah, so it says, 'We would expect that as our base grows more of the specific customer usage fluctuations will wash out in the aggregate.'  So where's the reference to current stability? A. I mean, the first part of the sentence says 'Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller.'  So that's the present. … Q. So is it your position that the word 'now' in that sentence is referring to current impacts of customers' fluctuation in usage and overall revenue? A. Yeah, I think it implies that.  Q. Okay.  Even though it's in the future tense? A. 'Now' means now.  Q. It's not just the start of a statement, 'Now we're going talk about X'? … THE WITNESS:  It -- to me reads as a description of present, and then into the future it gets even more stable as the fluctuations become smaller and less and less important as the diversification across the customer base effectively takes hold.").

minimal once the company scales to a higher revenue run rate,"[110] and reiterated on September 2, 2021—after the alleged misrepresentations—that "as the company continues to scale, the degree of quarterly variability should decline…"[111]  Dr. Nye provides no reliable economic basis for his interpretation that CEO Camara's statement informed market participants about the current impacts of customer fluctuations on CS Disco's revenue stability, and Dr. Nye's interpretation is contradicted by the fact that analysts continued to reiterate the revenue risks of its usage-based model after the alleged misrepresentations.

### C.    From an Economic Perspective, the January 11, 2022 Alleged Misrepresentations Did Not Impact CS Disco's Stock Price

50.    As discussed in **Section VI.B**, Plaintiff claims that "the misleading statements at issue in this case would not be expected to cause CS Disco's stock price to increase when Camara uttered them, but rather prevent the decline that would have occurred had Camara told the truth."[112] Dr. Nye's event study does not provide any economic evidence that any Company-specific information, including the alleged misrepresentations, caused CS Disco's stock price to increase on January 11, 2022.[113]  Specifically, Plaintiffs allege that CS Disco made misrepresentation during market hours at the Needham Conference.[114]  CS Disco's stock return on January 11,

---

[110] "Initiating Coverage with a Buy Rating and $60 PT," *Loop Capital*, August 16, 2021, p. 1.

[111] "Strong Start as a Public Company," *Loop Capital*, September 2, 2021, pp. 1, 8 (emphasis added).

[112] Plaintiff's Motion for Class Certification, p. 19.

[113] Dr. Nye does not directly analyze whether the alleged misrepresentations had a price impact. *See* Nye Deposition 85:17– 25 ("Q. But you didn't take any steps to determine whether there was front-end price impact on the misrepresentation dates?  A. I didn't -- directly examine them for the reason I just stated.  I mean, I did examine them largely through my event study, as you pointed out the early couple dates of misstatements in there -- but I didn't do that for the purpose of analyzing price impact.").

[114] Plaintiff's Motion for Class Certification, pp. 2–3; Business Wire, "DISCO to Present at Needham Growth Conference," January 6, 2022, available at https://www.businesswire.com/news/home/20220106005900/en/DISCO-to-Present-at-Needham-Growth-Conference.

2022 is 1.3%, which is not statistically significant at the 95% confidence level using a two-tailed test.[115, 116]

51.      Moreover, as discussed in the sections that follow, other economic evidence does not indicate that the allegedly omitted information would have impacted CS Disco's stock price at the time of the January 11, 2022 alleged misrepresentations or that there was an information asymmetry such that ███████████████████████████████████████ ████████████████████████████████████████ Specifically, I find that (i) CS Disco's ██████████████████████████████ do not indicate that large Review matters were the single "driver" of its growth in Q3 2021;[117] (ii) CS Disco's ███████████████████████████████████████ ██████ based on publicly available information following the alleged misrepresentations, which does not indicate that CS Disco's stock price would have declined had the Company disclosed ████████████████████████████████████ ██████ and (iii) CS Disco and analysts continued to discuss the revenue volatility risks with CS Disco's customer base and usage-based pricing model, and the analyst report published after the Needham Conference did not discuss the January 11, 2022 alleged misrepresentations.

---

[115] Dr. Nye found that CS Disco's residual return on January 11, 2022 was 1.3% and not statistically significant at the 95% level. *See* Nye Report, Exhibit 11B. Based on my review of public information disclosed on this date, I did not find negative, firm-specific information that would have offset a potential positive stock price change resulting from the alleged misrepresentations.

[116] Consistent with the lack of a statistically significant stock price movement, I also found that analyst reports following the alleged misrepresentations did not discuss the alleged misrepresentations from the Needham Conference. I identified only one report published within one week after the Needham Conference, issued by Needham analysts. This report did not contain any commentary on the alleged misrepresentations made at the Needham Conference on January 11, 2022. *See* "LAW: Needham Growth Conference Highlights," *Needham*, January 12, 2022. In addition, I note that neither of the alleged misrepresentations at the Needham Conference appears to have addressed CS Disco's Review product. Notably, one of the alleged misrepresentations was made specifically in response to a question about CS Disco's Ediscovery product: An analyst asked, "next question is on *e-discovery*, is expansion of *e-discovery* use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?" to which Defendant CEO Camara replied that "there's not as much variance in the ultimate wallet size of the customer." *See* 2022 Needham Conference, p. 11 (emphasis added).

[117] Plaintiff and Dr. Nye do not quantify what it would mean for customer spending to be "driven" by large Review matters.

### 1. From an Economic Perspective, Large Review Matters Were Not the Single "Driver" of CS Disco's Q3 2021 Financial Results

52. As discussed in **Section VI.B**, CS Disco disclosed information concerning the two large Review matters that contributed to its Q2 2021 revenues, as well as information on the many drivers of its revenues and revenue growth. These disclosures appear consistent with its ███████ ███ and were acknowledged by analysts. In addition, at the time of the Needham Conference on January 11, 2022, CS Disco had already released its Q3 2021 financial results.[118] Based on my review of ██████ CS Disco ███████████████████, the economic evidence does not support that large Review matters were the single "driver" of CS Disco's revenues or revenue growth in Q3 2021.

53. ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ █ ████████████████████████ ████████████████████████████████████████ ████████████████████████████████

54. ████████████████████████████████████ the Company's revenue performance in Q3 2021 *exceeded* analyst forecasts. Prior to announcing its Q3 2021 results, the Company provided guidance that Q3 2021 revenues would be $25.5–$25.9 million and the median analyst consensus forecast was $25.7 million.[121] On November 9, 2021, CS Disco announced Q3 revenues of $29.9 million, representing quarter-over-quarter growth of 1.4% and year-over-year growth of 67.1%.[122] In other words, ████████████████████████ ████████████████████████ CS Disco nevertheless posted overall growth in total

---

[118] Q3 2021 financial results were released on November 9, 2021. *See* CS Disco Q3 2021 Earnings Call, p. 1.

[119] *See* DISCO_001588.

[120] *See* **Exhibit 1**; DISCO_001588. ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

[121] *See* **Exhibit 3**.

[122] *See* CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Third Quarter 2021 Financial Results," November 9, 2021 ("CS Disco Q3 2021 Press Release"); **Exhibit 1**.

revenues exceeding analyst forecasts.  As shown in **Exhibit 1**, ████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████ ██  ██████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

### 2.    CS Disco's ████████████████████████ ████████████ **as of the Time of the Alleged Misrepresentations**

55.    As discussed in **Section VI.B**, Plaintiff claims there was "a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects.'"[124]  Dr. Nye refers to "the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects."[125]  If there were an asymmetry between external and internal information causing the market to underestimate the risks to future revenues, I would expect such an asymmetry to be reflected in ████████████████████████████████ ████████████████████████████  I do not observe this in ████████

56.    Based on my review of both CS Disco's ████████████████████████ ████████  following the alleged misrepresentations on January 11, 2022, CS Disco's ████████ ████████████████████████████████████████, the economic evidence does not indicate that the alleged misrepresentations resulted in ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████

57.    Specifically, based on ████████████████████████████ as of November 8, 2021, CS Disco had ████████████████████████████████████████

---

[123] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████ *See* DISCO_001588; DISCO_001583.
[124] Plaintiff's Motion for Class Certification, p. 10.
[125] Nye Report, ¶ 56 (emphasis added).

██████████████████████████████████ [126, 127]  As shown in **Exhibit 2**, ██████████
███████████████████████████████████████████ following the
alleged misrepresentations on January 11, 2022.  In addition, as discussed in **Section VI.B** and as
shown in **Exhibit 2**, CS Disco's ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ .

██████████████████████████████████████████████████████

██████ .

58.    As discussed above, stock prices should reflect the value of appropriately discounted
expected future cash flows in an efficient market. [128]  If a different disclosure would not move
forecasted or expected cash flows down, or move the discount rate up, then according to standard
financial economic theory, such information would not negatively affect the stock price.
Therefore, the economic evidence does not indicate that CS Disco's stock price would have
declined ████████████████████████████████████████

███████████████████████████ ██ ████████████████████████

████████████████████████ CS Disco's publicly provided guidance or analysts'
forecasts.

### 3.    CS Disco Reiterated the Revenue Risks of Its Usage-Based Model, and Analysts Continued to Discuss the Risks of Revenue Volatility

59.    As discussed in **Section IV.B**, I understand Plaintiff contends that "this case is premised
on a failure to disclose that customer spending was 'spiky and driven by only a few large Review

---

[126] *See* CS Disco, Inc. ████████████████████████████████
████████████████████████████ Additionally, █████████████
███████████████ .
[127] I note that the Company's ████████████████████████████
Specifically, in the November 9, 2021 earnings press release, CS Disco provided revenue
guidance of $28.2–$28.8 million for Q4 2021.  *See* CS Disco Q3 2021 Press Release, p. 1.
[128] *See* fn. 32.
[129] I understand that CS Disco's ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

projects.'"[130]  However, as discussed in **Section VI.A**, prior to the start of the Proposed Class Period, analysts already discussed that customer spending could be spiky, that use of Review could substantially increase customer spending, and that CS Disco was subject to customer concentration risk due to a few large customers accounting for a substantial portion of its revenues.  In addition, CS Disco reiterated the risk of revenue volatility from its usage-based business model during the Needham Conference, and analysts continued to acknowledge such risks.  The continued discussion of CS Disco's revenue volatility risk is inconsistent with Plaintiff's claim that a failure to disclose that CS Disco's revenue was "spiky and driven by only a few large Review projects" impacted its stock price.[131]

60.    Specifically, CS Disco reiterated the potential for volatility from its usage-based business model at the Needham Conference, stating:

> In terms of what drives variability in our results, it is the usage-based nature of our business and we've talked about that in our earnings call for Q2, where I talked about just everything going right across every line of our business.  We talked about it in Q3 earnings call, where we gave some examples of particular customers and that is an enduring attribute of our business model that you'll see continue.  *Any customer[']s usage can go up and down over time* based on the kinds of legal exposure the customer has and how much data or documents those legal matters involve.[132]

61.    I found only one analyst report that discussed CS Disco's presentation at the Needham Conference, which was published by analysts at Needham.  This report did not comment on the alleged misrepresentations, but did continue to acknowledge the risk of quarterly revenue volatility:

> Needham, January 12, 2022:  "Risks to Target[:]  Transactional revenue model creates scenarios where revenue visibility could dimish [*sic*] causing wide swings in quarterly revenues."[133]

---

[130] Plaintiff's Motion for Class Certification, p. 10.
[131] Plaintiff's Motion for Class Certification, p. 10.
[132] 2022 Needham Conference, p. 10 (emphasis added).
[133] "LAW: Needham Growth Conference Highlights," *Needham*, January 12, 2022, p. 3 (original emphasis removed).

