# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LYNN GAMBRILL, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

CS DISCO, INC., KIWI CAMARA, and
MICHAEL LAFAIR,

Defendants,

Case No. 1:24-CV-28-DAE

EXPERT REPLY REPORT OF ZACHARY NYE, PH.D.

November 17, 2025

**Table of Contents**

I.     Background and Qualifications ............................................................................ 1

II.    Scope of Engagement ...................................................................................... 2

III.   Bases for Opinions .......................................................................................... 2

IV.    Dr. Eisfeldt's Opinions on Price Impact Are Based on and Incorrect and Overly Narrow
       Interpretation of Plaintiff's Theory of Liability ..................................................... 3

       A.   *The Publicly Available Information Does Not Undermine Price Impact* ..................... 3

       B.   ██████████████████████████████████████████████ *Do Not
            Undermine Price Impact* ....................................................................... 19

       C.   *So-Called "Intervening Events" (Quarterly Results and FY2022 Guidance) Do Not
            Undermine Price Impact* ....................................................................... 28

       D.   *The Decline in the Price of Disco Stock Following the Alleged Corrective Event
            Conclusively Demonstrates Price Impact* ..................................................... 33

V.     Damages Can Be Measured on a Class-Wide Basis In a Manner Consistent With
       Plaintiff's Theory of Liability ......................................................................... 45

## I.    Background and Qualifications

1.    Previously in this matter, I submitted the Expert Report of Zachary Nye, Ph.D., dated August 4, 2025 (the "Nye Report"), in which I opined that:

    i.    The common stock of CS Disco, Inc. ("Disco" or the "Company") traded in an efficient market during the period September 3, 2021 through August 11, 2022, inclusive (the "Class Period").[1]

    ii.    Damages under §10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, for investors who purchased or otherwise acquired shares of Disco stock during the Class Period, can be calculated using a method that is common to all members of the Class and in a manner that is consistent with Plaintiff's theory of liability.[2, 3]

On September 11, 2025, I provided expert testimony at a deposition regarding my opinions contained in the Nye Report (the "Nye Tr.").

2.    My qualifications are contained in ¶1 of the Nye Report.  My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached as Exhibit 1 to the Nye Report.

3.    My current hourly rate is $1040.  I have received assistance from individuals at SCG, who worked under my direction; their fees charged for this project are their standard hourly rates.  Neither my compensation nor that of any individual at SCG is contingent on the outcome of this litigation.

---

[1] Nye Report, §VI.

[2] Nye Report, §VII.

[3] The claims in this action are set forth in the Amended Class Action Complaint, dated March 8, 2024, Dkt. No. 53 (the "Complaint").  *See also* Memorandum and Order of United States District Judge David Alan Ezra, filed January 30, 2025 (the "Motion to Dismiss Order").

## II.    Scope of Engagement

4.    I now have been retained by Counsel for Plaintiffs in this matter to reply to the Expert Report of Andrea L. Eisfeldt, Ph.D., dated October 3, 2025 (the "Eisfeldt Report").[4, 5]

## III.    Bases for Opinions

5.    My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter, and the analyses described in this Report and the Nye Report.  Documents, data, and other information that I have relied upon as bases for my opinions are cited in this Report and the Nye Report.  Such documents and information are typically relied upon by financial experts in securities class actions and by financial economists in their research.

6.    Counsel for Plaintiffs has informed me that the record in this matter continues to be developed and that fact discovery is ongoing.  To the extent they are relevant, I would expect to review additional information that may become available through discovery as well as the reports and deposition testimony of other expert witnesses.  The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

---

[4] Dr. Eisfeldt was deposed in this matter on November 4, 2025 (the "Eisfeldt Tr.").

[5] Dr. Eisfeldt was retained to "evaluate (i) whether, from an economic perspective, the alleged misrepresentations impacted the price of CS Disco's common stock" during the Class Period; and "(ii) whether Dr. Nye has proposed a methodology for measuring damages."  (Eisfeldt Report, ¶5.)  According to Dr. Eisfeldt, she was "asked to assume the market for CS Disco's common stock was efficient throughout the Proposed Class Period."  (*Id*., ¶21. *See also* Eisfeldt Tr., 86:6–10.)

**IV.    Dr. Eisfeldt's Opinions on Price Impact Are Based on and Incorrect and Overly Narrow Interpretation of Plaintiff's Theory of Liability**

### A.  The Publicly Available Information Does Not Undermine Price Impact

7.      According to Dr. Eisfeldt, "from an economic perspective, the alleged misrepresentations did not impact CS Disco's stock price."[6]  She argues that Plaintiff's allegations are predicated on "a failure to disclose that customer spending was 'spiky and driven by only a few large Review projects,'" but "information regarding the volatility of CS Disco's revenue and related risks was already publicly known," and "reiteration of such information would not impact CS Disco's stock price" during the Class Period.[7]  In support of this claim, Dr. Eisfeldt cites disclosures in Disco's IPO Prospectus,[8] Disco's Forms 10-K and 10-Q, and analyst reports initiating coverage of the Company,[9] which purportedly informed investors that: (i) "Disco's usage-based pricing model resulted in 'spiky' and 'lumpy' revenue"; (ii) "Disco's Review product resulted in large increases in revenue per customer"; (iii) "Disco had meaningful customer concentration"; and (iv) "Disco had recent 'extreme positive examples' of rapid customer expansion that contributed to the revenue growth experienced in Q2 2021, but which would not necessarily repeat in the future."[10]

---

[6] Eisfeldt Report, ¶8.

[7] Eisfeldt Report, ¶8.  *See also* Eisfeldt Tr., 24:5–13 ("Q. Okay.  And you say: [As read]: 'Plaintiff contends this case is premised on a failure to disclose the customer spending was spiky and driven by only a few large Review projects.'  To your knowledge, is this the only – is this every reason that summarizes why the complaint alleges the statements were misleading?  A. I think it's a good summary.").

[8] In the Eisfeldt Report, the "IPO Prospectus" refers to CS Disco, Inc., SEC Form 424B4, filed July 22, 2021.  (*See* Eisfeldt Report, footnote 7.)

[9] Dr. Eisfeldt testified that she did not analyze whether the initiation of analyst coverage of Disco on August 16, 2021 was associated with any stock price reaction.  (Eisfeldt Tr., 87:8–88:15.)

[10] Eisfeldt Report, ¶¶8, 22 (internal citation omitted).

8.       However, as discussed further below, Dr. Eisfeldt's price impact opinions rest on an incorrect and overly narrow interpretation of Plaintiff's allegations.  The disclosures she cites merely describe general business risks associated with usage-based contracts and customer concentration.  They did not disclose the specific, adverse facts alleged by Plaintiff regarding the unusually large, one-time, Review matters that were not expected to recur, much less the broader allegations regarding Disco's purported revenue stability, visibility, and growth prospects.

9.        Specifically, under Plaintiff's theory of liability, "Defendants' misleading statements consisted of reassurances regarding the reliability of CS Disco's revenues and ability to predict those revenues, based on historical patterns of customer spend."[11]  The Complaint further alleges that throughout the Class Period:

> CS Disco repeatedly touted strong growth in its revenues attributable to growth in the full spectrum of CS Disco's product suite, and asserted that it had good advance visibility into changes in the demand from individual customers over time, as well as years of data on their customer usage, allowing them to reliably forecast revenue.  In reality, however, at the time of the IPO and in the first few quarters after going public, Disco was benefiting from an unprecedented amount of revenue from a small number of unusually large Review assignments.  Worse, because the relatively new Review product was driving revenue, their projections were not based on the years of precedent that they claimed, but on the unwarranted assumption that they would continue to receive similarly large Review matters going forward.[12]

10.      According to the Court's Motion to Dismiss Order, Defendants' misstatements and omissions are alleged to be false and misleading because:

> they told investors that when customers increased their revenues to seven figures it represented a stable revenue source but in reality only several of its seven figure customers were driven by large Review projects.  Plaintiffs also allege that given the newness of large Review projects Disco lacked the ability to predict annual revenue accurately.  According to Plaintiffs, these statements were misleading

---

[11] Plaintiff's Opposed Motion and Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed August 4, 2025 ("Motion for Class Certification"), p. 19.

[12] Complaint, ¶3.  *See also* Complaint ¶¶50–53; 62–65.

because they failed to disclose that revenues were materially impacted by a small number of large Review matters that were not part of ongoing and continuous legal department spends. Plaintiffs further argue these statements are misleading because they falsely told investors that customers reached a mature stable spend, when in reality several of its largest customers at that time were spending unusually high amounts on Disco's Review product due to the existence of unusually large litigation matters.[13]

\*\*\*

Plaintiffs contend that the reality of Disco's budget was not a normal and ongoing continuous expenditure by its clients as discussed in the statements above. Therefore, according to Plaintiffs, the failure to disclose the true drivers of revenue growth is materially misleading.[14]

11. The Court further held that Plaintiff has sufficiently alleged the false and misleading nature of Defendant Camara's statements that fluctuations in customer-specific usage would "washout in the aggregate" and that customer spending was driven by "gradual adoption across a wide range of matters":

Plaintiffs have sufficiently alleged that while Camara's statements in these calls regarding 'growth drivers' may be true insofar as 'legal department budgets are steady over time,' Camara's statements could be misleading if there is evidence that Disco's real revenue drivers were in fact only a handful of large Review projects. In such case, Camara's statements suggesting that any fluctuations in specific customer usage would 'washout in the aggregate' could be false and misleading. …

Thus, … Plaintiffs have alleged sufficient facts that Camara's descriptions in the phone call that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers— were either false or misled investors if it is true that customer spending was actually spiky and driven by only a few large Review projects.[15]

12. Thus, as detailed in the following subsections, when Plaintiff's allegations are fully and accurately considered, it is clear that Dr. Eisfeldt's appeals to generic risk disclosures about usage-

---

[13] Motion to Dismiss Order, p. 19 (internal citations omitted).

[14] Motion to Dismiss Order, p. 20 (internal citations omitted).

[15] Motion to Dismiss Order, pp. 20–21. *See also* Motion for Class Certification, pp. 4–5; Nye Report, ¶55.

based pricing, revenue volatility, and customer concentration fail to refute the existence of price impact associated with the alleged misrepresentations.

### i.    Information Regarding Disco's Usage-Based Pricing Model

13.    Dr. Eisfeldt asserts that "Disco disclosed in its IPO Prospectus that the majority of its revenues were derived from 'usage-based' contracts," that "such usage-based revenues could cause fluctuations in its financial results," and that the Company "expect[ed] fluctuations of [its] financial results, which may cause quarterly comparisons not to be meaningful."[16]  However, these boilerplate statements about potential volatility (none of which even mention Disco Review) are a far cry from the then-existing, material, adverse condition that was allegedly known to management regarding the Company's dependence on a small number of exceptional Review matters that made its reported revenue growth appear stable when, in fact, it was not.

14.    Specifically, none of the disclosures Dr. Eisfeldt cites informed the market that: i) "Disco was benefiting from an unprecedented amount of revenue from a small number of unusually large Review assignments," such that its reported revenue growth was unsustainable;[17] (ii) these large Review matters "were not part of ongoing and continuous legal-department spends,"[18] and therefore should not be considered "mature stable spend";[19] (iii) customer-specific usage fluctuations would not "washout in the aggregate,"[20] because the "disproportionate impact of a few large Review projects" meant that "the ending of those projects would have a material

---

[16] Eisfeldt Report, ¶24.

[17] Complaint, ¶3.

[18] Complaint, ¶63.

[19] Complaint, ¶65.

[20] Complaint, ¶29.

- 6 -

impact on revenues";[21] (iv) the Company's "projections were not based on the years of precedent that they claimed, but on the unwarranted assumption that they would continue to receive similarly large Review matters going forward";[22] or that (v) when "customers increased their revenues to seven figures, that [did not] represent[] a stable revenue source" because those seven-figure customers "were driven by one-time large Review projects" associated with unusually large litigation matters.[23, 24]  Instead, the market was left with the false impression that Disco's rapid growth reflected broad-based adoption of its products when, in fact, internal data allegedly showed the opposite.  While investors may have understood that some customer-specific variability was inherent to a usage-based model, they were not informed of the alleged true magnitude, immediacy, or source of the risk.  Indeed, what investors knew at the time was that Disco's revenues had steadily increased every quarter from first-quarter 2019 through first-quarter 2022.[25]

---

[21] Complaint, ¶53.

[22] Complaint, ¶3.

[23] Complaint, ¶¶51, 53.

[24] Dr. Eisfeldt testified that she did not consider whether alternative, allegedly truthful statements would have had price impact.  *See* Eisfeldt Tr., 25:13–22 ("Q. … [D]id you come to an understanding of what would have been a truthful substitute that Defendants could have made at the time of their misstatements to make the statements not misleading?  A. I am -- am interested in hearing what -- what Plaintiffs think that would be.  Q. Right.  I'm asking what you think that would be.  A. I don't have an opinion as to that."); and 50:13–20 ("Q. … Do you opine on whether had Camara said that this customer spend was based on one or two large Reviews, whether or not that would have had a price impact, had he said that at the time? … THE WITNESS: I think this gets back to what we said before; that I was not asked to consider a specific alternative disclosure ….").

[25] *See, e.g.*, Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM, p. 4.

