**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LYNN GAMBRILL, BERT W. PLUYMEN, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) ) | Case Number 1:24-CV-28-DAE |
| Plaintiffs, ) ) | |
| vs. ) ) | Austin, Texas |
| CS DISCO, INC., KIWI CAMARA, and MICHAEL LAFAIR, ) ) ) ) | |
| Defendants. ) | December 4, 2025 |

*********************************

MOTIONS HEARING

BEFORE THE HONORABLE MAGISTRATE JUDGE MARK LANE

*********************************

**APPEARANCES**

For Plaintiffs:       Mr. Jonathan Stern
Bert W. Pluymen       The Rosen Law Firm, P.A.
and the Proposed      275 Madison Ave, 40th Floor
Class                 New York, New York 10016
                      jonathan.stern@gmail.com


For Defendants:       Mr. Joe Kendall
                      Kendall Law Group
                      3811 Turtle Creek, Suite 825
                      Dallas, Texas 75219
                      jkendall@kenda11lawgroup.com
- and -
                      Mr. Peter D. Kennedy
                      Graves, Dougherty, Hearon &
                      Moody, PC
                      401 Congress Avenue, Suite 2700
                      Austin, Texas 78701
                      Email: pkennedy@gdhm.com

**APPEARANCES (CONTINUED)**

For Defendants:        Mr. Patrick E. Gibbs
                       Ms. Tijana Brien
                       Cooley LLP
                       3175 Hanover Street
                       Palo Alto, California 94304
                       pgibbs@cooley.com
                       tbrien@cooley.com
-

Transcriber:           Ms. April Balcombe, CSR, CRR, CRC
                       501 West 5th Street, Suite 4150
                       Austin, Texas 78701
                       (512) 391-8795

Proceedings reported by digital sound recording, transcript produced by computer-aided transcription.

P-R-O-C-E-E-D-I-N-G-S

DEPUTY CLERK:  Court calls for a motion hearing, Lynn Gambrill and others v. CS Disco Incorporated, Case Number 24-CV-28.

THE COURT:  Let's start with announcements. Tell me who you are and who you represent.  We will start over here on my left.

MR. STERN:  Yes, Jonathan Stern for the Rosen Law Firm for the Plaintiff, Bert Pluyman, who is with me in the court and the proposed class.

MR. KENDALL:  Joe Kendall on behalf of the Plaintiff.

THE COURT:  All right.  Welcome.

MR. GIBBS:  Your Honor, Patrick Gibbs from Cooley on behalf of the defendants, and with me at counsel table are my co-counsel, Peter Kennedy, and my partner, Tijana Brien.

THE COURT:  Thank you.  Welcome to y'all as well.

The motions are y'all's.  How do you propose we proceed this morning?

MR. STERN:  Yes, Your Honor.  Unless there is a -- so the defendants only contested a couple of things.  And so unless you want to hear full recitation of the elements, I'm happy to jump into the contested

issues.

THE COURT:  Yeah, and thank you for that.  Is that acceptable to y'all?  I mean, there's a number of things y'all didn't contest, really, and the heart of the matter seems to be reliance and loss.

MR. GIBBS:  That's correct, Your Honor.  That's what we've got.

THE COURT:  Okay.  Well, do whatever you need to do in terms of a record, but I agree with you.  I think that waive is probably too strong of a word, but they haven't joined some of those issues.

MR. STERN:  Understood, Your Honor, and I'm happy to take the podium.

THE COURT:  Yes, please.  Again, just a reminder, we don't have a court reporter so if you -- if you need to type this up later, it is incumbent upon all of us to have a microphone pointed towards your face.

MR. STERN:  Understood, Your Honor.  Thank you.

THE COURT:  Very good.

MR. STERN:  And, again, we are moving for class certification.  Defendants have only contested two issues.  And on the main issue that they contested, price impact, this is not a case where the Plaintiffs bear the burden of proof.  The defendants have not

contested the price -- or the stock that CS Disco traded in an efficient market.  Under the case law, that creates a presumption of reliance satisfying the predominance elements of Rule 23(B).

THE COURT:  Is it that quick?

MR. STERN:  The -- we are happy -- I'm happy to walk through the Camara factors.

THE COURT:  Yes, you need to walk through those.

MR. STERN:  Okay.  Yes, Your Honor, and I'm also happy to quickly walk through the other elements real quick.

THE COURT:  Well, you know, like, Rule 23(A), we don't need to talk about that.  I mean, I'm kind of lasered in, quite frankly, on reliance and loss causation as elements of proving --

MR. STERN:  Yes.

THE COURT:  -- injury under 10b-5.

MR. STERN:  Yes, Your Honor.  So the main issue -- securities class actions, such as these, are -- are rarely found to be predominant so long as Plaintiffs can provide a presumption of reliance.

In this instance, we are relying on the presumption of reliance set forth in Basic v. Levinson, which is the so-called prong on the market presumption

of reliance.

It has four elements -- first, the misrepresentation was publically known.  There is no issue with that there.  We're all dealing with public statements of CS Disco and its officers.

Second, that the misrepresentations were material, which the Supreme Court has found is a merits issue.  It does not need to be resolved on class certification.

The third is that the stock traded in an efficient market and -- which I'll get to in a little more detail in a moment.

And the fourth is that the Plaintiff traded between the misrepresentation and when the truth emerged.  And there is no -- there has been no dispute that the Plaintiff traded between the times of the alleged misrepresentations and the corrective --

THE COURT:  I'm curious, this thought came to mind.  If somebody bought stock after September 2021, but they sold it before August 11th, 2022, they would still be a member of your class, but would they be harmed in any way?

MR. STERN:  They wouldn't be damaged thereby and so they wouldn't have damage and, you know, so we wouldn't seek damages on their behalf.

THE COURT:  So the class really doesn't include people who -- it only includes people who bought and held past August 11th?

MR. STERN:  Yes, Your Honor.

THE COURT:  Okay.

MR. STERN:  And, again, in terms of the elements of market efficiency and the Court has held that there is -- once an efficient market is established, there is a rebuttable presumption of reliance, and I will walk through the elements of market efficiency.

THE COURT:  And that's the Basic case?

MR. STERN:  That is the Basic case, and then the specific factors that tend to show market efficiency that we are relying on are the Cammer case and the Quitman case.

THE COURT:  Okay.

MR. STERN:  And those are cases that -- you know, those are facts that Courts commonly use to assess market efficiency.

THE COURT:  Can I digress on one point and that is the -- it is like an argument in the alternative or with regard to a presumption set out in Affiliated Ute, y'all mention it, but you don't really spend a lot of time on it.

MR. STERN:  Well, we're not relying on it. We're going to -- we're not proceeding with that.

THE COURT:  You're not.  Good, that helps.  So we're lasered in on Basic?

MR. STERN:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. STERN:  So the Cammer factors are trade and volume, analyst coverage, the number of market makers, the eligibility to file a Form S-3, and the cause-and-effect relationship between news -- company news and stock-price movements.

As to Factor 1, Dr. Nye's report on Paragraph 25 indicates that is the weekly average trading volume was 3.3 percent the -- of the public float, which is in excess of what the Courts -- what they require.

In terms of analyst coverage, there were 11 analysts.  Courts, typically, find that four analysts are sufficient.

In terms of market makers, because this is -- the New York Stock Exchange doesn't use market makers, they use a specialist system, and Courts, typically, find that trading on the New York Stock Exchange satisfies this requirement.

But in terms of alternative trading

platforms, Dr. Nye identified 80 market makers and over 100 institutional investors which also tends to support efficiency.

In terms of S-3 eligibility, CS Disco is not only because they hadn't been a publicly-traded company long enough, and Courts, typically, find that this factor -- that that's no barrier to finding market efficiency under Basic.

And then, finally, Cammer Factor 5, the cause-and-effect relationship, Dr. Nye presented -- presented an event study. He found that on 40 percent of -- he found 40 percent of dates with earnings announcements had a statistically significant movement at a 95 percent confidence level. That's within the range of what the Court's accepted in finding a cause-and-effect relationship.

There are also the Krogman factors, which also support -- this document also found support for efficiency. Those are the market capitalization. This is up to -- and we found maximum market capitalization of CS Disco was 3.78 billion, which is greater than 41 percent of the NYSE and greater than 82 percent of NASDAQ.

We did Ask Spread, which was also found by Dr. Nye to be within the range of what was accepted by

the Krogman factors.  And the public float meaning that most of the stock was traded by outsiders, not by insiders.  That was found to be also supportive of market efficiency.

The -- so this creates a presumption that everyone who purchased stock within the class period relied on the Defendants' statements.  That presumption is rebuttable.  But it is Defendants' burden not only to present evidence but to carry the burden of persuasion on rebutting the inference the price impact by showing the disconnect between -- and one way they can do so under Goldman is by showing the mismatch between the misstatements and the correct disclosures.

THE COURT:  So what -- from the briefing and from what your argument is, the presumption -- the Basic presumption, at least initially, appears to apply because of your run through those factors.

MR. STERN:  Yes.

THE COURT:  The issue, though, the big issue is whether or not they're going to meet their burden to rebut it?

MR. STERN:  Yes.

THE COURT:  Okay.  All right.

MR. STERN:  And I don't believe the Defendants have contested that they have carried the burden of

proof on this issue.

THE COURT:  At least on the establishment of the presumption?

MR. STERN:  Yes, or that they carry the burden of rebutting the presumption once it's established.

THE COURT:  Okay.  Well, I thought they did join the issue, but we'll hear from them.

Go ahead.

MR. STERN:  We can hear from them.

And so, again, turning to the issue of burden, price impact is Defendants' burden. Judge Ezra's recent decision in Cassava Sciences noted that:  Defendants have the daunting task to prove by a preponderance of the evidence that the publicly-known statements had no price impact.

Therefore, it's insufficient for them to show that some other factors might have also had price impact.  They have to completely sever the link and show that there was not even a cent of price impact.

Defendants' argument which they -- in Defendants' recent sur-reply, they present the argument that the inference of price impact was severed because the misstatements and the corrective disclosures don't concern the same period and then therefore, by definition, couldn't be corrective.

That argument doesn't carry any weight because the corrective disclosures when read in context are comparing earlier periods covered by their misstatements, with later periods where they didn't have the seven-figure review projects.

And so the fundamental issue here is it's a comparative statement.  It's saying, unlike in earlier periods where we had seven-figure review projects in the quarter, we didn't have any in this quarter and that's why the performance was not -- that's why we had to revise our guidance downward.

THE COURT:  Let me spit back at you what I hear you tell me.  The August '22 statement is not corrective?

