**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **LYNN GAMBRILL, Individually and On** | § | |
| **Behalf of All Others Similarly Situated,** | § | |
| **Plaintiff,** | § | **A-24-CV-28-DAE** |
| **V.** | § | |
| | § | |
| **CS DISCO, INC.; KIWI CAMARA;** | § | |
| **MICHAEL LAFAIR,** | § | |
| **Defendant.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE:

Before the court is Plaintiff's Opposed Motion and Memorandum of Law in Support of

Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt.

78) and all related briefing (Dkts. 97, 103).[1] Having considered the motions, pleadings, and

applicable law, and arguments made at the class-certification hearing, the undersigned submits the

following recommendations to the District Judge.

**I.    BACKGROUND**

This case concerns a securities class action lawsuit brought against Disco and Disco's

former Chief Executive Officer ("CEO") Kiwi Camara, and current Chief Financial Officer

("CFO") Michael LaFair ("Individual Defendants"). Dkt. 53 (Amd. Compl.). Plaintiff[2] alleges

securities fraud claims against Defendants under Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Amd.

---

[1] The motion was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules. Text Order dated August 5, 2025.

[2] Although the case is styled *Gambrill v. CS Disco, Inc., et al.*, the current Plaintiff is Bert W. Pluymen. Amd. Compl. ¶ 13.

1

Compl. ¶¶ 101–10. Plaintiff also brings claims for control person liability against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Amd. Compl. ¶¶ 111–16.

Disco provides ediscovery services mainly to law firms and corporate clients. Amd. Compl. at ¶ 3. It has three principal lines of business: (1) "Ediscovery," a platform for collecting and reviewing documents; (2) "Review," a service whereby Disco, relying on machine learning, conducts review projects for law firms and clients; and (3) "Case Builder," which allows attorneys to organize documents and evidence. *Id*. Camara served as Disco's CEO until his resignation on September 11, 2023. Amd. Compl. ¶ 16. LaFair is, and was at all relevant times in this suit, Disco's CFO. Amd. Compl. ¶ 17.

Plaintiff alleges that Defendants explained that their Review product added significantly to Disco's revenue growth but specifically denied, when asked by analysts, that Disco's rapid revenue growth and overperformance of guidance were attributable to a small number of large matters. Amd. Compl. ¶¶ 32-35. Specifically, Plaintiff points to several Alleged Misrepresentations[3] made by Camara and/or LaFair that allegedly downplayed to investors the risk of volatility from Disco's Review revenues relying on a small number of clients who spent an outsized amount. *See* Amd. Compl. ¶¶ 50, 52, 62, 64.[4] According to Plaintiff, in reality Disco's "outsized revenue performance and earnings beats throughout the Class Period were attributable to a small number of large Review projects—projects that Defendants knew were, by definition, of limited duration." Amd. Compl. ¶ 36.

---

[3] These will be described in greater detail in the analysis.
[4] Additional statements were asserted in the Amended Complaint, but these are the statements that survived Defendants' motion to dismiss. *See* Dkt. 69 (Court's Order on Mtn. to Dismiss).

On August 11, 2022, Disco revised its 2022 projections downward, projecting a decline of $17 million. Amd. Compl. ¶ 36. That same day, on an earnings call, Camara answered questions from analysts during which he confirmed that Disco's Review revenues had been disproportionately impacted by a small number of clients. Amd. Compl. ¶¶ 74-76. Between August 11, 2022 and August 12, 2022, Disco's stock price declined $15.53—a drop of more than 53 percent. Amd. Compl. ¶¶ 73-78.

Plaintiff alleges Defendants' Alleged Misrepresentations violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because Defendants misrepresented material facts that kept the stock price artificially high. *See* 15 U.S.C. § 78j(b); 17 C.F.R § 240.10b–5(b). A claim under § 10(b) requires: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Dkt. 69 (Court's Order on Mtn. to Dismiss) at 10-11 (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005)).

To recover for a violation of § 20(a), which imposes joint and several liability for an underlying securities fraud violation, a plaintiff must prove the individual defendants had actual power over the corporate defendant and induced or participated in the alleged violations. *In re Concho Res., Inc.*, No. 4:21-CV-2473, 2025 WL 1040379, at *8 (S.D. Tex. Apr. 7, 2025) (citing 15 U.S.C. § 78t(a); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 749-5 0 (S.D. Tex. 2012)). Because § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof. *Concho*, 2025 WL 1040379, at *8. The additional substantive issue of whether the Individual Defendants had actual power over Disco and participated in or induced the fraud will be proven (or disproven) by the Individual

3

Defendants' conduct, not by the conduct of Plaintiff or proposed class members. *See Concho*, 2025 WL 1040379, at *8. Accordingly, the court's class certification analysis will focus on the § 10(b) claim.

## II.   CLASS CERTIFICATION

Plaintiff seeks to certify the following class:

All purchasers of CS Disco, Inc.'s common stock between September 3, 2021 and August 11, 2022, inclusive. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.[5]

Dkt. 78 at 8.