62.    Other analysts also continued to acknowledge this risk in reports published after the Needham Conference (*see also* **Section VI.D.2**):

> J.P. Morgan, February 18, 2022:  "Management gave guidance for a sequential decline in revenue in the December quarter, a prudent move given the consumption-based model, but we believe ramping salesforce resources has the ability to drive sequential growth."[134]

### D.    Intervening Events After the Alleged Misrepresentations Impacted Analyst Revenue Forecasts

63.    After the alleged misrepresentations on September 2, 2021 and January 11, 2022 and prior to the alleged corrective disclosure on August 11, 2022, CS Disco had two earnings announcements that I understand are not at issue in this matter.  On February 24, 2022, CS Disco announced financial results for Q4 2021 and FY 2021, and on May 12, 2022, the Company announced results for Q1 2022.  On both dates, CS Disco beat its previously issued revenue guidance and analyst consensus revenue forecast.  In addition, CS Disco provided guidance for FY 2022 for the first time on February 24, 2022 and raised its guidance on May 12, 2022.  In both instances, the new guidance was above analyst consensus forecasts at the time.  Following these disclosures, analysts raised their FY 2022 revenue forecasts, consistent with academic literature finding that reported financial results are useful in predicting future earnings,[135] that more recent results have greater predictive power,[136] and that analysts incorporate management

---

[134] "4Q21 Earnings Week 5 Preview," *J.P. Morgan*, February 18, 2022, p. 4.  In its Q3 2021 earnings press release, CS Disco disclosed revenue guidance for Q4 2021 of $28.2–$28.8 million, compared to Q3 2021 reported revenues of $29.9 million.  *See* CS Disco Q3 2021 Press Release, p. 1.

[135] For example, a 2005 article by Myungsun Kim and William Kross finds that current firm earnings can predict one-year-ahead operating cash flows.  *See* Kim, Myungsun, and William Kross, "The Ability of Earnings to Predict Future Operating Cash Flows Has Been Increasing-Not Decreasing," *Journal of Accounting Research* 43, no. 5, 2005, pp. 753–780 at p. 755.  Similarly, a 2020 article by Suresh Nallareddy and coauthors finds that a firm's prior earnings can predict future cash flows, and that this predictive power has increased over time.  *See* Nallareddy, Suresh, et al., "Changes in Accrual Properties and Operating Environment: Implications for Cash Flow Predictability," *Journal of Accounting and Economics* 69, no. 2, 2020, 101306.

[136] For example, a 2022 article by Ray Ball and Valeri Nikolaev finds that the predictive power of earnings on future cash flows is lower for the two-year horizon compared to a one-year

guidance into their own forecasts.[137]  Notwithstanding the positive revenue news and guidance, CS Disco reiterated the revenue risks of its usage-based model, and analysts continued to discuss the risks of revenue volatility.

### 1. On February 24, 2022 and May 12, 2022 CS Disco Announced Financial Results That Exceeded Analyst Forecasts and Provided Revenue Guidance for FY 2022

64. On February 24, 2022, CS Disco announced revenues for Q4 2021 of $33.8 million, beating its previously issued guidance of revenues of $28.2–$28.8 million as well as the median analyst consensus forecast of $28.6 million.[138]  Additionally, CS Disco provided its initial FY 2022 revenue guidance of $146.8–$150.8 million, which was above the median analyst consensus forecast of $141.8 million.[139]

65. Following the initiation of FY 2022 guidance on February 24, 2022, analysts increased their FY 2022 revenue forecasts for CS Disco.  As shown in **Exhibit 4**, the median analyst consensus forecast for FY 2022 increased from $141.8 million to $149.3 million.  Analysts acknowledged the above-expectation revenue guidance:

> Bank of America, February 24, 2022:  "CS Disco reported solid Q4 results, with revenue upside being driven by healthy net-new customer adds and expanding [net revenue retention].  Total revenue of $33.8mn (+76% y/y) was 18.6% above our $28.5mn estimate.  Billings of $34.4mn (+74.4% y/y) was above our $28.5mn

horizon (compare Tables 6 and 7).  Additionally, for the three-year horizon, the paper finds that "explanatory power is a little diminished relative to the two-year horizon."  *See* Ball, Ray, and Valeri V. Nikolaev, "On Earnings and Cash Flows as Predictors of Future Cash Flows," *Journal of Accounting and Economics* 73, no. 1, 2022, 101485, pp. 12, 16, 18.

[137] *See*, *e.g.*, Hassell, John M., et al., "Management Earnings Forecasts: Their Usefulness as a Source of Firm-Specific Information to Security Analysts," *Journal of Financial Research* 11, no. 4, 1988, pp. 303–320 at p. 318 ("In this paper, the response of financial analysts to an exogenous information release—the release of a management earnings forecast—is examined. Findings indicate that during the four weeks following management announcements, analyst forecast errors for firms releasing a management earnings forecast decline at a statistically significantly greater rate than forecast errors of similar firms without management projections. This is consistent with management forecast[s] providing firm-specific information and being useful to analysts in producing less biased and more accurate earnings forecasts.").

[138] *See* CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Fourth Quarter and Fiscal Year 2021 Financial Results," February 24, 2022 ("CS Disco Q4 2021 Press Release"), p. 1; CS Disco Q3 2021 Press Release, p. 1; **Exhibit 3**.

[139] *See* CS Disco Q4 2021 Press Release, p. 1; **Exhibit 4**.

prior, although due to the usage based pricing model this metric is less reliable as an indicator of future growth."[140]

Canaccord Genuity, February 24, 2022: "If we had to sum up what we learned, we'd say: (1) new customer acquisition is going well – the base grew by 36% y-o-y in 2021; (2) customer spend trends and add-on attach rates continue to improve – net revenue retention increased 19 points y-o-y to 146%; (3) international is an early, but promising opportunity – revenue increased 4x y-o-y and Disco intends to accelerate investment in 2022; and (4) the platform and opportunity continues to expand – the best example of this is Disco's tuck-in of legal hold functionality, announced tonight, which will increase the surface area with which the firm is working with its corporate legal customers."[141]

Cowen, February 25, 2022: "LAW reported a strong 4Q with rev growth of 76% well above Street of 49%. [Net revenue retention] of 146% was well above 127% last [year], driven by growing wallet share in eDiscovery, up-market strength and increased cross-selling of new products. New customer adds were also strong."[142]

Loop Capital, February 25, 2022: "In terms of the December print, the company posted exceptionally strong 4Q results and 2022 guidance well ahead of consensus expectations."[143]

66.     On May 12, 2022, CS Disco disclosed revenues for Q1 2022 of $34.5 million, beating its previously issued guidance of revenues of $30.0–$31.0 million as well as the median analyst consensus forecast of $30.6 million.[144] Additionally, CS Disco raised FY 2022 revenue guidance to $149.0–$153.0 million, an increase of $2.2 million compared to its prior guidance of $146.8–$150.8 million. The midpoint of CS Disco's new guidance was above the median analyst consensus forecast of $149.3 million prior to the May 12, 2022 announcement.[145]

---

[140] "Strong finish to 2021, acquires new tech to expand platform; Reiterate Buy $50 PO," *Bank of America Global Research*, February 24, 2022, p. 1.

[141] "Excellent growth, and plans to add fuel to the fire in 2022; reiterate BUY," *Canaccord Genuity*, February 24, 2022, p. 1.

[142] "BIG 4Q BEAT; IN-LINE FY22 GROWTH OUTLOOK BUT SEE AMPLE UPSIDE, EBITDA LOWER," *Cowen*, February 25, 2022, p. 1.

[143] "Good Quarter and Guide; Assuming Coverage at Buy," *Loop Capital*, February 25, 2022, p. 1.

[144] *See* CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces First Quarter 2022 Financial Results," May 12, 2022 ("CS Disco Q1 2022 Press Release"), p. 1; CS Disco Q4 2021 Press Release, p. 1; **Exhibit 3**.

[145] *See* CS Disco Q1 2022 Press Release, p. 1; CS Disco Q4 2021 Press Release, p. 1; **Exhibit 4**.

67.     Following the increase in CS Disco's FY 2022 guidance, analysts increased their FY 2022 revenue forecasts for the Company.  As shown in **Exhibit 4**, median analyst consensus forecast for FY 2022 increased from $149.3 million to $152.1 million.  Analysts acknowledged the above-expectation revenue guidance:

> Jefferies, May 12, 2022:  "What We Liked — Big Beat; Early in Expansion Journey.  LAW posted a significant beat at 63% y/y top-line growth in Q1 against the easiest comp of the [year] at 35% in 1Q21.  Despite the [deceleration] from 76% last Q, top-line growth is meaningfully ahead of the company's ambition to deliver 30%+ growth."[146]

> Loop Capital, May 13, 2022:  "LAW posted solid Q1 results ahead of both our and consensus expectations.…  The solid 1Q results are further evidence that the company continues to execute well against this opportunity."[147]

> Needham, May 13, 2022:  "Disco reported a solid 1Q22, delivering a beat on the top and bottom line.…  While investors may pick at the beat in the quarter not completely flowing through to FY guidance, we do not get the sense management's outlook has changed, rather we see this as their typical prudence given the usage-based revenue model."[148]

### 2.      CS Disco Reiterated the Revenue Risks of Its Usage-Based Model, and Analysts Continued to Discuss the Risks of Revenue Volatility

68.     Notwithstanding the positive financial news on February 24, 2022 and May 12, 2022, which again I understand are not at issue, CS Disco continued to reiterate the risk of revenue volatility from its usage-based business model on the February 24, 2022 and May 12, 2022 conference calls, and analysts continued to acknowledge such risks.  I did not find analyst commentary suggesting that CS Disco's business had reached revenue stability or had resolved the risks of revenue volatility, but instead analysts continued discussing CS Disco's ongoing revenue volatility risk following these announcements.[149]

---

[146] "Marginal Raise on Big Beat," *Jefferies*, May 12, 2022, p. 1 (original emphasis removed).
[147] "Solid Print; Continuing to Invest for the Long-Term," *Loop Capital*, May 13, 2022, p. 1.
[148] "LAW 1Q22 Earnings Recap," *Needham*, May 13, 2022, p. 1 (original emphasis removed).
[149] Plaintiff's Motion for Class Certification, p. 5.

69.     Specifically, CS Disco reiterated the potential for volatility from its usage-based business model, stating:

February 24, 2022: "I will reiterate that our usage-based model can lead to fluctuations in revenue depending on the number and nature of matters on the platform, volume of data, length of time on the platform and other factors."[150]

May 12, 2022: "I'd like to reiterate that our business is primarily a usage-based model that is driven by the number and nature of matters, volume of data, length of time on the platform and other factors that may impact revenue in any given quarter."[151]

70.     Analysts published reports following these earnings announcements, which continued to acknowledge the risk of revenue volatility:

Bank of America, February 24, 2022: "Billings of $34.4mn (+74.4% y/y) was above our $28.5mn prior, although *due to the usage based pricing model this metric is less reliable as an indicator of future growth*."[152]

Canaccord Genuity, February 24, 2022: "A conservative guide shouldn't be surprising. Disco issued another quarterly guide that implies a sequential decline in revenue from the Q4 results just posted. Management has been pretty clear that (a) *with a usage-based model there can be some quarter-to-quarter variability*."[153]

Cowen, February 25, 2022: "Usage based revenue model: *LAW's model is largely usage-based which could drive meaningful volatility in quarterly*

---

[150] CS Disco Q4 2021 Earnings Call, p. 8. *See also* CS Disco 2021 Form 10-K, p. 19 (emphasis in original) ("*We expect fluctuations of our financial results, which may cause quarterly comparisons not to be meaningful.* Our business model is usage-based and there is inherent unpredictability in the timing, duration and scope of our customers' legal matters requiring use of our solution. Our operating results have fluctuated in the past and are expected to fluctuate in the future due to a variety of factors, many of which are outside of our control. As a result, our quarterly results of operations, including the levels of our revenues, working capital and cash flows, may vary significantly in the future, such that period-to-period comparisons of our results of operations may not be meaningful. Our financial results may fluctuate due to a variety of factors, many of which are outside of our control and may be difficult to predict").

[151] CS Disco Q1 2022 Earnings Call, p. 5. *See also* CS Disco Q1 2022 Form 10-Q, p. 43.

[152] "Strong finish to 2021, acquires new tech to expand platform; Reiterate Buy $50 PO," *Bank of America Global Research*, February 24, 2022, p. 1 (emphasis added).

[153] "Excellent growth, and plans to add fuel to the fire in 2022; reiterate BUY," *Canaccord Genuity*, February 24, 2022, p. 2 (original emphasis removed, emphasis added).