15.     Dr. Eisfeldt further contends that analysts "acknowledged that CS Disco's usage-based revenue model resulted in revenue volatility and unpredictability."[26]  However, the commentary she cites merely echoed the Company's generic risk disclosures about potential fluctuations in customer-specific revenue.  For instance, she points to Cowen's note that "[u]sage can fluctuate," and it "tends to spike during certain stages of cases,"[27] and to Bank of America's statement that "[u]sage based pricing model could result in lumpiness in growth trends[.]"[28]  None of the analyst reports she references suggest that Disco's quarterly revenues were disproportionately dependent on one or two large Review matters, that such spending was unsustainable, or that the Company lacked the claimed "years of data" supporting reliable forecasts.[29]  In fact, prior to the Class Period, analysts generally viewed Disco's usage-based pricing as a "transparent," "sustainable," and "efficient" model.  For example:

- **BofA**: "Disrupting software and services simultaneously …
  Being SaaS and usage based, Disco enables its customers the ability to leverage a next generation AI-powered eDiscovery platform as needed.  This means that Disco is differentiated against the legacy software vendors and the legal service providers at the same time, which is unique in the legal tech industry and an attractive investment trait, in our view. …

  SaaS with usage based pricing model.  Makes a ton of sense for eDiscovery …

  Usage based (~86% of revenue): Usage base model provides higher charges for Disco.  It also has lower entry barrier with no long term contract requirement."[30]

---

[26] Eisfeldt Report, ¶25.

[27] Eisfeldt Report, ¶25, quoting Cowen, "CS Disco, Initiating at Outperform; Disco Set to Boogie to Ediscovery Market Leadership," August 16, 2021, 5:28 AM.

[28] Eisfeldt Report, ¶25, quoting BofA Global Research, "CS Disco, Inc., Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," August 16, 2021, 6:00 AM.

[29] Complaint, ¶3.

[30] BofA Global Research, "CS Disco, Inc., Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO ," August 16, 2021, 6:00 AM.

- **Canaccord**: "The key thing to understand about the numbers here is that Disco is a usage-based revenue model. Customers are charged a per GB fee for unlimited user access, which translates to about $20 per GB during ingestion, and $5 per GB for every month thereafter. Billings are typically monthly in advance, based on current usage run-rates, and Disco generally looks to get one- to three-year commitments from its buyers. It's an easy-to-understand and transparent pricing model, which purchasing organizations appreciate."[31]

- **Cowen**: "LAW has also embraced a differentiated usage-based pricing model … which creates better pricing transparency and more predictable costs for end-users, also not common in the industry. And with pricing not based on a per seat basis, this helps drive more widespread usage of its technology, an important dynamic in helping transform the market. …

  [The Norton Rose Fulbright Litigation Trends] report shows a clear trend toward an increase in the number of legal disputes …. We believe this bodes well for LAW, particularly with its usage-based model, given that a growing number of legal disputes leads to more usage of LAW's platform."[32]

- **Jefferies**: "Disruptive Pricing — DISCO's simple all-in-one usage based model makes it easy for customers to understand pricing. While there are still some nuances around active and cold storage, the pricing is disruptive within the industry and does not require customers to pay a lot of money to get started. …

  DISCO's pricing model benefits from viral characteristics and network effects between individuals at a corporate entity and the law partners that serve them. In particular, DISCO benefits from network effects, as lawyers who are DISCO users move between firms and serve different corporate clients and bring DISCO along to new customers as they do so. Additionally, customers are able to seamlessly grow their usage in a self-service manner as they input more legal matters and users onto DISCO."[33]

- **J.P. Morgan**: "Financial Outlook – Scaling Quickly
  We believe LAW is a sustainable 30% grower for the next three years and is investing heavily on the sales and marketing front to fuel that growth. The usage-based pure SaaS model is an efficient one that generates non-GAAP gross margins above 70%, even at the company's current sub-$100M revenue scale. This efficiency means that the levers in the profitability model are almost entirely

---

[31] Canaccord Genuity, "CS Disco, Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," August 16, 2021, 5:01 AM.

[32] Cowen, "CS Disco, Initiating at Outperform; Disco Set to Boogie to Ediscovery Market Leadership," August 16, 2021, 5:28 AM.

[33] Jefferies, "LAW, DISCO Gets The Party Started; Initiate Hold," August 16, 2021, 12:00 AM.

discretionary, which gives management a lot of flexibility to dial up growth or margin as it sees fit."[34]

- **Needham**: "High net retention translates to strong revenue growth with existing customers, we believe. …

  Disco products are sold on a usage basis, with customers paying a per-GB ingestion fee and a monthly per-GB hosting fee (currently $30/GB).  This usage-based model allows Disco to quickly sign on new customers by negotiating a long-term subscription contract ….

  Because of Disco's usage-based pricing, companies can expand usage instantaneously without even contacting sales."[35]

16.     Analysts also expected any short-term "lumpiness" in revenue to "dissipat[e] as the business scales over time."[36]  In fact, Dr. Eisfeldt concedes that analysts acknowledged "that the Company's customer concentration risk was expected to decrease or 'wash out' as CS Disco grew over time and more customers were added."[37]  For example:

- **BofA**: "[W]e do see the potential for revenue lumpiness likely dissipating as the business scales over time. …

  Strong law firm 'partner' channel driving platform usage
  Disco shares a unique relationship with its law firm customers, which includes 171 of the AmLaw 200. … We believe Disco's law firm customers represent a very good 'partner' channel, driving increased usage and the awareness of the Disco platform as it is becomes increasingly the recommended eDiscovery platform by law firms across the industry."[38]

- **Canaccord**: "[P]er customer spend usually sees short-term fluctuations.  This noise should wash out when you consider the portfolio effect of a customer

---

[34] J.P. Morgan, "CS Disco, Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," August 16, 2021, 12:15 AM.

[35] Needham "CS Disco, Inc., Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," August 16, 2021.

[36] BofA Global Research, "CS Disco, Inc., Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," August 16, 2021, 6:00 AM.

[37] Eisfeldt Report, ¶29.

[38] BofA Global Research, "CS Disco, Inc., Next-gen platform ready to light the Disco inferno; Initiate Buy, $60 PO," August 16, 2021, 6:00 AM.

list that's growing and tops 900 today, but it's something to be aware of. Today the average customer is spending about $95K per year with Disco and the firm's net revenue retention rate is in the mid-120% range and improving as COVID impacts wane. …

[O]n a customer level basis, there can be some month-to month variability in spend. This probably creates some forecasting headaches at a micro-level, but when you consider the portfolio effect of more than 900 customers, it tends to smooth things out on an aggregate basis. Today, the average customer is spending about $93K per year with Disco, and as we noted in our net revenue expansion comments above, the trend here is up and to the right, even if it's not perfectly linear.

As of the end of Q1'21, Disco had 909 customers, of which ~1% were spending more than $1M per year, ~2.5% over $500K, ~7.5% over $250K, ~15% over $100K, and ~30% over $50K. From land to where they stand today, Disco has seen its best increase in annual spend being anywhere from 10-100x a customer's initial commitment. In terms of customer concentration, the firm's top 20 customers account for about 30% of revenue and its Top 10 account for about 20%, but no customer accounts for more than 5% of revenue, and we expect diversification will improve as the customer base scales."[39]

- **Cowen:** "LAW has shown the ability to consistently land new customers, including growing total customer count by 30% Y/Y in FY20 despite a global pandemic. LAW has nearly doubled its customer base over the past 2 years from 480 exiting 1Q19 to 909 exiting 1Q21. We forecast LAW to grow its customer base to ~1.4K exiting FY23, which represents a ~21% CAGR FY20-FY23. We see the significant uplift in sales coverage, new investments in marketing/brand awareness and continued network efforts all as key drivers of new customer generation that could make our forecasts be quite conservative."[40]

- **Jefferies**: "The company believes it can target companies with at least 100 employees or more, as these companies are likely to have the funds needed to maintain a legal department or retain a law firm. In aggregate, there are over 857K companies with more than 100 employees worldwide. DISCO had 909 customers as of March 31, 2021, which suggests penetration of less than 1% … [M]anagement arrives at a $42 billion TAM. The majority of this TAM (62%) represents companies with 250 to 4,999 employees category. …

---

[39] Canaccord Genuity, "CS Disco, Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," August 16, 2021, 5:01 AM.

[40] Cowen, "CS Disco, Initiating at Outperform; Disco Set to Boogie to Ediscovery Market Leadership," August 16, 2021, 5:28 AM.

Add new customers through network effects and go-to-market motion: DISCO has a big opportunity to continue to add new customers. Customer count increased from 635 at '19 year-end to 825 at '20 year-end (+30% y/y). Customer count was 909 as of Q1 '21 (+27% y/y) and 964 as of Q2 '21 (+26% y/y), based on management guidance. We believe DISCO has significant runway to increase its penetration of corporate legal departments.

Increase usage and penetration (expands) within existing customer base across both existing and new products: DISCO has a sizable opportunity to continue expanding usage of its products among existing customers (dollar-based net retention was 122% as of Q1 '21). We believe it will drive expands through increased usage of existing products, as well as increasing attach rates for its newer products among its existing eDiscovery base. Current attach rates are in the low teens for DISCO Review and immaterial for Case Builder, meaning they have significant runway for growth within their customer base for these two products alone."[41]

- **J.P. Morgan**: "Customer lands expected to be the primary driver of growth[.] Within the overall growth rate we expect the biggest driver to be customer additions. One of Disco's main differentiators is its targeting of in-house general council departments, which significantly widens the potential logo and customer pool. In the TAM section below we estimate that there are over 100K potential customers in the U.S. alone compared with the 909 paying customers the company had at the quarter ended March 31, 2021. We are forecasting 27.5% customer growth in 2021 and then 20-23% in the following three years. This translates to net-new customer addition growth of between 6.5% and 15.2% in the out years as well, which we believe is appropriate given the expected growth in new sales reps."[42]

- **Needham**: "High net retention translates to strong revenue growth with existing customers, we believe. Disco boasts a dollar-based net retention rate of 122%, and we look for it to drive revenue growth at current customers with minimal incidental S&M expense given its usage-based pricing model. …

  Usage-based pricing model could create revenue volatility. … However, corporate customers are often engaged in multiple concurrent litigation matters, which can buffer the impact from the revenue fall-off that accompanies a case's resolution."[43]

---

[41] Jefferies, "LAW, DISCO Gets The Party Started; Initiate Hold," August 16, 2021, 12:00 AM.

[42] J.P. Morgan, "CS Disco, Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," August 16, 2021, 12:15 AM.

[43] Needham "CS Disco, Inc., Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," August 16, 2021.

- 12 -

17.     As the above commentary demonstrates, analysts viewed Disco's usage-based pricing model favorably, expected revenue volatility to diminish over time, and were not aware that the Company's growth was unsustainable, as it was disproportionately dependent on a few unusually large, one-time, Review matters.

### ii. Information Regarding the Incremental Revenue Impact from Customers Utilizing Disco's Review Product

18.     Dr. Eisfeldt also cites analyst commentary noting that "CS Disco's revenue from a customer could increase two- to three-fold when a customer adopted the Review product,"[44] suggesting that analysts recognized the alleged true risks associated with large Review customers.  However, the commentary she references is devoid of any concern about revenue volatility or instability.  On the contrary, the statements from Citi, Cowen, Needham, and J.P. Morgan were uniformly positive assessments of Disco's growth potential, emphasizing the incremental revenue opportunity from customers adopting multiple products.  For example, Citi wrote that "Review grew more than 150% in 2020 and provides about 2–3x bigger spend than currently from ediscovery software customers."[45]  Cowen similarly observed that "Review provides a 2–3x uplift in spend,"[46] and Needham remarked that "when [DISCO Review is] adopted, customer spending increases by 2–3x" and "mature customers are more likely to add on Review."[47]  J.P. Morgan echoed this favorable view, noting that "for a customer that has fully

---

[44] Eisfeldt Report, ¶26.

[45] Eisfeldt Report, ¶26, quoting Citi, "Establishing new cloud-based precedent; initiating Buy/High Risk," August 16, 2021.

[46] Eisfeldt Report, ¶26, quoting Cowen, "CS Disco, Initiating at Outperform; Disco Set to Boogie to Ediscovery Market Leadership," August 16, 2021, 5:28 AM.

[47] Eisfeldt Report, ¶26, quoting Needham, "CS Disco, Inc., Break Out the Ball, This Disco Could Be an Alpha Party; Initiate at Buy, $60 PT," August 16, 2021.

deployed Ediscovery and the two additional products, $1 of E-discovery could lead to $2–2.5 in revenue in total."[48]  Collectively, these comments reflected analyst enthusiasm about Disco Review and anticipated revenue expansion, not an awareness of the allegedly concealed risks underlying that revenue, or its concentration in one or two exceptional Review matters.

### iii.  Information Regarding CS Disco's Customer Concentration

19.     Dr. Eisfeldt argues that "CS Disco disclosed information concerning its customer concentration" in its IPO Prospectus, including that it "had 909 customers as of March 31, 2021 and that the largest 157 customers (i.e., the top 17% of customers) accounted for approximately 75% of total revenues."[49]  She also notes that "CS Disco acknowledged it was 'susceptible to risks associated with customer concentration.'"[50]

20.     However, Dr. Eisfeldt incorrectly conflates *customer* concentration with the distinct issue allegedly misrepresented here—namely, revenue concentration in a small number of unusually large Review *matters*.  Indeed, customer concentration and matter concentration are not the same thing.  The Company's disclosure that a subset of customers accounted for a sizeable portion of its total revenues did not inform investors that a disproportionate share of its revenue stemmed from one-time, Review matters.[51]  On August 11, 2022 (*i.e.*, the end of the Class Period),

---

[48] Eisfeldt Report, ¶26, quoting J.P. Morgan, "CS Disco, Strength of Vertical App, Opportunity of Horizontal App – Initiating with OW Rating," August 16, 2021, 12:15 AM.

[49] Eisfeldt Report, ¶27.

[50] Eisfeldt Report, ¶27.