MR. STERN:  Sorry, the August 2022 statement is corrective.

THE COURT:  Corrective of?

MR. STERN:  Of Defendants' September and January misstatements.

THE COURT:  And that's another thing I wanted to just make sure we're all on the same page.

Judge Ezra's prior order dealt with a lot of other statements, but we're centered on the four that y'all briefed as it relates to this issue today, right?

MR. STERN:  Yes, yes, Your Honor.

THE COURT:  The September and the January?

MR. STERN:  Yes.

THE COURT:  Got you.

MR. STERN:  It's four statements that Judge Ezra found --

THE COURT:  Okay.

MR. STERN:  -- could sustain --

THE COURT:  And, to be clear, you're maintaining that the August 2022 statement was a corrective statement of both the January 2022 and the September 2021 statements?

MR. STERN:  That's right, Your Honor.

THE COURT:  Got you.  Okay.

MR. STERN:  Yes, and they are corrective because in each of those statements they were misrepresenting the sources of their revenue and failed to disclose that a material portion of the revenues in both the period covered by the September 2021 statement and the period covered by the January 2022 statements, they failed to disclose that a material portion of that revenue was being driven by a small number of large seven-figure review projects that were not likely to recur.

THE COURT:  Judge Ezra's order dealt a little bit with scienter.

MR. STERN:  Yes.

THE COURT:  How does that affect what we're dealing with here today?

MR. STERN:  We contend that it's not relevant at this point, what they knew or didn't know at this time that --

THE COURT:  Is that kind of a subset of the argument that this analysis today is not merits -- it doesn't have anything to do with merits?

MR. STERN:  That's correct.  Scienter -- whether we prove or don't prove scienter, it's a common issue.  What they knew or didn't know is common to the class and, therefore --

THE COURT:  If the presumption applies.

MR. STERN:  Well, what we say is reliance -- the reliance applies if the presumption applies.

THE COURT:  Right.

MR. STERN:  But scienter is a common issue -- scienter is a common issue regardless --

THE COURT:  Got you.

MR. STERN:  -- on whether presumption applies. The only problem for predominance would be reliance.

THE COURT:  Yeah, I will telegraph to everybody.  That's one of the things I've wrestled with is how much of this -- how far do we go into merits?

Because Judge Ezra's order wasn't dealing with merits. It was dealing with well-pled facts.  How much merits-based analysis does a judge at this stage conduct?

MR. STERN:  Yes, Your Honor.  And the Court has been clear that while you should -- you can't shy -- that there is no obligation to avoid issues because they overlap with the merits.

It's not appropriate to go into the merits for their own sake at this point in the process.  This is strictly about whether they've rebutted the presumption of reliance by severing the link between the misstatements and the corrective disclosure.

And the Goldman Sachs case -- and I think it's really there when we look at the facts of the Goldman Sachs case why that case is very different from here and why this mismatch concern doesn't really apply. In the Goldman Sachs case -- you know, Goldman is a very large business.

They have a lot of lines of business.  And they made very general statements about managing their conflicts well and looking after the best interests of the customer.  It turned out that in one transaction with one product, they failed to disclose to their customer that they were on the other side of the

transaction.

And this is, again, one customer across Goldman's entire business.  I don't -- and, you know, and that was -- and their statements were very, very broad and generic.

The Supreme Court found that there was a need to conduct a further inquiry as to whether, given how generic the statements were about their whole business and how very specific about a one narrow transaction, whether that really didn't affect the overall business, whether that that created a mismatch.

In our case, there were very specific statements about the drivers of revenue and about where their large customers' revenues were coming from and whether those were from a diverse, gradual adoption across all issues -- across a range of matters or whether it was driven by, you know, a company has one big litigation.

They have to spend seven figures per quarter on discovery in that litigation.  That's, obviously, not a normal thing, even for large companies.  And, therefore, there is no reason to expect that just because a company is extending with that order, that they are going to be a seven-figure customer going forward.  Because it's just one-off, rare --

THE COURT:  And, see, that's the merits-based problem that I have.  To me, that's common sense.

MR. STERN:  Yes.

THE COURT:  Everybody knows that.  So -- but now aren't I getting into merits based?

MR. STERN:  Well, I think the -- getting into merits based again, the only -- it gets into merits based in that you do look to whether the statement -- I guess it overlaps on the merits in the sense that it is a merits -- it also will come up in the merits whether there is a match --

THE COURT:  Yes, it is that reliance piece that I think maybe opens the door to it a little bit.  I just don't -- that's what I'm struggling with.

MR. STERN:  Yes, I think it's a very narrow merits inquiry which is -- and again, this will overlap with the merits and I'm sure they will argue at summary judgment at the next trial also that we can't prove loss causation because, you know, the statements aren't truly corrective.

And so I do think there needs to be some examination of it.  But in this case, it's not our burden to prove that, you know, there is a close match and that affirmatively, yes, it was corrective.  It's can they come forward and really prove and establish

that it was totally un-corrective.

THE COURT:  By a preponderance?

MR. STERN:  By a preponderance.

THE COURT:  Got you.

MR. STERN:  By a preponderance, but it has to be -- it has to be an entirely severable complaint by a preponderance.  So it -- so, you know, again, even if the Court finds that, you know, maybe there was one cent of price movement, while that might become a merits issue, even if there was any price movement, based on the information they concealed and if there is a match, that's -- that warrants certification.

THE COURT:  All right.  Can I circle back to something else earlier?

On the four statements that are set out in the briefing, your amended complaint has longer verbiage than, for instance, the September 2021 call.

But what Ezra seemed to have found -- Judge Ezra seemed to have found and what y'all are arguing today is not the whole paragraph -- double paragraph on Page -- what is it -- 10 of your complaint.

I hope I got that right.  Yes.  But instead, the more discrete statements that are set out in the briefing related to this issue.

MR. STERN:  Yes, like I said, so what we tried

to do in the complaint was we included in full paragraphs so there would be full context, and we bolded the statement in context that we thought was particularly worth focusing on.

And we focused on those in our briefing, the part that we thought was particularly relevant in terms of being misleading.  But we -- you know, the full context of the paragraph we think is relevant as well.

THE COURT:  Well, and then that opens up how big -- if I'm going to get -- if we're going to go beyond just what was bolded in the briefing on this motion to certify class to what is more broadly set forth in your amended complaint, isn't that against the backdrop of everything that happened on that whole phone call?

MR. STERN:  Well, what we would say is -- I would say if there is other stuff in the phone -- if there is other information in the phone call that's relevant to that inquiry, we would say, you know, like, in terms -- it's relevant to the extent that -- to understand those paragraphs in their full context, and, you know, obviously, you know, if you have questions on a phone call, it might make reference to their prepared remarks, but my understand -- but the thing I think that is going beyond what's relevant -- what's a relevant

inquiry at this stage is statements outside of those two calls.

So, for instance, the analyst reports that what the Defendants rely on to try to sever the link, we think that's going beyond what is appropriate at the class certification stage.

THE COURT:  Say that last part one more time.

MR. STERN:  Yes.  So the analyst reports which the Defendants rely on which are separate from those earnings -- well, the earning transcript from the conference transcripts.  September was an earnings call. January was an investor conference.

But those two transcripts are all part of the same discussion, but the analyst report that the Defendants rely on, which weren't issued by CS Disco, and in some cases were based on information provided by CS Disco or were analyst-independent research.  There is case law, including cases that Defendant cited, that say that under the Amgen Supreme Court decision, that's beyond the class certification inquiry.

THE COURT:  Okay.  So -- because that was kind of one of my next questions.  My instincts are to hold you to what you've briefed here which is the bolded language and not pick and choose other statements that were made during those same calls, for the reasons that

we're kind of talking about it.

Because it just seems I can't look -- otherwise, I need to look -- and probably I do -- I need to look at that sentence in light of everything that happened during that phone call and then this -- and I think you just answered it.

If the men were making a couple of these different type of phone calls with different parties at or near the same time, aren't they in context -- aren't they part of this whole thing about really whether -- you've accused them of lying?

MR. STERN:  Yes.

THE COURT:  Isn't that germane to this, whether or not these statements taken in -- during a lengthy phone call, just this statement is fraudulent? Or shouldn't I look at the whole of what's going on at that time, everything they're saying and doing?

MR. STERN:  Well, but, you know, in terms of the direct words of Defendants, those are really just -- and, again, I think that's -- in terms of are they lying or not, that's not an issue that's before the Court at this time.

The ultimate question of were they lying, were their statements false, that's not -- that's one of those merits issues that we would say is beyond the

scope of this.

The question is whether those statements, the statements that were made had a price impact in light of the corrective disclosure.  So I think it's a bit of a different issue than the question of, were they lying.

And again the -- and the other thing is that the materials the Defendants were relying on are not other -- at least primarily, I believe -- I don't recall whether Defendants put in any other statements directly made by any of the Defendants to the public.

These are statements from analysts that sort of say, you know, we believe that CS Disco, you know, has these sorts of customers and we believe that this is the nature of their business and we believe that these are the risks they face and these are the strengths of the company.

And so they're not statements that are attributed to the company.  These are analysts doing their own work independently.  And so that's sort of outside the question of the relationship between the misstatement and the corrective --

THE COURT:  And are you suggesting that I shouldn't consider that argument on their part?

MR. STERN:  Yes -- yeah, we would say that

that argument, actually, does go beyond the scope at this time.  It is appropriate on the merits for them to make that argument, but it's not a class certification argument.

But we also do think that even if you do consider those, that there is a distinction between what they found in the analyst reports and the risks that we are concerned about in this case.  Because what the analysts talk about are risks of customer concentration or the risks inherent in litigation.

And they're not focused on, well, are CS Disco's customers' customers with a lot of small matters, or are CS Disco's cust- -- big customers that is -- you know, customers with a lot of small matters that add up to a large amount or are they customers with one big matter.

And I think it's pretty clear that there is a big difference between the risk of having the first type of customer and the second type of customer as -- you know, in terms of how risky and volatile your business is.

And I think that's the crucial question here, and that's what they weren't able to show, even in the analyst reports, which, again, we don't think you need to consider.

But if you do consider them, they don't sever the link because they were concerned with a different risk, a risk that is real, that is different than the risk that they concealed.

And the fact they disclosed one risk, and the investors were aware of one risk, doesn't mean that they were aware of the risk that we're specifically addressing here.

THE COURT:  Okay.  Now, I just want to put a head on it.  I took -- we took your briefing and took the statements that you briefed that are fraudulent in your opinion.  And that's what I'm going to hold you to, I guess, is what I'm saying.