### A. Applicable Law

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 418 (5th Cir. 2023) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Class certification requires that plaintiffs' claims "can be proved on a classwide basis," *id*. (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356 (2011)), and it is the party seeking to maintain a class action who "must affirmatively demonstrate his compliance with Rule 23," *id*. (citing *Comcast*, 569 U.S. at 33). This is not "a mere pleading standard"; the plaintiff must "be prepared to prove" that the requirements of Rule 23 are met "in fact." *Id*. (citing *Comcast*, 569 U.S. at 33); *Elson v. Black*, 56 F.4th 1002, 1006 (5th Cir. 2023) ("It is the party seeking certification who bears the burden of establishing that the requirements of Rule 23 have been met.").

---

[5] At the hearing, Plaintiff agreed that anyone who both bought and sold stock during the class period would not have suffered any damages; the proposed class only includes those who continued to hold their stock through August 11, 2022.

District courts must "rigorously" consider Rule 23's prerequisites, and "[t]his 'rigorous analysis' mandate is not some pointless exercise . . . . It matters." *Sampson*, 83 F.4th at 418 (quoting *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020)). "[C]reative uses" of the class action form "are perilous" because improper certification "can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit. And the existence of a class fundamentally alters the rights of present and absent class members." *Id*. (quoting *Chavez*, 957 F.3d at 547). Therefore, "[n]o less than due process is implicated." *Id*.

Rule 23 is not a context where courts must diligently separate certification from merits issues; they will often be deeply intertwined. *Id.* at 421. The Rule 23 analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33-34 (cleaned up).

Rule 23(a) provides four prerequisites for a class action: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Elson*, 56 F.4th at 1006. Certification requires a plaintiff to satisfy all requirements of Rule 23(a) and at least one of the three requirements listed in Rule 23(b). *Sampson*, 83 F.4th at 418 (citing *Wal*-Mart, 564 U.S. at 345-46).

**B. Rule 23(a)[6]**

1. Rule 23(a)(1)—Numerosity

Numerosity requires a "class [so large] that joinder of all members is impracticable." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). During the Class Period, an average of more than 1.9 million Disco shares were traded each week on the NYSE. It is undisputed that the stock purchasers during the relevant frame are too many to join in this suit. *See Zeidman v. J. Ray*

---

[6] Defendants do not contest that the Rule 23(a) criteria are satisfied. *See* Dkt. 97 (contesting only the Rule 23(b) criteria). Defendants affirmed this position at the class certification hearing.

*McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981) (finding this assumption "reasonable" in that case).

### 2. Rule 23(a)(2)—Commonality

"Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Elson*, 56 F.4th at 1006 (quoting *Amchem*, 521 U.S. at 609). Accordingly, the court will examine this factor under Rule 23(b)(3).

### 3. Rule 23(a)(3)—Typicality

Rule 23(a)(3)'s typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). "[A] complete identity of claims" is not required; "[r]ather, the critical inquiry is whether the [named plaintiff's] claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.*

Here, the named Plaintiff seeks to represent a class of individuals who, like themself, purchased stock during the relevant time period and suffered losses. The legal claims of the named Plaintiff are typical of those of the class members.

### 4. Rule 23(a)(4)—Adequacy

Rule 23(a)(4) requires that the representative plaintiff "will fairly and adequately protect the interest of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement mandates an inquiry into (1) the zeal and competence of the representatives' counsel and (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests

of absentees. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). The adequacy inquiry also "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Id*. at 479-80. Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests. *Id*. at 480.

The court is satisfied that the named Plaintiff will adequately represent the class members' interest. *See* Dkt. 78-4 (Decl. of Bert Pluymen). The court is also satisfied that there are no conflicts between the named Plaintiff and the proposed class that would preclude their representation.

Plaintiff's counsel seeks to be appointed Class Counsel. The court must consider certain factors:

> (1) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A). The court is satisfied Plaintiff's counsel can adequately represent the class. Counsel has already competently asserted and defended Plaintiff's claims. Counsel is experienced in handling class actions and the types of claims asserted in this case. *See* Dkts. 78-5 (Rosen Law Firm P.A. Biography), 78-6 (Kendall Law Group Firm Resume). Counsel's knowledge of the relevant law was apparent in the briefing and at the class certification hearing. The court is satisfied counsel has the resources to represent the class. The court is also satisfied that there are no conflicts that would preclude their representation.

### C. Rule 23(b)(3)

Rule 23(b)(3) authorizes class certification where (1) "questions common to the class members predominate over questions affecting only individual members," and (2) "class

resolution is superior to alternative methods for adjudication of the controversy." *Elson*, 56 F.4th at 1006 (quoting *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003)).

1. Predominance

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Sampson*, 83 F.4th at 418 (quoting *Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). This inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 447–48 (W.D. Tex. 2019) (quoting *Amchem*, 521 U.S. at 623).