*revenue*.  Consumption revenue can be impacted by the timing of cases which are less predictable."[154]

Loop Capital, February 25, 2022:  "Primary risks include:  1) company's ***usage-based model leading to a high level of variability in its quarterly results***; 2) ***lower revenue visibility*** due to lack of long-term customer commitments."[155]

Jefferies, May 12, 2022:  "[I]n our view, the stock is fairly valued at current levels.  The premium is appropriate, given LAW's disruptive technology and sustainable growth profile balanced by ***higher volatility in results due to monthly usage***."[156]

Loop Capital, May 13, 2022:  "As noted above, relative valuation of roughly 5x EV/2023E revenue vs. peers at 5.5x could become an active concern given the company's continued (and large) operating losses and a ***less predictable usage-based business model***, particularly in the event of a future misstep or a continued pullback in the broader software sector."[157]

Needham, May 13, 2022:  "Risks to Target[:]  Transactional revenue model creates scenarios where ***revenue visibility could dimish [sic] causing wide swings in quarterly revenues***."[158]

### E.      The Price Decline on August 12, 2022 Does Not Provide Reliable Economic Evidence to Infer Price Impact from the Alleged Misrepresentations

71.      Plaintiff claims that "Dr. Nye finds a statistically significant excess stock price decline on August 12, 2022" and that this provides "clear evidence of price impact on August 12, 2022."[159] However, as discussed in the sections that follow, the price decline on August 12, 2022 does not provide reliable economic evidence to infer price impact from the alleged misrepresentations. Specifically, I find that (i) the economic content of the allegedly omitted information and that of

---

[154] "BIG 4Q BEAT; IN-LINE FY22 GROWTH OUTLOOK BUT SEE AMPLE UPSIDE, EBITDA LOWER," *Cowen*, February 25, 2022, p. 8 (original emphasis removed, emphasis added).

[155] "Good Quarter and Guide; Assuming Coverage at Buy," *Loop Capital*, February 25, 2022, p. 4 (emphasis added).

[156] "Marginal Raise on Big Beat," *Jefferies*, May 12, 2022, p. 2 (emphasis added).

[157] "Solid Print; Continuing to Invest for the Long-Term," *Loop Capital*, May 13, 2022, p. 1 (emphasis added).

[158] "LAW 1Q22 Earnings Recap," *Needham*, May 13, 2022, p. 7 (original emphasis removed, emphasis added).

[159] Plaintiff's Motion for Class Certification, p. 20.

the alleged corrective disclosure differ, particularly due to intervening financial results and guidance issued after the alleged misrepresentations that affected market expectations, and interim events that caused performance to fall short of these intervening expectations; and (ii) the price decline on August 12, 2022 is consistent with a materialization of previously disclosed risks.

### 1. The Economic Content of the Allegedly Omitted Information and That of the Alleged Corrective Disclosure Differ

72.     As discussed in **Section IV.B**, Dr. Nye contends that "the statistically significant Company-specific price decline that occurred on August 12, 2022 is demonstrative of price impact in this matter" because the decline was caused by CS Disco's disclosure of "***significantly lower 2H22 guidance*** as [CS Disco] de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers."[160]  However, as discussed in **Section IV.B**, I understand the alleged misrepresentations pertain to the revenue contribution in Q2 2021 from large Review matters, as well as general statements about customer "wallet sizes" and "adoption journeys," and that revenue guidance issued during the Proposed Class Period—including revenue guidance issued subsequent to the alleged misrepresentations—is not at issue in this matter.  More specifically, on February 24, 2022, CS Disco provided FY 2021 financial results and provided initial FY 2022 guidance, and on May 12, 2022, CS Disco provided Q1 2022 results and revised upward its FY 2022 guidance. The updated FY 2022 guidance that CS Disco issued on August 11, 2022 represented a $17.0 million decline at the midpoint from the guidance provided in May 2022.[161]

73.     My review of analyst commentary following the August 11, 2022 alleged corrective disclosure reveals that analysts addressed the lower FY 2022 guidance *relative to* the 2022 guidance, which was issued *after* the alleged misrepresentations.  Any stock price decline on August 12, 2022 due to the market updating its forecast relative to Company guidance disclosures from February 24, 2022 and May 12, 2022 does not provide reliable economic

---

[160] Nye Report, ¶ 56 (original emphasis removed, emphasis added).
[161] *See* CS Disco Q1 2022 Press Release, p. 1; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Second Quarter 2022 Financial Results," August 11, 2022 ("CS Disco Q2 2022 Press Release"), p. 1; **Exhibit 4**.

evidence to infer price impact from the alleged misrepresentations regarding the contribution in Q2 2021 from large Review matters, or general statements about customer "wallet sizes" and "adoption journeys," earlier in the Proposed Class Period.

74.    Academic literature indicates that reported financial results are useful in predicting future earnings,[162] and that more recent earnings results have greater predictive power compared to older earnings results.[163]  Consistent with the heightened relevance of intervening information, analyst commentary following the disclosure addressed the change in expected FY 2022 revenues *relative to* the guidance the Company had issued that was after the alleged misrepresentations.[164]  For example:

> Canaccord Genuity, August 11, 2022:  "Disco's Q2 came in at the high-end of its guidance range (versus larger beats in the past), but ***the big surprise was revised 2022 guidance*** that now has us at +18% revenue growth and (43%) EBITDA losses, down from +34% and (28%) prior."[165]

> Piper Sandler, August 11, 2022:  "LAW ***broke its cadence of beats/raises***, by delivering an in-line revenue quarter and ***materially lowering full year targets***. 2Q results were driven by robust demand for its eDiscovery offering, offset by pressured usage for its review product.  ***FY22 guidance was lowered*** by $17M, primarily due to pressured usage of its Review offering.  We estimate Review will deliver revenues of ~$30M (-5% y/y) in FY22 (eDiscovery ~$101M), largely driven by pressured usage at a few large clients.  ***Given the guide down, LAW is -27% in after market trading.***"[166]

---

[162] *See* fn. 135.

[163] *See* fn. 136.

[164] I note that Dr. Nye testified that the magnitude of the stock price reaction to a company's earnings could depend on the size of the earnings miss or beat.  *See* Nye Deposition 144:9–18 ("The size of the miss, I think, is -- is certainly going to affect the magnitude of the price decline, but I also think that the risk element could outweigh to a greater degree that -- that miss because it's basically -- because stock price valuation of the  product of not just the level of the expected cash flows but also the volatility also known as risk associated with those cash flows, and if the risk is significantly higher than investors realize, it can cause massive -- wealth effects.").  Academic literature has also found that analysts incorporate management guidance into their own forecasts.  *See* fn. 137.

[165] "Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," *Canaccord Genuity*, August 11, 2022, p. 1 (emphasis added).

[166] "Volatile Review Business Weighs on FY22 Targets; Remain OW, PT to $25," *Piper Sandler*, August 11, 2022, p. 1 (emphasis added).

<u>Bank of America, August 12, 2022</u>:  "We downgrade shares of CS Disco (LAW) to Neutral (from Buy) and lower our PO to $25 (from $34) on mixed Q2 results and ***a guide down of 2022 revenue and profitability.…  We believe the revenue guide down*** … could put into question the stability of the future growth profile and the potential for the business to display 30%+ growth over the medium-term."[167]

75.    I note that Plaintiff and Dr. Nye point to a report published by Cowen after the alleged corrective disclosure on August 11, 2022,[168] which stated:

Mgmt lowered FY22 rev guide from $149-$153m (+30-34%) to $132m-$136m (+15-19%), which includes an implied 2H growth guide of low single digits vs. previously low 30%.  Mgmt indicated it wanted to de-risk numbers and has now taken these large Review customers out of guide for 2H. … It was unclear what caused such a change in consumption from these large $1m+ customers.  A lot of it is likely due to a change in the stage of lawsuits/investigations.  Some could be competitors being used for new cases on-boarding where LAW may not be involved. In either case, the significant guide down reveals that 1) LAW is much more dependent on large customer consumption behavior than we had thought; 2) the strong growth last year appears to have been turbo-charged by its Review product, which is now modeled to decline this yr; and 3) the big recalibration in guide shows there is limited visibility in nearer-term usage trends.[169]

76.    However, neither Plaintiff nor Dr. Nye have shown that Cowen's commentary provides reliable economic evidence to infer that the price decline on August 12, 2022 demonstrates price impact from the earlier alleged misrepresentations.  In fact, ███████████████████ ████████████████████████████████████ by the time CS Disco released FY 2021 results and issued FY 2022 guidance in February 2022.  Specifically, ████████████████████████████████████████ ███████████████████████████████ ██████████████████████ CS Disco beat its previously issued guidance



---

[167] "Cut to Neutral, ability to drive durable 30%+ growth in question; Lower PO to $25," *Bank of America Global Research*, August 12, 2022, p. 1 (emphasis added).
[168] Amended Complaint, ¶ 77; Nye Report, fn. 103.
[169] "DOWNGRADING TO MARKET PERFORM; CONSUMPTION GROWTH MOMENTUM HITS A BIG SNAG," *Cowen*, August 12, 2022, p.1.
[170] DISCO_001588.  My review of ███████████████ also found ███████████ ████████████████████████████████████
DISCO_001588.

and analyst consensus forecasts for its Q4 2021 and Q1 2022 results.[171]  Thus, the observed evolution and timing of economic information does not support that ███████████████████ ████████████████████████████████████████████████████

77.     Instead, Cowen's commentary was in the context of discussing "the significant guide down," which is a statement relative to the guidance the Company had provided in February and May 2022, after the alleged misrepresentations.  In addition, Cowen's commentary that the Review product "is now modelled to decline this yr" and that the "big recalibration in guide shows there is limited visibility in nearer-term usage trends" appears to describe current and forward-looking expectations for CS Disco, and not expectations at the time of the alleged misrepresentations.  Moreover, each of the three issues identified by Cowen—customer concentration, growth in the Review product, and low visibility due to revenue volatility—were risks and factors discussed by Cowen prior to August 11, 2022.  For example:

> Cowen, August 16, 2021:  "DISCO Review generated >$5m of revenue in 1H21 (up >100% Y/Y)
> …
> LAW's top 20 customers represented ~31% of revenue in 2020, while top 10 customers represented ~20% of revenue, roughly in-line with the past two years. LAW's largest customer represented just under ~5% of revenue in 2020.
> …
> Usage based revenue model:  LAW's model is largely usage-based which could drive meaningful volatility in quarterly revenue.  Consumption revenue can be impacted by the timing of cases which are less predictable.  In turn, because of its pricing model, LAW carries minimal committed backlog or deferred revenue on its balance sheet, giving it less visibility than a traditional SaaS model.
> …
> ~30% of revenue comes from its top 20 customers, creating some level of customer concentration risk."[172]

---

[171] *See* **Exhibit 3**.

[172] "INITIATING AT OUTPERFORM; DISCO SET TO BOOGIE TO EDISCOVERY MARKET LEADERSHIP," *Cowen*, August 16, 2021, p. 23, 24, 41.  Cowen continued to note the risks from CS Disco's usage-based revenue model and customer revenue concentration in other reports published during the Proposed Class Period.  *See* "JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021, p.8; "SOLID PIPELINE CONVERSION & A 'TIDAL WAVE' OF INBOUND RFPS DRIVE BEAT & RAISE," *Cowen*, November 10, 2021, p. 8; "BIG 4Q BEAT; IN-LINE FY22 GROWTH OUTLOOK BUT SEE AMPLE UPSIDE, EBITDA LOWER," *Cowen*, February 25,

Cowen, September 3, 2021: "Mgmt indicated the outsized growth (up an unusually strong 40% Q/Q) benefited from a perfect tsunami of strength, incl. … increased cross-sell activity of new products, namely Document Review (which can increase ASPs by 2-3x)"[173]

Cowen, November 11, 2021: "LAW's newer products Review & Case Builder drive a 2-3x spend uplift vs. standalone eDiscovery and this is driving strong up-sell/cross-sell strength. … An example of fast expansions is a large consumer customer signed in 4Q20 who ramped quickly from $0 to multi-million over three quarters, driven by moving their entire eDiscovery platform to LAW and then adopting Disco Review in 2Q. This customer's strong usage continued in 3Q and mgmt expects them to be a large customer going forward."[174]

Cowen, February 25, 2022: "Mgmt highlighted two large customer expansions in FY21, incl. … a large energy co. which tripled its spend from 2Q21 to 4Q21 and is using both eDiscovery & Review.  LAW's newer products are seeing strong traction incl. Review adoption, which grew 3x in FY21."[175]

### 2.    Materialization of a Publicly Known Risk Does Not Demonstrate Price Impact from Earlier Alleged Misrepresentations

78.    As discussed in **Section IV.B**, Dr. Nye contends that the August 11, 2022 alleged corrective disclosure revealed "the *undisclosed risk* that Disco's customer spend growth was driven by only a handful of large Review projects," which was "clearly the root cause of the stock price decline that day."[176]  Contrary to Dr. Nye's claim, the risks that there could be revenue volatility due to customer concentration and fluctuations in customer usage were disclosed by the Company prior to the Proposed Class Period, reiterated by the Company throughout the Proposed Class Period, and discussed repeatedly by analysts.  Analyst commentary indicates that these risks were incorporated in consensus analyst forecasts of revenues ██████████████████████████████████  In addition, from an

---

2022, p. 8; "SOLID 1Q; A COUNTER-CYCLICAL SOFTWARE COMPANY FOR YOUR PORTFOLIO," *Cowen*, May 13, 2022, p. 8.