[51] Dr. Eisfeldt does not seem to appreciate the distinction between *customer* concentration and *matter* concentration.  When asked whether it was her opinion that investors were adequately informed that Disco's second-quarter 2021 revenues were materially impacted by two seven-figure Review *matters*, she conceded that she was "not sure" whether the "extreme examples" referenced by Camara involved customers adopting Review across multiple matters, leading to a seven-figure spend, or a single, large Review matter that had a seven-figure spend.  She also could not recall whether analysts understood that distinction.  (Eisfeldt Tr., 33:5–35:20.)

Defendant Camara himself made clear that customer concentration risk had not materialized when he stated: "It's less about lost customers and more about changes in customers' usage on the platform." The volatility "in the [R]eview business has to do with the presence or absence of a low single-digit number of big-ticket reviews."[52] In other words, the revenue volatility disclosed that day was driven by matter-level concentration, not by the loss of customers. Dr. Eisfeldt's failure to consider whether Disco adequately disclosed the risks associated with this matter-level concentration within Disco Review renders her price impact analysis incomplete and unreliable.

21.    Furthermore, as discussed above, Dr. Eisfeldt concedes that analysts expected "customer concentration risk" would "decrease or 'wash out' as CS Disco grew over time and more customers were added."[53] That expectation, however, reflects the false impression that Defendants allegedly fostered through their Class Period misstatements and omissions.[54] Under Plaintiff's theory of liability, Defendants misrepresented that "customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers."[55] In reality, Disco's revenue growth during the Class Period was heavily dependent on a small number of unusually large, one-time, Review matters that "were not part of

---

[52] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022. Camara added: "We're not seeing anything fundamentally different in win rates or in the demand environment or in sales cycle times or anything like that." (*Ibid.*)

[53] Eisfeldt Report, ¶29. *See also* Eisfeldt Report, ¶28 ("[A]lthough a substantial portion of CS Disco's revenues were concentrated in its top customers, customer concentration risk would be expected to diminish as the customer base grew and the Company's sources of revenues became more diversified. A fundamental concept in financial economics is that diversification reduces volatility and risk ….").

[54] Complaint, ¶53.

[55] Motion for Class Certification, pp. 4–5, citing Motion to Dismiss Order, p. 21. *See also* Nye Report, ¶55.

ongoing and continuous legal-department spends."[56]  Thus, the fact that analysts expected

customer concentration risk to decrease over time does not rebut price impact—it underscores

that the market was left with the allegedly false impression that customer-specific volatility

would "washout," when, as alleged, it was internally clear that the opposite was true with respect

to the usually large Review matters that had temporarily boosted Disco's revenues.[57]

### iv.  Information Regarding Atypical Customer Contributions to Q2 2021 Financial Results

22.     Dr. Eisfeldt further argues that, prior to the start of the Class Period, "it was publicly

available information that a new, large customer contributed to the revenue and revenue growth

of CS Disco's preliminary Q2 2021 financial results," and that analyst commentary "indicated

that this customer's ramping quickly from 4Q 2020 to 2Q 2021 was atypical."[58]

23.     However, vague references to a large customer contributing to second-quarter revenue do

not cure the alleged misstatements and omissions.  While analysts may have noted that a single

customer accounted for a meaningful portion of second-quarter revenue, investors were not

informed that the quarter had benefitted from "an unprecedented amount of revenue from a small

number of unusually large Review assignments,"[59] or that such matters were "not part of

ongoing and continuous legal department spend."[60]  Nor did the Company disclose that its

"projections were not based on the years of precedent that they claimed, but on the unwarranted

---

[56] Complaint, ¶63.

[57] *See* Complaint, ¶¶29, 52–53; Motion to Dismiss Order, p. 21.

[58] Eisfeldt Report, ¶¶31, 32.  Based on her ██████████████████████████████████
████████████████████████████████████████████
████████████     (Eisfeldt Report, ¶31.)

[59] Complaint, ¶3.

[60] Complaint, ¶63.

assumption that they would continue to receive similarly large Review matters going forward."[61] Indeed, analysts viewed the Company's guidance as "conservative,"[62] and saw "no reason why the momentum experienced in Q2 [would] not at least carry over in part into the back half [of the] year and beyond."[63] Thus, general awareness that a large customer contributed to second-quarter revenue clearly did not reveal the adverse facts alleged here—namely, that Disco's reported growth depended on an unsustainable concentration of revenue from a few transient Review matters.

24.     Moreover, Dr. Eisfeldt's opinion overlooks that analysts had, at best, limited visibility into the trends allegedly known to Defendants regarding Disco's product mix, and where its customers were on the "adoption journey." As described by Canaccord, Disco "provide[d] very few hard data points as to the quarterly performance of the underlying business – no customer count, no revenue retention metrics, insignificant deferred revenue build."[64] Yet, Disco's reported revenues had increased every quarter from first-quarter 2019 through first-quarter 2022, creating the appearance of steady, predictable growth rather than the "spiky" volatility Dr. Eisfeldt claims was apparent to the market.[65] Indeed, it was not until August 11, 2022 that Disco

---

[61] Complaint, ¶3.

[62] Jefferies, "LAW, DISCO Gets The Party Started; Initiate Hold," August 16, 2021, 12:00 AM.

[63] Canaccord Genuity, "CS Disco, Setting the pace in legal tech upgrades; on our 'vertical giant' watch list," August 16, 2021, 5:01 AM.

[64] Canaccord Genuity, "CS Disco, LAW seeking justice: fast growth again, but conservative guide will raise questions," May 12, 2022, 11:57 PM.

[65] *See* Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM, p. 4. *See also*, Cowen, "CS Disco, Solid 1Q; A Counter-Cyclical Software Company for Your Portfolio," May 13, 2022, 1:04 AM ("We view 2Q rev guide of -4% Q/Q growth as very conservative since revs have never declined Q/Q.").

announced its first-ever quarterly revenue decline, "[breaking] its cadence of beats/raises."[66, 67] The consistent upward trajectory in reported revenues prior to the end of the Class Period reinforced the allegedly false impression that Disco's customer base was broad and diversified, and that customer-specific usage fluctuations would "washout in the aggregate." Thus, prior to August 11, 2022, analysts had no basis to suspect that Disco needed to "de-risk[] usage of its Review solution by seemingly removing the usage and revenues associated [with] multiple large customers" from its financial guidance.[68]

### v. Continued Analyst Discussion of Revenue Risks Associated with Disco's Usage-Based Model

25.     Dr. Eisfeldt repeatedly asserts that, during the Class Period, "CS Disco and analysts continued to discuss the revenue volatility risks from CS Disco's customer base and usage-based pricing model."[69]  However, she again relies on generic risk disclosures about usage-based pricing and customer concentration that failed to inform investors of the adverse facts allegedly known to Defendants.  For example, she cites Disco's September 2, 2021 conference call, where

---

[66] Piper Sandler, "CS Disco, Inc., Volatile Review Business Weighs on FY22 Targets; Remain OW, PT to $25," August 11, 2022, 10:41 PM.

[67] The Company's reported quarterly revenue from first-quarter 2019 through second-quarter 2022 was (in millions): $10.38 (1Q19); $11.31 (2Q19); $12.65 (3Q19); $14.22 (4Q19); $15.67 (1Q20); $15.73 (2Q20); $17.86 (3Q20); $19.19 (4Q20); $21.13 (1Q21); $29.55 (2Q21); $29.85 (3Q21); $33.81 (4Q21); $34.47 (1Q22); $33.71 (2Q22).  (Sources: IPO Prospectus, p. 79; Disco, SEC Form 10-Q for period ended September 30, 2021, filed November 10, 2021, p. 5; Disco, SEC Form 10-K for fiscal year 2021, filed February 25, 2022, p. 51; Disco, SEC Form 10-Q for period ended March 31, 2022, filed May 13, 2022, p. 5; Disco, SEC Form 10-Q for period ended June 20, 2022, filed August 12, 2022, p. 5.)

[68] Needham, "CS Disco, 2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," August 12, 2022.

[69] Eisfeldt Report, ¶8.b.iii.  *See also* Eisfeldt Report, ¶¶47–48 (regarding September 2, 2021); ¶¶59–61 (regarding the January 11, 2022 Needham conference); ¶¶68–70 (regarding February 24, 2022 and May 12, 2022).

the Company stated that its usage-based model "subjected it to 'inherent volatility,'"[70] as well as analyst commentary similarly noting that such pricing is "subject to volatility,"[71] and "could result in lumpy revenue."[72]  She likewise points to Disco's remarks on January 11, 2022 "reiterat[ing] the potential for volatility" and Needham's reference to Disco's "[t]ransactional revenue model" as a price target risk,[73] as well as similar statements in Disco's February 24 and May 12, 2022 earnings calls and corresponding analyst reports.[74]  Yet, as with the pre-Class Period disclosures she relies on, none of these statements suggested that Disco's reported growth was already dependent on a handful of exceptional, one-time, Review matters, or that its growth was unsustainable.  They reflected only a general understanding of usage-based variability, not the concealed facts alleged here.

**B.** ████████████████████████████████████████████ **Do Not Undermine Price Impact**

26.    Dr. Eisfeldt asserts "the September 2, 2021 and January 11, 2022 alleged misrepresentations did not impact CS Disco's stock price at the time they were made," noting that "the economic evidence does not indicate that there was an information asymmetry such ██

████████████████████████████████████████████████████████████████

████████████████████████████████████[75]  Specifically, she finds that:

- "CS Disco's disclosures regarding its revenue and revenue growth appear consistent ████████████████████████████████████████

---

[70] Eisfeldt Report, ¶47.

[71] Eisfeldt Report, ¶48, citing Jefferies, "LAW, Law and Order in This Q," September 3, 2021, 12:00 AM.

[72] Eisfeldt Report, ¶48, citing BofA Global Research, "CS Disco, Inc., Great start as a public company; Reit Buy, PO to $70," September 3, 2021, 2:00 AM.

[73] Eisfeldt Report, ¶¶60, 61.

[74] Eisfeldt Report, ¶68.

[75] Eisfeldt Report, ¶8(b).

██████████████████████████████████████████████████████████ ;" and

- "CS Disco's ████████████████████████████████████
  █████████████ based on publicly available information following the
  alleged misrepresentations, which does not indicate that CS Disco's stock
  price would have declined had the Company disclosed its internal financial
  projections that were allegedly constructed under asymmetric information."[76]

27.    As an initial matter, it is my understanding that Dr. Eisfeldt's opinions prematurely
venture into liability issues at a time when fact discovery is ongoing.[77]  Moreover, she relies on a
small subset of discovery documents provided to her by Defendants' counsel and assumes the
accuracy and reliability of those materials.[78]  At her deposition, Dr. Eisfeldt clarified that: (i) ██
████████████████████████████████████████████████████████ [79] (ii) she ████████
██████████████████████████████████████████████████████████
██████████████████ ;[80] and (iii) ████████████████████████████████████
██████████████████████ [81]  Accordingly, Dr. Eisfeldt's veiled liability defense is
incomplete at best.

---

[76] Eisfeldt Report, ¶8(b)(i)–(ii).  *See also* Eisfeldt Report, ¶34 (regarding September 2, 2021); and ¶51 (regarding January 11, 2022).

[77] *See, e.g.*, Eisfeldt Tr., 25:4–12: "Q. Okay.  So you assume for the purposes of your analysis that revenue was, in fact, driven by only a few large Review matters?  A. I don't really know how to answer that because I did not find that revenue was singularly driven by a few large Review matters.  But I assumed for the purposes of my analysis that the alleged misrepresentations are misrepresentations."

[78] Eisfeldt Report, footnote 101 ("I have assumed that these projections represented the Company's best estimate of its financial results at the time they were made and include the Company's internal assessment of risks").  *See also* Eisfeldt Tr., 19: 21–20:22.

[79] Eisfeldt Tr., 13:19–15:18.

[80] Eisfeldt Tr., 17:15–19:8, 22:20–23:15, 118:23–119:8.

[81] Eisfeldt Tr., 119:10–22.

###### i. Disclosures Regarding Individual Customer Contribution to Revenues and the Drivers of Disco's Revenue Growth

28.    Dr. Eisfeldt claims that "CS Disco disclosed information concerning the two large Review matters that contributed to its Q2 2021 revenues," and the Company's "disclosures appear consistent with its ████████."[82]  However, Dr. Eisfeldt's opinions regarding Disco's ████████ fail to undermine price impact.  At most, her findings suggest ████████ ████████████████████████████████████████████████.[83]  Despite that knowledge, Defendants continued to assure investors that the Company's growth was broad-based and durable.

29.    For example, on September 2, 2021, Defendant Camara discussed how "each of [Disco's] customers goes through an adoption journey that has historically taken several years, and typically … grow to be a seven-figure customer at maturity," allegedly implying that seven-figure customers "represented a stable revenue source."[84]  He reinforced that allegedly false impression by touting a "great example of what has driven the acceleration in growth this quarter," which was a customer that had "ramped from zero to a multi-million dollar level of spend."[85, 86]  Camera further assured investors that, "as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation … becomes smaller and smaller,"[87] without

---

[82] Eisfeldt Report, ¶35.

[83] My opinions herein should not be construed as offering any affirmative conclusions about Disco's internal data, Dr. Eisfeldt's interpretation of such data, or what was known to Defendants during the Class Period.

[84] Complaint, ¶¶52–53.

[85] Complaint, ¶¶50–52.

[86] On the call, Camara noted "[a]nother example of rapid adoption [by] a leading global travel company that … grew to be a million-dollar-plus customer in the quarter."  (*See Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2021 Earnings Call," September 2, 2021.)