I'm not going to look at the rest of the phone call.  I just want to be clear, it's just those bolded misstatements -- alleged misstatements that you've set out in the briefing.  I just want to make sure we're on the same page there.

MR. STERN:  Yes, Your Honor.  I mean, the only thing we would say is, they are better understood in the context of the whole paragraph that we cite.

And we do -- you know, and we do, in our briefing, cite the larger --

THE COURT:  Yes.

MR. STERN:  -- paragraph of the complaint and

we do say that that paragraph is incorporated by reference. But the bolded part is the one that we depend- --

THE COURT: Is the operative part --

MR. STERN: The operative.

THE COURT: -- that I really need to be focused on?

MR. STERN: That you need to be most focused, yes.

THE COURT: Gotcha. All right. Thank you. Sorry to beat that to death.

MR. STERN: No, of course.

THE COURT: But that's kind of where I start with this.

MR. STERN: Yes.

THE COURT: Okay.

MR. STERN: I did just want to highlight, though, that turning to the authority -- you know, as I mentioned, we think the analyst reports are not something that you need to consider; although, again, we would say even if you do consider them, they don't sever the link, but I did want to highlight the case law that's relevant to that issue.

So the Supreme Court case that I mentioned was Amgen, the Connecticut Retirement Plans and

Tr. Funds.  And that's 568 U.S. 455.

And then we cite two opinions in our briefing that find that Amgen decision which holds that materiality -- so the Amgen decision holds that materiality is not something that the Court needs to consider regarding the class certification.

And what Courts have -- what two different Courts within this Circuit have found, even in the wake of the Goldman Sachs decision, which deals with rebutting the inference of price impact.

So those two decisions, Natera and Concho, they apply to Amgen and Goldman and said, you know, it's argued that the totality of the circumstances, statements, out -- you know, like, outside truths that supposedly come out for or outside of the challenged statements, those two cases rejected those arguments by defendants and said, we don't need to consider it at this stage.

That's something for the merits.  And the Natera case is Schneider v. Natera, and that's Western District of Texas and the Westlaw cite is 2025 WL 369243.

And Concho, which, again --

THE COURT:  To be clear, these cases that you're citing now are not in the briefing?

MR. STERN:  They are in the briefing.

THE COURT:  Okay.  Then we've got the cites?

MR. STERN:  I don't need to read them in?

THE COURT:  No, no, no, we spent some time on this.

MR. STERN:  Okay.  Great.

So it's Natera and Concho.  And then Concho is a case that Defendants themselves are relying on.  So we would say that that's particularly persuasive.

And then the other issue that we would focus on is Defendants' use of internal documents.  And they tried to argue that because there was no mismatch between Defendants' internal projections and what analysts had, this somehow severs the link between price impact and -- sorry, the misstatements and the corrective disclosure and that rebuts price impact and therefore reliance.

So there's two issues, you can say.  First, there is -- this is really not an issue that we've ever seen raised by the Defendant on class certification, let alone for it to be considered and rejected.

We're not really sure -- and again, it really doesn't go to scienter which is well beyond what is supposed to be considered here, which is a question of reliance.  So it's not just that it's a merits

element.  It's just that it's a merits element that is sort of very clearly distinct from the question of reliance.

You know, you can rely on a statement and we can prove that element.  And maybe they don't have scienter and, therefore, there's no liability, but it doesn't really change the question of whether, you know, class members relied on the statements or not.

And so that's really the only thing that it goes to.  And the further thing I would say is, the methodology we think is deeply flawed.

Dr. Eisfeldt reviewed a limited number of documents.  She only focused on this issue of the projections themselves.  And we don't contend in our complaint that the projections were standing alone corrective.

What we say in our complaint is that the projections together with the commentary that we laid out in several paragraphs afterwards, those together constituted a corrective disclosure.

THE COURT:  Say that part one more time.

MR. STERN:  Yes.

The revised guidance, together with Camara's commentary on them, some of which was in response to questions about why is this guidance being revised, and

then in the context of that -- those questions, he revealed that their guidance had been based on the fact that they previously had a small number of large review projects that had materially bolstered their revenues and these seven-figure-per-quarter review projects sort of had fallen off, and, therefore, they couldn't sort of sustain the guidance that they previously relied on.

So not only was this forward-looking thing about our guidance is changing, but it reveals the sources of their new revenue, and that's the part that's really corrective.

The Defendants, in their opening brief, understood this.  They had an entire section devoted to saying why this commentary about the loss of these several review projects isn't corrective.

And then in the sur-reply, they make the argument that we had never presented the argument.  But I think it's pretty clear if you look at the opposition, they understood this is the argument.  They opposed it. They had every opportunity to do so.  They set out a detailed response.

They chose to rely on these analyst reports and on these internal documentation that we believe -- persuasively, we argued, is not relevant.  So we think this issue has been -- they were able to brief in their

opposition.

They chose to make this argument about internal documents, showing that there was no mismatch. We would say that those documents were cherry picked, that these internal documents really aren't relevant because they go to scienter.

And Dr. Eisfeldt's analysis of them was flawed because Dr. Eisfeldt didn't understand the distinction in the deposition transcript between -- it appeared in the deposition transcript between a customer spending and the specific review matter. And I think it's -- and, again, that is the whole thing this case turns on.

And so if they're not reviewing their internal documents with an eye towards that distinction, that any analyst even to the extent that you consider scienter at this point, the analysis that Dr. Eisfeldt performed isn't really germane.

And then, also, to the extent that this is about what did Defendants know and what information they had versus what the public had, I'm not really sure why an economist is an expert on that at all. And so those are sort of the -- the problems that we saw with that argument.

And then turning to the actual issue of, is

there a mismatch in the analysis that Goldman requires us to perform, you know, we would say the Defendants didn't really make the argument in their opposition.

But to the extent that they raised it and they raised it in the reply, you know, the real argument is that the -- that the misstatements in September and January and the corrective disclosure in August don't concern the same period.

But I think what is clear is, those corrective disclosures are making a comparison between the more recent period and the earlier period.

And, obviously, a comparison between quarters can't only concern a single quarter.  So he was saying, this is what was going on with the earlier quarter that was good that we didn't tell you was the reason that things were good in these other quarters, and they went away, and that's bad.

But revealing that the good fortune that they had in those earlier quarters was based on such a contingent and borrow [sic] thing as a single large litigation, that's -- that is connected and it's related to the matter of misstatements, which is the sources of their revenues.

And so because we were able to -- because there is this match between those two things, they

failed to rebut the price impact.

THE COURT:  The four statements at issue --

MR. STERN:  Yes.

THE COURT:  -- what -- or do you have evidence that the men, when they said -- made those statements, that they were not telling the truth?

And what I mean by that is, when they said -- they're, obviously, optimistic statements about the future.  When did they learn that these bigger clients that they had weren't going to be sustaining that revenue stream anymore?  Was it in the fall of 2021, or was it after, for instance, the January 2022 statement?

MR. STERN:  Well, what we would say to that -- what I would, actually, say is that we don't think that the relevant issue is whether they knew when those projects were ending.  The fact that that they knew that revenues were dependent on those -- they knew they would end at some point.

THE COURT:  Yeah, but didn't everybody know that?  That is kind of my common sense thing.

MR. STERN:  Well, everyone knew that -- well, this is the thing, is, though, that no one knew that those big customers they were talking about only had one big project.  So because the public didn't know that it

was only one project, they didn't know, oh, this is inevitably going to end.  Because, you know, it's a company that just has so many matters.

You know, imagine a Walmart that just had so many slip and falls.  At any given time, they have 100 different, you know, has so many little cases going on at any given time, that, you know, just quarter in, quarter out, they are going to produce that revenue.

So if you get that customer, which for all investors knew, that was the sort of thing that is what had happened, that Camara was boasting that in September '21.

For all investors knew, it was some big customer that just has tons of small matters, that is always going to have a huge number of documents on there because there is just so many different cases, investors could have believed that.

What investors didn't realize is that these customers -- we do have evidence that Defendants were aware of this at this time, and there was the internal documentation showing this.  But the spending from those customers was just based on one or two large review projects.

And, you know, so the two customers, they talked in that September 2021 call -- and Judge Ezra --

I think this is something that was dealt with in the Motion to Dismiss -- found that it didn't disclose that those two customers were being -- or, you know, the revenues were being heavily driven by one or two large review projects.

And now we know from the internal information that we have, that those two customers are customers -- like, the two customers, specifically, they talked about are customers that only had one or two large cases.

In both cases, they only had one seven-figure-per-quarter litigation.  I believe one of them had another large six-figure-, but not seven-figure litigation ongoing at the time.

So that's the -- that's a fact that Defendants knew and investors didn't, which is not just that they were large customers, but that there is two very large projects that are driving each of those customers' revenues respectively.

So that we think is the real distinction and that's the thing that they knew and didn't tell investors.

So, yes, if they had said, this customer had one very large litigation and that's why -- you know, and I believe in one case they said this customer had a

series of legal matters which implies they had several different cases, that that's what drove customer spending.

So, in that case, you know, it was implying to investors that there was multiple litigations, multiple discoveries ongoing.  We're not seeing in the documents that there was a series of legal matters.

And just to emphasize that -- and, again, you know, we would -- and as we've noted, you know, the match between these statements and the corrective disclosure doesn't have to be perfect.  They merely need to be related, and they need not precisely mirror the misrepresentation.

And we can turn to the question of the damages model, unless you, unless there is --

THE COURT:  I guess what I want to leave is -- leave you with is, individual reliance, I think, is impossible.  For you to move forward on reliance, you have to have the presumption.

MR. STERN:  Yes.

THE COURT:  You've got to.

So that's really where I need to spend most of my time.

MR. STERN:  Yes.

THE COURT:  And this next issue which you are

about to launch into.

MR. STERN:  Yes.

THE COURT:  Very good.

Go ahead.

MR. STERN:  Yes.  This is the damages issue. The question of damages is not, will we, ultimately, be able to prove damages at trial.  The question is:  Does our theory of damages match our theory of liability?

And I think the -- you know, our theory was that -- our theory of liability is that there were these material facts that were withheld from the investors throughout the class period that they were revealed on August 11th.

And that the drop on August 11th is evidence of the amount of essentially price inflation that was built into the price of the stock by Defendants' misconduct.  That is our theory of liability.

Now, they might be able to disprove it in any number of different ways, but using that drop to calculate the damages very closely matches our theory of liability.

And, again, for this, we don't need to get into merits at all.  The simple question is:  Is this theory that we use to drop to calculate damages -- and, you know, again, for the company's specific drop.