Determining whether a plaintiff can clear the predominance hurdle set by Rule 23(b)(3) also requires courts to consider "how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp*, 339 F.3d at 302. This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individual trials." *Id.* at 302 (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though "other important matters" will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members. *Sampson*, 83 F.4th at 418, 422. But while damages are specifically described among these "other important matters," liability and injury are not. *Id.* at 422 (citing 2 Newberg and Rubenstein on Class Actions § 4:53 (6th ed.) ("A series of issues recur

in the predominance analysis. Several of these—[including] individual damage[s] . . .—rarely defeat a finding of predominance.")).

Here, Defendants contend individual issues of both liability and damages should defeat class certification.

### a. Liability

To assess whether common questions of law or fact will predominate over individual issues, the court revisits § 10(b) and Rule 10b-5. Its implicit private right of action has six elements:

> (1) a material misrepresentation (or omission),
> (2) scienter, i.e., a wrongful state of mind,
> (3) a connection with the purchase and sale of a security,
> (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"
> (5) economic loss, and
> (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss.

*Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015). It is helpful to focus on three "occurrences"—the misrepresentation, the security transaction, and the economic loss. *Ludlow*, 800 F.3d at 681. It is also helpful to focus on two "relationships": transaction causation (which connects the misrepresentation and security transaction) and loss causation (which connects the misrepresentation to the economic loss). *Ludlow*, 800 F.3d at 681.

The traditional, and most direct, way for a plaintiff to demonstrate reliance/transaction causation is by showing that he was aware of a company's statement and engaged in a relevant transaction based on that specific misrepresentation. *Ludlow*, 800 F.3d at 681 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 461 (2013)). In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that requiring direct proof of reliance would place an unnecessarily unrealistic evidentiary burden on the § 10b–5 plaintiff who had traded on an impersonal market. *Ludlow*, 800 F.3d at 681. Instead, if a plaintiff buys shares in a well-developed,

impersonal market, the plaintiff can, in certain circumstances, rely on a rebuttable presumption of reliance. *Ludlow*, 800 F.3d at 681. This presumption is based on the "fraud-on-the-market theory," which holds that the market price of shares traded on well-developed markets reflects all publicly available information, including any material misrepresentations. *Ludlow*, 800 F.3d at 681. To establish the *Basic* presumption, a plaintiff must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268 (2014).

Once established, a defendant can rebut the *Basic* presumption by proving, by a preponderance of the evidence, that an alleged misrepresentation did not actually affect the market price of the stock. *Halliburton II*, 573 U.S. at 284; *Goldman Sachs Group, Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 125 (2021) ("*Goldman I*"); *Ludlow*, 800 F.3d at 681. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman I*, 594 U.S. at 126-27.

Distinct from reliance, loss causation is a separate legal requirement that demands a causal connection between the misstatement and claimed economic loss. *Ludlow*, 800 F.3d at 681-82. Like proximate cause in tort, loss causation's task is to isolate those economic losses that the misrepresentations actually caused, rather than to provide investors with broad insurance against market losses. *Ludlow*, 800 F.3d at 682. A plaintiff must prove that the misstatements—not other

intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events—were the cause of the claimed economic injury. *Ludlow*, 800 F.3d at 682. And the plaintiff must do so without any presumptions that support reliance/transaction causation. *Ludlow*, 800 F.3d at 682.

The class-certification question of whether a defendant has rebutted the *Basic* presumption with a preponderance of evidence of no price impact overlaps with merits questions like materiality and loss causation. *In re Apache Corp. Sec. Litig.*, No. 4:21-CV-00575, 2024 WL 532315, at *4 (S.D. Tex. Feb. 9, 2024) (citing *Goldman I*, 594 U.S. at 122). District courts must "resist[ ] the temptation" to draw merits conclusions. *Apache*, 2024 WL 532315, at *4 (citing *Goldman I*, 594 U.S. at 122, n2.). But, "to maintain the consistency of the presumption with the class certification requirements of [Rule] 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Apache*, 2024 WL 532315, at *4 (quoting *Halliburton II*, 573 U.S. at 284).

When a plaintiff's theory is that a defendant's misrepresentations or omissions kept their stock artificially inflated, price impact may be shown on the back end. *See Goldman I*, 594 U.S. at 123. Front-end price impact may be inferred from a back-end price drop when the stock price falls after a corrective disclosure, demonstrating that a defendant's previous statements were untrue or that the defendant failed to disclose the truth. *See Goldman I*, 594 U.S. at 123. A back-end price drop supports this inference when the corrective disclosure "matches" the earlier misrepresentations or omissions. *See Goldman I*, 594 U.S. at 123. A corrective disclosure "need not precisely mirror an earlier misrepresentation." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (cleaned up). The two need only be "related" or "relevant" to

11

one another. *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). However, if there is a "mismatch" between the contents of the corrective disclosure and the misrepresentations or omissions, the inference of price impact is weaker. *See Goldman I*, 594 U.S. at 123.