[173] JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021, p. 1.

[174] "TAKEAWAYS FROM COWEN SOFTWARE BUS TOUR 2021 (LAW & ZEN)" *Cowen*, November 11, 2021, pp. 1, 2.

[175] "BIG 4Q BEAT; IN-LINE FY22 GROWTH OUTLOOK BUT SEE AMPLE UPSIDE, EBITDA LOWER," *Cowen*, February 25, 2022, p. 1.

[176] Nye Report, ¶ 56 (emphasis added).

economic perspective, the fact that a stock price declines when a risk materializes does not itself demonstrate a price impact from any under-disclosed risk. Here, any stock price decline on August 12, 2022 reflecting the materialization of publicly known risks regarding revenue volatility does not provide reliable economic evidence to infer price impact from the alleged misrepresentations.

79.     As an economic matter, the fact that a stock price declines following the materialization of a risk does not reliably establish that some allegedly under-disclosed risk had an earlier price impact. In fact, the realization of a fully disclosed risk can cause a large stock price decline. Consider the following hypothetical example. An early-stage pharmaceutical company with only one product candidate submits a new drug application with the Food and Drug Administration ("FDA"). If the drug is approved, the company will be able to sell the drug and begin generating revenues, but will not realize any revenues or profits if the drug is not approved. Assuming the company's stock is traded in an efficient market, if the risk of non-approval is *fully* disclosed, the market price of the company will incorporate the expected probability of FDA approval—that is, the market price of the company's stock will be greater than zero, reflecting that there is some probability of approval and future cash flow generation. In the event that the FDA rejects the new drug application, the company's stock price may experience a large decline as the risk of non-approval materialized. In this case, even though the entire stock price decline was attributable to the announcement that the FDA rejected the new drug application, this decline does not demonstrate that there was any price impact from an under-disclosed risk and would not appropriately measure any earlier inflation in the stock price. The risk was fully disclosed and the stock price decline following a materialization of the risk reflects a change in the market's perception that the probability of a risk materializing has increased to 100%.

80.     Notably, as discussed throughout this report above, CS Disco provided extensive discussion of the risks it faced, and analyst commentary reflected these risks. For example, in each of CS Disco's SEC filings from its IPO through the end of the Proposed Class Period, the Company stated there is "inherent unpredictability" in customers' usage of its products and that its financial results are "expected to fluctuate in the future" due to external factors "outside of

[its] control."[177]  Similarly, in each of its conference calls, the Company also highlighted that its performance was subject to volatility from its usage-based business model:

> September 2, 2021:  "As I mentioned previously, we have a usage-based business model.  So there is inherent volatility from quarter-to-quarter as customers' legal matters begin and expand and shrink and as activity in those matters increases and decreases usage of our different products."[178]

> November 9, 2021:  "As we mentioned on our last earnings call, we primarily have a usage-based model that is driven by the number and nature of matters, volume of data, length of time on the platform and other factors."[179]

> January 11, 2022:  "In terms of what drives variability in our results, it is the usage-based nature of our business and we've talked about that in our earnings call for Q2, where I talked about just everything going right across every line of our business.…  Any customer[']s usage can go up and down over time based on the kinds of legal exposure the customer has and how much data or documents those legal matters involve."[180]

> February 24, 2022:  "I will reiterate that our usage-based model can lead to fluctuations in revenue depending on the number and nature of matters on the platform, volume of data, length of time on the platform and other factors."[181]

> May 12, 2022:  "I'd like to reiterate that our business is primarily a usage-based model that is driven by the number and nature of matters, volume of data, length of time on the platform and other factors that may impact revenue in any given quarter."[182]

81.     Analysts similarly acknowledged this risk both prior to and during the Proposed Class Period.  As discussed in **Sections VI.A–C**, prior to the start of the Proposed Class Period and following the alleged misrepresentations, analysts repeatedly discussed that the Company's usage-based business model could result in volatility in its financial results.  Analysts also

---

[177] IPO Prospectus, pp. 25–26.  *See also* CS Disco Q2 2021 Form 10-Q, pp. 44–45; CS Disco Q3 2021 Form 10-Q, pp. 45–46; CS Disco 2021 Form 10-K, pp. 19–20; CS Disco Q1 2022 Form 10-Q, pp. 43–44; CS Disco Q2 2022 Form 10-Q, pp. 48–49.
[178] CS Disco Q2 2021 Earnings Call, p. 5.
[179] CS Disco Q3 2021 Earnings Call, p. 4.
[180] 2022 Needham Conference, p. 10.
[181] CS Disco Q4 2021 Earnings Call, p. 8.
[182] CS Disco Q1 2022 Earnings Call, p. 5.

acknowledged that CS Disco had repeatedly stated this risk factor.  For example, on February 24, 2022—after the alleged misrepresentations had been made—analysts at Canaccord Genuity remarked:

> Management has been pretty clear that … with a usage-based model there can be some quarter-to-quarter variability.…[183]

82.    Consistent with revenue unpredictability and volatility being fully disclosed risks, analyst commentary published after the alleged corrective disclosure discussed that the guidance revision was a result of usage-based volatility, which the Company had previously disclosed. For example, analysts at Canaccord Genuity wrote that "[t]o Disco's credit, *it has consistently communicated that the usage-based nature of its platform can and will result in revenue volatility*."[184]  Similarly, other analysts noted:

> J.P. Morgan, August 12, 2022:  "CS Disco reported a tough quarter due to usage based volatility and continuing to scale its go-to-market, which caused a FY22 guidance cut across the board."[185]

> Loop Capital Markets, August 12, 2022:  "LAW's attorney review business is relatively new and is a much smaller percentage of revenue (we estimate 20-25% of overall revenue), generally used by very large customers (i.e., $1M-plus accounts), and the business can be volatile due to the timing of activity in large reviews.  *Importantly, the lower Review revenue is more about the timing of usage, rather than slipped deals, competitive threats, or reduced long-term demand for the firm's software*."[186]

> Needham, August 12, 2022:  "LAW reported in line 2Q22 results but significantly lower 2H22 guidance as it de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers.…  While the guidance change assumes significantly lower near-term usage, we do

---

[183] "Excellent growth, and plans to add fuel to the fire in 2022; reiterate BUY," *Canaccord Genuity*, February 24, 2022, p. 2.

[184] "Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," *Canaccord Genuity*, August 11, 2022, p. 1 (emphasis added).

[185] "Customer Usage Drops, Cuts FY22 Guidance," *J.P. Morgan*, August 12, 2022, p. 1.

[186] "Middling Quarter and Guide; After Smack Down, Stock Probably Grinds Higher," *Loop Capital*, August 12, 2022, p. 1 (emphasis added).

not expect usage from these contracts to be zero in the aggregate, and see the change as a set-up for much large than historical revenue outperformance."[187]

Stifel, August 12, 2022:  "Disco reported a 2Q beat but offered a guide that came in well below the street.  Management pinned the blame on the company's Review business/product, which tends to be a 'big ticket' item for customers and is largely usage-based.  …[I]t's clear that at the company's current scale … there will be periods of volatility (especially in an uncertain macro environment) as a result of the usage-based model."[188]

## VII.    Dr. Nye Fails to Put Forth a Damages Methodology That Is Consistent with Plaintiff's Theory of Liability

83.    In his report, Dr. Nye puts forth what he claims to be a "general economic framework for quantifying per-security damages on a Class-wide basis, which reflects methodologies [he] would propose to use if asked to calculate damages in this matter."[189]  In particular, Dr. Nye specifies that he would measure price inflation on a class-wide basis by using "an event study [that] isolate[s] Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors."[190]  Dr. Nye opines that "[such an] event study analysis [would] appl[y] to all Class members, regardless of the extent to which the price movement is due to corrective disclosures and/or the materialization of a concealed risk."[191]

84.    I understand that at the class certification stage, plaintiffs are not required to calculate damages, but are required to present a methodology that can reliably measure damages on a class-wide basis consistent with their theory of liability.  As I discuss in this section, Dr. Nye has not proposed a damages methodology that can account for the specific facts and circumstances of this matter, and as a result, he has not proposed a methodology that can measure class-wide damages consistent with Plaintiff's theory of liability.

---

[187] "2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," *Needham*, August 12, 2022, p. 1 (original emphasis removed).
[188] "Review Product Volatility Weighs On '22 Revenue Guide; Investing More to Capture Share," *Stifel*, August 12, 2022, p. 1.
[189] Nye Report, ¶ 61.
[190] Nye Report, ¶ 63.
[191] Nye Report, ¶ 63.

85.      Specifically, Dr. Nye's proposed approach appears to rely on "backcasting," or as Dr. Nye testified, "isolat[ing] the portion of the -- price decline on the corrective event day that is due to the revelation of the relevant truth previously concealed" and "working backward in time, which has been endorsed by several Circuit Courts as a reliable and scientific way to estimate damages under Section 10b.…"[192]  In other words, Dr. Nye's proposed damages approach would measure inflation using the stock price decline following the August 11, 2022 alleged corrective disclosure.

86.      However, Dr. Nye's proposed damages approach cannot measure the inflation (if any) caused by the alleged misrepresentations in this case.  First, Dr. Nye has not shown that his proposed damages approach can measure only the damages attributable to Plaintiff's theory of liability, rather than losses due to intervening events that impacted market expectations and interim events that caused performance to fall short of these intervening expectations.  This means that the stock price decline following the August 11, 2022 alleged corrective disclosure cannot measure inflation due to the alleged misrepresentations during the Proposed Class Period.  Second, Dr. Nye's proposed damages approach cannot measure inflation (if any) arising from the alleged misrepresentations separately from the price reaction that results from the materialization of the previously disclosed risks (or even any allegedly under-disclosed risk) that CS Disco's revenues would experience volatility at the customer level and that its "extreme positive examples"[193] of rapid customer expansion due to the Review product would not necessarily repeat in the future.

---

[192] Nye Deposition, 134:24–135:11.  Dr. Nye acknowledged that he would consider whether there is a need to account for confounding factors on the alleged corrective disclosure date and whether inflation would be time-varying during the Proposed Class Period.  *See* Nye Deposition, 135:24–136:4 ("I would fully consider whether there would be a need to either isolate a portion of the decline due to -- you know, from non-fraud-related factors and whether Plaintiffs' theory of liability would apply a time-varying component from -- from the start date to the end of the class period.").

[193] Amended Complaint, ¶ 64.

A.    **Dr. Nye Has Not Proposed a Damages Methodology That Calculates Losses Only Attributable to Plaintiff's Theory of Liability Rather Than Losses Due to Intervening Events**

87.    Dr. Nye's proposed approach to measuring damages is premised on the assumption that the August 11, 2022 alleged corrective disclosure revealed the alleged truth such that inflation throughout the Proposed Class Period can be measured, at least in part, using CS Disco's stock price decline following the August 11, 2022 alleged corrective disclosure.  In fact, Dr. Nye testified that there is "is a big red flashing match between the corrective disclosure and the alleged omission":

> Q. And what causes you to think that there's a big red flashing match between the corrective disclosure and the alleged omission?
>
> A. It's just the exact same subject matter.
>
> I mean, Plaintiffs are alleging that they failed to disclose, you know, a significant exposure to large review projects that made their revenue projections and representations about their revenue growth and forward prospects to be misleading.
>
> The corrective disclosure is that we're lowering guidance because of the large review projects, you know, winding down, and we can't count on those going forward.
>
> I don't see how anyone could say there's a mismatch there.  That's the exact same subject matter.[194]

88.    Contrary to Dr. Nye's claim, as discussed in **Section VI.E.1**, the economic content of the alleged misrepresentations differs from the economic content of the alleged corrective disclosure, such that the stock price decline following the August 11, 2022 alleged corrective disclosure cannot reliably measure inflation due to the alleged misrepresentations earlier in the Proposed Class Period.