[87] Complaint, ¶52.

mentioning that his "great example" of a customer rapidly acquiring seven-figure status had not actually completed its adoption journey, but rather was the result of an unusually large Review matter that would not "washout in the aggregate."[88]

30.    At the January 11, 2022 Needham Virtual Growth Conference, Defendant Camara allegedly continued to mislead investors regarding the drivers and sustainability of Disco's revenue growth, when he assured the market that: (i) "for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform"; and (ii) customers "have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into."[89]    In that same call, Camara touted that the "ultimate wallet size of the customer" was "pretty consistent," and that Disco "typically [targeted] the high end of the market."[90, 91]

---

[88] Complaint, ¶52.

[89] Complaint, ¶62. *See also Bloomberg Transcript*, "Final Transcript, CS Disco, 24th Annual Needham Virtual Growth Conference," January 11, 2022.

[90] Complaint, ¶64.

[91] Dr. Eisfeldt testified that she did not specifically analyze such statements or look into whether Disco internally had contradictory information because, in her mind, they did not seem "controversial." Eisfeldt Tr., 131:12-135:3:

> Q. [F]or the January 11th, 2022 statements, the last sentence says: "People in general have an ongoing and continuous spend on their legal department and on legal services, and that is the budget that we tap into." In your opinion, did that give investors any new information about the volatility of CS DISCO's revenues? …
>
> THE WITNESS: I have no reason to think that it did.
>
> Q. Did you do anything to look into whether CS DISCO had any information that contradicted this statement?
>
> A. I didn't. This didn't seem like a controversial statement. …
>
> Q. [On that call, Camara responded there's] "not as much variant in the ultimate wallet size of the customer. So, like, how big will the customer be when they get to maturity? But there's more variance in how they get there." Did you do

31.     With respect to Dr. Eisfeldt's assertion that Defendant Camara's statements made during the September 2, 2021 conference call, regarding two examples of rapid customer adoption, "appear consistent with" Disco's ████████████,[92] she fails to mention that ████████



.[93] Thus,

████████████████████████████████████████████████

██████████████████████████████████████████ [94] ████████████

anything -- did you understand this statement to be providing any new information to investors? …

THE WITNESS: I didn't analyze that specifically.

Q. So then you didn't -- did you analyze whether that statement had any price impact?

A. I did analyze whether the alleged misrepresentation had price impact.

Q. But not that part specifically?

A. You asked a different question.

Q. Okay.  Did you analyze whether this specific statement had any price impact?

A. Yes, as a part of my analysis of whether the alleged misrepresentations had price impact.

Q. Sitting here today, do you believe that statement provided any new information to investors? …

THE WITNESS: I analyzed whether the alleged misrepresentations had a price impact, and whether that price impact could be inferred from the alleged corrective disclosure; the price change after the alleged corrective disclosure.

[92] Eisfeldt Report, ¶38.  *See also* Eisfeldt Report, ¶36, ████████████████████████████████████████████████ " citing DISCO_001585; DISCO_001586; DISCO_001587; DISCO_001588.

[93] *See* DISCO_001585; DISCO_001586; DISCO_001587, ████████████████████████████████████████████████

[94] Complaint, ¶¶50–52.



[95]

32.     Thus, far from undermining price impact, ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  Indeed, contrary to Dr. Eisfeldt's assertions, the volatility inherent to

Disco's dependence on a small number of outsized Review matters did not become clear to

investors until August 11, 2022, when the Company "de-risked" its guidance by explicitly

removing the volatility associated with the "presence or absence" of "large reviews billing north

of $1 million per quarter."[96]  As Camara admitted, "two or three of those reviews make the

quarter a great quarter, two or three more, make it a complete home run."[97]

33.     With respect to Dr. Eisfeldt's observation that "analysts discussed the 'atypical' customer

ramp for these two customers, and noted that such large customer activity should not be expected

to reoccur in future periods,"[98] she fails to consider that the acknowledgement of atypical

customer adoption does not imply an expectation of significantly reduced spending by that

---

[95] DISCO_003621 (████████████████████████████████████████████.

[96] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022.

[97] *Ibid*.

[98] Eisfeldt Report, ¶39.

customer in subsequent periods. On the contrary, as contemporaneous reports show, analysts viewed the second-quarter customer ramps as positive evidence of Disco's scalability, not warning signs. For example, Bank of America described Disco's quarterly results as a "great start as a public company" and saw the Company as "well positioned to disrupt a large $19.3bn TAM [total addressable market] … to deliver above SaaS industry growth (i.e., 30%+) for the foreseeable future."[99] Canaccord Genuity likewise called it "an exceptional quarter" and wrote that it did not "think the momentum has waned in the two months since," emphasizing Disco's "intermediate-term durability of growth."[100] Cowen similarly reported that "outsized growth … benefited from a perfect tsunami of strength," and believed management's guidance was "conservative."[101] Jefferies projected "sustainable 30%+ growth over the [long term],"[102] while Needham saw "vibrant end-market demand" and expected "revenue growth of greater than 40%."[103, 104] None of these analysts suggested that Disco's growth had stalled or that revenues would decline—indeed, they uniformly treated the Company's second-quarter results as evidence of continuing momentum and sustainable expansion.

---

[99] BofA Global Research, "CS Disco, Inc., Great start as a public company; Reit Buy, PO to $70," September 3, 2021, 2:00 AM.

[100] Canaccord Genuity, "CS Disco, Excellent quarter, conservative guide; early days on the path to vertical giant," September 2, 2021, 11:03 PM.

[101] Cowen, "CS Disco, Judge, Jury & Execution in Public Debut; Strong 2Q & FY21 Guide, PT to $63," September 3, 2021, 12:00 AM.

[102] Jefferies, "LAW, Law and Order in This Q," September 3, 2021, 12:00 AM.

[103] Needham, "CS Disco, 2Q Outperformance on Solid Post-IPO Start," September 3, 2021.

[104] Following its January 11, 2022 conference, Needham highlighted Disco's "viral expansion across organizations," a "powerful flywheel" created by its usage-based pricing model, and "strong uptake" of the Review product. (Needham, "LAW: Needham Growth Conference Highlights," January 11, 2022.)

34.     Dr. Eisfeldt also contends that "█████████████████████████████████

█████████████████████████████████."[105]  However, Plaintiff does not allege

that such matters were the only source of the Disco's revenue growth.  Rather, Plaintiff contends

that the Company's revenues were "materially dependent" on a small number of unusually large,

one-time, Review matters,[106] and that Defendants falsely portrayed the "reliability of CS Disco's

revenues and [its] ability to predict those revenues."[107]  Thus, whether other customers or

products contributed to Disco's revenue that quarter does not alter the fact that investors were

allegedly left with an unrealistic perception of the Company's revenue stability and growth

trajectory.

35.     Based on her review of Disco's internal data, Dr. Eisfeldt claims that while there had

been "███████████████ in ██████████████████████████████████

█████████████████████████████████████.[108]  She further

observes that █████████████████████████████████████████

█████████████████████████████████[109]  However, Dr. Eisfeldt's

observations miss the point.  Investors did not have access ████████████████

████████[110] and therefore they could not have known ████████████████

██████████████████████  The fact that █████████████████████

███████████████████████████████████████████

---

[105] Eisfeldt Report, ¶34.

[106] Complaint, ¶55.

[107] Motion for Class Certification, p. 19.

[108] Eisfeldt Report, ¶¶52–53.

[109] Eisfeldt Report, ¶54 (emphasis in original).

[110] Eisfeldt Report, ¶52.

███████████████████████████████████████████████████████

███████████████████████████████████████

### ii. Whether CS Disco's Internal Projections Were More Optimistic than Analysts' Revenue Forecasts

36.    Dr. Eisfeldt asserts that "[i]f there were an asymmetry between external and internal information causing the market to underestimate the risks to future revenues, I would expect such an asymmetry to be reflected in ███████████████████████████████████ ████████████████████████████████████████████████████████[111]

37.    Once again, Dr. Eisfeldt's opinions prematurely delve into liability issues.  Nevertheless, whether the specific ████████████ provided to Dr. Eisfeldt were ███████████ ███████████ has no bearing on whether the alleged misrepresentations had price impact.  The issue is not ████████████████, or whether Disco's "stock price would have declined had the Company disclosed ███████████████████" on which Dr. Eisfeldt relies.[112]  The question is whether Disco's reported growth reflected the sustainable, broad-based adoption portrayed to the market, rather than a temporary "turbo-charge[]" from a handful of unusually large, one-time, Review matters.[113]  Defendant Camara confirmed this disconnect on August 11, 2022, when he stated that "what we have sought to do is to de-risk the guidance from the point of view of these kinds of large reviews," thereby acknowledging that

---

[111] Eisfeldt Report, ¶¶42, 55.

[112] Eisfeldt Report, ¶34.

[113] Cowen, "CS Disco, Downgrading to Market Perform; Consumption Growth Momentum Hits a Big Snag," August 12, 2022, 5:28 AM.

Disco's prior revenue growth and projections had been inflated by a reliance on such exceptional matters.[114]

38.    Moreover, Dr. Eisfeldt fails to consider whether management's ███████████ during the Class Period were themselves unreasonable or reckless, given that they ███████



█████████████████████████████████████████████████

███████████████████████████████████"[115]  Instead, she assumes the

accuracy and reliability of ████████████████████████████████████

██████████████████████████

### C. So-Called "Intervening Events" (Quarterly Results and FY2022 Guidance) Do Not Undermine Price Impact

39.    Dr. Eisfeldt asserts that "[a]fter the alleged misrepresentations were made and prior to the alleged corrective disclosure on August 11, 2022, CS Disco had two earnings announcements in which it beat its previously issued revenue guidance," "provided guidance for fiscal year ('FY') 2022 for the first time on February 24, 2022, and raised this guidance on May 12, 2022."[116]  She also observes that "[f]ollowing these disclosures, analysts raised their FY 2022 revenue forecasts."[117]  Dr. Eisfeldt claims that these are "intervening events" that are "not at issue in this

---

[114] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022.

[115] Complaint, ¶3.

[116] Eisfeldt Report, ¶8(c).  *See also* Eisfeldt Report, ¶63.

[117] Eisfeldt Report, ¶8(c).  *See also* Eisfeldt Report, ¶63.

- 28 -

matter."[118]  On that basis, she concludes that "the economic content of the allegedly omitted information and that of the alleged corrective disclosure differ."[119]

40.      However, Dr. Eisfeldt's attempt to sever the link between the alleged misrepresentations and the corrective disclosure is based on an incorrect and overly narrow portrayal of Plaintiff's allegations.  She fails to recognize that Disco's interim financial performance reinforced the overly optimistic sense of the Company's revenue stability and growth prospects conveyed by the alleged misstatements and omissions.  According to Plaintiff, during the Class Period, Disco "touted strong growth" across the "full spectrum" of its products, and claimed to have "good advance visibility into changes" in customer-specific demand.[120]  In reality, however, the Company's results were "benefiting from an unprecedented amount of revenue from a small number of unusually large Review assignments," and its projections were based on "the unwarranted assumption that they would continue to receive similarly large Review matters going forward."[121]  Moreover, Disco's guidance toward steadily increasing future revenues, announced on February 24, 2022 and May 12, 2022, was entirely consistent with the monotonically increasing quarterly revenues the Company had reported since early 2019,[122] thereby reinforcing the allegedly false impression that Disco's customer base was broad and

---

[118] Eisfeldt Report, ¶63.  Dr. Eisfeldt also notes that more recent financial results "have greater predictive power," and "analysts incorporate management guidance into their own forecasts." (*Ibid*.)

[119] Eisfeldt Report, ¶8(d)(i).

[120] Complaint, ¶3.

[121] Complaint, ¶3.

[122] *See, e.g*., Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM, p. 4.

diversified, and that customer-specific usage fluctuations would "washout in the aggregate."[123]

Accordingly, such disclosures served to maintain the price inflation created by Defendants'

alleged misstatements and omissions.

41.     Contemporaneous analyst commentary demonstrates that Disco's February and May

2022 earnings releases were viewed as confirmations of steady, predictable growth, "driven by

gradual adoption across a wide range of matters."[124]  For example, following Disco's February

2022 release:

- **Canaccord Genuity** wrote: "[I]nvestors are still getting comfortable with the dynamics of the firm's usage-based model as well as how the team thinks about setting its targets," and "[t]he good news is that Disco's Q4 results should help to put some of those fears to bed, and we'd hope that investors will equally make the leap that the firm's Q1 guide is probably quite conservative as well. …

  Customer spend trends and add-on attach rates continue to improve – net revenue retention increased 19 points y-o-y to 146%. …

  In the grand scheme of things, Disco is still a pretty small company. … We believe there is a path for this company to become the 'category killer' in next-gen legal tech, so we're willing to stomach some near-term losses (so long as growth holds up) on the path to that end."[125]

- **Cowen** wrote: "LAW reported a strong 4Q with rev growth of 76% well above Street of 49%.  NRR of 146% was well above 127% last yr, driven by growing wallet share in eDiscovery, up-market strength and increased cross-selling of new products.  New customer adds were also strong.  FY22 guide of 28-32% growth was in line w/ Street & we think is conservative. …

---

[123] At her deposition, Dr. Eisfeldt conceded that Camara's assurance on November 11, 2021 that specific customer usage fluctuations would "washout in the aggregate" pertained to Disco's future. (Eisfeldt Tr., 77:4–12: "Q. … Do you understand that as a statement about the present or the future? … THE WITNESS: So let me preface this by saying this is a statement by Mr. Camara.  So I cannot say for sure what he meant.  But from a grammatical standpoint, this would appear to be a statement about the future 'as our base grows.'")

[124] Motion for Class Certification, pp. 4–5, citing Motion to Dismiss Order, p. 21.  *See also* Nye Report, ¶55.