So just to be clear, we can factor out, you know, so I -- if -- say that the market had a bad -- you know, say the market declined 50 percent and, you know, Defendants declined 40 per- -- Defendants declined 50 percent.  Sorry.

Say the market declined 10 percent and the Defendants declined 50 percent, you know, we have our expert -- I should say, we -- our expert has statistical tools that can sort of factor that out and look at the company-specific decline and use that to calculate damages.

It has been done in many cases.  Courts routinely certify class actions -- securities class actions using this exact theory of damages.  The cases that we've -- and this is called the out-of-pocket method.

The cases that -- where Courts have had more hesitancy such as the BP oil case which Defendants cite, these cases where for specific reasons, the out-of-pocket measure of damages doesn't really apply.

And while there are other theories of damages that you can use in a 10b case, we're not relying on those and those are, you know, less commonly used, and they create complexities that aren't present here.

So in the BP case, you know, this is related to the BP Gulf of Mexico oil spill that I'm sure the Court is familiar with, the basic facts of that, so you have two subjects.  People who -- so before --

So BP made statements about the safety of that undersea drilling operation before the leak, the spill, and then they, obviously -- and they continued to make statements afterwards.

And Plaintiffs have challenged statements both before and after.  On the statements after about, you know, how were they able to remediate; and the statements before, what are the likelihood of a spill.

And this created an issue because for the people who bought after the spill, they knew there was a spill and it was pretty straight -- it was pretty straightforward 10b-5 case.

But for the people before this spill, it gets a little more complicated because it's an issue of they disclose that there was this risk, but, you know, they didn't -- but, you know, they sort of downplayed the risk, but they disclosed the risk, you know, so people think it was 5 percent versus 10 percent, that's different.

And so because they were focused on that specific -- you know, there is, like, a 5 -- sorry, if

people thought there was a 5 percent risk of -- because of defendant's statements, but there is actually a 10 percent risk, it makes calculating damages more complicated based on, like, all the later things that happened.  So it just introduced this other level of complexity that the Court found that the Plaintiff failed to address.

This is a much more standard, you know, there was one corrective disclosure and if the Court finds that it related to the statements, we believe that that's a very straightforward application of, you know, a very standard damages analysis that Courts routinely approve at this stage.

THE COURT:  Just flying at 40,000 feet, what would be the damages, then?  Is there -- okay, you've got August 11th, in your opinion, corrective statement comes out, the price -- stock price goes down by 53 percent.

MR. STERN:  Yes.

THE COURT:  Is that damages two weeks later even if they didn't sell?  Has the stock price gone up? I mean, how --

MR. STERN:  Yes.  So, again, there is, you know, there is well-established documents on these issues.  There is one -- there is a statutory damages

formula that would modify this somewhat which is if you sold right after the drop, your damages are at the drop.

But if you held for any part of a 90-day period or for the full 90-day period, then your damages are limited to -- I'm quoting this from actually from before, so forgive me if I don't get it exactly right -- it's the price you paid, less the aver- -- the price you paid when you bought, less the average price from the time of the corrective. So from August 11th through to when you sold; or if you held for that full 90 days, then it is to the full 90 days. So that formula is a limitation on damage that Congress has imposed.

THE COURT: Okay.

MR. STERN: Obviously, we will follow that.

THE COURT: Got you.

MR. STERN: But that is the sort of one additional thing and that addresses -- and, you know, that was Congress wanting to address this issue as well. And sometimes the price recovers and maybe this is overcompensating. So Congress created a mechanism to deal with that and so that does sort of address those issues.

Defendants are also, you know, obviously, free to say, hey, part of -- you know, Defendants are,

obviously, free to argue about, no, we think market factors caused, you know, 5 percent versus 10 percent.

They're free to argue that, but those are issues that, again, you know, Defendants can raise, but they don't -- doesn't indicate that there is any inconsistency between our theory of liability and our theory of damages.  And so we think there is a close match between those two things as well, the theory of liability and damages.

And, again, we cited, you know, in our reply brief we attached an appendix of cases just to show how routine it is for Courts to approve this sort of model in these kind of 10b-5 cases, where there is a stock drop of direct exposure.

THE COURT:  Just curious, what has happened to the company?  I haven't Googled it or looked at it.  What happened to it?

MR. STERN:  The stock performance is not -- has sort of continued -- stock prices continued to go down --

THE COURT:  Okay.

MR. STERN:  -- since these statements.

THE COURT:  I was curious.  I was curious about something else.  I was never a civil lawyer in my -- before I got fortunate enough to get this job.  I

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

sometimes want to know why lawyers do different things. This case was filed up in New York, and then by agreement of the parties, it came here. Just curious, what was the decision making behind that?

MR. STERN: Yes, sir. So we were not the ones who filed the initial case. We were appointed lead through a Lead Plaintiff process. So it was a different firm that filed in New York. Some firms tend to just -- honestly, tend to file in New York because --

THE COURT: Right.

MR. STERN: -- you know, they are in New York. And we do try to file where the companies are located because we think it's appropriate. Defendants approached us about it and our client was also Austin based and so we thought that was appropriate.

And, you know, if they were -- I believe they were planning to move to -- I mean, they can speak for themselves, but I believe they were looking to transfer even if we opposed it, and we didn't think we had a very good reason to oppose it, so we were happy to come down here.

THE COURT: Fair enough. Thanks.

MR. STERN: Thank you.

THE COURT: Can I ask you something else? If this goes your way and we certify a class, what are you

going to do with a notice requirement?

MR. STERN:  Yes, Your Honor.  We have -- you know, we worked with a number of companies that provide -- of claim administrators that provide notice.

The way we tend to do it is we will contact these and these, you know, claim administrators have databases of all the major brokers.  They do this a lot.  So they contact all of the major brokers, you know, TD Ameritrade, JP Morgan, Robinhood; send out a notice.

We'll ask for a list of record holders from the Defendants, send notice to them.  We'll also publish notice, you know, in -- you know, in publications, and we'll post it on our website.  It will be easily be searchable because, you know, you can just put the CS Disco stock symbol to make it easily searchable.

But we have a pretty thorough process for providing notice, and, you know, we found that comparative statements for class actions, and this is sort of more going into court settlement.

But we think -- I think it's indicative of the fact there is another process.  We do tend to have fairly high claims rates.  Often in the 30 to 50 percent, is what we estimate the total number is.

So we tend to get a fairly high -- which, I think, tends to indicate the notice is actually quite

effective in securities cases because it's kind of easier to figure out, you know, where to direct anything.

So we'll just contact all of the brokers and say, Look, anyone who bought CS Disco in -- remotely in this time period, please send them this notice, or, Give us their information and we'll send the notice.

Institutional investors have services that kind of keep track of this stuff, and, you know, we contact them as well.  So that's sort of the notice process.

THE COURT:  Okay.  That helps.  Thank you.

MR. STERN:  Thank you.

MR. GIBBS:  Thank you, Your Honor.

Again, Patrick Gibbs for the Defendants. Before I begin, I want to take care of one housekeeping item if I could.

I think we need to formally request that the Court admit into evidence the exhibits that we've submitted with our briefing.

THE COURT:  Yes, I was going to ask you all at the end kind of what we need to put in our record.

Okay.  So if you want to do that now, go ahead.

MR. GIBBS:  Sure.  So we've submitted a

declaration of Ms. Ivanovski with 21 exhibits.

THE COURT: Right.

MR. GIBBS: And we would ask that they all be admitted into evidence. I just -- I do want to note for the record that Exhibits 2 and 3 are filed under seal, and Exhibit 4 has some matters that are redacted, so we would ask that once admitted and in the Court file that Exhibits 2 and 3 be sealed and that the redacted portions of Exhibit 4 remain redacted in the public file.

THE COURT: Mr. Stern, any objection?

MR. STERN: No objection.

THE COURT: All right. Those exhibits are admitted for purposes of this hearing with the understanding that Exhibits 2 and 3 will remain sealed and Number -- I think you said 4 or 5?

*(Exhibits admitted.)*

*(Exhibits 2 and 3 remain sealed. Exhibit 4 with redactions remain in place.)*

MR. GIBBS: 4.

THE COURT: 4 with -- those redactions will remain in place as well.

MR. GIBBS: Okay. Thank you, Your Honor.

THE COURT: You're welcome.

MR. GIBBS: I want to begin by sort of getting

back to the Court's task and I'll start with price impact.

This is a -- an evidence-based process.  The Court is supposed to make factual findings, and in particular here, the Court's task is, according to the Goldman Sachs case is to, quote:  Assess all the evidence of price impact, direct and indirect, and determine whether it is more likely than not that the alleged misrepresentations had a price impact, close quote.

And the Court goes on to say:  This analysis is qualitative as well as quantitative aided by a good dose of common sense.

That's an important set of principles to have in mind as we're talking about all of these issues.

On the merits question that you all discussed with Mr. Stern, the way I would urge the Court to look at that is, for purposes of the price impact analysis, the Court should consider all evidence and all arguments, regardless of whether those things also might go to a merits issue.

So if there is evidence or if there is an argument that is relevant to price impact, the Court should consider it for that purpose, again, regardless of whether it might also be relevant to scienter or loss

causation or some other element.

The principle is the Court need not and should not make findings as to those other elements. But if there is evidence or there are arguments that pertain to both, the Court should consider that.

So I think -- I think we can move pretty quickly to what is really the heart of the matter here because as -- as we've laid out in the briefing, in considering price impact, Courts, typically, look to either what they call the front end or the back end.

The front end of the question is:  Is there evidence indicating that these statements actually increased the price of the stock?

That's not at issue here because Plaintiffs are not claiming that it did.  Plaintiffs are putting forward a very straightforward, what's known as a price maintenance case.  They're claiming that these statements allegedly maintained inflation in the price of the stock, which -- which came out of the price when the so called truth was revealed.

In that setting, Courts do this mismatch analysis to try to assess whether that stock drop after the alleged corrective disclosure is evidence that the statements in the first instance maintained inflation. For that purpose it's really important for the Court to

look carefully as whether there is this fit or this match.

Because -- because if the -- if the stock price drop is reacting to something that's different from the alleged false statement, then that stock price drop isn't properly seen as evidence of inflation or price impact.  Okay?

So here, my friend, Mr. Stern, distinguished the facts of the Goldman Sachs case because that was about generic misstatements and a very specific disclosure and that's not what we're talking about here. I agree with that.  But it is also the case that a sort of a generic mismatch is only one type of mismatch that Courts look at.

The other type of mismatch that Courts look at or one other is sort of subject matter mismatch and I think the most precise way to think about that is reflected in some of the cases we cited to Your Honor including the Apache case.