Plaintiff argues they are entitled to a class-wide presumption of reliance based on the fraud-on-the-market theory recognized in *Basic*.[7] To establish that the Class is entitled to rely on the *Basic* presumption, Plaintiff must demonstrate (1) "the alleged misrepresentations were publicly known"; (2) the alleged misrepresentations were material; (3) "the stock traded in an efficient market"; and (4) putative class members "traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408.

Defendants do not contest Plaintiff's initial showing that the *Basic* presumption should apply. Instead, Defendants contend they have rebutted the *Basic* presumption and thus certification should be denied. Defendants admit that Disco's stock price dropped August 12, 2022 as a result of Disco's revised annual guidance. But Defendants assert the revised guidance and related comments (together, the Alleged Collective Disclosures) did not "correct" the Alleged Misrepresentations.

The parties' dispute focuses on the extent the later statements must match the earlier statements in order to be considered corrective and what evidence—beyond the precise statements themselves—the court should consider. Accordingly, the court turns its focus to the statements at issue.

---

[7] In their brief, Plaintiff also asserts they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Plaintiff, however, did not brief this assertion and conceded at the hearing that they are not moving forward on this ground.

On September 2, 2021, Camara and LaFair participated in an earnings call with investors for the second quarter of 2021, in which Camara stated in his opening remarks:

> A great example of what has driven the acceleration in growth this quarter is a well-known consumer brand that in Q4 of last year hired a new Deputy General Counsel to the major technology company that has been a longstanding DISCO customer. He ran a sole-source procurement for ediscovery when he started his new job, and between the fourth quarter of 2020, and the first quarter of 2021, his new company migrated their ediscovery program to DISCO Ediscovery. But in the second quarter of 2021, this company experienced a series of major legal issues that caused them to accelerate their adoption of our second product, DISCO Review. **So in three quarters, we saw this company ramped from zero to a multi-million dollar level of spend. That journey has historically taken our customary several years.**

Amd. Compl. ¶ 50 (in bold,[8] Alleged Misrepresentation 1). During the same call, Camara responded to a question from an analyst:

> Sterling Auty, Analyst
>
> Yeah. Thanks. Hi guys, and welcome to the public markets. Maybe just to get kicked off, my first question would be about that large consumer customer that you mentioned and kind of your comments about the business model and the variability it can generate. What are some **of** the things that you're doing to drive increased usage to try to let's say smooth out some of the volatility that you might see from a single customer quarter-to-quarter?
>
> Kiwi Camara, Chief Executive Officer and Director
>
> **So each of our customers goes through an adoption journey that has historically taken several years, and typically, they'll start out as a kind of mid to tougher five-figure customer grow to be a six-figure customer and then grow to be a seven-figure customer at maturity.** Over the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer. **Now as DISCO grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate.**

Amd. Compl. ¶ 52 (Alleged Misrepresentations 2 and 3, respectively[9]). On January 11, 2022, Camara participated in a virtual conference and responded to a question by Scott Berg:

---

[8] At the hearing, Plaintiff confirmed the bolded statements are the statements at issue.
[9] The parties group these as one misrepresentation. For clarity, the court treats each bolded statement separately so that they may be discussed more thoroughly.

> **Scott Berg**
>
> Okay. Around the complexity question often comes a view point that customers use a platform like Disco for maybe a short time frame and then maybe on an infrequent basis, but for an average Fortune 1000 type customer that you might have, how many matters could they be managing concurrently? And is the typical usage of the Disco platform maybe weekly, monthly or something longer for these matters?
>
> **Kiwi Camara**
>
> **So, for mature customers, they'll have dozens or hundreds of simultaneous active matters in our platform** and I think Scott that might be the first time I've ever heard someone say that they were pleased with how quickly the litigation system works. You take any one of these matters and we've got matters alive in our system; they date all the way back to 2013 the same way we have corporate customers, who have been continuous customers going all the way back to 2013. I think one good way to think about this is looking at companies spend on their own legal department or on legal services. While the nature of the legal matters that a company is exposed to may change from time to time and while unfortunately sometimes have spikes in their legal matters because of unprecedented issues like a defective product or something like that. **People, in general, have an ongoing and continuous spend on their legal department and on legal services and that is the budget that we tap into.**

Amd. Compl. ¶ 62 (Alleged Misrepresentations 4 and 5).  On the same call, Camara responded to another question:

> **Scott Berg**
>
> Is -- next question is on e-discovery, is expansion of e-discovery use fairly predictable across customer sets or is there a wide variance in potential expansion outcomes?
>
> …
>
> **Kiwi Camara**
>
> **I would say there's not as much variance in the ultimate wallet size of the customer. So, like how big will the customer be when they get to maturity. But there's more variance in how quickly they get there.** So, over the last few earnings calls, right, we've talked about the extreme positive examples, where it's somebody's second or third journey through the adoption curve and they might go from zero to seven figures in under a year or even shorter than that. And then there are also examples of customers that take four years, five years, even six years to get to their mature spend. **So, I would say, the wallets are pretty consistent across the kinds of customers, who we target and sell to, which is typically the high end of the market, but how long that journey takes varies more customer to customer.**

Amd. Compl. ¶ 64 (Alleged Misrepresentations 6 and 7).