89.    Specifically, as discussed in **Section VI.D.1**, CS Disco had not provided guidance for FY 2022 as of the dates of the alleged misrepresentations.  Instead, the Company first initiated its

---

[194] Nye Deposition, 142:3–17.

FY 2022 revenue guidance on February 24, 2022, and subsequently revised this guidance upward on May 12, 2022.  These events both occurred after the alleged misrepresentations, and I understand that neither event is at issue in this matter.  In response to both the February 24, 2022 guidance and the May 12, 2022 guidance, analysts revised their forecasts for FY 2022 revenue upward.  As shown in **Exhibit 4**, the median analyst forecast increased from $141.8 million to $149.3 million after February 24, 2022, and further increased to $152.1 million after May 12, 2022, consistent with academic literature indicating that analysts incorporate management guidance into their own forecasts.[195]  Commentary from analysts following the guidance released on February 24, 2022 and May 12, 2022 acknowledged the Company's above-expectation revenue guidance, as discussed in **Section VI.D.1.**  After the alleged corrective disclosure on August 11, 2022, analyst commentary focused on the change in expected FY 2022 revenues *relative to* the guidance the Company issued *after* the alleged misrepresentations,[196] consistent with academic literature finding that reported financial results are useful in predicting future earnings,[197] and that more recent results have greater predictive power compared to older earnings.[198]

### B.    Dr. Nye Has Not Proposed a Damages Methodology That Can Account for the Materialization of Any Purported Under-Disclosed Risk

90.    As discussed in **Section IV.B**, the Nye Report contends that the subject of the alleged misrepresentations was "the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects.…"[199]  Dr. Nye further testified that:

---

[195] *See* fn. 137.

[196] *See* **Section VI.E.1**.

[197] *See* fn. 135.

[198] *See* fn. 136.  Academic literature has also found that stock price reactions to forecast disclosures depends on the magnitude of the deviation between the forecast and expected earnings.  *See*, *e.g.*, Waymire, Gregory, "Additional Evidence on the Information Content of Management Earnings Forecasts," *Journal of Accounting Research* 22, no. 2, 1984, pp. 703–718 at p. 717 ("This paper reports evidence on the extent to which abnormal returns associated with public disclosure of management earnings forecasts are related to the information about the firm's future earnings prospects.  The findings suggest that abnormal returns are positively associated with the unexpected component of management forecasts (i.e., forecast deviations) in terms of both sign and magnitude.").

[199] Nye Report, ¶ 56.

I think under their theory of liability the reduction in 2022 revenue guidance and EBITDA guidance is a materialization of that risk that was concealed.

Q. Of what risk?

A. The risk that they had much more exposure to large review projects that were not reliable, or consistent or continuous, and that the company had a much more revenue volatility -- and worse prospects than the market understood.[200]

91.    As discussed in **Section VI.E.2**, the risks that there could be revenue volatility due to customer concentration and fluctuations in customer usage were disclosed by the Company prior to the Proposed Class Period, reiterated by the Company throughout the Proposed Class Period, and discussed repeatedly by analysts.  However, even if Dr. Nye were correct that the alleged corrective disclosure was the materialization of an under-disclosed risk, Dr. Nye's proposed damages approach—which would utilize the price decline following the August 11, 2022 purported materialization of such under-disclosed risk—cannot reliably be used to measure inflation throughout the Proposed Class Period.  Specifically, as an economic matter, the stock price decline following a materialization of a risk does not measure the inflation, if any, in the stock price from any concealment of potential risk, but rather reflects a change in the market's perception that the probability of a risk materializing has increased to 100%.  Thus, even assuming that there was some under-disclosed risk, as discussed in **Section VI.E.2**, the price decline upon the materialization of that under-disclosed risk is expected to be different from the price decline that would occur if the company fully disclosed the risk, but that risk had not yet materialized.

92.    In addition, I understand that Plaintiff is *not* claiming that CS Disco knew and could have disclosed at the beginning of the Proposed Class Period that revenues from large Review matters would fail to materialize in future quarters with certainty.  Indeed, the Complaint states, "given the newness of the Review business … CS Disco *lacked the ability to predict annual revenue accurately*."[201]  Thus, Dr. Nye provides no basis to simply assume that a portion (or all) of the stock price decline following the August 11, 2022 alleged corrective disclosure resulted from the materialization of a previously under-disclosed risk—as Dr. Nye contends—or that such a

---

[200] Nye Deposition, 147:6–14.
[201] Amended Complaint, ¶ 55 (emphasis added).

finding could be used to reliably estimate stock price inflation earlier in the Proposed Class Period.[202]

93.    Moreover, as discussed in detail throughout **Section VI**, CS Disco disclosed information regarding the contribution of large Reviews to total revenues and the risk of revenue volatility from customers both prior to and during the Proposed Class Period, which was discussed by analysts prior to and during the Proposed Class Period.  Thus, contrary to Dr. Nye's claims, it does not appear that the risk that "Disco's customer spend growth was driven by only a handful of large Review projects"[203] was under-disclosed.  Dr. Nye does not propose a damages methodology that would measure the inflation and dissipation of inflation attributable to the alleged misrepresentations as distinct from the materialization of the previously disclosed risks regarding revenue contribution and volatility from large Reviews.

Executed on this 3rd of October, 2025

_____
Andrea L. Eisfeldt

---

[202] I am not claiming that Dr. Nye needs to have calculated inflation or evaluated loss causation and damages during the Proposed Class Period.  However, I do not see anything in the portion of Dr. Nye's report discussing damages that qualifies as a "methodology" in the field of financial economics.

[203] Nye Report, ¶ 56.

HIGHLY CONFIDENTIAL

**Appendix A**

# Andrea L. Eisfeldt

Professor of Finance
Laurence D. and Lori W. Fink Endowed Chair in Finance
UCLA Anderson School of Management

Email: andrea.eisfeldt@anderson.ucla.edu
Website: https://sites.google.com/site/andrealeisfeldt/
Mailing Address: UCLA Anderson School of Management
110 Westwood Plaza, Suite C4.10
Los Angeles, California 90095-1481

## Academic Employment Positions

| | |
|---|---|
| 2015-Present | Laurence D. and Lori W. Fink Endowed Chair in Finance, UCLA Anderson School of Management. |
| 2015 | Anderson Faculty Term Chair in Finance and Professor of Finance, Anderson School of Management, UCLA. |
| 2014-2015 | Professor of Finance, Anderson School of Management, UCLA. |
| 2011-2014 | Associate Professor of Finance, Anderson School of Management, UCLA. |
| 2010-2011 | Visiting Associate Professor of Finance, Finance Area, Anderson School of Management, UCLA. |
| 2007-2011 | Associate Professor of Finance (with tenure), Kellogg School of Management, Northwestern University. |
| 2000-2007 | Assistant Professor of Finance, Kellogg School of Management, Northwestern University. |

## Education

| | |
|---|---|
| August 2000 | Ph.D., Department of Economics, University of Chicago. Thesis Committee: John Cochrane, Lars Hansen (co-chairs), Douglas Diamond. |
| August 2000 | M.A., Department of Economics, University of Chicago. |
| May 1994 | B.S. in Economics, Highest Honors, College of Commerce, University of Illinois at Urbana-Champaign. |

## Other Academic Positions

| | |
|---|---|
| 2024-Present | Advisory Board Member, Centre of Excellence for Quantitative Finance at Imperial College London |
| 2023-Present | Editorial Committee of the Annual Review of Financial Economics. |
| 2022-Present | Visiting Scholar, Federal Reserve Bank of San Francisco. |
| 2022-Present | NBER Macroeconomics Annual Advisory Board. |
| 2021-Present | Associate Editor, Journal of Political Economy. |
| 2021-Present | Associate Editor, Journal of Economic Perspectives. |
| 2014-Present | NBER Research Associate: Corporate Finance, Asset Pricing, Economic Fluctuations & Growth. |
| 2010-present | Member, Foundation for the Advancement of Research in Financial Economics (FARFE). |
| 2020-2022 | Co-Chair, then Chair, Society for Financial Studies Cavalcade. |
| 2017-2022 | Member, Macro Financial Modeling Executive Group. |
| 2016-2022 | Associate Editor, Review of Economic Dynamics. |
| 2014-2022 | Associate Editor, Journal of Monetary Economics. |
| 2014-2022 | Associate Editor, American Economic Journal: Macroeconomics. |

| | |
|---|---|
| 2019-2021 | Director, American Finance Association. |
| 2019-2021 | Director, Society for Financial Studies Cavalcade. |
| 2016-2019 | Associate Editor, Journal of Finance. |
| 2015-2016 | President, Macro Finance Society. |
| 2012-2017 | Director (founding board), Macro Finance Society. |
| 2009-2017 | Academic Advisory Board Member, Gutmann Center for Portfolio Management Board of Directors, Vienna. |
| 2015-2016 | Faculty Director, Fink Center for Finance and Investments at UCLA Anderson. |
| 2011-2014 | Invited member, Finance Theory Group. |
| 2010-2013 | Director, Western Finance Association. |
| 2009-2011 | Board Member, Chicago Census Data Research Center Board of Directors. |
| 2009-2010 | Co-Editor, Finance Research Letters. |
| 2003, 2004 | Visiting Scholar, Minneapolis Fed, Institute for Empirical Macroeconomics. |

## Other Board and Employment Experience

| | |
|---|---|
| 2022-Present | UCLA Investment Company Board. |
| 2021-Present | Academic Advisory Board, Vise AI Advisors, LLC. |
| 2020-Present | Affiliate, Cornerstone Research, LLC. |
| 2015-2018 | Consultant, AQR Capital Management, LLC. |
| 2013-2015 | Chief Economist and Principal, Structured Portfolio Management, LLC, (while on unpaid leave from UCLA Anderson). |
| 2012-2013 | Consultant, Structured Portfolio Management, LLC. |
| 1994-1996 | Associate, Chicago Partners, LLC, Economic Consulting. |

**Publications**

**"Endogenous Liquidity in Asset Markets"** *(lead article).*
*Journal of Finance* 2004, 59(1): 1-30.
**Smith Breeden Distinguished Paper**.
Reprinted in *"Handbook of Liquidity and Crises"* (2011), edited by Franklin Allen, Elena Carletti, Jan Pieter Krahnen, and Marcel Tyrell.

**"Capital Reallocation and Liquidity,"** with Adriano Rampini *(lead article).*
*Journal of Monetary Economics* 2006, 53(3): 369-399.

**"Smoothing with Liquid and Illiquid Assets."**
*Journal of Monetary Economics* 2007, 54: 1572-1586.

**"New or Used? Investment with Credit Constraints,"** with Adriano Rampini.
*Journal of Monetary Economics* 2007, 54: 2656-2681.

**"Managerial Incentives, Capital Reallocation, and the Business Cycle,"**
with Adriano Rampini. *Journal of Financial Economics* 2008, 87: 177-199.
**Jensen Prize Second Place**.

**"Leasing, Ability to Repossess, and Debt Capacity,"** with Adriano Rampini.
*Review of Financial Studies* 2009, 22: 1621-1657.

**"CEO Turnover in a Competitive Assignment Framework,"**
with Camelia Kuhnen. *Journal of Financial Economics* 2013, 109: 351-372.

**"Organization Capital and the Cross-Section of Expected Returns,"**
with Dimitris Papanikolaou. *Journal of Finance* 2013, 68: 1365-1406.
**Amundi Smith Breeden First Prize Paper**.