[125] Canaccord Genuity, "CS Disco, Excellent growth, and plans to add fuel to the fire in 2022; reiterate BUY," February 24, 2022, 11:07 PM.

LAW's newer products are seeing strong traction incl. Review adoption, which grew 3x in FY21. …

We are encouraged by the strong rev acceleration in 4Q and LAW's ability to continue moving up-market while expanding its cross-sell motions w/ new products.  We view the ~30% FY22 rev guide (midpoint) as very conservative, given its usage model & early days as a public company."[126]

- **Needham** wrote: "Disco reported an impressive 4Q21, delivering a solid beat on the top and bottom line.  Strength came from the continued acceleration of large customer growth driven by increasing usage, multi-product adoption, and higher initial lands. … Given the accelerating momentum, significant revenue outperformance the past two quarters, and prudence around the usage-based model, we believe FY22 revenue guidance of 30% Y/Y growth will ultimately prove conservative.

  We reiterate our Buy rating, and given the company's top quartile growth rates, large market opportunity, and impressive execution."[127]

- **Piper** wrote: "4Q growth was driven by an expanding footprint at existing customers (increased usage and multi-product uptake) and new logo adds.  Customer count increased to 1,126 (from 825 in 4Q20), and importantly, $100K+ customers increased to 214 (from ~141 y/y).  The company's initial revenue targets (which have a degree of conservatism) came in above consensus …"[128]

42.    Following the Company's May 2022 earnings release analysts similarly commented on

Disco's: (i) "strong net revenue retention"; (ii) "conservative financial management"; (iii)

"ability to sustain 60%+ revenue growth"; and (iv) "strong pipeline momentum":

- **BofA** wrote: "CS Disco reported solid Q1 results, with revenue upside being driven by healthy net-new customer adds and strong net revenue retention (NRR), according to management. …

---

[126] Cowen, "CS Disco, Big 4Q Beat; In-Line FY22 Growth Outlook But See Ample Upside, EBITDA Lower," February 25, 2022, 12:13 AM.

[127] Needham, "CS Disco, Solid 4Q Beat, Announces Acquisition to Move Upstream in Discovery Process," February 25, 2022.

[128] Piper Sandler, "CS Disco, Inc., 'Let's Groove,' CS Disco Dances its Way to +67% y/y Growth in 2021," February 24, 2022, 11:53 PM.

We believe Disco reported a very good Q1, with the key highlight being the revenue growth of +63% y/y that demonstrates the disruptiveness of the platform in the legal-tech end market."[129]

- **Canaccord Genuity** wrote: "63% percent revenue growth and a third consecutive 10%+ beat tells us that (a) Disco's business continues to scale very quickly, and (b) they get the game when it comes to conservative financial management. …

  Disco delivered strong Q1 results that were reflective of increasing adoption and penetration with existing clients, significant new customer wins, and expanding multi-product usage."[130]

- **Cowen** wrote: "Customers continue to ramp spend faster than in years past, driven by more market recognition & improved ability to up-sell & cross-sell products, noting a record qtr of cross-sell & expansion. …

  We are encouraged by LAW's ability to sustain 60%+ revenue growth for the fourth consecutive qtr (alongside ~74% GMs), driven by up-market traction, expansion of core e-Discovery & cross-selling new products. … We view 2Q rev guide of -4% Q/Q growth as very conservative since revs have never declined Q/Q."[131]

- **Piper Sandler** wrote: "Strong pipeline momentum supported by larger client wins, faster usage ramp, and multi-product adoption."[132]

43.    Thus, the Company's fourth-quarter 2021 and first-quarter 2022 earnings releases fail to establish that the "economic content" of the alleged misrepresentations "differ" from that of the corrective disclosure.[133]  Rather, they confirmed that investors continued to rely on the same misleading narrative of stable, predictable growth that was not corrected until August 11, 2022.

---

[129] BofA Global Research, "CS Disco, Inc., Solid Q1 results with 63% revenue growth; Reit. Buy, $41 PO," May 12, 2022, 7:41 PM.

[130] Canaccord Genuity, "CS Disco, LAW seeking justice: fast growth again, but conservative guide will raise questions," May 12, 2022, 11:57 PM.

[131] Cowen, "CS Disco, Solid 1Q; A Counter-Cyclical Software Company for Your Portfolio," May 13, 2022, 1:04 AM.

[132] Piper Sandler, "CS Disco, Inc., Platform Usage & Healthy Demand Support Upside to 2022," May 12, 2022, 11:27 PM.

[133] Eisfeldt Report, ¶8(d)(i).

### D. The Decline in the Price of Disco Stock Following the Alleged Corrective Event Conclusively Demonstrates Price Impact

44.     As discussed in the Nye Report, following the Company's second-quarter 2022 earnings release and conference call on August 11, 2022, Disco's stock price declined by -53.63%, or -56.08% net of market and industry effects, on August 12, 2022, which is statistically significant at the 99.99% confidence level.[134]  Based on my event study, I concluded that: (i) Disco's "stock price decline on August 12, 2022 was indeed caused by the Company's disclosure of 'significantly lower 2H22 guidance as [Disco] de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers'";[135] (ii) "the subject of the alleged misstatements and omissions—*i.e.*, the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects—was clearly the root cause of the stock price decline that day";[136] and (iii) "given that the circuit court decision on appeal in *Halliburton II* established that '[p]rice impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the

---

[134] Nye Report, ¶55.

[135] Nye Report, ¶56.

[136] Nye Report, ¶56, citing Exhibit 12, p. 64, quoting Needham, "CS Disco, 2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," August 12, 2022.

fraud,' … the statistically significant Company-specific price decline that occurred on August 12, 2022 is demonstrative of price impact in this matter."[137, 138]

45.      In rebuttal, Dr. Eisfeldt asserts that "the price decline on August 12, 2022 does not provide reliable economic evidence to infer price impact,"[139] for the following two reasons:

(i)  "the economic content of the allegedly omitted information and that of the alleged corrective disclosure differ, particularly due to intervening financial results and guidance issued after the alleged misrepresentations that affected market expectations, and interim events that caused performance to fall short of these intervening expectations;"[140] and

(ii)  "the price decline on August 12, 2022 is consistent with a materialization of previously disclosed risks."[141]

46.      However, Dr. Eisfeldt has not conducted an event study,[142] nor has she attempted to quantify what portion, if any, of Disco's August 12, 2022 stock price decline was due to either:

---

[137] Nye Report, ¶56, citing *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014) (emphasis added).  My understanding is that this definition of price impact was not challenged in the Supreme Court.  It is also my understanding that, at the class certification stage, Defendants bear the burden of proving a lack of price impact associated with the alleged misstatements and omissions.

[138] *See also* Motion for Class Certification, p. 3:

[T]he truth began to emerge on August 11, 2022, when CS Disco released financial results for the second quarter of 2022 that shocked investors and analysts alike.  The Company revised its annual revenue projections downward, revealing that its previous projections relied on the assumption that CS Disco would continue to receive seven figure per quarter revenues from a small number of large Review matters, matters which had disappeared in the preceding months.  As a result of these disclosures, the price of CS Disco stock declined $15.53 between August 11, 2022 and August 12, 2022, a drop of more than 53 percent.

[139] Eisfeldt Report, ¶71.

[140] Eisfeldt Report, ¶71.

[141] Eisfeldt Report, ¶71.

[142] *See* Eisfeldt Report, ¶21 ("For the purposes of this report, I [] refer to the results in Dr. Nye's event study."); Eisfeldt Tr., 86:4–5 ("Q.  … Did you perform your own event study?  A. I did not.").

- 34 -

(i) the market "updating its forecast relative to" Disco's guidance from February and May 2022;[143] or (ii) the claimed "materialization of previously disclosed risks."[144]  In fact, Dr. Eisfeldt testified that she has not offered an opinion about what caused the August 12, 2022 stock price decline.[145]  Thus, her conclusions on this point are, at best, speculative and unsupported.  Moreover, even if one accepts her unfounded assumption that some portion of the decline was unrelated to the alleged fraud, Dr. Eisfeldt's failure to account for the remaining decline renders her analysis incapable of ruling out price impact in this matter.

47.     Furthermore, Dr. Eisfeldt ignores the inextricably intertwined relationship between the alleged misrepresentations, the Company's guidance, and the alleged corrective disclosure.  As discussed above, Disco's February and May 2022 guidance disclosures, which were entirely consistent with the monotonically increasing quarterly revenues the Company had reported since early 2019, served to reinforce the overly optimistic sense of the Company's revenue stability

---

[143] Eisfeldt Report, ¶73.

[144] Eisfeldt Report, ¶71.

[145] Eisfeldt Tr., 94:8–95:13:

> Q. Is it your opinion that -- that the price decline is consistent with the disclosure previously disclosed risk -- or sorry -- consistent with the materialization of previously disclosed risks, or is it your contention that it was caused by those risks? …
>
> THE WITNESS: My opinion as stated here: "It's consistent with a previously – with previously disclosed risks." …
>
> Q. Okay.  The price of CS DISCO stock did fall to a statistically -- by a statistically significant amount on August 12, 2022; correct?
>
> A. According to Dr. Nye's event study, that's correct.
>
> Q. And you don't have any reason to think that that's an incorrect conclusion, do you?
>
> A. I'm not debating that conclusion.
>
> Q. Okay.  Do you have an opinion about what caused that price decline?
>
> A. I haven't offered an opinion on the cause of the price decline.

and growth prospects conveyed by the alleged misstatements and omissions, and analyst commentary confirms that the market continued to rely on the allegedly misleading narrative of stable, predictable growth that remained uncorrected until August 11, 2022.[146]  Accordingly, Dr. Eisfeldt has no basis to conclude that the "economic content" of the alleged misrepresentations "differ[s]" from that of the corrective disclosure.[147]

48.     With respect to her argument that the stock price decline on August 12, 2022 was due to the materialization of "publicly known risks," Dr. Eisfeldt again asserts that "the risks that there could be revenue volatility due to customer concentration and fluctuations in customer usage were disclosed by the Company prior to the Proposed Class Period, reiterated by the Company throughout the Proposed Class Period, and discussed repeatedly by analysts."[148]  However, the "publicly known risks" to which Dr. Eisfeldt refers are the same generic, boilerplate statements about the potential variability inherent to usage-based pricing models that I address above.[149] Such statements did not inform investors of the specific adverse facts allegedly known to Defendants, including, *inter alia*, that Disco's reported growth depended on a small number of unusually large, one-time, Review matters that were neither recurring nor reflective of ongoing customer adoption.  Nor did they disclose that management's supposed "visibility" into revenue trends was severely limited as a result of that dependence.

49.     Quite clearly, it was not until August 11, 2022 that the market learned that Disco's purportedly stable and predictable revenue growth was, in fact, driven by a handful of unusually large, one-time, Review matters that rendered its growth unsustainable.  That day, the Company

---

[146] *Supra* ¶24, §IV.C.

[147] Eisfeldt Report, ¶8(d)(i).

[148] Eisfeldt Report, ¶78.  *See also* Eisfeldt Report, ¶¶80–81.

[149] *Supra* §V.A.

lowered its 2022 revenue guidance, explaining that the reduction was "primarily attributed to the volatility in [its] [R]eview business," and reflected "the potential for incremental headwinds."[150] Defendant Camara elaborated that "[a]ctivity or lack of activity in particular cases especially in large cases can drive increased volatility in our revenue. This is especially true for our [R]eview product." He also emphasized that the issue was "less about lost customers and more about changes in customers' usage on the platform," noting that volatility in the Review business was driven by "the presence or absence of a low single-digit number of big-ticket reviews." Camara further explained that the "two big contributors to the volatility" were "larger ticket sizes … coupled with [R]eview being earlier in its product life and as a consequence having a smaller revenue base."[151] Thus, Disco's August 11, 2022 disclosures revealed that the Company's revenue growth had been "turbo-charged"[152] by a few transient Review matters and lacked the stability investors had been led to believe.[153] According to Canaccord Genuity, the "culprit" was "less large deal [R]eview activity – and the assumption that this persists."[154] These revelations directly contradicted Defendants' earlier assurances that Disco had "years of data," "good

---

[150] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022.

[151] *Ibid*.

[152] Cowen, "CS Disco, Downgrading to Market Perform; Consumption Growth Momentum Hits a Big Snag," August 12, 2022, 5:28 AM.

[153] *See also* Complaint, ¶5 ("The truth began to emerge on August 11, 2022, when CS Disco released financial results for the second quarter of 2022 that shocked investors and analysts alike. The company revised its annual revenue projections downward, revealing that its previous projections relied on continuing to receive revenues from a small number of large Review matters, matters which had disappeared in the preceding months.").

[154] Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM.

advance visibility," and a predictable revenue model where fluctuations would "washout in the aggregate."[155]

50.     Contemporaneous analyst commentary supports Plaintiff's claim that it was not until August 11, 2022 that investors understood that the Company's revenue trajectory was not stable or predictable, but instead inflated by a small number of unusually large, one-time, Review matters.  For example:

- **BofA**: "Mgmt lowers '22 rev guide by 11% on Review risks …

  [S]hares could be range bound until there are salient data points that the revenue model volatility experienced in the quarter is not an ongoing issue that puts into question the future growth profile of the business.  Specifically, the revenue model volatility is mostly attributable to its Review product that when combined with eDiscovery, can drive deal sizes 2-3x higher versus eDiscovery alone.  Usage of Review was lower than expected in Q2, which drove the soft revenue result.  Furthermore, lower visibility into future Review usage is resulting in mgmt lowering its 2022 revenue growth target to +17% y/y at the midpoint, which is well below the +32% prior guidance. … We believe the revenue guide down and mgmt commentary on revenue predictability could put into question the stability of the future growth profile and the potential for the business to display 30%+ growth over the medium-term."[156]

- **Canaccord**: "This one came as a surprise to us.  We always knew that a usage-based model could present some quarter-to-quarter variability, but we likewise thought that (a) corporate litigation would create a fairly linear and resilient backdrop, and (b) that Disco was taking share in the space.  To be honest, it feels like that's probably still the case, but we'd be lying if we said that the firm's updated outlook doesn't create at least a bit of doubt. … The culprit in the quarter and guide was less large deal review activity – and the assumption that this persists – which management attributed more to timing/ luck versus anything fundamental/macro-driven. … [T]his is a pretty significant change in course. …

  Customer spend volatility finally cuts the other way.  To Disco's credit, it has consistently communicated that the usage-based nature of its platform can and will result in revenue volatility.  The surprise, we suppose, and why we're

---

[155] Complaint, ¶¶3, 29, 52–53, 55.