And there, the question is whether the alleged corrective disclosure either directly corrects or -- or contradicts the prior statement or it reveals facts which, if true, render some portion of the prior alleged misstatement false or misleading.

That, I think, is the critical standard that

this Court should be applying to assess price impact in this case.

THE COURT:  Say that one more time.  And that comes from the Apache case?

MR. GIBBS:  That comes from the Apache case and a number of other cases that we've cited.

The question for this purpose is whether the alleged corrective disclosure either directly corrects or reveals facts which, if true, renders some portion of the prior alleged misstatement false or misleading.

THE COURT:  Okay.

MR. GIBBS:  Okay?  And so there, my friend, Mr. Stern was -- was arguing that the September 22nd alleged corrective disclosure is corrective -- sorry, the August 22 alleged corrective disclosure is corrective, because Mr. Camara's statements during that call were comparative.

And -- and you heard Mr. Stern sort of characterizing the comments from the August 2022 call as -- as he -- as if Mr. Camara had said:  In these prior periods, we had these large reviews, but in this most recent period, we didn't have those reviews.

That's his position as to why it's corrective.

That bears virtually no resemblance as to

what Mr. Camara actually said during that August 2022 call. And we've -- sort of to aid this analysis, we prepared a handout with just some quotes, quotes of the alleged misstatements and the alleged corrective disclosure.

And I'd like to hand that out to Your Honor, if I could.

THE COURT: Yes, please, and then if I'm finding them later, are they in the exhibits that you offered now?

MR. GIBBS: They're not in the exhibits. They've got -- the material is embedded in all of this paper that we have given you because these are just quotes from the earnings calls.

THE COURT: Okay.

MR. GIBBS: So they are in the earnings calls transcripts.

THE COURT: Okay.

MR. GIBBS: But I just -- I thought that it would be helpful to the Court.

THE COURT: If you will just hand it to one of these --

MR. GIBBS: But I think -- I think this is, essentially, the analysis the Court should properly view.

THE COURT:  And do you have one other copy?

MR. GIBBS:  I'm sure we do (indicating).  I have one I have written on, so here you go (indicating).

THE COURT:  And if you'd give it to this nice person.

MR. GIBBS:  (Indicating.)

THE COURT:  There you go.

MR. GIBBS:  We don't need this in evidence.  This is more in nature of kind of a demonstrative.

And so what -- what I would suggest the Court should do is, if you look at first page I've handed you, there are challenge statements and there are two statements from September 2021.  And then on the third piece of paper, there is the alleged corrective disclosures from August of 2022.

And in September 2021, Mr. Camara made some comments about sort of the typical customer journey.  It takes some time for them to move from being small customers to being larger customers.

He calls out one example of a customer who went through that journey much more quickly than had, typically, been the case and described a company that went from zero to a multimillion-dollar level of spend.

So that's his statement.

If you then look at the August 11th

corrective disclosures, there is no discussion in there about what Mr. Camara said in September of 2021. There is no discussion in there about the customer adoption journey. He doesn't say anything different about the customer adoption journey. He doesn't describe it in any different ways.

And -- and to the argument that -- that Mr. Stern made, he does not say anywhere in this August 11th, 2022 corrective disclosure anything about the makeup of the company's revenue in any prior quarters.

He does not say: In the prior quarters we had 1, 2, 3 or 4 -- seven-figure reviews, but in the most recent one, we did not.

He doesn't say anything like that.

What he says is, in response to a question about what happened -- remember they reduced their four-year guidance on this call. They had just raised it back in May the last time they were talking to analysis.

And so one of the questions he gets is, what happened between May and now? And in that context, Mr. Camara notes they -- they didn't have one or two or three large seven-figure reviews, so the quarter was a little softer than they had expected.

That's his explanation for why they viewed the business differently in August than they did in May, that's true.

And he's making the point that had we had even one or two big seven-figure reviews, the quarter would have looked different and our guidance would be different.  That's all he's saying.  But he's not saying anything about what had happened in prior quarters.

And, importantly, we know from Dr. Eisfeldt's report and in the internal documents that she reviewed, it's not even true that -- that the revenue in prior quarters had been driven by a small number of large review projects.

In the second quarter, the one that Mr. Camara was talking about in September, there were two customers with large reviews, and both of them were actually discussed on the call.

In the next one, there was only one and it was a small percentage of the company's revenue.  And so the thing that Plaintiffs claim the market learned in August of 2022, it's not even true based on the evidence in front of the Court.

But more importantly, just doing a straightforward mismatch analysis, nothing that Mr. Camara said on August 11th, 2022 either corrects or

renders false any of the -- the bolded statements that he made in September of 2021.  He did the same analysis for the statements in January of 2022.

There, Mr. Camara is talking about what a mature customer looks like, what kind of spend those customers have, what the typical wallet size is of a big customer and --

THE COURT:  I'm just curious, is there any evidence that in January of 2022 that any of these mature -- I think that's the term that's used here -- mature companies, that it was beginning to fall apart?  Or did it only happen after January 2022, when the bigger customer started throttling back on what they were --

MR. GIBBS:  Well, what I would say is the evidence that Dr. Eisfeldt walks through shows that the composition of the company's revenue from quarter to quarter, it varies from quarter to quarter.  It's not like it's the same customers every single quarter.  It varies, as one would expect based on common sense, right?

THE COURT:  Yes.

MR. GIBBS:  So I don't think there is a -- it begins to fall apart.  What I know is in each of the quarters up until the alleged corrective disclosure in

August of 2022, in each of those quarters, the company significantly exceeded analysts' expectations.  They consistently did better than analysts expected them to.  They consistently did better than the guidance that they announced to the market.

THE COURT:  And only after January of 2022 did that begin to change?

MR. GIBBS:  Correct.  The big change is in the second quarter of the 2022 fiscal year, the one they were reporting on in August of 2022 --

THE COURT:  And this is a calendar quarter or fiscal year quarter?

MR. GIBBS:  It is calendar quarter.  All right?  Okay.  I have another case going on that is not a calendar quarter.

THE COURT:  I know.  I can get caught up in that.

MR. GIBBS:  So, yes, the answer to the first question is:  So up until the quarter they were reporting on in August of 2022, up until that point, the company is consistently beating its own guidance and consistently beating analysts' expectations.

So if the question is:  What does that suggest for sort of when things went bad?  What it suggests is it went bad during the second quarter, after

the company had raised its guidance.

And that's why they went into the earnings call for the second quarter and lowered it because they had a bad quarter.  They had a quarter that disappointed them for the first time in their time as a public company and they reacted by bringing their guidance down.

That's all he said about these large review projects.  The remainder of the commentary that Plaintiffs cite from August of 2022 isn't really talking about what happened in any particular quarter.

The point he's making is:  Keep in mind, guys, that a small number of large review projects can make a big difference to our business.  That's entirely common sense.

At this point the company's quarterly revenues are hovering around $30 million or so, 30- to $35 million.  He's just making the point that given that scale of the business, if we have two or three seven-figure review projects in a quarter, it's going to change the way the quarter looks dramatically.

THE COURT:  What role, if any, do your -- does Disco's internal projections have?

MR. GIBBS:  Yes, that is a good question.

So I think Plaintiffs are misunderstanding

the way in which we're using those internal estimates. We're not trying to use them to get you to make a finding about anybody's state of mind.  That's not the point.  We're not asking for a scienter finding.

The point that Dr. Eisfeldt is making is, if you're thinking about whether a statement has price impact, it only has price impact if it paints a misleading picture of the company.  Right?

And one of the ways in which Dr. Eisfeldt gets to her conclusion that these statements did not have a price impact is by assessing, sort of, what if the market knew what the company knew.  And what she looks like for that purpose is what was the company expecting to happen in the current quarter and future quarters.

And she is comparing that to what the market was expecting, what analysts were expecting, because the analysts' expectations are shaped by the company's public statements.

So the point she is making is, as another way of assessing, did these statements plausibly impact the price of the stock, she is looking at, well, what was sort of the internal information about the company's ongoing or expected performance?  Is that different from -- is it worse than what the market has come to

expect based on the company's statements?

And her answer to that is, no.  And so that's the role that they play.

I want to make sure I'm responsive to everything my colleague said.  I try to take notes, but I run out of steam sometimes.  I want to address one point that Counsel made a couple of times.

Neither the Amgen -- and this has to do with the analyst reports.  So neither the Amgen case nor any other case says that the Courts shouldn't look at analyst reports in this stage of the proceedings.

In fact, I think Goldman makes it pretty clear that you're supposed to consider all evidence and the analyst reports are part of the evidentiary record.

In Amgen, the defendants tried to argue that a Plaintiff seeking class certification should be required to prove materiality at the class certification stage.  The Courts said, no, they don't have to do that.

That is a common issue.  If it is material, it is material for everyone.  That's what Amgen is about.  There is nothing in Amgen that says you can't look at analyst reports.  And again, we think, under Goldman, you should.

The reason I say that is because in assessing the fit or the match, right, you have to look

at whether the August 2022 statement corrects or renders false any of these prior statements.  In order to do that, I think you have to understand all of the statements in context.

In other words, you know, we've talked about what I call a subject matter mismatch.  Does it correct those prior statements?

There are also cases saying a corrective disclosure is not corrective for price impact purposes if it's just repeating something the market already knew.  It has to be new.  Otherwise, it's not correcting anything.  It's just repeating something the market already knows.

The reason I say that is, it is -- it could not be more clear on this record.  The record is overwhelming, I think, that the market very well knew what Your Honor has already pointed out as sort of common sense, which is that there was a risk of volatility in CS Disco's revenue because of the nature of their pricing model, this usage-based pricing model.

Plus, what are they doing?  They are helping clients with litigation, which everybody knows waxes and wanes and can spike.  And it can spike up; it can spike down.  Right?

So the record is just littered with analyst commentary before and after all of the challenged statements, acknowledging that because it's usage based, because of the nature of the matters that they're helping clients with, there could be volatility in revenue.

The reason why this matters is because what happened in August -- in the second quarter of 2022. What was revealed in August of 2022 with those alleged corrective disclosures was the materialization of a risk that everybody knew existed.

What they didn't know and what the company didn't know was, when is it going to turn against us? When is that volatility going to work against us as opposed to for us?

Remember, the class period starts with the second quarter of the prior year where the volatility had worked for them.  They had these outsized results from a couple of customers.

And they said:  This is unusual.  You can't expect this to repeat.  This isn't going to happen every quarter.

A year later, it turned against them. That's what happened.  That's what's known as a materialization of a risk.  The reason why that's

important is because that's another reason why the disclosure that the risk had materialized isn't corrective.