14

Plaintiff asserts the Alleged Corrective Disclosures include Disco's August 11, 2022 revised 2022 guidance and answers Camara gave to analysts on an earnings call the same day:

> Derrick Wood, Analyst
>
> Thank you. I guess, Kiwi, I mean in your prepared remarks you talked about how your market is -- you know, withstands the macro headwinds. And in fact, often
>
> leads to more disputes and litigation activity. Why do you think you're seeing this kind of change in demand behavior play out, especially considering your review technology has a strong ROI? I guess, just trying to get a sense for what has changed so dramatically over the last three months and is it perhaps due to some lost customers from using review or can you just shed a little bit more color on what the customer behavior is doing, when it's doing?
>
> Kiwi Camara, Co-Founder, Chief Executive Officer and Director
>
> Sure. It's less about lost customers and more about changes in customers' usage on the platform. Again to put this in perspective, the presence of two to three large reviews, reviews that build more than $1 million in a quarter would cause this to be a great quarter and two to three more reviews were caused to be an absolute home run quarter. So the volatility that we're talking about in the review business has to do with the presence or absence of a low single-digit number of big-ticket reviews.

Scott Berg, Analyst

Hi, Kiwi and Michael, thanks for taking my question today. Kiwi, let me ask this in a different way. I know where all kind of ask in roughly the same question, plus or minus. But your new guidance caused for second half revenues to be down 21.5% at the midpoint with that $17 million reduction, that's a big number annualized $34 million. I guess what we're trying to understand is, in this review product, $17 million, even if I break up between two quarters, it sounds like it's more than just a couple of customers. How can that -- I guess how can the magnitude be that big in a swing factor be that big in this one area? It's not a couple gigabytes of data usage yields, not a few million bucks one way or the other necessarily up. The big enough number, the big enough percentage that it's outside of, I think our standard deviation or two of what we would think volatility with model to look like? Thank you.

Kiwi Camara, Co-Founder, Chief Executive Officer and Director

I think the magnitude we're talking about in the review business and specifically what we saw a shortage of in the second quarter are a couple one, two or three large reviews billing north of $1 million per quarter. The presence or absence of one to six of those reviews can take a quarter from good to great to a complete home run and again that is volatility that's created by the big ticket sizes in review, as well as the relatively small size of the review revenue base today.

In terms of our go-forward guidance, we have sought to de-risk the guidance as much as possible and to adhere to the guidance philosophy that we've articulated on each of our prior earnings calls, where we expect to be prudent in our forward guidance. Now that will result in some quarters that have outsized beats[ph] as you've seen in the past and some quarters that have more modest beats like the quarter we just reported.

Tyler Radke, Analyst

Hey, thanks for taking a follow-up. So, Kiwi, maybe you could help us understand why these review deals aren't happening, is it simply because maybe these use cases were for a legal case that got pushed out, that was maybe more cyclical and then just help us understand are you not anticipating any more of these larger of (inaudible) is to form the second half. Just help us understand how much you've kind of de-risk the guide from the Disco Review perspective?

Thank you.

Kiwi Camara, Co-Founder, Chief Executive Officer and Director

Sure. So, typically and again we're talking about a small handful of reviews that build more than $1 million in a quarter. Those tend to be a big ticket litigation of the sort[ph] you would read about in the paper. And the timing of them is again somewhat exogenous. It depends on when such a litigation is initiated, when a big new investigation is initiated, it depends on rulings by the court or other decision makers say a regulator about the scope of discovery. In the investigation, it depends on the progress or lack thereof in settlement negotiations if the timing of rulings on incremental motions and on the final disposition of the case. So it's a lot dependent on what's going on in the specific legal process.

In terms of our guidance, what we have sought to do is to de-risk the guidance from the point of view of these kinds of large reviews.

16

Amd. Compl. ¶¶ 74-76 (collectively, "Alleged Corrective Disclosures").

Plaintiff characterizes the Alleged Misrepresentations as misleading because "Defendants specifically denied, when asked by analysts, that their rapid revenue growth and overperformance of guidance were attributable to a small number of large matters." Amd. Compl. ¶ 33. But, in the Amended Complaint, the paragraphs that support this characterization include excerpts from the September 2, 2021 earnings call, a November 11, 2021 earnings call, and a February 4, 2022 earnings call. Amd. Compl. ¶¶ 33-35. But those statements are *not* the Alleged Misrepresentations that Plaintiff asserts are misleading. At the hearing, Plaintiff confirmed that the Alleged Misrepresentations are *only* the bolded statements, which Plaintiff asserts should be understood in the context of their answers and questions asked. The statements in the Amended Complaint paragraphs 33-35 are in neither of those categories.