**"The Value and Ownership of Intangible Capital,"** with Dimitris Papanikolaou.
*American Economic Review Papers & Proceedings*, 2014, 104: 189-94.

**Appendix A**

| | |
|---|---|
| **Publications, cont'd.** | **"Entry and Exit in OTC Derivatives Markets,"** with Andrew Atkeson and Pierre-Olivier Weill. *Econometrica,* 2015, 83: 2231-2292. |

**"Aggregate External Financing and Savings Waves,"** with Tyler Muir. *Journal of Monetary Economics* 2016, 84: 116-133.

**"The Financial Soundness of US Firms 1926-2012,"** with Andrew Atkeson and Pierre-Olivier Weill. *Research in Economics* 2017, 71: 613-635

**"Government Guarantees and the Valuation of US Banks,"** with Andrew Atkeson, Adrien d'Avernas and Pierre-Olivier Weill. *2018 NBER Macroeconomics Annual.*

**"Capital Reallocation,"** with Yu Shi. *Annual Review of Financial Economics* 2018, 10: 361-386.

**"The Cross Section of MBS Returns"** *(lead article),* with Peter Diep and Scott Richardson. *Journal of Finance* 2021, 76: 2093-2151.

**"Total Returns to Single Family Rentals"** *(lead article),* with Andrew Demers. *Real Estate Economics* 2022, 50: 7-32. ***Edwin Mills Best Paper Award****.*

**"Intangible Value,"** with Edward T. Kim and Dimitris Papanilolaou. *Critical Finance Review* 2022, 11: 299-332.

**"Human Capitalists,"** *(lead article),* with Antonio Falato and Mindy Xiaolan. *NBER Macro Annual 2022.*

**"The Economics of Intangibles,"** with Nicolas Crouzet, Janice Eberly, and Dimitris Papanikolaou. *Journal of Economic Perspectives* 2022, 36:3, 29-52.

**"OTC Intermediaries,"** with Bernard Herskovic, Sriram Rajan, and Emil Siriwardane. *Review of Financial Studies* 2023, 36:2, 615-677.

**"Complex Asset Markets,"** with Hanno Lustig and Lei Zhang. *Journal of Finance* 2023, 78:5, 2519-2562.

**"Bonds vs. Equities: Information for Investment,"** with Adrien d'Avernas and Huifeng Chang. *Accepted, Journal of Finance.*

| | |
|---|---|
| **Published Comments** | **"Comment on the Rise of Global Corporate Saving, by Peter Chen, Loukas Karabarbounis, and Brent Neiman."** *Journal of Monetary Economics* 2017, 89: 20-24. |

**"Book Review: Jonathan Haskel and Stian Westlake: Restarting the Future: How to Fix the Intangible Economy."** *Business Economics* 2023, 58(2): 125–127.

**Appendix A**

| | |
|---|---|
| **Working Papers** | **"AI and Finance"** with Gregor Schubert. |

**"Intangible Capital, Non-Rivalry, and Growth,"**
with Nico Crouzet, Janice Eberly, and Dimitris Papanikolaou.

**"Interdealer Price Dispersion,"** with Bernard Herskovic and Shuo Liu.

**"Generative AI and Firm Values,"** with Gregor Schubert and Miao Ben Zhang.

**"The Deposit Business at Large vs. Small Banks,"**
with Adrien d'Avernas, Can Huang, Richard Stanton, and Nancy Wallace.

**"Equity Pay Beyond the C-Suite,"**
with Antonio Falato, Dongryeol Lee, and Mindy Xiaolan.

**Unpublished Papers**

**"A Model of Intangible Capital,"** with Nico Crouzet,
Janice Eberly, and Dimitris Papanikolaou. NBER Working Paper 30376.

**"The Market for OTC Derivatives,"** with Andrew Atkeson and
Pierre-Olivier Weill.

"**Financing Shortfalls and the Value of Aggregate Liquidity,**"
with Adriano Rampini.

**"Colonies,"** with Matthias Doepke.

## Fellowships, Honors and Awards

| | |
|---|---|
| 2023 | Market Frictions and Financial Stability Grant, US Treasury OFR and NSF. |
| 2022 | Edwin Mills Best Paper Award, *Real Estate Economics.* |
| 2022 | Keynote Speaker and Chair, Society for Financial Studies Cavalcade. |
| 2022 | Keynote Speaker, Midwest Finance Association. |
| 2017 | Keynote Speaker: 12th Annual Hedge Fund Conference, Imperial College. |
| 2017 | Macro Financial Modeling Grant. |
| 2013-2016 | National Science Foundation Grant. |
| 2013 | Amundi Smith Breeden First Prize Paper Award, *Journal of Finance.* |
| 2012-2013 | Bank of France Research Grant. |
| 2013 | Excellence in Refereeing Award, *American Economic Review.* |
| 2012 | Fink and Ziman Center Data Purchase Grants. |
| 2011 | Fink Center Research Grant. |
| 2008 | Jensen Prize, Second Place, *Journal of Financial Economics.* |
| 2004 | Smith Breeden Distinguished Paper Award, *Journal of Finance.* |
| 2003, 2004 | Searle Fund Grant. |
| 1999 | Margaret Reid Dissertation Fellowship. |
| 1998 | Lee Prize for Best Money and Banking Paper, University of Chicago. |
| 1997 | National Science Foundation Honorable Mention. |
| 1996-1999 | University of Chicago Century Scholarship. |

## Invited Seminar Presentations

| | |
|---|---|
| 2023 | Future Proof, Q Group, Columbia, University of Chicago Booth Empirical Finance Conference, Federal Reserve Bank of San Francisco, Bank for International Settlements, OECD |
| 2022 | Carnegie Mellon University, University of Wisconsin, University of Chicago Booth School of Business, University of Michigan, University of Bonn, BEA, University of Arizona, HKUST, Santa Clara University, UT Austin, NYU Stern, Boston University |

**Appendix A**

| | |
|---|---|
| 2021 | Michigan State University Econ, Richmond Fed, LSE, LBS, UNC, Bank of England, McGill, Insead |
| 2020 | Labor and Finance Online Seminar, Search and Matching in Macro and Finance Virtual Seminar, School of Business at ITAM, Rotman School of Business, Peking University, Tuck School of Business, Triangle Macro Finance Virtual Seminar, Toronto Econ, University of Maryland Robert H. Smith School of Business |
| 2019 | MIT Econ, MIT Sloan, Stanford Econ, UC Davis Econ, UT Austin McCombs, Northwestern Econ, UCLA Macro Finance Lunch, Chicago Booth Macro, Chicago Booth Finance, Columbia Econ |
| 2018 | Berkeley Haas, USC, University of Minnesota Carlson School of Management, Boston University, Office of Financial Research, US Treasury, Federal Reserve Board DC |
| 2017 | NYU Stern, CREI, Bocconi, LSE, UCL, Imperial College, FRB San Francisco, Berkeley Haas Real Estate, University of Washington Foster School |
| 2016 | UCSD Economics, AQR, University of Michigan Economics |
| 2015 | Ohio State University, Harvard University, Brigham Young University, Olin School WUSTL |
| 2014 | UNC, Wharton, Yale SOM, Columbia GSB, NYU Stern, Stanford GSB, Berkeley Haas, BlackRock, FRB NY |
| 2013 | MIT, University of Lausanne, Federal Reserve Bank of San Francisco, Boston University Economics, Columbia University Economics, NYU Economics |
| 2012 | Stanford University, University of Texas, Carnegie Mellon University, London Business School, London School of Economics, Duke University, University of Wisconsin |
| 2011 | University of Michigan, Columbia University, Yale University |
| 2010 | Ohio State University, University of Chicago, Boston University, University of Washington Foster School, USC Marshall School of Business, UCLA Department of Economics |
| 2009 | Toulouse School of Economics, NHH, Bergen, IESE Barcelona, ESADE Barcelona, UCLA Anderson, University of Illinois |
| 2008 | University of North Carolina |
| 2007 | Vanderbilt University, University of Florida, Northwestern University Macro Lunch, Berkeley, Indiana University, University of Vienna (Research Fellow), Columbia University Department of Economics, Rice University, Chicago Fed |
| 2006 | University of British Columbia, University of Minnesota, University of Colorado, Stockholm School of Economics, Chicago Graduate School of Business, Harvard Business School, UCLA Department of Economics |
| 2005 | Michigan State, MIT Sloan School, University of Wisconsin |
| 2004 | University of Maryland, Census Bureau Washington DC, University of Illinois, Duke University |
| 2003 | Bank of International Settlements, Federal Reserve Board of Governors, London Business School, Federal Reserve Bank of Minneapolis |
| 2002 | Northwestern University Department of Economics, University of Michigan Department of Economics, Carnegie Mellon University GSIA |
| 2000 | UCLA Anderson School of Business, Northwestern University Kellogg School, University of Michigan GSB, Harvard Business School, Stanford University GSB, Stanford University Department of Economics, Berkeley Haas, University of Pennsylvania Wharton School, Columbia University GSB, University of Illinois Department of Economics and Department of Finance |
| 1999 | University of Chicago, Department of Economics |

**Referee/Reviewer**

Journal of Finance, Journal of Financial Economics, Review of Financial Studies,
Journal of Monetary Economics, American Economic Review (2013 Excellence in Refereeing Award),
Econometrica, Journal of Political Economy, Review of Economic Studies,
Census Bureau, National Science Foundation.

**Appendix A**

### Dissertation Committees

Edward T. Kim, 2023, UCLA Anderson, placed University of Michigan Ross School of Business.

Huifeng Chang, 2022, UCLA Economics, placed Fudan School of Management.

Yu Shi, 2021, UCLA Anderson, placed Nankai University (chair).

Geoffrey Zheng, 2020, UCLA Anderson, placed NYU Shanghai.

Mahyar Kargar, 2019, UCLA Anderson, placed University of Illinois Urbana Champaign (chair).

Darren Aiello, 2018, UCLA Anderson, placed Brigham Young University.

Leo Li, 2018, UCLA Anderson, placed Shanghai University of Finance and Economics (chair).

Adrien d'Avernas, 2017, UCLA Economics, placed Stockholm School of Economics.

Lei Zhang, 2016, UCLA Economics, placed Hong Kong University (chair).

Robert Richmond, 2016, UCLA Anderson, placed NYU Stern.

Robert Kurtzman, 2015, UCLA Economics, placed FRB DC.

Aurelien Philippot, 2015, UCLA Anderson, placed Laval University, Quebec.

Frederico Grinberg, 2015, UCLA Economics, placed IMF.

Mindy Xiaolan Zhang, 2014, UCLA Anderson, placed UT Austin Finance.

Tyler Muir, 2013, Kellogg Finance, placed Yale Finance.

Briana Chang, 2012, Northwestern Economics, placed University of Wisconsin Finance.

Joel David, 2012, UCLA Economics, placed USC Economics.

Matthias Kehrig, 2011, Northwestern Economics, placed UT Austin Economics.