[156] BofA Global Research, "CS Disco, Inc., Cut to Neutral, ability to drive durable 30%+ growth in question; Lower PO to $25," August 12, 2022, 5:00 AM.

somewhat scratching our heads, is that the company is now extrapolating forward ('de-risking' in its own words) its Q2 performance despite indicating the swing in revenue is normal and as expected.  In terms of what drove the volatility, the company pointed at its Review product, which can see particularly big swings in revenue contribution ...."[157]

- **Cowen**: "We are downgrading LAW to Market Perform.  Implied 2H growth guide was lowered from low 30% to low single digits.  Mgmt cited weaker consumption from a handful of large customers using its Doc Review offering and it now has taken all big Review customers out of guide for 2H to help de-risk.  This raises concerns of near-term consumption trends and large deal dependence.  Big reset to model.  PT to $20. ...

  [T]he significant guide down reveals that 1) LAW is much more dependent on large customer consumption behavior than we had thought; 2) the strong growth last year appears to have been turbo-charged by its Review product, which is now modeled to decline this yr; and 3) the big recalibration in guide shows there is limited visibility in nearer-term usage trends. ...

  [T]o now exclude the handful+ of large customers that were spending ~$30m+ in annualized revenue on Review (or ~20%+ of total annualized revs) from the 2H model raises concerns around near-term consumption trends from its largest customers. ...

  With limited committed backlog on hand, visibility into durable rev growth is now constrained."[158]

- **Jefferies**: "LAW delivered a narrow beat, but lowered its '22 guide by 15% (17% vs. 32% prior) due to higher usage volatility for its Review product.  Mgmt. is also lowering margin guide to -43% vs. -31% prior.  We are downgrading LAW due to limited visibility into growth. ...

  We believe we have lower visibility in top line growth given the volatility cited by Mgmt. on the Review product.  As such, we downgrade LAW to Hold."[159]

---

[157] Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM.

[158] Cowen, "CS Disco, Downgrading to Market Perform; Consumption Growth Momentum Hits a Big Snag," August 12, 2022, 5:28 AM.

[159] Jefferies, "Internet, Legal Tech Takes A Break: LAW Guides Down (D/G to Hold); LZ Refocuses on EBITDA," August 11, 2022, 11:52 PM.

- **JP Morgan**: "CS Disco reported a tough quarter due to usage based volatility and continuing to scale its go-to-market, which caused a FY22 guidance cut across the board."[160]

- **Needham**: "LAW reported in line 2Q22 results but significantly lower 2H22 guidance as it de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers.  The result was a $17mm reduction (~21%) to our 2H22 revenue estimate.  While the guidance change assumes significantly lower near-term usage, we do not expect usage from these contracts to be zero in the aggregate ….

  Volatility to Review product adding to incremental conservatism to revenue guidance."[161]

- **Piper Sandler**: "LAW broke its cadence of beats/raises, by delivering an in-line revenue quarter and materially lowering full year targets.  2Q results were driven by robust demand for its eDiscovery offering, offset by pressured usage for its review product.  FY22 guidance was lowered by $17M, primarily due to pressured usage of its Review offering."[162]

- **Company Conference Call (Scott Berg, Needham & Company)**: "But your new guidance caused for second half revenues to be down 21.5% at the midpoint with that $17 million reduction, that's a big number annualized $34 million.  I guess what we're trying to understand is, in this review product, $17 million, even if I break up between two quarters, it sounds like it's more than just a couple of customers.  How can that -- I guess how can the magnitude be that big in a swing factor be that big in this one area?  It's not a couple gigabytes of data usage yields, not a few million bucks one way or the other necessarily up.  The big enough number, the big enough percentage that it's outside of, I think our standard deviation or two of what we would think volatility with model to look like?"[163]

51.    Dr. Eisfeldt asserts that "analyst commentary published after the alleged corrective disclosure discussed that the guidance revision was a result of usage-based volatility, which the

---

[160] JP Morgan, "CS Disco, Customer Usage Drops, Cuts FY22 Guidance," August 12, 2022, 6:14 PM.

[161] Needham, "CS Disco, 2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," August 12, 2022.

[162] Piper Sandler, "CS Disco, Inc., Volatile Review Business Weighs on FY22 Targets; Remain OW, PT to $25," August 11, 2022, 10:41 PM.

[163] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022.

Company had previously disclosed."[164]  However, while certain analysts acknowledged general usage variability, they also made clear that the August 11, 2022 disclosures revealed new, material, adverse information regarding Disco's dependence on a handful of large, one-time, Review matters.  For example, while Dr. Eisfeldt cites Canaccord's statement that Disco "has consistently communicated that the usage-based nature of its platform can and will result in revenue volatility,"[165] she ignores that Canaccord also emphasized that: (i) "This one came as a surprise to us"; (ii) it was a "pretty significant change in course"; (iii) "we're somewhat scratching our heads" because "the company is now … 'de-risking' … its Q2 performance despite indicating the swing in revenue is normal and as expected"; and (iv) "the magnitude and abruptness of change here is almost certainly going to make investors gun-shy."[166]

52.     With respect to Cowen's observation that Disco's August 11, 2022 disclosures revealed that:

> 1) LAW is much more dependent on large customer consumption behavior than we had thought; 2) the strong growth last year appears to have been turbo-charged by its Review product, which is now modeled to decline this yr; and 3) the big recalibration in guide shows there is limited visibility in nearer-term usage trends,"

Dr. Eisfeldt argues that the "evolution and timing of economic information" does not support the claim that the large Review matters that contributed to Disco's second-quarter 2021 revenue

---

[164] Eisfeldt Report, ¶82.

[165] Eisfeldt Report, ¶82, quoting Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM.

[166] Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM.

"caused the forward-looking guidance revision in August 2022."[167, 168]  She further contends that Cowen's commentary "describe[s] current and forward-looking expectations for CS Disco, and not expectations at the time of the alleged misrepresentations."[169]  However, as discussed herein, Plaintiff's allegations are not merely about two discrete Review matters contributing to Disco's second-quarter 2021 revenues.  They concern the Company's broader, ongoing exposure to the revenue volatility those matters exemplified.  As Defendants acknowledged on August 11, 2022, the guidance reduction was made to "de-risk" the Company's outlook by removing revenues associated with large Review customers whose "activity or lack of activity" was hard to predict.[170]  This revelation corrected the allegedly false perception that Disco "had good advance visibility into changes in the demand from individual customers over time,"[171] and that its spend growth was supported by broad-based customer adoption, rather than by a small number of transient, large Review matters.

53.     Furthermore, when she asserts that "each of the three issues identified by Cowen— customer concentration, growth in the Review product, and low visibility due to revenue volatility—were risks and factors discussed by Cowen prior to August 11, 2022,"[172] Dr. Eisfeldt

---

[167] Eisfeldt Report, ¶76, quoting Cowen, "CS Disco, Downgrading to Market Perform; Consumption Growth Momentum Hits a Big Snag," August 12, 2022, 5:28 AM.

[168] Dr. Eisfeldt asserts that "neither Plaintiff nor Dr. Nye have shown that Cowen's commentary provides reliable economic evidence to infer that the price decline on August 12, 2022 demonstrates price impact from the earlier alleged misrepresentations." (Eisfeldt Report, ¶76.) However, it is my understanding that, at the class certification stage, Defendants bear the burden of proving a lack of price impact.

[169] Eisfeldt Report, ¶77.

[170] *Bloomberg Transcript*, "Final Transcript, CS Disco, Q2 2022 Earnings Call," August 11, 2022.

[171] Complaint, ¶3.  *See also* Complaint ¶¶50–53; 62–65

[172] Eisfeldt Report, ¶77.

- 42 -

once again conflates generic observations about usage-based pricing with disclosure of the specific, adverse facts alleged here.  Specifically, the prior Cowen commentary she cites addressed usage-based variability and customer concentration in the abstract, and did so in a uniformly positive context.  For example, Cowen had previously reported that: (i) "DISCO Review generated >$5m of revenue in 1H21 (up >100% Y/Y)," and that customer concentration was "roughly in-line with the past two years";[173] (ii) the Company's results reflected a "perfect tsunami of strength, incl. … increased cross-sell activity of new products, namely Document Review (which can increase ASPs by 2-3x)";[174] (iii) "LAW's newer products Review & Case Builder drive a 2-3x spend uplift vs. standalone eDiscovery and this is driving strong upsell/cross-sell strength," citing a large customer who "ramped quickly from $0 to multi-million," and whose "strong usage continued in 3Q and mgmt expects them to be a large customer going forward";[175] and (iv) "LAW's newer products are seeing strong traction incl. Review adoption."[176]  None of these statements conveyed that Disco's growth during the Class Period was dependent upon one or two exceptional, non-recurring Review matters, or that such growth was unsustainable.  Moreover, at her deposition, Dr. Eisfeldt admitted that she "can't answer" whether Cowen's August 12, 2022 observation that Disco was "much more dependent on large customer consumption behavior than [it] had thought," reflected a change in

---

[173] Eisfeldt Report, ¶77, quoting Cowen, "CS Disco, Initiating At Outperform; Disco Set To Boogie To Ediscovery Market Leadership," August 16, 2021, 5:28 AM.

[174] Eisfeldt Report, ¶77, quoting Cowen, "CS Disco, Judge, Jury & Execution In Public Debut; Strong 2Q & FY21 Guide, PT to $63," September 3, 2021, 12:00 AM.

[175] Eisfeldt Report, ¶77, quoting Cowen, "CS Disco, Takeaways From Cowen Software Bus Tour 2021 (Law & Zen)," November 11, 2021, 12:00 AM.

[176] Eisfeldt Report, ¶77, quoting Cowen, "CS Disco, Big 4Q Beat; In-Line FY22 Growth Outlook But See Ample Upside, EBITDA Lower," February 25, 2022, 12:13 AM.

understanding.  Instead, she dismissed it as "one analyst report" about which she "didn't know what [the] writer was thinking."[177]

54.     Additionally, Dr. Eisfeldt disregards the fact that Disco stock traded in an efficient market (a fact she does not dispute),[178] which implies that it "reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information" throughout the Class Period.[179]  Thus, immediately preceding the alleged corrective event, Disco's stock price would have already reflected the "publicly known risks" identified by Dr. Eisfeldt, and the price decline observed on August 12, 2022 must have been in response to incremental, new information that caused investors to update their expectations about Disco's "expected future cash flows or the discount rate applied to those cash flows."[180]  Indeed, this price decline reflected the market's reaction to new, corrective information regarding the Company's previously concealed dependence on a handful of unusually large, one-time, Review matters, which strongly contradicted Defendants' prior assurances of a mature and stable customer base with predictable overall revenue growth.  Accordingly, under Plaintiff's theory of liability, no portion of the resulting stock price decline was due to the materialization of a known risk.

---

[177] Eisfeldt Tr., 122:14–22.  *See also* Cowen, "CS Disco, Downgrading to Market Perform; Consumption Growth Momentum Hits a Big Snag," August 12, 2022, 5:28 AM.

[178] Dr. Eisfeldt was "asked to assume the market for CS Disco's common stock was efficient throughout the Proposed Class Period."  (Eisfeldt Report, ¶21.)

[179] Nye Report, ¶54.

[180] Eisfeldt Report, ¶¶19–20 ("[I]f the market for a security is efficient, then information within the relevant information set should be quickly and fully incorporated into the price. … [T]he price of a security that trades in an efficient market will [] respond to *new* and *value-relevant* information—that is, information that affects the expected future cash flows or the discount rate applied to those cash flows." (Emphasis in original.  Internal citations omitted)).

**V.    Damages Can Be Measured on a Class-Wide Basis In a Manner Consistent With Plaintiff's Theory of Liability**

55.    The analyses set forth in the Nye Report establish a foundation for estimating damages on a Class-wide basis and in a manner consistent with Plaintiff's theory of liability.[181]  Specifically, by controlling for changes in market and industry effects, the event study set forth in the Nye Report isolates the change in the stock price due to the release of Company-specific information on every day of the Class Period, including the alleged corrective event date.  Thus, as the decline in a security's price in response to corrective disclosures and/or the materialization of a concealed risk reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions, such company-specific price changes are the natural starting point from which to measure the level of price inflation present during the Class Period.  Indeed, this "out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b) securities cases."[182]

56.    As described in the Nye Report, while to date I have not conducted an analysis of loss causation or calculated Class-wide damages in this matter, a damages methodology that can be commonly applied to the Class involves measuring the Company-specific return (*i.e.*, abnormal or residual return net of market and industry effects) in response to the alleged corrective event, adjusting for the effect of any confounding news, and then calculating the amount of inflation in

---

[181] Nye Report, §VII.