THE COURT:  What is your best case for the distinction between corrective and material -- what was the word?

MR. GIBBS:  Materialization --

THE COURT:  Materialization of risk?

MR. GIBBS:  -- of risk.

I'm going to need to find that for you.

No help from the peanut gallery.

THE COURT:  They are watching SportsCenter over there.

MR. GIBBS:  I am sure they are.  I'm sure we cited it in the briefing, I just don't have it --

THE COURT:  I'm not trying to --

MR. GIBBS:  Yeah, we absolutely make the argument in the briefing that the materialization of a known risk is not corrective for this purpose and --

THE COURT:  All right.  When we walk away, if you'll give that case to Ms. Houston.

MR. GIBBS:  We have that case, I'm sure.

All right.  I think we've covered price impact unless Your Honor has any questions for me.

THE COURT:  No, I think I'm good.

MR. GIBBS:  As I said, I just think the core of it is the Court needs to look at the statements themselves and the alleged corrective disclosure and ask yourself, is the corrective disclosure either correcting prior statements or is it revealing facts which, if true, render those prior statements false or misleading?

I think if you sit with those statements, like on the paper we gave you, it's just clear they are not correcting, they are not revealing any facts that render those prior statements false or misleading at all.

So with that I'm going to turn to the damages issue, the Comcast issue.  And, first of all, here, I would disagree with the way that Counsel described the issue.  I think he said something like the issue is whether their theory of damages matches their theory of liability.

I don't think that's what Comcast says. What Comcast says is at class certification, the Plaintiff has to come forward with a method for calculating damages that matches their theory of

liability.

And the reason why I think that distinction matters is, as with other aspects of class certification, this is part of the predominance requirement.  The Plaintiff bears the burden of proof on this one.

It is not like price impact where we're rebutting a presumption.  They have the burden of persuading Your Honor that common issues outweigh individualized issues including with respect to damages. That matters because they have to come forward with evidence.

What that means, in our view, is they need to show you a model, not just say, I can construct a model some time down the road using some unspecified tools.  They need to actually show you a model and persuade you that that model does the job, that model measures damages consistent with their theory of liability.

So a couple of examples of the ways in which Dr. Nye's testimony here doesn't cut it.  Dr. Nye -- Professor Nye -- Dr. Nye said -- conceded that damages could vary over the course of the class.

The inflation might be different from day to day.  It's not just, we'll take the dollar drop at the

end and say that's the inflation for every single day of the class period.  So he conceded damages could vary. He has not offered or described any method he could use to take into account those variations.

What he said is, I'm going to look at the drop at the back end and use that to calculate inflation.  That's all he said.  That doesn't tell you anything about whether it's actually feasible to account for changes or variations in the amount of inflation on different dates in the class period.

Similarly --

THE COURT:  Does he have to do that?

MR. GIBBS:  He does have to do that in my view.

THE COURT:  Okay.

MR. GIBBS:  Now, there are -- I will concede, there are cases that have granted class certification based on similar assurances.  I think those cases are wrongly decided.

I don't think it's enough for an expert to come in here and say, I promise you, Judge, I can do it. I think he's got to show you he can do it.  Related point, Nye also concedes that the Plaintiffs' claim is based on a materialization of risk, and Counsel denies it.

But in his deposition, Nye specifically said, quote:  I think under their theory of liability, the reduction in 2022 revenue guidance and EBITDA guidance is a materialization of that risk that was concealed.  It is a materialization of a risk.

That's important because, if you're just talking about a fact is concealed and then a fact is disclosed, then the stock price drops, then there is a pretty good match between the stock price drop and the amount of inflation.

When you're talking about materialization of a risk, though, it's different.  There is a -- in terms of economic impact, there is a fairly obvious difference between what's the economic impact of a risk of a bad thing happening versus the certainty that the bad thing actually has happened, right?

If you think there is an X percent risk that the company's revenue is going to go down instead of up, that's not the same economically as it has actually gone down instead of up.  Right?

And so if your theory involves the materialization of a risk, you have to have some methodology for starting with the drop that comes when -- when the bad outcome is a certainty and account for what is the difference between that and what if the

market had been fully informed about the risk but the risk has not yet come to pass?

They do nothing on that. They've offered you nothing. They tell you no way in which they could account for that distinction, between certainty and the risk, and that would be an important part of damages.

And, again, we're not saying they have to calculate it --

THE COURT: And do they have to do that?

MR. GIBBS: No. Well, I think they have to show you that they're capable of doing it, yes.

THE COURT: Okay.

MR. GIBBS: Unless Your Honor has questions, I think I'm done. I'd like to check with my team to see if there is anything I missed.

THE COURT: Sure. We're going to take a real short break and come back. But, I mean, I've got a question here.

Oh, I was curious about this. Again, y'all are experts on class certification. I'm not. So what happens if I rule in Plaintiffs' favor after this. Do they then work on -- and y'all collectively get together on notice or are you then filing a motion for summary judgment on the facts? I mean, where does that come in?

MR. GIBBS: Sure. Well, the answer is, we

will do all of those things.  So if a class is certified, Plaintiffs will go through their notice procedure and all of that.  In the meantime, the case proceeds on the merits.  We would probably consider seeking review of a class --

THE COURT:  Sure.  I'm assuming no matter what I do here, it's getting reviewed.  But okay.  So that -- it would continue on one track and then, at some point, you would still have the right to file a Motion for Summary Judgment --

MR. GIBBS:  Absolutely.

THE COURT:  -- at an appropriate point?

MR. GIBBS:  Absolutely, and we certainly would.

THE COURT:  Okay.  Is there anything about Judge Ezra's order -- this is kind of -- not a great question.  But is there anything about his original order that kind of shapes what the decision that I'm -- that he's asked me to, at least, provide him a report and recommendation on?  Or was that just a different standard and a different issue and it -- but it remains helpful because it has narrowed us down to the four statements that we're talking about?

MR. GIBBS:  That's a good question.  My answer would be it is relevant only in the sense that it --

that it limits the case to the four statements.  Those are the only four statements at issue.

Other than that, though, I think that ruling is not really relevant to what is before the Court now. It says these four statements are at issue in the case.

But, procedurally, it is a different procedural posture because there, the Court was required to accept all allegations as true and grant all reasonable inferences in Plaintiffs' favor.

Here, we're not in that posture at all. This is -- this is an evidentiary process.  So it's not about allegations, and you're not required to accept anything as true.

You look at the evidence and you make up your own mind about the facts.  And it's a preponderance standard.  So you're not starting off with a presumption that you indulge all inferences in favor of --

THE COURT:  That's true.

MR. GIBBS:  -- one side or the other.  You simply look at the evidence and you decide what's more likely than not, which means the way in which the Court read the statements or said the statements might be interpreted or what have you, it's not relevant here, because that was -- that was shaped by the procedural posture in which that decision was made.

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

So, again, in my view, other than noting that we now have only four statements at issue, the rest of the order is not relevant to the inquiry before you.

THE COURT:  All right.  Thank you, Mr. Gibbs.

Here's what I propose.  We're going to take a five-minute break, but before we do that, Mr. Stern, did you have some evidence that we need to get into the record just, procedurally?

MR. STERN:  Yes, Your Honor.

We would ask that our -- the declarations of Jonathan Stern in the opening and then the reply and the exhibits that are attached thereto be admitted as evidence.  Some of the exhibits in the reply were in some parts of -- some of these exhibits in sur-reply were filed under seal or redacted.  So we would ask that those be redacted and filed under seal.  I can pull those up.

THE COURT:  We'll -- we'll get that squared away.

Then, Mr. Gibbs, any objection to the admission into evidence for purposes of this hearing the documents that were cited by Mr. Stern?

MR. GIBBS:  No objections.

THE COURT:  Very good.  They're admitted for the purposes of the hearing.  We will get straight at

some point today on what is sealed and what's not, and we'll move forward from there.

*(Plaintiffs' exhibits admitted with redactions as stated.)*

THE COURT:  All right.  Let's take a five-minute break, y'all, and I'll come back and then I'm going to -- I'm not cutting you off.  You can talk as long as you want.

*(Recess taken.)*

THE COURT:  A judge who says he'll be five minutes is like a lawyer who says just a couple of more questions, Your Honor.  Well, we're not telling the truth.

Okay.  Thanks for your patience with me.

Had you passed?

MR. GIBBS:  A quick follow up if I may, Your Honor.

THE COURT:  Sure.

MR. GIBBS:  Your Honor asked about this materialization of the risk issue, and so I wanted to get back to you on that.

So this issue is discussed at Pages 15 to 17 of our opposition brief, and the cases we cite there are Greenberg and FibroGen, but I want to be very clear about what those cases are about.

THE COURT:  Sure.

MR. GIBBS:  They are talking about the fact that repetition of information that's previously known to the market cannot be correct by definition, because it can't change the stock price.

And in -- in that regard, and when a known risk materializes, it's not revealing anything new about the risk because the risk was known, and the materialization of the risk is a new thing that could not have been disclosed back at the time the challenged statements were made.

And I'll focus for a second on the FibroGen case because I know it the best.  So in FibroGen, there was a known risk that the company's application for approval with the FDA was going to be rejected and it was rejected.

And the Court said, the decision to reject itself by this adcomm, that event is not corrective because it didn't happen until it happened.  It couldn't have been predicted.

Everybody knew there was some risk of that happening, but the fact that it happened doesn't correct any prior statements because it's a new thing.  It couldn't have been disclosed when the challenged statements were made.

And so to the extent we're talking here about a quarter where the volatility went the wrong way, turned against the company, whereas previously it worked for the company, we think that's clearly a materialization of a known risk.

Because as I said, the record is just littered with people recognizing that this usage-based model, plus the nature of litigation, equals a risk of revenue volatility.

And, in fact, one of the analysts coming out of the August 2022 call said -- they had been telling us, it's volatile; it could work against them.  It finally turned against them.

So we think that is the materialization of a known risk.  Therefore, it's not -- it's not revealing anything that makes the prior statements false.  It's just showing that the risk can actually materialize.

Now, I think Plaintiffs' counsel will say, No, no, Mr. Gibbs, it's not a known risk because what they didn't know is how much of the revenue in prior quarters was from these one-off large reviews.

That's the thing they didn't know.  That doesn't work, though, for multiple reasons.  One, it's not true, and we -- in -- in Dr. Eisfeldt's report, she talks about the actual composition of the company's

revenues in those two quarters that we're talking about -- those two prior quarters, and finds that the revenue in those two prior quarters was not, in fact, driven by a small number of large one-off reviews.