In contrast to Plaintiff's characterization of the Alleged Misrepresentations, the Alleged Misrepresentations actually discuss the growth of usage by one client (Alleged Misrepresentation 1); the general adoption of Disco's services by typical clients (Alleged Misrepresentations 2, 4, 6, and 7); the expectation that as Disco grows, fluctuations in usage by any one client will become less impactful (Alleged Misrepresentation 3); and that larger companies are consistently dealing with litigation and budget accordingly (Alleged Misrepresentations 4 and 5). Notably, in a sentence Plaintiff does not assert was misleading, Camara stated—sandwiched between Alleged Misrepresentations 2 and 3—"Over the course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer." Amd Compl. ¶ 52.

These statements are quite different from the Alleged Corrective Disclosures. Plaintiff asserts the Alleged Corrective Disclosures "reveal[ed] that its previous projections relied on the

assumption that CS Disco would continue to receive seven figure per quarter revenues from a small number of large Review matters, matters which had disappeared in the preceding months." Dkt. 78 at 10. But first, the previous Quarter 2 of 2022 projections are *not* Alleged Misrepresentations.

Second, the Alleged Corrective Disclosures only discuss Quarter 2 of 2022. The Alleged Corrective Disclosures do demonstrate that the projected revenue decline was due at least in part to fewer large Review accounts, Amd. Compl. ¶ 74 ("So the volatility that we're talking about in the review business has to do with the presence or absence of a low single-digit number of big-ticket reviews."); *id*. ¶ 75 ("[W]hat we saw a shortage of in the second quarter are a couple, two or three large reviews billing norther of $1 million per quarter. The presence or absence of one to six of those reviews can take a quarter from good to great to a complete home run and against that is volatility that's created by the big ticket sizes in review, as well as the relatively small size of the review revenue base today."); *id*. ¶ 76 ("and again we're talking about a small handful of reviews that build more than $1 million in a quarter"). The Alleged Corrective Disclosures do not contradict Alleged Misrepresentation 1 concerning the growth of one client, *compare id.* ¶¶ 74-77, *with id*. ¶ 50; or Alleged Misrepresentations 2, 6, and 7 concerning the general adoption of Disco's services by typical clients, *compare id.* ¶¶ 74-77, *with id*. ¶¶ 52, 64. Nor do they contradict Alleged Misrepresentations 4 and 5 that larger companies are consistently dealing with litigation and budget accordingly, *compare id.* ¶¶ 74-77, *with id*. ¶ 62.

Defendants have demonstrated that the Alleged Corrective Disclosures do not sufficiently match Alleged Misrepresentations 1, 2, 3, 5, 6, or 7. The court's comparison reveals too great a distance between the content of what the statements discussed. *See Concho*, 2025 WL 1040379, at *16 ("A mismatch between the contents of the misrepresentation and the corrective disclosure

also rebuts the presumption.") (citing *Goldman I*, 594 U.S. at 123). The comparison also reveals too great a distinction in the specificity of the matters discussed. *See Concho*, 2025 WL 1040379, at *13 ("A mismatch also occurs when there is a difference in specificity between the earlier and later statements.") (citing *Ark. Tchr. Ret. Sys. v. Goldman Sachs Group, Inc.*, *v.* 77 F.4th 74, 102 (2nd Cir. 2023). ("*Goldman II*")

The Alleged Misrepresentation most closely related to the Corrective Disclosures is Alleged Misrepresentation 3: "Now as Disco grows our overall revenue base, the impact of any particular customer's fluctuation and usage on our overall revenue becomes smaller and smaller, and so we would expect, Sterling, that as our base grows, more of these specific customer usage fluctuations washout in the aggregate." Amd. Compl. ¶ 52. At first blush, the Alleged Corrected Disclosures do appear to contradict Alleged Misrepresentation 3. However, they are distinct in several important ways. First, Alleged Misrepresentation 3 discussed the impact of a *single* customer's fluctuation in usage and spending. *Id*. ("any particular customer[]"). The Corrective Disclosures revealed that that *several* customers had decreased their spending in Quarter 2. Amd. Compl. ¶¶ 74-76 (referring to "a couple, two or three large reviews," "presence or absence of one to six of those reviews," and "a small handful of reviews"). Second, Alleged Misrepresentation 3 proffered that as the revenue base grew, such fluctuations would have a decreased impact. Alleged Misrepresentation 3 did not predict when that would happen, nor did it speculate such growth would be achieved by Quarter 2 of 2022. Reading the statements on their face, the Alleged Corrective Disclosures do not contradict Alleged Misrepresentation 3.

Plaintiff argues the Alleged Misrepresentations must be read in context and that context is that Disco was concealing the extent to which the Review revenues was impacted by a handful of clients. But within the context of Alleged Misrepresentation 2 and 3, Camara stated, "Over the

19

course of that journey, their specific legal usage will fluctuate and that will cause fluctuations in the revenue received from a particular customer." Amd. Compl. ¶ 52. In fact, Camara's answer was in response to a question about what he was doing to "drive increased usage to try to let's say smooth out some of the *volatility that you might see from a single customer quarter-to-quarter*?" Amd. Compl. ¶ 52 (emphasis added). It is apparent from the question that the market was aware that a single large customer could have a large impact on Disco's revenues.