**Appendix B**

# Testimony of Andrea L. Eisfeldt, Ph.D.
# During the Past Four Years

**Case Name:**      *Confidential arbitration involving a contractual dispute between crypto venture capital firms*

**Case No.:**       N/A

**Date of Testimony:**   June 2025 (Arbitration)


**Case Name:**      *State of New York ex rel. Edelweiss Fund, LLC v. JPMorgan Chase & Co. et al*

**Case No.:**       Supreme Court of the State of New York, Index No. 100559/2014

**Date of Testimony:**   May 2024 (Deposition)


**Case Name:**      *Jed and Alisa Behar v. Northrop Grumman Corporation and Northrop Gruman Systems Corporation*

**Case No.:**       United States District Court for the Central District of California, Case No. 2:21-cv-03946-HDV-SK

**Date of Testimony:**   November 2023 (Deposition)


**Case Name:**      *Alistair Capital Fund, LP, et al. v. UBS Securities, LLC*

**Case No.:**       Financial Industry Regulatory Authority, Arbitration No. 20-03268

**Date of Testimony:**   August 2023 (Arbitration)


**Case Name:**      *State of Illinois ex rel. Edelweiss Fund, LLC, v. JPMorgan Chase & Co. et al.*

**Case No.:**       Circuit Court of Cook County, Illinois, Case No. 2017 L 000289

**Date of Testimony:**   April 2023 (Deposition)

**Case Name:**      *Lavvan Inc. v. Amyris, Inc.*

**Case No.:**       INTERNATIONAL CHAMBER OF COMMERCE, No. 25598/PDP

**Date of Testimony:**   October 2022 (Arbitration)


**Case Name:**      *Saisravan Bharadwaj Karri, et al. v. Oclaro, Inc., et al.*

**Case No.**:       United States District Court for the Northern District of California, Case No. 3:18-cv-03435-JD

**Date of Testimony:**   October 2022 (Deposition)


**Case Name:**      *In re Omega Healthcare Investors, Inc. Securities Litigation*

**Appendix B**

| | |
|---|---|
| **Case No.:** | United States District Court for the Southern District of New York, Case No. 1:17-cv-08983-NRB |
| **Date of Testimony:** | June 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | *Sarah Valelly v. Merrill Lynch, Pierce, Fenner & Smith Incorporated* |
| **Case No.:** | United States District Court for the Southern District of New York, Case No. 1:19-cv-07998-VEC |
| **Date of Testimony:** | June 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | *DBD Credit Funding LLC v. Glorya Kaufman et al.* |
| **Case No.:** | Superior Court of California, County of Los Angeles, Case No. 19STCV31137 |
| **Date of Testimony:** | January 2022 (Deposition); February 2022 (Trial) |

| | |
|---|---|
| **Case Name:** | *ICONIQ Capital Group, L.P. v. Chad L. Boeding* |
| **Case No.:** | Santa Clara, California, Civil No. 01-20-0010-8382 |
| **Date of Testimony:** | October 2021 (Arbitration) |

| | |
|---|---|
| **Case Name:** | *Barbour v. Barbour* |
| **Case No.:** | Superior Court of Arizona, County of Maricopa, Case No. FN2019-053196 |
| **Date of Testimony:** | September 2021 (Trial) |

| | |
|---|---|
| **Case Name:** | *Findley v. Findley* |
| **Case No.:** | Superior Court of California, County of San Francisco, Case No. FDI-18-789764 |
| **Date of Testimony:** | October 2020 (Deposition) |

HIGHLY CONFIDENTIAL

Appendix C

# List of Documents Considered

**Academic Articles**

- Ball, Ray, and Valeri V. Nikolaev, "On Earnings and Cash Flows as Predictors of Future Cash Flows," *Journal of Accounting and Economics* 73, no. 1, 2022, 101485

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, 1970, pp. 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617

- Hassell, John M., et al., "Management Earnings Forecasts: Their Usefulness as a Source of Firm-Specific Information to Security Analysts," *Journal of Financial Research* 11, no. 4, 1988, pp. 303–320

- Kim, Myungsun, and William Kross, "The Ability of Earnings to Predict Future Operating Cash Flows Has Been Increasing-Not Decreasing," *Journal of Accounting Research* 43, no. 5, 2005, pp. 753–780

- Nallareddy, Suresh, et al., "Changes in Accrual Properties and Operating Environment: Implications for Cash Flow Predictability," *Journal of Accounting and Economics* 69, no. 2, 2020, 101306

- Waymire, Gregory, "Additional Evidence on the Information Content of Management Earnings Forecasts," *Journal of Accounting Research* 22, no. 2, 1984, pp. 703–718

**Analyst Reports**

- "Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," *Needham*, August 16, 2021

- "DISCO Gets The Party Started; Initiate Hold," *Jefferies*, August 16, 2021

- "Establishing new cloud-based precedent; initiating Buy/High Risk," *Citi*, August 16, 2021

- "INITIATING AT OUTPERFORM; DISCO SET TO BOOGIE TO EDISCOVERY MARKET LEADERSHIP," *Cowen*, August 16, 2021

- "Initiating Coverage of CS Disco with a Buy Rating and $60 Target Price," *Stifel*, August 16, 2021

- "Initiating Coverage with a Buy Rating and $60 PT," *Loop Capital*, August 16, 2021

- "Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," *Bank of America Global Research*, August 16, 2021

**Appendix C**

- "Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," *Canaccord Genuity*, August 16, 2021

- "Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," *J.P. Morgan*, August 16, 2021

- "CS Disco soars 20% in past month," *BuySellSignals*, August 20, 2021

- "Enterprise Software - Software as a Service," *Canaccord Genuity*, September 2, 2021

- "Strong Start as a Public Company," *Loop Capital*, September 2, 2021

- "2Q Outperformance on Solid Post-IPO Start," *Needham*, September 3, 2021

- "Great start as a public company; Reit Buy, PO to $70," *Bank of America Global Research*, September 3, 2021

- "JUDGE, JURY & EXECUTION IN PUBLIC DEBUT; STRONG 2Q & FY21 GUIDE, PT TO $63," *Cowen*, September 3, 2021

- "Law and Order in This Q," *Jefferies*, September 3, 2021

- "Justice Is Not Blind to This Impressive Growth," *J.P. Morgan*, September 29, 2021

- "Guru Stock Report," *Validea*, September 30, 2021

- "Expert Download: Invite to This Week's Calls (AMZN, CRM, Z, IAS, LAW)," *Jefferies*, October 4, 2021

- "CS Disco in bottom 1% performers of NYSE market in past month," *BuySellSignals*, October 11, 2021

- "The Party Never Stops at CS Disco with 30%+ Growth; Initiating at OW," *Piper Sandler*, October 29, 2021

- "CS Disco in top 5% performers of NYSE market in past quarter," *BuySellSignals*, November 1, 2021

- "3Q PREVIEWS: APPN, AYX, CFLT, HUBS, LAW, MNDY, NEWR, RMNI, TDC," *Cowen*, November 2, 2021

- "DISCO Keeps The Party Rolling," *Jefferies*, November 9, 2021

- "Fast growth, improving margins, nice quarter; Reit. Buy, $70 PO," *Bank of America Global Research*, November 9, 2021

- "3Q21: Demand Strength Drives Sequential Growth Against a Tough Compare," *J.P. Morgan*, November 10, 2021

- "Another Solid Revenue Beat as Transaction Model Drives Upside in 3Q," *Needham*, November 10, 2021

- "Business Remains Strong Leading to Another Strong Quarter; Guidance Raised," *Loop Capital*, November 10, 2021

**Appendix C**

- "Good Execution with New Logo Growth and Upsells," *Piper Sandler*, November 10, 2021

- "Laying down the law with another quarter of excellent execution," *Canaccord Genuity*, November 10, 2021

- "SOLID PIPELINE CONVERSION & A 'TIDAL WAVE' OF INBOUND RFPS DRIVE BEAT & RAISE," *Cowen*, November 10, 2021

- "TAKEAWAYS FROM COWEN SOFTWARE BUS TOUR 2021 (LAW & ZEN)," *Cowen*, November 11, 2021

- "Flattening Org Structure - COO to Depart," *J.P. Morgan*, November 29, 2021

- "CS Disco in bottom 2% performers of NYSE market in past quarter," *BuySellSignals*, December 9, 2021

- "CS Disco sinks 29% in past quarter," *BuySellSignals*, January 3, 2022

- "Guru Stock Report," *Validea*, January 6, 2022

- "LAW: *Needham* Growth Conference Highlights," *Needham*, January 12, 2022

- "Expert Download: SPLK, PCOR, WIX, PWSC, LAW + Invites," *Jefferies*, January 31, 2022

- "C4Q PREVIEWS: APPN, AYX, CFLT, HUBS, LAW, MNDY, NEWR, RMNI, TDC," *Cowen*, February 3, 2022

- "4Q21 Earnings Week 5 Preview," *J.P. Morgan*, February 18, 2022

- "Excellent growth, and plans to add fuel to the fire in 2022; reiterate BUY," *Canaccord Genuity*, February 24, 2022

- "'Let's Groove' | CS Disco Dances its Way to +67% y/y Growth in 2021," *Piper Sandler*, February 24, 2022

- "Strong finish to 2021, acquires new tech to expand platform; Reiterate Buy $50 PO," *Bank of America Global Research*, February 24, 2022

- "4Q21: Secular Inflection," *J.P. Morgan*, February 25, 2022

- "BIG 4Q BEAT; IN-LINE FY22 GROWTH OUTLOOK BUT SEE AMPLE UPSIDE, EBITDA LOWER," *Cowen*, February 25, 2022

- "CS Disco shares post best month in six months," *BuySellSignals*, February 25, 2022

- "Good Quarter and Guide; Assuming Coverage at Buy," *Loop Capital*, February 25, 2022

- "Software - LAW Beats, VMW Guides Below, UPLD Goes Negative," *Jefferies*, February 25, 2022

- "Solid 4Q Beat, Announces Acquisition to Move Upstream in Discovery Process," *Needham*, February 25, 2022

**Appendix C**

- "CS Disco Inc," *PriceTargetResearch*, March 15, 2022

- "Quarter 1 of 2022 : CS Disco (LAW:$33.97) decreases 5.0%," *BuySellSignals*, April 5, 2022

- "RATING AND FORECAST REPORT," *ValuEngine*, April 5, 2022

- "Q1 preview: Checks suggest Disco's reputation building; Maintain Buy, $50 PO," *Bank of America Global Research*, April 13, 2022

- "Guru Stock Report," *Validea*, April 14, 2022

- "Industry Work Suggest Strong SaaS Tilt to Meet Rapidly Evolving Needs," *Needham*, April 20, 2022

- "CS Disco tumbles 11% in past quarter, Revenue up 67%," *BuySellSignals*, April 29, 2022

- "C1Q PREVIEWS: AYX, AVPT, CFLT, LAW, MNDY, NEWR, RMNI, TDC," *Cowen*, May 3, 2022

- "LAW seeking justice: fast growth again, but conservative guide will raise questions," *Canaccord Genuity*, May 12, 2022

- "Marginal Raise on Big Beat," *Jefferies*, May 12, 2022

- "Platform Usage & Healthy Demand Support Upside to 2022," *Piper Sandler*, May 12, 2022

- "Solid Q1 results with 63% revenue growth; Reit. Buy, $41 PO," *Bank of America Global Research*, May 12, 2022

- "LAW 1Q22 Earnings Recap," *Needham*, May 13, 2022

- "SOLID 1Q; A COUNTER-CYCLICAL SOFTWARE COMPANY FOR YOUR PORTFOLIO," *Cowen*, May 13, 2022

- "Solid Print; Continuing to Invest for the Long-Term," *Loop Capital*, May 13, 2022

- "Revisiting 7 Small Cap Software Names: We Highlight ETWO, EXFY, LAW, LPSN, PRCH, WEAV & EGAN," *Loop Capital*, May 19, 2022

- "Expert call invite: A conversation about trends in eDiscovery," *Bank of America Global Research*, May 27, 2022

- "CS Disco in bottom 6% performers of NYSE market in past quarter, reports 1.9% sequential rise in Quarterly Revenue," *BuySellSignals*, May 31, 2022

- "Reminder: Expert call invite: A conversation about trends in eDiscovery," *Bank of America Global Research*, May 31, 2022

- "ENTERPRISE SOFTWARE TAKEAWAYS FROM COWEN'S TMT CONFERENCE DAY 1," *Cowen*, June 2, 2022

- "CS Disco Inc," *PriceTargetResearch*, June 23, 2022

**Appendix C**

- "Model and Price Target Update," *J.P. Morgan*, June 23, 2022

- "Quarter 2 of 2022 : CS Disco (LAW:$18.04) in bottom 5% performers of NYSE market," *BuySellSignals*, June 30, 2022

- "RATING AND FORECAST REPORT," *ValuEngine*, July 6, 2022

- "Guru Stock Report," *Validea*, July 21, 2022

- "Expert Download: PCOR, SONO, and LAW + Invites to Upcoming Calls," *Jefferies*, July 26, 2022

- "CS Disco tumbles 31% in 2022, but outperforming Software sector; reports 1.9% sequential rise in Quarterly Revenue," *BuySellSignals*, July 29, 2022

- "C2Q PREVIEWS: APPN, AVPT, AYX, CFLT, LAW, MNDY, NEWR, RMNI, TDC," *Cowen*, August 2, 2022

- "Q2 preview: Checks consistent with prior, expect rev/EBITDA upside," *Bank of America Global Research*, August 3, 2022