[182] *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018).  *See also, e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act cases); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226-YGR, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016); *In re SanDisk LLC Sec. Litig.*, No. 15-CV-01455-VC, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."); *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

Disco stock throughout the Class Period.[183] "Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis."[184] This is precisely the same damages methodology that I put forth at the class certification phase in *Waggoner v. Barclays PLC*, which was endorsed by the Second Circuit.[185]

57.     Moreover, Plaintiff has advanced a single theory of liability that directly alleges a causal connection between Defendants' alleged misrepresentations and the actual losses suffered by Class members upon the revelation of the relevant truth on the corrective event date.[186] Thus, given that an "event study shows how much money the fraud caused shareholders to lose," by "[i]dentifying residual returns on days when allegedly concealed information reached the market," and calculates "'what the price of [the defendant company's] security would have been

---

[183] Nye Report, ¶63, citing *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

[184] Nye Report, ¶65.

[185] *See Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017).  *See also* the following cases in which the court accepted my proposed damages methodology at class certification: *Borteanu v. Nikola Corp.*, No. 2:20-cv-01797, 2025 WL 33147, at *14 (D. Ariz. Jan. 6, 2025); *Sayce v. Forescout Technologies, Inc.*, 2024 WL 2750003, at *6-7 (N.D. Cal. May 28, 2024); *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*, No. 20-4660-KSM, 2023 U.S. Dist. LEXIS 197573, at *72–74 (E.D. Pa. Nov. 3, 2023); *Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *35–38 (D. Nev. Mar. 1, 2023); *In re Allergan PLC Sec. Litig.*, No. 18-cv-12089-CM-GWG, 2021 WL 4077942, at *14–15 (S.D.N.Y. Sep. 8, 2021); *Karinski v. Stamps.com, Inc.*, No. 19-cv-01828-MWF-SK, 2020 WL 6572660, at *8 (C.D. Cal Nov. 9, 2020); *In re Zillow Group, Inc. Securities Litigation*, No. 17-cv-01387-JCC, 2020 WL 6318692, at *8 (W.D. Wash. Oct. 28, 2020); *In re Snap Inc. Securities Litigation*, 334 F.R.D. 209, 216–18 (C.D. Cal. Nov. 20, 2019); *Roofer's Pension Fund, et al. v. Papa, et al.*, 333 F.R.D. 66, 87–88 (D.N.J. Nov. 14, 2019); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47–48 (S.D.N.Y. Jun. 15, 2018); *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. May 31, 2018); *Cooper v. Thoratec Corp.*, No. 14-cv-00360-CW, 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016); and *Thorpe v. Walter Investment Management Corp., et al.*, No. 14-cv-20880-UU, 2016 WL 4006661, *15–16 (S.D. Fla. Mar. 16, 2016).

[186] Nye Report, ¶64, citing Complaint, ¶¶8, 104, 107.

had the alleged wrongful conduct not occurred,' by estimating the amount of artificial inflation in the company's stock price over time,"[187] it is clear that "this is a case in which the Plaintiff's 'proposed measure for damages is ... directly linked with their underlying theory of classwide liability ... and is therefore in accord with the Supreme Court's ... decision in *Comcast*.' *U.S. Foodservice*, 729 F.3d at 123 n.8."[188]

58.     Nonetheless, Dr. Eisfeldt contends that I have "not proposed a damages methodology that can account for the specific facts and circumstances of this matter."[189]  Specifically, she claims that:

    i.    I have "not shown that [my] proposed damages approach can measure only the damages attributable to Plaintiff's theory of liability, rather than losses due to intervening events that impacted market expectations and interim events that caused performance to fall short of these intervening expectations";[190] and

    ii.    the "proposed damages approach cannot measure inflation (if any) arising from the alleged misrepresentations separately from the price reaction that results from the materialization of the previously disclosed risks (or even any allegedly under-disclosed risk) that CS Disco's revenues would experience volatility at the customer level and that its 'extreme positive examples' of rapid customer expansion due to the Review product would not necessarily repeat in the future."[191]

59.     However, Dr. Eisfeldt's opinions critically fail to acknowledge that a determination of whether, and to what extent, there was inflation present in Disco's stock price necessarily requires an assessment of "loss causation—a causal connection between the defendants' alleged

---

[187] *Pfizer*, 819 F.3d at 649.

[188] *Waggoner*, 875 F.3d at 106.  *See also Roofer's Pension Fund*, 333 F.R.D. at 88 (citing *Neale v. Volvo Cars of North Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)).

[189] Eisfeldt Report, ¶84.

[190] Eisfeldt Report, ¶86.

[191] Eisfeldt Report, ¶86 (internal citation omitted).

misrepresentations and the plaintiffs' economic losses,"[192] which I understand is not required at

this stage of the litigation.[193]  Indeed, Dr. Eisfeldt's critique simply boils down to her own

personal requirement that Plaintiff's proposed damages methodology must establish, at the class

certification phase, the precise mechanisms by which potential confounding information (*i.e.*,

"intervening events" and/or "the materialization of the previously disclosed risks") will be

disentangled from the alleged corrective stock price decline.  Yet, it is my understanding that no

such requirement exists.  Rather, Plaintiff's Counsel has informed me that "Courts have long

held that 'Plaintiffs are not required at [the class certification] stage to demonstrate that any price

impact was due to the prior misrepresentation alone.'  *Pirnik v. Fiat Chrysler Automobiles, N.V.*,

327 F.R.D. 38, 46 (S.D.N.Y. 2018); see also *Haliburton I*, 563 U.S. at 807."[194, 195]

---

[192] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014) ("*Halliburton II*") (internal quotations omitted).

[193] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).

[194] *In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021).

[195] *See also, e.g.*, the following cases in which defense experts proffered strikingly similar arguments regarding the estimation of damages at the class certification phase, which were rejected by the court:

*Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *37–38 (D. Nev. Mar. 1, 2023):

> Nye's methodology of determining damages is consistent with the plaintiffs'
> theory that the class's losses come from the inflated stock price caused by the
> defendants' misstatements and later price drop when the truth was revealed.  The
> defendants' argument that Nye should take into consideration other confounding
> events that may explain some or all of the back-end price drop is a loss-causation
> argument that I do not address at the class certification stage.  Moreover, Nye
> states in his report attached to the plaintiffs' reply that he has not actually
> performed a loss causation analysis, but confounding information can be
> addressed by his methodology when that analysis is performed.  *See* ECF No.
> 270-2 at 58-65.  Finally, the defendants' argument that Nye's method fails to
> account for the possibility that inflation is not necessarily constant over the entire

- 48 -

class period is premature at this stage. *See Waggoner, 875 F.3d at 106* (rejecting the argument that class certification was improper where "the [p]laintiffs' damages model failed to account for variations in inflation over time" because damage calculations need not be "so precise" at the class certification stage). The plaintiffs therefore have established a methodology for determining damages on a class-wide basis such that common issues predominate.

*In re Apple Inc. Securities Litigation*, No. 19-CV-2033-YGR, 2022 WL 354785, at *12 (N.D. Cal. Feb. 4, 2022):

The Ninth Circuit has stated that *Comcast* demands only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva*, 716 F.3d at 514. There is only one theory of liability here, namely, that defendants' misrepresentation inflated the stock price and corrective disclosures removed such inflation. Plaintiff has proposed a standard method of calculating damages that is consistent with this theory of liability and can be applied classwide. At the class certification, plaintiff is not required to do more.

Next, defendants fault Dr. Feinstein for failing to consider numerous purported facts, namely:

the fact[s] that (i) there is a subject-matter 'mismatch' between the contents of the [c]hallenged [s]tatement and the November 2018 purportedly corrective disclosures, and thus a 'corrective' price decline cannot be assumed, (ii) the qualitative fact of Apple slowing business in China was well known to the market at the time the [c]hallenged [s]tatement was made, and thus the quantitative "corrective" statements could not affect Apple's stock price, (iii) the "new information" disclosed on January 2, 2019 regarding the 'magnitude and severity' of the quarter-end drop in Apple's iPhone business in China could not have been known at the time the [c]hallenged [s]tatement was made two months earlier; and (iv) there was non-fraud related information released on January 2, 2019 that caused the [c]ompany's stock price to drop.

(Opp. at 24.) However, these "attack[s on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement … [are] nothing more than [ ] attack[s] on loss causation," which plaintiff need not show as a condition of class certification. *Hatamian*, 2016 WL 1042502, at *9 (citing *Halliburton I*, 563 U.S. at 813). "Defendants' arguments are therefore misplaced." *Id*.

*In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *14-15 (S.D.N.Y. Sep. 8, 2021):

Allergan insists that the damages model Nye offers does not correspond with its only remaining theory of liability, but would rather calculate generalized damages, which would conflate several different theories of liability (some of

- 49 -

> which were dismissed in the Court's prior order discussing Allergan's motion to dismiss).
>
> But Allergan's damages model is consistent with its liability case.
>
> ***
>
> Additionally, Nye's opinions about class-wide damages are no different from those he offered in a different case, where the Second Circuit upheld his methodology as complying with *Comcast*.  In *Waggoner v. Barclays PLC*, Nye offered an opinion on a damages model that "complie[d] with *Comcast*" because it "directly measured" the harm associated with earlier misrepresentations by observing "the drop in price" of a corrective disclosure.  875 F.3d at 106.  This Court does not see any noticeable difference between Nye's event study damages model in *Waggoner* and the event study damages model that he offers in this case.  And insofar as Allergan is insisting that an event study damages model is unable to isolate the price drop attributable to any specific misrepresentation or corrective disclosure, this Court has in the past "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information.  Were it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084, at *20.  As this Court has previously noted, there is "no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case." *Ibid*.  That same principle applies, here.
>
> There is no reason to conclude that the event study model offered in this case is flawed.  Of course, DeKalb will ultimately need to disaggregate any legitimate confounding factors to *prove* economic loss, but it need not do so at this juncture to establish that common issues relating to damages predominate for purposes of class certification.  *See Waggoner*, 875 F.3d at 106.  Courts have long held that "Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *see also Haliburton I*, 563 U.S. at 807.  Rather, a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.  The methodology that Nye describes, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the class members.

*Karinski v. Stamps.com, Inc.*, No. CV-19-1828-MWF (SKx), 2020 WL 6572660, at *8 (C.D. Cal Nov. 9, 2020):

> Finally, Defendants argue that Plaintiff has not provided a class-wide damages model as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  However, courts in the Ninth Circuit read *Comcast* "to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Hatamian*, 2016 WL 1042502, at *8 (quoting *Levya*,

- 50 -

716 F.3d at 514). Here, Lead Plaintiff has demonstrated that damages can be calculated using a common, widely-accepted methodology for all Class members. (*See* Nye Rpt. ¶¶ 60-63). Dr. Nye's damages methodology has been routinely accepted by courts examining these same issues at class certification. *See Cooper v. Thoratec Corp.*, No. 14-CV-0360 CW, 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018) (approving Dr. Nye's event study method for calculating per-share damages); *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018) (same); *Todd*, 2017 WL 821662, at *11 ("'[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation'") (citation omitted).

*SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 335 F.R.D. 276, 288 (N.D. Cal. May 8, 2020):

> Defendants argue that an event study cannot work here because there is allegedly no evidence of price increases following the alleged misrepresentations and no evidence of price declines following any disclosure of the alleged truth concerning what defendant contends are plaintiff's liability theories. Defendants' arguments are not, as defendants would have it, an attack on Dr. Hartzmark's damages model. Rather, defendants assert that plaintiff will be unable to disaggregate the artificial inflation from confounding events. This is an inquiry into loss causation and loss causation need not be analyzed at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

*Roofer's Pension Fund, et al. v. Papa, et al.*, 333 F.R.D. 66, 87-88 (D.N.J. Nov. 14, 2019):

> Third, Defendants' criticisms about Dr. Nye's methodologies are largely focused on Dr. Nye's failure to make precise damage calculations, which are not required for class certification. See Comcast, 569 U.S. at 35 (stating that "[c]alculations need not be exact"); Reyes, 802 F.3d at 485, 489 (noting that "an inability to calculate damages on a classwide basis will not, on its own, bar certification"); Neale, 794 F.3d at 374-75; City of Sterling Heights, 2015 WL 5097883, at *13 (explaining that Comcast "did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before certification can be granted"); Waggoner v. Barclays PLC, 875 F.3d 79, 106 (2d Cir. 2017) (finding that the lead plaintiff's failure to "account for variations in inflation over time" is inconsequential at the class certification stage). Nor is it dispositive that individualized issues may affect damages calculations so long as common issues determining liability predominate. See Neale, 794 F.3d at 374-75; In re Wilmington Tr. Sec. Litig., 310 F.R.D. 243, 246 (D. Del. 2015) ("[C]lass certification is not defeated when there are individual issues with respect to the calculation of damages."); West Palm Beach Police Pension Fund, 2016 WL 4138613, at *14-15.

- 51 -

For those reasons, that Dr. Nye did not address certain hypotheticals offered by Defendants, see Defs. Br. at 21-23, and did not actually calculate the amount of damages for each class is inconsequential at this juncture. The Court is not required to "assess the validity of Plaintiff's damages model[s]" to determine whether class certification is warranted. See City of Sterling Heights, 2015 WL 5097883, at *13. It is enough for Lead Plaintiff to show that each of Dr. Nye's proposed methodologies can be used to prove damages on a class-wide basis, which it has done. The Court thus finds that the predominance requirement is met with respect to measuring damages for each proposed class.