I can't repeat the details because that's part of what is redacted in the report, but I would just refer Your Honor to Paragraphs 33 and 32 of the Eisfeldt report for the discussion about revenues in Q2 of 2021, and Paragraphs 52 through 54 of Dr. Eisfeldt's report for the discussion of composition of revenues in Q3. So it's just not true.

Separately, it's simply not the case that the August 2022 disclosure revealed this supposedly unknown fact. Again, if you looked at the sheets that I've handed up to Your Honor, he never says, in prior quarters we had one, two, three, or four big seven-figure reviews and in Q2 of this year, we didn't. That's not what he says.

He doesn't say anything in the corrective disclosure about prior quarters. In fact, on that same call transcript, the only place where he does reference one of those two prior quarters is a part that the Plaintiffs don't cite as corrective because he just repeats what he had said previously.

In reference to Q2 of 2021, which was a

quarter where they had outsized positive results from the volatility of working for them, the following year, Mr. Camara said, Look, we grew this year and it was against a tough comparison, because, remember, last Q2, Q2 of 2021, we had this outsized result from a small number of customers who had unexpectedly large reviews.

So, first of all, I think it's telling that in the one portion of the call where he actually talks about a prior quarter, Plaintiffs aren't claiming it's corrective.

But also I think that bears on whether the other portions of that call should be considered corrective because when he talks about a prior quarter in August of 2022, he just repeated what he said the year earlier, outsized results driven by a small number of customers.

It is, in my view, not consistent with common sense to think that on the same conference call, he simultaneously corrected or rendered false his prior statements, but also repeated one of them.  It doesn't make any sense.

So, again, the specific thing that Plaintiffs say was concealed, that prior quarter revenues had been driven by a small number of large one-off review projects, A, is not true based on the

evidence as Dr. Eisfeldt walks you through it.

But even setting that aside, it doesn't matter because that wasn't revealed.  That wasn't disclosed in August.  So that's not the cause of the stock price drop and it doesn't give the Court a basis to infer price impact.

THE COURT:  All right.  Thank you, Mr. Gibbs.

MR. GIBBS:  Thank you, Your Honor.

THE COURT:  Mr. Stern.

MR. STERN:  Thank you, Your Honor.  Unless Your Honor has specific questions, I'm not going to address everything.  There is just a couple of key things.

First, we note that this demonstrative that was provided --

THE COURT:  Yes.

MR. STERN:  -- it only includes the answers that Camara made in August 11 of 2022 and not the questions that were asked.

And the complaint itself does include those questions, and I think it's important in particular because -- so on Paragraph 75 of the complaint, an analyst named Scott Berg seemed surprised that a small number of large review customers could have such an impact on revenues.

He is saying even if they break it up between two quarters, it sounds like it's more than just a couple of customers.  How can that -- I guess how can the magnitude be that big in the swing factor in that one area.  And so he's really surprised.

THE COURT:  If I look at that analyst report, shouldn't I look at the analyst reports that they want me to look at?

MR. STERN:  So this is not an analyst report.  This is an analyst asking a question on that call, and so Paragraph --

THE COURT:  I know, but my point is it's outside of what the Defendant said.

MR. STERN:  Well, I think it's important to say this is the specific thing the analyst is responding to --

THE COURT:  Okay.

MR. STERN:  -- sorry, that Camara is responding to.

THE COURT:  Okay.

MR. STERN:  That's part of the lead up to this guy's question, and then Camara is answering that.

And so I would just say when we're reviewing -- you know, and this is in the complaint, and it's what we're reviewing.  It is really the question

that Berg is asking.

THE COURT:  Okay.

MR. STERN:  And then, obviously, yes, we would also say to the extent that you do look at those outside analyst reports, I think this question of surprise does refute the idea that analysts were aware of this risk, I think that it pretty clearly does, and so I think it would go to that.

But I'm only saying in terms of the context in which the question was asked, this is part of the same exact call.

THE COURT:  Okay.

MR. STERN:  And I do think the idea that it's common sense, you know, yes, it is common sense that there is bigger, you know, reviews and smaller reviews, but I don't think it's common sense that most people who are not honestly big firm lawyers or people with big companies that reviews can -- that you have seven figures of quarter spending just at the doc-review vendor, not even legal bills, just as a doc-review vendor, seven figures per quarter on a single case. That's -- I think would surprise most people and, frankly, probably even most lawyers who aren't, you know, dealing with those kinds of cases.

So I don't think the fact that the

seven-figure review project, that that itself is common sense.

Unless Your Honor has any other questions...

THE COURT:  Well, it goes back to -- I've got a lot of moving parts, but in the end, a big part of this is whether that presumption survives.

MR. STERN:  Yes, that's, I think, is the biggest thing.

THE COURT:  Because it strikes me from a reliance standpoint, these four statements are so deeply in the weeds, you have to be the most sophisticated of stock investors to have said, oh, wow, I heard this conference call this guy was on, I'm going all in, I'm putting my life savings into this.

My sense is that didn't happen very often so you've got to have this presumption.  I'm going to come back to Mr. Gibbs -- I neglected to ask him.

They appeared to concede that the presumption applies, but they argue that they have rebutted it and -- do I have this thing distilled down to its essence, basically?

MR. STERN:  That's my understanding, that they're saying the presumption applies because -- and, again, you know, the idea is that, you know, yes, most investors aren't listening to the call.

But the stock price responds to the news because sophisticated analysts move the markets. And so that's our presumption, is that even though most analysts probably didn't listen to these --

THE COURT: They did.

MR. STERN: -- sorry, most investors. Analysts probably did listen. But most investors didn't listen to this call, but because the way the markets work, this information gets impounded into the price of the stock, is the term economists use. And that's the presumption. And then the Court should presume that when the market is efficient and Defendants haven't challenged our efficiency analysis.

What they're saying is, yes, normally, it does happen, but in this case it didn't because of specific reasons, and there -- that's why they have to rebut their presumption. I believe that that is their burden and that's what they have not satisfied.

THE COURT: Okay. All right. Very good.

Mr. Gibbs, yeah, I did mean to ask you. Are you conceding that the basic presumption -- they've met their five-factor test, or whatever it is, to apply, and, really, then that part shifted to your burden by a preponderance of the evidence to rebut it?

MR. GIBBS: We are not contesting that the

presumption has been triggered.

THE COURT:  Okay.

MR. GIBBS:  We are solely seeking to rebut it.

THE COURT:  Very good.  Okay.

MR. GIBBS:  And, briefly, I did want to respond briefly to Counsel's point about that question during the August earnings call --

THE COURT:  Yeah, yeah.  We have got all morning.  Take your time.

MR. GIBBS:  -- Mr. Berg's commentary.  So in that sequence, you have to look at the whole sequence.

What Mr. Berg is responding to is not surprise that a small number of reviews can have a big impact on a given quarter.  I don't think that's what he is saying.

Remember, what happened on that August call is -- back up, the company has given its full year 2022 guidance in February 2022.  They have another blowout quarter.  So in May of 2022, they increase their guidance.

Then, they have a surprisingly negative quarter.  So on an August call, they bring down the annual guidance that they had just increased three months earlier, and they brought it down by a lot.

So they reduced it from a range of 149 to

153 million, down to a range of 132 to 136 million. Right? So at the low end of the range, they're bringing it down by 17 million, at the high end -- 17 million. Right? The whole thing moves by $17 million.

The question for Mr. Berg that Counsel alluded to is expressing surprise, not just at the idea that a small number of large reviews could swing results, what he is confused by is the magnitude of the decrease in guidance for the full year.

Because he is saying, Okay, I understand a small number of reviews can cause some swings in your quarterly results, but you're talking about $17 million reduction for the second half of the year; that's two quarters. So he is trying to figure out, why did you reduce it that much if the issue is a lack of a handful of large review projects.

I actually think that helps us more than it helps Plaintiffs because it's making the point that they reduced guidance because they got more pessimistic about business. It's not just the absence of one or two reviews that caused them to reduce guidance. They reduced it by way more than that. They got conservative with it.

So Mr. Berg's question is not reflecting the notion that he had no idea that a small of number of large

reviews existed or that they could swing your quarterly results. He's confused because that math doesn't add up to a $17 million reduction in guidance over a two-quarter period. That's all.

THE COURT: Okay. All right.

MR. GIBBS: Thank you.

THE COURT: Very good. All right. As it relates to the class issue, anybody want to say anything else?

Okay. Motion to Compel. Mr. Stern, I -- obviously, I've read everything that you all have filed. Take one stab at it, why the actual identities of the individual customers are relevant to anything we've been talking about today?

MR. STERN: May I?

THE COURT: Yes, absolutely.

MR. STERN: Yes, Your Honor. The reason that they're relevant is it just present -- being able to review their documents, question what Camara and what Lafair knew and when they knew it becomes much more difficult if the documents themselves are redacted because, you know, we can't use them to refresh people's recollection.

It becomes much more difficult to compare documents with each other and say, okay, this says

Customer Number 1; that says Customer Number 1.

We are relying on the Defendants to use it the same way.  For some of their redactions, they don't even -- they just say non-seven-figure review customers, so it's making it impossible to do document-to-document comparisons.

The information is relevant not necessarily because you need to admit those customer names in trial, but just in terms of being able to use at deposition, refresh people's recollection, to understand the documents.

And just to look up, hey, so -- for instance, Camara is talking about this one customer in September of 2021 who, you know, has a series of legal matters.  It would be much easier for us if we could just say, okay, that customer's series of legal matters, who is it?  Can we Google them?

And, say, okay, what legal matters is this person having, and understanding the context of what that statement is if we know who the customer is.

So the relevance is really being able -- and, again, you know, this doesn't mean that we're, you know, necessarily ever going to ask to file the names in court or that we're ever going to need to publically present them --

THE COURT:  Then why is it -- why are their names in court if you never --

MR. STERN:  Well, again, because, you know, at depositions, we might need to -- and, I guess, yeah, we might need, you know, depending on how the deposition kind of goes, just to refresh a customer's recollection -- or to refresh a defendant's or a witness's recollection and say, you read this email saying, oh, boy, you know, blank is ending.

And he's going to look at it and it's redacted, he's going to go, I have no idea who that is, and he is not going to remember.

THE COURT:  Would the compromise the Defendants propose where, again, the big ones they give you, or at least provide notice to them, but as it relates to all the other customers, weren't they going to number them one through, I'm going to say, 500?

And so you could go to the deposition:  All right.  This is Customer 416.

Why would the deponent have any problems answering questions in that situation?