A court may use its "common sense in assessing whether a generic misrepresentation had a price impact." *Concho*, 2025 WL 1040379, at *13 (citing *Goldman I*, 594 U.S. at 122 ("In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.") (cleaned up). *Goldman I* gave an example of when a mismatch occurs: "A 'mismatch' between the earlier and later statement occurs 'when the earlier misrepresentation is generic (e.g., 'we have faith <u>in</u> our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')." *Goldman I*, 594 U.S. at 123. Common sense leads the court to believe Alleged Misrepresentation 3 and the Alleged Corrective Disclosures are too similar to the example given in *Goldman I* to find a sufficient match. Here, the volatility that Disco hoped to outgrow as discussed in Alleged Misrepresentation 3 finally came to fruition in the Alleged Collective Disclosures. Disco has carried its burden to show a "mismatch" between the contents of the Alleged Corrective Disclosures and the Alleged Misrepresentations. *See Goldman I*, 594 U.S. at 123.

Plaintiff's expert's reports do not alter the court's conclusion on this issue. Plaintiff's expert, Dr. Nye, appears to rely on—and misunderstand—the District Judge's Order on Defendants' motion to dismiss. *See* Dkt. 78-7 (Nye Report). Dr. Nye performed an event study to

determine whether Disco's stock price reflected information disclosed to the market. Dkt. 78-7 ¶ 54. He states:

> I further understand that, in its Motion to Dismiss Order, the Court found that Plaintiff has sufficiently alleged that Defendants' prior representations "that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers—were either false or misled investors if it is true that customer spending was actually spiky and driven by only **a few large Review projects**."[]
>
> 56. My event study confirms that the statistically significant stock price decline on August 12, 2022 was indeed caused by the Company's disclosure of "significantly lower 2H22 guidance as [Disco] **de-risked usage of its Review solution by seemingly removing the usage and revenues associated to multiple large customers**."[] Thus, the subject of the alleged misstatements and omissions—*i.e.*, the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects—was clearly the root cause of the stock price decline that day.

Dkt. 78-7 ¶¶ 55-56 (emphasis in original; footnotes omitted). Although his event study did show that the stock price drop was caused by the Disco's announcement of revised guidance, which Defendants do not dispute, his conclusion that "the alleged misstatements and omissions—*i.e.*, the undisclosed risk that Disco's customer spend growth was driven by only a handful of large Review projects—was clearly the root cause of the stock price decline that day" is entirely conclusory. In the Motion to Dismiss Order, the District Judge did find that Plaintiff *sufficiently alleged* "that customer spending was driven by gradual adoption across a wide range of matters—with the result being a steady mature spend by the customers—were either false or misled investors if it is true that customer spending was actually spiky and driven by only a few large Review projects," but the court *did not find this causation as a fact*. *See* Dkt. 69 at 21. To the extent Dr. Nye took it as such, he is mistaken. Dr. Nye provides no analysis in his Opening Report (Dkt. 78-7) or his Reply Report (sealed) that teases out the impact on Disco's stock price from the revised earnings

21

guidance as opposed to the allegedly new knowledge[10] that "Disco's customer spend growth was driven by only a handful of large Review projects."[11] Dr. Nye does no comparison of the Alleged Misrepresentations to the Alleged Corrective Disclosures.[12] Accordingly, Dr. Nye does not persuade the court that its conclusion is erroneous.

Without the *Basic* presumption, individual issues of liability will predominate over common issues. Accordingly, the undersigned will recommend the District Judge deny Plaintiff's motion for class certification.

### b.  *Damages*[13]

In order to establish that the calculation of damages is a common question "susceptible of measurement" on a class-wide basis, plaintiffs must demonstrate that their theory of damages is consistent with their theory of liability. *See Ludlow*, 800 F.3d at 688–89; *see also Comcast*, 569 U.S. at 35 ("a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory").

Congress has not specifically defined "economic loss" for purposes of a securities violation. *Ludlow*, 800 F.3d at 682. It has provided an upper cap on damages. *Ludlow*, 800 F.3d at 682; *see* 15 U.S.C. § 78u–4(e)(1) ("the award of damages . . . shall not exceed the difference between the purchase or sale price paid or received . . . and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market").

---

[10] Dr. Nye relies on excerpts of analysts' reports and comments to conclude the risk was not known to the market. *See* Dkt. 78-7 ¶ 56, n.103; Dkt. 78-7 (Nye Report Exh. 12) at 161-73; Nye Reply Report ¶ 50. Defendants' expert, Dr. Eisfeldt also relies on analysts' reports and comments to conclude the risk was known to the market. *See* Dkt. 97-26 ¶¶ 47-62, 81-82.

[11] Dr. Nye criticizes Defendants' expert, Dr. Eisfeldt, for failing to do this analysis. Reply Report ¶ 46.