- "Software Valuations: The Tide Continues To Turn," *Jefferies*, August 7, 2022

- "Legal Tech Takes A Break: LAW Guides Down (D/G to Hold); LZ Refocuses on EBITDA," *Jefferies*, August 11, 2022

- "Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," *Canaccord Genuity*, August 11, 2022

- "Volatile Review Business Weighs on FY22 Targets; Remain OW, PT to $25," *Piper Sandler*, August 11, 2022

- "2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," *Needham*, August 12, 2022

- "DOWNGRADING TO MARKET PERFORM; CONSUMPTION GROWTH MOMENTUM HITS A BIG SNAG," *Cowen*, August 12, 2022

- "Customer Usage Drops, Cuts FY22 Guidance," *J.P. Morgan*, August 12, 2022

- "Cut to Neutral, ability to drive durable 30%+ growth in question; Lower PO to $25," *Bank of America Global Research*, August 12, 2022

- "Middling Quarter and Guide; After Smack Down, Stock Probably Grinds Higher," *Loop Capital*, August 12, 2022

- "Panic at the Disco," *Citi*, August 12, 2022

- "Review Product Volatility Weighs On '22 Revenue Guide; Investing More to Capture Share," *Stifel*, August 12, 2022

**Appendix C**

**Books**

- Berk, Jonathan, and Peter DeMarzo, "Chapter 9: Valuing Stocks," in *Corporate Finance*, Fourth Edition (Harlow, England: Pearson Education, 2017), pp. 309–347

- Brealey, Myers, et al., *Principles of Corporate Finance*, Tenth Edition (New York, NY: McGraw-Hill/Irwin, 2011)

- Malkiel, Burton G., "Efficient Market Hypothesis," in *Finance*, ed. John Eatwell et al. (London: Palgrave Macmillan, 1989), pp. 127–134

- Ross, Stephen A., et al., *Corporate Finance*, Seventh Edition (New York, NY: McGraw-Hill/Irwin, 2005)

**Data**

- LSEG Workspace
- Bloomberg

**Earnings and Conference Calls**

- CS Disco, Inc., "Q2 2021 CS Disco Inc Earnings Call," September 2, 2021
- CS Disco, Inc., "Q3 2021 CS Disco Inc Earnings Call," November 9, 2021
- CS Disco, Inc., "24th Annual *Needham* Virtual Growth Conference," January 11, 2022
- CS Disco, Inc., "Q4 2021 CS Disco Inc Earnings Call," February 24, 2022
- CS Disco, Inc., "Q1 2022 CS Disco Inc Earnings Call," May 12, 2022
- CS Disco, Inc., "Q2 2022 CS Disco Inc Earnings Call," August 11, 2022

**Expert Reports and Depositions**

- Deposition of Zachary Nye, Ph.D., September 11, 2025
- Expert Report of Zachary Nye, Ph.D., August 4, 2025 and materials produced therewith

**██████████**

- DISCO_001583
- DISCO_001585
- DISCO_001586
- DISCO_001587

- DISCO_001588

- CS Disco, Inc. Presentation "Q2 '21 Earnings Release and Q3 '21 / FY2021 Guidance Update," August 31, 2021, DISCO_001876–91

- CS Disco, Inc. Presentation "Q3 '21 Earnings Release and Q4 '21 / FY2021 Guidance Update," November 8, 2021, DISCO_001926–43

- CS Disco, Inc. Presentation "Q1 FY2022 and Full Year FY2022 Guidance Discussion Materials," February 15, 2022, DISCO_001958–71

- CS Disco, Inc. Presentation, "Board of Directors," January 28, 2022, DISCO_003621–96

**Legal Pleadings and Court Decisions**

- Amended Class Action Complaint, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, March 8, 2024

- Order:  (1) Granting in Part and Denying in Part Defendants' Motion to Dismiss Without Prejudice; (2) Granting Motion for Judicial Notice; and (3) Cancelling Hearing Set for February 14, 2025, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, January 30, 2025

- Plaintiff's Opposed Motion and Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representations and Class Counsel, *Lynn Gambrill et al. v. CS Disco, Inc. et al.*, August 4, 2025

**Websites**

- Business Wire, "DISCO to Present at Needham Growth Conference," January 6, 2022, available at https://www.businesswire.com/news/home/20220106005900/en/DISCO-to-Present-at-Needham-Growth-Conference

- Financial Industry Regulatory Authority, "Asset Allocation and Diversification," available at https://www.finra.org/investors/investing/investing-basics/asset-allocation-diversification

- The Vanguard Group, "Diversifying Your Portfolio," available at https://investor.vanguard.com/investor-resources-education/portfolio-management/diversifying-your-portfolio

**SEC Filings**

- CS Disco, Inc., Form 10-K for the Fiscal Year Ended December 31, 2021, filed February 25, 2022

- CS Disco, Inc., Form 10-Q for the Quarter Ended June 30, 2021, filed September 3, 2021

**Appendix C**

- CS Disco, Inc., Form 10-Q for the Quarter Ended September 30, 2021, filed November 10, 2021

- CS Disco, Inc., Form 10-Q for the Quarter Ended March 31, 2022, filed May 13, 2022

- CS Disco, Inc., Form 10-Q for the Quarter Ended June 30, 2022, filed August 12, 2022

- CS Disco, Inc., Form 424B4, filed July 22, 2021

- CS Disco, Inc., Form DEF14A, filed May 31, 2022

- CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "CS Disco Announces Second Quarter 2021 Financial Results," September 2, 2021

- CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Third Quarter 2021 Financial Results," November 9, 2021

- CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Fourth Quarter and Fiscal Year 2021 Financial Results," February 24, 2022

- CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces First Quarter 2022 Financial Results," May 12, 2022

- CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Second Quarter 2022 Financial Results," August 11, 2022

**Note:  In addition to the documents on this list, I relied upon all documents cited in this report and exhibits to form my opinions.**



HIGHLY CONFIDENTIAL

# Exhibit 2



**Analyst Consensus Revenue Estimates[5]**

| | | | | | |
|---|---|---|---|---|---|
| Low | $25.7 | $27.5 | $28.5 | $136.6 | $136.6 |
| Median | $25.7 | $27.6 | $28.6 | $141.8 | $141.8 |
| Mean | $25.8 | $27.6 | $28.6 | $141.7 | $141.7 |
| High | $25.9 | $27.7 | $29.0 | $151.8 | $151.8 |
| Number of Analysts Included in Consensus | 7 | 7 | 9 | 10 | 10 |

Note:
[1] ███████████████████████████████████████████. Analyst estimates are from *LSEG Workspace* as of 9/9/21, one week after the date of the alleged misrepresentation.
[2] ██████████████████████████████████████ Analyst estimates are from *LSEG Workspace* as of 1/18/22, one week after the date of the alleged misrepresentation.
[3] ██████████████████████████████████████████████████████ Analyst estimates are from *LSEG Workspace* as of 1/28/22.
[4] ████████████████████████████████████ Analyst estimates are from *LSEG Workspace* as of 2/15/22.
[5] Consensus analyst estimates are as reported by *LSEG Workspace*.

HIGHLY CONFIDENTIAL

# Exhibit 3
# Comparison of CS Disco Actual Revenues to
# Prior Guidance and Analyst Forecasts
Q2 2021 – Q2 2022

*($ in millions)*

|  | Q2 2021: 9/2/21 | Q3 2021: 11/9/21 | Q4 2021: 2/24/22 | Q1 2022: 5/12/22 | Q2 2022: 8/11/22 |
|---|---|---|---|---|---|
| **CS Disco Actual Revenues** | $29.5 | $29.9 | $33.8 | $34.5 | $33.7 |
| **CS Disco Prior Guidance[1]** | $28.5 – $29.8 | $25.5 – $25.9 | $28.2 – $28.8 | $30.0 – $31.0 | $32.0 – $34.0 |
| Date of Prior Guidance | 7/22/21 | 9/2/21 | 11/9/21 | 2/24/22 | 5/12/22 |
| **Analyst Forecasts[2]** | | | | | |
| Low | $29.0 | $25.7 | $28.5 | $29.6 | $32.9 |
| Median | $29.1 | $25.7 | $28.6 | $30.6 | $33.2 |
| Mean | $29.1 | $25.8 | $28.6 | $30.6 | $33.4 |
| High | $29.1 | $26.0 | $29.0 | $31.2 | $34.0 |
| Number of Analysts Included in Consensus[3] | 8 | 8 | 9 | 9 | 9 |

Source:  *LSEG Workspace*; CS Disco, Inc., Form 424B4, filed July 22, 2021; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "CS Disco Announces Second Quarter 2021 Financial Results," September 2, 2021; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Third Quarter 2021 Financial Results," November 9, 2021; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Fourth Quarter and Fiscal Year 2021 Financial Results," February 24, 2022; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces First Quarter 2022 Financial Results," May 12, 2022; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Second Quarter 2022 Financial Results," August 11, 2022

Note:
[1]  Prior guidance for Q2 2021 is the preliminary Q2 2021 financial results as stated in CS Disco's IPO Prospectus.
[2]  Analyst forecasts are as of one day prior to each quarter's earnings release according to *LSEG Workspace*.
[3]  Consensus analyst estimates are as reported by *LSEG Workspace*.

HIGHLY CONFIDENTIAL

**Exhibit 4**
**Changes in Analyst Revenue Estimates for FY 2022 Following CS Disco Financial Results**
Q2 2021 – Q2 2022
*($ in millions)*

| | Q2 2021 Financial Results: 9/2/21 | | Q3 2021 Financial Results: 11/9/21 | | FY 2021 Financial Results: 2/24/22 | | Q1 2022 Financial Results: 5/12/22 | | Q2 2022 Financial Results: 8/11/22 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CS Disco Guidance[1]** | — | | — | | $146.8 – $150.8 | | $149.0 – $153.0 | | $132.0 – $136.0 | |
| **Analyst Revenue Estimate** | Before[2] | After[3] | Before[2] | After[3] | Before[2] | After[3] | Before[2] | After[3] | Before[2] | After[3] |
| Low | $131.8 | $133.0 | $133.4 | $136.6 | $136.6 | $148.0 | $148.0 | $151.0 | $151.0 | $132.0 |
| *% Change* | | *0.9%* | | *2.4%* | | *8.4%* | | *2.0%* | | *-12.6%* |
| Median | $133.4 | $136.5 | $137.0 | $141.8 | $141.8 | $149.3 | $149.3 | $152.1 | $152.0 | $134.2 |
| *% Change* | | *2.3%* | | *3.6%* | | *5.3%* | | *1.8%* | | *-11.7%* |
| Mean | $133.9 | $137.0 | $137.3 | $142.0 | $141.7 | $149.9 | $149.8 | $152.3 | $152.0 | $134.8 |
| *% Change* | | *2.3%* | | *3.4%* | | *5.7%* | | *1.6%* | | *-11.3%* |
| High | $135.8 | $145.1 | $145.1 | $151.8 | $151.8 | $153.3 | $153.3 | $154.6 | $153.5 | $139.0 |
| *% Change* | | *6.9%* | | *4.6%* | | *1.0%* | | *0.9%* | | *-9.4%* |
| **Number of Analysts Included in Consensus[4]** | **9** | **9** | **10** | **10** | **10** | **10** | **10** | **9** | **10** | **9** |

Source:  *LSEG Workspace*; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "CS Disco Announces Second Quarter 2021 Financial Results," September 2, 2021; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Third Quarter 2021 Financial Results," November 9, 2021; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Fourth Quarter and Fiscal Year 2021 Financial Results," February 24, 2022; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces First Quarter 2022 Financial Results," May 12, 2022; CS Disco, Inc., Exhibit 99.1 to Form 8-K, Press Release, "DISCO Announces Second Quarter 2022 Financial Results," August 11, 2022

Note:
[1]  CS Disco first provided guidance for FY 2022 on 2/24/22.
[2]  Analyst estimates before the financial results are taken as of one day before results were released according to *LSEG Workspace*.
[3]  Analyst estimates after the financial results are taken as of one week after results were released according to *LSEG Workspace*.
[4]  Consensus analyst estimates are as reported by *LSEG Workspace*.

HIGHLY CONFIDENTIAL