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3-4 n.3 (N.D. Cal. Oct. 11, 2018):

Defendants aver that plaintiffs' "failure to describe a specific method is fatal to certification because there is no way for the Court to determine whether the proposed methodologies will measure damages that are solely attributable to plaintiffs' theory of liability." (Opp. at 10 (citing *Doyle*, 663 F. App'x at 579) (internal quotations omitted).) However, in *Doyle*, the Ninth Circuit faulted plaintiffs' method for calculating damages for failed [*sic*] to "measure only the damages that are attributable to the theory of liability." Here, plaintiffs assert a fraud-on-the-market theory of liability, accordingly, the method proposed by plaintiffs—which is based on an economic valuation analyzing the extent to which the disclosure(s), correcting the alleged misrepresentations and omissions, caused the price of RH stock to fall—will limit damages to those that are attributable to that theory of liability. *See Nursing Home Pension Fund v. Oracle Corp.*, 2006 WL 8071391, at *11 n. 4 (N.D. Cal. Dec. 20, 2006) (finding that the out-of-pocket method, which "consist[]]s of an event study and analysis of price movement attributable to company specific events," is "[t]he methodology used to calculate damages in fraud-on-the-market cases [and] is well-established.") Moreover, unlike in *Doyle*, there are no individualized issues regarding liability.

\*\*\*

The Court is unpersuaded by defendants' argument at the October 1, 2018 hearing that this case is much more complicated than those cases in which courts have approved use of a out-of-pocket or event theory method of damages calculation.

\*\*\*

In support of their second agreement, that plaintiffs' proposed method does not contain anything that "addresses any of the specific [*sic*] of this litigation," defendants aver that "Dr. Feinstein could replace the two referenced to 'RH' with the name of another company and come to the conclusion that this same general methodology would apply in any other set of circumstances involving securities litigation." (Opp. at 5.) However, this assertion seems to reflect the fact that

- 52 -

securities fraud cases fit Rule 23 "like a glove," rather than suggest that class treatment is inappropriate. …

Finally, defendants' argument that the plaintiffs' proposed method fails "to demonstrate how one would measure inflation using any 'standard tools of valuation' if it cannot be measured using an event study" is essentially an assertion that plaintiffs' method will result in incorrect calculations.  However, this criticism prematurely addresses the quantification and allocation of damages, which courts consistently find are not appropriately raised at the class certification stage.  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("damage calculations alone cannot defeat certification").  Additionally, the Ninth Circuit has held that plaintiffs are not required to prove their damages with "exact proof" at the certification stage.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013).

*Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. Jun. 26, 2018):

Defendants contend that Dr. Nye's damages model (1) fails to account for the possibility of variation in inflation over time; (2) "rests on flawed assumptions, such as that FCA could have disclosed the 'truth' of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed 'corrective disclosures'"; and (3) does not control for confounding information.  (Dfs.' Opp'n 22).  The Second Circuit has held, however, that *Comcast* does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage.  *See Waggoner*, 875 F.3d at 106 ….

\*\*\*

Similarly, Defendants' second and third challenges go to the question of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors), and the Supreme Court has held "that loss causation … [is a] common question[] that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475 (citing *Halliburton I*, 563 U.S. at 809); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) ("[P]laintiffs are not required to establish loss causation … on class certification.").  Accordingly, Comcast provides no basis to deny Plaintiffs' motion for class certification.

*Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at \*9 (N.D. Cal. Dec. 22, 2016):

Avenue Capital attacks the methodology of Nye's event study on several grounds similar to those raised by the defendant in Hatamanian [*sic*].  The critiques fall into two main categories.  First, Avenue Capital attacks the "fit" of Nye's damages methodology, arguing that the study fails to take into account price inflation over time, the impact of the 2014 corrective disclosures, and the impact of confounding news.  ECF No. 249 at 26-29.  Like the defendant in Hatamanian [*sic*], Avenue Capital points to a Southern District of Texas case as an example of

60.     Moreover, Dr. Eisfeldt provides absolutely no basis (academic, legal, or otherwise) for her understanding of what constitutes "a methodology that can reliably measure damages on a class-wide basis consistent with [Plaintiff's] theory of liability."[196]  Indeed, it is my understanding that "*Comcast* does not suggest that damage calculations must be so precise at this juncture.  To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.' 569 U.S. at 35."[197]  Thus, her assertions about what the proposed damages methodology must specify

---

a court rejecting an event study under <u>Comcast</u> as insufficient tailored.  <u>In re BP p.l.c. Sec. Litig.</u>, No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).  But as the <u>Hatamanian</u> [*sic*] court recognized, <u>In re BP</u> is distinguishable because in that case the problem was the event study's failure to "take into account two differing theories of fraud liability plaintiffs were pursuing." 2016 U.S. Dist. LEXIS 34150, at *26, 2016 WL 1042502.  Plaintiffs have only one theory here.  The flaws that Avenue Capital identifies in Nye's study, like in <u>Hatamanian</u> [*sic*], are "are ultimately immaterial to class certification" because they relate to loss causation, an issue "properly addressed by a fact-finder on the merits." <u>Id</u>.

*Hatamian v. Advanced Micro Devices, Inc*., No. 14-CV-00226-YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016):

Defendants argue that Plaintiffs' simplistic damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures.  In other words, Defendants attack the "fit" between an alleged corrective disclosure and a prior alleged fraudulent statement.  This is nothing more than an attack on loss causation, or Plaintiffs' ability to "show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 131 S.Ct. at 2186 (emphasis in original).  So too is Defendants' argument that Professor Coffman's methodology would not be able to "disaggregate the price inflation" attributable to particular theories of liability.  (Oppo. at 24:16-21.)  As explained by Professor Coffman, this inquiry is appropriately understood as a loss causation analysis.  (Coffman Rebuttal ¶ 56.)  *See, e.g. In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012) ('evaluating potentially confounding information on the disclosure dates, and determining whether it was material, is tantamount to a loss causation analysis').  These sorts of inquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification.  *See Halliburton I,* 131 S. Ct. at 2186.  Defendants' arguments are therefore misplaced.

[196] Eisfeldt Report, ¶84.

[197] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

- 54 -

at this stage of the litigation, and that the "backcasting" approach is inappropriate in this matter, amount to pure *ipse dixit*.[198]

61.     On the contrary, the use of an event study, like mine, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation."[199]  MacKinlay (1997), a widely cited academic primer on event study analysis, similarly notes that "in legal liability cases event studies are used to assess damages."[200]  As noted in the Nye Report, the Second Circuit's decision in *Pfizer* clearly states that price inflation is appropriately measured based on the "residual return" (*i.e.*, the Company-specific return) "on a day when the market discovers allegedly concealed information."[201]

---

[198] Eisfeldt Report, ¶85.

[199] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016), quoting *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013); *See also, e.g.*, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

[200] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39, ("MacKinlay (1997)"), at p. 13, citing Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.  According to Google Scholar, MacKinlay (1997) has been cited by at least 8,430 other academic publications.

[201] Nye Report, ¶63, quoting *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted, emphasis in original):

> Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation

Similarly, the Seventh Circuit's decision in *Glickenhaus* states that "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."[202]  Indeed, as noted by the Supreme Court in *Dura*, "the Restatement of Torts, in setting forth the judicial consensus, says that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts … become generally known' and 'as a result' share value 'depreciate[s].'"[203]

62.      Accordingly, it is my understanding that the measure of price inflation, and thus per-share damages, is premised on the actual losses suffered by investors when "the truth makes its way into the marketplace."[204]  Event studies, like mine, establish whether there is the necessary

---

in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[202] *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).

[203] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005).

[204] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).  Specifically, the *Dura* court stated that:

[A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-

"causal connection" between an alleged misrepresentation and subsequent economic loss, which "in turn, allows an expert to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information."[205] Dr. Eisfeldt's assertion that the out-of-pocket, or event study, methodology "cannot measure the inflation (if any) caused by the alleged misrepresentations in this case,"[206] garners no similar support from case law or academic literature.

63.     Furthermore, Dr. Eisfeldt's claims that Plaintiff must specify how to separate out the effects of "intervening events" and/or "the materialization of the previously disclosed risks," rest on the same flawed premises that underlie her price-impact analysis. As discussed above, her assertion that "the economic content of the alleged misrepresentations differs from the economic content of the alleged corrective disclosure,"[207] stems from her erroneous characterization of the Company's initial and updated full-year 2022 guidance as unrelated "intervening" events.[208] In doing so, she incorrectly treats the February and May 2022 earnings releases as confounding disclosures, when in fact they reinforced the same allegedly misleading narrative of a mature and stable customer base with predictable overall revenue growth that remained uncorrected until the

---

specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss. (Emphasis in original.)

[205] *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

[206] Eisfeldt Report, ¶¶9, 86.

[207] Eisfeldt Report, ¶88.

[208] *See* §IV.C.

end of the Class Period.  Indeed, Disco's August 11, 2022 disclosure, of "significantly lower 2H22 guidance as it de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers,"[209] confirmed that the guidance revision was caused by the very facts Defendants' allegedly concealed throughout the Class Period.  Namely, that Disco's revenue growth, which had steadily increased every quarter since early 2019,[210] was heavily dependent on a small number of unusually large, one-time, Review matters that were not part of ongoing or recurring customer spend that would "washout in the aggregate."[211]

64.        With respect to the notion that Disco's stock price decline following the August 11, 2022 corrective disclosure was caused by the materialization of "known" risks, as discussed above, the "publicly known risks" to which Dr. Eisfeldt appeals are generic, boilerplate statements about potential customer-specific variability inherent to usage-based pricing models.[212]  Such statements did not inform investors of the specific adverse facts allegedly known to Defendants, including, *inter alia*, that Disco's reported revenue growth was heavily dependent on a small number of unusually large, one-time, Review matters that were neither recurring nor reflective of ongoing customer adoption.  Nor did they disclose that management's purported "visibility" into revenue trends was severely limited as a result of that dependence.  Moreover, given that Disco stock traded in an efficient market (a fact Dr. Eisfeldt does not dispute),[213] the Company's stock

---

[209] Needham, "CS Disco, 2Q22 In Line; Changing Review Usage, Guidance Stops the Disco Music," August 12, 2022.

[210] *See, e.g.*, Canaccord Genuity, "CS Disco, Usage model surprises to the downside; estimate reset pushes us to sidelines; downgrade to HOLD," August 11, 2022, 11:00 PM, p. 4.

[211] *See* §§IV.C, IV.D.

[212] *See* §IV.A.

[213] Nye Report, ¶54.  *See also* Eisfeldt Report, ¶21 (Dr. Eisfeldt was "asked to assume the market for CS Disco's common stock was efficient throughout the Proposed Class Period.").

price would have already reflected the "publicly known risks" identified by Dr. Eisfeldt, prior to the alleged corrective event, and the August 12, 2022 price decline must have been in response to incremental, new information that caused investors to update their expectations about Disco's "expected future cash flows or the discount rate applied to those cash flows."[214]  Indeed, the price decline reflected the market's reaction to new, corrective information contradicting Defendants' prior assurances of a mature and stable customer base with predictable overall revenue growth.  Thus, contrary to Dr. Eisfeldt's assertion, there is no need to disentangle any portion of the observed stock price decline purportedly caused by the materialization of "known" risks.

65.    Nevertheless, to the extent that any truly confounding information was disclosed on the corrective event date, it is widely recognized that an event study can be fashioned to isolate the effects of such information.  Indeed, MacKinlay (1997), a widely cited academic primer on event study analysis, states that:

> Over the decades from the early 1930s until the late 1960s the level of sophistication of event studies increased.  John H. Myers and Archie Bakay (1948), C. Austin Barker (1956, 1957, 1958), and John Ashley (1962) are examples of studies during this time period.  The improvements included removing general stock market price movements and separating out confounding events.
>
> ***
>
> Ideally the empirical results will lead to insights relating to understanding the sources and causes of the effects (or lack of effects) of the event under study.

---

[214] Eisfeldt Report, ¶¶19–20 ("[I]f the market for a security is efficient, then information within the relevant information set should be quickly and fully incorporated into the price. … [T]he price of a security that trades in an efficient market will [] respond to *new* and *value-relevant* information—that is, information that affects the expected future cash flows or the discount rate applied to those cash flows."  (Emphasis in original.))

Additional analysis may be included to distinguish between competing explanations.[215]

I further understand that courts have "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail."[216]

66.    At my deposition, I discussed how the science of financial economics provides a variety of tools that can be used to disentangle the price impact associated with different pieces of information:

> [T]he -- event study methodology is remarkably reliable with respect to disentangling confounding information, and you can do it -- It's not just a regression analysis. … [O]nce you get that company-specific component, then all of the tools of financial economics are available and that's, you know, understood. The event study goes into that disentangling analysis, if it's required, because an event study is studying the event at issue, and, if it's here a fraud-related component, you can use discounted cash flow modeling to try and break out some of the more quantitative pieces from the disclosure, especially an earnings announcement. There's looking at the voluminous corporate finance literature or basically academic literature associated with finance that has studied many types of corporate events and chronicled their conditional average responses to those. That can be helpful with this entangling. Discovery evidence has been very important in some of my prior cases with respect to determining how much of … a company's negative news was associated with the fraud-related part of the business. I mentioned option pricing theory earlier. I've used that to disentangle information before. And there's also … comparable companies, so looking at multiples, that can help disentangle various business components, … if required to try and -- hone in on the fraud-related portion of the drop. So I just want to make clear there that it's not just a regression model. The event study has all the tools of finance available to it in order to isolate that portion of the decline you're concerned with.[217]

---

[215] MacKinlay (1997), pp. 14, 15–16.

[216] *In re Allergan PLC Sec. Litig.*, No. 1-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021), quoting *In re Signet Jewelers Ltd. Secs. Litig.*, No. 16-CIV-6728 (CM) (RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019).

[217] Nye Tr., 152:15–153:24.

- 61 -

67.     My work in this matter is ongoing.  My opinions in this Report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein.  I understand that discovery is ongoing.  Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on November 17, 2025, at Redwood City, California.

Zachary Nye, Ph.D.