MR. STERN:  So they've had two -- so there is two things.  So, one, their compromise is actually, just for the seven-figure review customers, they would give us the name.  The other customers they would give us

identifiers --

THE COURT:  Right.

MR. STERN:  -- but not the name -- sorry, the other seven-figure customers, they would give us the numbers, not the names.  And then for all other customers, they would just give us nothing.  They would just say non-seven figure review customer.

And that's what they've done in the redactions.  We don't even have a number for 90 percent of their customers.  We have non-seven figure review customers.  That's what it just says.

THE COURT:  Okay.  I may be misreading.  This is the compromise, as I understand, they proposed.  And to go a step further by providing anonymized identification numbers for all other customers who generated seven figures -- okay, that's your point.

MR. STERN:  That's my point.

So what I would say is, I think, so for the non-seven-figure customers, this is totally useless because we have no ability to compare any documents.

And so, you know, we won't even know which customer is being referred to, how much they spent, if it's, you know, a customer that spent 999 -- sorry, if it's a customer that spent almost a million dollars or if it's a customer who spent $50, we have no way of

knowing because they're not going to give us the, you know -- they're not going to give us the -- even a number.

And then, you know, I think for the seven-figure customers who weren't review customers, just showing a document to say, hey, Customer 453, and asking -- you know I mean, you know, unless they're going to have --

THE COURT:  Well, my example I had wrong --

MR. STERN:  Yes.

THE COURT:  -- so forget that.

MR. STERN:  Yes.

THE COURT:  Okay.  All right.  Let me hear from them.

Mr. Gibbs -- who has got this?

MS. BRIEN:  Me, Your Honor.

THE COURT:  Okay.  Bringing in the A team. I'm sympathetic, but give me something that -- I just don't see these down ballot customers as having any importance or relevance, but something that's not all the way at the bottom that's short of the seven figures, you have to take them at their word.

This has some arguable relevance.  For me it's about whether or not it's proportionate.  Have you got any other possible solutions for me here?

MS. BRIEN:  Well, we're certainly open to it, Your Honor.  I do think Plaintiffs had made very clear that the only thing that matters to their case are seven-figure review customers.

Now, we have agreed to go a step further and bring in all seven-figure customers.  You know, we can certainly talk about adding anonymized numbers to some other subset of customers, whether it's $100,000 or more per quarter, but really, it's about the potential harm to Disco and its business, right?

They're in a very sensitive business.  Their customers depend upon them to, you know, keep these matters and their names confidential, and so we really need to figure out a way to get information that's actually relevant; and I'm not hearing them saying it's relevant.

I'm hearing them say it would make it easier.  It would make it easier on us.  That's not really the standard here, especially when you compare it to the burden of going out and notifying thousands of customers -- some customers who have only spent, you know, a couple thousand dollars in a quarter -- we just don't see how that's relevant.

THE COURT:  But -- okay.  Let's focus then on the seven figure, many of whom are named in some of the

public disclosures, I trust.  What's the harm there?  I mean, what percentage of this seven-figure customers is already been tacitly disclosed?

MS. BRIEN:  So a few of the seven-figure customers have been named publicly as generally a customer of Disco.  They have not been identified as a customer for a particular matter or investigation.

So there is definitely still sensitivity and there is definitely still a process that Disco would have to go through to notify these customers:  Hey, we've been sued in this securities class action. Plaintiffs are seeking your information.  We now have to go out and, you know, provide this information that might give away some information about your very sensitive, you know, matters that you've engaged us for.

THE COURT:  Okay.  I'm inclined to order you to provide the -- the identities of the seven-figure customers subject to a Protective Order that's been entered.  So that's kind of where I'm leaning.

MS. BRIEN:  And just to clarify, so it's the seven-figure, non-review customers as well?  Because I do think there is a distinction.

Plaintiffs have made clear that their case is about seven-figure review customers.  You know, we have offered to do that.

I think once we get beyond that and we're talking about customers using Disco's other products, you know, I just want to make sure that we understand exactly where you are.  And are we talking about seven figures in a quarter or seven figures in a year?

THE COURT:  Well, the reduction in revenues that Mr. Gibbs pointed out, what was it, 149 to 153, dropping to 132, something, was that drop review related or was it related to the other products that Cisco --

MS. BRIEN:  Well, it's Plaintiffs' position that it was, that it revealed that Disco had seven-figure review customers that were just, you know, one-off customers, so everything is tied to review customers.

THE COURT:  Okay.  Let me ask him.

All right.  Thank you.

Yes.  I mean, seven figures as it relates to review only or seven-figure customers of Disco that the revenue is generated for any of the other platforms?

MR. STERN:  Well, again, our contention is that they concealed these seven-figure review customers, but Defendants are defending themselves in part on the basis that this wasn't a single driver.  We had a lot of other customers, you know --

THE COURT:  But can't that be revealed in just

the macro gross spreadsheets and whatnot?  I mean, it's down to the company names.  I just don't -- you haven't persuaded me that you need the identity of these other non-seven-figure review companies.

MR. STERN:  Well, Your Honor, so the -- you know, in reply, we provided an exhibit, and it was an exhibit that appears to be presented to analysts in advance of the -- their, I feel, road show, where they filed an IFPO, provided them to analysts, and the page is totally redacted.  So I can't tell at this point if it's seven-figure review or a seven-figure non-review.

You know, if we want to be able to take this and understand what the information you're trying to tell analysts, you have an entire page essentially totally redacted.

So we can't make heads or tails of what's in there.  And it presents a real challenge if all of the large review customers are redacted.  And, you know, again, I would note that, from our understanding -- and they can correct me if I'm wrong -- you know, our original proposal was six figures for both review and non-review, and we understood that that would eliminate 90 percent of the customers, and that those could be provided on the basis of a number only.  That was our close compromise, is that we would get them 90 percent

of the way to what they want.

THE COURT:  I just don't understand why you need the name of a customer that generated 150,000 in revenue.

MR. STERN:  You know, we would be happy to cut it off at 500,000 per year --

THE COURT:  Well, the time to compromise was before you got here.

All right.  I'm going to entertain the offered compromise that the Defense offered here.

But what is the difference between the number of the companies y'all have to reveal that are seven-figure review-related customers versus seven-figure customers for whom the e-discovery or the other five forms generated?

I mean, give me some context.  Are we talking about, if you order us to reveal all seven figures, it is 30 companies.  But if it's just limited to review generations, it is only 9?  I mean, what is it?

MS. BRIEN:  Yeah, so it is dozens more.  I believe it's about 33 if we have to notify all seven-figure customers, and it's only about, I want to say 45 if we have to notify only review customers.

So it is a pretty big difference when you

think about the sensitivity involved here, and these are important customers.  They are seven-figure customers.

THE COURT:  All right.  To me, this whole case is about the review portion of the statements that you're alleging were false.

Anything 500,000 and above that's review related -- review related.  So I don't know what that's going to be.  It's going to be something that's between the five or six and the 33 that you just mentioned.

MR. STERN:  Your Honor, if you can clarify if that's per quarter or per year.

THE COURT:  What have we been talking about?

MR. STERN:  We have been talking about seven figures per quarter.

THE COURT:  Okay.  $500,000 per quarter.  All right.  So I kind of butchered that.  What am I going to write in my order?

I am granting it and denying the Motion to Compel in part, and I'm ordering Defendants to do what? What do you want me to say, given what I've just said?

MR. STERN:  To provide unredacted copies of all responsive documents as to review customers who spent more than $500,000 in any single quarter from the first quarter of 2020 to the second quarter of 2022, which is the full period covered by -- although I don't

know that there weren't --

MS. BRIEN:  A couple of clarifications.  So on the time period, I believe that our discovery obligations that are from August 2021 to August 2022.  So...

MR. STERN:  You guys were disclosing review revenue from before that, and, you know, if there were no customers who were spending -- I believe there were no customers who were spending seven figures in the quarter before --

MS. BRIEN:  Q2.

MR. STERN:  -- before Q2 of --

MS. BRIEN:  2021.

MR. STERN:  -- 2021.  And I think that's covered -- so Q2 2021, we agree, is relevant?

MS. BRIEN:  Yes.

THE COURT:  Q2 of 2021 to --

MS. BRIEN:  To Q2 of '22.

MR. STERN:  Through Q2 of 2022.

MS. BRIEN:  Yes.  But just one more clarification, Your Honor, if I may.

THE COURT:  Sure.

MS. BRIEN:  We would request that the order be that we provide notice to those customers and then, you know, go through the contractual process that Disco is

required to go through in order to satisfy its notice obligations.

THE COURT:  That's fine.  But you need to do it with some deliberate speed.

And I'll tell you, whatever notice you provide needs to let them know that you're providing notice consistent with the contract, but they're going to be ordered by a Federal Judge to do something.

And if they want to object to that, they're going to need to come to either Judge Ezra's courtroom or mine and tell me why.

MS. BRIEN:  Yes, Your Honor.

THE COURT:  Okay.

MR. STERN:  And with respect to -- and, again, this was, this non-review, plus -- the non-seven-figure review customers, if they were less than seven figures, we only had a -- we don't even have a numerical identifier, so we would ask for a numerical identifier for everything.  That seems appropriate just so that we can compare it.

THE COURT:  I know.  See, I get so tired of cutting babies in half up here.  That is what you guys are supposed to do before you come here.  I mean, this was kind of an obvious cut a baby in half.

And what I mean by that is, I'm trying to

search for a compromise that honors a little bit of what you represented to me you need but is consistent with what -- my questioning of just how much you need it in terms of proportionality.  I mean, I hear what you're saying, but I'm not doing that.

MR. STERN:  Understood, Your Honor.

And, I guess, we would ask that there be a date certain for -- provided for the...

THE COURT:  That's fair.

What do you recommend, y'all?

MS. BRIEN:  Can we have 30 days?

THE COURT:  Absolutely.  We're coming up on the holidays.  Yeah, let's call it the Friday after -- the first Friday in January after the new year holiday, whatever day that is.  Okay?

MR. STERN:  Thank you.

MS. BRIEN:  Thank you, Your Honor.

THE COURT:  All right.  Okay.  Good job, y'all.  Enjoyed it.  I actually did.  Thank you.  We're adjourned.

*(Proceedings adjourned.)*

REPORTER'S CERTIFICATE


I, APRIL C. BALCOMBE, DO HEREBY CERTIFY THAT THE

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

FOREGOING WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES, ON THIS 8th DAY OF DECEMBER, 2025.

/S/April C. Balcombe
APRIL C. BALCOMBE, CSR, CRR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street, Suite 4150
Austin, Texas 78701
(512) 391-8795
SOT Certification No. 5752
Expires: 7-31-26