[12] Dr. Nye also criticizes Dr. Eisfeldt for failing to do this analysis. Reply Report ¶ 47.

[13] The court addresses damages and the remaining issues in the event the District Judge does not adopt the undersigned's finding that common questions of law or fact as to liability will not predominate over individual issues.

To calculate damages, the "out-of-pocket measure," also referred to as the "price inflation" metric, is often used. *Ludlow*, 800 F.3d at 682. Under this theory, a purchaser of securities may recover against a defendant only the difference between the price paid and the true value of the security at the time of the initial purchase by the defrauded buyer. *Ludlow*, 800 F.3d at 682. While the Fifth Circuit has not held that this metric is the exclusive way to measure damages in securities violation cases, it does insist that cognizable damage must be *caused* by the misstatements in question. *Ludlow*, 800 F.3d at 682. That is, a loss does not constitute an "economic loss" for these purposes unless loss causation can be established. *Ludlow*, 800 F.3d at 682.

Plaintiff argues their expert, Dr. Nye, will apply a single out-of-pocket damages theory that applies to all class members to calculate their individual damages. Plaintiff argues that the *Basic* presumption presumes a causal connection between the misrepresentations and the stock price. Plaintiff asserts Dr. Nye "will use an event study to isolate fraud-related losses following the corrective disclosure" and this will limit damages to those attributable to Plaintiff's theory of liability.

Defendants dispute that damages can be calculated on a class-wide basis and argue that Dr. Nye's methodology cannot withstand a rigorous analysis. Part of Defendants' argument hinges on Defendants' theory that the August 11 disclosures were not corrective. Defendants assert that at least two courts have denied class certification based on the out-of-pocket method being inconsistent with a materialization of risk theory because the back-end stock drop cannot match front-end inflation. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (*"BP I"*); *Ind. Pub. Ret. Sys. v. AAC Holdings., Inc.*, 2023 WL 2592134, at *24-25 (M.D. Tenn. Feb. 24, 2023). This argument rises and falls with the liability issues already discussed. Defendants also argue that Dr. Nye has failed to explain how he will calculate inflation on each

23

day of the class period. Defendants contend that the alleged artificial inflation of stock price can vary and the purported price inflation may be less than the back-end price drop.

In reply to Defendants' argument that Plaintiff's methodology has prevented class certification in two cases, Plaintiff cites a myriad of cases that have approved it. Reply at 8-9; Reply Exh. C. Plaintiff also points out that Defendants did not cite any cases that required a damages calculation for each day of the class period. Plaintiff asserts that Defendants' arguments attempt to recast—and miscast—their liability theory.

The court is satisfied that, if a class is certified, damages can be calculated on a class-wide basis and that individual damages issues will not predominate over class-wide issues.

### 2. Superiority

To establish superiority, the plaintiff must demonstrate that class certification is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Rule 23 sets forth several "matters pertinent" to a finding of superiority, including: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *Rooney*, 330 F.R.D. at 451 (citing FED. R. CIV. P. 23(b)(3)(A)–(D)).

First, Plaintiff argues the proposed class likely contains thousands of investors whose respective damages are small enough to render individual litigation prohibitively expensive. Second, Plaintiff states they know of no other pending actions concerning the claims alleged here. Third, Plaintiff argues concentrating the litigation here is desirable given that Disco's headquarters is here and the investors are likely geographically dispersed. Additionally, doing so would promote

judicial efficiency, economy, and uniformity of decisions. Finally, Plaintiff does not anticipate any difficulties in managing this case as a class action.

Disco has not put forward any argument in response, and the court concludes that Plaintiff has established that class certification is superior to other available methods of adjudication.

### D. Ascertainability

The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Rule 23. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)(per curiam). Courts traditionally refuse to certify classes that are "amorphous" or "imprecise." *John*, 501 F.3d at 445 & n.3. Ascertainability is required for both Rule 23(b)(2) and (3) classes. *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 n.36 (5th Cir. 2023); *DeBremaecker*, 433 F.2d at 734 (requiring ascertainability in a Rule 23(b)(2) class action).

As the proposed class is purchasers of stock within a certain time period, the court finds the class sufficiently ascertainable.

### III.    CONCLUSION

The court has taken pains to avoid reaching the merits of the case and to restrict itself to only the class certification issues. But as other courts have acknowledged, these issues are at times intertwined. *See Goldman I*, 594 U.S. at 124 (courts "must take into account all record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue").

Defendants have rebutted the *Basic* presumption that would allow reliance to be decided on a class-wide basis. Without that presumption, individual issues of reliance will dominate class issues as to liability. Accordingly, although all other factors support certification, the undersigned cannot recommend the class be certified under Rule 23(b)(3).

## IV.   RECOMMENDATIONS

For the reasons stated above, the court **RECOMMENDS** that Plaintiff's Opposed Motion and Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. 78) be **DENIED**.

## V.   OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

SIGNED December 16, 2025.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE